FILED    EY                          1:22-CR-115

3/2/2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. |
| | ) | |
| v. | ) | Violations: Title 18, United States |
| | ) | Code, Sections 371, 666(a)(1)(B), |
| MICHAEL J. MADIGAN and | ) | 1343, 1346, 1951, 1952(a)(3), |
| MICHAEL F. McCLAIN | ) | 1962(d), and 2 |

## COUNT ONE

The SPECIAL APRIL 2021 GRAND JURY charges:

JUDGE BLAKEY
MAGISTRATE JUDGE COLE

1.    At times material to this indictment:

### The Illinois General Assembly and the Speaker of the House

a.    The legislative branch of government for the State of Illinois was commonly known as the Illinois General Assembly.   The Illinois General Assembly was composed of two houses: the House of Representatives and the Senate.   The Illinois General Assembly commonly met for a spring session, which concluded in or around the end of May.   Legislation that passed in the spring session but was then vetoed by the Governor or that did not pass in the spring session could be considered in the General Assembly's veto session, which commonly occurred in November.

b.    The House of Representatives was comprised of 118 members, each of whom represented a district within the State of Illinois, and who were also known as Representatives.   Representatives were publicly elected, were employees and agents of the State of Illinois, and were paid a salary by the State of Illinois.   The State of

Illinois annually received in excess of $10,000 in federal benefits in each calendar year from 2011 through 2019.

      c.     The presiding officer of the House of Representatives was known as the Speaker of the House of Representatives. The Speaker had a variety of formal and informal powers, including but not limited to: (i) the power to appoint members to House committees that would consider bills introduced in the House, including whether such bills were suitable for consideration by the House as a whole; (ii) the power to influence the movement of bills within the House; (iii) the power to decide what legislation would be called for a vote in the House; and (iv) the power to exercise substantial influence over fellow lawmakers concerning legislation.

      d.     The Speaker maintained an office (the "Office of the Speaker") within the State Capitol, which was located in Springfield, Illinois. The Office of the Speaker had a staff of individuals that assisted the Speaker in performing the Speaker's official duties.

## The Chicago City Council, Aldermen & Committeemen

      e.     The City of Chicago was a unit of local government known as a municipal corporation, and a political subdivision of the State of Illinois.

      f.     The City of Chicago's legislative branch of government was the Chicago City Council (the "City Council"), which comprised fifty City Council members, each of whom represented one of Chicago's fifty wards, and who were also known as Aldermen. The Aldermen were compensated and publicly elected. It was one of the

2

functions of Aldermen to provide or withhold their support for real estate development projects proposed for land in their respective wards, which support or non-support was instrumental in securing necessary governmental action or inaction relating to the proposed projects.

g. The City Council maintained a Committee on Zoning, Landmarks & Building Standards, which exercised legislative powers pertaining to land use in the City of Chicago, including the approval of zoning changes and other authorizations required for real estate development projects.

h. Each ward also publicly elected individuals for each respective political party that were each known as a "Committeeman" or "Committeeperson." A Committeeman had varying roles in each ward, that could include such tasks and duties as addressing day-to-day grievances presented by ward residents; having a role in endorsing candidates for office and deciding the composition of the "slate" of candidates for their political party for office within Cook County; and having a role in deciding who would be appointed to fill any vacancies that arose with respect to certain public offices.

### The Thirteenth Ward Democratic Organization

i. The State of Illinois's Twenty-Second District was largely made up of two Chicago wards: the Thirteenth Ward and the Twenty-Third Ward.

j. The Thirteenth Ward Democratic Organization was a political party committee that maintained an office within Chicago's Thirteenth Ward at 6500 South Pulaski Road, Chicago, Illinois (the "Thirteenth Ward Office"). The purpose of the

3

Thirteenth Ward Democratic Organization was to, among other things, cultivate support for political candidates and public officials who ran for and held public office through a variety of means, which included door-to-door campaigning by political workers, including those known as "precinct captains," who were associated with the Thirteenth Ward Democratic Organization.

### Madigan & Getzendanner

k.      Madigan & Getzendanner was a law firm with offices located in Chicago, Illinois. Madigan & Getzendanner specialized in contesting tax assessments made on real property and seeking reductions in such tax assessments for the firm's clients.

### The Democratic Party of Illinois

l.      The Democratic Party of Illinois was a political party organization whose purposes included fostering support for political candidates and public officials throughout the State of Illinois by providing these individuals with, among other things, campaign funding, staffing, and other resources.

### Relevant Individual

m.      Alderman A was Alderman of the Twenty-Fifth Ward in Chicago and Chairman of the Committee on Zoning, Landmarks & Building Standards. As Chairman of the Committee on Zoning, Landmarks & Building Standards, Alderman A had authority over which matters would be considered by that Committee. Alderman A cooperated in an undercover capacity with the Federal Bureau of Investigation, and

4

acted at the direction of law enforcement, a fact that was unknown to the defendants prior to in or around January 2019.

### State Law: Acts Involving Bribery

n.     There was in force and effect felony criminal statutes of the State of Illinois which were punishable by imprisonment for more than one year, that prohibited bribery, including the bribery statute, Chapter 720 Illinois Compiled Statutes § 5/33-1(d)-(e); the official misconduct statute, Chapter 720 Illinois Compiled Statutes § 5/33-3(a)(4) (formerly codified as Chapter 720 Illinois Compiled Statutes § 33-3(d)); and the legislative misconduct statutes, Chapter 720 Illinois Compiled Statutes § 645/1 (effective until December 31, 2012) and Chapter 720 Illinois Compiled Statutes § 5/33-8 (effective January 1, 2013).

These statutes provided in pertinent part:

### Section 5/33-1.   Bribery

A person commits bribery when:

(d)     He or she receives, retains or agrees to accept any property or personal advantage which he or she is not authorized by law to accept knowing that the property or personal advantage was promised or tendered with intent to cause him or her to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness; or

(e)     He or she solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he or she shall improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness.

### Section 5/33-3.    Official Misconduct

(a)    A public officer or employee or special government agent commits misconduct when, in his official capacity . . . he or she commits any of the following acts:

(4)    Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law.

### Section 645/1.    Acceptance of money, etc.; prohibition

No member of the General Assembly shall accept or receive, directly or indirectly, any money or other valuable thing, from any corporation, company or person, for any vote or influence he may give or withhold on any bill, resolution or appropriation, or for any other official act.

### Section 5/33-8.    Legislative Misconduct

(a)    A member of the General Assembly commits legislative misconduct when he or she knowingly accepts or receives, directly or indirectly, any money or other valuable thing, from any corporation, company or person, for any vote or influence he or she may give or withhold on any bill, resolution or appropriation, or for any other official act.

### Federal Law: Extortion and Use of
### Interstate Facility in Aid of Racketeering Activity

o.    There was in force and effect a federal statute, Title 18, United States Code, Section 1951, which prohibited extortion, attempted extortion, and conspiracy to commit extortion affecting commerce either through the wrongful use of actual and threatened fear of economic harm or under color of official right or both.

p.    There was in force and effect a federal statute, Title 18, United States Code, Section 1952, which prohibited the use of any facility in interstate commerce in aid of racketeering activity, including extortion and bribery in violation of the laws of the United States and the State of Illinois.

6

## I.  THE ENTERPRISE

2.     Defendant  MICHAEL  J.  MADIGAN,  defendant  MICHAEL  F.
McCLAIN, the Office of the Speaker, the Thirteenth Ward Democratic Organization,
Madigan & Getzendanner, and others known and unknown together constituted an
enterprise as that term is defined in Title 18, United States Code, Section 1961(4), that
is, a group of individuals and entities associated in fact (referred to herein as the
"Madigan Enterprise" or the "enterprise").   The Madigan Enterprise was engaged in,
and its activities affected, interstate commerce.   The Madigan Enterprise constituted
an ongoing organization whose members functioned as a continuing unit for the common
purpose of achieving the objectives of the enterprise.

3.     The purposes of the Madigan Enterprise included but were not limited to:
(i) to exercise, to preserve, and to enhance MADIGAN's political power and financial
well-being; (ii) to financially reward MADIGAN's political allies, political workers, and
associates for their loyalty, association with, and work for MADIGAN; and (iii) to
generate income for members and associates of the enterprise through illegal activities.

4.     The illegal activities committed by members and associates of the Madigan
Enterprise included, but were not limited to: (a) soliciting and receiving bribes and
unlawful personal financial advantage from persons and parties having business with the
State of Illinois and the City of Chicago, or otherwise subject to the authority and powers
vested in MADIGAN and other public officials acting on MADIGAN's behalf; (b) using
MADIGAN's powers as Speaker, including his ability to affect the progress of bills in the

7

House of Representatives, as well as his control over the resources of the Office of the Speaker, including its staff, in order to cause third parties to financially reward MADIGAN, his political allies, political workers, and associates; (c) using threats, intimidation, and extortion to solicit benefits from private parties; and (d) using facilities of interstate commerce to coordinate, plan, and further the goals of the enterprise.

5. In order to carry out its activities, the enterprise utilized individuals employed by and associated with it who had varying roles and responsibilities. The defendants occupied the following roles and responsibilities:

## DEFENDANT MICHAEL J. MADIGAN

6. MADIGAN occupied a number of positions, including but not limited to the following: (i) Representative for the State of Illinois's Twenty-Second District; (ii) Speaker of the House of Representatives; (iii) Democratic Committeeman for the Thirteenth Ward; (iv) Chairman of the Thirteenth Ward Democratic Organization; (v) Chairman of the Democratic Party of Illinois; and (vi) partner in Madigan & Getzendanner through a corporate entity.

7. MADIGAN was the leader of the enterprise, and used these positions to oversee, direct, and guide certain of the enterprise's illegal activities. Among other things, MADIGAN utilized his official positions as a Representative and Speaker: (i) to cause various businesses to employ, contract with, and make direct and indirect monetary payments to MADIGAN's political allies, political workers, and associates as a reward for and to promote their loyalty, association with, and work for MADIGAN, at times in

8

return for little or no legitimate work performed for the benefit of the businesses; and (ii) to solicit and receive from persons and parties having business with the State of Illinois and the City of Chicago, or otherwise subject to the authority and powers vested in MADIGAN and other public officials acting on MADIGAN's behalf, including Alderman A, bribes and unlawful personal financial advantage, including but not limited to fees arising from the retention of his law firm, Madigan & Getzendanner.  MADIGAN utilized his positions as Democratic Committeeman for the Thirteenth Ward and Chairman of the Thirteenth Ward Democratic Organization to direct the activities of his political allies and political workers within the Thirteenth Ward, and to maintain his political power for purposes of ensuring his continued retention of his positions as a member of the Illinois House of Representatives and Speaker.  MADIGAN utilized his position as Chairman of the Democratic Party of Illinois to influence and garner loyalty from legislators by providing or withholding staff and funding to legislators and their campaigns.  MADIGAN utilized his position as a partner in Madigan & Getzendanner to reap the benefits of private legal work unlawfully steered to his law firm.  MADIGAN directed the activities of his close friend and associate, McCLAIN, who carried out illegal activity at MADIGAN's direction.

## DEFENDANT MICHAEL F. McCLAIN

8.    McCLAIN served with MADIGAN in the House of Representatives for approximately ten years beginning in 1972.  McCLAIN was an attorney who was registered to practice law from between in or around 1977 to in or around 2016.  After

9

McCLAIN's service in the House of Representatives, McCLAIN served as a lobbyist and/or consultant, including for Commonwealth Edison Company.

9.      McCLAIN served the enterprise by, among other things: (i) making unlawful demands on MADIGAN's behalf to third parties, such as corporate executives and lobbyists, for jobs and payments to be made to MADIGAN's political allies, political workers, and associates, thereby acting as an intermediary in order to shield MADIGAN from direct contact with third parties in connection with the discussion of the enterprise's criminal activity; (ii) causing the creation of false documentation and formulating means of indirect payment in order to conceal the true nature of payments made to MADIGAN's political allies, political workers, and associates; (iii) conveying MADIGAN's instructions and messages to public officials, lobbyists, and business executives, including but not limited to instructions on whether MADIGAN wished to support, advance, or hold legislation pending before the General Assembly; (iv) providing strategic advice to MADIGAN on sensitive political matters; (v) briefing MADIGAN on his activities on behalf of the enterprise; (vi) otherwise acting as MADIGAN's agent for the purposes of conveying MADIGAN's instructions, requests, and messages to third parties; and (vii) using intimidation to advance the interests of the enterprise's illegal activities.

## II.  THE RACKETEERING CONSPIRACY

10.    Beginning no later than in or around 2011, and continuing through in or around 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL J. MADIGAN and
MICHAEL F. McCLAIN,

defendants herein, being persons employed by and associated with an enterprise, namely, the Madigan Enterprise as described in paragraphs 2-9 above, which enterprise engaged in, and the activities of which affected, interstate commerce, did knowingly conspire together and with others known and unknown to the Grand Jury, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity as those terms are defined in Title 18, United States Code, Sections 1961(1) and (5), in violation of Title 18, United States Code, Section 1962(c), as further specified in paragraphs 11 and 12 below.

11.    The pattern of racketeering activity consisted of:

a.    multiple acts indictable under:

i.    Title 18, United States Code, Section 1951 (relating to interference with commerce by extortion); and

ii.    Title 18, United States Code, Section 1952 (relating to the use of facilities in interstate commerce in aid of racketeering activity); and

b.    multiple acts and threats involving bribery chargeable under the following provisions of the law of the State of Illinois: Chapter 720 Illinois Compiled Statutes § 5/33-1(d)-(e); Chapter 720 Illinois Compiled Statutes § 5/33-3(a)(4) (formerly

11

codified as Chapter 720 Illinois Compiled Statutes § 33-3(d)); Chapter 720 Illinois Compiled Statutes § 645/1 (effective until December 31, 2012); and Chapter 720 Illinois Compiled Statutes § 5/33-8 (effective January 1, 2013).

12. It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

### III. MANNER AND MEANS OF THE CONSPIRACY

13. The manner and means by which the conspirators agreed to conduct and participate in the conduct of the affairs of the enterprise included, among others, the following:

a. It was part of the conspiracy that MADIGAN's and Alderman A's positions as public officials (including Alderman A's position as Chairman of the Committee on Zoning, Landmarks & Building Standards) would be and were used to solicit and receive from persons and parties having business before the State of Illinois and the City of Chicago, or otherwise subject to the authority and powers vested in MADIGAN and Alderman A, unlawful personal financial advantage, including but not limited to fees arising from the retention of MADIGAN's law firm, Madigan & Getzendanner.

b. It was further part of the conspiracy that private benefits for MADIGAN's political allies, political workers, and associates would be and were solicited from various entities having business before the General Assembly.

12

c.     It was further part of the conspiracy that defendant MADIGAN's official position as Speaker of the House of Representatives and control over the staff of the Office of the Speaker would be and was used to take and cause official action, including: (1) the promotion, support, and furtherance of legislation favorable to, and obstruction of legislation unfavorable to, companies that would and did provide private benefits to MADIGAN and MADIGAN's political allies, political workers, and associates; and (2) the appointment of MADIGAN's political allies, political workers, and associates to public employment, including but not limited to appointments made in exchange and as a reward for private benefits provided to MADIGAN, including but not limited to private work for MADIGAN's law firm, Madigan & Getzendanner.

d.     It was further part of the conspiracy that nominees and intermediaries would be and were used in order to conceal and direct payments received from entities having business before the General Assembly to MADIGAN's political allies, political workers, and associates.

e.     It was further part of the conspiracy that documentation would be and was prepared to make it falsely appear that certain payments made for the purpose of bribing MADIGAN were made solely for legitimate commercial purposes.

f.     It was further part of the conspiracy that intimidation and threats would be and were used to cause third parties to provide private benefits to MADIGAN, his political allies, political workers, and associates.

13

g.      It was further part of the conspiracy that the internet, email accounts, cellular telephones, landline telephones, and associated communications networks would be and were used with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of bribery and extortion; and thereafter, a member of the conspiracy would and did perform, cause to be performed and aid and abet the performance of acts to promote, manage, establish, and carry on and facilitate the promotion, management, establishment, and carrying on of said unlawful activity.

h.      It was further part of the conspiracy that the conspirators would and did use coded language in their discussions and used coded references for purposes of discussing fellow conspirators.

i.      It was further part of the conspiracy that the conspirators would and did meet in person and use third parties' cellular and private telephones in order to reduce law enforcement's ability to intercept their communications.

j.      It was further part of the conspiracy that the conspirators misrepresented, concealed and hid, caused to be misrepresented, concealed and hidden, and attempted to misrepresent, conceal and hide the illegal operation of the enterprise and acts done in furtherance of the enterprise.

All of the above in violation of Title 18, United State Code, Section 1962(d).

14

## COUNT TWO

The SPECIAL APRIL 2021 GRAND JURY further charges:

1.      Paragraphs 1(a) through 1(j), 6 and 8 of Count One of this indictment are realleged and incorporated here.

2.      At times material to Count Two of this indictment:

### Commonwealth Edison Company and Affiliates

a.      Commonwealth Edison Company ("ComEd"), with headquarters located in Chicago, delivered electricity to industrial, commercial, and residential customers across northern Illinois and was the largest utility company in the State.

b.      As a utility, ComEd was subject to extensive regulation by the State of Illinois.   The State of Illinois regulated the rates that ComEd could charge its customers, as well as the rate of return ComEd could realize from its business operations.

c.      ComEd maintained a summer internship program (the "ComEd Internship Program") that provided paid internship positions to students.   Based on their performance during the internship, participating students could be considered for subsequent summer internship positions or full-time jobs within ComEd.

d.      ComEd was a majority-owned indirect subsidiary of Exelon Corporation ("Exelon"), a utility services holding company that provided energy to customers in multiple states.   ComEd and Exelon had a class of securities registered pursuant to Section 12 of the Securities and Exchange Act of 1934 (15 U.S.C. § 78a *et seq.*) and were required to file reports with the Securities and Exchange Commission under

15

Section 15(d) of the Exchange Act. ComEd and Exelon were therefore each an "issuer" under the Foreign Corrupt Practices Act of 1977 (the "FCPA").

e. Exelon Business Services Company, LLC ("Exelon Business Services") was a limited liability company organized under the laws of the State of Delaware. Exelon was the sole member of Exelon Business Services. Exelon Business Services provided support functions for companies affiliated with Exelon such as ComEd, including but not limited to contracting, accounting, and vendor payment functions.

## ComEd and Exelon's Internal Controls Program

f. Pursuant to the FCPA, issuers, such as ComEd and Exelon, were required to maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; (ii) transactions were recorded as necessary to (A) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (B) maintain accountability for assets; (iii) access to assets was permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals, and appropriate action was taken with respect to any differences. The FCPA prohibited any person from knowingly and willfully circumventing or failing to implement

the required system of internal accounting controls or knowingly and willfully falsifying any book, record, or account that issuers were required to keep.

g.     Exelon, together with ComEd and Exelon Business Services, maintained a system of internal controls to detect and prevent improper payments, including bribe payments.     These controls included various policies, programs, and procedures designed to ensure that Exelon's books and records, and those of their majority-owned subsidiaries including ComEd and Exelon Business Services, accurately reflected transactions engaged in by the company.     The controls were also designed to detect unlawful payments, and included requiring multiple employees to be involved in the approval of contracts that exceeded specified amounts and auditing to help ensure accurate reporting of payments.     Exelon maintained a corporate anti-bribery policy and implemented a Code of Business Conduct, which governed the conduct of Exelon, ComEd, and Exelon Business Services employees and agents, including third-party consultants.

h.     From in or around 2006 through in or around 2015, the Code of Business Conduct provided that "[m]anagement is accountable for establishing and maintaining a system of internal controls within an organization," that management was required to "ensure that there is clear, complete, fair, and accurate reporting of financial and non-financial information pertaining to business transactions," and that management was accountable to the Exelon board of directors for compliance.     The Code of Business Conduct further specified that employees were accountable for "recording all business

17

transactions, events and conditions accurately and completely," and were prohibited from "falsifying data, information or records with respect to the Company's finances or operations, including those related to, among other things: assets, liabilities, revenues, expenses and earnings . . . ." and from "creating off-book accounts or funds or making any other entry in any other record that intentionally misrepresents, conceals or disguises the true nature of any transaction, event or condition . . . ." Senior officers of Exelon were also required to ensure that internal controls around financial reporting were properly designed and effective, and were further required to promptly report any violations of these requirements. The Code of Business Conduct further provided that the "FCPA also requires that publicly held companies, like Exelon, maintain accurate books, records and accounts and devise a system of internal accounting controls sufficient to provide reasonable assurance that, among other things, the Company's books and records fairly and accurately reflect business activities and transactions."

          i.     In or around 2015, the Code of Business Conduct was revised, and from in or around 2015 to in or around 2019 provided that "[b]usiness and financial records are essential to our business operations. Exelon relies on the integrity and accuracy of these records to make strategic decisions and has designed and implemented a series of internal controls—organizational structures, processes, procedures, systems, etc.—to effectively manage financial reporting." The Code of Business Conduct further instructed employees to: "[n]ever keep off-the-book accounts or false or incomplete records"; "[n]ever make an entry in any record that intentionally misrepresents, conceals

or disguises the true nature of any transaction, event or condition"; "[r]ecord all business transactions, events and conditions accurately, completely and in a timely fashion"; "[e]nsure that there is clear, complete fair and accurate reporting and supporting records of financial information pertaining to business transactions"; "[n]ever mislead or misinform anyone about our business operations or finances"; "[i]mmediately report any requests received to manipulate accounts, books and records, or financial reports, and any suspected misconduct regarding accounting, internal controls, or auditing matters to the Ethics and Compliance Office, Audit and Controls, or the Legal Department."   The Code of Business Conduct further emphasized under the heading "Fighting Bribery and Corruption" that bribes and kickbacks of any kind violated the Code of Business Conduct and were illegal, and that the FCPA "[r]equires that publicly held companies, like Exelon, have accounting controls to assure that all transactions are recorded fairly and accurately in our financial books and records."   The Code of Business Conduct provided the following examples of what was expected of employees and agents: (a) "[k]eep accurate and complete records so all payments are honestly detailed and company funds are not used for unlawful purposes"; (b) "[c]onduct due diligence on all potential agents, consultants or other business partners"; and (c) "[n]ever use a third party to make payments or offers that could be improper."   Exelon's Code of Business Conduct also prohibited bribery and listed as an example of a prohibited bribe: "Providing something of value for the benefit of a public official in a position to make a decision that could benefit the company."

j.     Exelon, together with ComEd and Exelon Business Services, provided training on the Code of Business Conduct to employees in the form of training guides.

k.     Employees of Exelon and its subsidiaries, including ComEd and Exelon Business Services, were required to annually certify adherence to Exelon's Code of Business Conduct.    Employees were also required to promptly report potential violations of the Code of Business Conduct, including but not limited to "[a]ccounting improprieties, internal accounting controls or auditing matters."

### The Illinois General Assembly and
### Legislation Affecting ComEd's Business

l.     The Illinois General Assembly routinely considered bills and passed legislation that had an impact on ComEd's and Exelon's operations and profitability, including but not limited to legislation that affected the regulatory process used to determine the rates ComEd could charge customers for the delivery of electricity.

m.     In 2011, the General Assembly passed the Energy Infrastructure and Modernization Act ("EIMA").    EIMA provided for a regulatory process through which ComEd was able to more reliably determine rates it could charge customers and, in turn, determine how much money it was able to generate from its operations to cover, among other things, costs for grid-infrastructure improvements.    The passage of EIMA therefore helped improve ComEd's financial stability.

n.     Following the passage of EIMA, the Illinois Commerce Commission ("ICC") interpreted the language of EIMA in a manner adverse to ComEd.    In 2013, the

20

General Assembly passed legislation, known as Senate Bill 9, that effectively overruled the ICC's adverse interpretation of EIMA.

        o.     On or about December 1, 2016, the General Assembly passed the Future Energy Jobs Act ("FEJA"), which provided for a renewal of the regulatory process that was beneficial to ComEd.    After the passage of FEJA, ComEd maintained a continuing interest in advancing legislation in the General Assembly favorable to its interests, and opposing legislation that was not consistent with its operational and financial success.

        p.     On or about February 16, 2018, House Bill 5626 ("HB 5626"), which was intended to amend the Public Utilities Act to impose certain obligations upon alternative retail electric suppliers, was filed in the Illinois House of Representatives. ComEd was opposed to HB 5626, and HB 5626 was not enacted into law.

### Relevant Individuals

        q.     Anne Pramaggiore was the chief executive officer of ComEd between in or around March 2012 and May 2018.    From on or about June 1, 2018 to on or about October 15, 2019, Pramaggiore served as a senior executive at an affiliate of Exelon, and had oversight authority over ComEd's operations.    Pramaggiore was an attorney who was registered to practice law from between in or around 1989 to in or around 2019. Each year between in or around 2012 and in or around 2016, Pramaggiore received annual ethics training, including training on the duty to maintain accurate books and records.

Each year between in or around 2010 and in or around 2018, Pramaggiore certified her understanding of the Code of Business Conduct.

r.     John Hooker served as ComEd's executive vice president of legislative and external affairs from in or around 2009 until his retirement in or around 2012.    From in or around 2012 to in or around 2019, Hooker served as an external lobbyist for ComEd.    Exelon required Hooker to certify his understanding of the Code of Business Conduct. Between in or around 2010 and in or around 2011, Hooker certified his understanding of the Code of Business Conduct.

s.     Fidel Marquez served as ComEd's senior vice president of external and governmental affairs from in or around March 2012 until in or around September 2019.    Each year between in or around 2012 and in or around 2016, Marquez received annual ethics training, including training on the duty to maintain accurate books and records.    Each year between in or around 2010 to in or around 2018, Marquez certified his understanding of the Code of Business Conduct.

t.     Jay Doherty was the owner of Jay D. Doherty & Associates ("JDDA"), which performed consulting services for ComEd beginning prior to in or around 2011 and continuing until in or around 2019.

u.     Individual 13W-1 was the Alderman for the Thirteenth Ward from in or around 1994 until on or about April 30, 2011, and was the Treasurer of the Thirteenth Ward Democratic Organization.

22

v.      Individual 13W-2 was associated with the Thirteenth Ward Democratic Organization and was a precinct captain within the Thirteenth Ward.

w.      Individual 13W-3 was associated with the Thirteenth Ward Democratic Organization and was a precinct captain within the Thirteenth Ward.

x.      Individual FR-1 was a former member of, and political ally of MADIGAN's in, the House of Representatives.

y.      Individual 23W-1 was the Alderman for the Twenty-Third Ward until on or about May 31, 2018.

z.      Individual BM-1 was a resident of Elmwood Park, Illinois, who sought a position on ComEd's board of directors.

aa.     Intermediary 2 was employed as a member of the Speaker's Office until in or around 2012, and was thereafter employed as a lobbyist and consultant.

bb.     Intermediary 3, who formerly served in the Illinois House of Representatives with MADIGAN, performed lobbying and consulting services for ComEd beginning in or around 2018 and continuing until in or around 2019.

2.      Beginning no later than in or around 2011, and continuing through in or around 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL J. MADIGAN,

defendant herein, did conspire with Michael F. McClain, Anne Pramaggiore, John Hooker, Jay Doherty, Fidel Marquez, and others known and unknown to the Grand Jury:

23

a.    to corruptly solicit and demand, and to accept and agree to accept from another person things of value, namely, jobs, contracts, and monetary payments associated with those jobs and contracts, for the benefit of MADIGAN and his associates, intending that MADIGAN, an agent of the State of Illinois, be influenced and rewarded in connection with any business, transaction, and series of transactions of the State of Illinois involving things of value of $5,000 or more, namely, legislation affecting ComEd and its business, in violation of Title 18, United States Code, Section 666(a)(1)(B);

b.    to corruptly give, offer, and agree to give things of value, namely, jobs, contracts, and monetary payments associated with those jobs and contracts, for the benefit of MADIGAN and his associates, with intent to influence and reward MADIGAN, as an agent of the State of Illinois, in connection with any business, transaction, and series of transactions of the State of Illinois involving things of value of $5,000 or more, namely, legislation affecting ComEd and its business, in violation of Title 18, United States Code, Section 666(a)(2); and

c.    knowingly and willfully to circumvent a system of internal accounting controls and to falsify any book, record, and account of Exelon and ComEd, in violation of Title 15, United States Code, Sections 78m(b)(5) and 78ff(a).

3.    It was part of the conspiracy that, for the purpose of influencing and rewarding MADIGAN in connection with his official duties as Speaker of the Illinois House of Representatives, and to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and the defeat of legislation unfavorable to ComEd

24

and its business, the conspirators (i) arranged for various associates of MADIGAN, including MADIGAN's political allies and individuals who performed political work for MADIGAN, to obtain jobs, contracts, and monetary payments associated with those jobs and contracts from ComEd and its affiliates, even in instances where such associates performed little or no work that they were purportedly hired to perform for ComEd; and (ii) created and caused the creation of false contracts, invoices, and other books and records to disguise the true nature of certain of the payments and to circumvent internal controls.

### Hiring of MADIGAN's Associates as Vendor "Subcontractors" Who Performed Little or No Work for ComEd

4.     It was further part of the conspiracy that MADIGAN and McClain sought to obtain from ComEd jobs, vendor contracts and subcontracts, as well as monetary payments for various associates of MADIGAN, including MADIGAN's political allies and individuals who performed political work for MADIGAN, including but not limited to Individual 13W-1, Individual 13W-2, Individual 13W-3, Individual FR-1, and Individual 23W-1.

5.     It was further part of the conspiracy that ComEd, together with senior executives and agents of the company, including but not limited to McClain, Pramaggiore, Hooker, and Marquez, corruptly arranged for jobs, vendor contracts and subcontracts, as well as monetary payments to be provided to various associates of MADIGAN.

6.     It was further part of the conspiracy that, at certain times, in order to conceal the nature and source of the payments and to prevent detection of the illegal

activity, these jobs, vendor subcontracts, and monetary payments were indirectly provided to MADIGAN's associates through third-party intermediaries.

7.  It was further part of the conspiracy that, in or around 2011, MADIGAN approved of the plan to make indirect payments to his associates through third-party intermediaries, and thereafter, McClain reported to MADIGAN concerning the status of payments made to MADIGAN's associates.

8.  It was further part of the conspiracy that certain recipients of these jobs, vendor contracts and subcontracts, as well as monetary payments, often did little or no work in return for such benefits.

9.  It was further part of the conspiracy that the conspirators caused third-party intermediaries to enter into false contracts, to submit false invoices for payment, and further caused the creation and retention of other false documents and records within Exelon, ComEd, and Exelon Business Services that made it falsely appear that payments intended for third-party intermediaries were solely for legitimate services to be rendered or actually rendered by the third-party intermediaries, when in fact, the contracts, invoices, and internal documentation were intended to disguise the fact that a substantial amount of the payments to the third-party intermediaries was intended for MADIGAN's associates, who performed little or no work for ComEd.

10.  It was further part of the conspiracy that, at times, MADIGAN's associates who were recipients of vendor subcontracts and monetary payments submitted invoices to third-party intermediaries, purporting to document services for the benefit of ComEd,

concealing the fact that little or no work was performed by them for the benefit of ComEd, in order to ensure the continuation of such payments.

11.    It was further part of the conspiracy that MADIGAN determined when payments made by ComEd through third party intermediaries to certain of his associates might be terminated, and based on his instructions, McClain and other conspirators caused such payments to end.

12.    It was further part of the conspiracy that MADIGAN, either directly or through his agents, including but not limited to the staff of the Speaker's office, took official action to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and to defeat legislation unfavorable to ComEd and its business.

### Retention of Law Firm A

13.    It was further part of the conspiracy that the conspirators caused ComEd to retain Law Firm A, for the purpose of influencing and rewarding MADIGAN in connection with MADIGAN's official duties.

14.    It was further part of the conspiracy that, in or around 2011, McClain and Hooker, who were not members of ComEd's legal department, advised a member of ComEd's legal department that it was important to retain Law Firm A. Thereafter, Law Firm A was retained by ComEd pursuant to a contract that provided Law Firm A would be provided with approximately 850 hours of work a year.

15.    It was further part of the conspiracy that, in or around 2014, Pramaggiore instructed a member of ComEd's legal department that Law Firm A's contract had to be

27

renewed and that McClain had to be dealt with in connection with the renewal of the contract.

16.     It was further part of the conspiracy that, in or around 2016, after personnel within ComEd sought to reduce the number of hours of legal work provided to Law Firm A because there was not enough appropriate legal work to provide to Law Firm A, McClain interceded with Pramaggiore, in order to cause Law Firm A's contract to be renewed on terms acceptable to Law Firm A.

17.     It was further part of the conspiracy that, in or around 2016, a ComEd employee, who was assigned as a project manager by Pramaggiore to assist with obtaining legislative approval of FEJA—and who had no oversight authority over ComEd's legal department—began to monitor the renewal of Law Firm A's contract in order to help ensure that Law Firm A's contract was renewed.

18.     It was further part of the conspiracy that, in or around 2016, the conspirators caused ComEd to enter into a new contract with Law Firm A, with the intent to influence and reward MADIGAN in connection with MADIGAN's official duties, including the promotion and passage of legislation that affected ComEd.

### Thirteenth Ward Interns

19.     It was further part of the conspiracy that, for the purpose of influencing and rewarding MADIGAN, the conspirators caused positions in the ComEd Internship Program to be set aside for individuals associated with the Thirteenth Ward who were identified to ComEd by McClain.

28

20.     It was further part of the conspiracy that potential Thirteenth Ward interns identified to ComEd by McClain did not need to compete against the general intern applicant pool, and instead, received more favorable treatment when it came to assessing their qualifications for positions within the ComEd Internship Program.

21.     It was further part of the conspiracy that Marquez would contact other employees within ComEd for the purpose of stressing the need to hire intern candidates who were referred by McClain, and ensuring that Thirteenth Ward intern candidates received favorable treatment during the hiring process.

22.     It was further part of the conspiracy that ComEd's minimum academic requirements for intern candidates, such as a minimum required grade point average, were waived at times for certain Thirteenth Ward intern candidates who did not meet those requirements.

### Appointment to ComEd Board

23.     It was further part of the conspiracy that, by no later than in or around November 2017, MADIGAN and McClain sought the appointment of Individual BM-1 to the ComEd board of directors, and Pramaggiore agreed to seek the appointment of Individual BM-1 with the intent to influence and reward MADIGAN in connection with MADIGAN's official duties.

24.     It was further part of the conspiracy that between in or around 2017 and in or around 2019, Pramaggiore took steps to cause ComEd and Exelon to appoint Individual BM-1 to the ComEd board of directors, including urging other ComEd and Exelon executives to agree to and arrange for Individual BM-1's appointment.

29

25.     It was further part of the conspiracy that, in or around April 2019, Individual BM-1 was appointed to the ComEd board of directors.

### Hiring of Other Individuals

26.     It was further part of the conspiracy that McClain regularly made requests on MADIGAN's behalf to Pramaggiore, Marquez, and other personnel within ComEd to hire individuals associated with MADIGAN as full-time employees, consultants, and contractors.

27.     It was further part of the conspiracy that, for the purpose of influencing and rewarding MADIGAN, the conspirators often secured and attempted to secure jobs and contracts for these individuals as requested by McClain.

### Concealment

28.     It was further part of the conspiracy that, in order to conceal the unlawful benefits tendered for the purpose of influencing and rewarding MADIGAN, the conspirators concealed multiple violations of Exelon's Code of Business Conduct, including violations of: (i) the requirement to keep accurate and complete records of all payments made by ComEd, Exelon, and Exelon Business Services; (ii) the prohibition on never using a third party to make payments or offers that could be improper; and (iii) the prohibition on "providing something of value for the benefit of a public official in a position to make a decision that could benefit the company."

29.     It was further part of the conspiracy that, in order to conceal the nature and purpose of their conduct, conspirators often referred to MADIGAN as "our Friend," or "a Friend of ours," rather than using MADIGAN's true name.

30.     It was further part of the conspiracy that the defendants and their co-conspirators misrepresented, concealed and hid, and caused to be misrepresented, concealed and hidden, and attempted to misrepresent, conceal and hide acts done in furtherance of the conspiracy and the purpose of those acts.

## Overt Acts

31.     In furtherance of the conspiracy and to effect its objects and purposes, the defendant and his co-conspirators committed and caused to be committed the following overt acts, among others, within the Northern District of Illinois and elsewhere:

a.      On or about May 30, 2011, MADIGAN voted in favor of EIMA.

b.      On or about October 26, 2011, MADIGAN voted in favor of overriding the Governor of Illinois's veto of EIMA.

c.      On or about March 21, 2013, MADIGAN voted in favor of SB9.

d.      On or about May 22, 2013, MADIGAN voted in favor of overriding the Governor of Illinois's veto of SB9.

e.      On or about each date set forth below, the conspirators caused payments to be made to JDDA in the approximate amount set forth below, with a substantial portion of each payment intended for associates of MADIGAN:

31

| Overt Act | Date | Amount |
|-----------|------|--------|
| e-1 | 01/27/2014 | $31,000 |
| e-2 | 03/03/2014 | $31,000 |
| e-3 | 03/31/2014 | $43,000 |
| e-4 | 04/28/2014 | $37,000 |
| e-5 | 05/30/2014 | $37,000 |
| e-6 | 07/03/2014 | $37,000 |
| e-7 | 07/28/2014 | $37,000 |
| e-8 | 08/29/2014 | $37,000 |
| e-9 | 09/29/2014 | $37,000 |
| e-10 | 10/30/2014 | $37,000 |
| e-11 | 12/01/2014 | $37,000 |
| e-12 | 12/29/2014 | $37,000 |
| e-13 | 01/29/2015 | $37,000 |
| e-14 | 03/02/2015 | $37,000 |
| e-15 | 03/30/2015 | $37,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| e-16 | 04/27/2015 | $37,000 |
| e-17 | 06/01/2015 | $37,000 |
| e-18 | 06/29/2015 | $37,000 |
| e-19 | 08/11/2015 | $37,000 |
| e-20 | 08/31/2015 | $37,000 |
| e-21 | 09/28/2015 | $37,000 |
| e-22 | 10/29/2015 | $37,000 |
| e-23 | 11/30/2015 | $37,000 |
| e-24 | 12/28/2015 | $37,000 |
| e-25 | 01/29/2016 | $37,000 |
| e-26 | 02/29/2016 | $37,000 |
| e-27 | 03/31/2016 | $37,000 |
| e-28 | 04/28/2016 | $37,000 |
| e-29 | 05/31/2016 | $37,000 |
| e-30 | 06/27/2016 | $37,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| e-31 | 08/01/2016 | $37,000 |
| e-32 | 08/29/2016 | $37,000 |
| e-33 | 09/29/2016 | $37,000 |
| e-34 | 10/31/2016 | $37,000 |
| e-35 | 11/28/2016 | $37,000 |
| e-36 | 03/02/2017 | $69,500 |
| e-37 | 04/03/2017 | $65,000 |
| e-38 | 05/30/2017 | $32,500 |
| e-39 | 06/01/2017 | $32,500 |
| e-40 | 06/29/2017 | $32,500 |
| e-41 | 07/31/2017 | $32,500 |
| e-42 | 09/11/2017 | $32,500 |
| e-43 | 09/29/2017 | $32,500 |
| e-44 | 10/30/2017 | $32,500 |
| e-45 | 11/27/2017 | $32,500 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| e-46 | 01/16/2018 | $32,500 |
| e-47 | 04/03/2018 | $65,000 |
| e-48 | 04/16/2018 | $32,500 |
| e-49 | 04/30/2018 | $32,500 |
| e-50 | 05/29/2018 | $32,500 |
| e-51 | 06/29/2018 | $32,500 |
| e-52 | 07/30/2018 | $37,500 |
| e-53 | 08/27/2018 | $37,500 |
| e-54 | 10/01/2018 | $42,500 |
| e-55 | 10/29/2018 | $37,500 |
| e-56 | 11/30/2018 | $37,500 |
| e-57 | 12/31/2018 | $3,750 |
| e-58 | 01/04/2019 | $33,750 |
| e-59 | 04/01/2019 | $112,500 |
| e-60 | 04/09/2019 | $37,500 |

| Overt Act | Date | Amount |
|---|---|---|
| e-61 | 05/03/2019 | $37,500 |

f. On or about each date set forth below, Doherty caused a check to be made to Individual 13W-1 in the approximate amount set forth below, for payments totaling approximately $256,000:

| Overt Act | Date | Amount |
|---|---|---|
| f-1 | 12/30/2013 | $4,000 |
| f-2 | 01/31/2014 | $4,000 |
| f-3 | 02/28/2014 | $4,000 |
| f-4 | 03/31/2014 | $4,000 |
| f-5 | 04/30/2014 | $4,000 |
| f-6 | 05/30/2014 | $4,000 |
| f-7 | 06/30/2014 | $4,000 |
| f-8 | 07/31/2014 | $4,000 |
| f-9 | 08/31/2014 | $4,000 |
| f-10 | 09/30/2014 | $4,000 |

| Overt Act | Date | Amount |
|:---:|:---:|:---:|
| f-11 | 10/31/2014 | $4,000 |
| f-12 | 11/30/2014 | $4,000 |
| f-13 | 12/31/2014 | $4,000 |
| f-14 | 01/31/2015 | $4,000 |
| f-15 | 02/28/2015 | $4,000 |
| f-16 | 03/31/2015 | $4,000 |
| f-17 | 04/30/2015 | $4,000 |
| f-18 | 05/31/2015 | $4,000 |
| f-19 | 06/30/2015 | $4,000 |
| f-20 | 07/31/2015 | $4,000 |
| f-21 | 08/31/2015 | $4,000 |
| f-22 | 09/30/2015 | $4,000 |
| f-23 | 10/31/2015 | $4,000 |
| f-24 | 11/30/2015 | $4,000 |
| f-25 | 12/31/2015 | $4,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| f-26 | 01/31/2016 | $4,000 |
| f-27 | 02/29/2016 | $4,000 |
| f-28 | 03/31/2016 | $4,000 |
| f-29 | 04/30/2016 | $4,000 |
| f-30 | 05/31/2016 | $4,000 |
| f-31 | 06/30/2016 | $4,000 |
| f-32 | 07/31/2016 | $4,000 |
| f-33 | 08/31/2016 | $4,000 |
| f-34 | 09/30/2016 | $4,000 |
| f-35 | 10/31/2016 | $4,000 |
| f-36 | 11/30/2016 | $4,000 |
| f-37 | 03/03/2017 | $4,000 |
| f-38 | 03/03/2017 | $4,000 |
| f-39 | 03/31/2017 | $4,000 |
| f-40 | 04/05/2017 | $4,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| f-41 | 06/05/2017 | $4,000 |
| f-42 | 06/08/2017 | $4,000 |
| f-43 | 07/06/2017 | $4,000 |
| f-44 | 07/31/2017 | $4,000 |
| f-45 | 09/15/2017 | $4,000 |
| f-46 | 10/06/2017 | $4,000 |
| f-47 | 11/06/2017 | $4,000 |
| f-48 | 12/07/2017 | $4,000 |
| f-49 | 01/23/2018 | $4,000 |
| f-50 | 04/10/2018 | $4,000 |
| f-51 | 04/10/2018 | $4,000 |
| f-52 | 04/24/2018 | $4,000 |
| f-53 | 05/07/2018 | $4,000 |
| f-54 | 06/05/2018 | $4,000 |
| f-55 | 07/09/2018 | $4,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| f-56 | 07/31/2018 | $4,000 |
| f-57 | 09/05/2018 | $4,000 |
| f-58 | 10/05/2018 | $4,000 |
| f-59 | 11/06/2018 | $4,000 |
| f-60 | 12/10/2018 | $4,000 |
| f-61 | 01/10/2019 | $4,000 |
| f-62 | 04/08/2019 | $4,000 |
| f-63 | 04/18/2019 | $4,000 |
| f-64 | 04/26/2019 | $4,000 |

g.      On or about each date set forth below, Doherty caused a check to be made to Individual 13W-2's company in the approximate amount set forth below, for payments totaling approximately $325,000:

| Overt Act | Date | Amount |
|-----------|------|--------|
| g-1 | 12/30/2013 | $5,000 |
| g-2 | 01/31/2014 | $5,000 |

40

| Overt Act | Date | Amount |
|-----------|------|--------|
| g-3 | 02/28/2014 | $5,000 |
| g-4 | 03/31/2014 | $5,000 |
| g-5 | 04/30/2014 | $5,000 |
| g-6 | 05/30/2014 | $5,000 |
| g-7 | 06/30/2014 | $5,000 |
| g-8 | 07/31/2014 | $5,000 |
| g-9 | 08/31/2014 | $5,000 |
| g-10 | 09/30/2014 | $5,000 |
| g-11 | 10/31/2014 | $5,000 |
| g-12 | 11/30/2014 | $5,000 |
| g-13 | 12/31/2014 | $5,000 |
| g-14 | 01/31/2015 | $5,000 |
| g-15 | 02/27/2015 | $5,000 |
| g-16 | 03/31/2015 | $5,000 |
| g-17 | 04/30/2015 | $5,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| g-18 | 05/31/2015 | $5,000 |
| g-19 | 06/30/2015 | $5,000 |
| g-20 | 07/31/2015 | $5,000 |
| g-21 | 08/31/2015 | $5,000 |
| g-22 | 09/30/2015 | $5,000 |
| g-23 | 10/31/2015 | $5,000 |
| g-24 | 11/30/2015 | $5,000 |
| g-25 | 12/31/2015 | $5,000 |
| g-26 | 01/31/2016 | $5,000 |
| g-27 | 02/29/2016 | $5,000 |
| g-28 | 03/31/2016 | $5,000 |
| g-29 | 04/30/2016 | $5,000 |
| g-30 | 05/31/2016 | $5,000 |
| g-31 | 06/30/2016 | $5,000 |
| g-32 | 07/31/2016 | $5,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| g-33 | 08/31/2016 | $5,000 |
| g-34 | 09/30/2016 | $5,000 |
| g-35 | 10/31/2016 | $5,000 |
| g-36 | 11/30/2016 | $5,000 |
| g-37 | 03/03/2017 | $5,000 |
| g-38 | 03/03/2017 | $5,000 |
| g-39 | 03/31/2017 | $5,000 |
| g-40 | 04/05/2017 | $5,000 |
| g-41 | 06/05/2017 | $5,000 |
| g-42 | 06/08/2017 | $5,000 |
| g-43 | 07/06/2017 | $5,000 |
| g-44 | 07/31/2017 | $5,000 |
| g-45 | 09/15/2017 | $5,000 |
| g-46 | 10/06/2017 | $5,000 |
| g-47 | 11/06/2017 | $5,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| g-48 | 12/07/2017 | $5,000 |
| g-49 | 01/23/2018 | $5,000 |
| g-50 | 04/10/2018 | $5,000 |
| g-51 | 04/10/2018 | $5,000 |
| g-52 | 04/24/2018 | $5,000 |
| g-53 | 05/07/2018 | $5,000 |
| g-54 | 06/05/2018 | $5,000 |
| g-55 | 07/09/2018 | $5,000 |
| g-56 | 07/31/2018 | $5,000 |
| g-57 | 09/05/2018 | $5,000 |
| g-58 | 10/05/2018 | $5,000 |
| g-59 | 11/06/2018 | $5,000 |
| g-60 | 12/10/2018 | $5,000 |
| g-61 | 01/10/2019 | $5,000 |
| g-62 | 04/08/2019 | $5,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| g-63 | 04/18/2019 | $5,000 |
| g-64 | 04/26/2019 | $5,000 |
| g-65 | 05/06/2019 | $5,000 |

h.     On or about each date set forth below, Doherty caused a check to be made to Individual 13W-3 in the approximate amount set forth below, for payments totaling approximately $144,000:

| Overt Act | Date | Amount |
|-----------|------|--------|
| h-1 | 03/31/2014 | $4,500 |
| h-2 | 04/30/2014 | $4,500 |
| h-3 | 05/30/2014 | $4,500 |
| h-4 | 06/30/2014 | $4,500 |
| h-5 | 07/30/2014 | $4,500 |
| h-6 | 08/31/2014 | $4,500 |
| h-7 | 09/30/2014 | $4,500 |
| h-8 | 10/31/2014 | $4,500 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| h-9 | 11/30/2014 | $4,500 |
| h-10 | 12/31/2014 | $4,500 |
| h-11 | 01/31/2015 | $4,500 |
| h-12 | 02/27/2015 | $4,500 |
| h-13 | 03/31/2015 | $4,500 |
| h-14 | 04/30/2015 | $4,500 |
| h-15 | 05/31/2015 | $4,500 |
| h-16 | 06/30/2015 | $4,500 |
| h-17 | 07/31/2015 | $4,500 |
| h-18 | 08/31/2015 | $4,500 |
| h-19 | 09/30/2015 | $4,500 |
| h-20 | 10/31/2015 | $4,500 |
| h-21 | 11/30/2015 | $4,500 |
| h-22 | 12/31/2015 | $4,500 |
| h-23 | 01/31/2016 | $4,500 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| h-24 | 02/29/2016 | $4,500 |
| h-25 | 03/31/2016 | $4,500 |
| h-26 | 04/30/2016 | $4,500 |
| h-27 | 05/31/2016 | $4,500 |
| h-28 | 06/30/2016 | $4,500 |
| h-29 | 07/31/2016 | $4,500 |
| h-30 | 08/31/2016 | $4,500 |
| h-31 | 09/30/2016 | $4,500 |
| h-32 | 10/31/2016 | $4,500 |

   i. On or about February 27, 2015, McClain sent an email to Marquez, in which he wrote, "Our Friend's ward? Summer interns? 10 jobs or 12 or what is the ceiling? Best, Mike."

   j. On or about April 2, 2015, in response to an email asking whether there was pressure to hire a prospective intern, or whether the intern could simply be "fairly considered" for the ComEd Internship Program, Marquez wrote an email that said, "There is pressure to hire Hope she interviews well."

k.　　On or about April 29, 2015, Marquez forwarded an email to McClain, advising that a candidate McClain had referred to ComEd for the ComEd Internship Program had been hired.

l.　　On or about January 20, 2016, McClain wrote an email to Pramaggiore and Hooker that said the following: "I am sure you know how valuable [Lawyer A] is to our Friend," and then went on to write, "I know the drill and so do you. If you do not get involve [sic] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend.　Our Friend will call me and then I will call you.　Is this a drill we must go through?　For me, Hook and I am sure you I just do not understand why we have to spend valuable minutes on items like this when we know it will provoke a reaction from our Friend."

m.　　On or about January 20, 2016, Pramaggiore wrote an email to McClain, in response to the email referenced in paragraph 31(l) and responded, "Sorry. No one informed me.　I am on this."

n.　　On or about January 20, 2016, Pramaggiore forwarded the email referenced in paragraph 31(l) to Marquez.

o.　　On or about January 20, 2016, Pramaggiore forwarded the email referenced in paragraph 31(l) to an employee in ComEd's legal department.

p.　　On or about February 25, 2016, McClain wrote an email to Marquez, in which McClain advised that "the 13th Ward may not want these people in their column," in reference to ComEd counting interns that returned to the ComEd Internship

48

Program against the number of positions allotted to individuals from the Thirteenth Ward.

      q.    On or about April 15, 2016, McClain wrote an email to ComEd's project manager for FEJA with the subject heading, "[Lawyer A] law firm?!"

      r.    On or about May 22, 2016, the project manager for FEJA wrote an email to a member of ComEd's legal department that asked, in reference to Law Firm A, "Are we closed out on this topic?"

      s.    On or about May 24, 2016, McClain wrote an email to a member of ComEd's legal department, Hooker, and the project manager for FEJA, in which McClain proposed terms for the renewal of Law Firm A's contract with ComEd.

      t.    On or about each date set forth below, Intermediary 2 caused a check to be made to Individual 13W-3 in the approximate amount set forth below, for payments totaling approximately $72,000:

| Overt Act | Date | Amount |
|-----------|------|--------|
| t-1 | 11/12/2016 | $4,500 |
| t-2 | 12/28/2016 | $4,500 |
| t-3 | 01/24/2017 | $4,500 |
| t-4 | 02/23/2017 | $4,500 |
| t-6 | 03/20/2017 | $4,500 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| t-7 | 04/26/2017 | $4,500 |
| t-8 | 05/31/2017 | $4,500 |
| t-9 | 06/31/2017 | $4,500 |
| t-10 | 07/26/2017 | $4,500 |
| t-11 | 08/28/2017 | $4,500 |
| t-12 | 09/27/2017 | $4,500 |
| t-13 | 10/29/2017 | $4,500 |
| t-14 | 11/25/2017 | $4,500 |
| t-15 | 12/20/2017 | $4,500 |
| t-16 | 01/30/2018 | $4,500 |
| t-17 | 02/26/2018 | $4,500 |

   u.  On or about December 1, 2016, FEJA was called for a vote in the Illinois House of Representatives.

   v.  On or about December 2, 2016, McClain wrote an email to a member of ComEd's legal department, in which McClain followed up on a prior email concerning

Law Firm A, and asked, "After you catch a couple of good nights [sic] sleep can we put this item to bed?"

   w. On or about December 3, 2016, Pramaggiore sent an email to McClain in which she assured McClain that she would resolve outstanding issues relating to Law Firm A's contract, by noting, "Fidel and I are meeting on Monday to make our list. This will be on it."

   x. In or around January 2017, in connection with the renewal of JDDA's contract, Pramaggiore signed a false and misleading document, known as a "Single Source Justification," in support of the renewal of JDDA's contract and caused it to be submitted to Exelon Business Services. This Single Source Justification form made it falsely appear that the large amount of money to be paid to JDDA under the contract was on account of, among other things, JDDA's "unique insight & perspective to promote ComEd and its business matters to further develop, execute and manage its Government Relations presence" and did not indicate that a substantial amount of the fees that would be paid to JDDA was intended for third parties in an effort to influence and reward MADIGAN.

   y. On or about each date set forth below, Intermediary 2 caused a check to be made to Individual FR-1 in the approximate amount set forth below, for payments totaling approximately $60,000:

51

| Overt Act | Date | Amount |
|-----------|------|--------|
| y-1 | 03/20/2017 | $5,000 |
| y-2 | 04/26/2017 | $5,000 |
| y-3 | 05/31/2017 | $5,000 |
| y-4 | 06/31/2017 | $5,000 |
| y-5 | 07/26/2017 | $5,000 |
| y-6 | 08/28/2017 | $5,000 |
| y-7 | 09/27/2017 | $5,000 |
| y-8 | 10/29/2017 | $5,000 |
| y-9 | 11/25/2017 | $5,000 |
| y-10 | 12/20/2017 | $5,000 |
| y-11 | 01/03/2018 | $5,000 |
| y-12 | 02/26/2018 | $5,000 |

z. On or about April 2, 2017, McClain sent an email to Marquez, Pramaggiore, and Hooker, inquiring about the participation of individuals associated with the Thirteenth Ward in the ComEd Internship Program, and noted, "I strongly

recommend this item as we go through this transition period. My goal is that both parties are happy and not frustrated a second. I hope you agree."

        aa.    On or about November 17, 2017, MADIGAN caused an email to be sent to Pramaggiore, containing a copy of the resume for Individual BM-1.

        bb.    On or about November 17, 2017, Pramaggiore sent an email to a member of ComEd's legal department, forwarding an email that had been sent at the request of MADIGAN, containing a copy of the resume for Individual BM-1.

        cc.    In or around January 2018, MADIGAN placed a call to Individual BM-1 and advised Individual BM-1 that Individual BM-1 would be contacted by someone at ComEd concerning the appointment to the ComEd board of directors.

        dd.    On or about January 5, 2018, Marquez sent an email approving the renewal of JDDA's contract for 2018.

        ee.    On or about January 8, 2018, in connection with the renewal of JDDA's contract, Pramaggiore signed a false and misleading document, known as a "Single Source Justification," in support of the renewal of JDDA's contract and caused it to be submitted to Exelon Business Services. This Single Source Justification form made it falsely appear that the large amount of money to be paid to JDDA under the contract was on account of, among other things, "Consultant has specific knowledge that cannot be sourced from another consultant/supplier." The form did not indicate that a substantial amount of the fees that would be paid to JDDA was intended for third parties in an effort to influence and reward MADIGAN.

ff.     On or about February 9, 2018, McClain sent an email to Marquez's assistant, in which McClain wrote that it was his understanding that the Thirteenth Ward would be provided ten positions in the ComEd Internship Program: "[F]or as long as I can remember it has been ten interns??"

gg.     On or about February 12, 2018, Marquez caused an email to be sent by his assistant to McClain, in which the assistant wrote, "Confirmed with Fidel we will work to provide you 10 slots."

hh.     On or about February 28, 2018, Intermediary 3 sent Individual 13W-3 a draft contract that made it falsely appear that Individual 13W-3 would perform consulting services for ComEd.

ii.     On or about each date set forth below, McClain caused a check to be made to Individual 13W-3 by Intermediary 3's business in the approximate amount set forth below, for payments totaling approximately $45,000:

| Overt Act | Date | Amount |
|-----------|------|--------|
| ii-1 | 3/12/2018 | $4,500 |
| ii-2 | 04/30/2018 | $4,500 |
| ii-3 | 06/09/2018 | $4,500 |
| ii-4 | 06/18/2018 | $4,500 |
| ii-5 | 07/18/2018 | $4,500 |

| Overt Act | Date | Amount |
|:---:|:---:|:---:|
| ii-6 | 09/04/2018 | $4,500 |
| ii-7 | 10/03/2018 | $4,500 |
| ii-8 | 11/05/2018 | $4,500 |
| ii-9 | 12/08/2018 | $4,500 |
| ii-10 | 12/31/2018 | $4,500 |

jj.   On or about each date set forth below, McClain caused a check to be made to Individual FR-1 by Intermediary 3's business in the approximate amount set forth below, for payments totaling approximately $50,000:

| Overt Act | Date | Amount |
|:---:|:---:|:---:|
| jj-1 | 3/12/2018 | $5,000 |
| jj-2 | 04/30/2018 | $5,000 |
| jj-3 | 06/09/2018 | $5,000 |
| jj-4 | 06/18/2018 | $5,000 |
| jj-5 | 07/18/2018 | $5,000 |
| jj-6 | 09/2018 | $5,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| jj-7 | 10/2018 | $5,000 |
| jj-8 | 11/05/2018 | $5,000 |
| jj-9 | 12/08/2018 | $5,000 |
| jj-10 | 12/31/2018 | $5,000 |

kk.   In or around March 2018, MADIGAN met Individual 13W-3, and after Individual 13W-3 expressed concern to MADIGAN that Individual 13W-3 was performing no work for ComEd, MADIGAN told Individual 13W-3 not to worry, and explained that what Individual 13W-3 was doing, that is, campaign work for MADIGAN, was what was important to MADIGAN and that Individual 13W-3 was doing what Intermediary 3 and ComEd wanted.

ll.   On or about April 24, 2018, McClain placed a call to Hooker and informed Hooker that he was going to tell Pramaggiore that MADIGAN wanted to add Individual 23W-1 to the group of MADIGAN associates paid by ComEd indirectly through JDDA.

mm.   In or around April 2018, MADIGAN called Individual BM-1 and advised Individual BM-1 about the expected timing of Individual BM-1's appointment to the ComEd board of directors.

56

nn.    In or around April 2018, MADIGAN gave McClain permission to work to kill HB 5626 on behalf of ComEd, and ComEd thereafter worked to defeat HB 5626.

oo.    On or about May 2, 2018, MADIGAN placed a call to McClain, and after McClain advised MADIGAN that Pramaggiore was experiencing push-back to the appointment of Individual BM-1 to the ComEd board of directors, and had proposed finding a job that would pay Individual BM-1 the same amount of money as a board member, MADIGAN instructed McClain, "Yeah, Mike, I would suggest that we continue to support [Individual BM-1]."

pp.    On or about May 16, 2018, McClain placed a telephone call to Pramaggiore during which they discussed preventing HB 5626 from being passed in the Illinois General Assembly.

qq.    On or about May 16, 2018, at approximately 10:20 a.m., MADIGAN placed a call to McClain, during which MADIGAN instructed McClain (i) to discuss Individual 23W-1 with Pramaggiore; and (ii) to "go forward with" the appointment of Individual BM-1.

rr.    On or about May 16, 2018, McClain placed a telephone call to Pramaggiore, during which call (i) Pramaggiore advised McClain that she had instructed Marquez to "hire" Individual 23W-1 after checking with Doherty; and (ii) McClain informed Pramaggiore that MADIGAN wanted to "keep pressing" for the appointment of Individual BM-1 to the ComEd board of directors, and Pramaggiore agreed to do so.

57

ss.     On or about May 16, 2018, McClain placed a telephone call to Marquez, during which McClain explained why certain individuals were being paid indirectly through JDDA, by making reference to their utility to MADIGAN's political operation, and advised Marquez that Individual 23W-1 should be paid $5,000 a month.

tt.     On or about May 16, 2018, MADIGAN placed a telephone call to McClain, during which McClain advised MADIGAN, "You can call [Individual 23W-1] and say that they're going to get in touch with him."

uu.     On or about May 16, 2018, MADIGAN placed a telephone call to Individual 23W-1.

vv.     On or about May 18, 2018, McClain caused an email to be sent to Pramaggiore, Hooker, and other ComEd employees referencing HB 5626 that noted "a friend of ours" had authorized McClain to "go ahead and kill it."

ww.     On or about June 20, 2018, McClain placed a telephone call to Hooker, during which McClain stated that MADIGAN was the person who first "warned" them about HB 5626 and that MADIGAN had given ComEd permission to work to "kill" the legislation.

xx.     On or about June 29, 2018, Doherty caused an email to be sent to a ComEd employee, which made it falsely appear that the justification for an additional $5,000 a month sought under JDDA's revised contract was because JDDA would assume an "expanded role with Cook County Board President's office and Cook County Commissioners and Department Heads," when in fact the additional $5,000 a month in

58

compensation sought was intended for payment to Individual 23W-1, who performed little or no work for JDDA or ComEd.

yy. On or about July 10, 2018, McClain caused an email to be sent to Pramaggiore in which he stated, in reference to Individual BM-1, "Our Friend would like to make a call to him before it is announced, of course. I know this surprises you but I meet with our Friend every two weeks and he has a piece of paper in his file where it is brought to our attention."

zz. On or about July 17, 2018, McClain placed a telephone call to Pramaggiore during which Pramaggiore told McClain that "we're moving forward with [Individual BM-1]" and that McClain could tell MADIGAN.

aaa. On or about July 17, 2018, McClain placed a telephone call to MADIGAN during which McClain told MADIGAN that Individual BM-1 would be appointed to ComEd's board of directors.

bbb. On or about September 7, 2018, MADIGAN placed a telephone call to McClain during which MADIGAN asked McClain to confirm that Individual BM-1 would be appointed to the ComEd board of directors.

ccc. On or about September 7, 2018, McClain and Pramaggiore participated in a telephone call, during which Pramaggiore assured McClain that Pramaggiore was continuing to advocate for the appointment of Individual BM-1 to ComEd's board of directors and explained, "You take good care of me and so does our friend and I will do the best that I can to, to take care of you."

59

ddd.     On or about December 5, 2018, Marquez placed a call to McClain, during which call McClain authorized Marquez to "get rid" of Individual FR-1, meaning ComEd could discontinue making payments to Individual FR-1.

eee.     On or about December 6, 2018, McClain sent an email to Marquez and others at ComEd, in which McClain advised, in reference to the ComEd Internship Program, "I am pretty sure the 'ask' will be to 'put aside' or 'save' ten summer jobs for the 13th Ward."

fff.     On or about December 7, 2018, MADIGAN placed a call to McClain, during which call MADIGAN instructed McClain to have ComEd discontinue its indirect payments to Individual 13W-3.

ggg.     On or about December 8, 2018, McClain advised Intermediary 3 of MADIGAN's decision to terminate payments to Individual 13W-3, and instructed Intermediary 3 to make it falsely appear that a remaining payment to Individual 13W-3 was a holiday bonus, even though Individual 13W-3 performed little or no work for Intermediary 3.

hhh.     On or about January 29, 2019, Hooker traveled to the Union League Club, in Chicago, Illinois for the purpose of meeting with Marquez to discuss the renewal of the JDDA contract.

iii.     On or about February 7, 2019, McClain traveled to a restaurant in Springfield, Illinois, for the purpose of meeting with Marquez to discuss the renewal of the JDDA contract.

60

jjj.    On or about February 11, 2019, McClain placed a telephone call to Hooker and the two men discussed that MADIGAN was informed of the plan to have ComEd pay Individual 13W-1 indirectly through Doherty's lobbying firm and MADIGAN "thought it was great."

kkk.    On or about February 12, 2019, McClain placed a telephone call to Pramaggiore during which Pramaggiore told McClain that the appointment of Individual BM-1 would move forward.

lll.    On or about February 13, 2019, Doherty met with Marquez in Chicago, Illinois, and discussed how to present information to ComEd's chief executive officer concerning the renewal of the JDDA contract.

mmm. On or about February 18, 2019, Pramaggiore participated in a telephone call with Marquez, during which call, after she was told that the subcontractors associated with Doherty just "collect a check" and that Marquez needed to brief the chief executive officer of ComEd concerning the JDDA contract, Pramaggiore advised Marquez not to make any changes to the contract, because "we do not want to get caught up in a, you know, disruptive battle where, you know, somebody gets their nose out of joint and we're trying to move somebody off, and then we get forced to give 'em a five-year contract because we're in the middle of needing to get something done in Springfield."

61

nnn.    On or about February 19, 2019, MADIGAN placed a telephone call to McClain during which MADIGAN authorized McClain to call Individual BM-1 for the purpose of letting Individual BM-1 know about the ComEd board appointment.

ooo.    In or around March 2019, in connection with the renewal of JDDA's contract, the conspirators caused the preparation of a false and misleading document, known as a "Single Source Justification," in support of the renewal of JDDA's contract, and the submission of this form to Exelon Business Services.    This Single Source Justification form made it falsely appear that the large amount of money to be paid to JDDA was because, among other things, "Consultant has specific knowledge that cannot be sources [sic] from another supplier/contractor," and did not indicate that a substantial amount of the fees that would be paid to JDDA was intended for third parties in an effort to influence and reward MADIGAN.

ppp.    On or about March 5, 2019, McClain met with a ComEd executive and Marquez for the purpose of explaining why the JDDA contract and the payments to Individual 13W-1, Individual 13W-2, and Individual 23W-1 should be continued for another year.

qqq.    On or about March 11, 2019, Doherty caused a representative from Exelon Business Services to execute a contract containing false representations and promises that the compensation paid to JDDA was in return for providing ComEd with advice on legislative issues, when in fact a significant portion of the compensation to be

62

paid to JDDA was intended for Individual 13W-1, Individual 13W-2, and Individual 23W-1, who in fact did little or no legitimate work for ComEd.

rrr.    On or about April 25, 2019, Pramaggiore advised McClain by text message, "Just sent out Board approval to appoint [Individual BM-1] to ComEd Board."

sss.    On or about April 26, 2019, ComEd filed a notice with the U.S. Securities and Exchange Commission stating that Individual BM-1 had served as a director of ComEd since April 2019.

All in violation of Title 18, United States Code, Sections 371 and 2.

## COUNT THREE

The SPECIAL APRIL 2021 GRAND JURY further charges:

1.      Paragraphs 1 and 2 of Count Two of this indictment are realleged and incorporated here.

2.      Between in or around November 2017 and in or around April 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MICHAEL J. MADIGAN,

defendant herein, together with Michael F. McClain, with MADIGAN being an agent of the State of Illinois, corruptly solicited and demanded a thing of value and agreed to accept a thing of value from ComEd, namely, a position on the ComEd board of directors for Individual BM-1, and monetary payments associated with that position, intending for MADIGAN to be influenced and rewarded in connection with any business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, legislation affecting ComEd and its business;

In violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

## COUNT FOUR

The SPECIAL APRIL 2021 GRAND JURY further charges:

1.      Paragraphs 1 and 2 of Count Two of this indictment are realleged and incorporated here.

2.      Between in or around April 2018 and in or around June 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MICHAEL J. MADIGAN,

defendant herein, together with Michael F. McClain, with MADIGAN being an agent of the State of Illinois, corruptly solicited and demanded and agreed to accept a thing of value from ComEd, namely, payments of $5,000 a month, for the benefit of MADIGAN and his associate, Individual 23W-1, intending for MADIGAN to be influenced and rewarded in connection with any business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, legislation affecting ComEd and its business;

In violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

## COUNT FIVE

The SPECIAL APRIL 2021 GRAND JURY further charges:

On or about June 29, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

## MICHAEL J. MADIGAN,

defendant herein, together with Michael F. McClain, Anne Pramaggiore, John Hooker, and Jay Doherty, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by the service provider Google, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of Chapter 720 Illinois Compiled Statutes § 5/33-1(d) (bribery) and Chapter 720 Illinois Compiled Statutes § 5/33-8 (legislative misconduct), and thereafter, the defendant did perform, did cause to be performed, and did attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

66

## COUNT SIX

The SPECIAL APRIL 2021 GRAND JURY further charges:

1.     Paragraphs 1 and 2 of Count Two of this indictment are realleged and incorporated here.

2.     Between in or around January 2019 and on or about March 11, 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MICHAEL J. MADIGAN,

defendant herein, together with Michael F. McClain, with MADIGAN being an agent of the State of Illinois, corruptly solicited and demanded and agreed to accept a thing of value from ComEd, namely, a new annual contract for JDDA and monetary payments associated with that contract, for the benefit of MADIGAN and his associates, Individual 13W-1, Individual 13W-2, and Individual 23W-1, intending for MADIGAN to be influenced and rewarded in connection with any business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, legislation affecting ComEd and its business;

In violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

67

## COUNT SEVEN

The SPECIAL APRIL 2021 GRAND JURY further charges:

On or about July 10, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MICHAEL J. MADIGAN,

defendant herein, together with Michael F. McClain, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by the service provider Adams Telephone Co-Operative, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of Chapter 720 Illinois Compiled Statutes § 5/33-1(d) (bribery) and Chapter 720 Illinois Compiled Statutes § 5/33-8 (legislative misconduct), and thereafter, the defendant did perform, did cause to be performed, and did attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT EIGHT

The SPECIAL APRIL 2021 GRAND JURY further charges:

1.     Paragraphs 1(a) through 1(g), 1(k), 1(m), and 6 of Count One of this indictment are realleged and incorporated here.

2.     At times material to Count Eight of this indictment:

a.     Company A was a New York-based real estate company. Individual A-1 was associated with Company A and was involved in overseeing and managing a real estate development project located within Alderman A's ward.

b.     Organization B was a Chicago-based community organization. Individual B-1 was the chief executive officer of Organization B.

c.     The State of Illinois established various boards and commissions (referred to collectively as the "State boards") to carry out certain governmental functions.     These State boards included the Illinois Commerce Commission and the Illinois Labor Relations Board.

d.     The Illinois Commerce Commission was, among other things, responsible for regulating public utilities, regulating intrastate rates charged by property motor carriers, and inspecting railroad crossings and tracks.     Commissioners appointed to the Illinois Commerce Commission received a salary of at least approximately $117,043 per year.

e.     The Illinois Labor Relations Board was, among other things, responsible for administering the Illinois Public Labor Relations Act, the primary law

69

governing relations between unions and public employers. The Illinois Labor Relations Board maintained State and local panels that paid a salary to members of at least approximately $93,926.

f.      Certain salaried positions on the State boards, including the Illinois Commerce Commission and the Illinois Labor Relations Board, were filled by appointment of the Governor of the State of Illinois. In selecting candidates to fill such positions, the Governor would consider the advice of other public officials concerning suitable candidates.

3.      Beginning in or around June 2018 and continuing to in or around January 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL J. MADIGAN,

defendant herein, together with others known and unknown to the Grand Jury, knowingly devised, intended to devise, and participated in a scheme to defraud the people of Illinois of the intangible right to the honest services of MADIGAN through bribery and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme is further described below.

4.      It was part of the scheme that MADIGAN agreed to accept business steered by Alderman A towards his private law firm, Madigan & Getzendanner, and in exchange, MADIGAN agreed to assist, in his official capacity as Speaker of the House of Representatives, in advising and inducing the Governor of the State of Illinois to appoint

70

Alderman A to a State board that would pay Alderman A compensation of at least approximately $93,926 a year upon Alderman A's retirement from the City Council.

5.     It was further part of the scheme that, on or about June 20, 2018, MADIGAN met with Alderman A and agreed to assist Alderman A with obtaining an appointment upon his retirement from the City Council to a State board that compensated its board members, in exchange for Alderman A's assistance in steering business towards MADIGAN's private law firm, Madigan & Getzendanner.

6.     It was further part of the scheme that, on or about July 11, 2018, MADIGAN caused information concerning State board positions, including the composition of each State board, how board members were appointed, board terms, and board compensation, to be delivered to Alderman A's office.

7.     It was further part of the scheme that, on or about July 23, 2018, at MADIGAN's request, Alderman A contacted Individual A-1, and asked Individual A-1 to meet with MADIGAN so that MADIGAN could introduce himself for purposes of obtaining legal business from Individual A-1.

8.     It was further part of the scheme that, on or about August 2, 2018, MADIGAN met with Alderman A, and during the meeting: (a) Alderman A explained that he was most interested in appointment to a State board that would pay him over $100,000 a year; (b) MADIGAN explained that he would assist Alderman A in obtaining an appointment to a State board by "go[ing] to [the future Governor of the State of Illinois].   That's what I would do. . . . So you'd come in as [the future Governor's]

recommendation;" (c) Alderman A assured MADIGAN that "there's a lot of good stuff happening in my ward" and that he would help MADIGAN obtain legal business for his private law firm; and (d) MADIGAN in return assured Alderman A that he would help him obtain a State board appointment by telling Alderman A, "Just leave it in my hands," and asked that Alderman A also help a relative of MADIGAN and the relative's employer obtain business from Organization B.

9.      It was further part of the scheme that, on or about August 3, 2018, MADIGAN contacted Alderman A's assistant to check on the status of the planned meeting with Individual A-1.

10.     It was further part of the scheme that, on or about August 15, 2018, MADIGAN contacted Alderman A to check on the status of the planned meeting with Individual A-1, and asked Alderman A to convince Individual A-1 to provide MADIGAN legal business for a specific commercial real property located in Chicago that MADIGAN believed Company A to have an interest in.

11.     It was further part of the scheme that, on or about August 21, 2018, MADIGAN caused an assistant to send an email to Alderman A's assistant that confirmed that MADIGAN would be available to meet with Individual A-1 on September 4, 2018.

12.     It was further part of the scheme that, on or about August 31, 2018, at MADIGAN's request, Alderman A advised Individual A-1 that MADIGAN was interested in obtaining tax work for a specific piece of commercial real property.

13. It was further part of the scheme that, on or about September 4, 2018, MADIGAN met with Alderman A and Individual A-1 at his law firm, Madigan & Getzendanner, for the purpose of MADIGAN soliciting business for his private law firm from Company A.

14. It was further part of the scheme that, on or about September 26, 2018, MADIGAN asked Alderman A to assist him with obtaining tax work concerning a second commercial property MADIGAN believed Company A to have an interest in.

15. It was further part of the scheme that, on or about October 9, 2018, based on MADIGAN's request, Alderman A contacted Individual A-1.

16. It was further part of the scheme that, on or about October 26, 2018, MADIGAN met with Alderman A, and after Alderman A advised MADIGAN that Individual A-1 had agreed to give MADIGAN's law firm business, MADIGAN assured Alderman A that he would advise and induce the Governor of Illinois to appoint Alderman A to a State board.

17. It was further part of the scheme that, on or about November 23, 2018, MADIGAN met with Alderman A, and during the meeting: (a) Alderman A advised MADIGAN that he would not run for re-election, but was still committed to generating additional business for MADIGAN's law firm; (b) MADIGAN thanked Alderman A and asked Alderman A, "Do you wanna go forward now on one of those state appointments?"; (c) MADIGAN asked for Alderman A's resume, "Because I wanna have a meeting with [the Governor-elect] the week after next"; (d) MADIGAN explained that MADIGAN

wanted to let the Governor-elect "know what's coming next," but that his communication with the Governor-elect did not "need to be in writing. I can just verbally tell him"; and (e) after Alderman A indicated a relative was interested in a State job, MADIGAN asked for the relative's resume as well.

18.     It was further part of the scheme that, on or about December 1, 2018, MADIGAN called Alderman A and confirmed Alderman A's interest in being appointed to the Illinois Commerce Commission or the Illinois Labor Relations Board.

19.     It was further part of the scheme that, on or about December 4, 2018, pursuant to MADIGAN's earlier request for Alderman A's and Alderman A's relative's resumes, Alderman A's assistant emailed copies of these resumes to an assistant who worked at the Thirteenth Ward Office.

20.     It was further part of the scheme that, on or about December 4, 2018, an assistant who worked at the Thirteenth Ward Office emailed the resumes for Alderman A and Alderman A's relative to MADIGAN's assistant at Madigan & Getzendanner.

21.     It was further part of the scheme that, on or about December 4, 2018, MADIGAN met with the Governor-elect for the State of Illinois to discuss, among other things, the composition of the State boards.

22.     It was further part of the scheme that MADIGAN concealed, misrepresented, and hid and caused to be concealed, misrepresented and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme.

23.     On or about August 21, 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL J. MADIGAN,

defendant herein, for the purpose of executing the scheme, knowingly caused to be transmitted by wire communication in interstate commerce certain writings, signs, and signals, namely, an email to Alderman A's assistant that confirmed that MADIGAN would be available to meet with Individual A-1 on September 4, 2018, which email was processed through servers located outside Illinois;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT NINE

The SPECIAL APRIL 2021 GRAND JURY further charges:

1.     Paragraphs 1 through 22 of Count Eight of this indictment are realleged and incorporated here.

2.     On or about December 4, 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MICHAEL J. MADIGAN,

defendant herein, for the purpose of executing the scheme, knowingly caused to be transmitted by wire communication in interstate commerce certain writings, signs, and signals, namely, an email to an assistant who worked at the Thirteenth Ward Office that contained copies of resumes for Alderman A and Alderman A's relative, which email was processed through servers located outside Illinois;

In violation of Title 18, United States Code, Sections 1343 and 1346.

76

## COUNT TEN

The SPECIAL APRIL 2021 GRAND JURY further charges:

1.     Paragraphs 1 through 22 of Count Eight of this indictment are realleged and incorporated here.

2.     On or about December 4, 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MICHAEL J. MADIGAN,

defendant herein, for the purpose of executing the scheme, knowingly caused to be transmitted by wire communication in interstate commerce certain writings, signs, and signals, namely, an email to MADIGAN's assistant at Madigan & Getzendanner that contained resumes for Alderman A and Alderman A's relative, which email was processed through servers located outside Illinois;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT ELEVEN

The SPECIAL APRIL 2021 GRAND JURY further charges:

1.      Paragraphs 1 and 2 of Count Eight of this indictment are realleged and incorporated here.

2.      Beginning in or around June 2018, and continuing until in or around January 2019, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MICHAEL J. MADIGAN,

defendant herein, as an agent of the State of Illinois, corruptly solicited and demanded, and agreed to accept things of value, namely, fees arising from the retention of his law firm, Madigan & Getzendanner, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, the appointment of Alderman A to a compensated State board position upon Alderman A's retirement from public office;

In violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT TWELVE

The SPECIAL APRIL 2021 GRAND JURY further charges:

On or about August 15, 2018, at approximately 1:58 p.m. (Session #63241), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MICHAEL J. MADIGAN,

defendant herein, caused the use of a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-0292, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of Chapter 720 Illinois Compiled Statutes § 5/33-1(a) (bribery), Chapter 720 Illinois Compiled Statutes § 5/33-1(d) (bribery), Chapter 720 Illinois Compiled Statutes § 5/33-1(e) (bribery) and Chapter 720 Illinois Compiled Statutes § 5/33-8 (legislative misconduct), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT THIRTEEN

The SPECIAL APRIL 2021 GRAND JURY further charges:

On or about August 31, 2018, at approximately 9:58 a.m. (Session #64345), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

## MICHAEL J. MADIGAN,

defendant herein, caused the use of a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-0292, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of Chapter 720 Illinois Compiled Statutes § 5/33-1(a) (bribery), Chapter 720 Illinois Compiled Statutes § 5/33-1(d) (bribery), Chapter 720 Illinois Compiled Statutes § 5/33-1(e) (bribery), and Chapter 720 Illinois Compiled Statutes § 5/33-8 (legislative misconduct), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

80

## COUNT FOURTEEN

The SPECIAL APRIL 2021 GRAND JURY further charges:

On or about December 1, 2018, at approximately 2:06 p.m. (Session #69799), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MICHAEL J. MADIGAN,

defendant herein, caused the use of a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-0292, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of Chapter 720 Illinois Compiled Statutes § 5/33-1(a) (bribery), Chapter 720 Illinois Compiled Statutes § 5/33-1(d) (bribery), Chapter 720 Illinois Compiled Statutes § 5/33-1(e) (bribery), and Chapter 720 Illinois Compiled Statutes § 5/33-8 (legislative misconduct), and thereafter, the defendant did perform, did cause to be performed and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

81

## COUNT FIFTEEN

The SPECIAL APRIL 2021 GRAND JURY further charges:

1.      Paragraphs 1(a) through 1(g), 1(k), 1(m), and paragraph 6 of Count One of this indictment are realleged and incorporated here.

2.      At times material to Count Fifteen of this indictment:

a.      Company C was a joint-venture involved in the development of a large, multi-unit apartment building in Chicago, Illinois (the "Apartment project"). Individual C-1 was associated with the joint venture.

b.      As of in or around June 2017, the Apartment project had not obtained the approvals required for the project from the City of Chicago, including a zoning change that would come for approval before the Committee on Zoning, Landmarks & Building Standards, chaired by Alderman A.

3.      On or about June 12, 2017, MADIGAN asked Alderman A to introduce him to representatives of Company C, so that MADIGAN could seek business for his private law firm, Madigan & Getzendanner, from Company C.

4.      On or about June 23, 2017, after Alderman A informed MADIGAN that: (i) representatives of Company C would meet with MADIGAN so that MADIGAN could seek legal work for his private firm; (ii) Company C still needed to deal with Alderman A "in terms of zoning" for the Apartment project; and (iii) "I think they understand how this works, you know, the *quid pro quo*, the *quid pro quo*," MADIGAN said, "Okay. . . . Very good."

5. On or about July 12, 2017, after Alderman A informed MADIGAN that, with respect to Individual C-1: (i) Alderman A had confirmed a meeting between Individual C-1 and MADIGAN so that MADIGAN could seek private legal work from Company C; and (ii) "I just talked to him, and I think, you know, by me giving him the zoning change and everything he needs and I think he understands, so I think it'll be okay," MADIGAN said, "Very good, okay."

6. On or about July 18, 2017, immediately prior to a meeting with Individual C-1 and another representative for Company C, MADIGAN privately told Alderman A not to use the phrase *quid pro quo*, and falsely suggested a pretext for Alderman A's introduction of Company C to MADIGAN for tax services: "You're just recommending . . . because if they don't get a good result on their real estate taxes, the whole project will be in trouble. . . . Which is not good for your ward. So you want high quality representation." In truth and fact, as MADIGAN well knew, MADIGAN had asked Alderman A to introduce him to Company C for the purpose of obtaining private legal work; Alderman A had expressed no concern about the viability of the Apartment project based on real estate taxes; and Alderman A had twice advised MADIGAN of an understanding that approvals for the Apartment project would be received in exchange for private legal work being provided to MADIGAN's law firm.

7. On or about July 18, 2017, MADIGAN met with Individual C-1 and another representative of Company C and, in Alderman A's presence, sought tax work for his private law firm, Madigan & Getzendanner.

8.    On or about September 7, 2017, after Alderman A informed MADIGAN that he would soon be taking official action on the Apartment project, and asked MADIGAN whether MADIGAN's law firm had received business from Company C: "I'm gonna be deciding on this development . . . . I told you, I think before, that I'm very likely to do it. . . . . But I wanted to know if you had done anything with them yet," MADIGAN responded, "I'm almost positive the answer is yes," but asked Alderman A for an opportunity to "double check with my partner."

9.    On or about September 11, 2017, after Alderman A asked MADIGAN during a telephone call whether Company C "had . . . contacted your firm or not," MADIGAN, using vague language to conceal the nature and significance of his instruction, told Alderman A, "Umm, you know, you should go ahead and process that. . . . You were contemplating processing something.   You should go ahead and process that."

10.    Beginning no later than in or around June 2017 and continuing through in or around September 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL J. MADIGAN,

defendant herein, did knowingly attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that MADIGAN attempted to obtain property, namely, fees arising from the retention of MADIGAN's law firm, Madigan &

84

Getzendanner, to be paid by Company C, with the consent of Company C, induced under color of official right;

In violation of Title 18, United States Code, Section 1951(a) and 2.

## COUNT SIXTEEN

The SPECIAL APRIL 2021 GRAND JURY further charges:

On or about June 23, 2017, at approximately 4:58 p.m. (Session #34338), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MICHAEL J. MADIGAN,

defendant herein, caused the use of a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-0292, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 18 U.S.C. § 1951(a) (extortion) and Chapter 720 Illinois Compiled Statutes § 5/16-1(a) (theft), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT SEVENTEEN

The SPECIAL APRIL 2021 GRAND JURY further charges:

On or about July 12, 2017, at approximately 1:51 p.m. (Session #35528), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MICHAEL J. MADIGAN,

defendant herein, caused the use of a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-0292, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 18 U.S.C. § 1951(a) (extortion) and Chapter 720 Illinois Compiled Statutes § 5/16-1(a) (theft), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT EIGHTEEN

The SPECIAL APRIL 2021 GRAND JURY further charges:

On or about July 19, 2017, at approximately 5:42 p.m., at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MICHAEL J. MADIGAN,

defendant herein, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by the service provider Network Solutions to send an email to Individual C-1, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 18 U.S.C. § 1951(a) (extortion) and Chapter 720 Illinois Compiled Statutes § 5/16-1(a) (theft), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT NINETEEN

The SPECIAL APRIL 2021 GRAND JURY further charges:

1.      Paragraphs 1(a) through 1(g), 1(k), 1(m), 6, and 8 of Count One of this indictment are realleged and incorporated here.

2.      At times material to Count Nineteen of this indictment:

### Relevant Entities and Individuals

a.      The State of Illinois owned a parcel of land located in Chicago's Chinatown neighborhood (the "Chinatown parcel") that was used to operate a parking lot accessible to the community.

b.      A group of individuals ("Group A") sought to develop the Chinatown parcel and the adjacent area by converting the parking lot into a commercial development which would include a hotel.    In order to move forward with this development, Group A sought to have the State of Illinois transfer ownership of the Chinatown parcel to the City of Chicago, so that Group A could in turn acquire the Chinatown parcel from the City and thereafter develop it and the adjacent area.

c.      Lobbyist 1 was engaged in the practice of lobbying public officials in the legislative and executive branches of the State of Illinois.

d.      Representative A and Representative B were elected members of the House of Representatives.

e.      The Illinois Department of Transportation was responsible for planning, construction, operation, and maintenance of the State of Illinois's

transportation network.    Part of the duties of the Illinois Department of Transportation included seeking the introduction of bills in the Illinois General Assembly, known as land transfer bills or land use bills, that authorized the transfer of surplus State-owned real property.    Such land transfer bills would provide for the State to sell or transfer the property to a third party on the terms specified therein.

f.    The Illinois Secretary of Transportation was the chief executive officer within the Illinois Department of Transportation.

g.    The Office of the Illinois Secretary of State, headed by the Secretary of State, was responsible for, among other things, issuing driver's licenses, registering vehicles, and promoting traffic safety.

3.    Beginning on or about July 18, 2017, and continuing to in or around January 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL J. MADIGAN and
MICHAEL F. McCLAIN,

defendants herein, together with others known and unknown to the Grand Jury, knowingly devised, intended to devise, and participated in a scheme to defraud the people of the State of Illinois of the intangible right to the honest services of MADIGAN through bribery and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme is further described below.

4.    It was part of the scheme that MADIGAN agreed to use his position as Speaker of the House to assist with and cause the passage of legislation providing for the transfer of the Chinatown parcel with the understanding that, in exchange, legal work

90

would be steered to his private law firm, Madigan & Getzendanner, which would generate legal fees that personally benefitted MADIGAN.

### MADIGAN Assigns McCLAIN to Work on the Transfer of the Chinatown Parcel

5.    It was further part of the scheme that on or about July 18, 2017, MADIGAN discussed with Alderman A the transfer of the Chinatown parcel from the State of Illinois to the City of Chicago so that Group A could in turn acquire the Chinatown parcel from the City of Chicago for the purposes of commercially developing the parcel.

6.    It was further part of the scheme that on or about September 7, 2017, MADIGAN advised Alderman A that the decision to transfer the Chinatown parcel was in the "hands of" the Illinois Department of Transportation, and that MADIGAN would find somebody to talk to the Illinois Department of Transportation.

7.    It was further part of the scheme that, on or about September 13, 2017, MADIGAN obtained the telephone number of a member of Group A from Alderman A, and instructed Alderman A to tell this individual that McCLAIN would be in contact in one or two days.

8.    It was further part of the scheme that, on or about September 13, 2017, McCLAIN contacted a member of Group A for the purpose of discussing the transfer of the Chinatown parcel.

9.    It was further part of the scheme that, on or about November 14, 2017, McCLAIN met with Alderman A and, thereafter, with members of Group A to discuss the transfer of the Chinatown parcel.

10.    It was further part of the scheme that, on or about December 15, 2017, McCLAIN and Alderman A discussed McCLAIN's plan to involve Lobbyist 1 in the effort to transfer the Chinatown parcel, owing to Lobbyist 1's useful contacts within the Governor's administration.

### MADIGAN and McCLAIN Are Told MADIGAN Will Receive Tax Work in Exchange for Assisting with the Transfer of the Chinatown Parcel

11.    It was further part of the scheme that, on or about December 18, 2017, after McCLAIN was informed by Alderman A that "In the past, I have been able to steer some work to Mike [MADIGAN], and these guys will do the same thing," McCLAIN agreed that MADIGAN would assist with the transfer of the Chinatown parcel.

12.    It was further part of the scheme that, in or around late 2017, McCLAIN indicated to Lobbyist 1 that MADIGAN would not block any bill providing for the transfer of the Chinatown parcel from passage in the House of Representatives.

13.    It was further part of the scheme that, on or about March 26, 2018, after Alderman A told MADIGAN that "I've been around for a long time.    I can be discreet," and that Group A would provide MADIGAN with property tax work for the Chinatown parcel, MADIGAN thanked Alderman A, and agreed to follow up on matters relating to the transfer of the Chinatown parcel, to include having McCLAIN communicate with the sponsor of an already-filed land transfer bill that could be amended to also provide for the transfer of the Chinatown parcel.

14.    It was further part of the scheme that, on or about March 27, 2018, after Alderman A told MADIGAN that, if MADIGAN could take care of the transfer of the

Chinatown parcel, Group A would "appreciate it" and give MADIGAN tax work for his private law firm, MADIGAN said, "Okay, alright, very good."

### MADIGAN and McCLAIN Work to Overcome Opposition to the Transfer of the Chinatown Parcel

15.    It was further part of the scheme that, between on or about April 17, 2018, and on or about April 18, 2018, McCLAIN discussed with Lobbyist 1 how to overcome the obstacle posed by State Senator A, who was believed to oppose legislation providing for the transfer of the Chinatown parcel to the City of Chicago, so that the land could thereafter be transferred to Group A.

16.    It was further part of the scheme that, on or about April 24, 2018, after confirming that MADIGAN was using a private telephone, McCLAIN reported that "we got troubles" concerning the transfer of the Chinatown parcel, and MADIGAN suggested that a "big delegation" from Chinatown visit State Senator A and another senator who were believed to oppose legislation providing for the transfer of the Chinatown parcel.

17.    It was further part of the scheme that, on or about April 25, 2018, McCLAIN told Alderman A and Lobbyist 1 about MADIGAN's suggestion to have a delegation from Chinatown visit two State senators to persuade them to remove their opposition to the transfer of the Chinatown parcel.

18.    It was further part of the scheme that, on or about May 16, 2018, MADIGAN asked McCLAIN for a report on McCLAIN's progress in arranging for the transfer of the Chinatown parcel, and McCLAIN explained that he was in the process of

having information concerning the Chinatown parcel delivered to a member of MADIGAN's legislative staff.

19. It was further part of the scheme that on or about May 28, 2018, for the purpose of concealing MADIGAN's participation in the illegal activity and making it appear that MADIGAN was uninvolved in efforts to transfer the Chinatown parcel, McCLAIN told MADIGAN's staff member to make sure MADIGAN voted "present" on the bill concerning the transfer of the Chinatown parcel because the bill concerned "a developer of his," and based on McCLAIN's questions concerning the insertion of language concerning the Chinatown parcel into a bill, the staff member offered to follow up with Lobbyist 1 concerning the additional language authorizing the transfer of the Chinatown parcel that needed to be added to a pending land transfer bill.

20. It was further part of the scheme that, on or about May 30, 2018, McCLAIN advised MADIGAN's chief of staff that State Senator A had put a "brick" on the transfer of the Chinatown parcel in the Senate, meaning that any bill providing for the transfer of the Chinatown parcel would not pass in the Senate.

21. It was further part of the scheme that, on or about May 31, 2018, McCLAIN left a message for MADIGAN and reported that "we have had many hurdles" concerning the transfer of the Chinatown parcel, that the Illinois Secretary of Transportation was opposed to the transfer of the Chinatown parcel, and that Lobbyist 1 was still attempting to "find a vehicle" for the transfer of the Chinatown parcel.

94

22.     It was further part of the scheme that, on or about May 31, 2018, MADIGAN called McCLAIN, and instructed McCLAIN to "put the file in the drawer for a while" due to the opposition mounted by the Secretary of Transportation and others to legislation concerning the transfer of the Chinatown parcel.

23.     It was further part of the scheme that, on or about May 31, 2018, after Alderman A advised McCLAIN that the amendment to Representative A's bill authorizing the transfer of the Chinatown parcel had been filed and indicated his understanding that the plan was to have the legislation considered during the General Assembly's upcoming fall veto session, McCLAIN agreed, and explained that he expected the Secretary of Transportation to have found "another job and be gone" by that time, and that MADIGAN was "fine with that" plan.

### MADIGAN and McCLAIN Identify and Secure a Sponsor in the House for a Bill Concerning the Transfer of the Chinatown Parcel

24.     It was further part of the scheme that, on or about June 20, 2018, MADIGAN explained to Alderman A that "in all likelihood" the Secretary of Transportation would no longer be in office after the election in early November 2018, and in response to Alderman A's request for MADIGAN's intervention either in November 2018 or January 2019 to ensure the passage of legislation concerning the Chinatown parcel, MADIGAN agreed to get it done.

25.     It was further part of the scheme that, on or about June 22, 2018, based on MADIGAN's request for information, McCLAIN asked for additional information from Lobbyist 1 in relation to the transfer of the Chinatown parcel.

95

26.     It was further part of the scheme that, on or about July 31, 2018, McCLAIN advised Alderman A that McCLAIN had talked to MADIGAN about the transfer of the Chinatown parcel the previous week, and that McCLAIN did not anticipate any problems with passing legislation authorizing the transfer of the Chinatown parcel in the fall.

27.     It was further part of the scheme that, on or about August 7, 2018, McCLAIN discussed with Lobbyist 1 finding a different sponsor for the land transfer bill and the amendment authorizing the transfer of the Chinatown parcel in the House of Representatives, owing to the fact that Representative A did not support the transfer of the Chinatown parcel.

28.     It was further part of the scheme that, on or about October 26, 2018, MADIGAN advised Alderman A of his willingness to call legislation concerning the Chinatown parcel for a vote in the House during the veto session, and told Alderman A, "I have to find out about . . . . who would be the proponent in the House.    We gotta find the appropriate person for that.    I have to think it through."

29.     It was further part of the scheme that, on or about November 2, 2018, MADIGAN told McCLAIN that "we never settled on a sponsor" for the bill concerning the transfer of the Chinatown parcel, and MADIGAN told McCLAIN that Representative B would be a suitable sponsor for the bill in the House of Representatives because Representative B's seat was within the Senate district that included the Chinatown parcel.

30. It was further part of the scheme that, on or about November 7, 2018, McCLAIN left a voicemail message for Representative B, in which McCLAIN asked Representative B to sponsor the bill providing for the transfer of the Chinatown parcel in the House of Representatives.

31. It was further part of the scheme that, on or about November 8, 2018, McCLAIN told Representative B that "a friend of ours [MADIGAN] talked to me and said that, since you're the other half of that Senate district ... the thought was that maybe that they would hand the bill over to you and that you'd be the chief sponsor," and Representative B agreed to sponsor the bill.

32. It was further part of the scheme that, on or about November 10, 2018, McCLAIN sent an email to Lobbyist 1, in which McCLAIN asked Lobbyist 1 if Lobbyist 1 had talked to Representative B about moving sponsorship of the land transfer bill to Representative B, and whether there were any problems with moving the bill to Representative B.

33. It was further part of the scheme that, on or about November 11, 2018, MADIGAN and McCLAIN caused Lobbyist 1 to email Representative B a copy of the proposed amendment to the land transfer bill introduced by Representative A that would provide for the transfer of the Chinatown parcel to the City of Chicago.

34. It was further part of the scheme that, on or about November 21, 2018, McCLAIN advised Alderman A that a "major hurdle" to passage of legislation concerning the Chinatown parcel had arisen, in that the Illinois Secretary of State had

97

received petitions from local businesspeople in Chinatown who were opposed to the transfer of the Chinatown parcel, and that the Illinois Secretary of State had reached out to leadership in the Senate to express opposition to the transfer.

35. It was further part of the scheme that, on or about November 23, 2018, after Alderman A advised MADIGAN that there was opposition to legislation providing for the transfer of the Chinatown parcel and that it was best to wait until after upcoming elections and attempt to pass the legislation in May 2019, MADIGAN agreed to do so.

36. It was further part of the scheme that, on or about November 23, 2018, MADIGAN confirmed with McCLAIN that the bill to transfer the Chinatown parcel would not go forward in the General Assembly's veto session.

37. It was further part of the scheme that MADIGAN and McCLAIN concealed, misrepresented, and hid and caused to be concealed, misrepresented and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme.

38. On or about November 10, 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL J. MADIGAN and
MICHAEL F. McCLAIN,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by wire communication in interstate commerce certain writings, signs, and signals, namely, an email from McCLAIN to Lobbyist 1, in which McCLAIN asked if Lobbyist 1 had talked to Representative B about moving sponsorship of a land transfer

bill to Representative B, and whether there were any problems with moving the bill to

Representative B, which email was processed through servers outside Illinois;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT TWENTY

The SPECIAL APRIL 2021 GRAND JURY further charges:

1. Paragraphs 1 through 37 of Count Nineteen of this indictment are realleged and incorporated here.

2. On or about November 11, 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL J. MADIGAN and
MICHAEL F. McCLAIN,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by wire communication in interstate commerce certain writings, signs, and signals, namely, an email from Lobbyist 1 to Representative B, which contained a copy of the language of the proposed amendment to a land transfer bill providing for the transfer of the Chinatown parcel, which email was processed through servers located outside Illinois;

In violation of Title 18, United States Code, Sections 1343 and 1346.

100

## COUNT TWENTY-ONE

The SPECIAL APRIL 2021 GRAND JURY further charges:

1.      Paragraphs 1 and 2 of Count Nineteen of this indictment are realleged and incorporated here.

2.      Beginning in or around July 2017, and continuing until in or around November 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL J. MADIGAN and
MICHAEL F. McCLAIN,

defendants herein, with MADIGAN being an agent of the State of Illinois, corruptly solicited and demanded, and agreed to accept things of value, namely, fees arising from the retention of MADIGAN's law firm, Madigan & Getzendanner, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, a bill authorizing the transfer of the Chinatown parcel;

In violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

## COUNT TWENTY-TWO

The SPECIAL APRIL 2021 GRAND JURY further charges:

On or about November 2, 2018, at approximately 2:10 p.m. (Session #14490), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MICHAEL J. MADIGAN and
### MICHAEL F. McCLAIN,

defendants herein, caused the use of a facility in interstate commerce, namely, a telephone assigned telephone number (773) XXX-7700, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of Chapter 720 Illinois Compiled Statutes § 5/33-1(a) (bribery), Chapter 720 Illinois Compiled Statutes § 5/33-1(d) (bribery), Chapter 720 Illinois Compiled Statutes § 5/33-1(e) (bribery), and Chapter 720 Illinois Compiled Statutes § 5/33-8 (legislative misconduct), and thereafter, the defendants did perform, did cause to be performed, and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

102

## FORFEITURE ALLEGATION ONE

The SPECIAL APRIL 2021 GRAND JURY alleges:

1.     The allegations contained in Count One of the indictment are realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 1963(a)(3).

2.     As a result of the violation of Title 18, United States Code, Section 1962(d), as alleged in the foregoing indictment,

MICHAEL J. MADIGAN and
MICHAEL F. McCLAIN,

defendants herein, have property constituting, and derived from, proceeds which were obtained, directly and indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962.

3.     The interests of the defendants subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3), include but are not limited to approximately $2,850,337.

4.     To the extent that the property described above as being subject to forfeiture pursuant to Title 18, United States Code, Section 1963(a)(3), as a result of any act or omission by the defendants:

   a. cannot be located upon the exercise of due diligence;

   b. have been transferred or sold to, or deposited with, a third party;

   c. have been placed beyond the jurisdiction of the Court;

   d. have been substantially diminished in value; or

103

    e.  have been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to Title 18, United States Code, Section 1963(m) to seek forfeiture of any other property of the defendant up to the value of the property described above as being subject to forfeiture;

  All pursuant to Title 18, United States Code, Section 1963(a)(3).

## FORFEITURE ALLEGATION TWO

The SPECIAL APRIL 2021 GRAND JURY further alleges:

1.      Counts Two through Twenty-Two of this indictment are incorporated here for the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.      As a result of the offenses charged in Counts Two through Twenty-Two of this indictment,

MICHAEL J. MADIGAN and
MICHAEL F. McCLAIN,

defendants herein, shall forfeit to the United States any and all right, title, and interest they have in any property, real and personal, which constitutes or is derived from proceeds traceable to the offenses in Counts Two through Twenty-Two.

3.      The interests of defendants subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) as incorporated by Title 28, United States Code, Section 2461(c), include but are not limited to approximately $2,827,837.

4.      If, as a result of any act or omission by the defendants, any of the forfeitable property described above:

   a.      cannot be located upon the exercise of due diligence;

   b.      has been transferred or sold to, or deposited with, a third party;

   c.      has been placed beyond the jurisdiction of the Court;

   d.      has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____

FOREPERSON

_____

UNITED STATES ATTORNEY

106