**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 22-CR-00115 |
| v. | ) | |
| | ) | Honorable John Robert Blakey |
| MICHAEL J. MADIGAN and | ) | |
| MICHAEL F. McCLAIN, | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MICHAEL J. MADIGAN'S**
**MOTION TO DISMISS CERTAIN COUNTS OF THE SUPERSEDING INDICTMENT**

**Table of Contents**

Preliminary Statement ................................................................................................ 1

The Superseding Indictment ...................................................................................... 3

    I.     RICO Conspiracy ................................................................................ 4

    II.    Solicitation of Jobs from Utilities ..................................................... 5

        A.    ComEd ......................................................................................... 5

        B.    AT&T ............................................................................................ 6

    III.   Solicitation of Business for Madigan's Law Firm ............................ 6

        A.    Company A .................................................................................. 7

        B.    Company C .................................................................................. 7

        C.    Chinatown Parking Lot .............................................................. 7

Legal Standard .......................................................................................................... 8

Argument .................................................................................................................. 9

    I.     The RICO Conspiracy Charge (Count One) Must Be Dismissed ......... 9

        A.    Count One Does Not Allege a RICO Enterprise. ..................... 10

        B.    Count One Does Not Allege That Madigan and McClain Agreed to Conduct or Participate in the Affairs of an Enterprise. ............................ 14

        C.    Count One Charges Racketeering Activity Predicated on Unconstitutional State Statutes. ................................................................ 17

            1.    The Illinois Bribery and Official Misconduct Statutes Are Facially Overbroad in Violation of the First and Fourteenth Amendments. ................................................................................. 19

            2.    The Illinois Bribery and Official Misconduct Statutes Are Facially Vague in Violation of the Fifth and Fourteenth Amendments. ................................................................................. 26

            3.    The Illinois Bribery and Official Misconduct Statutes Are Void for Vagueness as Applied to Madigan. ............................... 29

            4.    The Illinois Bribery and Official Misconduct Statutes Cannot Be Sufficiently Narrowed by Judicial Construction. .................... 34

i

II. ComEd ......................................................................................... 34

    A. The Federal Program Bribery Charges Related to ComEd (Counts Two, Three, Four, and Six) Must Be Dismissed ........................................ 34

        1. Charges Based on a Bribery Theory Must Be Dismissed. ........... 36

        2. Charges Based on a Gratuity Theory Must Also Be Dismissed. ................................................................................... 45

        3. Section 666 Charges Must Be Dismissed Under the Rule of Lenity. ................................................................................... 48

        4. Without a *Quid Pro Quo* Requirement for Bribes or a Link for Gratuities, § 666 Is Unconstitutional. ............................................. 49

        5. Counts Two (in Part) and Three Must Be Dismissed Because the Alleged Bribes Were Bona Fide Salaries Under § 666(c). ..... 54

    B. The Travel Act Charges Related to ComEd (Counts Five and Seven) Must Be Dismissed. ......................................................... 57

III. Company A ...................................................................................... 57

    A. The Federal Program Bribery Charge Related to Company A (Count Eleven) Must Be Dismissed. ..................................................... 57

    B. The Travel Act Charges Related to Company A (Counts Twelve, Thirteen, and Fourteen) Must Be Dismissed. ............................................ 58

IV. Chinatown Parking Lot .................................................................... 58

    A. The Federal Program Bribery Charge Related to the Chinatown Parking Lot (Count Twenty-One) Must Be Dismissed. ............................... 58

    B. The Travel Act Charge Related to the Chinatown Parking Lot (Count Twenty-Two) Must Be Dismissed. ............................................... 59

V. The Conspiracy Charge Related to AT&T (Count Twenty-Three) Must Be Dismissed. ................................................................................... 59

    A. Count Twenty-Three Fails to Allege that Madigan Was Aware of and Agreed to Commit a Corrupt Exchange in Violation of § 666. ......... 60

    B. The Court Should Apply the Rule of Lenity to Dismiss Count Twenty-Three. ................................................................... 62

    C. Count Twenty-Three Must Be Dismissed as Unconstitutional. ................ 62

Conclusion ............................................................................................ 63

**Table of Authorities**

**Cases**                                                **Page(s)**

*Baker v. IBP, Inc.*,
357 F.3d 685 (7th Cir. 2004) ................................................................................10

*Bell v. Keating*,
697 F.3d 445 (7th Cir. 2012) .................................................................... *passim*

*Bible v. United Student Aid Funds, Inc.*,
799 F.3d 633 (7th Cir. 2015) ........................................................................14, 16

*Bobb v. Swartz–Retson P.C.*,
2018 WL 4384292 (N.D. Ill. Sept. 14, 2018) ........................................................16

*Boyle v. United States*,
556 U.S. 938 (2009)................................................................................10, 11

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973).........................................................................................34

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)........................................................................................36

*City of Houston, Tex. v. Hill*,
482 U.S. 451 (1987)........................................................................................20

*Crichton v. Golden Rule Ins. Co.*,
576 F.3d 392 (7th Cir. 2009) ...............................................................................14

*Farrell v. Burke*,
449 F.3d 470 (2d Cir. 2006)...................................................................... *passim*

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....................................................................26, 27, 51, 52

*Forsyth County, Ga. v. Nationalist Movement*,
505 U.S. 123 (1992)........................................................................................20

*Goren v. New Vision Int'l, Inc.*,
156 F.3d 721 (7th Cir. 1998) ...............................................................................14

*Grayned v. City of Rockford*,
408 U.S. 104 (1972).........................................................................................53

*Guaranteed Rate, Inc. v. Barr*,
912 F. Supp. 2d 671 (N.D. Ill. 2012) ............................................................10, 16

*Hamling v. United States*,
 418 U.S. 87 (1974) ............................................................................................. 8

*Holder v. Humanitarian L. Project*,
 561 U.S. 1 (2010) ............................................................................................. 29

*Hynes v. Mayor and Council of Borough of Oradell*,
 425 U.S. 610 (1976) ......................................................................................... 26

*Maracich v. Spears*,
 570 U.S. 48 (2013) ........................................................................................... 50

*McCormick v. United States*,
 500 U.S. 257 (1991) ......................................................................................... 34

*McDonnell v. United States*,
 579 U.S. 550 (2016) ................................................................................. *passim*

*Menzies v. Seyfarth Shaw LLP*,
 197 F. Supp. 3d 1076 (N.D. Ill. 2016) ............................................................. 10

*Mont v. United States*,
 139 S. Ct. 1826 (2019) ..................................................................................... 50

*NAACP v. Button*,
 371 U.S. 415 (1963) ......................................................................................... 20

*Oberoi v. Mehta*,
 2011 WL 1337107 (N.D. Ill. Apr. 6, 2011) ..................................................... 16

*Ocasio v. United States*,
 578 U.S. 282 (2016) .................................................................................... 45, 60

*People v. Johnson*,
 780 N.E.2d 803 (Ill. App. Ct. 2002) ................................................................ 28

*People v. Jordan*,
 304 N.E.2d 713 (Ill. App. Ct. 1973) ................................................................ 28

*People v. Kleffman*,
 412 N.E.2d 1057 (Ill. App. Ct. 1980) .............................................................. 26

*Rao v. BP Products North America, Inc.*,
 589 F.3d 389 (7th Cir. 2009) .................................................................. 11, 13, 14

*Reves v. Ernst & Young*,
 507 U.S. 170 (1993) ......................................................................................... 14

*Sabri v. United States*,
    541 U.S. 600 (2004)..............................................................................................39

*Salinas v. United States*,
    522 U.S. 52 (1997)...........................................................................................31, 39

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)..............................................................................................10

*Shaw v. United States*,
    580 U.S. 63 (2016)................................................................................................48

*Shearson/American Express, Inc. v. McMahon*,
    482 U.S. 220 (1987)..............................................................................................10

*Skilling v. United States*,
    561 U.S. 358 (2010)....................................................................................... *passim*

*United Food & Commercial Workers Unions and Employers Midwest Health
    Benefits Fund v. Walgreen Co.*,
    719 F.3d 849 (7th Cir. 2013) ......................................................................... *passim*

*United States v. Agostino*,
    132 F.3d 1183 (7th Cir. 1997) .........................................................................41, 42

*United States v. Allen*,
    10 F.3d 405 (7th Cir. 1993) .............................................................................44, 45

*United States v. Baranski*,
    484 F.2d 556 (7th Cir. 1973) ................................................................................62

*United States v. Blagojevich*,
    794 F.3d 729 (7th Cir. 2015) ................................................................................54

*United States v. Boender*,
    649 F.3d 650 (7th Cir. 2011) ......................................................................... *passim*

*United States v. Brown*,
    973 F.3d 667 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1253 (2021)....................9, 10

*United States v. Burke*,
    Case No. 19-CR-322, 2022 WL 1970189 (N.D. Ill. June 6, 2022) .....................24, 26, 29, 41

*United States v. ComEd*,
    Case No. 20-CR-368 (N.D. Ill. July 17, 2020), ECF No. 3 ...............................55, 56

*United States v. Cook*,
    970 F.3d 866 (7th Cir. 2020) ................................................................................29

*United States v. Coscia*,
    866 F.3d 782 (7th Cir. 2017) ........................................................................ *passim*

*United States v. Davis*,
    139 S. Ct. 2319 (2019) ......................................................................26, 34, 52

*United States v. Donagher*,
    520 F. Supp. 3d 1034 (N.D. Ill. 2021) ..............................................................8, 41

*United States v. Fernandez*,
    722 F.3d 1 (1st Cir. 2013) ...................................................................................46

*United States v. Ganim*,
    510 F.3d 134 (2d Cir. 2007) ......................................................................42, 47, 50

*United States v. Gee*,
    432 F.3d 713 (7th Cir. 2005) ..................................................................40, 41, 42

*United States v. Gimbel*,
    830 F.2d 621 (7th Cir. 1987) ..............................................................................9

*United States v. Hamilton*,
    46 F.4th 389 (5th Cir. 2022) ..............................................................................45

*United States v. Hawkins*,
    777 F.3d 880 (7th Cir. 2015) ........................................................................ *passim*

*United States v. Hawkins*,
    Case No. 12-CR-528 (N.D. Ill. Oct. 25, 2013), ECF No. 107 ................................40

*United States v. Huet*,
    665 F.3d 588 (3d Cir. 2012) ..............................................................................9

*United States v. Isaacs*,
    493 F.2d 1124 (7th Cir. 1974) ..........................................................................24

*United States v. Jarigese*,
    Case No. 17-CR-656-2 (N.D. Ill. May 16, 2019), ECF No. 131 ...........................41

*United States v. Jennings*,
    160 F.3d 1006 (4th Cir. 1998) ........................................................................ *passim*

*United States v. Johnson*,
    621 F.2d 1073 (10th Cir. 1980) ........................................................................36

*United States v. Jones*,
    689 F.3d 696 (7th Cir. 2012) ............................................................................26

*United States v. Kelerchian,*
    937 F.3d 895 (7th Cir. 2019) ......................................................45, 60

*United States v. Lanier,*
    520 U.S. 259 (1997).......................................................29, 34, 52, 62

*United States v. Lindberg,*
    39 F.4th 151 (4th Cir. 2022) ........................................................46, 51

*United States v. Mann,*
    172 F.3d 50, 1999 WL 17647 (6th Cir. 1999) ........................................54

*United States v. Marcotte,*
    835 F.3d 652 (7th Cir. 2016) ..............................................................48

*United States v. McClain,*
    Case No. 20-CR-812, 2022 WL 488944 (N.D. Ill. Feb. 17, 2022).........................41

*United States v. McClain,*
    Case No. 20-CR-812 (N.D. Ill. Nov. 18, 2020), ECF No. 1 ..............................16, 17

*United States v. McNair,*
    605 F.3d 1152 (11th Cir. 2010) ...........................................................43

*United States v. Medley,*
    913 F.2d 1248 (7th Cir. 1990) ............................................................41

*United States v. Mills,*
    140 F.3d 630 (6th Cir. 1998) ........................................................54, 56

*United States v. Mullins,*
    800 F.3d 866 (7th Cir. 2015) ........................................................41, 42

*United States v. Ng Lap Seng,*
    934 F.3d 110 (2d Cir. 2019).................................................................51

*United States v. Olson,*
    450 F.3d 655 (7th Cir. 2006) ...............................................................9

*United States v. Panarella,*
    277 F.3d 678 (3d Cir. 2002).................................................................9

*United States v. Patel,*
    778 F.3d 607 (7th Cir. 2015) ..............................................................48

*United States v. Pirro,*
    212 F.3d 86 (2d Cir. 2000)...................................................................8

*United States v. Porter*,
  886 F.3d 562 (6th Cir. 2018) ........................................................................51

*United States v. Redzic*,
  627 F.3d 683 (8th Cir. 2010) ........................................................................43

*United States v. Resendiz–Ponce*,
  549 U.S. 102 (2007)............................................................................ *passim*

*United States v. Ring*,
  706 F.3d 460 (D.C. Cir. 2013) ......................................................................61

*United States v. Risk*,
  843 F.2d 1059 (7th Cir. 1988) ........................................................55, 56, 57

*United States v. Roberson*,
  998 F.3d 1237 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1109 (2022)............42, 51

*United States v. Robinson*,
  663 F.3d 265 (7th Cir. 2011) ........................................................54, 56, 57

*United States v. Rosen*,
  716 F.3d 691 (2d Cir. 2013)..........................................................................43

*United States v. Stevens*,
  559 U.S. 460 (2010).............................................................................19, 50

*United States v. Sun–Diamond Growers of Cal.*,
  526 U.S. 398 (1999)............................................................................ *passim*

*United States v. Tamras–Martin*,
  Case No. 18-CR-267-2 (N.D. Ill. Feb. 17, 2019), ECF No. 63 ...............38, 40, 41

*United States v. Tello*,
  687 F.3d 785 (7th Cir. 2012) ........................................................................31

*United States v. Thirty-Seven (37) Photographs*,
  402 U.S. 363 (1971)......................................................................................34

*United States v. White*,
  610 F.3d 956 (7th Cir. 2010) ..........................................................................8

*United States v. Williams*,
  553 U.S. 285 (2008)..........................................................................19, 20, 50

*Wash. St. Grange v. Wash. St. Republican Party*,
  552 U.S. 442 (2008)..........................................................................19, 50

*Wis. Right to Life, Inc. v. Barland,*
  751 F.3d 804 (7th Cir. 2014) ............................................................26, 27, 51, 52

*Wooden v. United States,*
  142 S. Ct. 1063 (2022) ............................................................................................48

**Statutes**

720 ILCS § 5/33-1 ........................................................................................... *passim*

720 ILCS § 5/33-3(a)(4) ................................................................................. *passim*

720 ILCS § 5/33-8 ................................................................................................4, 18

720 ILCS § 645/1 ................................................................................................4, 18

18 U.S.C. § 2 ........................................................................................................3, 4

18 U.S.C. § 201 ............................................................................................... *passim*

18 U.S.C. § 371 ............................................................................................... *passim*

18 U.S.C. § 666 ............................................................................................... *passim*

18 U.S.C. § 1343 ..................................................................................................4, 7, 8

18 U.S.C. § 1346 ..................................................................................................4, 7, 8

18 U.S.C. § 1951 ....................................................................................................4, 7

18 U.S.C. § 1952 ............................................................................................ *passim*

18 U.S.C. § 1961 *et seq*.................................................................................. *passim*

**Rules**

Fed. R. Crim. Proc. 7(d) .................................................................................. *passim*

Fed. R. Crim. Proc. 12(b)(3)(B)(v) ................................................................ *passim*

**Other Authorities**

Email from M. McClain to Exelon employee on July 16, 2016, regarding "Aaron
  Winters R[e]sume." Publicly available at:
  https://www.ilga.gov/house/committees/101Documents/BSPE/2016.07.16%2
  0COMED-SIC-0000154.pdf ............................................................................33

Email from M. McClain to F. Marquez on January 19, 2016, regarding "Did we hire Tom Walsh? Under [REDACTED]? Best, Mike." Publicly available at: https://ilga.gov/house/committees/101Documents/BSPE/2016.01.19%20COMED-SIC-0000109.pdf ............................................................................................32

Email from M. McClain to F. Marquez on November 6, 2015, regarding "Walsh's Resume." Publicly available at: https://ilga.gov/house/committees/101Documents/BSPE/2015.11.09%20COMED-SIC-0000105.pdf ............................................................................................32

House Roll Call for Senate Bill 2814, 99th General Assembly for the State of Illinois (Dec. 1, 2016). Publicly available at: https://www.ilga.gov/legislation/votehistory/99/house/09900SB2814_12012016_007000T.pdf ............................................................................................32

Illinois Lobbying Entity Registration filed with the Illinois Secretary of State by Advantage Government Strategies, LLC (Entity ID 7846) in 2016. Publicly available at: https://apps.ilsos.gov/lobbyistsearch/ ....................................................33

Illinois Lobbying Entity Registration filed with the Illinois Secretary of State by Thomas J. Walsh (Entity ID 3397) in 2016. Publicly available at: https://apps.ilsos.gov/lobbyistsearch/ ....................................................................32

Illinois Lobbying Entity Registration filed with the Illinois Secretary of State by The Winters Group, LLC (Entity ID 7920) in 2017. Publicly available at: https://apps.ilsos.gov/lobbyistsearch/ ....................................................................33

Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947 (1970) ............................................................................................10

S. REP. No. 98-225 (1983) ............................................................................................38

U.S. Const. Amendment I ................................................................................ passim

U.S. Const. Amendment V ............................................................................... passim

U.S. Const. Amendment VI ......................................................................45, 47, 62

U.S. Const. Amendment XIV ........................................................................ passim

**Preliminary Statement**

After years of investigation, thousands of hours of wiretaps and consensual recordings, wide-ranging searches of homes and offices, and countless witness interviews, the government's case against Michael J. Madigan comes down principally to this: He recommended people for jobs with ComEd and AT&T while legislation of interest to those utilities was pending before the Illinois House of Representatives. Roughly half of the sprawling Superseding Indictment charges Madigan with criminal conduct on that basis. It alleges that he had the capacity to and did promote or defeat legislation consistent with the interests of ComEd and AT&T; and that— after more than a decade of investigation, during which time Madigan made countless job recommendations for innumerable candidates to ComEd, AT&T, and elsewhere—four of those candidates (which do not reflect all, most, or even many of Madigan's recommendations) did "little or no" work once hired.

What the Superseding Indictment does not allege, however, is a *connection* between the job hires or any other benefits that Madigan purportedly received and any legislative decision that Madigan made. In 117 pages, the Superseding Indictment does not allege a single word spoken to or by Madigan linking these simple job recommendations to any legislative act by him. Nor does it more generally allege that Madigan took or refrained from taking (or agreed to take, or refrain from taking) legislative action because of, in exchange for, or resulting from any hiring decisions made by ComEd and AT&T. The government carefully avoids any such factual allegation. Instead it asserts, in the most conclusory terms, that Madigan "accepted" job hires "intending to be influenced" in connection with legislation affecting the utilities, on which he voted "in furtherance" and to "effect [the] objects and purposes" of a conspiracy to influence him.

1

These allegations do not state a federal crime. Instead, what they describe is a commonplace practice in which public officials and party leaders make job recommendations for constituents and associates to employers within their jurisdictions. Those employers may (and often do) accept such recommendations, and they may well do so in an effort to curry favor with the officials in question. But currying favor with government officials—even those with the capacity to influence legislation of interest to the employers—is legal. "Accepting" job hires made by employers, even if they were made with the desire to curry favor, is legal. In contrast, corruptly soliciting something of value in return for official action is not. The Superseding Indictment blurs that distinction entirely, rendering its cornerstone allegations involving ComEd and AT&T deficient under the corruption statutes and constitutionally untenable.

The remaining counts of the Superseding Indictment target conduct unrelated to ComEd and AT&T, alleging behavior involving real estate projects and Madigan's private law firm. Some of those counts fall short because of defects in the statutes the government invokes and the thinness of the allegations.

One overarching failure stands out, however: the government's effort to allege a single, all-encompassing RICO charge in Count One. That count purports to graft together, into a RICO conspiracy, one half of the Superseding Indictment (alleging misconduct involving ComEd and AT&T) with the other half (alleging misconduct involving Madigan's law firm). But the alleged facts, purposes, and major players at issue in the two halves of the Superseding Indictment are wholly distinct. A RICO enterprise requires a common purpose. On the face of the Superseding Indictment, no such common purpose is alleged. Whatever may have been the government's reason for cobbling disparate claims together—whether to bolster its cornerstone ComEd/AT&T allegations, or otherwise—it has failed to allege a proper RICO conspiracy claim.

In short, this far-flung Superseding Indictment impermissibly treats lawful ingratiation as illegal bribery, and stitches together unrelated allegations of purported misconduct into a single scheme. The mismatch between the conduct alleged and the statutes invoked is a fatal defect that precludes this prosecution. For these reasons and others described below, Counts One through Seven, Eleven through Fourteen, and Twenty-One through Twenty-Three are fatally infirm, constitutionally and otherwise. Madigan respectfully requests their dismissal either in full or in part.

### The Superseding Indictment

On October 12, 2022, the government filed a twenty-three-count Superseding Indictment that sets forth two distinct fact patterns as summarized in the table below. First, Counts Two through Seven and Count Twenty-Three allege that Madigan corruptly solicited jobs for his political allies from two utilities, Commonwealth Edison ("ComEd") and Illinois Bell Telephone Company ("AT&T"), intending to be influenced and rewarded in connection with his official duties as Speaker of the Illinois House of Representatives (the "Utility Allegations"). Superseding Indictment, at 23–24, 104–05. Separately, Counts Eight through Twenty-Two allege that Madigan unlawfully solicited and received business for his private law firm from "persons and parties having business with the State of Illinois and the City of Chicago, or otherwise subject to the authority and powers vested in MADIGAN and other public officials acting on MADIGAN's behalf" (the "Law Firm Allegations"). *Id.* at 9. Count One purports to allege a RICO conspiracy covering both of these distinct fact patterns.

| Count | Statute(s) | Utility or Law Firm Allegations |
|:-----:|------------|:-------------------------------:|
| 1 | 18 U.S.C. § 1962(d) | Utility and Law Firm |
| 2 | 18 U.S.C. §§ 371 and 2 | Utility |
| 3 | 18 U.S.C. §§ 666(a)(1)(B) and 2 | |

| | | |
|---|---|---|
| 4 | 18 U.S.C. §§ 666(a)(1)(B) and 2 | |
| 5 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 6 | 18 U.S.C. §§ 666(a)(1)(B) and 2 | |
| 7 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 8 | 18 U.S.C. §§ 1343 and 1346 | Law Firm |
| 9 | 18 U.S.C. §§ 1343 and 1346 | |
| 10 | 18 U.S.C. §§ 1343 and 1346 | |
| 11 | 18 U.S.C. § 666(a)(1)(B) | |
| 12 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 13 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 14 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 15 | 18 U.S.C. §§ 1951(a) and 2 | Law Firm |
| 16 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 17 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 18 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 19 | 18 U.S.C. §§ 1343 and 1346 | Law Firm |
| 20 | 18 U.S.C. §§ 1343 and 1346 | |
| 21 | 18 U.S.C. §§ 666(a)(1)(B) and 2 | |
| 22 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 23 | 18 U.S.C. §§ 371 and 2 | Utility |

## I.     RICO Conspiracy

In Count One, the government asserts that Madigan led a nearly decade-long association-in-fact enterprise, the purpose of which was twofold: first, "to cause various businesses to employ [and] contract with . . . MADIGAN's political allies," and second, to solicit business for Madigan's private law firm from "persons and parties having business with the State of Illinois and the City of Chicago, or otherwise subject to the authority and powers vested in MADIGAN and other public officials acting on MADIGAN's behalf." Superseding Indictment, at 8–9. Count One is predicated on a pattern of racketeering activity consisting of Hobbs Act extortion, 18 U.S.C. § 1951; violation(s) of the Travel Act, 18 U.S.C. § 1952; bribery, 720 ILCS § 5/33-1(d)–(e); official misconduct, 720 ILCS § 5/33-3(a)(4); and legislative misconduct, 720 ILCS § 645/1 (effective until Dec. 31, 2012) and 720 ILCS § 5/33-8 (effective Jan. 1, 2013).

*Id.* at 11–12. In Count One, as explained further below, the government melds together two distinct enterprise conspiracies motivated by separate goals and carried out by different actors.

## II.     Solicitation of Jobs from Utilities

Counts Two through Seven and Count Twenty-Three center on the assertion that Madigan corruptly solicited jobs for his political allies from ComEd and AT&T, intending to be influenced and rewarded in connection with his official duties as Speaker.

### A.     ComEd

Counts Two through Seven charge Madigan with conspiracy, federal program bribery, and violations of the Travel Act, all premised on the assertion that ComEd sought to influence Madigan by arranging for individuals associated with him to obtain jobs and contracts with ComEd. Superseding Indictment, at 24–25. In particular, Counts Three, Four, and Six assert respectively that Madigan corruptly solicited a position on the ComEd board of directors for Individual BM-1, *id.* at 64, payments of $5,000 a month under a ComEd contract for Individual 23W-1, *id.* at 65, and a ComEd contract for Jay D. Doherty & Associates for the benefit of Individuals 13W-1, 13W-2, and 23W-1, *id.* at 67, all in violation of the federal program bribery statute. Counts Five and Seven charge violations of the Travel Act based on the same allegations, asserting underlying violations of the Illinois bribery and legislative misconduct statutes. *Id.* at 66, 68.

Count Two alleges a conspiracy to influence and reward Madigan with these and other purported benefits from ComEd, and to "assist ComEd with respect to the passage of legislation favorable to ComEd and its business and the defeat of legislation unfavorable to ComEd and its business." *Id.* at 24–25. Count Two identifies four pieces of legislation that Madigan allegedly acted upon or refrained from acting upon in furtherance of the conspiracy: (1) the Energy Infrastructure and Modernization Act ("EIMA," passed in 2011), for which he voted and

overrode the Governor's veto, *id.* at 31; (2) Senate Bill 9 (passed in 2013), for which he voted

and overrode the Governor's veto, *id.*; (3) the Future Energy Jobs Act ("FEJA," passed in 2016),

for which he did not cast a vote, *id.* at 50; and (4) House Bill 5626 (introduced in 2018 but never

enacted), which he allegedly "gave [Michael] McClain permission to work to kill" on behalf of

ComEd, *id.* at 57. Beyond identifying the foregoing bills and Madigan's position on them, the

Superseding Indictment alleges no facts establishing a causal connection between these (or any

other) legislative actions taken by Madigan and the benefits he allegedly received.

### B.      AT&T

Akin to the ComEd-related counts, Count Twenty-Three alleges that Madigan conspired

with McClain and a former AT&T employee to arrange for a former member of the Illinois

House of Representatives, Individual FR-1, to receive payments made at the direction of

AT&T for the purpose of influencing and rewarding Madigan in connection with his official

duties as Speaker, and to assist AT&T with respect to the passage of legislation concerning the

utility's carrier of last resort ("COLR") obligation. Superseding Indictment, at 105–06. With

regard to the latter, Count Twenty-Three alleges that the Speaker's office requested a "complete

roll call" on Senate Bill 1839 (which included COLR legislation) and that Madigan voted in

favor of that bill and other COLR-related legislation. *Id.* at 111. As with ComEd, the

Superseding Indictment does not allege facts establishing a causal connection between the

legislative actions undertaken by Madigan and the benefits he allegedly received from AT&T.

## III.    Solicitation of Business for Madigan's Law Firm

Wholly distinct from the ComEd and AT&T factual episodes, Counts Eight through

Twenty-Two allege that Madigan unlawfully sought and agreed to accept business for his private

law firm from "persons and parties having business with the State of Illinois and the City of

Chicago, or otherwise subject to the authority and powers vested in MADIGAN and other public

officials acting on MADIGAN's behalf." Superseding Indictment, at 9. These fifteen counts relate to three real estate developments in Chicago involving Company A, Company C, and a parking lot in Chinatown.

### A. Company A

Counts Eight through Fourteen allege that Madigan agreed to accept business from Company A that was steered to his private law firm by Alderman A, a member of the Chicago City Council, in exchange for recommending Alderman A to the Governor of Illinois for appointment to a compensated state board position. Superseding Indictment, at 70–71. Based on this allegation, Counts Eight, Nine, and Ten charge honest services fraud, *id.* at 75–77; Count Eleven federal program bribery, *id.* at 78; and Counts Twelve, Thirteen, and Fourteen violations of the Travel Act, *id.* at 79–81.

### B. Company C

Counts Fifteen through Eighteen allege that Alderman A set up a meeting for Madigan to pitch his law firm's services to Company C, which was seeking to construct an apartment building in Chicago. Superseding Indictment, at 82–84. These counts allege that Madigan used Alderman A (and the alderman's power over zoning decisions) to attempt the extortion of Company C. *Id.* at 84–85. Based on these allegations, Count Fifteen charges Madigan with attempted extortion, *id.*; and Counts Sixteen, Seventeen, and Eighteen violations of the Travel Act, *id.* at 86–88.

### C. Chinatown Parking Lot

Counts Nineteen through Twenty-Two allege that a group of individuals sought to have the State of Illinois transfer ownership of a parking lot in Chinatown to the City of Chicago so that they could in turn acquire the lot from the City. Superseding Indictment, at 89. These counts allege that Madigan "agreed to use his position as Speaker of the House to assist with and cause

7

the passage of legislation providing for the transfer of the Chinatown parcel with the understanding that, in exchange, legal work would be steered to his private law firm." *Id.* at 90–91. Based on these allegations, Counts Nineteen and Twenty charge honest services fraud, *id.* at 98–100; Count Twenty-One federal program bribery, *id.* at 101; and Count Twenty-Two a violation of the Travel Act, *id.* at 102.

### **Legal Standard**

To be legally sufficient, an indictment must: (1) state all the elements of the crime charged; (2) adequately inform the defendant of the nature of the charges so that he may prepare a defense; and (3) allow the defendant to plead the judgment as a bar to any future prosecutions. *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Hamling v. United States*, 418 U.S. 87, 117 (1974) (quotation marks omitted). But where the statute fails to set forth all the elements necessary to constitute the offense, indictments "must do more than restate the language of the statute." *United States v. Resendiz–Ponce*, 549 U.S. 102, 109–10 (2007). In that case, "when one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense." *United States v. Donagher*, 520 F. Supp. 3d 1034, 1041 (N.D. Ill. 2021) (quoting *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000)). This is because absent the implicit element, the indictment would fail "to provide fair notice to [the] defendant[] and [] ensure that any conviction [] arise[s] out of the theory of guilt presented to the grand jury." *Resendiz–Ponce*, 549 U.S. at 109–10.

8

Although a court's review of the facts at this stage is limited, the court "need not blindly accept a recitation in general terms of the elements of the offense." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012), *abrogated on other grounds by Rehaif v. United States*, 139 S. Ct. 2191 (2019). Even if an indictment recites necessary elements in boilerplate wording, "'if the specific facts' that are alleged 'fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation,' the indictment fails to state an offense." *Id.* (quoting *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358 (2010)); *cf. United States v. Gimbel*, 830 F.2d 621, 624 (7th Cir. 1987) ("In order to be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating.").

**Argument**

## I. The RICO Conspiracy Charge (Count One) Must Be Dismissed.

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). And it is unlawful for any person to conspire to do the same. 18 U.S.C. § 1962(d). To sustain a RICO conspiracy charge, "the government must show (1) an agreement to conduct or participate in the affairs (2) of an enterprise (3) through a pattern of racketeering activity." *United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020) (quoting *United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006)), *cert. denied*, 141 S. Ct. 1253 (2021). The Superseding Indictment fails on all fronts: first and foremost, it does not adequately plead a RICO enterprise; second, it does not plead an agreement to conduct or participate in the *enterprise*'s affairs; and, third, it charges racketeering activity predicated in part on unconstitutional state statutes.

While "Congress' mandate [is] to 'liberally' construe the [RICO Act] in light of its broad remedial purposes," *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1097 (N.D. Ill. 2016) (Blakey, J.) (quoting Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947; *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 (1985)), "RICO is not violated every time two or more individuals commit one of the predicate crimes listed in the statute," *United Food & Commercial Workers Unions and Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 851 (7th Cir. 2013). Indeed, as reflected below, federal courts have dismissed civil RICO actions that fail to allege an agreement to conduct or participate in the affairs of an enterprise. And when one's liberty is at stake, courts should hue to "the Supreme Court's admonition to read the statute's provisions the same way in both a criminal or civil context." *Menzies*, 197 F. Supp. 3d at 1097 (citing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 239 (1987); *Sedima*, 473 U.S. at 489) (discussing pleading of "pattern" in a civil RICO action).

A. **Count One Does Not Allege a RICO Enterprise.**

Count One of the Superseding Indictment must be dismissed because it fails to allege a RICO enterprise. The RICO Act defines "enterprise" to include "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "An association-in-fact includes any 'group of persons associated together for a common purpose of engaging in a course of conduct.'" *Brown*, 973 F.3d at 682 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)). The Supreme Court has held that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. "**The existence of a common goal or purpose is an 'essential ingredient' of an association-in-fact enterprise**." *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 687 (N.D. Ill. 2012) (Kendall, J.) (emphasis added) (quoting *Baker v. IBP, Inc.*,

10

357 F.3d 685, 691 (7th Cir. 2004)). Count One fails to allege a common purpose uniting the so-called "Madigan Enterprise."

The case of *Rao v. BP Products North America, Inc.*, 589 F.3d 389 (7th Cir. 2009), is instructive. In *Rao*, the Seventh Circuit affirmed dismissal of civil RICO claims brought under 18 U.S.C. § 1962(a), (c), and (d), in part because the complaint failed to show a "group of persons associated together for a ***common purpose*** of engaging in a course of conduct." *Id.* at 400 (emphasis added) (quoting *Boyle*, 556 U.S. at 944). The plaintiff in *Rao* alleged RICO violations against BP, a regional sales manager, an area representative and her husband, and other unnamed employees. *Id.* at 393–95. The plaintiff alleged: (1) the regional sales manager, as well as the area representative and her husband, "forced [the plaintiff] to sell his share of a [gas] station to [the area representative] at a false price, under the threat that he would lose his other franchises if he did not"; (2) "after [the plaintiff] spoke with the FBI, unnamed '[BP] employees' told [the plaintiff] his franchises would be terminated if he sought help"; and (3) "BP allowed [the regional sales manager] to force [the plaintiff] into purchasing two parcels of its land . . . under the threat of increased costs and the loss of his business if he refused." *Id.* at 400. In affirming dismissal of the plaintiff's complaint for failure to allege a RICO enterprise, the Seventh Circuit reasoned that the plaintiff's allegations "contain different actors for each event," "do not indicate how the different actors are associated," and "do not suggest a group of persons acting together for a common purpose or course of conduct." *Id.*

To be sure, Count One muddies the water by asserting a congeries of purposes for which the purported "Madigan Enterprise" acted, namely:

> (i) to exercise, to preserve, and to enhance MADIGAN's political power and financial well-being; (ii) to financially reward MADIGAN's political allies, political workers, and associates for their loyalty, association with, and work for MADIGAN; and (iii) to

> generate income for members and associates of the enterprise through illegal activities.

Superseding Indictment, at 7. A thorough read of Count One, however—and the indictment as a whole—reveals two distinct enterprise conspiracies motivated by separate goals and carried out by different actors. This bifurcation is best articulated in Count One itself, which states:

> Among other things, MADIGAN utilized his official positions as a Representative and Speaker: (i) to cause various businesses to employ, contract with, and make direct and indirect monetary payments to MADIGAN's political allies, political workers, and associates as a reward for and to promote their loyalty, association with, and work for MADIGAN, at times in return for little or no legitimate work performed for the benefit of the businesses; and (ii) to solicit and receive from persons and parties having business with the State of Illinois and the City of Chicago, or otherwise subject to the authority and powers vested in MADIGAN and other public officials acting on MADIGAN's behalf, including Alderman A, bribes and unlawful personal financial advantage, including but not limited to fees arising from the retention of his law firm, Madigan & Getzendanner. . . .

*Id.* at 8–9.

The first conspiracy allegations, ostensibly encompassing Madigan's interactions with ComEd and AT&T, assert a scheme to bolster Madigan's political power by directing benefits to his political allies to "promote their loyalty." *Id.* at 8. Absent from this conspiracy is any assertion that the alleged enterprise sought to obtain "personal financial advantage" for Madigan. The second conspiracy allegations contend that Madigan, in his capacity as a partner at a private law firm, sought to "reap the benefits of private legal work unlawfully steered to his law firm." *Id.* at 9. The Superseding Indictment fails to allege that the participants of the purported Madigan Enterprise associated together for the "common purpose" of effectuating both schemes.

For example, the Superseding Indictment is devoid of any allegations that Madigan's private law firm shared a common purpose to enhance Madigan's political power or reward Madigan's political allies. Rather, the Law Firm Allegations contend that Madigan sought to

obtain "*personal* financial advantage" through fees arising from the retention of the law firm. *Id.* at 12 (emphasis added). The law firm is not mentioned once in the sixty-five pages charging conduct related to ComEd (Counts Two through Seven) and AT&T (Count Twenty-Three). *Id.* at 15–68, 103–113. Neither is Alderman A, who plays a central role in every one of the Law Firm Allegations set forth in Counts Eight through Twenty-Two. He does not surface once in the Utility Allegations because he is entirely irrelevant to them.

Likewise, the Thirteenth Ward Democratic Organization is conspicuously absent from the thirty-four pages of the Superseding Indictment that outline the Law Firm Allegations. *Id.* at 69–102. Rather, Count One makes clear that the purpose of the Thirteenth Ward Democratic Organization was political:

> The purpose of the Thirteenth Ward Democratic Organization was to, among other things, cultivate support for political candidates and public officials who ran for and held public office through a variety of means, which included door-to-door campaigning by political workers, including those known as "precinct captains," who were associated with the Thirteenth Ward Democratic Organization.
>
> . . . .
>
> . . . MADIGAN utilized his positions as Democratic Committeeman for the Thirteenth Ward and Chairman of the Thirteenth Ward Democratic Organization to direct the activities of his political allies and political workers within the Thirteenth Ward, and to maintain his political power for purposes of ensuring his continued retention of his positions as a member of the Illinois House of Representatives and Speaker. . . .

*Id.* at 4, 9. The Superseding Indictment lacks any assertion that the Thirteenth Ward Democratic Organization shared a common purpose to obtain personal financial advantage for Madigan.

Like the complaint in *Rao*, Count One of the Superseding Indictment fails to show "a group of persons acting together for a *common purpose* or course of conduct." *Rao*, 589 F.3d at 400 (emphasis added). Indeed, Count One reveals the government's attempt to shoehorn two

13

distinct fact patterns—involving ComEd and AT&T on the one hand and Madigan's private law firm on the other—into a single RICO conspiracy charge. Moreover, these disparate fact patterns frequently "contain different actors for each event" and "do not indicate how the different actors are associated." *Id.* Accordingly, Count One fails to allege an association-in-fact RICO enterprise and, therefore, must be dismissed.

### B. Count One Does Not Allege That Madigan and McClain Agreed to Conduct or Participate in the Affairs of an Enterprise.

Even if this Court finds that Count One sufficiently alleges the existence of an association-in-fact enterprise under *Boyle*, Count One should still be dismissed because it fails to allege that each member of the purported enterprise agreed to conduct or participate in the "*enterprise*'s affairs," as opposed to their "*own* affairs." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)). In other words, Count One fails to allege "a truly joint enterprise where each individual entity act[ed] in concert with the others to pursue a common interest"; instead, it reveals that "each entity act[ed] in its individual capacity to pursue its individual self-interest." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655–56 (7th Cir. 2015) (citing *United Food*, 719 F.3d at 855; *Crichton*, 576 F.3d at 400). And because "the touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute," *United Food*, 719 F.3d at 856 (quoting *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998)), "[h]aving failed to [allege] facts that would establish a violation of Section 1962(c), the [government] cannot [bring an indictment] for conspiracy under Section 1962(d) based on those same facts," *id.* at 856–57.

In *United Food*, for example, an employee benefit plan brought a RICO action against Walgreens and Par Pharmaceutical, Inc., contending that the two formed an enterprise to defraud

the plan by filling prescriptions of Par's drugs with a dosage form that was more expensive than the form prescribed to the customer. 719 F.3d at 850. The plaintiff alleged extensive evidence of cooperation between Walgreens and Par. Among other things, the complaint asserted that "Par proposed the drug-switching program and Walgreens agreed to implement it"; Walgreens's director of pharmacy marketing conveyed false information to Walgreens's pharmacists about Par's dosage forms; and, after Walgreens stopped switching dosage forms following scrutiny from the Justice Department, the two companies negotiated price reductions to offset Walgreens's revenue losses. *Id.* at 852, 854.

Despite these and other allegations of association, the Seventh Circuit found the complaint "fail[ed] to allege that Walgreens and Par 'conduct[ed]' the affairs of an 'enterprise.'" *Id.* at 853 (quoting 18 U.S.C. § 1962(c)). The Seventh Circuit reasoned:

> [N]othing in the complaint reveals how one might infer that these communications or actions were undertaken on behalf of the *enterprise* as opposed to on behalf of Walgreens and Par in their individual capacities, to advance their individual self-interests. The complaint does not allege, for instance, that officials from either company involved themselves in the affairs of the other. . . . Nor does the complaint anywhere suggest that profits from the illegal drug-switching scheme were siphoned off to the [] enterprise or to individual enterprise members. . . .
>
> To be sure, Walgreens and Par were not strangers. Representatives from the companies regularly communicated with one another, and Walgreens purchased its generic [drugs] from Par. This type of interaction, however, shows only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity for purposes of improperly filling [drug] prescriptions. . . .

*Id.* at 854–55. Moreover, the Seventh Circuit observed, "the fact that Walgreens's and Par's activities were by all appearances illegal [does not] indicate that the companies were acting on behalf of a distinct enterprise." *Id.* at 855. The Seventh Circuit further held that the plaintiff's "failure adequately to allege that Walgreens and Par conducted the affairs of an enterprise is also

fatal to its RICO conspiracy claim." *Id.* at 856. The court reasoned that "[j]ust as the complaint fails to allege that Walgreens and Par acted on behalf of the [] enterprise, it equally fails to allege that Walgreens and Par *agreed* to act on behalf of the enterprise." *Id.*

Count One likewise fails to allege that Madigan and McClain acted, or agreed to act, "in concert . . . to pursue a common interest" rather than "in [their] individual capacit[ies] to pursue [their] individual self-interest." *Bible*, 799 F.3d at 655–56. As an initial matter, Count One does not assert that McClain stood to profit from participating in any of the affairs of the alleged enterprise. *See Bobb v. Swartz–Retson P.C.*, 2018 WL 4384292, at *7 (N.D. Ill. Sept. 14, 2018) (no RICO enterprise where defendants made their own respective profits and did not share in the profits of the alleged enterprise); *Guaranteed Rate*, 912 F. Supp. 2d at 687 (same); *Oberoi v. Mehta*, 2011 WL 1337107, at *4 (N.D. Ill. Apr. 6, 2011) (same). This is unsurprising, as Count One makes clear that "McClain served as a lobbyist and/or consultant . . . for [ComEd]." Superseding Indictment, at 10. Count One reveals that McClain interacted with Madigan to further the interests of *his* client, ComEd, and to build *his* credentials as a Springfield lobbyist.

The government acknowledged as much when it indicted McClain along with other former ComEd employees and consultants in November 2020. In that case—which is set for trial before Judge Leinenweber next month—the government charged McClain and his co-defendants with conspiring to:

> arrange[] for various associates of [Madigan], including [Madigan's] political allies and individuals who performed political work for [Madigan], to obtain jobs, contracts, and monetary payments associated with those jobs and contracts from ComEd and its affiliates, even in instances where such associates performed little or no work that they were purportedly hired to perform for ComEd. . . .

Indictment at 12–13, *United States v. McClain*, Case No. 20-CR-812 (N.D. Ill. Nov. 18, 2020), ECF No. 1. Critically, the *McClain* indictment alleges that this conspiracy was undertaken "for

16

the purpose of influencing and rewarding [Madigan] in connection with his official duties as Speaker of the Illinois House of Representatives, and ***to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and the defeat of legislation unfavorable to ComEd and its business***." *Id.* at 12 (emphasis added). As suggested by the *McClain* indictment, McClain associated with Madigan on issues related to ComEd to advance ComEd's legislative interests, not to benefit the so-called "Madigan Enterprise."

With respect to Madigan and McClain's association on matters unrelated to ComEd, Count One also fails to allege that their "communications or actions were undertaken on behalf of the *enterprise* as opposed to on behalf of [Madigan] and [McClain] in their individual capacities, to advance their individual self-interests." *United Food*, 719 F.3d at 854. To be sure, Madigan and McClain "were not strangers," and they "regularly communicated with one another." *Id.* at 855. But their interactions demonstrate a relationship between a lobbyist and public official, not an effort to join together to create a distinct entity for the purpose of improperly advancing Madigan's personal interests. *Id.* Therefore, Count One fails to "plausibly alleg[e] the type of concerted activity undertaken on behalf of an identifiable enterprise necessary to a successful RICO claim." *Id.* at 850–51.

### C. Count One Charges Racketeering Activity Predicated on Unconstitutional State Statutes.

Count One is predicated, in part, on an alleged pattern of racketeering consisting of "multiple acts and threats involving bribery chargeable under the law of the State of Illinois," including 720 ILCS § 5/33-1(d)–(e) (bribery) and 720 ILCS § 5/33-3(a)(4) (official

17

misconduct).[1] Superseding Indictment, at 11–12. The Illinois bribery statute provides that a

person commits bribery when:

> (d) He or she receives, retains or agrees to accept any property or personal advantage which he or she is not authorized by law to accept knowing that the property or personal advantage was promised or tendered with intent to cause him or her to influence the performance of ***any act related to the employment or function of any public officer***, public employee, juror or witness; or

> (e) He or she solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he or she shall improperly influence or attempt to influence the performance of ***any act related to the employment or function of any public officer***, public employee, juror or witness.

720 ILCS § 5/33-1(d)–(e) (emphasis added). The Illinois official misconduct statute provides:

> A public officer . . . commits misconduct when, in his official capacity . . . [he] [s]olicits or knowingly accepts for the performance of ***any act*** a fee or reward which he knows is not authorized by law.

720 ILCS § 5/33-3(a)(4) (emphasis added).

As explained below, the sweeping "any act" language found in the Illinois bribery and

official misconduct statutes renders both unconstitutional in two respects. First, the statutes are

overbroad in violation of the First and Fourteenth Amendments. Second, the statutes are void for

vagueness under the Fifth and Fourteenth Amendments, both facially and as applied in

Count One. Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), Count One must be

dismissed insofar as it is predicated on these unconstitutional Illinois statutes. Furthermore,

---

[1] As a predicate for racketeering activity, Count One also cites the Illinois statute concerning legislative misconduct, 720 ILCS § 645/1 (effective until Dec. 31, 2012) and 720 ILCS § 5/33-8 (effective Jan. 1, 2013). Superseding Indictment, at 12. That statute is not included in this motion because, in contrast to the vast "any act" requirement in the bribery and official misconduct statutes, it requires a more circumscribed "official act." 720 ILCS § 5/33-8 (forbidding Illinois General Assembly members from receiving any valuable thing for "any vote or influence he or she may give or withhold on any bill, resolution or appropriation, or for any other official act"). While even this "official act" requirement should ultimately be subject to a limiting instruction defining the term in accordance with the Supreme Court's analysis in *McDonnell v. United States*, 579 U.S. 550 (2016), that issue need not be resolved here.

pursuant to Federal Rule of Criminal Procedure 7(d), references to the Illinois bribery and official misconduct statutes should be stricken from the Superseding Indictment.

### 1. The Illinois Bribery and Official Misconduct Statutes Are Facially Overbroad in Violation of the First and Fourteenth Amendments.

Political officials routinely work with lobbyists and entertain outreaches from their constituents. This conduct is central not only to the conduct of office but also to American democracy. Citizens have a First Amendment right to petition elected representatives, and our democratic system envisions that politicians will be responsive to their concerns. Statutes that impermissibly chill such interactions infringe on rights that go to the core of democratic government and violate the First Amendment. Here, the Court must scrutinize the Illinois bribery and official misconduct statutes to ensure that they do not trench on this protected sphere of activity, and strike down prohibitions that are unconstitutionally overbroad.

Statutes infringing First Amendment rights "suffer from overbreadth and necessitate facial invalidation if their unconstitutional applications against otherwise protected expression outnumber their legitimate ones." *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012); *see also United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 449 n.6 (2008)) (statute facially invalid as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep"). "Where a sufficient imbalance exists, the statute proves facially invalid, not because it lacks any conceivable constitutional application, but because the 'threat of [its] enforcement . . . deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas.'" *Bell*, 697 F.3d at 453 (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). "Technically overbroad statutes, in short, must fail because they unconstitutionally chill protected expression." *Id.*

To determine whether a statute is overbroad, courts perform a two-step analysis. First, the court must "construe the challenged statute." *Williams*, 553 U.S. at 293. Second, the court must determine whether the statute, as so construed, "criminalizes a substantial amount of protected expressive activity." *Id.* at 297. Criminal statutes must be "scrutinized with particular care" because "those that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 459 (1987). In considering a defendant's challenge to the facial validity of a statute under the First Amendment, the Court should "not hesitate[] to take into account possible applications of the statute in other factual contexts beside[] [those] at bar." *NAACP v. Button*, 371 U.S. 415, 432 (1963); *see also Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992) ("It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable.").

### a. Illinois Bribery Statute

The Illinois bribery statute sweeps much more broadly than the Constitution permits because of its wide and undifferentiated coverage of "any act related to the employment or function of any public officer." 720 ILCS § 5/33-1(d)–(e). This statutory text covers conduct that lies within the protection of the First Amendment. That such all-encompassing coverage chills protected activity is shown most clearly by the comparison of Illinois law to the federal statute, 18 U.S.C. § 201(a)(3), at issue in *McDonnell v. United States*, 579 U.S. 550 (2016).

In *McDonnell*, the Supreme Court considered the federal analog of the Illinois bribery statute, which requires an "official act," defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such

official's place of trust or profit." 18 U.S.C. § 201(a)(3). The Court in *McDonnell* narrowed the federal statute substantially, in large measure to avoid constitutional concerns that would arise from an expansive and unbounded interpretation of "official act" encompassing virtually any act an official might perform. Because the statutory narrowing approach in *McDonnell* is not available here for Illinois laws, those same constitutional concerns require a holding that the Illinois bribery statute is unconstitutionally overbroad.

At issue in *McDonnell* were jury instructions on the meaning of an "official act." The trial court first charged the jury on the statutory definition, and then—as the government had requested—advised the jury that the term encompassed "'acts that a public official customarily performs,' including acts 'in furtherance of longer-term goals' or 'in a series of steps to exercise influence or achieve an end.'" *McDonnell*, 579 U.S. at 564–65. The jury found the defendant, the former Governor of Virginia, Robert McDonnell, guilty of honest services fraud and Hobbs Act extortion. *Id.* at 565. He appealed, challenging the definition of "official act" provided to the jury. *Id.* at 566.

The Supreme Court reversed the conviction, citing the need for "a more bounded interpretation of 'official act.'" *Id.* at 567. The Court began by curtailing the *subject matter* upon which an "official act" may be taken to require "a formal exercise of governmental power" that is "specific and focused." *Id.* at 574. The Court then held that the *conduct* requisite for an "official act" must be a "decision" or "action" *on* a "question, matter, cause, suit, proceeding or controversy" (a definition not met by "[s]etting up a meeting, talking to another official, or organizing an event"). *Id.* Finally, the Court interpreted the phrase "which may at any time be pending, or which may by law be brought" to "suggest something that is relatively

21

circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 570.

The Illinois bribery statute lacks such narrowing features, and thereby encompasses a multitude of ordinary interactions between politicians and their constituents that are constitutionally protected. Such overbreadth poses constitutional concerns akin to those that troubled the Supreme Court in *McDonnell*.

*First*, the Court narrowed what qualifies as an "official act" because public officials routinely engage with their constituents, some of whom may have matters pending before them. In restricting what qualifies as a "decision" or "action," the Supreme Court recalled its analysis in *United States v. Sun–Diamond Growers of Cal.*, 526 U.S. 398 (1999). *See McDonnell*, 579 U.S. at 571–72. In *Sun–Diamond*, the Court stated that it was not an "official act" under the statute for the President to host a championship sports team at the White House, the Secretary of Education to visit a high school, or the Secretary of Agriculture to deliver a speech to farmers on matters of USDA policy. *Id.* at 571 (citing *Sun–Diamond*, 526 U.S. at 407). That is because "the Secretary of Agriculture *always* has before him or in prospect matters that affect farmers, just as the President always has before him or in prospect matters that affect college and professional sports, and the Secretary of Education matters that affect high schools." *Id.* (quoting *Sun–Diamond*, 526 U.S. at 407). The Court explained that "the existence of such pending matters was not enough to find that ***any action*** related to them constituted an 'official act.'" *Id.* (emphasis added) (quoting *Sun–Diamond*, 526 U.S. at 407).

*Second*, the *McDonnell* Court voiced "significant constitutional concerns" with the government's expansive interpretation of "official act," where "nearly anything a public official accepts—from a campaign contribution to lunch—counts as a *quid*; and nearly anything a public

official does—from arranging a meeting to inviting a guest to an event—counts as a *quo*." *Id.*
at 574–75. The Court warned that the government's position "could cast a pall of potential
prosecution" over relationships between public officials and their constituents, when the "basic
compact underlying representative government *assumes* that public officials will hear from their
constituents and act appropriately on their concerns." *Id.* at 575.

      *McDonnell* underscored the substantiality of this concern by noting that "White House
counsel who worked in every administration from that of President Reagan to President Obama
warn[ed] that the [g]overnment's 'breathtaking expansion of public-corruption law would likely
chill federal officials' interactions with the people they serve and thus damage their ability
effectively to perform their duties.'" *Id.* (quoting Brief for Former Federal Officials as Amici
Curiae 6). The Court also noted that seventy-seven former state attorneys general—including
three from Illinois—filed an amicus brief echoing those concerns. *Id.* (citing Brief for 77 Former
State Attorneys General (Non-Virginia) as Amici Curiae 1–2). The Court warned that under the
"standardless sweep" of the government's expansive reading, "public officials could be subject
to prosecution, without fair notice, for the most prosaic interactions"—which a narrow
interpretation of "official act" served to avoid. *Id.* at 576.

      The Illinois bribery statute, with its unlimited application to any act by a public official,
poses the very constitutional concerns that troubled the *McDonnell* Court and supported
narrowing the statute's reach. The Court envisioned that the government's interpretation of
"official act" could "cast a pall of potential prosecution" over a public official's relationship with
homeowners seeking answers for why it took five days to restore power to their neighborhood
after a storm if, for example, the homeowners had previously invited the official to attend a
ballgame. *Id.* at 575. Applying the Supreme Court's hypothetical in Illinois, that potential "pall"

becomes a reality: if the public official took (or agreed to take) any action in his official capacity to obtain answers for his constituents—for example, if a state representative sought to have the power utility testify before the Illinois General Assembly about why it took five days to restore power—the public official could be found to have violated the Illinois bribery statute. This concern is particularly acute where, as in Illinois, bribery may be established under a stream of benefits theory. *See, e.g.*, *United States v. Isaacs*, 493 F.2d 1124, 1145 (7th Cir. 1974) (Under Illinois law, "[n]o particular act need be contemplated by the offeror or offeree"; "[t]here is bribery if the offer is made with intent that the offeree act favorably to the offeror when necessary."), *abrogated on other grounds by McNally v. United States*, 483 U.S. 350 (1987).

In short, the Illinois bribery statute is invalid because of its unconstitutional overbreadth. It reaches precisely the sort of constitutionally protected official-constituent interactions highlighted in *McDonnell*. But unlike in *McDonnell*, where those constitutional concerns supported a narrowing construction, here, Illinois law has no comparable boundary. For that reason, the statute is facially invalid under the First and Fourteenth Amendments and cannot properly serve as a predicate act for the RICO allegation in Count One of the Superseding Indictment.[2]

---

[2] Last year, Judge Dow rejected the only post-*McDonnell* challenge to the Illinois bribery statute on First Amendment overbreadth grounds, reasoning that the statute did not encompass nominal gifts because "[t]he plain language of the statute imposes a scienter requirement such that the statute only proscribes the receipt of gifts intended to 'improperly influence' specific conduct." *United States v. Burke*, Case No. 19-CR-322, 2022 WL 1970189, at *39 (N.D. Ill. June 6, 2022). But a scienter requirement cannot save a bribery statute from overbreadth. The federal bribery statute also imposes a scienter requirement that limits the statute's reach to "corrupt[]" conduct, but the *McDonnell* Court still found it necessary to narrow the definition of "official act" to avoid chilling representative-constituent relations—even though there was substantial evidence that Governor McDonnell had accepted things of value in exchange for taking actions favorable to the payor's business interests. *McDonnell*, 579 U.S. at 556–61. Irrespective of a scienter requirement, the government action (the *quo*) must be carefully cabined to avoid "significant constitutional concerns." *Id.* at 574.

### b.    Illinois Official Misconduct Statute

The Illinois official misconduct statute similarly lacks the safeguards to avoid sweeping more broadly than the Constitution permits. Under the Illinois statute, a public officer commits official misconduct when "in his official capacity" he "[s]olicits or knowingly accepts for the performance of *any act* a fee or reward which he knows is not authorized by law." 720 ILCS § 5/33-3(a)(4) (emphasis added). The official misconduct statute thus relies on the same sweeping "any act" requirement as the Illinois bribery statute; accordingly, § 5/33-3(a)(4) also threatens to chill representative-constituent relations. Citizens interact with and give gifts to government officials in a wide variety of scenarios, any of which could be criminal under Illinois's statute absent clarity about the specific act for which an official is being rewarded. In federal law, the Supreme Court specified the type of link between reward and act that avoids those constitutional concerns. *See Sun–Diamond*, 526 U.S. at 414. But Illinois law lacks any comparable requirement of a link.

In *Sun–Diamond*, the Court held that to sustain a federal gratuity charge, the government "must prove a link between a thing of value conferred upon a public official and a *specific* 'official act' for or because of which it was given." 526 U.S. at 414 (emphasis added). Unlike the federal gratuity statute, however, Illinois law criminalizes "any act," as opposed to a "specific 'official act.'" Illinois courts have not similarly circumscribed the "any act" required to establish a violation of § 5/33-3(a)(4). As a result, the official misconduct statute, like the Illinois bribery statute, reaches a substantial quantity of constitutionally protected expressive activity.

Accordingly, the Illinois official misconduct statute is facially invalid under the First and Fourteenth Amendments.[3]

### 2. The Illinois Bribery and Official Misconduct Statutes Are Facially Vague in Violation of the Fifth and Fourteenth Amendments.

"In our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). The "[v]agueness doctrine rests on concerns about fair notice and arbitrary enforcement." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 835 (7th Cir. 2014) (quoting *United States v. Jones*, 689 F.3d 696, 701 (7th Cir. 2012)). "All laws must be clear and precise enough [1] to give a person of ordinary intelligence fair notice about what is required of him and also [2] to guard against the arbitrary and discriminatory exercise of enforcement discretion." *Id.* (citing *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). Although the vagueness doctrine derives from due process concerns, "a statute that is vague may implicate a [defendant's] First Amendment rights, fostering those same chilling concerns that attend an overbreadth challenge." *Bell*, 697 F.3d at 455 (citing *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 620 (1976)); *accord Wis. Right to Life*, 751 F.3d at 835. Accordingly, "[i]n those instances when an imprecise law implicates speech and assembly rights, [a defendant] may also facially challenge a statute as void for vagueness." *Bell*, 697 F.3d at 455. "[R]igorous adherence" to the requirements of clarity and precision is "necessary to ensure that ambiguity

---

[3] In *Burke*, Judge Dow rejected an overbreadth challenge to the Illinois official misconduct statute, reasoning that § 5/33-3(a)(4) "only prohibits soliciting a fee or reward that is 'not authorized by law.'" 2022 WL 1970189, at *41 (quoting 720 ILCS § 5/33-3(a)(4)). Judge Dow analogized this limitation to § 5/33-3(a)(3)'s requirement that the public official perform an act "in excess of his lawful authority," which the Illinois Appellate Court found to have "imposed a limiting principle that 'renders the statute inapplicable to constitutionally protected conduct.'" *Id.* (quoting *People v. Kleffman*, 412 N.E.2d 1057, 1060 (Ill. App. Ct. 1980)). But the phrase, "which he knows is not authorized by law," does not save § 5/33-3(a)(4) from overbreadth. The federal gratuity statute includes a similar clause that limits its application to public officials who, "otherwise than as provided by law for the proper discharge of official duty," solicit or accept something of value for or because of an official act. 18 U.S.C. § 201(c)(1)(B). Nevertheless, as noted above, the *McDonnell* Court substantially curtailed the definition of "official act"—which applies to both gratuities and bribes—citing "significant constitutional concerns" with the government's "expansive interpretation" of the term. 579 U.S. at 574.

does not chill protected speech." *Wis. Right to Life*, 751 F.3d at 835 (quoting *Fox Television*, 567 U.S. at 253–54).

### a.    Illinois Bribery Statute

In addition to being overly broad, the Illinois bribery statute is facially void for vagueness under the Fifth and Fourteenth Amendments. The statute's shapeless "any act" requirement fails to define bribery "(1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Bell*, 697 F.3d at 461 (quoting *Skilling*, 561 U.S. at 402–03). As a result, the statute "foster[s] those same chilling concerns that attend [the] overbreadth challenge" discussed above. *Id.* at 455.

As the Supreme Court noted in *Sun–Diamond* and *McDonnell*, an unbounded "official act" requirement—let alone the far broader "any act" language in the Illinois statute—would criminalize constituents' token gifts to their public officials in exchange for, or because of, ceremonial governmental actions like those described further above. The *Sun–Diamond* Court warned that when "no particular 'official act' need be identified, and the giving of gifts by reason of the recipient's mere tenure in office constitutes a violation, ***nothing but the [g]overnment's discretion prevents the foregoing examples [of ceremonial actions] from being prosecuted***." 526 U.S. at 408 (emphasis added). Similarly, the *McDonnell* Court found that under the government's expansive interpretation of the "official act" requirement, the scope of this criminal prohibition would not be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited," or "in a manner that does not encourage arbitrary and discriminatory enforcement." 579 U.S. at 576 (quoting *Skilling*, 561 U.S. at 402–03). *McDonnell* narrowly interpreted the federal bribery statute's "official act" requirement to avoid the

"absurdities" and vagueness concerns that would have otherwise resulted. *McDonnell*, 579 U.S. at 571 (quoting *Sun–Diamond*, 526 U.S. at 408).

The breadth of the Illinois bribery statute is revealed by the Illinois courts' application of the "any act" statutory language without any limiting construction. In *People v. Johnson*, 780 N.E.2d 803 (Ill. App. Ct. 2002), for example, the Illinois Appellate Court overturned the trial court's dismissal of an indictment on vagueness grounds by reasoning, in pertinent part, that the indictment alleged an intent to influence an act that was *related* to the function of a public employee and *tangential* to the duties of the employee's office. *Id.* at 805–06. This sweeping construction of the Illinois bribery statute will yield the very absurdities that provoked the Supreme Court's vagueness concerns and, as a consequence, chill representative-constituent relations.

### b.    Illinois Official Misconduct Statute

The Illinois official misconduct provision criminalizing gratuities, § 5/33-3(a)(4), is also facially void for vagueness under the Fifth and Fourteenth Amendments. It applies the same, shapeless "any act" language seen in the Illinois bribery statute. As a result, it too fails to define official misconduct "(1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Bell*, 697 F.3d at 461 (quoting *Skilling*, 561 U.S. at 402–03). Consequently, § 5/33-3(a)(4) "foster[s] those same chilling concerns that attend [the] overbreadth challenge" discussed above. *Id.* at 455.

While Illinois courts have suggested the government must identify a specific act to sustain a conviction under § 5/33-3(a)(4), *see, e.g.*, *People v. Jordan*, 304 N.E.2d 713, 716 (Ill. App. Ct. 1973), they have not defined the scope of the required "act," as in *McDonnell*. As a result, the official misconduct statute is "not defined 'with sufficient definiteness that ordinary

people can understand what conduct is prohibited,' or 'in a manner that does not encourage

arbitrary and discriminatory enforcement.'" *McDonnell*, 579 U.S. at 576 (quoting *Skilling*,

561 U.S. at 402–03). Because § 5/33-3(a)(4) presents the same vagueness and attendant chilling

concerns that were raised in *McDonnell*, the statute is facially void for vagueness under the Fifth

and Fourteenth Amendments.[4]

### 3. The Illinois Bribery and Official Misconduct Statutes Are Void for Vagueness as Applied to Madigan.

Even if a statute is not invalidated as facially vague, it may still be vague as applied to

"the facts of the particular case." *See United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020).

In such circumstances, a penal statute satisfies due process only if it "define[s] the criminal

offense (1) with sufficient definiteness that ordinary people can understand what conduct is

prohibited and (2) in a manner that does not encourage arbitrary and discriminatory

enforcement." *Bell*, 697 F.3d at 461 (quoting *Skilling*, 561 U.S. at 402–03). As to the first

criterion, the touchstone is "whether the statute, either standing alone or as construed, made it

reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v.

Coscia*, 866 F.3d 782, 792 (7th Cir. 2017) (quoting *United States v. Lanier*, 520 U.S. 259, 267

(1997)). As to the second criterion, "the defendant must prove that *his* prosecution arose from

arbitrary enforcement"; "this inquiry 'involve[s] determining whether the conduct at issue falls

so squarely in the core of what is prohibited by the law that there is no substantial concern about

arbitrary enforcement because no reasonable enforcing officer could doubt the law's application

in the circumstances.'" *Id.* at 794 (quoting *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006)).

---

[4] Judge Dow held that Alderman Edward Burke could not challenge the Illinois bribery and official misconduct statutes as facially vague because his alleged conduct "fit neatly into the [] core" of these statutes. *Burke*, 2022 WL 1970189, at *43, 45. As discussed in the following section, Madigan's alleged conduct is not "clearly proscribed" by the Illinois bribery and official misconduct statutes; therefore, he is not barred from raising a facial vagueness challenge. *Id.* at *42 (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–19 (2010)).

### a.     Illinois Bribery Statute

The Illinois bribery statute is impermissibly vague as applied because it did not provide Madigan with fair notice that his conduct was (even arguably) criminal, nor did it protect him from arbitrary and discriminatory enforcement.

**Lack of Fair Notice.** As discussed above, the Illinois bribery statute's "any act" requirement falls well short of the definiteness provided by the federal bribery statute's "official act" requirement, particularly after *Sun–Diamond* and *McDonnell*. As a result, it failed to make reasonably clear that Madigan's conduct was criminal.

Count One fails to make reasonably clear—even today—what of Madigan's conduct gave rise to the alleged RICO conspiracy. In fact, Count One fails to allege *any* specific act that Madigan (or any other member of the purported enterprise) agreed (or was aware of an intent) to "influence the performance of" in exchange for the private benefits and personal financial advantage allegedly solicited and received by the enterprise. 720 ILCS § 5/33-1(d)–(e). The closest Count One comes is asserting that the "members and associates" of the purported "Madigan Enterprise":

> (a) solicit[ed] and receiv[ed] bribes and unlawful personal financial advantage from persons and parties having business with the State of Illinois and the City of Chicago, or otherwise subject to the authority and powers vested in MADIGAN and other public officials acting on MADIGAN's behalf; [and] (b) us[ed] MADIGAN's powers as Speaker, including his ability to affect the progress of bills in the House of Representatives, as well as his control over the resources of the Office of the Speaker, including its staff, in order to cause third parties to financially reward MADIGAN, his political allies, political workers, and associates. . . .

Superseding Indictment, at 7–8. This allegation falls short. It does not allege knowledge or an agreement on the part of Madigan, or any other member of the purported enterprise, to attempt to "influence the performance of *any act* related to the employment or function of any public

officer." 720 ILCS § 5/33-1(d)–(e) (emphasis added). And it certainly does not allege a decision or action *on* a "specific and focused" "question, matter, cause, suit, proceeding or controversy" involving "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *McDonnell*, 579 U.S. at 574. Rather, it alleges the *capability* of the Speaker to affect bills or to control his Office's resources, generalized characteristics that accompanied the Office of the Speaker. But it falls short of identifying *conduct* that can inform the basis of a bribery charge—*e.g.*, soliciting or receiving benefits to exercise those powers in a particular way. Governmental power is not the same as government acts.

Of course, the Superseding Indictment need not allege that Madigan *himself* committed or agreed to commit the predicate acts of racketeering, *United States v. Tello*, 687 F.3d 785, 792 (7th Cir. 2012) (citing *Salinas v. United States*, 522 U.S. 52, 63, 65–66 (1997)); nor need it allege that any such acts were ultimately committed by anyone, *id.* (citing *Salinas*, 522 U.S. at 63). However, "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas*, 522 U.S. at 65. To avoid a "vagueness shoal," the *McDonnell* Court required the government to prove a narrowly defined, "specific and focused" official act to sustain a charge of bribery. 579 U.S. at 574, 576. The government has failed to allege such an act here.

**Arbitrary Enforcement.** As applied here, the Illinois bribery statute also fails to protect against arbitrary and discriminatory enforcement. In lieu of alleging a "specific and focused" *act*, the locus of Count One is Madigan's *position*. Count One asserts that the enterprise "us[ed] MADIGAN's powers as Speaker, including his ability to affect the progress of bills in the House of Representatives, as well as his control over the resources of the Office of the Speaker,

including its staff" to effectuate certain of the enterprise's activities. Superseding Indictment, at 7–8. Count One further alleges that Madigan, himself, "utilized his official positions as a Representative and Speaker" to do the same. *Id.* at 8–9. *Sun–Diamond* portended the danger of such a theory, warning that when "no particular 'official act' need be identified, and the giving of gifts by reason of the recipient's mere tenure in office constitutes a violation, nothing but the government's discretion" prevents benign conduct from being prosecuted. 526 U.S. at 408.

The threat of arbitrary and discriminatory enforcement of the Illinois bribery statute is not merely hypothetical. Publicly available information shows that other Illinois politicians have recommended political allies and associates for private-sector jobs—at utility companies, no less—yet no one has suggested that their conduct violated the Illinois bribery statute. For example, Illinois House Minority Leader Jim Durkin recommended former Illinois State Representative Thomas Walsh for employment with ComEd in November 2015, as the FEJA negotiations were ongoing. McClain told ComEd, "I really believe it is a wise move to respond favorably to Leader Durkin's request."[5] In January 2016, McClain emailed ComEd again, asking: "Did we hire Tom Walsh?"[6] ComEd engaged Walsh as a subcontracting lobbyist in February 2016.[7] In December 2016, Leader Durkin voted in favor of FEJA.[8] Similarly, McClain emailed Exelon in July 2016:

---

[5] Email from M. McClain to F. Marquez on November 6, 2015, regarding "Walsh's Resume." Publicly available at: https://ilga.gov/house/committees/101Documents/BSPE/2015.11.09%20COMED-SIC-0000105.pdf.

[6] Email from M. McClain to F. Marquez on January 19, 2016, regarding "Did we hire Tom Walsh? Under [REDACTED]? Best, Mike." Publicly available at: https://ilga.gov/house/committees/101Documents/BSPE/2016.01.19%20COMED-SIC-0000109.pdf.

[7] *See* Illinois Lobbying Entity Registration filed with the Illinois Secretary of State by Thomas J. Walsh (Entity ID 3397) in 2016. Publicly available at: https://apps.ilsos.gov/lobbyistsearch/.

[8] House Roll Call for Senate Bill 2814, 99th General Assembly for the State of Illinois (Dec. 1, 2016). Publicly available at: https://www.ilga.gov/legislation/votehistory/99/house/09900SB2814_12012016_007000T.pdf.

> I am just following up on my recommendation to you to hire Aaron Winters as a consultant for our efforts. . . .
>
> I think we are approaching a critical time with the Governor's Office. I think we can use his abilities inside the Office, not to lobby, but to help us understand the new personalities and their thought processes.
>
> I hope you will take another look at him and consider hiring him as soon as possible.[9]

In August 2016, Exelon engaged Winters's lobbying firm.[10] Governor Bruce Rauner signed FEJA into law in December 2016. As of the date of this motion, no federal or state law enforcement agency has publicly announced bribery-related charges against Leader Durkin or Governor Rauner for recommending their former colleagues to ComEd and Exelon before taking action on FEJA. To be clear, these examples are not meant to suggest that Leader Durkin or Governor Rauner violated the Illinois bribery statute, but rather to demonstrate a real concern of arbitrary and discriminatory enforcement arising from this law.

**b.      Illinois Official Misconduct Statute**

Similarly, even if § 5/33-3(a)(4) of the Illinois official misconduct statute is not facially void for vagueness, it is unduly vague as applied. Section 5/33-3(a)(4), as applied in Count One, does not define official misconduct with sufficient definiteness to have "made it reasonably clear at the relevant time that [Madigan's] conduct was criminal," *Coscia*, 866 F.3d at 792 (quoting

---

[9] Email from M. McClain to Exelon employee on July 16, 2016, regarding "Aaron Winters R[e]sume." Publicly available at: https://www.ilga.gov/house/committees/101Documents/BSPE/2016.07.16%20COMED-SIC-0000154.pdf.

[10] Winters joined Advantage Government Strategies on or about June 23, 2016; Exelon engaged Advantage Government Strategies on or about August 2, 2016. *See* Illinois Lobbying Entity Registration filed with the Illinois Secretary of State by Advantage Government Strategies, LLC (Entity ID 7846) in 2016. Publicly available at: https://apps.ilsos.gov/lobbyistsearch/. On January 9, 2017, Winters registered his own lobbying firm, The Winters Group, with the Illinois Secretary of State, identifying himself as a subcontracting lobbyist (under Advantage Government Strategies) for Exelon. *See* Illinois Lobbying Entity Registration filed with the Illinois Secretary of State by The Winters Group, LLC (Entity ID 7920) in 2017. Publicly available at: https://apps.ilsos.gov/lobbyistsearch/.

*Lanier*, 520 U.S. at 267); nor does Madigan's conduct "fall[] so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement," *id.* at 794 (quoting *Farrell*, 449 F.3d at 494). For the same reasons the vast "any act" requirement renders the Illinois bribery statute unduly vague as applied to Madigan, it also renders vague the official misconduct statute's proscription on gratuities, § 5/33-3(a)(4).

### 4. The Illinois Bribery and Official Misconduct Statutes Cannot Be Sufficiently Narrowed by Judicial Construction.

No doubt, facially invalidating a statute is "strong medicine" that courts have employed "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). But federal courts "lack jurisdiction authoritatively to construe state legislation," *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 369 (1971), and Illinois courts have offered no basis for a narrowing construction. Accordingly, this Court should treat the Illinois bribery statute, 720 ILCS § 5/33-1, and the gratuity provision of the official misconduct statute, 720 ILCS § 5/33-3(a)(4), as a nullity. *See Davis*, 139 S. Ct. at 2323 ("When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again.").

## II. ComEd

### A. The Federal Program Bribery Charges Related to ComEd (Counts Two, Three, Four, and Six) Must Be Dismissed.

For more than three decades, the Supreme Court has curtailed an array of overbroad and vague bribery statutes. It has done so to ensure the statutes reach only corrupt conduct and not the ordinary interactions between public officials and their constituents. *See, e.g.*, *McDonnell*, 579 U.S. at 567, 574; *Skilling*, 561 U.S. at 408–09; *Sun–Diamond*, 526 U.S. at 414; *McCormick v. United States*, 500 U.S. 257, 274 (1991). With its Superseding Indictment, the government goes against the grain by attempting to criminalize job recommendations—conduct that has long

been commonplace by legislators across the country. The government's view would make it a federal crime for a legislator to recommend someone for a job if the employer might, down the line, be affected by legislation. And it would undoubtedly "cast a pall of potential prosecution" over a host of representative-constituent relationships. *McDonnell*, 579 U.S. at 575.

Key to distinguishing legal efforts to generate goodwill from illegal acts of bribery is a defendant's intent. To violate the federal program bribery statute, 18 U.S.C. § 666(a)(1)(B), (a)(2), a defendant must act "corruptly." Section 666 contains two distinct corrupt intents: the intent to *influence* and the intent to *reward*. The former connotes bribery while the latter connotes gratuity. *See United States v. Hawkins*, 777 F.3d 880, 881 (7th Cir. 2015); *United States v. Boender*, 649 F.3d 650, 655 (7th Cir. 2011). The Superseding Indictment charges that Madigan intended to be "influenced *and* rewarded" in connection with "legislation affecting ComEd and its business." Superseding Indictment, at 24, 64–65, 67 (emphasis added).

The text of § 666, its legislative history, and the jurisprudence of the Supreme Court, Seventh Circuit, and other courts in this district all confirm that the government must allege a *quid pro quo* to bring an indictment for bribery under § 666. They further confirm that to bring an indictment for gratuity—if such an offense is even criminalized by § 666—the government must allege a *link* between a thing of value conferred upon a public official and a specific act for or because of which it was given. Fatally, here, the Superseding Indictment alleges neither a *quid pro quo* nor a link connecting ComEd's hiring decisions to Madigan's actions in the Illinois General Assembly. Therefore, this Court should dismiss Counts Three, Four, and Six in full and Count Two (the conspiracy count) to the extent it is based on a violation of § 666.

If the Court finds § 666 ambiguous as to whether a *quid pro quo* or link is required, it should apply the rule of lenity and construe the statute in Madigan's favor. Alternatively, if the

Court determines that § 666 requires neither a *quid pro quo* for bribes nor a link for gratuities, then it should find § 666 overbroad in violation of the First Amendment and void for vagueness under the Due Process Clause of the Fifth Amendment. In either case, again, Counts Two (in part), Three, Four, and Six must be dismissed.

Separately, § 666 "does not apply to bona fide salary, wages, fees, or other compensation paid . . . in the usual course of business." 18 U.S.C. § 666(c). This Court must dismiss Counts Two (in part) and Three because the Superseding Indictment makes clear that the individuals and entities on whose hiring these counts are based performed the work they were hired to do; accordingly, the compensation paid to these individuals and entities is bona fide and cannot give rise to conduct criminalized under § 666.

### 1. Charges Based on a Bribery Theory Must Be Dismissed.

"[A] good will gift to an official to foster a favorable business climate, given simply with the 'generalized hope or expectation of ultimate benefit on the part of the donor,' does not constitute a bribe." *United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998) (quoting *United States v. Johnson*, 621 F.2d 1073, 1076 (10th Cir. 1980)); *cf. Sun–Diamond*, 526 U.S. at 405–06 (18 U.S.C. § 201(c) does not criminalize acts taken "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future"). Simply put, "ingratiation and access . . . are not corruption." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 360 (2010). To avoid sweeping this innocent conduct into the ambit of federal anti-bribery statutes, the Supreme Court has required the government to identify a *quid pro quo*—that is, "a specific intent to give or receive something of value *in exchange* for an official act." *Sun–Diamond*, 526 U.S. at 404–05 (discussing 18 U.S.C. § 201(b)).

### a. A *Quid Pro Quo* Is an Essential Element of a Bribery Charge Under § 666.

Statutory text, legislative history, and controlling Supreme Court and Seventh Circuit precedent all dictate that a *quid pro quo* is required to sustain a bribery charge under § 666.

**Statutory Text.** Section 666(a) provides, in relevant part, that one commits federal program bribery if she or he:

> (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—
>
> . . .
>
> (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more.

18 U.S.C. § 666(a)(1)(B).[11] Section 666 closely tracks 18 U.S.C. § 201(b), the anti-bribery statute applicable to federal officials, which was codified decades before Congress sought to extend the anti-bribery laws to state and local officials. Section 201(b) provides that one commits bribery if she or he:

> (2) being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for:
>
> (A) being influenced in the performance of any official act.

18 U.S.C. § 201(b)(2)(A). Notably, § 666(a)(1)(B)'s "corruptly . . . intending to be influenced" is substantively identical to § 201(b)(2)(A)'s "corruptly . . . in return for being influenced."

---

[11] Count Two also alleges that Madigan conspired to violate § 666(a)(2), which criminalizes "corruptly giv[ing], offer[ing], or agree[ing] to give anything of value to any person, with intent to influence or reward an agent of [a State government] in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(2). The analysis applicable to the receipt of bribes applies with equal force to the payment of bribes.

*Cf.* Order at 6, *United States v. Tamras–Martin*, Case No. 18-CR-267-2 (N.D. Ill. Feb. 17, 2019), ECF No. 63 ("No reason comes to mind to interpret 'corruptly with intent to influence' one way for § 201(b)[(1)(A)] and another way for § 666(a)(2).").

While the statutory language differs in some respects, these differences result from the fact that the statutes apply to different groups of people. Section 201(b) applies to federal officials, whereas § 666 applies to state, local, and tribal officials, as well as agents of nongovernmental organizations that receive federal funding. Because agents of nongovernmental organizations do not perform "official act[s]," 18 U.S.C. § 201(b), § 666 replaces this phrase with the requirement that an agent intend to be influenced "in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more," 18 U.S.C. § 666(a)(1)(B). But Congress's modifications do not touch the core element of the crime of bribery—that is, the corrupt intent to be influenced.

**Legislative History.** The legislative record further evidences that Congress's intent in passing § 666 was to extend the applicability of § 201(b), not to eliminate the *quid pro quo* requirement. The Senate Judiciary Committee explained:

> With respect to bribery, 18 U.S.C. 201 generally punishes corrupt payments to Federal public officials, but there is some doubt as to whether or under what circumstances persons not employed by the Federal government may be considered as a "public official" under the definition in 18 U.S.C. 201(a). . . . The courts of appeals have divided on the question whether a person employed by a private organization receiving Federal monies pursuant to a program is a "public official" for purposes of section 201. . . .

S. REP. NO. 98-225, at 369 (1983). Section 666 resolved this circuit split by creating a new offense "to augment the ability of the United States to vindicate significant acts of . . . bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program." *Id.* The legislative record includes no indication

that Congress intended to relax or modify the *quid pro quo* requirement inherent in § 201(b) for bribery cases brought under § 666.

**Case Law.** The Supreme Court has acknowledged that § 666 was designed to extend § 201 to cover bribery of state and local officials employed by agencies receiving federal funds. *See Sabri v. United States*, 541 U.S. 600, 607 (2004); *Salinas*, 522 U.S. at 58. And in *Sun–Diamond*, the Court illuminated the types of illegal conduct proscribed by § 201. The *Sun–Diamond* Court explained that § 201 "set[s] forth . . . ***two separate crimes*** . . . with ***two different sets of elements*** and authorized punishments," with § 201(b) criminalizing bribery and § 201(c) criminalizing gratuity. 526 U.S. at 404 (emphasis added). The Court explained that "[t]he distinguishing feature of each crime is its intent element." *Id.* Bribery requires the intent "to be influenced" and, therefore, needs "a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act." *Id.* at 404–05. Illegal gratuity, on the other hand, "requires only that the gratuity be . . . accepted 'for or because of' an official act" and, therefore, "may constitute merely a reward for some future act that the public official will take . . . or for a past act that he has already taken." *Id.*

Drawing on *Sun–Diamond*, Seventh Circuit case law suggests that a *quid pro quo* is an essential element when the government charges § 666 under an intent-to-influence (or bribery) theory. *Boender* is instructive on this point. The defendant in *Boender* paid nearly $40,000 for repairs to a Chicago alderman's home; the alderman was a "crucial player in [the defendant's] attempt to have certain industrial property rezoned for commercial and residential development." 649 F.3d at 651. Following his conviction under § 666(a)(2), the defendant appealed, arguing that after *Sun–Diamond* "a violation of § 666(a)(2) requires evidence of a specific *quid pro quo*." *Id.* at 654. The *Boender* court began its analysis by observing that *Sun–Diamond* required a

"specific *quid pro quo*" for bribery under § 201(b) but not for gratuity under § 201(c). *Id.* at 655

(citing *Sun–Diamond*, 526 U.S. at 404, 406). The *Boender* court then noted that in contrast to

§ 201(b), § 666(a)(2) "criminalizes both bribes and rewards in the same section." *Id.* Therefore,

the *Boender* court held, "[a] *quid pro quo* of money for a specific legislative act is sufficient to

violate [§ 666], but is not *necessary.*" *Id.* (quoting *United States v. Gee*, 432 F.3d 713, 714 (7th

Cir. 2005)).

     As Judge Edmond Chang has explained, "the *reasoning* underlying *Boender*'s holding

actually acknowledges the distinction between the two distinct forms of liability—bribery versus

gratuity—in [§ 666]." Order at 4–5, *Tamras–Martin*, Case No. 18-CR-267-2. In *Boender*, the

Seventh Circuit embraced the distinct criminal intents that *Sun–Diamond* enunciated for bribery

and gratuity offenses. *Boender* intimates that the government must allege a *quid pro quo* to

charge bribery under § 666 but not to charge illegal gratuity. In this sense, a *quid pro quo* is

*sufficient* to establish a § 666 violation under a bribery theory but is not *necessary* to establish a

§ 666 violation under a gratuity theory.

     In *Hawkins*, the Seventh Circuit stated explicitly what *Boender* implied. *Hawkins*

involved the prosecution of public employees who received things of value intending to be

influenced or rewarded, in violation of § 666(a)(1)(B). 777 F.3d at 881. In upholding the district

court's instruction on "corruptly," the Seventh Circuit explained:

> As this jury was instructed, [the defendants] could be convicted only
> if (a) **the payee intended to be influenced (that is, to perform
> some *quid pro quo*) or rewarded**; (b) the payor intended to
> influence or reward the defendants, and (c) the payee knew the
> payor's intent. That is a triple safeguard against criminalizing
> innocent acts. . . .

*Id.* at 882 (emphasis added). Notably, the district court's jury instructions contained no mention

of a *quid pro quo*. Jury Instructions at 27–29, *United States v. Hawkins*, Case No. 12-CR-528

40

(N.D. Ill. Oct. 25, 2013), ECF No. 107. The Seventh Circuit added the explanatory parenthetical to distinguish the "intent[] to be influenced," which requires "some *quid pro quo*" from the "intent[] to be . . . rewarded," which does not. *Hawkins*, 777 F.3d at 882. Multiple courts in this district have instructed the jury that it must identify a *quid pro quo* to find a defendant guilty of bribery under § 666. *See* Order at 6, *Tamras–Martin*, Case No. 18-CR-267-2 (defining "corruptly with an intent to influence" in jury instructions for § 666(a)(2) as "act[ing] with the intent that the agent perform an official act *in exchange for* something of value" (emphasis added)); Jury Instructions at 39, *United States v. Jarigese*, Case No. 17-CR-656-2 (N.D. Ill. May 16, 2019), ECF No. 131 (Gettleman, J.) (same).

The government will undoubtedly point to language in opinions from the Seventh Circuit and other courts in this district broadly pronouncing that a *quid pro quo* is not required under § 666. *See United States v. Mullins*, 800 F.3d 866, 871 (7th Cir. 2015); *Boender*, 649 F.3d at 655; *Gee*, 432 F.3d at 714; *United States v. Agostino*, 132 F.3d 1183, 1190 (7th Cir. 1997); *Burke*, 2022 WL 1970189, at *13–15; *United States v. McClain*, Case No. 20-CR-812, 2022 WL 488944, at *4–6 (N.D. Ill. Feb. 17, 2022) (Leinenweber, J.); *Donagher*, 520 F. Supp. 3d at 1046–49. But a closer reading reveals that Seventh Circuit precedent supports interpreting § 666 to require, at a minimum, a *quid pro quo* of a general nature—even if established through a "stream of benefits" theory.

When the Seventh Circuit first examined § 666 in its current form, it stated that "[t]he *essential element* of a section 666 violation is a 'quid pro quo.'" *United States v. Medley*, 913 F.2d 1248, 1260 (7th Cir. 1990) (emphasis added). The Seventh Circuit later explained, in *Agostino*, that "the *Medley* court was not positing an additional element to the statutory definition of the crime, but instead was explaining the *sine qua non* of a violation of § 666."

41

132 F.3d at 1190. Since *Agostino*, the Seventh Circuit has consistently held that while the government need not show a "specific" *quid pro quo*, it must show "some" *quid pro quo* to establish a violation of § 666 under a bribery theory. *Compare Agostino*, 132 F.3d at 1190 ("We decline to import an additional, **specific** *quid pro quo* requirement into the elements of § 666(a)(2)." (emphasis added)); *Gee*, 432 F.3d at 714 ("A *quid pro quo* of money for a **specific** legislative act is *sufficient* to violate [§ 666(a)(1)(B)], but it is not *necessary*." (emphasis added in bold)); *Boender*, 649 F.3d at 655 ("[W]e conclude that the government was not required to establish a **specific** *quid pro quo* of money in exchange for a legislative act." (emphasis added)) *with Hawkins*, 777 F.3d at 882 (defining the "intent[] to be influenced" as the intent "to perform **some** *quid pro quo*" (emphasis added)).[12]

By holding on the one hand that a *quid pro quo* is the "*sine qua non* of a violation of § 666," *Agostino*, 132 F.3d at 1190, and defining the intent to influence as "**some** *quid pro quo*," *Hawkins*, 777 F.3d at 882 (emphasis added), while holding on the other hand that the government need not assert a "**specific** *quid pro quo*," *Boender*, 649 F.3d at 655 (emphasis added), Seventh Circuit precedent is in harmony with the jurisprudence of many other circuits that require a *quid pro quo* but allow it to be established through a stream of benefits over time. *See United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007) (Sotomayor, J.) ("[S]o long as the jury finds that an official accepted gifts in exchange for a promise to perform official acts for the giver, it need not find that the specific act to be performed was identified at the time of the promise, nor need it link each specific benefit to a single official act.");[13] *accord United States v.*

---

[12] In *Mullins*, the Seventh Circuit stated more generally that "evidence of quid pro quo is not necessary to establish a violation of § 666(a)(1)(B)," 800 F.3d at 871, but it cited *Boender* and *Gee* in support, both of which require a "specific" *quid pro quo*.

[13] This sentence from *Ganim* appears under the heading of "Hobbs Act Extortion," but the Second Circuit seems to have been making a point about both that offense and § 666, and its discussion has been understood in those terms.

*Roberson*, 998 F.3d 1237, 1251 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1109 (2022); *United States v. Redzic*, 627 F.3d 683, 692 (8th Cir. 2010); *Jennings*, 160 F.3d at 1014.

The statutory language and legislative history of § 666, as well as a careful reading of Supreme Court and Seventh Circuit precedent, require the government to allege a *quid pro quo* to sustain a bribery charge—that is, a specific intent to give or receive something of value *in exchange for* a specific action (or course of action). This requirement serves the critical purpose of distinguishing innocent acts of ingratiation from criminal bribery.

### b. Counts Two, Three, Four, and Six Fail to Allege a *Quid Pro Quo*.

Counts Three, Four, and Six charge Madigan with violating § 666(a)(1)(B) by soliciting, demanding, and agreeing to accept things of value from ComEd intending to be influenced "in connection with . . . legislation affecting ComEd and its business." Superseding Indictment, at 64–65, 67. Premised largely on the same conduct, Count Two charges Madigan with conspiring to, among other things, offer and accept bribes under § 666(a)(1)(B), (a)(2), in violation of § 371. *Id.* at 23–24. Although each of these counts tracks the language of § 666, the language of the statute alone is insufficient to state all essential elements of a violation of the federal program bribery statute. *See Resendiz–Ponce*, 549 U.S. at 109–10. As noted, bribery charges under § 666 must allege a *quid pro quo*—that is, a specific intent to give or receive something of value *in exchange for* a specific action (or course of action) in connection with, as applied here, the business of the Illinois General Assembly. The Superseding Indictment fails to allege this essential *quid pro quo* element.

---

See *United States v. McNair*, 605 F.3d 1152, 1189–90 (11th Cir. 2010); *see also United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) (applying *Ganim* to *quid pro quo* agreements under federal bribery and honest services fraud statutes).

The government alleges that ComEd hired certain individuals or entities at Madigan's recommendation and contends that, because legislation affecting ComEd passed the Illinois General Assembly during the same decade, crime was afoot. That is not enough. Yes, the government identifies votes Madigan cast or positions he took with respect to certain energy legislation, but it fails to assert that Madigan took any of those votes or positions for the purpose of benefiting ComEd in exchange for its hiring decisions. Superseding Indictment, at 31, 57. It is not enough to allege that Madigan took actions that *happened* to benefit ComEd—indeed, myriad interest groups across Illinois supported the same legislation as ComEd. Nor would it be enough for the government to allege that Madigan took actions *intending* to benefit ComEd. The government must allege that Madigan solicited jobs from ComEd intending to take actions in the Illinois General Assembly to benefit ComEd *in exchange for* ComEd's hiring decisions. It has not done so.

Nor has the government sufficiently alleged a *quid pro quo* under a stream of benefits theory. As discussed in the section above, other circuits have found the *quid pro quo* requirement to be satisfied where the evidence shows a "course of conduct of favors and gifts flowing to a public official *in exchange for* . . . . a specific *type* of official action." *Jennings*, 160 F.3d at 1014. However, "[v]ague expectations of some future benefit" are not sufficient. *Id.* at 1013 (quoting *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993)). For example, in *Jennings*, the Fourth Circuit reviewed the district court's jury instructions, which "repeatedly charged that it was sufficient if [the bribor] paid [the bribee] to influence [the bribee] 'in connection with' or 'in reference to' HABC business." *Id.* at 1022.[14] The *Jennings* court found the jury instructions

---

[14] In *Jennings*, the defendant, a housing repair contractor, was convicted of violating § 666(a)(2) for making payments to a Baltimore Housing Authority employee who awarded contracts for the renovation of vacant housing units owned by the Authority. 160 F.3d at 1010–12.

erroneous, reasoning that the district court's "allusions to HABC business were too general because they did not describe any official acts that [the bribor] intended to induce with his payments to [the bribee]." *Id.* The *Jennings* court explained that the jury instructions "could have described a situation in which [the bribor] paid [the bribee] with a '[v]ague expectation[] of some future benefit,'" *id.* (quoting *Allen*, 10 F.3d at 411); as a result, the jury instructions "did not necessarily require the jury to find that [the bribor] had the intent to engage in a quid pro quo," *id.* The Superseding Indictment is just as vague. The government's allusions to "legislation affecting ComEd and its business," Superseding Indictment, at 24, 64–65, 67, fail to allege a "specific *type* of official action" that has enough definiteness to support a *quid pro quo*, *Jennings*, 160 F.3d at 1014. And without any factual allegations illustrating a *quid pro quo*, the Superseding Indictment violates Madigan's Fifth Amendment rights to indictment by a grand jury and protection against double jeopardy, as well as his Sixth Amendment right to be informed of the nature and cause of the accusations against him. *See Resendiz–Ponce*, 549 U.S. at 108.[15]

### 2.     Charges Based on a Gratuity Theory Must Also Be Dismissed.

The government cannot save the ComEd-related counts brought under § 666 by jettisoning its bribery theory in favor of an intent-to-reward (or gratuity) theory. As an initial matter, this Court should follow the thoughtful analyses of the First and Fifth Circuits and hold that § 666 only criminalizes bribes, not gratuities. *See United States v. Hamilton*, 46 F.4th 389,

---

[15] To establish a conspiracy to commit an offense against the United States in violation of § 371, "each conspirator must have specifically intended that *some conspirator* commit each element of the substantive offense." *United States v. Kelerchian*, 937 F.3d 895, 915 (7th Cir. 2019) (quoting *Ocasio v. United States*, 578 U.S. 282, 292 (2016)). "[T]he fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all the elements of [the underlying substantive] criminal offense.'" *Id.* (quoting *Ocasio*, 578 U.S. at 287). As discussed, an essential element of a bribery charge under § 666 is a *quid pro quo*. Thus, for a charge of conspiracy to commit bribery, the Superseding Indictment must allege that Madigan specifically intended that some conspirator would give or receive something of value in exchange for a specific action (or course of action) in connection with the business of the Illinois General Assembly.

394–98 (5th Cir. 2022); *United States v. Fernandez*, 722 F.3d 1, 20–26 (1st Cir. 2013); *see also United States v. Lindberg*, 39 F.4th 151, 171 n.17 (4th Cir. 2022) (citing *Jennings*, 160 F.3d at 1016 n.4) ("[W]hile our Court has not yet had occasion to directly answer [the] question [of whether § 666 covers gratuities], we have previously been skeptical that it does."). While the Seventh Circuit has permitted convictions under § 666 based on a gratuity theory, the court's position is ripe for review. In *Hawkins*, the Seventh Circuit acknowledged the First Circuit's contrary view but concluded that it had not been asked to reconsider the reach of § 666 in light of *Fernandez*. *Hawkins*, 777 F.3d at 881. Given the Fourth and Fifth Circuits' decisions within the last year, in *Lindberg* and *Hamilton* respectively, the issue has never been more acute.

But even if this Court declines *Hawkins*'s invitation to reconsider the reach of § 666, it should still dismiss Counts Two (in part), Three, Four, and Six under a gratuity theory because the Superseding Indictment fails to allege a link between any of ComEd's hires and a specific act that Madigan took in connection with the business of the Illinois General Assembly. In *Sun–Diamond*, the Supreme Court held that in order to establish a violation of § 201(c), "the [g]overnment must prove a ***link*** between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." 526 U.S. at 414 (emphasis added). *Sun–Diamond* refers to an "official act" because that term appears in § 201(c); the same term does not appear in § 666. But that section, like § 201(c), requires more than a generalized effort to obtain goodwill. It requires that the public official intended to be rewarded (or that the payor intended to reward the public official) "in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B), (a)(2). The rationale behind *Sun–Diamond* applies equally to both § 201(c) and § 666: "Undergirding the Court's decision in *Sun–Diamond* was a need to

46

distinguish legal gratuities (given to curry favor because of an official's position) from illegal gratuities (given because of a specific act)." *Ganim*, 510 F.3d at 146.

The Superseding Indictment fails to allege a link between any of ComEd's hires and a specific act that Madigan took in connection with the business of the Illinois General Assembly. The substantive bribery counts each allege that Madigan recommended a particular individual (or group of individuals) to ComEd for employment intending to be rewarded "in connection with . . . legislation affecting ComEd and its business." Superseding Indictment, at 64–65, 67. The conspiracy count alleges that ComEd hired various individuals at Madigan's recommendation for the purpose of rewarding Madigan "in connection with his official duties as Speaker of the Illinois House of Representatives, and to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and the defeat of legislation unfavorable to ComEd and its business." Superseding Indictment, at 24–25.

On each count, the government fails to identify the specific act for or because of which Madigan purportedly intended to be rewarded. And absent the identification of any specific act, there is necessarily no allegation linking an act to any of the charged hires. Consequently, the Superseding Indictment contravenes *Sun–Diamond*, which rejected the government's assertion that illegal gratuity "requires only a showing that a 'gift was motivated, at least in part, by the recipient's *capacity to exercise governmental power or influence* in the donor's favor' without necessarily showing that it was connected to a particular official act." 526 U.S. at 405–06 (quoting Brief for United States Dept. of Justice as Amicus Curiae 17). Because these essential elements are not alleged, the Superseding Indictment violates Madigan's Fifth Amendment rights to indictment by a grand jury and protection against double jeopardy, as well as his Sixth

Amendment right to be informed of the nature and cause of the accusations against him. *See Resendiz–Ponce*, 549 U.S. at 108.

### 3.     Section 666 Charges Must Be Dismissed Under the Rule of Lenity.

The rule of lenity "requires that an ambiguous criminal statute be construed in favor of the defendant because criminal statutes must provide fair warning concerning conduct rendered illegal." *United States v. Marcotte*, 835 F.3d 652, 656 (7th Cir. 2016) (citing *United States v. Patel*, 778 F.3d 607, 618 (7th Cir. 2015)). The rule applies if "'at the end of the process of construing what Congress has expressed' . . . there is 'a grievous ambiguity or uncertainty in the statute.'" *Shaw v. United States*, 580 U.S. 63, 71 (2016) (citations omitted). Before applying the rule, the court will first consider a statute's "text, context, structure, history and purpose." *Marcotte*, 835 F.3d at 656.

The language and structure, legislative history, and motivating policies of § 666, as well as Seventh Circuit jurisprudence, make clear that the statute is best understood as extending the proscriptions of § 201 to agents of state and local governments (and nongovernmental organizations) that receive federal funding—and not an effort to eliminate the government's burden to connect a "thing of value" with a specific action (or course of action). However, if after consulting these sources the Court still finds § 666 grievously ambiguous as to whether the government must allege a *quid pro quo* or a link, then it should apply the rule of lenity and construe the statute in Madigan's favor. *See generally Wooden v. United States*, 142 S. Ct. 1063, 1083 (2022) (Gorsuch, J., concurring in the judgment) ("[L]enity has played an important role in realizing a distinctly American version of the rule of law—one that seeks to ensure people are never punished for violating just-so rules concocted after the fact, or rules with no more claim to democratic provenance than a judge's surmise about legislative intentions."). Here, again,

Counts Two (in part), Three, Four, and Six must be dismissed because the Superseding Indictment fails to allege either a *quid pro quo* or a link.

*       *       *

In short, the government seems to have conjured up a legal theory whereby if it proceeds under *both* an intent to reward and an intent to influence theory, it need not allege the legal basis for either. That cannot be. At a minimum, if the government wishes to charge § 666 under a bribery theory, it must allege a *quid pro quo*. And if it wishes to charge § 666 under a gratuity theory (assuming the Court permits such a charge), it must allege a *link* between a thing of value conferred upon a public official and a specific act for or because of which it was given. The government alleges neither. Therefore, this Court should dismiss Counts Three, Four, and Six in full, and Count Two (the conspiracy count) to the extent it is based on a violation of § 666.

### 4.    Without a *Quid Pro Quo* Requirement for Bribes or a Link for Gratuities, § 666 Is Unconstitutional.

If the Court finds that § 666 requires neither a *quid pro quo* (for bribes) nor a link (for gratuities), then it should hold § 666 unconstitutional. At bottom, these essential elements require the government to allege a *connection* between a thing of value conferred upon a public official and a *specific action* (or course of action) intended to be influenced or rewarded. Without these foundational elements, § 666 is overbroad in violation of the First Amendment and void for vagueness under the Due Process Clause of the Fifth Amendment, both facially and as applied. Therefore, Counts Two (in part), Three, Four, and Six must be dismissed pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), and stricken from the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 7(d).

49

### a.   Section 666 Is Facially Overbroad in Violation of the First Amendment.

Section 666 casts a much wider net than § 201; as a result, it poses an even greater threat of sweeping protected expression within its ambit. Without requiring either a *quid pro quo* or link between a thing of value conferred upon a public official and a specific act for or because of which it was given, "a substantial number of [§ 666's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (quoting *Wash. St. Grange*, 552 U.S. at 449 n.6). As a consequence, § 666 is facially invalid "because the 'threat of [its] enforcement . . . deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas.'" *Bell*, 697 F.3d at 453 (quoting *Williams*, 553 U.S. at 292).

First, as noted, the *Sun–Diamond* Court read § 201(b) to require a *quid pro quo* and § 201(c) to require a link, both of which demand that the government allege a nexus between a thing of value conferred upon a public official and an "official act." 526 U.S. at 404–05, 414; *cf. Ganim*, 510 F.3d at 146, 152. On its face, § 666 requires no such nexus. Rather than targeting the intent to influence or reward a specific act, § 666 targets the intent to influence or reward a State or local official "***in connection with*** any business, transaction, or series of transactions of [State or local government]." 18 U.S.C. § 666(a)(1)(B), (a)(2) (emphasis added). The statutory phrase "in connection with" is no substitute for demanding that the government allege a *quid pro quo* or link. As the Supreme Court has recognized in other statutory contexts, the phrase "'in connection with' is essentially indeterminate because connections, like relations, stop nowhere." *Mont v. United States*, 139 S. Ct. 1826, 1832 (2019) (quoting *Maracich v. Spears*, 570 U.S. 48, 59 (2013)).

Second, despite § 201(a)(3)'s relative precision in defining "official act," the Supreme Court adopted an even more limited definition of the term "to avoid the 'absurdities' of

convicting individuals on corruption charges for engaging in [benign] conduct." *McDonnell*, 579 U.S. at 571 (quoting *Sun–Diamond*, 526 U.S. at 408). Section 666 contains no "official act" requirement within its text, and appellate courts that have considered the issue have declined to read such a precise act requirement into the statute. *See Lindberg*, 39 F.4th at 166; *Roberson*, 998 F.3d at 1247; *United States v. Ng Lap Seng*, 934 F.3d 110, 132–33 (2d Cir. 2019); *United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018).

Without requiring either a *quid pro quo* or a link between a thing of value conferred upon a public official and a specific act for or because of which it was given, the government could seek to criminalize—as it does here—the receipt of benefits by a public official that were provided to him because of his *position* alone; that is, because of the power historically vested in the Speaker of the House, Madigan had the *capacity* to influence government business. That approach obliterates the distinction between generating goodwill and influencing improper action. *See generally Sun–Diamond*, 526 U.S. at 405–06. Compounding § 666's overbreadth, the government could seek to criminalize "nearly any activity by a public official"—a position the Supreme Court has rejected. *McDonnell*, 579 U.S. at 567–68. Such a vast interpretation of § 666 would undoubtedly embrace a substantial amount of constitutionally protected expressive activity and chill "normal political interaction between public officials and their constituents." *Id.* at 576.

### b. Section 666 Is Facially Vague in Violation of the Fifth Amendment.

Because § 666 implicates speech and petitioning rights, not only may Madigan facially challenge the statute as void for vagueness, *Bell*, 697 F.3d at 455, but the statute "must meet a higher standard of clarity and precision. . . . 'to ensure that ambiguity does not chill protected speech,'" *Wis. Right to Life*, 751 F.3d at 835 (quoting *Fox Television*, 567 U.S. at 253–54).

51

Without requiring either a *quid pro quo* or a link between a thing of value conferred upon a public official and a specific act for or because of which it was given, § 666 is not "clear and precise enough" to provide fair notice and guard against arbitrary enforcement. *Id.* (citing *Fox Television*, 567 U.S. at 253–54).

By failing to distinguish legal efforts to curry favor from illegal acts of bribery, § 666—to an even greater extent than § 201—threatens to subject public officials and their constituents "to prosecution, without fair notice, for the most prosaic interactions." *McDonnell*, 579 U.S. at 576. As a result, "[o]fficials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse." *Id.* at 575. And by not requiring a particular act to be identified—let alone a *quid pro quo* or a link—§ 666 "undermine[s] the Constitution's separation of powers" by "hand[ing] responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide." *Davis*, 139 S. Ct. at 2325; *cf. Sun–Diamond*, 526 U.S. at 408.

### c.      Section 666 Is Void for Vagueness as Applied to Madigan.

Even if the Court finds that § 666 is not facially void for vagueness, the statute is vague as applied because it did not "ma[ke] it reasonably clear at the relevant time that [Madigan's] conduct was criminal," *Coscia*, 866 F.3d at 792 (quoting *Lanier*, 520 U.S. at 267), and his conduct did not "fall[] so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement," *id.* at 794 (quoting *Farrell*, 449 F.3d at 494).

**Lack of Fair Notice.** As noted previously, the ComEd-related bribery and conspiracy counts rotely track the language of § 666, each failing to identify either a *quid pro quo* or a link. Superseding Indictment, at 24, 64–65, 67. Moreover, not one of the counts identifies a specific action with respect to which Madigan intended to be influenced or rewarded. Instead, the

52

charging language generically asserts that Madigan intended to be influenced and rewarded in connection with "legislation affecting ComEd and its business." *Id.* Even with its lengthy speaking indictment, including 71 paragraphs alleging overt acts in support of Count Two, the government identifies only four votes that Madigan cast on two pieces of energy legislation—the earliest vote having been cast more than two-and-a-half years before (and the last having been cast more than seven months before) any overt act alleging a thing of value that Madigan received from ComEd. *Id.* at 31–63.

Such boundless application of § 666 would expose untold numbers of public officials and their constituents to federal prosecution. As indicted here, any state or local official who receives (and anyone who gives a state or local official) a "thing of value" would risk prosecution if the official ever took an action that benefits the giver—even if the thing of value and the act are so attenuated as to permit only the most feeble inference of a causal connection between the two. This is precisely the type of "standardless sweep" that the *McDonnell* Court warned could lead "to prosecution, without fair notice, for the most prosaic interactions." 579 U.S. at 576. Under the government's construction of § 666, there is simply no way for ordinary people to distinguish criminal conduct from legal efforts to curry favor or generate goodwill.

**Arbitrary Enforcement.** Section 666's boundless application also "impermissibly delegates to law enforcement the authority to arrest and prosecute on 'an ad hoc and subjective basis.'" *Bell*, 697 F.3d at 462 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)). While the government may wish to stretch the boundaries of § 666, the irreducible core of the statute is a settled matter: bribes require the intent to influence demonstrated by a *quid pro quo*; gratuities require the intent to reward demonstrated by a link between a thing of value and a specific act. *See Sun–Diamond*, 526 U.S. at 404–05, 414; *cf. Hawkins*, 777 F.3d at 881–82;

53

*Boender*, 649 F.3d at 654–55. Because the ComEd-related bribery and conspiracy counts do not allege a *quid pro quo* or a link, they fail to allege conduct that is "so squarely in the core of what is prohibited by [§ 666] that there is no substantial concern about arbitrary enforcement." *Coscia*, 866 F.3d at 794 (quoting *Farrell*, 449 F.3d at 494). That concern is real, for the reasons already noted.

### 5.      Counts Two (in Part) and Three Must Be Dismissed Because the Alleged Bribes Were Bona Fide Salaries Under § 666(c).

Section 666 "does not apply to bona fide salary, wages, fees, or other compensation paid . . . in the usual course of business." 18 U.S.C. § 666(c). The Seventh Circuit has opined that "[t]he natural reading of the exception is that . . . compensation paid in the ordinary course shall not be construed as a bribe." *United States v. Robinson*, 663 F.3d 265, 272 (7th Cir. 2011); *see also United States v. Blagojevich*, 794 F.3d 729, 736 (7th Cir. 2015) ("Compensation for a job by someone other than a ghost worker is a 'bona fide salary.'").[16] The "things of value" alleged in Counts Two (in part) and Three fall squarely within § 666(c)'s safe harbor and, therefore, cannot form the basis of a violation of § 666.[17]

**Individual BM-1.** Count Three alleges that Madigan sought Individual BM-1's appointment to ComEd's board of directors "intending . . . to be influenced and rewarded in

---

[16] Salaries are bona fide and thus outside the scope of conduct that § 666 criminalizes, even if the employment at issue was corruptly procured, so long as "the indictment does not allege that the jobs in question were unnecessary or that the individuals who obtained those employment positions did not responsibly fulfill the duties associated with their employment." *United States v. Mills*, 140 F.3d 630, 633–34 (6th Cir. 1998); *see also United States v. Mann*, 172 F.3d 50 (Table), 1999 WL 17647, at *3 (6th Cir. 1999) (defendant did not violate 18 U.S.C. § 666(a)(1)(A) by serving as a school principal and drawing a principal's salary despite lacking the appropriate credentials under state law; defendant's wages were bona fide "because he legitimately performed the functions of the necessary position of principal").

[17] Counts Two (in part), Four, and Six are premised on ComEd's hiring of subcontractors. Superseding Indictment, at 25–27, 65, 67. The defense does not concede that compensation paid to contract lobbyists who, as the government asserts, "performed little or no work" is not bona fide or in the usual course of business. *Id.* at 25–27. However, the defense recognizes that this—unlike ComEd's hiring of Individual BM-1, Law Firm A, and interns from the Thirteenth Ward—is an issue of fact for the jury to decide.

connection with . . . legislation affecting ComEd and its business." Superseding Indictment, at 64. ComEd's appointment of Individual BM-1 is also alleged in the conspiracy charged in Count Two. *Id.* at 29–30. But there is no question that Individual BM-1 filled a vacant, pre-existing seat on ComEd's board of directors and performed the job to which he was appointed. *See* Superseding Indictment, at 63 ("On or about April 26, 2019, ComEd filed notice with the U.S. Securities and Exchange Commission stating that Individual BM-1 had served as a director of ComEd since April 2019."); Deferred Prosecution Agreement ("DPA") at A-10, *United States v. ComEd*, Case No. 20-CR-368 (N.D. Ill. July 17, 2020), ECF No. 3 ("Board Member 1" filled a "vacant board seat" after "ComEd and Exelon conducted due diligence on Board Member 1 and ultimately determined he was qualified for a [b]oard position."). Therefore, Counts Two (in part) and Three must be dismissed. *See United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) (Where an indictment fails to charge a valid statutory violation, a district court may dismiss the indictment "not because the government [can] not prove its case, but because there [is] no case to prove.").

**Law Firm A.** Count Two alleges that "the conspirators caused ComEd to retain Law Firm A, for the purpose of influencing and rewarding MADIGAN in connection with MADIGAN's official duties." Superseding Indictment, at 27. As with Individual BM-1, the undisputed facts establish that Law Firm A performed substantive work for ComEd. Count Two asserts that in 2011, "Law Firm A was retained by ComEd pursuant to a contract that provided Law Firm A would be provided with approximately 850 hours of work a year." *Id.* ComEd entered into a new contract with Law Firm A in 2016. *Id.* at 28. The DPA provides additional color about the renewal discussions:

> [P]ersonnel within ComEd sought to reduce the hours of legal work
> they provided to Law Firm A from the 850 hours specified in the

> 2011 retention agreement *because ComEd paid only for hours worked* and there was not enough appropriate legal work to give Law Firm A to fill 850 annual hours.

DPA at A-11, *ComEd*, Case No. 20-CR-368 (emphasis added). Ultimately, "ComEd agreed in or around June 2016 to renew Law Firm A's contract *with substantially reduced annual hours*." *Id.* (emphasis added). These facts show, indisputably, that ComEd not only expected Law Firm A to perform substantive legal work, but it "substantially reduced [Law Firm A's] annual hours" when it became concerned that "there was not enough appropriate legal work to give Law Firm A." *Id.* Because ComEd's retention of Law Firm A was bona fide and in the ordinary course of business, it cannot be construed as a bribe. *See Robinson*, 663 F.3d at 272; *cf. United States v. Mills*, 140 F.3d 630, 633 (6th Cir. 1998). Count Two must be dismissed to the extent it is predicated on ComEd's retention of Law Firm A. *See Risk*, 843 F.2d at 1061.

**Thirteenth Ward Interns.** Count Two alleges that "[i]t was further part of the conspiracy that, for the purpose of influencing and rewarding MADIGAN, the conspirators caused positions in the ComEd Internship Program to be set aside for individuals associated with the Thirteenth Ward who were identified to ComEd by McClain." Superseding Indictment, at 28. To be clear, this was "a summer internship program . . . that provided paid internship positions to students." *Id.* at 15. Here, again, there is no contention that the internship positions in question were "unnecessary." *Mills*, 140 F.3d at 633. In fact, Count Two quotes numerous emails stating that ComEd "put aside," "save[d]," or "allotted" a handful of internship "slots" for kids from the Thirteenth Ward—language evincing that ComEd would have assigned the internships to someone else if not a student from the Thirteenth Ward. Superseding Indictment, at 48–49, 54, 60.

Moreover, the Superseding Indictment makes no contention that students hailing from the Thirteenth Ward did not "responsibly fulfill the[ir] duties." *Mills*, 140 F.3d at 633. Rather, it

asserts that "[b]ased on their performance during the internship, participating students could be considered for subsequent summer internship positions or full-time jobs within ComEd." Superseding Indictment, at 15. This says it all—ComEd expected its interns to put in the work and, if the students proved their merit, they might be invited back. The Thirteenth Ward Interns received bona fide compensation "paid in the ordinary course" of the ComEd Internship Program; accordingly, their hiring "shall not be construed as a bribe." *Robinson*, 663 F.3d at 272. Count Two must be dismissed to the extent it is predicated on ComEd's hiring of Thirteenth Ward Interns. *See Risk*, 843 F.2d at 1061.

### B. The Travel Act Charges Related to ComEd (Counts Five and Seven) Must Be Dismissed.

Counts Five and Seven assert Travel Act violations predicated on conduct that is purportedly unlawful under the Illinois bribery and legislative misconduct statutes. Superseding Indictment, at 66, 68. As discussed, the Illinois bribery statute is facially overbroad and vague in violation of the First, Fifth, and Fourteenth Amendments. *See* Argument, § I.C.1–2, *supra*. Therefore, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), Counts Five and Seven must be dismissed insofar as they are predicated on the Illinois bribery statute. And references to the Illinois bribery statute should be stricken from the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 7(d).

## III. Company A

### A. The Federal Program Bribery Charge Related to Company A (Count Eleven) Must Be Dismissed.

As discussed, § 666 is facially overbroad in violation of the First Amendment and void for vagueness under the Due Process Clause of the Fifth Amendment. *See* Argument, § II.A.4.a–b, *supra*. Thus, Count Eleven must be dismissed pursuant to Federal Rule of Criminal Procedure

12(b)(3)(B)(v), and stricken from the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 7(d).

### B. The Travel Act Charges Related to Company A (Counts Twelve, Thirteen, and Fourteen) Must Be Dismissed.

Counts Twelve through Fourteen assert Travel Act violations predicated on conduct that is purportedly unlawful under the Illinois bribery and legislative misconduct statutes. Superseding Indictment, at 79–81. As discussed, the Illinois bribery statute is facially overbroad and vague in violation of the First, Fifth, and Fourteenth Amendments.[18] *See* Argument, § I.C.1–2, *supra*. Therefore, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), Counts Twelve, Thirteen, and Fourteen must be dismissed insofar as they are predicated on the Illinois bribery statute. And references to the Illinois bribery statute should be stricken from the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 7(d).

## IV. Chinatown Parking Lot

### A. The Federal Program Bribery Charge Related to the Chinatown Parking Lot (Count Twenty-One) Must Be Dismissed.

As discussed, § 666 is facially overbroad in violation of the First Amendment and void for vagueness under the Due Process Clause of the Fifth Amendment. *See* Argument, § II.A.4.a–b, *supra*. Accordingly, Count Twenty-One must be dismissed pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), and stricken from the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 7(d).

---

[18] Counts Twelve through Fourteen cite subsections (a), (d), and (e) of the Illinois bribery statute, 720 ILCS § 5/33-1(a), (d), (e), as predicate unlawful activity for the Travel Act charges. Superseding Indictment, at 79–81. Section I.C of the Argument, *supra*, addresses subsections (d) and (e) of the Illinois bribery statute because those subsections form the predicate activity alleged in Count One. Superseding Indictment, at 5, 11–12. Section 5/33-1(a) employs the same boundless "any act" language that renders subsections (d) and (e) unconstitutional.

**B.**     **The Travel Act Charge Related to the Chinatown Parking Lot (Count Twenty-Two) Must Be Dismissed.**

Count Twenty-Two asserts a Travel Act violation predicated on conduct that is purportedly unlawful under the Illinois bribery and legislative misconduct statutes. Superseding Indictment, at 102. As discussed, the Illinois bribery statute is facially overbroad and vague in violation of the First, Fifth, and Fourteenth Amendments.[19] *See* Argument, § I.C.1–2, *supra*. Therefore, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), Count Twenty-Two must be dismissed insofar as it is predicated on the Illinois bribery statute. And references to the Illinois bribery statute should be stricken from the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 7(d).

**V.     The Conspiracy Charge Related to AT&T (Count Twenty-Three) Must Be Dismissed.**

Count Twenty-Three asserts that Madigan took part in a conspiracy to violate § 666(a)(1)(B), (a)(2). Superseding Indictment, at 104–05. The conspiracy, it alleges, was to arrange for a former member of the Illinois House of Representatives, Individual FR-1, to be hired by AT&T for the purpose of "influencing and rewarding" Madigan "in connection with his official duties as Speaker" and "to assist AT&T Illinois with respect to the passage of COLR legislation." *Id.* at 105–06. Count Twenty-Three must be dismissed because it fails to allege a *quid pro quo* or a link connecting AT&T's engagement of Individual FR-1 to Madigan's support for COLR legislation; therefore, it necessarily fails to allege that Madigan was aware of or agreed to commit a corrupt exchange in violation of § 666.

---

[19] Like Counts Twelve through Fourteen, Count Twenty-Two cites subsections (a), (d), and (e) of the Illinois bribery statute, 720 ILCS § 5/33-1(a), (d), (e), as predicate unlawful activity for the Travel Act charges. Superseding Indictment, at 102. *See* note 18, *supra*, regarding § 5/33-1(a).

If the Court determines that § 666 is ambiguous as to whether a *quid pro quo* or link is required, then it should apply the rule of lenity and construe the statute in Madigan's favor. Alternatively, if the Court determines that § 666 does not require either a *quid pro quo* (for bribes) or a link (for gratuities), then it should find § 666 overly broad and unduly vague in violation of the First and Fifth Amendments, respectively. In either case, the Court must dismiss Count Twenty-Three.

### A.    Count Twenty-Three Fails to Allege that Madigan Was Aware of and Agreed to Commit a Corrupt Exchange in Violation of § 666.

"[T]he fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all the elements of [the underlying substantive] criminal offense.'" *United States v. Kelerchian*, 937 F.3d 895, 915 (7th Cir. 2019) (quoting *Ocasio v. United States*, 578 U.S. 282, 287 (2016)). "[E]ach conspirator must have specifically intended that *some conspirator* commit each element of the substantive offense." *Id.* (quoting *Ocasio*, 578 U.S. at 292). As discussed, a *quid pro quo* (for bribes) or a link (for gratuities) is an essential element of a § 666 charge. Thus, to charge Madigan with conspiring to violate § 666, the government must allege that he **knew** of the object of the conspiracy—*i.e.*, that AT&T hired Individual FR-1 either *in exchange for* (if a bribe) or *for or because of* (if a gratuity) his support for COLR legislation—and **agreed** to accomplish its unlawful objective. *Id.* at 914. Count Twenty-Three must be dismissed because it fails to allege that Madigan knew of and agreed to effectuate such a transaction with AT&T.

**Agreement.** Count Twenty-Three alleges that Madigan and McClain "sought to obtain monetary payments for Individual FR-1 from AT&T"—a topic that McClain purportedly broached in February 2017 when he contacted AT&T about a "small contract" for Individual FR-1. Superseding Indictment, at 106, 108. Count Twenty-Three further asserts that two days

after McClain raised the topic of Individual FR-1's contract, "McCLAIN advised AT&T . . . that MADIGAN had assigned McCLAIN to work on the COLR legislation . . . as a 'Special Project' for MADIGAN." Superseding Indictment, at 106. As it relates to Madigan, Count Twenty-Three next identifies three votes that Madigan cast in favor of COLR legislation on May 31, June 29, and July 1, 2017. Superseding Indictment, at 111. In short, the government identifies a "thing of value" on the one hand (Individual FR-1's engagement) and an act on the other (Madigan's support of COLR legislation), and calls it a day. But that is not enough. The government must also allege a *connection* between the benefit and the act; it has failed to do so. As a result, the government has necessarily failed to allege that Madigan intended or agreed that his support for COLR legislation would be "in exchange for" or "for or because of" AT&T's engagement of Individual FR-1.

**Knowledge.** Count Twenty-Three cites various emails *among* AT&T employees discussing whether AT&T will "get credit from the powers that be" if Individual FR-1 is engaged indirectly as a consultant through an intermediary, instead of directly as a lobbyist. Superseding Indictment, at 109–10. But this language does not prove a crime. *Cf. United States v. Ring*, 706 F.3d 460, 463 (D.C. Cir. 2013) ("In order to more effectively communicate their clients' policy goals, lobbyists often seek to cultivate personal relationships with public officials."). There is no suggestion that AT&T intended for its engagement of Individual FR-1 to influence or reward Madigan on a specific action (or course of action). More importantly, even if these *internal* emails sufficiently alleged (though they do not) that AT&T intended its hiring of Individual FR-1 to influence or reward Madigan's support of COLR legislation, Count Twenty-Three does not allege that Madigan knew of these emails or, more generally, believed that AT&T harbored such an intent.

Because Count Twenty-Three fails to allege that Madigan knew of the object of the purported conspiracy and agreed to accomplish its unlawful objective, the Superseding Indictment violates Madigan's Fifth Amendment rights to indictment by a grand jury and protection against double jeopardy, as well as his Sixth Amendment right to be informed of the nature and cause of the accusations against him. *See Resendiz–Ponce*, 549 U.S. at 108.

### B. The Court Should Apply the Rule of Lenity to Dismiss Count Twenty-Three.

If the Court finds that § 666 is grievously ambiguous as to whether the government must allege a *quid pro quo* or a link between a thing of value conferred upon a public official and a specific act for or because of which it was given, then it should apply the rule of lenity and construe the statute in Madigan's favor. *See* Argument, § II.A.3, *supra*. Because it fails to allege either, Count Twenty-Three must be dismissed.

### C. Count Twenty-Three Must Be Dismissed as Unconstitutional.

If the Court finds that § 666 requires neither a *quid pro quo* for bribes nor a link for gratuities, then Count Twenty-Three must be dismissed because it asserts a conspiracy to violate a statute that is unconstitutional. *United States v. Baranski*, 484 F.2d 556, 561 (7th Cir. 1973) ("[T]he statutory requirement of conspiring to commit an 'offense against the United States,' 18 U.S.C. § 371, is not fulfilled by an offense which fails to meet constitutional muster."). Absent a *quid pro quo* or link requirement, § 666 is facially overbroad and vague in violation of the First and Fifth Amendments. *See* Argument, § II.A.4.a–b, *supra*. Moreover, the government's application of § 666 to Madigan in Count Twenty-Three—mechanically tracking the language of § 666 and failing to identify either a *quid pro quo* or a link—is yet another demonstration of the statute's as-applied vagueness.

**Lack of Fair Notice.** Section 666 failed to "ma[ke] it reasonably clear at the relevant time that [Madigan's] conduct was criminal." *Coscia*, 866 F.3d at 792 (quoting *Lanier*, 520 U.S.

at 267). As with the ComEd-related conspiracy and bribery charges discussed above, the government's boundless application of § 666 in Count Twenty-Three obscures any intelligible distinction between criminal conduct and legal efforts to curry favor or generate goodwill. *See* Argument, § II.A.4.c, *supra*. The government's charge hangs on the allegation that Madigan cast three votes on legislation relevant to AT&T approximately three to four months after McClain inquired with AT&T about a "small contract" for Individual FR-1. Superseding Indictment, at 108, 111. Under the government's theory of prosecution, the only way for state legislators to avoid committing a federal crime with assurance would be to abstain entirely from recommending individuals for jobs with private companies that might possibly be affected by legislation. That is not and cannot be what the law requires.

**Arbitrary Enforcement.** Because Count Twenty-Three alleges neither a *quid pro quo* nor a link, it also fails to allege conduct that is "so squarely in the core of what is prohibited by [§ 666] that there is no substantial concern about arbitrary enforcement." *Coscia*, 866 F.3d at 794 (quoting *Farrell*, 449 F.3d at 494). And, again, that concern is real.

## Conclusion

For the reasons given above, Madigan respectfully requests that the following counts of the Superseding Indictment be dismissed:

1. Count One

   a. Count One must be dismissed in its entirety for failing to allege a RICO enterprise and an agreement to conduct or participate in the enterprise's affairs.

   b. Alternatively, Count One must be dismissed to the extent it is predicated on violations of the Illinois bribery and official misconduct statutes, which this Court should find unconstitutionally overbroad and vague.

2. Counts Two, Three, Four, Six, and Twenty-Three

   a. Count Two (to the extent it alleges a conspiracy to violate § 666) and Counts Three, Four, Six, and Twenty-Three (in their entirety) must be dismissed because:

      i. They fail to allege either a *quid pro quo* (for bribes) or a link (for gratuities); or

      ii. The rule of lenity counsels dismissal if § 666 is ambiguous as to whether a *quid pro quo* or link is required; or

      iii. Absent a *quid pro quo* or link requirement § 666 is unconstitutionally overbroad and vague.

   b. Alternatively, Count Two (to the extent it alleges a conspiracy to violate § 666 predicated on ComEd's hiring of Individual BM-1, Law Firm A, or the Thirteenth Ward Interns) and Count Three (in its entirety) must be dismissed pursuant to § 666(c).

3. Counts Five, Seven, Twelve, Thirteen, Fourteen, and Twenty-Two must be dismissed to the extent they charge Travel Act violations predicated on conduct unlawful under the Illinois bribery statute, which this Court should find unconstitutionally overbroad and vague.

4. Counts Eleven and Twenty-One must be dismissed in their entirety because, absent a *quid pro quo* or link requirement, § 666 is unconstitutionally overbroad and vague.


Dated: February 28, 2023        Respectfully submitted,

                  By: /s/ Sheldon T. Zenner

                  Sheldon T. Zenner, Esq. (ARDC #3122184)
                  Gil M. Soffer, Esq. (ARDC #6201959)
                  Daniel J. Collins, Esq. (ARDC #6224698)
                  Lari A. Dierks, Esq. (ARDC #6329610)
                  Ian A. Vitalis, Esq. (ARDC #6333510)
                  Katten Muchin Rosenman LLP
                  525 West Monroe Street
                  Chicago, Illinois 60661
                  (312) 902-5476
                  Sheldon.Zenner@Katten.com
                  Gil.Soffer@Katten.com
                  Daniel.Collins@Katten.com
                  Lari.Dierks@Katten.com
                  Ian.Vitalis@Katten.com

                  ***Attorneys for Defendant Michael J. Madigan***