UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MICHAEL J. MADIGAN and
MICHAEL F. McCLAIN

No.   22 CR 115
Hon.  John R. Blakey

**GOVERNMENT'S SANTIAGO PROFFER AND MOTION TO ADMIT
EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 801(d)(2)(E)**

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:   /s/ *Amarjeet S. Bhachu*
AMARJEET S. BHACHU
DIANE MacARTHUR
SARAH STREICKER
TIMOTHY CHAPMAN
JULIA K. SCHWARTZ
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

# TABLE OF CONTENTS

I. Introduction ........................................................................................................... 1

II. Applicable Law .................................................................................................... 2

   A. Existence of and Membership in the Conspiracy .......................................... 2

   B. "In Furtherance of" the Conspiracy ............................................................... 7

   C. Alternative Bases for Admissibility of Statements ..................................... 10

      1. A Defendant's Own Statements ............................................................. 10

      2. Non-Hearsay Statements ........................................................................ 11

      3. Statements Against Penal Interest ......................................................... 12

      4. Statements of Agents ............................................................................. 13

III. Evidence Demonstrating the Existence of the Charged Racketeering Conspiracy as Well as the Subsidiary Conspiracies and Joint Ventures, and the Defendants' Participation in These Crimes ................................................................ 14

   A. General Overview of the Racketeering Conspiracy........................................ 14

   B. ComEd-Related Conduct. ............................................................................. 20

      1. Anticipated Witness Testimony ............................................................ 22

      2. Documentary and Other Physical Evidence .......................................... 55

      3. Wiretap Communications and Consensual Recordings ........................ 80

   C. AT&T-Related Conduct. ............................................................................. 121

      1. Anticipated Witness Testimony .......................................................... 123

      2. Documentary and Other Physical Evidence ........................................ 131

      3. Wiretap Communications .................................................................... 142

   D. State Board-Related Conduct. .................................................................... 143

      1. Consensual Recordings Made by Solis and His Anticipated Testimony... 144

      2. Additional Anticipated Witness Testimony........................................ 157

      3. Documentary and Other Physical Evidence ....................................... 160

   E. Chinatown-Related Conduct ....................................................................... 164

      1. Consensual Recordings Made by Solis and His Anticipated Testimony... 166

i

2.      Additional Anticipated Witness Testimony...................................................182

3.      Documentary and Other Physical Evidence...............................................186

F.      Apartment Project-Related Conduct. ...............................................................189

1.      Consensual Recordings Made by Solis and His Anticipated Testimony... 191

2.      Documentary and Other Physical Evidence...............................................202

G.      Other Proof of Enterprise and Enterprise Activity. ......................................204

1.      Proof of McClain's Status as an Agent for Madigan .....................................204

2.      Proof of Other Conduct Undertaken in Furtherance of the Objectives of the Racketeering Conspiracy...........................................................................206

IV.      Coconspirator Statements ....................................................................................209

V.      Conclusion .............................................................................................................213

The United States of America, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, submits the following proffer of evidence as to the admission at trial of certain coconspirator statements against defendants Michael J. Madigan and Michael F. McClain, and moves for the admission of such statements pursuant to Federal Rules of Evidence 104(a) and 801(d)(2)(E), and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## I.  Introduction

In this submission, the government describes the law governing coconspirator statements, outlines some of its evidence establishing the charged conspiracy, and sets forth some of the coconspirator statements for which a pretrial ruling by the Court is requested, in accordance with *Santiago*, 582 F.2d at 1130-31, and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris*, 585 F.3d 394, 398, 400 (7th Cir. 2009).

This submission does not detail all of the government's evidence that would establish the existence of the conspiracy or all of the coconspirator statements that were made in furtherance of the charged conspiracy. Rather, this submission highlights for the Court certain of the government's evidence sufficient to establish the existence of the conspiracy described in Count One and the participation of the coconspirators, as well as the subsidiary conspiracies and joint ventures described herein. As a result, this submission does not list all of the government's evidence and witnesses, nor does it provide all of the evidence that will be presented by identified witnesses. Finally, by

presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed.

## II.    Applicable Law

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[1]

### A.    Existence of and Membership in the Conspiracy

In accord with *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), this Court must determine whether statements by the defendants' coconspirator will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination, this Court must decide "if it is more likely than not that the declarant and the defendant were

---

[1]    No Sixth Amendment confrontation issues arise by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant because they are not testimonial. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . . ." *Id.* at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If this Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).[2]

Under *Santiago*, the government must make a preliminary offer of evidence to show: (1) a conspiracy existed; (2) the defendants and declarant were members of the

---

[2] As described in greater detail herein, certain of the racketeering acts charged in Count One revolve around underlying conspiracies and joint ventures. Rule 801(d)(2)(E) encompasses not only conspiracies, but also joint ventures, including statements made by joint venturers that participate in schemes. The Notes of the Committee on the Judiciary for Rule 801 make clear that "[w]hile the rule refers to a coconspirator, it is this committee's understanding that the rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged." *United States v. Shah*, No. 19 CR 864, 2023 WL 22140, at *1 (N.D. Ill. Jan. 3, 2023) (Durkin, J.) (quoting Fed. R. Evid. 801, Notes of Committee on the Judiciary, Senate Report No. 93-1277 (citing *United States v. Spencer*, 415 F.2d 1301, 1304 (7th Cir. 1969)). The Seventh Circuit is in accord with this view. *See, e.g., United States v. Kelley*, 864 F.2d 569, 573 (7th Cir.1989) ("Rule 801(d)(2)(E) applies not only to conspiracies but also to joint ventures, and . . . a charge of criminal conspiracy is not required to invoke the evidentiary rule."); *United States v. Coe*, 718 F.2d 830, 835 (7th Cir.1983) ("Conspiracy as an evidentiary rule differs from conspiracy as a crime. The crime of conspiracy comprehends much more than just a joint venture or concerted action, whereas the evidentiary rule of conspiracy is founded on concepts of agency law. Recognizing this, some courts refer to the co-conspirator exception as the 'joint venture' or 'concert of action' exception.") (internal citations omitted) (citing *United States v. Gil*, 604 F.2d 546, 549 (7th Cir.1979)). *See also United States v. Gewin*, 471 F.3d 197, 201 (D.C.Cir.2006) ("[T]he rule, based on concepts of agency and partnership law and applicable in both civil and criminal trials, embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are admissible against the others, if made in furtherance of the common goal.") (internal quotations and ellipsis omitted); *Smith v.*

conspiracy; and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134-35; *see also*, *e.g.*, *Alviar*, 573 F.3d at 540. According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid. 801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (*en banc*).

While this Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and the defendants' participation in it, *Bourjaily*, 483 U.S. at 178, 180; *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009), the

---

*Bray*, 681 F.3d 888, 904–05 (7th Cir. 2012) (statements made by individuals acting in concert to fire employee susceptible to admission under Rule 801(d)(2)(A)), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). For ease of reading, the government will generally refer to the concepts governing the admission of Rule 801(d)(2)(E) statements by referring to them as coconspirator statements although, as noted above, such concepts apply to joint venturers as well.

contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and a defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson*, 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[3]

There is no requirement, under Rule 801(d)(2)(E), that the government establish all elements of a conspiracy, such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *Gil*, 604 F.2d at 548-50. The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in

---

[3]     The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted. Accordingly, statements by coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant out of cocaine not hearsay because showed membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) (addressing "war stories" about the drug trade); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value to establish knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to set scope of anticipated conspiracy).

crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-50; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet*, 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator. *Longstreet*, 567 F.3d at 919; *Jones*, 275 F.3d at 652.

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*,

6

900 F.2d 1064, 1074 (7th Cir. 1990). A coconspirator who has become inactive or less active in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context, and/or other evidence) that the declarant was in fact a coconspirator. *Id.*

## B. "In Furtherance of" the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea*, 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*,

7

991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala*, 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, No. 02 CR 400, 2004 WL 1151630, *2-3 (N.D. Ill. Apr. 28, 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *Alviar*, 573 F.3d at 545 (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

- to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also Johnson*, 200 F.3d at 533;

- to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), *abrogated on other grounds by United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

- to identify other members of the conspiracy and their roles, *Alviar*, 573 F.3d at 545;

- to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

- as an assurance that a coconspirator can be trusted to perform his role, *Sophie*, 900 F.2d at 1073-74; *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

- to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

- to control damage to an ongoing conspiracy, *Johnson*, 200 F.3d at 533; *United States v. Molinaro*, 877 F.2d 1341, 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

- to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

- to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

- to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

- to "describe[e] the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992); and

- statements to outsiders "to serve as a salesmanship technique to enhance his position in the eyes of [the outsider] and give confidence about the ability of the organization," *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995); *United States v. Curtis*, 37 F.3d 301, 308 (7th Cir. 1994).

- statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720, 722 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera*, 136 F. App'x 925, 926 (7th Cir. 2005)

9

("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

## C. Alternative Bases for Admissibility of Statements

Various statements made during the course of a conspiracy or joint venture are independently admissible and do not require a Rule 801(d)(2)(E) analysis.

### 1. A Defendant's Own Statements

A defendant's own admissions are relevant to establish the factual predicates for the admission of coconspirator statements against him. *See United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997). A defendant's own admissions are admissible against him pursuant to Rule 801(d)(2)(A), without reliance on the coconspirator-statement rule. *See United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). *See also* Fed. R. Evid. 801(d)(2)(A) (providing that a "statement" is not hearsay if "[t]he statement is offered against a party and . . . was made by the party in an individual or representative capacity"). Additionally, a defendant's own admissions are relevant to establishing the factual predicates for the admission of coconspirator statements against him. *See Godinez*, 110 F.3d at 455; *United States v. Potts*, 840 F.2d 368, 371-72 (7th Cir. 1987).

Moreover, statements during a conversation with a defendant that are offered by the government to provide context for a defendant's statements are, as a general matter, admissible as non-hearsay. For example, in *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011), the Seventh Circuit addressed the district court's introduction of a confidential

informant's recorded statements to the defendant. The Court held that the challenged statements were non-hearsay because they were offered not for their truth but to put the defendant's "own words in context and to help the jury make sense out of his reaction to what [the informant] said and did." *Id.* at 580 (defendant's responses "would have been unintelligible without the context provided by [the informant's] statements").

### 2. Non-Hearsay Statements

The coconspirator statement rule is not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification. Thus, a statement that is incapable of verification—such as a suggestion, question, offer, demand, or order—does not constitute hearsay because it "do[es] not make any truth claims." *United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999); *see also United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). This is because a "statement" is defined as "an oral [or] written assertion" or "nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not require Rule 801(d)(2)(E) analysis. *See Tuchow*, 768 F.2d at 868.

Finally, the coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay"

as defined by Rule 801(c).[4] Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *Gajo*, 290 F.3d at 929-30; *see also United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.

### 3. Statements Against Penal Interest

Under Federal Rule of Evidence 804(b)(3), a hearsay statement is admissible if (1) the declarant is unavailable; (2) the statement was against the declarant's penal interest at the time it was made; and (3) corroborating circumstances exist indicating that the statement is trustworthy. *See United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011). When determining whether a statement is against penal interest, each portion of a proffered out-of-court statement is examined to determine whether it subjected the declarant to criminal liability. *United States v. Westmoreland*, 240 F.3d 618, 626 (7th Cir. 2001). A statement may satisfy this requirement if it would be probative at trial against the declarant. *United States v. Nagib*, 56 F.3d 798, 804 (7th Cir. 1995). Applying this standard, the Seventh Circuit has held that a declarant's inculpatory statements made to

---

[4]     Federal Rule of Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."

friends and acquaintances about crimes committed by the declarant and his associates are admissible. *See, e.g. United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir. 1994) (holding that a jailhouse conversation between two codefendants which incriminated a third codefendant but was also inculpatory of the first two codefendants was admissible against the third codefendant); *United States v. Curry*, 977 F.2d 1042, 1056 (7th Cir. 1992) (affirming admission of a codefendant's inculpatory statement which also incriminated the defendant because it was not made in an attempt to curry favor with law enforcement but was made to an acquaintance).

Such statements against penal interest are admissible against non-declarant defendants. *See United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir. 2014); *United States v. Watson*, 525 F.3d 583, 587-88 (7th Cir. 2008); *Hamilton*, 19 F.3d at 356. *See also United States v. Smalls*, 605 F.3d 765, 773-81 (10th Cir. 2010).

### 4.     Statements of Agents

Rule 801(d)(2)(D) provides that a statement is not hearsay when offered against an opposing party and was "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." *See, e.g.*, *Baines v. Walgreens Co.*, 863 F.3d 656, 663 (7th Cir. 2017) (statements made by a subordinate, reflecting subordinate's understanding of criteria used by supervisor to make hiring and firing decisions is admissible against the supervisor); *Nekolny v. Painter*, 653 F.2d 1164, 1171–72 (7th Cir. 1981) (finding admissions where declarant was an "advisor" to the decision-maker, participated in interviews, discussed employees' performance, and communicated news

of termination). So long as the proponent demonstrates that the "agent was authorized to act for his principal concerning the matter about which he allegedly spoke," *Friedman v. Premier Cruise Lines*, 966 F.2d 1456, Appendix at *2 (Report and Recommendation of Magistrate Judge) (citing *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1565-66 (11th Cir. 1991) for the proposition that a statement is admissible, because the "authority to do an act would conclusively imply authority to speak narratively about the act, if the utterance was made before the termination of the agency" (internal citation omitted)).

### III. Evidence Demonstrating the Existence of the Charged Racketeering Conspiracy as Well as the Subsidiary Conspiracies and Joint Ventures, and the Defendants' Participation in These Crimes.

#### A. General Overview of the Racketeering Conspiracy.

Count One of the superseding indictment charges that from no later than in or around 2011 and continuing through in or around 2019, Michael Madigan and Michael McClain, being persons employed by and associated with an enterprise, which enterprise engaged in, and the activities of which affected, interstate commerce, did knowingly conspire together and with other persons known and unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity. R. 37, Count 1.

The pattern of racketeering activity included the following: (a) multiple acts indictable under Title 18, United States Code, Section 1951 (relating to interference with commerce by extortion), and Title 18, United States Code, Section 1952 (relating to the

14

use of facilities in interstate commerce in aid of racketeering activity); and (b) multiple acts and threats involving bribery chargeable under the law of the States of Illinois, namely, Chapter 720 ILCS § 5/33-1(d)-(e) (bribery); Chapter 720 ILCS § 5/33-3(a)(4) (official misconduct (formerly § 33-3(d))); and Chapter 720 ILCS § 645/1 and § 5/33-8 (legislative misconduct).[5]

Defendant Madigan occupied a number of positions, including but not limited to: (i) Representative for the State of Illinois's Twenty-Second District; (ii) Speaker of the Illinois House of Representatives; (iii) Democratic Committeeman for Chicago's Thirteenth Ward; (iv) Chairman of the Thirteenth Ward Democratic Organization; (v) Chairman of the Democratic Party of Illinois; and (vi) partner in the law firm, Madigan & Getzendanner.

Defendant McClain served with Madigan in the Illinois House of Representatives for approximately ten years, beginning in 1972. After his service in the House, McClain worked as a lobbyist and/or consultant.

Both defendants were members of an association-in-fact enterprise that included various entities. These entities, specifically, the Office of the Speaker, the Thirteenth Ward Democratic Organization, and Madigan & Getzendanner, were each helmed by Madigan and each was an independent entity in its own right. The defendants and these

---

[5] 720 ILCS § 645/1 was effective until December 31, 2012, and § 5/33-8 was effective thereafter.

entities collectively formed an ongoing organization (the "Madigan Enterprise" or "enterprise") focused as a continuing unit on the common purpose of achieving the objectives of the enterprise. The purposes of the Madigan Enterprise included but were not limited to: (i) to exercise, to preserve, and to enhance Madigan's political power and financial well-being; (ii) to financially reward Madigan's political allies, political workers, and associates for their loyalty, association with, and work for Madigan; and (iii) to generate income for members and associates of the enterprise through illegal activities.

Madigan was the leader of the enterprise, and he used his various positions to oversee, direct, and guide certain of the enterprise's illegal activities. Among other things, Madigan utilized his official positions as a Representative and Speaker: (i) to cause various businesses to employ, contract with, and make direct and indirect monetary payments to Madigan's political allies, political workers, and associates as a reward for and to promote their loyalty, association with, and work for Madigan, at times in return for little or no legitimate work performed for the benefit of the businesses; and (ii) to solicit and receive from persons and parties having business with the State of Illinois and the City of Chicago, or otherwise subject to the authority and powers vested in Madigan and other public officials acting on Madigan's behalf, including Chicago Alderman Daniel Solis, bribes and unlawful personal financial advantage, including but not limited to fees arising from the retention of Madigan's law firm, Madigan & Getzendanner.

Madigan used his positions within the Thirteenth Ward to direct the activities of his political allies and political workers and to maintain his political power for purposes

of ensuring his continued retention of his positions as a member of the House and Speaker. He also used his position as Chairman of the Democratic Party of Illinois to influence and garner loyalty from legislators through his ability to control funding to legislators and their campaigns. Madigan used his partnership position in Madigan & Getzendanner in order to reap the benefits of private legal work unlawfully steered to the firm.

Madigan also directed the activities of his close friend and associate, McClain, who carried out illegal and legal activity at Madigan's direction. For his part, McClain served the enterprise by (i) making unlawful demands on Madigan's behalf to third parties, such as corporate executives and lobbyists, for jobs and payments to be made to Madigan's political allies, political workers, and associates, thereby acting as an intermediary in order to shield Madigan from direct contact with third parties in connection with the discussion of the enterprise's criminal activity; (ii) causing the creation of false documentation and formulating means of indirect payment in order to conceal the true nature of payments made to Madigan's political allies, political workers, and associates; (iii) conveying Madigan's instructions and messages to public officials, lobbyists, and business executives, including but not limited to instructions on whether Madigan wished to support, advance, or hold legislation pending before the General Assembly; (iv) providing strategic advice to Madigan on sensitive political matters; (v) briefing Madigan on his activities on behalf of the enterprise; (vi) otherwise acting as Madigan's agent for the purposes of conveying Madigan's instructions, requests, and messages to third

17

parties; and (vii) using intimidation to advance the interests of the enterprise's illegal activities.

The enterprise engaged in a variety of different activities which constitute both proof of the existence of the enterprise and the pattern of racketeering activity the conspirators agreed to. For purposes of discussion, this conduct can be separated into the following categories:

- <u>ComEd</u>. In exchange for Madigan's assistance to Commonwealth Edison Company ("ComEd") with respect to the passage of legislation favorable to ComEd and the defeat of legislation unfavorable to ComEd, Madigan, McClain and others arranged for associates of Madigan (including his political allies and individuals who performed political work for Madigan) to obtain jobs, contracts, and monetary payments associated with those jobs from ComEd and its affiliates, even in instances where such associates performed little or no work for ComEd.[6]

- <u>AT&T</u>. Madigan and McClain arranged for a former State Representative, Individual FR-1, to indirectly receive payments made at the direction of AT&T Illinois ("AT&T") in exchange for Madigan's assistance with the passage of legislation beneficial to AT&T, even though Individual FR-1 performed no work in return for such payments.[7]

- <u>Chinatown Parcel</u>. Madigan and McClain sought to secure the passage of legislation providing for the transfer of a parcel of land in Chicago's Chinatown neighborhood (the "Chinatown Parcel") with the understanding

---

[6] As discussed below, the evidence concerning the ComEd-related conduct establishes the existence of a separate, ComEd-focused subsidiary conspiracy (charged in Count 2 of the superseding indictment) that also renders these statements independently admissible under Rule 801(d)(2)(E).

[7] As discussed below, the evidence concerning the AT&T-related conduct establishes the existence of a separate, AT&T-focused subsidiary conspiracy (charged in Count 23 of the superseding indictment) that also renders these statements admissible under Rule 801(d)(2)(E).

that, in exchange, the prospective owner of the Chinatown Parcel would steer legal work to Madigan & Getzendanner.[8]

- <u>State Board position</u>. Madigan agreed to use his official position as Speaker of the House of Representatives to assist former Alderman Daniel Solis's appointment to a paying State Board position in exchange for Solis steering business to Madigan & Getzendanner and a relative of Madigan.

- <u>Apartment Project</u>. Madigan attempted to commit extortion, in that Madigan attempted to obtain legal fees for his law firm, Madigan & Getzendanner, understanding that Company C, the developers of an apartment project, would provide those fees in exchange for receiving the necessary approvals for the development project from Alderman Solis.

- <u>Other Enterprise Activity</u>. As described in detail below, Madigan and McClain engaged in other conduct that constitutes proof of the existence of the enterprise, the purposes of the enterprise, and McClain's role as an agent for Madigan within the enterprise.

Notably, as described in detail below, the above-described racketeering activity often occurred in parallel—with Madigan and McClain engaged in multiple illegal conspiracies and schemes taking place over the same period of time, indeed, with a number of them often being advanced during the course of the same conversation or telephone call, thus demonstrating the relatedness and continuity of the pattern of racketeering.

---

[8] As discussed below, the evidence concerning the Chinatown-related conduct establishes the existence of a separate, Chinatown-focused subsidiary joint venture (charged in Counts 19 and 20 of the superseding indictment) that also renders these statements admissible under Rule 801(d)(2)(E).

19

As set out below, the evidence that proves the existence of both the enterprise and the pattern of racketeering is strong, and easily satisfies the preponderance of the evidence standard applicable at this juncture. It includes the testimony of witnesses, court-authorized interceptions of wire communications, consensual recordings, and documentary evidence obtained through grand jury subpoenas and seizures. Below, the government has summarized some but not all of the evidence that it will present at trial regarding the existence of the charged conspiracies and joint ventures.

### B. ComEd-Related Conduct.[9]

ComEd was a company headquartered in Chicago that delivered electricity to customers across northern Illinois. ComEd was a subsidiary of Exelon Corporation ("Exelon"), a utility services holding company that provided energy to customers in multiple states.

Between in and around 2011 and 2019, Madigan and McClain arranged for ComEd to confer a stream of benefits on Madigan, in exchange for Madigan's efforts to assist ComEd with respect to legislation affecting ComEd's business. These benefits conferred on Madigan included jobs, vendor contracts and subcontracts, and monetary payments

---

[9]     Based on a substantially similar proffer as to the ComEd-related conduct, Judge Leinenweber agreed that the government had made the requisite showing under *Santiago* in *United States v. McClain*, No. 20 CR 812 (N.D. Ill.). All defendants were subsequently convicted after a trial and their post-trial motions were denied. Sentencing in that case has been deferred pending the Supreme Court's judgment in *Snyder v. United States*, No. 23-108.

for Madigan's associates and political allies. Notably, defendants arranged for Madigan's associates—including a former Thirteenth Ward Alderman and political associate of Madigan, Frank Olivo (identified as "Individual 13W-1" in the superseding indictment),[10] Thirteenth Ward precinct captains Ray Nice and Edward Moody ("Individual 13W-2" and "Individual 13W-3" respectively in the superseding indictment), a former 23rd Ward Alderman and political ally of Madigan, Michael Zalewski, Sr. ("Individual 23W-1"), and a former state representative and political ally of Madigan, Edward Acevedo ("Individual FR-1")—to be hired as ComEd "subcontractors." These individuals reaped over one million dollars in payments even though they did little or no work for ComEd. Defendants sought to conceal the nature of the payments to the Madigan subcontractors, including by causing the falsification of internal records at ComEd and by using intermediaries to make payments. In addition, the defendants caused ComEd to retain Reyes Kurson ("Law Firm A") a firm who had a partner, Victor Reyes, who was particularly valuable to Madigan's political operation, as demonstrated when McClain went so far as to threaten ComEd that reducing the firm's hours would provoke an adverse reaction from Madigan. Defendants also caused Juan Ochoa ("Individual BM-1") to be appointed to ComEd's board of directors at Madigan's request, despite reservations expressed by

---

[10]     The government has redacted names of certain uncharged individuals for purposes of this public filing. The previously anonymized individuals now referenced by name have been publicly disclosed at trial in the related case, *United States v. McClain*, 20 CR 812 (N.D. Ill.) (Leinenweber, J.).

ComEd officials. And defendants caused ComEd to set aside summer internship positions for, and gave preferential treatment to, individuals identified by McClain and associated with Madigan and the Thirteenth Ward—for the purpose of corruptly ensuring ComEd's legislative goals were met.[11]

### 1.     Anticipated Witness Testimony

The government anticipates that the witnesses called at trial will include the testimony of the individuals referenced below, among others. The testimony of these witnesses will demonstrate the existence of the conspiracy and the methods used to engage in the illegal activity, identify the defendants' roles within the conspiracy, and explain the conspirators' motive and opportunity to engage in the illegal conduct.

### a.     Tom O'Neill (Individual LD-1)

The government expects to call Tom O'Neill, who was a member of ComEd's legal department ("Individual LD-1") at times relevant to the superseding indictment.

### i.     ComEd's Legislative Initiatives and Madigan's Support of Them

The government expects O'Neill will testify about several major legislative initiatives ComEd supported beginning in or around 2011, and Madigan's involvement

---

[11]     This conduct also serves as the basis for a separate conspiracy charged in Count 2 of the superseding indictment. The evidence described in this section also establishes the existence of this subsidiary conspiracy, the participation of the defendants in this subsidiary conspiracy, and the statements the government intends to offer at trial pursuant to the coconspirator exception.

with and support of them—which constitutes context and evidence of the purpose behind illicit benefits conferred on Madigan and his associates.

O'Neill is expected to testify that in or around 2005, ComEd faced the prospect of filing for bankruptcy, and several years later, its operational capabilities were poor. At the request of Anne Pramaggiore (who went on to serve as chief executive officer of ComEd between 2012 and 2018), O'Neill participated in the negotiation of legislation that would ultimately be passed as the Energy Infrastructure Modernization Act (known as "EIMA").

O'Neill is expected to testify about the regulatory environment ComEd faced before EIMA was enacted. Among other things, O'Neill is expected to testify that prior to 2011, the rates ComEd could charge customers were set through a process regulated by the Illinois Commerce Commission, commonly known as a "rate case." The rate case process prior to 2011 had become very contentious, cumbersome, and unpredictable. ComEd could not effectively make future plans for investment because it could not be assured of what returns it would receive on its investments.

EIMA overcame this dilemma by providing for what was known as a "formula rate," which provided a simpler and more predictable formula for devising what ComEd was permitted to charge customers—thereby providing ComEd with greater economic stability and the ability to more accurately forecast its return on investment.

O'Neill will explain that McClain was ComEd's lead outside lobbyist in connection with the passage of EIMA. O'Neill will explain that he understood McClain was very

close with Madigan, and that Madigan and McClain had previously worked together in the General Assembly. McClain brought messages and information from Madigan to ComEd, and relayed messages to Madigan from the company. Because of his close relationship with Madigan, and his role as a lobbyist for ComEd, McClain was sometimes referred to as a "double agent" by O'Neill and others at ComEd. O'Neill will explain that McClain often referred to Madigan as "our friend" rather than by his name.

O'Neill will also identify John Hooker as a former Executive Vice President of Legislative and External Affairs at ComEd, and subsequently a contract lobbyist, including for ComEd, who was very close to McClain.

O'Neill is also expected to testify that Pramaggiore often relied on an inner circle to make decisions; when those decisions concerned political strategy, the decision-makers would be Pramaggiore, McClain, and Hooker, not the ComEd management committee.

O'Neill will explain that initial negotiations concerning EIMA took place in a small conference room within Madigan's suite of offices within the State Capitol, and that McClain and Hooker arranged for O'Neill's presence at these meetings. Both McClain and Hooker moved freely within Madigan's office space within the State Capitol.

O'Neill learned during the negotiations that Madigan's support and involvement was critical to the passage of EIMA. For example, O'Neill is expected to testify that during the negotiations, a member of Madigan's staff told him that Madigan held staff meetings on Sundays and discussed pending matters including EIMA; O'Neill understood it was critical that Madigan support the legislation because he was the one who would call

24

it for a vote in the House. EIMA passed the General Assembly in May 2011, and the Governor's veto was overridden in the fall of that year. O'Neill was told by McClain and Hooker that Madigan had supported overriding the Governor's veto.

O'Neill is expected to further testify that he was involved in the negotiation of a subsequent piece of legislation championed by ComEd, the Future Energy Jobs Act ("FEJA"), which passed in late 2016. O'Neill will explain that the purpose of FEJA included an extension of the otherwise applicable deadline set for the "formula rate" that provided greater predictability and stability to ComEd's operations—it had been subject to a "sunset" provision in EIMA and therefore new legislation was needed to keep it in place. O'Neill is expected to testify that he represented ComEd in Springfield during the negotiations related to FEJA. In the fall of 2016, Madigan's staff brought the stakeholders (which included another utility company and other groups, such as environmental groups) together for final negotiations on the bill. O'Neill will testify that McClain informed him that Madigan had approved Representative Robert Rita to be the sponsor of the bill. O'Neill will explain that this legislator did not have expertise on energy matters. [12]

---

[12]     In addition to O'Neill, the government expects that another ComEd employee, Scott Vogt, will testify about the company's financial condition in the mid-2000s and the financial benefits of the formula rate legislation enacted in EIMA and extended in FEJA. The government disclosed the substance of this witness's anticipated testimony in a written notice to defense counsel.

O'Neill will explain that McClain and Hooker were present throughout the negotiations on FEJA, and that it was O'Neill's impression that they spoke to Madigan throughout the process because they had access to non-public information about the status of the legislation. In addition, McClain and Hooker answered O'Neill's questions about the legislation in a manner that suggested that they were in communication with Madigan.

O'Neill is expected to testify that Pramaggiore was credited with the passage of EIMA and FEJA. Pramaggiore's general strategy was to support ComEd's success in the legislature, instead of through the Illinois Commerce Commission. Madigan was an important part of Pramaggiore's strategy, and O'Neill is expected to testify that Pramaggiore would say things like, "What's important to the Speaker is important to ComEd." This message would be repeated at meetings concerning legislative, regulatory, and management issues. According to Pramaggiore, Madigan was very important to ComEd because, in her view, ComEd's business depended on political relationships, and it was important to maintain a good relationship with the Speaker. Indeed, Pramaggiore gave prominence to the company's relationship with Madigan above other legislators; O'Neill understood this to be as a consequence of Madigan's importance in directing the business of the General Assembly. Pramaggiore maintained a good personal and professional relationship with Madigan, and even traveled to Turkey with Madigan as part of a sponsored trip.

### ii.     Retention of Reyes Kurson

O'Neill is expected to testify that ComEd first signed a contract with Reyes Kurson in approximately October 2011, which was approved by O'Neill. Although O'Neill had been initially introduced to Victor Reyes in the summer of 2011, O'Neill did not take any immediate action to retain Reyes Kurson. However, O'Neill will explain that McClain began asking in the late summer and fall of 2011 whether ComEd had found work for Reyes Kurson. McClain told O'Neill that hiring Reyes Kurson was important—though he did not explain why it was important. O'Neill did not heed McClain's initial comments; however, as the fall veto session approached in 2011 (the session at which the Governor's veto of EIMA was overridden), McClain asked more frequently about Victor Reyes and work for Reyes Kurson. O'Neill will testify that one day while O'Neill was in Springfield for negotiations on EIMA legislation, Hooker came into his office and closed the door. Hooker asked O'Neill about Reyes Kurson, and explained that it was important that O'Neill act on the contract for Reyes Kurson—but Hooker mentioned nothing about any legal expertise that Reyes Kurson could provide to ComEd. O'Neill understood by McClain and Hooker's comments to mean that the contract was important because it was important to Madigan.

Thereafter, O'Neill decided to approve a contract for Reyes Kurson, based on several considerations. One of them was because McClain and Hooker had told him that the contract was important to Madigan; the others included the fact that ComEd was trying to increase its work with diverse firms such as Reyes Kurson, and because there

was legal work for Reyes Kurson to do. The contract was unusual, however, in that it provided for Reyes Kurson to be guaranteed a minimum of 850 billable hours of work per year—a provision that was presented by Victor Reyes. The government expects O'Neill will testify that, at the time, it was unusual for ComEd to enter into a law firm contract that provided for a set number of billable hours.

In or about 2014, O'Neill asked Pramaggiore if he had to renew the contract for Reyes Kurson, and Pramaggiore told O'Neill that O'Neill had to renew the contract.

In or about 2016, O'Neill wanted to reduce the number of hours of legal work that the company was obligated to provide Reyes Kurson, because there was not enough appropriate legal work to give the firm. When McClain learned that O'Neill had proposed decreasing the firm's hours, which would have had the corresponding effect of reducing the amount of legal fees the firm received, McClain contacted O'Neill to express his unhappiness and also forwarded email correspondence about this to Pramaggiore. McClain pushed O'Neill to renew Reyes Kurson's contract on terms favorable to Reyes Kurson. McClain told O'Neill that Madigan was interested in ComEd renewing the contract and that McClain was advocating for Reyes Kurson on behalf of Madigan. O'Neill is expected to testify that McClain, who had no responsibility within ComEd's legal department, even proposed terms for the contract, and eventually wore down O'Neill's resistance to some of those terms—though O'Neill reduced the guaranteed number of hours Reyes Kurson would receive under the new contract. O'Neill renewed the contract

in approximately mid-2016. He will testify that he felt pressured by McClain to renew the contract on the terms McClain proposed.

### iii. Board Appointment

O'Neill is expected to testify about Pramaggiore's efforts to have Juan Ochoa appointed to ComEd's board of directors. Specifically, O'Neill is expected to testify that ComEd had an "advisory" board that was focused on community involvement and representation. O'Neill learned in or around the fall of 2017 that Ochoa was being considered to fill an open seat on the ComEd board. Pramaggiore was the person who offered Ochoa's name as a candidate; she indicated that Ochoa had been recommended by Madigan, and provided O'Neill with Ochoa's resume, which had come from Madigan. O'Neill raised with Pramaggiore whether the company ought to place a person recommended by Madigan on the board, because O'Neill felt it created an optics issue and could make it appear that Madigan had access to confidential, non-public information. Pramaggiore did not appear to agree with O'Neill, and she pushed for Ochoa to be appointed to the board. Indeed, in a subsequent meeting with the President of Exelon, Pramaggiore advocated for Ochoa's appointment by stating that Ochoa had been recommended by Madigan. Ochoa was ultimately appointed to the board in 2019.

### iv. Other Benefits

O'Neill is expected to testify that McClain made other requests for employment for a variety of different individuals; O'Neill noted that McClain was unique in the sense that he was a contract lobbyist, was relentless, and often indicated that the requests came

from Madigan. O'Neill responded to McClain's requests because he realized if they did not respond, McClain would go to Pramaggiore. As an example, McClain made requests that included wanting to know whether the legal department was finding legal work for the father of Madigan's son-in-law. As another example, McClain asked to be advised of what bond counsels, bond companies, and litigation attorneys ComEd used; O'Neill understood that McClain wanted the information so he could brief Madigan.

### b. Fidel Marquez

The government anticipates Fidel Marquez will testify at trial. Marquez served as ComEd's senior vice president of external and governmental affairs from in or around March 2012 until in or around September 2019. Marquez was charged with conspiring to corruptly influence and reward Madigan in a separate case. *See United States v. Fidel Marquez*, 20 CR 602 (Rowland, J.). Marquez pleaded guilty pursuant to a written plea agreement and agreed to cooperate with the government.

Marquez is expected to testify in detail about his role in the conspiracy to corruptly influence and reward Madigan. Marquez is expected to testify that he participated in a conspiracy to provide benefits to Madigan's associates with the intent to induce Madigan to take action as Speaker that was favorable to ComEd, including support of ComEd's efforts to pass legislation beneficial to ComEd. The benefits ComEd provided to Madigan included: (a) paying money to Madigan associates through third-party lobbying and consulting firms, even though the Madigan associates did very little or no work for ComEd; (b) contracting with Reyes Kurson, a firm operated by a Madigan political ally;

(c) the appointment of Ochoa to the ComEd board of directors; and (d) providing paid intern or employment positions to Madigan associates.

Like O'Neill, Marquez is expected to testify that Pramaggiore placed great importance on legislative matters. Marquez is expected to testify that ComEd's relationship with the General Assembly and Madigan was poor in the early to mid-2000s, and that Pramaggiore and her predecessor took steps to improve ComEd's standing with Madigan. Pramaggiore made it clear to Marquez that she did not want anyone from ComEd to anger Madigan; Pramaggiore viewed Madigan as immensely powerful in the General Assembly and wanted him to be favorably disposed towards ComEd, and it was not uncommon for her to ask what Madigan's position was on an issue.

Moreover, like O'Neill, Marquez is expected to testify about the close relationship Pramaggiore had with her fellow coconspirators, McClain and Hooker. After assuming his role in governmental affairs, it was apparent to Marquez that Pramaggiore and Hooker were both close to Madigan. Moreover, Pramaggiore worked very closely with McClain, who was someone who communicated on behalf of Madigan; she trusted McClain completely and often sought his advice. McClain sometimes participated in conference calls and meetings as the only person who was not a ComEd employee. Moreover, even though both McClain and Hooker were technically under Marquez's authority as lobbyists and consultants, McClain and Hooker often communicated directly with Pramaggiore without including Marquez. Indeed, at times, Pramaggiore would strategize with McClain and Hooker outside of Marquez's presence—something Marquez would

31

learn of later. McClain would refer to Madigan as "our friend," and only rarely referred to him by his actual name.

### i.    Hiring of Subcontractors

Marquez is expected to testify that ComEd hired and paid a series of subcontractors who did little or no work for the purpose of corruptly influencing and rewarding Madigan. Specifically, Marquez is expected to testify that Jay Doherty's firm, Jay D. Doherty & Associates, Inc. ("JDDA") served as a consultant for ComEd, and primarily focused on helping ComEd obtain access to officials associated with the City of Chicago and Cook County. When Marquez became the Senior Vice President of Governmental and External Affairs in 2012, the JDDA contract was paid out of the budget of ComEd's CEO, instead of the lobbying budget, which was unusual for individuals who provided services like Doherty.

Marquez learned after he assumed this position that two Madigan associates—Frank Olivo and Ray Nice—were being paid by ComEd as "subcontractors" through JDDA, and soon after, a third Madigan associate, Edward Moody, was added as a subcontractor. Marquez will explain that the payments to Olivo and Nice continued through the entirety of his service as Senior Vice President of Governmental and External Affairs,[13] and the payments continued to Moody until and including 2018 (though

---

[13]    Marquez was terminated in 2019, after the government's investigation went overt.

Moody was paid through multiple third parties, including JDDA, Shaw Decremer (referred to as "Intermediary 2" in the superseding indictment), and John Bradley (referred to as "Intermediary 3" in the superseding indictment). Marquez will testify that (i) he never asked any of these individuals to perform any work for ComEd, and did not expect them to perform any work for ComEd; (ii) Marquez was never informed they were performing work for anyone at ComEd; and (iii) none of them had any unique skills that ComEd needed or wanted. The method of paying them—that is, as subcontractors—was unusual. The intermediaries, like JDDA, served as "pass through" entities in order to pay the subcontractors. Marquez is expected to further testify that while paying individuals as requested by Madigan and McClain did not guarantee legislative success, the purpose of the payments was to influence Madigan and to ensure Madigan did not act against ComEd and its legislative requests and agenda due to a failure to fulfill Madigan's hiring requests.

With respect to Olivo, Marquez is expected to testify that he learned Olivo was being paid under the JDDA contract when he spoke to McClain in 2013 about adding Moody as an additional subcontractor under JDDA. Marquez knew Olivo had served as the Alderman for Chicago's Thirteenth Ward, and that it was widely known that the Thirteenth Ward was "Madigan's ward," where Madigan had long served as the Committeeman. During his conversation with McClain, McClain described Olivo as a close Madigan associate. Prior to his cooperation with the government, Marquez did not give Doherty any direction about what work Olivo should perform in return for payment,

33

because Marquez did not expect Olivo to perform any work for ComEd. Moreover, Marquez is expected to testify that he does not believe that he ever discussed with Doherty what work Olivo was doing.

Similarly, Marquez is expected to testify that when he learned from McClain that Ray Nice was a JDDA subcontractor, McClain advised him that Nice was close to Madigan. As with Olivo, Marquez never gave Doherty any direction about what work Nice should perform because he did not expect Nice to perform any work. Moreover, Marquez is expected to testify that he does not recall either McClain or Doherty discussing any work performed by Nice.

With respect to Moody, Marquez is expected to testify that he learned about Moody in 2013, when Pramaggiore forwarded Marquez an email she had received from McClain. At the time, Moody was being paid as a ComEd subcontractor through McClain's firm, Awerkamp & McClain. In the email, McClain asked that Moody be moved from McClain's firm to the JDDA contract. After Pramaggiore sent Marquez the email, Marquez discussed the matter with McClain. McClain told Marquez that Moody was associated with Chicago's Thirteenth Ward and was important to Madigan. Marquez does not recall discussing what, if anything, Moody was doing for ComEd. Marquez contacted Doherty to tell him that Moody would be placed under the JDDA contract; when he did so, Doherty did not express surprise or ask why this was happening. Doherty did not ask what work Moody was to perform; Marquez did not discuss with Doherty any work that

Moody would perform; and Marquez did not tell Doherty that Moody would be doing any work for Marquez or ComEd.

Payments to Moody were again shifted in approximately November 2016, so that he was paid under a contract with Shaw Decremer instead of JDDA. Decremer was a former Madigan staffer who began acting as an external lobbyist for ComEd in approximately 2013 or 2014. Moody was moved to Decremer because Moody became a Cook County Commissioner and Doherty sometimes lobbied Cook County Commissioners, thereby creating what could appear to be a conflict—in that Doherty might need to lobby Moody, to whom Doherty was paying thousands of dollars a month (with funds provided by ComEd). Marquez remembers discussing the move with McClain, whom Marquez believes consulted with Madigan about the move. As with Olivo and Nice, Marquez did not give Decremer any direction about what work Moody should be performing, because Marquez did not expect Moody to perform any work.

Marquez is expected to testify that, from Decremer, Moody was moved again, to be paid as a subcontractor of another intermediary, the John Bradley Law Firm. The owner of the law firm, John Bradley, was a former Illinois House representative who was close to Madigan. Moody was moved because Decremer had been accused of sexual harassment, which caused ComEd to terminate Decremer's lobbying contract. Marquez did not discuss the move with Bradley; nor did Marquez give Bradley any direction about what work Moody should perform for ComEd. Marquez did not expect Moody to perform

any work. Marquez is expected to testify that the payments to Moody ended in December 2018, because Moody became the Cook County Recorder of Deeds.

Marquez is further expected to testify that Pramaggiore was aware that Olivo, Nice, and Moody were paid under the JDDA contract; she never discussed any work these individuals were supposed to be performing for ComEd, nor did she ever discuss any work they actually performed for ComEd's benefit. Based on these facts, as well as the fact that (i) the payments were made under her budget; and (ii) Pramaggiore never questioned why the individuals were being paid through JDDA, Marquez concluded that Pramaggiore did not expect these individuals to perform any work, and that they were hired and paid to influence Madigan, and to ensure that Madigan did not do anything unfavorable to ComEd's legislative interests.

Marquez is expected to testify that a fourth individual, Michael Zalewski, Sr., a former 23rd Ward Alderman who was known to be a political ally of Madigan, was added as a JDDA subcontractor in 2018. McClain asked, on behalf of Madigan, for Zalewski to be added; the request was made by McClain to Pramaggiore, who in turn directed Marquez to make arrangements for payments to begin to Zalewski. At the time Zalewski was added as a subcontractor, Marquez suggested asking McClain whether it would be acceptable to Madigan for ComEd to drop any of the other subcontractors. Marquez made this suggestion because he knew the other individuals that were paid as subcontractors through Doherty and Bradley were not doing any work. Marquez would testify that, due to Pramaggiore's promotion to a new role at Exelon, which entailed her departure from

ComEd and the appointment of a new ComEd CEO, Joseph Dominguez, both he and Pramaggiore were concerned that the new CEO, Dominguez, might question the JDDA contract, because the contract was $450,000 a year and was paid out of the CEO's budget. Much of that amount was for payment of Madigan's associates who did nothing. Marquez was concerned that Dominguez might eliminate some of the subcontractors, thereby angering Madigan, which could affect ComEd's prospects with respect to pending or future legislation.

Marquez is expected to further testify that Doherty had to provide a written justification for why his firm would be paid more money with the addition of Zalewski. Doherty provided a justification that stated that the increased payment was due to JDDA's "expanded role with Cook County Board President's office and Cook County Commissioners and Department Heads." Marquez will testify that Doherty's statement was false, because it did not explain that the anticipated payments to Zalewski were the reason for the need to amend the contract. While Marquez contemplated using Zalewski for work with the City, he took no steps to have Zalewski perform any work, and never discussed Zalewski doing work with McClain, Pramaggiore, Doherty, or Zalewski himself. To Marquez's knowledge, no one at ComEd asked Zalewski to perform any work; and since Marquez had arranged for him to be added as a subcontractor, Marquez will explain he would expect to know if Zalewski had performed any work for ComEd.

Marquez is further expected to testify that a fifth individual, former State Representative Edward Acevedo (referred to as "Individual FR-1" in the superseding

indictment), was also hired as a subcontractor of ComEd at Madigan's request. Acevedo had initially approached Marquez directly about getting a job as a lobbyist before he retired from the General Assembly; however, given Marquez's concerns about Acevedo— among other things, Marquez believed him to have a difficult personality and as sloppy in his conversation and approach to issues—Marquez did not want to hire Acevedo, though he did not tell Acevedo that, because the FEJA bill was set for a vote before the General Assembly at the end of 2016. However, in December 2016, McClain asked ComEd to hire Acevedo after Acevedo left the General Assembly in early 2017. Marquez understood this request came from Madigan. Marquez hired Acevedo; though but for the request coming from McClain and Madigan, Marquez would not have hired him. Acevedo was also paid indirectly—through a third-party entity. Marquez advised Pramaggiore about these events, as it was Marquez's general practice to tell her about any conversations with McClain, especially those involving requests from Madigan. Marquez met with Acevedo periodically to get information about the mood of the General Assembly, but never tasked Acevedo with a particular project. Acevedo was subsequently moved, so that he was paid under Decremer, and then Bradley. Marquez never had any discussions with Bradley about Acevedo, because Marquez did not anticipate Acevedo performing any real work.

### ii. Retention of Reyes Kurson

Marquez is expected to testify concerning the retention of Reyes Kurson. Marquez will explain that Victor Reyes, along with Reyes' partner, ran Reyes Kurson. Marquez knew Victor Reyes to be a former chief of staff of the mayor of Chicago, and a leader of

an Hispanic organization in Chicago. Marquez also understood Victor Reyes to be politically important to Madigan.

Marquez will testify that in early 2016, he learned that Reyes Kurson had a contract with ComEd that guaranteed it a minimum number of billable hours of work each year. Marquez will explain that he had never heard of a third-party contract that made such a guarantee to a firm. Marquez will testify that around that time, McClain complained that the company was not providing enough work to meet its contractual requirement to Reyes Kurson. Marquez believes he was copied on the email because McClain hoped Marquez would understand that, if Victor Reyes was not happy with how the matter of work and hours was addressed, then Victor Reyes would go to Madigan for assistance. Marquez also understood that both he and Pramaggiore were contacted by McClain because McClain was hoping Marquez and Pramaggiore would intercede and assist Reyes Kurson. Marquez let the attorneys in ComEd's legal department know that Madigan would be unhappy if Victor Reyes was not pleased with how the matter was handled—it was therefore made clear to members of the legal department that failing to give adequate work to Victor Reyes could negatively affect the company's legislative goals.

### iii.    Board Appointment

Marquez is expected to testify that Pramaggiore told him in approximately 2018 that she had received a request from McClain that ComEd appoint Juan Ochoa to ComEd's board of directors. Marquez understood this to be a request made for the benefit

of Madigan. It was also his understanding from his conversations with Pramaggiore that Pramaggiore had pushed for Ochoa's appointment to the ComEd board of directors based on Madigan's request that Ochoa be appointed to the board, in order to please Madigan and ensure there was no adverse impact on future legislation the company sought.

### iv.    Internship Program

Marquez will explain that ComEd had a large summer internship program for students. Each summer, ComEd hired approximately 100 to 150 interns company-wide. In order to be eligible for the program, a candidate needed to be enrolled full-time in college or a university, except for a few select high school students. ComEd would recruit prospective interns on college campuses and would also receive referrals from public officials and others. However, even those who were referred in this manner had to compete with the general pool of interns.

This was not the case with interns from Madigan's Thirteenth Ward. Well before Marquez became Senior Vice President of Governmental and External Affairs, ComEd allocated a number of intern spots for the Thirteenth Ward. This meant Thirteenth Ward candidates did not need to compete with the general pool of candidates. By the time Marquez took his position, the number of allocated spots to the Thirteenth Ward was six to eight, but by 2015 or 2016, had risen to ten spots. These spots were Madigan's to fill because of his position as Speaker and his legislative importance to ComEd—the company was attempting to influence Madigan in his role as a public official.

40

McClain referred Thirteenth Ward interns to ComEd, and Marquez worked hard to ensure they were placed because Marquez did not want to risk Madigan forming a negative view of the company, which would impact the legislative goals of ComEd. At times, Marquez was able to waive the minimum GPA requirement for applicants from the Thirteenth Ward, and often Marquez emphasized in communications with other employees the sensitivity and need to hire Thirteenth Ward interns. Marquez will testify that he did this to avoid any negative reaction from Madigan, which could impact future legislation the company sought.

v.    **Other Benefits**

Marquez will testify that the company received other requests from Madigan and McClain to hire individuals for positions at ComEd. Generally, when a request was received from McClain, Marquez would advise the human resources department that a resume had been received, and the candidate would be invited for an interview or to sit for requisite testing. In addition, in certain cases, Marquez would contact the manager of the department to highlight that a particular candidate's hiring was important. This was done in part for the purpose of making sure that those making the decision to hire a candidate were aware that rejecting the candidate could damage the relationship between ComEd and a public official.

For example, Marquez will describe the extraordinary treatment afforded one candidate recommended by McClain, Kathy Laski. Marquez will explain that in early 2016, McClain asked ComEd to hire Laski. McClain made it clear to Marquez that the

request to hire Laski came from Madigan. Laski proved difficult to place in a job, because she was particular about what type of job she was willing to perform. As a result, Marquez will explain the company took unusual steps to find a position for her by, among other things, providing advice for how she could revise her resume, looking for additional positions for Laski more to her liking, and offering to coach Laski so that she could present better in job interviews with ComEd. Marquez will explain that he did all these things because it was his understanding that hiring Laski was very important to Madigan, and Marquez believed it was important to cater to Madigan's request to hire Laski so that there was no adverse effect on ComEd's legislative agenda. In late July 2016, Laski was hired by ComEd; Marquez understood from communications that Madigan would be informed of the hire.

As another example, Marquez will testify that the company received a request to hire a specific external lobbyist. Marquez will testify that he believes the request came from McClain, and that the lobbyist was a friend of Madigan's son. Marquez met with the lobbyist, but did not wish to hire him, so he dragged his feet on hiring the lobbyist. McClain complained to Pramaggiore, who then suggested to Marquez that he reconsider hiring the lobbyist. The lobbyist was thereafter hired.

Furthermore, as noted below, Marquez is also expected to explain the contents of recorded conversations made both before and after he began cooperating with the government, in which the conspirators discussed, among other things, the provision of benefits to Madigan and the intent the conspirators had in providing those benefits.

### c. Edward Moody

The government expects to call Edward Moody as a witness at trial. Moody is one of the subcontractors who was paid through intermediaries such as McClain, Doherty, Decremer, and Bradley. The government anticipates that Moody will confirm that Moody performed minimal work in return for payments received indirectly from ComEd, and that the payments were made because Moody was a valuable political operative for Madigan.

The government expects that Moody will testify that he worked as a precinct captain for Madigan, and that Madigan considered Moody to be among his most valuable political operatives due to his skill as a precinct captain.

Moody will testify that he received a series of patronage jobs—other jobs that Madigan secured for Moody as compensation for Moody's work as a precinct captain and for other political campaign work Moody performed for Madigan. These patronage positions included jobs in local government.

Moody continued to work hard for Madigan on political campaigns, in part because Moody enjoyed the work, and in part out of fear that Madigan would threaten Moody's government job.

Moody is expected to testify that, in addition to the government positions that Madigan obtained for Moody, Madigan also arranged for Moody to receive additional money on top of his full-time job. Specifically, Moody asked Madigan for a job as a consultant or lobbyist where Moody could make an additional $45,000 per year, so that

43

Moody had sufficient funds for his retirement. Ultimately, Madigan informed Moody that he would be "working for McClain." Moody knew McClain to be a part of Madigan's "kitchen cabinet," that is, he knew McClain to be one of the Madigan's closest confidants and advisors. However, Madigan told Moody that he (Madigan) controlled the contract, and that if Moody left the organization (meaning Madigan's political organization), Moody would no longer work for McClain.

Moody is expected to testify that he began receiving $45,000 per year beginning in approximately May 2012. During the first few months of payment, at McClain's instruction, Moody called a list of legislators McClain had provided to determine if they had any issues relevant to ComEd, and this work had little substance to it. Moody also performed some door-to-door canvassing for several months. Moody understood, however, that the payments from McClain were in reality made for Moody's work on political campaigns. Moody is expected to testify that he spent much more time on political work for Madigan than he ever spent on ComEd-related work.

Moody is expected to further testify that in approximately January or February 2014, McClain told Moody that, going forward, he would be working for Jay Doherty. Moody met with Doherty, who, among other things, told Moody that he would be "on call" and that if Doherty needed anything, he would let Moody know. Moody is expected to testify that after that initial meeting with Doherty, Moody had no further contact with Doherty. Moody was not asked to do any work for Doherty, and he did no work for Doherty. Moody never did any work for ComEd at the direction of Doherty and did not

44

believe that his payments from Doherty had any connection to ComEd. Moody received $4,500 from Doherty a month; Moody understood that payments from Doherty were, like payments from McClain, compensation for his political work for Madigan.

Moody will testify that after being appointed as a Cook County Commissioner with Madigan's assistance, Doherty told Moody that since Moody was now a Cook County Commissioner, Doherty had to let him go due to a conflict, in that Doherty lobbied the County. Either the same day or the next day, Moody received a call from Madigan, who told Moody to take the Commissioner position and that Madigan would find something else for Moody (to replace the payments Moody had received from Doherty). Thereafter, McClain called Moody and informed him that Moody would now work for Decremer, whom Moody knew had previously held a position within Madigan's office. As with Doherty, Moody received $4,500 a month from Decremer. Moody received no assignments from Decremer, and did no work for Decremer. Moody understood these payments continued to be compensation for Moody's campaign work for Madigan.

Moody will testify that payments from Decremer ended, and he began receiving payments from Bradley. Moody received a consulting contract from Bradley that referenced providing services to ComEd. Moody signed the contract that suggested that Moody would provide services to ComEd, but it was apparent quite quickly that Moody was not going to do any work for ComEd.

Specifically, Moody will testify that approximately two to three weeks after receiving the contract from Bradley, Moody had a conversation with Madigan while

Moody was out doing campaign work in the Thirteenth Ward. During that conversation, Moody expressed his concern to Madigan that Moody had not been doing any work for ComEd as the contract suggested. Madigan responded that Moody did not have to worry about that, because what Moody was doing right then—meaning campaign work—was what was important to Madigan. Madigan further told Moody that Moody was doing what Bradley and ComEd wanted Moody to be doing. Moody understood Madigan to be referring to political campaign work for Madigan, and further understood he did not have to worry about doing any work for ComEd.

Moody is expected to testify that Moody never did any work for Bradley or for ComEd while he was being paid by Bradley. Bradley never asked Moody to do any work and neither did anyone at ComEd during that period. Moody received payments, like he had with Doherty and Decremer, and did no work for those payments.

Moody is expected to testify that the payments from Bradley were terminated when Moody became the Cook County Recorder of Deeds. McClain called to inform Moody that the payments had to end because Moody was "too close" to ComEd, and that he would find Moody something else, which Moody understood to mean a new source of payments.

Moody will testify that a series of invoices that were sent to Doherty and others, purporting to claim that Moody had performed services—including services rendered to ComEd—were false, because Moody never performed any such services for Doherty, Decremer, or Bradley.

46

### d. Relative of Frank Olivo

A relative of Olivo is expected to testify, and confirm that Olivo was a former Alderman for the Thirteenth Ward. Further, the relative is expected to testify that Olivo asked the relative to email invoices to JDDA. While the relative never asked about the invoices, Olivo never said he worked for ComEd; by January 2018, Olivo and his spouse cared for the relative's children full time. The relative was not aware of Olivo having any other employment. Like the testimony of Marquez and Moody (as well as the recorded conversations discussed below), this testimony will confirm that the coconspirators caused ComEd to pay money to the Madigan subcontractors even though they performed no work in return.

### e. Professor Dick Simpson

The government expects to call Professor Dick Simpson as an expert witness. Professor Simpson, a professor emeritus who worked at the University of Illinois at Chicago for over fifty years, is an expert in the field of political science and government, and has previously been qualified as an expert.

Professor Simpson is expected to testify about the structure, method, and operation of the Chicago political machine. Among other things, Professor Simpson is expected to testify that a political machine is defined as a permanent political organization or political party that is characterized by patronage, favoritism, government contracts, loyalty, and precinct work. He will explain that machine politics is a defined academic term used in the study of government, particularly local government. Professor Simpson

will testify that a political machine is a hierarchical political organization or political party that seeks to control the government through patronage, favors to voters, government contracts, loyalty, and precinct work. Professor Simpson will explain that political machines are typically organized through a political party and are capable of delivering the vote with mechanical regularity for that party.

Professor Simpson is expected to further testify about the operation of machine politics at the Ward level within Chicago. Specifically, Professor Simpson will testify that Wards are divided into precincts. A precinct is an official governmental unit for purposes of elections. A precinct captain is a political position, not a governmental position. Precinct captains are appointed by the party, and more specifically, by the Ward Committeeman. Precinct captains are selected based largely on their loyalty to the party, as well as their ability to gather votes for the party. Many precinct captains volunteer their time in hopes of receiving, maintaining, or enhancing patronage positions. Some precinct captains volunteer their time also in the hopes of being slated as a party candidate in a future election or some other material benefit.

The job of a precinct captain is to deliver the votes at election time for the party's chosen candidates (also referred to as the party's slate of candidates), no matter who the candidate is in terms of ideology or character. In between elections, precinct captains deliver city services for the residents in their precinct. For example, if a street needs repair, the precinct captain will report it to the Alderman or Ward Committeeman in order to get it repaired.

48

Precinct captains typically have assistant precinct captains working for them, and these are typically individuals who are performing this work without payment in the hopes of receiving a patronage job. Precinct captains and assistant precinct captains work to gather support for the party's slate of candidates, by going door-to-door to talk to voters within the precinct and seeking their support for the party's candidates.

Professor Simpson's testimony will thus serve to corroborate and inform the jury's assessment of the testimony of Moody (one of several Madigan subcontractors, who was a precinct captain and was provided with a no-show job funded by ComEd that, in reality, was designed to compensate him for political work for Madigan within the Thirteenth Ward), as well as help the jury understand and put in context the nature of McClain's comments during wiretap and recorded conversations (discussed further below), in which McClain mentions the importance of various subcontractors to Madigan's political operation, such as their status as precinct captains within the Thirteenth Ward organization (*see* McClain Phone, Session #2686 described below), and in which McClain describes ComEd's payments to the subcontractors as part of the "old fashioned patronage system" (*see* March 5, 2019 recording described below). Professor Simpson's testimony will provide a framework to help the jury understand the evidence regarding Madigan's and McClain's efforts to have the subcontractors paid by ComEd and to determine the intent or purpose behind these efforts—these were no simple arms' length job recommendations; they often were efforts to obtain payments for key political workers of Madigan, who were integral to the political machine.

49

In addition, Professor Simpson's testimony will assist the jury in understanding the purposes and objectives of the charged enterprise as alleged in Count One of the superseding indictment. Paragraph 3 of Count One alleges that the purposes of the charged enterprise were "(i) to exercise, to preserve, and to enhance Madigan's political power and financial well-being; (ii) to financially reward Madigan's political allies, political workers, and associates for their loyalty, association with, and work for Madigan; and (iii) to generate income for members and associates of the enterprise through illegal activities." By explaining the patronage system, Professor Simpson will shed light on the motivations for Madigan's actions, including his and McClain's efforts to obtain jobs (including through illegal means) for his political allies and workers.

### f.   Various Federal Law Enforcement Agents

The government anticipates introducing testimony from multiple federal law enforcement officers concerning searches of various locations pursuant to court-authorized warrants, as well as the results of subpoenas for documents served on multiple parties. Their testimony is expected to establish the absence of any indication in these sources of any of work performed for ComEd by the Madigan subcontractors—thereby demonstrating that their employment was not *bona fide* and in the ordinary course, but and was instead part of a conspiracy to corruptly influence and reward Madigan. Specifically, the targets of these searches and subpoenas include the residences of certain Madigan subcontractors, as well as entities that acted as conduits for payment to the subcontractors (such as the offices and spaces used by JDDA). The government

anticipates that this testimony will reflect, consistent with the testimony of Marquez, Moody, and the relative of Olivo (as well as wire interceptions discussed in greater detail below) that there were few, if any, documents found or produced that reflected any actual work product prepared by Madigan subcontractors or that reflected specific work actually performed by the subcontractors—even though they were paid under ComEd CEO's budget for approximately eight years.

### g.    Juan Ochoa

The government expects to call Juan Ochoa as a witness. Ochoa is expected to confirm that Madigan assisted in Ochoa's appointment to the ComEd board, and the circumstances under which Madigan decided to do so—testimony that again demonstrates the position was sought by Madigan and McClain to assist Madigan political ally.

Specifically, Ochoa is expected to testify that he previously worked as the chief executive officer of a municipal corporation between approximately 2010 and 2013. Ochoa met with Madigan twice shortly after Ochoa became CEO.

In 2017, a number of years after Ochoa left the municipal corporation, Ochoa asked a member of Congress to set up meetings with Madigan and Chicago Mayor Rahm Emanuel to request that they both recommend Ochoa for an open position on ComEd's board. The member of Congress had endorsed Madigan in the prior election cycle. Ochoa and the member of Congress met with Madigan at Madigan's office; Madigan agreed to recommend Ochoa for the ComEd board seat. After the meeting, someone from

Madigan's office requested a copy of Ochoa's resume. Ochoa also met with Mayor Emanuel about a recommendation.

Ochoa is expected to testify that sometime in January 2018, Madigan called Ochoa and told him that someone at ComEd would be following up with him. A few months later, in approximately April 2018, Madigan called Ochoa and advised that Ochoa would possibly be seated on the ComEd board for the August 2018 board meeting. After Ochoa spoke to Madigan, Pramaggiore called Ochoa and told him she was inviting him onto the board if he was still interested in the position. Pramaggiore indicated that she would set up a dinner for Ochoa with her and her incoming replacement as CEO, Joseph Dominguez. That dinner happened on September 10, 2018, though only Marquez and Dominguez attended. At that dinner, Ochoa was advised that the ComEd board was being restructured, and that Ochoa's appointment would not occur until after the next general election.

Ochoa spoke to ComEd CEO Dominguez on the telephone on February 13, 2019, and discussed the progress of Ochoa's appointment to the board. Ochoa was told that the process was moving along. Ochoa reached out to Madigan at some point between February 13, 2019 and February 19, 2019 to set up a meeting with himself, the member of Congress, and Madigan about a different matter. Ochoa was not able to speak with Madigan and Ochoa left a message but did not state in the message the topic he and the member of Congress wished to discuss with Madigan. On approximately February 19, 2019, McClain called Ochoa. During the call, McClain assured Ochoa that he would be

appointed to the board and that McClain had told Madigan that McClain would call Ochoa to alleviate any anxiety Ochoa had. Ochoa was surprised to learn that McClain knew of his efforts to join the board.

Ochoa ultimately joined the board in April 2019. Ochoa is expected to further testify that shortly after Ochoa attended his first ComEd board meeting in May 2019, Ochoa spoke to McClain and thanked McClain for his support and asked McClain to thank Madigan as well. McClain advised Ochoa to "whisper" into Pramaggiore's ear to thank her because she had been very helpful. McClain told Ochoa that it was a larger team, or words to that effect, which Ochoa understood to mean that there were a number of people that had been supporting Ochoa's efforts.

### h. Legislators and Other Witnesses

The government anticipates calling various current and former members of the General Assembly and other witnesses familiar with the operation of both the General Assembly and Madigan's office during times relevant to the indictment. These witnesses are expected to establish that Madigan was understood to be the most powerful legislator in Springfield, and had effective power to control the flow and passage of legislation through the Illinois House of Representatives by, among other things, (i) deciding what bills would stay within committee; (ii) deciding what bills would be called for a vote; (iii) controlling committee assignments; and (iv) controlling financial and campaign assistance

to lawmakers, and running candidates against those that did not accede to his wishes, thus making it difficult for them to take positions in opposition to his wishes.

This testimony will be relevant and provide important context for the jury in understanding why the ComEd conspirators were so eager to satisfy Madigan's requests for payments and other benefits, and why Madigan and McClain were in a position to make requests for such largess. The testimony of legislators will also serve to corroborate the testimony of other cooperating witnesses who will explain the motivation for complying with Madigan's requests—his outsized power in the General Assembly meant his approval was necessary for the passage or defeat of legislation relevant to ComEd.

Legislators and other witnesses are also expected to corroborate the testimony of Marquez, by confirming that McClain was very close to Madigan; that McClain was known to act as Madigan's agent; and that McClain often physically positioned himself on visits to the Capitol building in Springfield in close proximity to Madigan's office—thus visibly demonstrating his close relationship with the Speaker. This testimony will corroborate that Madigan and McClain were closely associated and that McClain acted on Madigan's behalf in soliciting and facilitating the provision of benefits from ComEd (and will also help to prove their association-in-fact, as well as McClain's association with the Speaker's Office).

2.        **Documentary and Other Physical Evidence**

a.        **Hiring of Subcontractors**

i.        **Financial Records Evidencing Payments to Subcontractors**

The government anticipates introducing records, including financial institution records, as well as records of payments made by ComEd and intermediaries such as JDDA to demonstrate that the Madigan subcontractors received payments over the course of approximately eight years. These payments originated from ComEd's affiliate, which was responsible for issuing such payments, and were directed to an intermediary such as McClain, Doherty, Decremer, and Bradley. Thereafter, the payments were disbursed to the subcontractors, such as Moody, with funds obtained from ComEd. All told, these records will reflect that the subcontractors, who did little to no work, received well in excess of $1.2 million during the period from in or around 2011 to in or around 2019. The fact that these Madigan associates received over $1.2 million over the course of many years, even though they did little to no work, is clear and convincing proof of the existence of the conspiracy and illicit nature of the activity the conspirators joined in.

ii.        **Absence of Records Reflecting Actual Work Performed by Subcontractors**

As noted above, the government anticipates introducing testimony concerning the absence of documents as proof of the illegal activity. Specifically, the government intends to introduce testimony concerning searches executed at multiple locations (as well as the results of subpoenas served on multiple parties). The targets of these requests include

55

the residences of certain Madigan subcontractors, as well as entities that acted as conduits for payment to the subcontractors. The government will introduce certain documents that were found within various search locations, which did not concern actual work product prepared by Madigan subcontractors and did not reflect specific work actually performed by the subcontractors. Indeed, with respect to invoices, the jury will learn that many of the invoices found during the searches were pre-printed in advance, so that they could be sent each month. Nothing else was found suggesting actual work performed for ComEd.

### iii. False Records Concerning Payments Made to Subcontractors

The government's evidence will demonstrate that, during the course of the conspiracy, numerous false documents were generated over an eight-year period to conceal the fact that the subcontractors were being paid, despite the fact that they did little or no work, and that they were being paid to corruptly influence Madigan. The extensive efforts undertaken to hide and falsify the nature of the payments and to circumvent internal controls within the company constitutes evidence of the corrupt intent of the conspirators. Some examples are as follows.

<u>False Invoices</u>

From September 2011 through 2019, Doherty caused invoices to be submitted to ComEd for payment. Each of those invoices falsely stated that the invoiced amount was for Doherty's firm, and more specifically, was compensation for "Public Affairs and

Government Affairs Counsel in connection with the Mayor's Office, City of Chicago Elected Representatives and the Department of Environment." Each invoice falsely described the intended ultimate recipients of the payments, falsely described the reason for the payments to the ultimate recipients, and omitted that Doherty would make payments to Olivo, Nice, Moody, and Zalewski, who did little or no work for Doherty's firm during each period covered by each invoice. An example of one of these invoices appears below:



**JAY D. DOHERTY**

**I N V O I C E**

CONTRACT ORDER #00129557
INVOICE # 41515
INVOICE DATE: 4/15/15
INVOICE AMOUNT: $37,000

Exelon Business Services Co.
An Exelon Company
P.O. Box 87656
Chicago, IL 60680-0656

**PROFESSIONAL SERVICES:** Public Affairs and Government Affairs Counsel in connection with the Mayor's Office, City of Chicago Elected Representatives and the Department of Environment.

As specified in our contract of January 1, 2000
(for services rendered 5/01/15 – 6/01/15):          $37,000

                                         TOTAL:   $37,000

Payable upon receipt.

Please make check payable to:

Jay D. Doherty & Associates

In addition, Doherty invoiced amounts in excess of his monthly contractual rate for certain months. The invoices associated with those months falsely stated that the additional amounts invoiced related to additional "services rendered" or "additional scope of services." For example, Doherty submitted an invoice for $30,000 to Exelon Business Services Co. dated September 15, 2011, which falsely claimed that $5,000 was for "Services rendered 8/1/11 – 9/1/11." Doherty submitted an invoice for $42,500 to Exelon Business Services Co. dated September 1, 2018, which falsely claimed that $5,000 was for "additional scope of services." These invoices did not state that the payments would actually be passed on to subcontractors who were hired to corruptly influence and reward Madigan and who did little or no work for Doherty's firm.

The conspirators caused other intermediaries used to pay the Madigan subcontractors to submit false invoices as well. For example, from November 2016 through February 2018, Decremer caused invoices to be submitted to ComEd for payment, which ComEd processed internally. Each of those invoices falsely stated that the invoiced amount was for Decremer's firm, and more specifically, for "Lobbying services." None of the invoices stated that Decremer would be paying any subcontractors, even though Decremer made payments to Moody and Acevedo during that time period, and those subcontractors did little or no work for Decremer. Moreover, each of the invoices that were made part of the company's books and records falsely described the reason for each payment as being solely for "lobbying services," when in truth the payments were intended in part to corruptly influence and reward Madigan.

58

<u>False Asset Suite Records</u>

Payments to consultants were tracked in Exelon's and ComEd's "Asset Suite" management system, and information from that system was automatically incorporated into the company's general ledger on a daily basis.

From August 2011 to 2019, Pramaggiore and others approved or caused the approval of payments to JDDA in the company's Asset Suite management system, which entries contained false and misleading information. Specifically, entries into the Asset Suite management system falsely indicated that the payments (1) were intended for "Jay Doherty & Associates" (in the "Description" entry), (2) were connected to the associated invoice submitted by Doherty (in the "Invoice Number" entry), which falsely described the nature of the payment, and (3) pertained to a legitimate commercial transaction (for example, the "SubAcct" entry listed "515060" and the "Detail Cost Element" entry listed "3T," which made it appear that the payment was for professional work, namely, a consultant voucher). These records were false in that they did not reflect that a portion of the payments were in truth intended for subcontractors, who did little or no work for Doherty's firm, and they falsely stated the reason for these payments. Similar false records were generated with respect to payments made through other intermediaries to Madigan subcontractors.[14]

---

[14]    The government expects to call a witness from ComEd or an affiliate who will explain, among other things, how false entries in Asset Suite would then be incorporated within the company's general ledger, thus generating false accounting records for the company.

<u>False Contracts</u>

JDDA entered into a number of written contracts with ComEd which falsely described why money was being paid to JDDA. For example, Jay Doherty signed a contract dated January 3, 2017, which falsely stated that JDDA was retained "to promote Commonwealth Edison and its business matters," and to "develop execute and manage its Government Relations Presence. Government Relations will be provided in connection with the City of Chicago, including the Mayor's Office, Department Agency heads and Aldermanic offices; Cook County, including Board President's Office and Department Agency heads; and State of Illinois, including the Governor's Office and State Agency heads." This was false and misleading because, in fact, a substantial portion of each month's payment from ComEd was destined for the subcontractors, and the contract falsely stated the reason for these payments.

As another example, Doherty signed a contract amendment increasing monthly payments to JDDA by $5,000 per month, to $37,500 per month. That contract amendment falsely stated that JDDA was retained for June 1, 2018 to January 13, 2019 to provide "Government and Public Affairs Professional Services for the following: City Council,

---

In conjunction with this evidence, the government will also offer the testimony of witnesses to establish that ComEd and its parent company Exelon were issuers under the Exchange Act; were required to maintain a system of internal controls in order to assure the accuracy of books and records; and had a system of internal controls (including an ethical code of conduct) that prohibited bribe payments as well as the creation of false entries within the company's books and records.

Department heads and Mayor's Office, plus expanded role with Cook County Board President's office and Cook County Commissioners Department Heads." This amendment was false and misleading because the amendment was signed in order to provide for the monthly payment of $5,000 to Individual 23W-1, who did no work for Doherty as to the matters described in the amendment. The amendment thus falsely stated the reason for this payment.

As another example, the conspirators caused Decremer to sign a contract dated January 1, 2018, which falsely suggested that all the money paid under that contract was to "assist ComEd by providing Illinois political and legislative analysis on all bills and resolutions in which ComEd has any interest, direct or indirect, present or prospective; and represent ComEd in legislative and regulatory matters before the Illinois General Assembly and other Illinois governmental bodies," among other services, when in fact a substantial portion was destined for the subcontractors for the illicit purposes described above.

As another example, as described above, Moody was provided a contract by Bradley that falsely represented that Moody would provide consulting services to ComEd—even though Moody performed no such services for ComEd whatsoever. A portion of this phony contract read as follows:

**CONTRACT FOR SERVICES TO BE RENDERED BY**

**EDWARD MOODY**

**FOR**

**THE JOHN E. BRADLEY LAW FIRM**

This agreement for services is entered into as of March 1, 2018, between EDWARD MOODY for Edward Moody's services exclusively ("Consultant"), and The John E. Bradley Law Firm and shall terminate on February 28, 2019.

Consultant is in the business of performing legislative and regulatory representation and consulting services and has expertise in said business, and The John E. Bradley Law Firm desires to engage the services of Consultant for the purposes of working on the ComEd account.

Now, therefore, in consideration of the foregoing recitals and of the promises and conditions contained herein, it is agreed as follows:

1. Consultant agrees to perform the following services:

   a) Provide Illinois political and legislative analysis for ComEd; and,

   b) Work on the ComEd account in legislative and regulatory matters before the Illinois General Assembly and other Illinois governmental bodies.

2. As compensation for the foregoing, The John E. Bradley Law Firm agrees to pay Consultant Four Thousand Five Hundred Dollars ($4,500.00) per month for the Contract.

### False Single Source Justifications

Pramaggiore caused a number of internal documents to be prepared that provided false justifications as to why payments to the Madigan subcontractors needed to be made. For example, on January 23, 2017, Pramaggiore signed a single source justification related to JDDA's contract, stating that Doherty's firm would be paid $429,400 in 2017 because of his "unique insight & perspective to promote ComEd and its business matters to further develop, execute and manage its Government Relations presence." A single source justification was used at ComEd to justify why a service provided by an outside

vendor was not subjected to competitive bidding. This single source justification further falsely stated that JDDA's "scope of work" included: "to promote Commonwealth Edison and its business matters" and "to further develop, execute and manage its Government Relations presence," and that "Government relations will be provided in connection with the City of Chicago, including the Mayor's Office, Department Agency heads and Aldermanic offices; Cook County, including Board President's office & Department Agency heads and: State of Illinois, including the Governor's Office and State Agency heads." This single source justification was false in that it did not state that a substantial portion of the funds paid to JDDA would be going to the subcontractors, who did little or no work for Doherty's firm and falsely stated the reason for such payments.

<u>Other False Communications</u>

The conspirators caused other false statements to be made regarding JDDA's contracts and payments. For example, on July 29, 2018, Doherty's assistant wrote to

ComEd accounting personnel with an explanation of why the JDDA contract needed to be increased by $5,000 a month:

> I just spoke to Jay regarding his increased and expanded responsibilities for ComEd effective June 1, 2018.
>
> Here are the scope of services:
>
> City Council, Department Heads and Mayor's Office, plus expanded role with Cook County Board President's office and Cook County Commissioners and Department Heads.
>
> Can you please confirm if this is acceptable.
>
> Thank you,
>
> Have a great weekend,

The information Doherty, through his assistant, provided in this email was false, because Doherty's legitimate responsibilities related to lobbying Cook County governmental bodies were not, in fact, expanding; instead, the additional payments would be going to a new subcontractor, Zalewski, who was being paid not for the reasons described, but for the purpose of corruptly influencing and rewarding Madigan.

### iv. Records Otherwise Demonstrating the Relationship of the Conspirators and their Roles with Respect to Subcontractors

The government anticipates introducing additional documents that demonstrate the relationship of the conspirators and their role in the conspiracy with respect to the subcontractor payments. For example, the government expects to offer documents seized from McClain pursuant to a court-authorized search warrant of his vehicle. Among the

documents seized is a handwritten list of assignments and work McClain performed for

Madigan. Not only does the list reflect that McClain was "available 24/7" at the beck and

call of Madigan—thereby establishing that McClain acted at the direction of and for the

benefit of Madigan—but it also included an entry reflecting that McClain "currently

manage[d]" the subcontractors on Madigan's behalf—who did little or no work, as well as

Madigan's allotment of interns:



As another example, an email communication between Pramaggiore and Doherty is instructive. Pramaggiore credited Doherty—the man who received hundreds of thousands of dollars of payments intended for the Madigan subcontractors—with helping her in "creating an understanding" with Madigan:



**From:** Pramaggiore, Anne R:(ComEd)
**Sent:** Saturday, October 11, 2014 10:55 AM
**To:** 'jay@jayddoherty.com'
**Subject:** Re: Mike Madigan and Pat Quinn

Thanks Jay -- I really appreciate your note. It has been a long path with each of them and relationships always require care. Thanks for your help in creating an understanding with both of those gentlemen. You are always there for us!

We are starting to plan our next round of action. Ameren is starting to stir up activity on the formula rate and that is pushing us out there a little faster than we would have liked, but we are ready. We will bring you into the dialogue in the next week or so.

Always something!

Anne

**From:** Jay Doherty [mailto:jay@jayddoherty.com]
**Sent:** Saturday, October 11, 2014 05:04 AM
**To:** Pramaggiore, Anne R:(ComEd)
**Subject:** Mike Madigan and Pat Quinn

I was thrilled to:

1. observe the nice relationship which you and Mike have with **Speaker Mike Madigan** at last evening's Field Museum reception; and
2. hear the story about **Governor Pat Quinn's** nice words at the reception hosted by Joe Power. You EARNED them, just like the union leader's kind words.

Thank you for all you do.

Jay Doherty

The government will introduce other emails that demonstrate the role McClain played for Madigan with ComEd, including emails that were exchanged when it came time to begin grooming a replacement for McClain with ComEd. They include the following document, where McClain spelled out how cautious Madigan was about letting "people know and do what he needs done":

On Feb 23, 2019, at 7:38 AM, Michael McClain <mcclain@adams.net> wrote:

Anne and Fidel,

I would like to make some recommendations. They are:

# John Hooker is the point person for Cullerton…

# I would like to sit down with Will Cousineau and talk to him about this position on Wednesday. It is not an easy position. Will has our Friend's confidence right now with non governmental items including messaging. That is a really good thing. He is also our point person talking with our "sexual harassment" consultant in DC. (SKD Knickerbocker). I would like him to shadow me these weeks on what I do and what I am asked to do so he is able to step into my shoes in the future. Yes, I talked with Cinda and she is okay with me doing this item. I would like to try it out for a week or so and not change my status as a consultant to a "lobbyist". I will, of course, keep you informed about that status. "Lobbyist" is the easiest decision for the company and me right now but it is not a pathway I want to take if I can avoid it  legally and ethically. (Our Friend is very, very cautious about letting people know and do what he needs done. I will have to talk to him about this item too, of course. I have told him that I am trying to mentor Will but Will is very busy accumulating current and new clients. I may have to have a stronger talk with Will about the flexibility this "kind of assignment" requires both legally and ethically.)

*** I would like a consideration that the company pay for all my expenses whether it includes Springfield or Chicago. ( Yes, this is very ticklish. If there is ever, ever, a time that I buy one pepsi for a Legislator I will file as a lobbyist the next day.)

*** I am not greedy but if you would consider appropriately amending my "consultant contract" I would appreciate it.

Other documents will demonstrate the close relationship between Madigan and McClain—and illustrate that requests made to ComEd by McClain originated from Madigan, who McClain considered his "real" client. For example, upon his formal retirement as a lobbyist in 2016, McClain sent the following letter to Madigan illustrating his loyalty and continued willingness to carry out "assignments" for Madigan upon request, as well as the nature of the two defendant's relationship within the charged racketeering conspiracy:[15]

---

[15]     The government's evidence will demonstrate this letter was written on the heels of the passage of FEJA on December 1, 2016, and around the same time McClain was making additional demands to ComEd concerning Reyes Kurson's contract.

December 3, 2016

Dear Shirley and Mike,

I am writing this letter just in case I do _not_ express all of my items to you "face to face". Or, if I do _not_ see you before you go West.

Cinda is typing this note because my "Catholic nun penmanship" is not up to par.

I am retiring as a lobbyist. It is time. I want to go out at my professional peak. I wanted to let my "real" client know that I am retiring as a lobbyist.

On December 2, 2014, on our 29th wedding anniversary I gave Cinda a gift. I told her I would retire December 2, 2015. We decided I could not leave my "real" client at that time for obvious reasons, and so we decided to stay and help. I did.

I am willing, with Cinda's blessing to do "assignments". Michael, you will have to decide if you want me to do it, legally and ethically. I offer it. I am willing to be part of strategic and tactical discussions also.

At the end of the day I am at the bridge with my musket standing with and for the Madigan family. I will never leave your side, Shirley and Mike.

So, I am happy for the new life. I hope you are happy for us. Cinda is accustomed to me being gone for 100 to 150 nights a year. Sixty or more hours a week. Paying clients who want conference calls on Saturday night at 10 p.m. or at 8 p.m. on Sunday night. Interesting life. It will be a change.

The most difficult and the most anxious part of this process is to tell you I am retiring. I hope I do _not_ cry. Mike, I have known you since 1975. Shirley is not far behind. I will, no, we will work hard to keep the wonderful love and friendship.

Thank you. God bless.

*I could have written many words but the fewer the better. Illinois is a great State because of your hand on the rudder and you know instinctively now, just like Richard J. Daley, when to start, slow or turn off the engine. Our love, John and Cinda*

In addition, numerous emails corroborate the testimony of Marquez and others. For example, with respect to the transfer of payment for Moody from the JDDA contract to Decremer, McClain sent an email to Marquez, which confirmed both McClain's role and

Madigan's ("Our friend") role in the transfer of Moody from JDDA to Decremer, as well as the fact that Decremer was read into the plan.[16]

Finally, numerous records will be introduced to demonstrate the importance of the subcontractors to Madigan and the nature of their relationship. For example, emails from Madigan's assistant dated January 4, 2019 and January 6, 2019, indicate that Madigan agreed to let Moody and Zalewski sit in his box during an inauguration.

### b. Retention of Reyes Kurson

Documents make it clear that the retention of Reyes Kurson was linked to ComEd's legislative agenda and the need to corruptly influence and reward Madigan. Specifically, in 2016, after ComEd personnel sought to reduce the number of hours of legal work provided to Reyes Kurson, McClain interceded in the internal decision-making process and wrote a series of emails making it clear that Reyes Kurson was on the payroll at Madigan's request and there would be repercussions if Reyes Kurson's work was

---

[16] The government introduced numerous emails and other correspondence during the trial in *United States v. McClain*, 20 CR 812 (N.D. Ill.), including emails and correspondence that concerned the subcontractors, such as requests to arrange and approve their payment, and to provide justifications for their payment. The government intends to introduce substantially same emails in this trial, including but not limited to: GX 229 (EXE00081681), 373 (EXE00051907), 374 (EXE00051918), 375 (EXE00092341), 400 (EXE00158747), 405 (00347602), 412 (EXE00047495), 414 (EXE00047226), 460 (EXE00182105), 492 (EXE00096183), 546 (EXE00027935), 574 (EXE00020862), 867 (EXE00005385), and 868 (EXE0002350). (The government may assign different exhibit numbers to these documents.)

significantly curtailed. First, McClain wrote Marquez on January 19, 2016, advising him

that Reyes Kurson was hired at Madigan's request (identified in the email as "a friend"):

---

**Message**

| | |
|---|---|
| **From:** | Michael McClain [mcclain@adams.net] |
| **Sent:** | 1/19/2016 12:40:26 AM |
| **To:** | Marquez Jr, Fidel:(ComEd) [fidel.marquez@comed.com] |
| **Subject:** | RE: [EXTERNAL] Reyes-Kurson Law Office work with ComEd |

It was in response to a request of a friend. After some time we entered into a contract guaranteeing "at least" 850 billable hours a year for the Law Firm of Reyes Kurson for three years.

I am anticipating that Tom would like to lower the hours. I am anticipating Tom likes their firm and is happy with their work.

I am anticipating that a mutual friend of ours will be solicited to help Reyes. I just would like to get ahead of the game.

Am I making any sense?

Mike

Michael F. McClain
Awerkamp & McClain, P.C.
P.O. Box 250
Quincy, IL 62306
Office Phone: 217-224-8606
Office Fax: 217-224-5123

---

**From:** Marquez Jr, Fidel:(ComEd) [mailto:Fidel.Marquez@ComEd.com]
**Sent:** Monday, January 18, 2016 6:33 PM
**To:** Michael McClain <mcclain@adams.net>
**Subject:** Re: [EXTERNAL] Reyes-Kurson Law Office work with ComEd

What's the agreement in this case?

Fidel

---

Then, the next day, McClain bluntly informed Pramaggiore that there would be

consequences if the company meddled with Reyes Kurson's contract:

70

**From:** Michael McClain <mcclain@adams.net>
**Date:** January 20, 2016 at 9:02:15 AM CST
**To:** "Pramaggiore, Anne R:(ComEd)" <anne.pramaggiore@ComEd.com>
**Cc:** John Hooker <johnhookert@gmail.com>
**Subject:** [EXTERNAL] FW: Reyes-Kurson Law Office work with ComEd

Well, I hate to bring this to your attention but I must.

Sorry. I am sure you know how valuable Victor is to our Friend.

In anticipation of a meeting between the Law Department and Reyes-Kurson I wrote the below document to Tom and Fidel.

Last night I got a call from Victor who informed me that the company cut his law firm down to administrative hearing hours only. No other hours.

I know the drill and so do you. If you do not get involve and resolve this issue of 850 hours for his law firm per year then he will go to our Friend. Our Friend will call me and then I will call you.

Is this a drill we must go through?

For me, Hook and I am sure for you I just do not understand why we have to spend valuable minutes on items like this when we know it will provoke a reaction from our Friend.

I just felt compelled to not follow the chain of command and inform you.

My best,

Mike

That same day, Pramaggiore—consistent with the anticipated testimony of Marquez concerning her policy of keeping Madigan happy—prostrated herself and her company in response to McClain's demand: "Sorry. No one informed me. I am on this." She then forwarded McClain's email to Marquez and O'Neill, demonstrating that she wanted her subordinates to promptly act on McClain's demand.

Thereafter, the ComEd project manager who was tasked with helping to obtain legislative approval of FEJA, but who had no oversight authority whatsoever over ComEd's legal department, began to monitor the renewal of Reyes Kurson's contract. On

April 15, 2016—weeks before the spring legislative session was scheduled to end in late May—McClain sent the project manager an email with the subject heading, "Victor Reyes law firm?!" EXE00429350. On May 22, 2016, the project manager emailed O'Neill, asking, "Are we closed out on this topic [of Reyes Kurson's contract renewal]?" On May 24, 2016, McClain again pressed ComEd's legal department, Hooker, and the project manager about Reyes Kurson's contract, and proposed terms for the contract renewal. As explained earlier, Reyes Kurson's contract was renewed.[17]

Other evidence will help explain why McClain and Madigan were so keen to obtain work for Reyes Kurson; Reyes Kurson and Victor Reyes were "valuable" to Madigan because they took a prominent role in political activity and fundraising for the Speaker. The government anticipates introducing documents at trial demonstrating that Reyes Kurson was a key contributor of money to Madigan.[18] For example, the government intends to introduce memos addressed to Madigan, detailing the amount of campaign

---

[17] The government intends to introduce other emails concerning the Reyes Kurson contract, including but not limited to the following exhibits introduced during *United States v. McClain*, 20 CR 812 (N.D. Ill.): GX 327 (EXE00113245), GX337 (EXE00059783), GX 458 (EXE00042844), GX 549 (EXE00095884), and GX 538 (EXE00095913). (The exhibit numbers may change.)

[18] These would include, but not be limited to, the following exhibits previously admitted during trial in *United States v. McClain*, 20 CR 812 (N.D. Ill.): GX 311 (EXE00065436), and 312 (EXE00065448). (The exhibit numbers may change.)

contributions Reyes Kurson had raised for Madigan, as well as fliers reflecting that Victor Reyes took a prominent role in fundraising events benefitting Madigan.[19]

### c. Board Appointment

The government anticipates offering several documents concerning the appointment of Ochoa to the ComEd board of directors. For example, the government intends to offer an email sent by Pramaggiore to O'Neill on or about November 17, 2017, forwarding an email sent on Madigan's behalf, containing a copy of Ochoa's resume. EXE00186055. As another example, which again demonstrates the role Pramaggiore took in pushing forward hiring requests made at Madigan's request, Pramaggiore prompted Marquez to arrange a dinner with Ochoa as a prelude to his appointment on the board (EXE00007208):

---

[19] The government anticipates calling another witness who will explain that Madigan had asked Victor Reyes to assist with the legislative remapping process (a matter discussed further below) because of his connections to the Hispanic community, and that Reyes had also acted as a fundraiser for Madigan. Reyes's political assistance to Madigan further demonstrates why Madigan and McClain were so intent upon Reyes receiving business from ComEd.

| | |
|---|---|
| **Message** | |
| **From:** | Pramaggiore, Anne R:(Exelon Utilities) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B898AC7B0BA64ACB90EE1F1EC5870631-PRAMAGGIORE] |
| **Sent:** | 8/30/2018 6:57:51 PM |
| **To:** | Wade, Margaret E:(ComEd) [margaret.wade@comed.com]; Marquez Jr, Fidel:(ComEd) [fidel.marquez@comed.com] |
| **Subject:** | Re: |

Thank you!

_____

**From:** Wade, Margaret E:(ComEd)
**Sent:** Thursday, August 30, 2018 1:50:45 PM
**To:** Pramaggiore, Anne R:(Exelon Utilities); Marquez Jr, Fidel:(ComEd)
**Subject:** RE:

Hi Anne, dinner with Juan, Fidel& joe is set for 9/10.

-Maggs

**From:** Pramaggiore, Anne R:(Exelon Utilities)
**Sent:** Thursday, August 30, 2018 12:32 PM
**To:** Marquez Jr, Fidel:(ComEd) <Fidel.Marquez@ComEd.com>
**Cc:** Wade, Margaret E:(ComEd) <Margaret.Wade@ComEd.com>
**Subject:**

Fidel — Did you get dinner set with you, Joe and Juan Ochoa?

As a further example, the government intends to introduce the notice ComEd filed with the United States Securities and Exchange Commission on or about April 26, 2019, noting that Ochoa had served as a director of ComEd since April 2019.

### d.     Internship Program

As noted earlier, Marquez associated the requests for hiring interns from the Thirteenth Ward with Madigan, the Committeeman of the Thirteenth Ward. In emails, McClain expressly linked the hiring of these interns to Madigan. For example, in an email dated February 27, 2015, McClain asked Marquez, "Our Friend's ward? Summer interns? 10 jobs or 12 or what is the ceiling?" EXE00072560. Several weeks later, Marquez

74

responded as follows to a question from another ComEd employee whether an intern referral from the Thirteenth Ward could simply be "fairly consider[ed]" or whether there was "pressure to hire" (EXE00070893):



On April 2, 2017, McClain sent an email to Marquez, Pramaggiore, and Hooker, again stressing the importance of hiring Thirteenth Ward interns: "I strongly recommend

this item as we go through this transition period. My goal is that both parties are happy and not frustrated a second. I hope you agree." EXE00046442.

On February 9, 2018, McClain sent an email to Marquez's assistant, saying he understood that the Thirteenth Ward would be provided ten positions in the ComEd Internship Program, as had been done "for as long as I can remember." Three days later, Marquez caused an email to be sent by his assistant to McClain, confirming that ComEd would provide the ten internship positions. EXE00440481.

On December 6, 2018, McClain emailed Marquez and others at ComEd: "I am pretty sure the 'ask' will be to 'put aside' or 'save' ten summer jobs for the 13th Ward." EXE00024660.[20]

### e. Other Benefits

There are numerous emails concerning other benefits sought by Madigan and McClain from ComEd. For example, as noted earlier, Marquez is expected to testify

---

[20] The government intends to introduce a number of emails and correspondence concerning the hiring of interns that it also introduced during trial in *United States v. McClain*, 20 CR 812 (N.D. Ill.), including but not limited to: GX 209 (EXE00083663), GX 226 (EXE00082160), GX 244 (EXE00078706), GX 245 (EXE00078709), GX 247 (EXE00077868), GX 263 (EXE00076919), GX 283 (EXE00072560), GX 284 (EXE00072340), GX 286 (EXE00731183), GX 289 (EXE00016277), GX 294 (EXE00070893), GX 323 (EXE00062222), GX 338 (EXE00113229), GX 339 (EXE00113230), GX 421 (EXE0000464442), GX 425 (EXE00008090), GX 427 (EXE00046263), GX 430 (EXE00443289), GX 431 (EXE00443301), GX 438 (EXE00442791), GX 483 (EXE00096245), GX 508 (EXE00439733), GX 510 (EXE00439735), GX 525 (EXE00038688), GX 526 (EXE00038695), GX 532 (EXE00036838), GX 533 (EXE00037254), GX 541 (EXE0034963), GX 568 (EXE00024660), and GX 853 (EXE00078792).

about the lengths that he went to in order to have an individual recommended by Madigan, Kathy Laski, hired by the company. Marquez understood the request to originate from Madigan. Contemporaneous emails corroborate Marquez's expected testimony. As reflected below, Marquez made it apparent to other personnel within ComEd that there was a "very strong need" to bring Laski in—despite the fact that she had refused to interview for five different openings—because of the fact that she was connected to Madigan, and that this situation was on Pramaggiore's radar (even though

Laski was being considered for relatively low-level positions within ComEd) (EXE00056785):



This and many other emails discussing the provision of jobs and benefits to Madigan associates at McClain's request were previously introduced in *United States v. McClain*,

20 CR 812 (N.D. Ill.), and the government intends to introduce the same emails in this

case as well.[21]

---

[21]     The government intends to introduce a number of emails and correspondence concerning other benefits and hires, including but not limited to those that it also introduced during trial in *United States v. McClain*, 20 CR 812 (N.D. Ill.), including but not limited to: GX 210 (EXE00083447), GX 211 (EXE00083448), GX 220 (EXE00082735), GX 225 (EXE00082245), GX 228 (00081689), GX 230 (EXE00185825),GX 232 (EXE00080304), GX 233 (00080254), GX 240 (EXE000798840),GX 243 (00078782), GX 246 (EXE00197214), GX 249 (EXE00077812), GX 250 (EXE00077740), GX 252 (EXE00077533), GX 255 (EXE00077338), GX 258 (00197189), GX 269 (EXE00075247), GX 271 (00113762), GX 275 (EXE00073919), GX 276 (EXE73923), GX 278 (EXE00073760), GX 288 (EXE00174730), GX 293 (EXE00071253), GX 299 (EXE00069305), GX 325 (EXE00062196), GX 342 (EXE00059325), GX 354 (00056785), GX 363 (EXE0092237), GX 365 (EXE00373696), GX 366 (EXE00053876), GX 367 (EXE00053650), GX 368 (00053439), GX 377 (EXE00051802), GX 396 (EXE00050324), GX 403 (EXE 00049248), GX 417 (EXE00046963), GX 418 (00350862), GX 419 (00046499), GX 446 (EXE00007853), GX 448 (EXE00043616), GX 449 (EXE00043299), GX 453 (EXE00042987), GX 457 (EXE00042850), GX 477 (EXE00042162), GX 514 (EXE00041612), GX 516 (EXE00041557), GX 521 (EXE00039783), GX 589 (EXE00021476), GX 599 (EXE00095702). The government will also seek to introduce email communications concerning campaign contributions to demonstrate the close nature of the relationship between Madigan and ComEd, and to rebut claims that have been previously made that Madigan and ComEd were effectively political adversaries or enemies. The government will not argue that such contributions themselves were illegal benefits that were provided to Madigan. Such communications would include GX 307 (EXE00067831), GX 335 (EXE00060251), GX 364 (EXE00054407), and GX 518 (EXE00041391).

### 3.     Wiretap Communications and Consensual Recordings

The government anticipates introducing numerous wiretapped and consensual recordings as proof of the existence of the conspiracies charged in Counts One and Two. Collectively, these recordings provide powerful corroborating evidence of the existence of the conspiracies and the participation of each defendant in the conspiracies, contain coconspirator statements in furtherance of the conspiracies, and corroborate the anticipated testimony of government witnesses and documentary evidence, including those witnesses and documents discussed above. These recordings are divided into the following categories for purposes of discussion: (a) recordings concerning efforts to confer benefits on Madigan and his associates, as well as the corrupt intent of the conspirators; and (b) the relationship of the various conspirators and their roles within the conspiracy.[22]

### a.     Recordings Concerning Efforts to Confer Benefits on Madigan and His Associates, as well as the Corrupt Intent of the Conspirators

#### i.          Hiring of Subcontractors

The government will introduce multiple calls and meetings demonstrating that the conspirators arranged for payments to be made to Madigan's associates, who were paid as purported subcontractors by Jay Doherty and others, even though they did little or no work in return. Indeed, the recordings reflect that the conspirators were aware that

---

[22]     The transcripts quoted below are in draft form only and are subject to revision before trial.

these subcontractors did no real work in return for payment, that the purpose of payments was to influence and reward Madigan, and despite this, they caused, directed, and facilitated the payments to be made.

Recordings concerning Payments to<br>Michael Zalewski and Other Subcontractors

As discussed above, Marquez is expected to testify concerning the addition of Michael Zalewski as a subcontractor who was paid through Doherty at Madigan's and McClain's request—though he did no work for ComEd. Contemporaneous wire interceptions confirm these events.

For example, on or about May 16, 2018, at approximately 10:20 a.m. (McClain Phone, Session #2657), McClain was asked by Madigan, "And ah, when you're with Anne, you're talking about, uh, Mike Zalewski?" McClain said, "Mike Zalewski and Juan Ochoa."[23]

Within the hour, McClain was on the telephone with Pramaggiore. Specifically, on or about May 16, 2018, at approximately 11:06 a.m (McClain Phone, Session #2664), McClain made an outgoing call to Pramaggiore. During the call, Pramaggiore and McClain discussed individuals who were being indirectly paid by ComEd at the request of Madigan and McClain. Specifically, McClain asked, "Secondly . . . have you thought any

---

[23] Exhibit A is a draft list of audio or video recordings the government may seek to introduce in its case-in-chief. The government will tender copies of the draft transcripts to the Court. The list of recordings, and the transcripts, are in draft form and may be amended before trial.

more about Mike Zalewski?" Pramaggiore said, "Yeah, I told Fidel [Marquez] to hire him. To get it done, so I'll follow up on that. Oh yeah." McClain said, "Okay. I'll, I'll tell a friend of ours so he can call him." Pramaggiore said, "Yeah, let me, just let me make sure, let me just double check with Fidel. . . The only question Fidel had was . . . you know, when Dominguez comes in, he's gonna look at all this stuff and—" McClain said, "Oh yeah." Pramaggiore continued, "—we got a lot of people hanging out there and so one question Fidel and I had was, is there anybody who, you know, we could sort of take off the roster? And I think he was going to ask you about that."

These interceptions establish a number of different points: (i) the request to hire Zalewski as a subcontractor was made by McClain, based on Madigan's direction; (ii) Pramaggiore, the CEO of ComEd, was directly responsible for agreeing to the request to put Zalewski on the payroll and directing Marquez to arrange for payments to Zalewski ("I told Fidel to hire him"); (iii) McClain wanted Madigan to inform Zalewski that he had been hired, not an individual from ComEd—thus further demonstrating this was not a *bona fide*, arms' length employment decision made in the ordinary course of business; and (iv) Pramaggiore (the CEO) asked McClain (the nominally subordinate contract consultant) for permission to reduce the number of Madigan subcontractors, out of concern that the payments would be scrutinized by her successor. As to the latter point, based on Marquez's expected testimony referenced above, as well as subsequent interceptions, the jury will be provided with evidence that reflects that certain of the conspirators were concerned that the new CEO, Joe Dominguez (who was scheduled to

replace Pramaggiore as CEO of ComEd and who was known to be a former federal prosecutor), would question the payments made to Madigan's associates. This is unsurprising, because there were a "lot of people" being paid who were just "hanging out," to use Pramaggiore's own words.

As another example, on or about May 16, 2018, at approximately 2:31 p.m. (McClain Phone, Session #2686), McClain made an outgoing call to Marquez. During the call, the men reviewed payments that were being made by ComEd at the request of Madigan and McClain to the Madigan subcontractors, and discussed adding Zalewski to the roster of subcontractors. Notably, during this call, McClain (i) set the price to be paid to Madigan's associate, Zalewski, as opposed to a ComEd official making that determination—once again demonstrating that the payments were not *bona fide* and not made in the ordinary course of business; (ii) explained the reason why each of the various subcontractors was being paid by ComEd—with reference to their political association or utility to Madigan—as opposed to any legitimate, actual work they performed for ComEd; and (iii) reiterated that Madigan, not a ComEd official, would be the one to tell Zalewski that he would begin receiving payments. Specifically, Marquez said, "Did you get my message?" McClain said, "You wanted to talk about Zalewski?" Marquez said, "Yeah, so Anne mentioned your conversation with her about, about Mike [Zalewski]. Um, what were you thinking numbers wise?" McClain said, "Five, five." Marquez said, "Okay, so we still have Ray Nice." (In other words, Marquez confirmed that ComEd was currently providing

payments to Nice at Madigan and McClain's request.)[24] McClain said, "Right. Let me just tell you about each guy as you go through them. So Ray Nice, he's, um, one of, um, he's one of the top three precinct captains, and he also trains, uh, people how to go door to door . . . just to give you an idea . . . of how important the guy is." Marquez said, "Frank Olivo." McClain said, "Frank Olivo, former alderman." Marquez said, "Yup, I remember, actually when I first started doing this external stuff he was Alderman down there. Um, then we've got Zalewski. McClain said, "Ed Moody." Marquez said, "Pardon me?" McClain said, "There's Ed Moody." Marquez said, "Yup . . . Ed Moody. Now, he's no longer a Commissioner but is he going to be Recorder of Deeds?" McClain laughed, and said, "I don't think it's possible." Marquez said, "Okay, alright. Someone felt that that might be the case." McClain said, "It's a funny business up here." Marquez said, "Eddie Acevedo." McClain said, "Eddie Acevedo, I gotta talk to M—, somebody about that, let me talk about that." Marquez said, "We're gonna go ahead and add Frank, oh, um, Mike Zalewski. . . What I'm gonna do is have Jay Doherty reach out to him . . . and work it that way." Marquez thus advised McClain that ComEd would begin paying Zalewski, through Doherty's lobbying firm. McClain said, "Give me a, a few hours so I can call somebody else to make, make a call to him, would you?" (McClain asked for time to call Madigan, so

---

[24] Where bracketed interpretations in recorded conversations appear, the government anticipates that a participant to the conversation (such as Marquez in this case), will explain what was meant or understood by either what the witness said or heard.

that Madigan could, in turn, call Zalewski to tell him that he would begin receiving payments from Doherty's lobbying firm.) Marquez said, "You let me know."

Recordings concerning 2019<br>Renewal of JDDA Contract

The government anticipates the evidence at trial (including the testimony of Marquez) will reflect that Doherty's consulting contract was subject to renewal in 2019—after Dominguez had taken over as CEO from Pramaggiore. In early 2019, Marquez began cooperating with the government and began recording conversations concerning the renewal of Doherty's contract. A number of the coconspirators were captured on recordings discussing the renewal of the contract, either in direct conversation with Marquez or with each other. Marquez sought advice from other ComEd conspirators in explaining to the Dominguez *why* the Doherty subcontractors were being paid so much money by ComEd.

Notably, not a single conspirator suggested any subcontractor was being paid to perform valuable, legitimate work for ComEd; despite this, they all attempted to ensure Doherty's contract (and the payments to the Madigan subcontractors) were authorized to continue for another year. The recorded conversations reflect that the payments were both corruptly solicited and offered, that other ComEd conspirators, including McClain, were involved in them being made, and that the conspirators were aware of the true purpose of the payments.

For example, on or about February 7, 2019, at approximately 12:04 p.m., McClain and Marquez met at a restaurant in Springfield, Illinois. During the meeting, McClain and Marquez discussed the renewal of ComEd's contract with Doherty, which included money to pay Madigan's associates through JDDA. This conversation is notable because it establishes, among other things, (i) McClain's effort to conceal why the subcontractors under Doherty were being paid, as demonstrated by his advice to Marquez not to put anything in writing about what the subcontractors did for payment; (ii) that McClain did not believe they did any legitimate work for the company, in that McClain never suggested they performed any legitimate work for the company when asked for advice on how to explain what the subcontractors did, nor did he suggest the obvious step of simply asking Doherty what they did; (iii) that McClain was aware that paying the subcontractors indirectly through Doherty could be used as an artifice by the company and those associated with the company to deny knowledge that the subcontractors were not performing any work; and (iv) that the subcontractors were hired at Madigan's request, and that this alone justified their payment, regardless of whether they actually did anything. Specifically, Marquez said, "I met with Hooker not that long ago. . . the ah contract with Jay Doherty is under the CEO's budget. I never had to touch it . . . Now, someone needs to talk to Joe [Dominguez] about it. I don't know how, you Joe is, I don't know how he is gonna react." McClain said, "I don't either." Marquez said, "So John [Hooker], he, he suggested that I have a write-up for each of Jay's subcontractors. Nice, uh, Zalewski, and um, Olivo.  And have 'em write up what they do. I don't know what

86

they do. I don't know if I can tell Joe what they do. And, you know, Joe's gotta approve it." McClain agreed he did not know how Dominguez would react, and stated, "he could just as easily require something in writing, but, um, I would say to you don't put anything in writing." Marquez said, "that was John's suggestion, alright, but my, my dilemma is I gotta go in to Joe and say, 'Here's, this is under your budget, here's Jay's contract.' He's gonna say, 'How much is this for? What's all included? . . . What are we paying Jay for?'" McClain said, "So, um, they're all, you know, former Ward committeemen and Aldermen. Zalewski, former Alderman Olivo, and, uh, this either was number one, two, or three depending on the, the year, his [Madigan's] best precinct worker. He actually trains other precinct workers, so—" Marquez asked, "Meaning, mean Nice?" McClain said, "Nice." McClain continued, "it's a favor and it's uh, Doherty's contract, so Doherty's the one that has to, has to prove that if the IRS ever comes in and says, 'Who are these guys and what do they do?'" Marquez said, "Right." McClain said, "Doherty's gotta prove it. . . The company [ComEd] doesn't have to."[25] Marquez said, "I understand that, but Joe is going to, and legitimately so, I think it's a legitimate question—" McClain said, "It is, yeah." Marquez said, "It's a legitimate question. Joe's gonna ask, 'What are we paying Doherty for?'" McClain said, "Well, on, on Doherty, for Doherty's sake, he does work for

---

[25]    Marquez is expected to testify that he understood McClain's reference to the payments being a "favor" as meaning that the payments were a favor to Madigan.

us. . . you're talking about the three con—"[26] Marquez noted that Doherty's contract was "a pretty hefty amount." McClain said, "One hundred and sixty-eight grand [$168,000] just for the subs [Madigan associates]."

Later during the conversation, McClain said, "If that hour he's [referring to Dominguez] got his ex-prosecutor hat on, he's gonna say we can't do this. Right?" Marquez said, "That's right, that's a possibility. And, and in his conversations with his staff, he brings that up often. Former prosecutor, former prosecutor, former prosecutor." McClain said, "It's very possible that that's what his reaction is going to be, and, um, then I think you have to have, at least I'd ask you to recommend that, before you do anything, uh, can McClain and you have a sit-down?'" McClain continued, "And you could say, 'Look I didn't think it was appropriate for McClain to . . . talk to you about this.'" Marquez said, "I don't even wanna bring that up." McClain said, "You're welcome to." Marquez said, "Eh. Well, Joe is funny about conversations you and I might have that he's not aware of. . . Joe will probably believe that somehow we're plotting against him." McClain said, "Or he probably thinks that all the time any—" Marquez said, "Well, that's what I mean. I mean this will give him another nail in the coffin. So that's why, that's why I don't wanna do that. So, recommend nothing in writing." McClain said, "I think all that can do is hurt

---

[26]     Marquez is expected to testify that he understood McClain to be contrasting Doherty, who actually did legitimate work ("he does work for us"), from the Madigan subcontractors—who did not.

ya. There's no way you could . . . except for maybe giving him a biography of each of the three [Madigan subcontractors]. But I certainly wouldn't do the work product 'cause you don't supervise that."[27] Marquez said, "I don't." McClain said, "Or monitor that, that's Jay's. . . And you know what I would say to Joe is 'Jay's been really good to us at City Hall, and he does that . . . City Club.'" Marquez stated that he would "try that with Joe, here's this, here's what's going on." McClain responded, "You don't know what Joe Dominguez will show up that day, that's the problem." McClain continued, "So I can see him saying 'we can't do this. . . . Anne [Pramaggiore] may have done that, but I don't feel good about this. Um, it, it, it looks raw to me.'"

A telephone call between Michael McClain and John Hooker occurred on or about February 11, 2019, at approximately 10:36 p.m. (McClain Phone, Session #19533). During the call, McClain and Hooker discussed McClain's meeting with Marquez on February 7, 2019 (described above), and the payments to Madigan's associates through Doherty. In the call, the men agree that ComEd "had" to hire the subcontractors because Madigan had asked them to be hired, that McClain and Hooker devised the plan of placing the Madigan subcontractors under Doherty to conceal the arrangement, and that it was immaterial whether the subcontractors performed work or not. Specifically, Hooker

---

[27]     Marquez is expected to testify that he understood McClain was advising him against putting anything in writing because a truthful explanation would disclose the Madigan subcontractors did no work, or alternatively, he would submit a false document.

asked, "How did you make out with Fidel [Marquez] when he came to talking about Doherty?" McClain said, "Well, I just told him to be transparent with uh . . . with uh . . ." Hooker said, "Joe." McClain said, "Joe. I mean just like Joe you told, I mean I, I said to Fidel, 'You may not be able to say this, you may be able to say that.' Just like, you ended up telling Fidel he had to hire [a named individual] because [a named labor leader] came to you. We had to hire these guys because Mike Madigan came to us. That's, it's that simple." Hooker agreed: "That's how simple it is." McClain confirmed: "That's how simple it is. So if you want to make it a Federal court suit, okay, but that's how simple it is." Hooker said, "Right. And this was the best way to do it. That, this avenue is one of the best avenues . . . it's clean for all of us." McClain said, "Right. We don't have to worry about whether or not, I'm just making this up, whether or not Mike Zalewski, Sr., is doing any work or not. That's up to Jay Doherty to prove that." Hooker said, "That's right." McClain said, "We're not, we're not, uh, monitoring his work load; whether or not Mike Zalewski's earning his five grand a month. That's up to Jay Doherty." Hooker said, "That's right." McClain said, "That's why we set it up like this, John." Hooker said, "We came up with this plan and between him, our friend [Madigan],[28] and . . . Tim, and the alderman; they thought it was great." McClain said, "Yep. Well, yeah. Well, you and I came up with it." Hooker said, "I know." McClain said, "They didn't come up with the

---

[28]      As noted above, multiple witnesses, including Marquez, are expected to testify that McClain often referred to Madigan as "our friend" in conversation.

idea. You and I came up with it." Hooker said, "No, we came up with it, but they thought it was great once they heard it." McClain said, "Oh yeah, oh yeah, oh yeah, yep, yep."

Doherty, one of the conspirators, also discussed the subcontractors with Marquez two days later. On or about February 13, 2019, at approximately 1:31 p.m., Marquez and Doherty met in Marquez's office at ComEd. During the meeting, Marquez and Doherty discussed ComEd's payments to the Madigan associates through Doherty's firm. This conversation demonstrates (i) Doherty's knowledge that the subcontractors he paid for approximately eight years performed no work; (ii) Doherty's understanding that the subcontractors were paid for the purpose of corruptly influencing and rewarding Madigan; (iii) that Doherty was conscious of the illegality of his own conduct as reflected by his own guarded behavior during this conversation; and (iv) that Doherty continued to act as a nominee after explicitly confirming that the subcontractors he paid did no work and his understanding that they were being paid to corruptly influence and reward Madigan. Specifically, Marquez said, "Here's the change, Jay, and here's why I needed to talk to you. So, Joe is new, he's new to ComEd. . . . And you may or may not know this. Probably a lot of detail that you don't know. . . But your contract is under Joe Dominguez's budget." Doherty said, "Right." Marquez said, "It's always been under the CEO's budget." Doherty said, "Right," and added "Back to Frank," a reference to ComEd's former CEO Frank Clark. Marquez said, "Does it go all the way back to Frank? How long ago?" Doherty said, "Oh gosh, I started working for Commonwealth Edison Company, thank you lord, in 1985." Later in the conversation, Doherty said, "And then

came along, again, this is just you and me talking, I don't even know who else knows this. Uh, John Hooker calls and says, 'Jay, I've got a sub for you. You know, a sub—" Marquez said, "A subcontractor." Doherty said, "'Subcontractor . . . Frank Olivo. He says, 'We're gonna pay him [Doherty holds up 4 fingers] every month and you just.' . . . I think John [Hooker] said, 'I'll talk to Fidel.' I don't know who he talks to." In other words, Doherty relayed that Hooker had instructed him to pay $4,000 per month to Olivo.[29] Doherty moved on to the next subcontractor, Nice: "I've known you and we've become great friends. Uh, and then came on, I think, Ray Nice . . . who ran recorder of deeds office." Doherty continued, "And then came on, for a while, uh Moody, Ed Moody . . . who's now Recorder of Deeds. I mean, it's, before he was Cook County Assessor. And then uh, and then now, Mike Zalewski." Doherty continued, "So, I don't know if that, I just can't remember if Mike McClain was part, I think it was really John Hooker who always just called me. . . and said, 'Hey, you know I just wannta, I'm gonna slug this guy on.' And so then it went up to whatever it is today, $37,000, so it looks like I'm making a gillion dollars." Doherty thus expressly referenced the efforts to conceal the subcontractors by using his firm as intermediary.

Continuing during the same conversation, Marquez said, "this is something Joe's gotta approve, right?" Doherty said, "Yeah." Marquez said, "And I've got to go to Joe and

---

[29]     Doherty's refusal to audibly note how much money he was paying Olivo smacks of his consciousness of guilt—as does his statement "this is just you and me talking."

say, 'I know you're new here... You know Jay." Marquez said, "So, ah, he's gonna ask questions." Doherty said, "Sure, right, he should." Marquez said, "And, how did it get this way and stuff like that." Doherty said, "Right." Marquez said, "So, as far as I know, and maybe you can tell me different, all these guys do is, they're a sub under you and you cut them a check. Do they do anything? Or, what do they do? What do you have 'em doing?" Doherty said, "When, not, not much . . . to answer the question. Not much." Doherty continued: "If I ever ask, need anything, you know, in general, I would ask them. But this is really all, this is, you know, just you and me talking. . . This all came from Hooker, McClain, Frank. . . And I don't, I don't talk to Frank Olivo," other than when Doherty's dad died. Doherty said, "But I don't say, go do this in Springfield" or "Go do this at the [Chicago] City Council." As to Nice and Moody, Doherty said, "Ray Nice, I met with a couple times. Ed Moody, I mean, I see him, but I don't, you know, but I don't do anything specific." Doherty continued, "But I do know that every six or eight or nine months, every once in a while, Hooker will call and say, 'Is everything okay with the guys?' . . . 'Cause I know John [Hooker] sees the chairman, or the, strike that, the Speaker [Madigan]. . . .

John [Hooker] is a head of that committee or commission, or whatever, on the fair maps."[30]
Doherty continued, "So, I don't think I'd tinker with that. . . . I really, I really don't."[31]

Continuing during the same conversation, Marquez said, "I've just got to go to Joe
. . . and explain it to him . . . the best I could. . . And I'm just not sure what kind of
questions he's got. So I'm just trying to prepare myself, Jay . . . for what questions, uh,
he might have." Doherty suggested how to approach Dominguez: "Here's how I might.
Uh, number one, your money comes from Springfield [where the State legislature is
located]. ComEd money, right? I mean, for the most part." Marquez said, "You mean,
that's how we make our money." Doherty said, "Yeah." Marquez said, "Yeah, yeah.

---

[30] The government anticipates calling a witness who will explain that the legislative districts in Illinois are redrawn, or remapped, every ten years, and that this remapping process, which decides the boundaries of each district, was critical towards ensuring the greatest number of Democrats could be elected. Further, this witness is expected to testify that in 2014, a group called the "Fair Maps Initiative," known as the "Initiative," challenged the remapping process. The Initiative wanted an independent commission, and not the majority party in the Illinois House, to be in charge of the remapping process. Madigan wanted the Initiative defeated. An independent commission would mean that Madigan would lose the ability to affect district boundaries in his favor and in favor of the Democratic Party. The witness is expected to testify that Hooker was a plaintiff in a lawsuit filed to challenge the Initiative. Hooker was a ComEd lobbyist at the time and ComEd had legislation before the Illinois House. Hooker was represented by an attorney close to Madigan. Like Reyes, Hooker acted as a political ally to Madigan. This evidence is also relevant to show the purposes of enterprise charged in Count One.

[31] Marquez is expected to testify that he understood Doherty to be telling him that the Madigan subcontractors did not perform any work for Doherty or ComEd, that Hooker continued to monitor the situation on behalf of Madigan, and that there would be negative consequences from terminating the contract that sent payments to the Madigan's subcontractors, even though they did no work.

Through our rates, yes, regulated."[32] Doherty said, "Mike Madigan's not my best friend, but if I called him right now, he'd call or he'd say, 'Jay,' if I want to go see him, I'd go see him. But, my bottom line advice would be, 'if it ain't broke, don't fix it' with those guys." Doherty continued, "Madigan doesn't ask, I never, ever once had a conversation with Mike [Madigan] about these people . . . But I know, I have every reason to believe, that McClain has. . . I know Hooker has. . . . 'Cause Hooker would call me with (unintelligible) these guys. I mean, I never met these guys. I met Olivo because what you guys . . . do with the City Council. And Zalewski I know well." Marquez said, "When he was the alderman." Doherty said, "Yeah." Doherty continued: "They keep their mouth shut, and you know, so. But, do they, do they do anything for me on a day to day basis? No."[33]

Later in the conversation, Doherty imagined what Dominguez might say: "'Why would we pay a guy like Doherty, and these other three people, all this money?' I don't know about the other three people. That's, that, I guess, can be answered in Springfield with Madigan. And to keep, to keep Mike Madigan happy, I think it's worth it. I mean just 'cause you'd hear otherwise." Marquez said, "Okay." Doherty said, "I mean, my opinion. . . I never talked to him about it. . . but I didn't have to. . . But Hooker has. . . Do

---

[32]     Marquez's reference here is to the formula rate legislation embodied in EIMA and FEJA. As noted earlier, multiple witnesses will establish that Madigan supported these legislative initiatives, and indeed, ensured the passage of FEJA by causing others to vote for the legislation. *E.g.*, McClain Phone, Session #2628 (5/16/2018).

[33]     Marquez is expected to testify that he understood Doherty to be telling him that the Madigan subcontractors kept quiet about the fact they received payments in return for doing nothing.

you talk to John much?" Marquez said, "Yeah, I talk to John. I talk to John." Doherty said, "He'll know the story . . . ." This recording makes clear that Doherty understood the payments to the Madigan subcontractors to be part of a pay-to-play arrangement made to corruptly influence and reward Madigan.

Marquez subsequently discussed the renewal of the Doherty contract with Pramaggiore during a telephone call on or about February 18, 2019 (Marquez Phone, Session #6182). During that call, Pramaggiore explicitly instructed Marquez that he should convince Dominguez to renew the contract in order to avoid any negative impact on legislative initiatives in Springfield that were then pending, including a beneficial extension of the formula rate legislation that was pending at the time.[34] Specifically, Marquez explained to Pramaggiore that, "I met with Jay, uh, Jay pretty much, well he did say, 'Well, you know all these guys [the Doherty subcontractors] do is pretty much collect a check, um, and you should just leave it alone. Don't mess with it, just leave it alone, um, otherwise things can go, you know, bad for us in Springfield.'" After Marquez explained to Pramaggiore that he needed to talk to the new CEO, Dominguez, about the contract, Pramaggiore interrupted him and said the following:

> Yeah here's the—you do—but here's the problem: Is if you go
> in and say, you know, "We need to clean this stuff up, it's been

---

[34]    The government's evidence will show that at the time of this conversation, ComEd was seeking an extension of the effective date of the formula rate legislation previously passed by the Illinois General Assembly that had been extremely favorable to the company. Marquez is expected to testify that Doherty's work was focused within Chicago and the Cook County area.

that way since Frank Clark," he's gonna do a victory lap that he's got another thing on me and, you know, everything is how much better he can handle things than me. My suggestion is, and you potentially, I mean he can do what he wants, but my suggestion is you go in and say, "Hey Joe, you know we've got some contracts, some sub-contracts, it's probably a good time to make a switch. We got a new governor in place, you know, um you got, you know, 30% change over in the, in the um, in the s-, in the, uh, legislature, but let's not do it until after the session's over. Let's look at this in terms of going forward to next year because we do not want to get caught up in a, you know, disruptive battle where, you know, somebody gets their nose out of joint and we're trying to move somebody off and then we get forced to give 'em a five-year contract because we're in the middle of needing to get something done in Springfield.

Pramaggiore, a high-level company executive who oversaw the hiring and payment of the Madigan subcontractors for roughly eight years even though they did no work, advised Marquez to continue paying individuals hired at Madigan's request thousands of dollars a month to ensure (i) that her successor did not have derogatory information that could be used against her; (ii) that ComEd's legislative efforts were not thwarted; and (iii) that a larger corrupt payment was not necessary to ensure favorable legislation was passed.

McClain subsequently met with the Dominguez on March 5, 2019, in order to discuss the renewal of the Doherty contract. During the conversation, McClain made it clear that the Doherty subcontractors were patronage workers hired at Madigan's request, and that hiring them was for the purpose of influencing and rewarding Madigan. Specifically, Dominguez began that portion of the discussion by stating, "But anyway, with Jay [Doherty's contract], so-" McClain stated, "So, let's go back, I think we gotta go

97

backwards. So, um, the history with Madigan is, um, even in the, um, when, when Lee Daniels was, was, uh, Speaker . . . we had a bill that we wanted, uh, heard, and Lee [Daniels] wanted no part of it, and even then Madigan grabbed the bill and had the meetings in his office, and, uh, and the same thing when we [ComEd] de-regged [sought deregulation legislation], um, it, it, it's just, um, um, I don't know if it's his [Madigan's], um, um, view of ComEd, uh, from even the 70's [1970s] when, when, you know, he [Madigan] got to name people to be meter readers, right? I mean, it's uh, the old fashioned patronage system and. . ." Dominguez interjected, "Mm-hmm." McClain continued, ". . . uh, ComEd played it like, um, like a . . ." Dominguez stated, "Like a chip." McClain stated, "You're a Ward Committeeman and, um, we have seven meter readers in your, in your, in your ward and you can name four of them, you know." McClain continued, "And that's just the way ComEd was for, uh, years, and then, as, as we kinda morphed into, um, not being able to do that, no meter readers, and um, ah your, your um, frankly, your employees are more skilled than a lot of people in his Ward, uh, we morphed into, 'How else can we help you?'" Dominguez stated, "Right." McClain said, "Right." McClain then gave an example of an individual who ComEd hired as a staff attorney, which was, in turn, based upon a request that came from the individual's father. McClain also indicated that the individual's father, "had a special love for ComEd, before that and after that . . . because of that commitment." McClain continued, "So um, um, so that, that's just what we've always done for, good lord, over 20 years now, because we can't really do meter readers, we don't have them anymore—" McClain continued, "—we don't linemen, there's

98

no one from the Thirteenth Ward that's a lineman. So what we have is, uh, um, Mike Zalewski, Junior, I'm sorry, Senior, used to be an alderman, um next uh, and his son is Chairman of the Revenue Committee, um and uh, Ray Nice, who's a top three precinct committeeman." Dominguez responded, "And available, when, when we need uh, when we need some help, right?" McClain responded, "Mhmm." McClain then analogized the payment of individuals by ComEd through Doherty's firm to the hiring of a person by Dominguez at the request of a union leader. Thereafter, Dominguez indicated the contract would be renewed.

McClain and Hooker also repeatedly made clear in other recorded conversations their understanding that ComEd hired individuals at Madigan's direction, and that these hires were made in exchange for ensuring favorable action on legislation by Madigan. For example, prior to McClain's meeting with Dominguez, McClain met with Hooker and Marquez on or about February 27, 2019. During this meeting, Marquez indicated that the Dominguez might not approve the renewal of Doherty's contract, and asked McClain and Hooker how "our friend," that is, Madigan, would react if the Doherty contract was not renewed. Hooker expressed his understanding that Madigan would adversely affect ComEd's legislative agenda: " 'You're not going to do it? You're not going to do something for me, I don't have to do anything for you.' He [Madigan] won't say it [out loud]." Hooker added that Madigan might reach out to the CEO of Exelon to discuss the renewal of the Doherty contract "before he hurt, hurt us."

As another example, after meeting with the Dominguez, on or about March 6, 2019, at approximately 3:05 p.m. (McClain Phone, Session #21893), McClain called Hooker. During the call, McClain and Hooker discussed McClain's meeting with Marquez and Dominguez on or about March 5, 2019. Specifically, McClain said, "They [ComEd] asked me to come into town yesterday and um, because, uh, they wanted me to explain the Jay Doherty situation, you know the contracts? And uh—" Hooker said, "To Joe?" McClain said, "Yeah. And so the, why that's important. And um, I, I did it in about two minutes and he said, 'well that's not the way Fidel told me about it, th-this is fine with me.' I said okay." Hooker said, "Michael, you gotta tell me, what did you just say? 'This is why this is important to us.'" McClain said, "Right. And you know, and, and I think maybe they just d-they don't, they're so scared of him, so they don't talk bluntly to him, you know what I mean?" Hooker said, "Right, right. You know, you got, you got, you, you, w-with the Jay Doherty stuff, you gotta little leg up." McClain said, "Right, exactly." Hooker said, "I mean it's, it's un, it's unmentioned but you know, that which is understood need not be mentioned." McClain said, "Right, exactly. Exactly ."

Additional Recordings Demonstrating Corrupt Intent
of Conspirators with Respect to Subcontractor Relationships

The government anticipates introducing a number of recordings that further demonstrate the intent of the conspirators with respect to the retention of subcontractors hired by ComEd at Madigan's request. For example, certain recordings demonstrate that Madigan was in control of which subcontractors would continue to be paid, thus

100

demonstrating the illicit nature of the hiring arrangements made by the conspirators to benefit Madigan.

On December 7, 2018, Madigan authorized McClain to tell ComEd they could stop paying Ed Moody. McClain Phone, Session #17919 (12/7/2018). McClain asked "Moody, uh, Ed Moody?" McClain further stated: "right now we pay him and, uh, I thought it was under Shaw Decremer, but now I remember that after Shaw had his problem, we moved it under Bradley. So, do you want us to keep going with Ed Moody under that ComEd agreement? Or do you want us to pull off a little bit because this Recorder of Deeds thing?" Madigan responded, "Yeah, that might be a good idea to pull back."

The recordings the government will offer show that McClain called Bradley the next day, as Madigan instructed. Specifically, on or about December 8, 2018, McClain told Bradley, "I did talk to himself [Madigan], um, about Moody." McClain Phone, Session# 17973 (12/8/2018). Bradley responded, "Yeah." McClain said, "himself thinks that maybe we oughta, stop it [the payments to Moody from ComEd via Bradley]." Bradley said, "Okay." McClain said, "I called Moody just to congratulate him [for becoming Recorder of Deeds]. And then next week I'll call him and say that we're gonna cut off the contract." Bradley responded, "Okay." McClain indicated that terminating the payments to Moody were "prudent." Bradley asked, "So, what do I do with that, they gonna reduce the amount then that comes to me?" McClain responded, "Um, why don't ya do the, um, pay the November one and December just pay for like, you know, a half a month or something." Bradley responded, "Okay." McClain said, "Just say, you know, you know,

101

"Merry, Merry Christmas, Ed, uh, from the Bradleys." Something like that." Bradley asked, "Okay. Like a bonus?" As noted above, Moody will testify that he never performed any work for Bradley or for ComEd while he was being paid by Bradley; therefore, representing a final payment to Moody as a "bonus" was yet another bogus explanation to cover an illicit payment made pursuant to a phony contract.

As another example demonstrating McClain's intent in causing ComEd to hire individuals at Madigan's direction—as well as the close relationship Madigan had with ComEd as a result—McClain explained the Madigan/ComEd relationship to a ComEd employee, Melissa Washington. On or about February 21, 2019, at approximately 6:16 p.m. (Session #20664), McClain placed a call to Washington. During the call, McClain and Washington discussed Madigan's need for someone at ComEd to be immediately responsive to Madigan's requests, as McClain was in the process of retiring. Specifically, McClain said, "Speaker [Madigan] called me. He said, 'Mike, on all these bills before, whether . . . it was uh, uh what the green people wanted or Exelon Generation wanted or ComEd wanted, uh I, I just always use you [McClain] as the point person.'" Washington said, "Yeah." McClain said, "'now you're not here. And um, so who can be the point person? Uh, because I, I, I don't, I, I don't wanna be goin' to five different people or ten different people.' And so, uh what I was calling you about was I think you and Fidel you guys gotta get your heads straight, because it's not just that you're the point person, it also is if there's a problem with a legislator um . . . like they're having a problem with ComEd. Well then, you gotta get it fixed." Washington said, "Yeah." McClain said, "And

you gotta get it fixed like, yesterday. Um, and if um, if the Speaker . . . comes to me and he says, 'Can ya, can ya hire a Latino PR company for the rest of the session, right?' I mean . . . it, it's that, it's that kinda stuff that whoever it is has gotta have the confidence of, uh, the Speaker to uh, that you're gonna act on it right away. But more importantly, the principals back in Chicago gotta know that if a request comes from that person, like let's say me, uh . . . that then, it, it's uh, it's gotta drop everything and get it done. It can't be, "I'll get it done next week." McClain explained that it had to be someone Madigan trusts, "'Cause, some of that, some of that stuff is kind of delicate, right?" Washington said, "Yeah, yeah." McClain said, "Um, and uh, you know and there have been times Melissa where uh like, uh he comes to me and says, 'Have them take a look at this resume and see if they can find uh, uh, a space for this person.'" McClain explained, "it's a delicate thing, right?" Washington said, "Oh no, I understand. I understand. So it's gotta be someone that he's trusting outside of our company, right?" McClain said, "I don't, I, I think it can't be an employed person. I think that, some of the things that are- that may be talked about . . . should only be shared with one person or two people inside the company." Washington asked McClain who came ot mind, and McClain responded that he recommended two people because "some day, they could, one of them or both of them could take my place," but that they were not ready yet. McClain added, "you can't be corporate so like . . . for instance um, like he'll, like he'll say to me at dinner, he'll say-he would say, 'Mike just, what do you guys [ComEd] really want? I mean tell me what the bottom line is and then we, we'll start working towards that end. . . Let's say you're my

contact person. . . Let's say back when Hooker was executive vice president and I'd say, 'Okay, I disclose where we're going.' And so, so now he's in sync with us on where the final bill's gonna look like, but . . . I don't think you can tell Dominguez that."

McClain reiterated his message that hiring requests from Madigan were relayed through code, and that it was expected they would be acted on promptly. For example, on or about February 22, 2019, at approximately 2:59 p.m. (McClain Phone, Session #20732), McClain participated in a conference call with Pramaggiore and Marquez. During this call, McClain, Pramaggiore and Marquez discussed the selection of a person outside of ComEd who would serve as Madigan's central point of contact with ComEd. Specifically, McClain said, "We're in a conundrum." Pramaggiore said, "Yep. Yeah, so Fidel, we wanted to put the three of us together, um, we, we've got a challenge with the Springfield dynamics and, Michael's [McClain's] really, I think he's gotta, you know, share that, um, 'cause he understands it but, better than, I mean, I understand it, but um, in any event I think, I wanted to talk, um, before it got to a broader audience just so you could, I think it's gotta come, I think it may need to come from you. But I want to, I want to make sure you can control the message that's, um, you or I so, but probably you. Michael, you wanna?" McClain said:

> Sure. So Fidel, last, um, Wednesday, uh, Speaker called me up and said, "You know Mike, um, we have this, um, Green, uh, set of bills that they wanna do. We have uh, Exelon Generation wants to do something, and ComEd wants to do something. And no matter what happened in the past, I've just always gone to you. Even though you, maybe you didn't represent different people, um, I always used you as the point

104

person. But, you're not here anymore so who's the point person?" And this is like at 4:00 or 4:30 at night, and he said, "So if you can still get back to me before I go to dinner I'd appreciate it." I went, "Holy shtick." . . .

And so I still haven't got, I still haven't gotten back to him. Um, but um, and, and as you know Fidel, um the, the point person has to be um, uh have his trust and also have the company's trust. And, that person's gotta be very discreet (clears throat) and whoever that person is, uh, talking to for the company uh, like let, let's say it's you. Uh, there's a code, right? So like, when all of a sudden I come to you and say, "Uh w-, would you take a look at this resume?" I mean, that's like, "Will you drop and do and try to get this done as fast as possible," right?

It is notable that McClain again and again brought up the fact that any future point of contact with Madigan had to be conditioned to comply with Madigan's hiring requests, which were delivered through "code," and also notable that Pramaggiore expressed no reservations about this practice.

Indeed, another wire interception confirms that both McClain and Madigan understood that individuals employed by ComEd at Madigan's request often did little to no work—further demonstrating their joint knowledge of the lack of a *bona fide* reason for payments to individuals employed at Madigan's request. Specifically, on or about August 4, 2018 (McClain Phone, Session #10276), McClain discussed the execution of a labor agreement with Madigan that involved ComEd. During the conversation, McClain noted that a named individual was going to drive the agreement around to various parties so that it could be executed—in effect, acting as a courier. Madigan then asked, "B-but Mike he's [the named individual] involved with ComEd?" McClain responded, "Yeah,

105

remember we got him that contract, um, maybe five years ago now, whenever it was?" For a buck fifty a year." Madigan said, "Mhmm" and laughed. Madigan interjected, "Some of these guys have made out like bandits Mike." McClain said, "Oh my God, (coughs) for very little work too." Madigan said, "Yeah." McClain then reiterated, "Very little work." Indeed, many of the Madigan subcontractors made out like thieves, just as Madigan observed.

As a final example, a conversation between McClain and a former Madigan staffer and lobbyist, Individual MA-2, demonstrates that McClain was involved in a long-running practice of making payments to Madigan associates on the pretense that they were performing legitimate work. Specifically, on or about August 28, 2018 (McClain Phone, Session #12138), McClain had a call with Individual MA-2. During the call, McClain recommended to Individual MA-2 that Individual MA-2 "start another company," and that the company would be used "to do more than just political contributions." In explaining the something "more," McClain explained that "at one point in time I had uh, maybe five consultants working for me," and "all they ever really did is give me pieces of paper."[35] McClain added that Individual MA-2 having another company would come in

---

[35]   McClain's comments came in the context of McClain's request that Individual MA-2 make payments of $1,000 a month to a former Thirteenth Ward employee, who had left service with the Thirteenth Ward after sexual harassment allegations were leveled against him. In connection with the requested payments, McClain had suggested that the former Thirteenth Ward employee be tasked with preparing a short report—clearly as a pretext for the payment, which Individual MA-2 referred to as a "bullshit report," recognizing it for what it was—a proposed sham to cover a payment to a Madigan associate.

handy if "he"—meaning Madigan—ever asked Individual MA-2 to hire someone for several months.

### ii. Retention of Reyes Kurson

The government anticipates offering recordings that illuminate the purpose behind providing benefits to Reyes Kurson. These interceptions reflect that multiple requests made on Madigan's behalf to provide business to Reyes Kurson were motivated by Reyes Kurson's valuable contributions to Madigan's political activities—consistent with the anticipated testimony of O'Neill, the ultimatum McClain posed to Pramaggiore by email as discussed above (where McClain noted how "valuable" Reyes Kurson was to Madigan), and the documents reflecting Reyes Kurson's involvement in fundraising for Madigan. For example, in one interception on or about October 22, 2018 (Session #29848), McClain and Marquez discussed giving additional legal work to Reyes Kurson. McClain complained that he still hadn't heard about "how much money they're gonna end up . . . doing for" Reyes Kurson. Marquez explained that he had spoken to an individual within ComEd's legal department, and that they had been able to find more work for Reyes Kurson. Marquez further indicated that he would "stay on it," because his "pushing and inquiring" might cause an individual within the legal department to try "harder" to find business for Reyes Kurson. Marquez noted that "sometimes you gotta do that," and McClain noted that "everything else is . . . meaningless until reapportionment. Then it's, then it's punctuated." The interception therefore reflects McClain's association of work

and money provided to Reyes Kurson by ComEd with political initiatives Victor Reyes helped Madigan on, such as legislative remapping.

Indeed, on or about October 26, 2018, (McClain Phone, Session #13947), McClain spoke with Victor Reyes, one of the principals of Reyes Kurson. During the call, McClain directed Victor Reyes to drop $90,000 in political donations at Madigan's law office; Victor Reyes promptly informed McClain that a fellow partner was trying to obtain additional business from ComEd, and noted that "hopefully . . . it will proceed," but that if "somethin' slows down . . . I'll give you a call." McClain acknowledged this, and asked to be blind copied on further correspondence concerning efforts to obtain work from ComEd. This interception starkly reveals defendants' transactional relationship with Reyes Kurson and Victor Reyes, and explains why the men were focused on ComEd providing benefits to Reyes Kurson.

### iii. Board Appointment

The government also anticipates offering recordings that demonstrate the efforts taken to appoint Ochoa to the ComEd board by the conspirators at Madigan's request—even in the face of internal opposition within the company. For example, on or about May 2, 2018 (McClain Phone, Session #1648), Madigan and McClain discussed the appointment of Ochoa to ComEd's board of directors. Madigan said, "you left some notes for me last night and one of them was concerned with Juan Ochoa." McClain said, "Yes, so um, they've got just a little bit of push back, I guess Juan's had some financial problems in the past and stuff like that, and then there's some guys that are doing the due diligence

wanting to know if [a former ComEd board member] would like to come back on the board. And so, Anne asked me to talk to you about um, a board member gets paid 78 grand a year, is, is it important to you for Juan to be on the board? And if it is, she'll keep pushing, if it's not, you're just trying to help him out, then she'll try to find something that would compensate him equally with that." Madigan asked, "What would that mean Mike?" McClain answered, "I don't know and he, she didn't know, but she said she'd find something. Not, not a full-time job, it, it would not be a full-time job." Madigan said, "And Mike, a board member gets paid how much?" McClain said, "Seventy-eight thousand."[36] Madigan laughed, and said, "Maybe I'll take the appointment." Later in the conversation, Madigan said, "Yeah. Mike, I would suggest that we continue to support Juan Ochoa." McClain said, "Okay." Madigan said, "Um, but keep me advised as to how much push back there is." McClain said, "Right, I will. She says . . . it's none from her and none from [a senior Exelon executive], it's just, uh you know, it's just uh, you know, uh, the second and third tier . . . people, right."

Madigan revisited the subject of Ochoa's appointment to the ComEd board days later. Specifically, on or about May 16, 2018 at approximately 10:37 a.m. (McClain Phone, Session #2657), Madigan told McClain, "There's a request from Congressman Gutiérrez

---

[36]     Pramaggiore's willingness to find something—anything—that would serve as a vehicle to pay a Madigan associate $78,000 a year is yet another vivid demonstration of her corrupt relationship with Madigan and McClain.

to see me." McClain said, "Mhmm." Madigan said, "And I suspect that may relate to Juan Ochoa." McClain said, "Okay." Madigan asked, "Do you know anything further on that?" McClain said, "I'm seeing Anne [Pramaggiore] tomorrow morning." Madigan said, "Okay." McClain said, "So I'll know better uh tomorrow." Madigan said, "Alright and, and, and, and Mike my recommendation is uh go forward with Ochoa so if the only complaint about Ochoa is that he suffers from bankruptcy twice so did Harry Truman." McClain said, "Right."

McClain promptly acted on Madigan's instruction. Specifically, on or about May 16, 2018, at approximately 11:06 a.m. (McClain Phone, Session #2664), McClain called Pramaggiore, and during the call, Pramaggiore and McClain discussed the appointment of Ochoa to the ComEd board. McClain said, "I talked to him about Juan Ochoa." Pramaggiore said, "Yes." McClain said, "And he would appreciate if you would keep pressing." Pramaggiore said, "Okay. Got it. I will keep pressing." McClain said, "Okay."

On or about July 17, 2018, at approximately 8:52 a.m. (McClain Phone, Session #8429), McClain and Pramaggiore discussed Pramaggiore's efforts to have Ochoa appointed to the ComEd board, as requested by Madigan. Specifically, Pramaggiore said:

> [H]ey the reason I called was I, um, so I talked to [the Exelon CEO] yesterday and um, we're moving forward with Juan Ochoa. So, that's a positive. Um, what he asked me to do, and I talked to Tom, uh, yesterday, uh late afternoon. But I think what we're going to do is, um, I'm just gonna confirm that, you know, that uh, this can be, uh, communicated to Juan. Um, [the Exelon CEO] wanted me to set up a dinner for Joe and Juan, um. . . So, I'm gonna (cough) put that in motion. Um, but I'm gonna just, I'm gonna check with Tom today and just get

110

the protocol for, you know, who oughta be calling Juan to let him know. Um, you know, then I'll set up the dinner with Joe and, you know, we'll sort of put the, the, you know, the program together, the, the process together about how, you know, timing wise when he comes on and that sort of thing. So, we have a board meeting Thursday so it's probably next quarter when um, you know, would be his first meeting. . . Which gives us plenty of time to get him, you know, sittin' down with, with Joe.

McClain said: "So, is, is this, um, formal enough that I can tell our friend or do you want me to hold off a little?" Pramaggiore said: "Yes." McClain said: "Oh, okay." Pramaggiore said, "Yep, you can tell him, yep." McClain said: "Thank you. I will." Pramaggiore said, "Yeah, that one was a little, you know, took a little bit, but um, yeah. We're all good." McClain said: "It's interesting though uh, the um, how long some things take. Isn't it, Anne?" Pramaggiore said: "Yeah. Well and, you know, it's interesting, you know, I'm getting a little more of a read on the culture and psyche of the Exelon corporate world, which is very different than ComEd. But you kind of have to cut through it." Pramaggiore's willingness to "cut through" internal resistance to the appointment of Ochoa to the board at Madigan's request is further proof of her corrupt relationship with Madigan and McClain.

McClain promptly advised Madigan that Ochoa would be appointed to the ComEd board as Madigan had requested. Specifically, on or about July 17, 2018, at approximately 10:31 a.m. (McClain Phone, Session #8447), within two hours of the conversation with Pramaggiore (McClain Phone, Session #8429) described above, McClain called Madigan and said, "Speaker, Juan Ochoa?" Madigan responded, "Yeah." McClain said: "You may

111

call him." Madigan said, "So that's gonna happen?" McClain said, "Yep, so [a senior Exelon executive] . . . told Anne [Pramaggiore] yesterday, and Anne called me this morning." Madigan said, "Very good." McClain said, "I made it clear that, so our friend should now call Juan. She said, 'Yes.'" Madigan said, "Okay, I'll probably call [Congressman] Gutierrez." McClain said, "Okay." Madigan said, "Tell him first." McClain said, "Sure." Madigan said, "I mean he, he's the reason I would talk to Juan Ochoa." McClain said, "Sure."

Madigan continued to press for information on Ochoa's appointment after it was delayed. Specifically, on or about September 7, 2018, at approximately 3:17 p.m. (McClain Phone, Session #13095), Madigan asked McClain, "Mike, are we for certain that Juan Ochoa is on the board?" McClain said, "Um, I can call Anne [Pramaggiore], but I mean that's what she said. She, uh, what is sh-, have you heard some information that that's—" Madigan said, "No I haven't, I haven't heard anything different, I just kept, uh, the note here." McClain said, "Yeah. Well, let, let me call Anne's, uh, secretary, cause I think she's traveling today, and, and make sure that that happened." Madigan said, "Okay, yeah."

McClain followed up on Madigan's request for information by calling Pramaggiore, who confirmed that Ochoa would be appointed to the board—and had done her best to "take care" of Madigan by seeing to the appointment of Ochoa to the board because Madigan took care of her. Specifically, on or about September 7, 2018, at approximately 5:01 p.m. (McClain Phone, Session #13111), Pramaggiore told McClain, "Um, so, I wanted to respond to your text on . . . Juan Ochoa. And kinda tell you where it was and I didn't

112

want to put it in writing." McClain said, "Sure." Pramaggiore said, "he is not officially on the board, but he, you know, sh, should be. I mean, barring anything like bizarre. Um, basically, you know, what's been happening is, you know, um, you know, [a senior executive has] been a little bit of an issue and I finally just went directly to [the Exelon CEO] and I'm like, 'We need to do this.'"

Later in the conversation, Pramaggiore explained there were still reservations within the company about appointing Ochoa to the board, which she had to overcome: "So it's in the works, but um [the Exelon CEO] is, like I said, [the Exelon CEO] is signed on." Pramaggiore later added, "You know 'cause Tom [O'Neill] and [a senior Exelon executive] were like, well, you know and so as I told ya, they, you know, they were, you know, well, he had a, you know. I don't know if he had a foreclosure or something, you know that, and I'm like, "Get over it," you know, just get over it. So, they have, but I (laughs) had to kinda push a little." Pramaggiore later added, "it's movin' and like I said, I talked to Juan myself and the dinner is Monday night, I believe." McClain said, "Perfect." Pramaggiore said, "Yeah, so." McClain said, "Appreciate it." Pramaggiore said, "Anyway, yeah, you bet, of course, of course. You take good care of me and, and so does our friend [Madigan] and I will do the best that I can to, to take care of you. You're a good man." Pramaggiore herself made it crystal clear that she sought to influence and reward Madigan—by placing an individual on the ComEd board in the face of internal reservations in return for Madigan "taking care of" her in Springfield.

### iv.    Other Benefits

The government anticipates introducing recordings of other benefits the ComEd conspirators sought to solicit and confer on Madigan. For example, on or about December 11, 2018 (McClain Phone, Session #18290), Madigan asked McClain if he had received a resume for a named individual who was related to a Cook County public official, and told McClain, "my thought was that there might be a place for her at ComEd," thus demonstrating Madigan's awareness of the goals of the conspiracy. McClain advised Madigan he would bring the resume with him when he had breakfast with Marquez.[37]

As another example, on or about April 9, 2019 (Marquez Phone, Session #17513), John Hooker had a telephone call with Marquez. During the call, Hooker reported to Marquez that Pramaggiore was exploring hiring Madigan's former chief of staff, who had left his position in the wake of allegations of harassment made by other State employees. Hooker explained that Pramaggiore wanted to have the former chief of staff work for her, but Pramaggiore suggested to "pay him but hide his contract in someone else's," and Hooker had suggested "put him in as a consultant with McClain."

McClain similarly suggested to Marquez in an intercepted phone call that ComEd could "hide things" by employing Madigan's former chief of staff as a consultant through a third party. Marquez Phone, Session #3870 (6/20/2018). Of course, Pramaggiore's and

---

[37]    The government also anticipates introducing documentary evidence concerning this referral.

McClain's proposed method of concealment of payments to Madigan's former chief of staff had been employed by the coconspirators with the Madigan subcontractors for years to great effect.[38]

As another example, on February 16, 2019, McClain spoke to another ComEd lobbyist, in follow-up to that lobbyist's request that Madigan help him secure more lobbying work. McClain acknowledged that the lobbyist had come to see the Speaker; McClain told him that "we're on it" and "this is [Madigan's] return call." The lobbyist told McClain that he was hoping to get more work and acknowledged that he enjoyed his work for ComEd. McClain Phone, Session #20021. This call demonstrates that McClain acted as Madigan's agent ("this is his return call"), and that Madigan arranged for McClain to help to secure consulting work at ComEd and other companies for individuals connected to Madigan.[39]

---

[38] The government anticipates introducing the testimony of a witness who will explain that Pramaggiore abandoned her plan to hire Madigan's former chief of staff after she discovered the existence of the federal criminal investigation.

[39] In the same vein, the government intends to publish certain wiretap recordings on this subject that were admitted into evidence during the trial in *United States v. McClain*, 20 CR 812 (N.D. Ill.) including but not limited to: GX 37 (McClain Phone Session #4420), GX 38 (McClain Phone Session #4423), GX 39 (McClain Phone Session #4445), GX 68 (Marquez Phone Session #16829), GX 69 (Marquez Phone Session #16882), GX 50 (Marquez Phone Session #3870), GX 53 (Marquez Phone Session #4715), GX 89 (McClain Phone, Session #13096), GX 113 (McClain Phone, Session #18290), GX 127 (McClain Phone, Session #19614), GX 158 (Marquez Phone, Session #17513), GX 83 (McClain Phone Session #12393), GX 150 (McClain Phone Session #22334), and GX 159 (consensual May 7, 2019).

**b.** **Recordings Establishing Relationship of the Conspirators and their Respective Roles in the Conspiracy**

The government anticipates introducing a number of recordings that establish the close relationships between the conspirators and their respective roles in the conspiracies—for the purposes of, among others, demonstrating (i) the conspirators acted jointly; (ii) nullifying any defense that the conspirators acted independently of each other in asking for and providing benefits to Madigan; and (iii) demonstrating the mutually beneficial relationship the conspirators had cultivated with Madigan.[40]

For example, the government will introduce recordings that demonstrate that McClain was Madigan's right-hand man, acted pursuant to Madigan's directions, and served as a conduit of messages and information from Madigan to others, including ComEd. These interceptions will constitute proof that McClain's requests to ComEd were made in his capacity as an agent and trusted confidante of Madigan—thus also corroborating the testimony of Marquez and O'Neill about McClain's allegiance to Madigan. For example, during a call on February 20, 2019, (McClain Phone, Session #20526), McClain advised a named individual (who expressed concern that at times he did

---

[40] As to this last point, certain other interceptions already discussed demonstrate the symbiotic relationship between Madigan and ComEd—ComEd would deliver payments to Madigan associates, and Madigan would take favorable action for ComEd—by, for example, arranging for votes on critical legislation, or sitting with McClain to better understand ComEd's legislative goals.

not pursue the best interests of Madigan in his affairs), that McClain had convinced himself "twenty years ago" that "my client is the Speaker. My client is not ComEd."

Consistent with this belief, the government will introduce a series of calls that vividly demonstrate that McClain was Madigan's trusted confidante and that Madigan directly and regularly gave him  assignments and instructions to pass to others.[41] For example:

- On or about May 24, 2018 (McClain Phone, Session #3340), Madigan told McClain that he got a message from a named individual, and asked McClain "Are you in a position to advise [that named individual] just to stay away from me?" McClain responded "Yes." Minutes later, McClain called the named individual and told him that Madigan could not meet with him due to optics. McClain Phone, Session #3342. McClain then told Madigan's assistant that he had taken care of the request. McClain Phone, Session #3343.

- On or about June 6, 2018 (McClain Phone, Session #5092), McClain and a former staff member of Madigan discussed hiring a public relations firm to "sav[e] the Speaker" in the wake of well-publicized allegations of misconduct by a member of Madigan's staff.

- On or about July 2, 2018 (McClain Phone, Session #7508), Madigan asked McClain to make an inquiry to find out who within the Governor's administration could assist to have appropriated money released for use.

- On or about July 29, 2018 (McClain Phone, Session #9550), McClain and Madigan discussed a list of assignments McClain performed for Madigan. During the conversation, among other things, (i) McClain related information he had received from Madigan's chief of staff to Madigan, concerning what answers the chief of staff would give if questioned concerning a specific

---

[41]    These calls also are proof of the charged association in fact enterprise and further demonstrate the hierarchy of the enterprise as alleged in the superseding indictment.

matter;[42] and (ii) McClain indicated he would bring Madigan's staff up to speed on the status of certain legislation unrelated to ComEd concerning hospital funding.

- On or about September 5, 2018 (McClain Phone, Session #12860) during a telephone call between Madigan and McClain, Madigan asked for McClain's advice on how to respond to the Senate President, who was understood to have authorized political advertisements to be broadcast that cast Madigan in a negative light. McClain advised Madigan to "let your agents do it for . . . now," "I'd let us handle this for twenty-four, forty-eight hours and if [the Senate President] by that time hasn't called you, then I guess you, you're gonna have to call him . . ."

- On or about November 16, 2018 (McClain Phone, Session# 14849), Madigan reviewed his efforts to gather votes to be re-elected Speaker with McClain, discussed McClain arranging to have a message passed to Illinois' Joint Committee on Administrative Rules concerning a directive issued by the Governor. In addition, McClain asked Madigan when McClain should tell then Representative Lou Lang, who Madigan wanted to resign, that he needed to resign. Madigan instructed McClain to do so "sooner rather than later." Thereafter, on or about August 11, 2018 (McClain Phone, Session #15167), McClain called then Representative Lang to tell him that "this is no longer me talking. I'm an agent [of Madigan's], somebody that cares deeply about ya, who thinks that you really oughta move on." McClain confirmed to Lang that Madigan was not going to move Lang "up in leadership." (McClain made a number of other calls in which he discussed his communications with that State Representative on Madigan's behalf. *See, e.g.*, McClain Phone, Session #14739, 15068, 15768, 16563.)[43]

---

[42] It appears obvious that McClain acted as an intermediary between Madigan and his chief of staff so both men could deny talking to each other about a sensitive subject where questions might be raised about whether they had "coordinated" their stories. This vignette demonstrates how implicitly Madigan trusted McClain.

[43] McClain's work on behalf of Madigan to force former Representative Lang to retire is discussed in more detail in the government's motion *in limine* to admit certain evidence as direct evidence of the racketeering enterprise or, in the alternative, under Federal Rule of Evidence 404(b), which is filed contemporaneously with this motion.

- On or about March 15, 2019 (McClain Phone, Session #22879) and March 19, 2019 (McClain Phone, Session #23293), Madigan directed McClain to call a third party and advise them that Madigan would not sign a letter, and in a later call with the third party, McClain complained that his "assignments" took longer and longer time, and thereafter advised that third party that Madigan would not sign a draft letter to the Secretary of Transportation.

The government will introduce other recordings that demonstrate that McClain attended regular meetings in which Madigan and his inner circle discussed pending legislation and other sensitive political matters. *See*, *e.g.*, McClain Phone, Session #17995. For example, McClain was involved in calls about the Speaker's Office's response to sexual harassment issues that engulfed Madigan and his office in 2018 (*see*, *e.g.*, McClain Phone, Session #5092, 5121, 5665, 7192), and the replacement of Madigan's chief of staff after his resignation in the wake of harassment allegations in 2018 (*see*, *e.g.*, McClain Phone, Session #5646). Another category of tasks McClain performed for Madigan related to fundraising efforts for Democratic candidates in Illinois, including McClain's soliciting campaign contributions from lobbyists and their clients. *See*, *e.g.*, McClain Phone, Session #7268, 17761.

The government will also introduce recordings that demonstrate that Pramaggiore was closely associated with Madigan and McClain and that she attributed her success at ComEd to both of these men. For example, on May 8, 2018, Pramaggiore (who was then the CEO of ComEd) informed McClain that she had been promoted and would become the chief executive officer of Exelon Utilities. Even though the news was not yet public, Pramaggiore told McClain that Madigan was her "first call." Pramaggiore

119

thanked McClain for her promotion by adding, "It never would have happened without you, and John, and the Speaker, and I mean, hon—really, 'cause the only reason I am in this position is because ComEd has done so well, and you guys have been my, my spirit guides and more on that. . . . I love you guys."

In the same vein, McClain discussed with Madigan in a separate call that he believed Madigan had "developed a real nice relationship" with Pramaggiore during a joint trip the two went on to Turkey. McClain Phone, Session # 6533 (6/19/2018).

The government will also introduce recordings consistent with the testimony of witnesses that demonstrate that, in addition to ComEd providing benefits to Madigan, ComEd received favorable assistance from Madigan with respect to legislation affecting ComEd—and that the conspirators were aware of Madigan's critical assistance to ComEd in the past with respect to legislative matters. For example, during a recorded call between McClain and John Hooker on or about May 16, 2018 (McClain Phone, Session #2628), the pair discussed their concerns about how a new legislative proposal was against ComEd's interests. In discussing the legislative outlook, McClain reminded Hooker that, with respect to the passage of FEJA, "If you remember at the, that last day, um, when we had to go to Madigan. Madigan put 47 votes on" to help pass the bill."[44] That same day,

---

[44]     This interception will confirm the anticipated testimony of another government witness, who will testify that, as a member of Madigan's staff, shortly before the passage of FEJA, he was asked by Madigan to obtain additional votes for FEJA once it became apparent that FEJA did not have the votes to pass.

McClain and Pramaggiore spoke over the phone about House Bill 5626, a legislative proposal advocated by Attorney General Lisa Madigan that was adverse to ComEd's interests. In a phone call that day, McClain told Pramaggiore, "On this Lisa Madigan bill. . . we've gotta kill it. Period." Pramaggiore agreed. McClain Phone, Session #2634. In a May 18, 2018, email from McClain to Pramaggiore and others at ComEd, McClain stated, "approximately a month ago, a friend of ours [Madigan] alerted me and thereby us to this initiative [HB5626] and the concept of an amendment. As we all know that was code for we can go ahead and kill it." EXE00007525.

Similarly, McClain told a ComEd employee that the "Speaker himself" told him about the bill and said " 'Mike are you aware of this? . . . 'Well, you, you guys oughta, you oughta let your client know that they oughta be aware of it.'" McClain elaborated: "Well that's code for, you can kill it, right?" McClain Phone Session #2871 (5/20/2018); *See also* McClain Phone, Session #2814 (5/18/2018).

McClain similarly reported to Hooker that Madigan recognized that the bill "doesn't have any legs," in a call recorded on May 22, 2018. McClain Phone, Session #3108. And on June 20, 2018, McClain told Hooker that Madigan told him that he would "kill" the bill if they (meaning ComEd) wanted him to. McClain Phone, Session #6764. House Bill 5626 did not pass.

C.        **AT&T-Related Conduct.**

At the same time Madigan and McClain were arranging for and maintaining a stream of benefits directed to Madigan and his associates from ComEd, Madigan and

121

McClain also plotted to solicit bribes from Illinois Bell Telephone Company, doing business as "AT&T Illinois." AT&T Illinois (generally referred to herein simply as "AT&T") was an Illinois company that provided regulated wireline and other communications services in Illinois.[45]

Between February 2017 and January 2018, Madigan, McClain, the president of AT&T, Paul La Schiazza, and others discussed below agreed to corruptly confer benefits on Madigan, intending to corruptly influence and reward Madigan in connection with efforts to pass legislation favorable to AT&T.

The bribes AT&T paid to Madigan were comprised of payments totaling $22,500 made indirectly by AT&T to a former legislator, Individual FR-1, for the last nine months of 2017. Individual FR-1 did no work in return for these payments. The coconspirators concealed the nature of the payments to Individual FR-1 by paying Individual FR-1 indirectly through Intermediary 4 (one of AT&T's lobbyists) and by causing the creation of a false contract and other false internal records to disguise the true nature of the payments.

In return for those payments, Madigan and McClain helped AT&T to pass valuable legislation, including AT&T's carrier of last resort (or "COLR") legislation, which was a

---

[45]     This conduct also serves as the basis for a separate conspiracy charged in Count Twenty-Three of the superseding indictment. The evidence described in this section also establishes the existence of this subsidiary conspiracy, the participation of the defendants in this subsidiary conspiracy, and the statements the government intends to offer at trial pursuant to the co-conspirator exception.

prerequisite for AT&T to terminate its costly obligation to provide landline telephone services to all Illinois residents that requested such services.

Madigan's and McClain's conduct with regard to AT&T parallels their conduct in helping Individual FR-1 obtain payments from ComEd. With both ComEd and AT&T, Madigan and McClain targeted companies that needed his support for critical legislation. In both instances, McClain simultaneously acted as an agent for Madigan in soliciting bribes and in working on the companies' legislative agenda.

### 1. Anticipated Witness Testimony

#### a. Individual ATT-2

The government anticipates calling Individual ATT-2 at trial about his role in the conspiracy to corruptly influence and reward Madigan in connection with the decision in 2017 to hire Individual FR-1. Individual ATT-2 worked in government relations at AT&T or its predecessors from 1994 to March 2019. Individual ATT-2 has been granted immunity by the government.

Individual ATT-2 is expected to testify that in 2017, Madigan designated McClain to gather information about AT&T's proposed COLR legislation. This legislation was important to AT&T, because it was a step in the process to remove AT&T's costly responsibility to provide landline telephone service to any Illinois resident who requested it. AT&T had sought to pass this legislation for years before 2017, but Madigan had previously decided not to move the legislation. Indeed, Individual ATT-2 is expected to testify that Individual ATT-2 viewed Madigan as the most important member of the

Illinois House of Representatives with control over the passage of all major legislation. Madigan's support was deemed to be critical to pass the COLR legislation by Individual ATT-2 and other members of AT&T's lobbying team.

Individual ATT-2 is expected to testify that AT&T Illinois President Paul La Schiazza frequently got hiring requests from McClain, on Madigan's behalf, so much so that AT&T started to set aside funds in the consulting budget for potential McClain referrals, including for 2017. Individual ATT-2 will testify that it was difficult to say "no" to these hiring requests, because of a concern that doing so could risk upsetting Madigan.

Individual ATT-2 is expected to testify about AT&T's decision to pay Individual FR-1 a total of $2,500 per month for the last nine months of 2017 at the request of Madigan, through McClain. Those payments were made indirectly through Intermediary 4's consulting firm. Individual ATT-2 is expected to testify that AT&T hired Individual FR-1 to ensure Madigan, viewed as the most important member of the Illinois House, did not erect any barriers to the passage of the COLR legislation and other legislation. In essence, AT&T knew Madigan had the power to stall AT&T's legislation and did not want to find out what might happen if the company did not hire Individual FR-1.

Individual ATT-2 is expected to testify that in March 2017, shortly after Individual FR-1 retired from the Illinois General Assembly, McClain asked La Schiazza to hire Individual FR-1. McClain was acting as Madigan's representative. Individual ATT-2 did not want Individual FR-1 to register as an AT&T outside lobbyist, however, because some Republican legislators had told Individual ATT-2 that hiring Individual FR-1 would

be a "dealbreaker" for their support of COLR legislation. Individual ATT-2 also had an unfavorable opinion of Individual FR-1; among other things, Individual ATT-2 is expected to testify that Individual FR-1 was seen as being partisan, and was known to frequent bars at night and become "loose-lipped," which was not a good quality for an employee or outside consultant. AT&T nevertheless internally approved payments intended for Individual FR-1 on or about April 20, 2017. Internal justifications for the payments to Individual FR-1 were incomplete, in that they did not mention that Individual FR-1 was the intended recipient of the payments.[46]

Individual ATT-2 is expected to testify that Individual ATT-2 does not believe any AT&T employee even spoke to Individual FR-1 about the consulting contract until April 26, 2017. In other words, AT&T submitted a justification to pay Individual FR-1 before even discussing the prospect of hiring Individual FR-1 with Individual FR-1. Individual ATT-2 is expected to testify that this sequence was not ordinary but was done to ensure Madigan did not pose any impediment with regard to AT&T's legislation.

Individual ATT-2 is expected to testify about a meeting he had with Individual FR-1, Individual ATT-3, and Intermediary 4 on April 26, 2017 at the Capitol Building in Springfield. During this meeting, Individual FR-1 was offered a role as a consultant through Intermediary 4's company. Individual FR-1 was offered $2,500 per month and

---

[46]      Certain documentation relating to the internal approval of payments to Individual FR-1 is discussed below.

was told he would be working on a report concerning the internal dynamics of the Latino Caucus in the General Assembly and the Chicago City Council (a project description that was different than the explanation used in order to obtain internal approval for the payments to Individual FR-1). Individual ATT-2 will testify that Individual FR-1 complained that Individual FR-1 deserved more money, and abruptly ended the meeting.

Individual ATT-2 later learned that there was a second meeting, in which Individual FR-1 countered with $3,000 per month, although ultimately Individual FR-1 accepted $2,500 per month after AT&T representatives communicated with McClain about Individual FR-1's counteroffer.

Individual ATT-2 is expected to testify that he is not aware of whether Individual FR-1 ever prepared a report on the political dynamics of the Latino Caucus of the General Assembly and City of Chicago, and while it may have been useful, Individual ATT-2 is expected to testify that this report was unnecessary at the time and was not something AT&T would have paid for but for McClain's request on Madigan's behalf to hire Individual FR-1. Individual ATT-2 will testify that he does not recall any follow-up by anyone to determine whether Individual FR-1 had prepared the report. About a month after Individual FR-1 accepted AT&T's offer to pay him $2,500 a month, AT&T's COLR legislation passed the Illinois House of Representatives.[47]

---

[47]    As discussed below, the government will introduce evidence of Madigan's voting records, to show that he took official action favorable to AT&T during the 2017 and 2018 legislative

### b. Intermediary 4

The government anticipates calling Intermediary 4 at trial. Intermediary 4 was an external lobbyist engaged by AT&T. Intermediary 4 will testify that in April 2017, Intermediary 4's firm's lobbying contract with AT&T was increased from $7,500 per month to $10,000 per month for the remainder of 2017. This amendment was intended to cover payments from AT&T through Intermediary 4's firm to Individual FR-1 of $2,500 per month for nine months.

Intermediary 4 will testify that Individual ATT-1 first approached him about hiring Individual FR-1 in approximately late March 2017. Individual 4 only agreed to act as intermediary in making payments to Individual FR-1 with money AT&T sent to Intermediary 4 because Individual ATT-1 asked him; he otherwise would not have hired Individual FR-1 because he did not believe Individual FR-1 could add any value to his lobbying firm. Individual 4 knew that Individual ATT-1 discussed the arrangement with McClain, and assumed McClain was the source of the request.

Individual 4 will testify that he signed a contract amendment with AT&T on April 20, 2017, which increased AT&T's monthly payments to his firm by $2,500 for the last nine months of 2017. At the time of the contract amendment, Individual 4 had not spoken to Individual FR-1 about the arrangement. On or around April 25, 2017, Individual ATT-

_____

session, including by voting in favor of the COLR legislation on May 31, 2017, and voting to override the Governor's veto of the COLR legislation on July 1, 2017.

1 asked Intermediary 4 to set up a meeting with Individual FR-1 to discuss the payments for the first time.

Individual 4 will testify that he met with Individual ATT-2, Individual ATT-3, and Individual FR-1 in the Capitol Building in Springfield, Illinois on April 26, 2017. This meeting was the first time Individual 4 spoke to Individual FR-1 about the subcontract. At the meeting, Individual ATT-2 told Individual FR-1 that AT&T planned to pay him $2,500 per month through Intermediary 4's firm. After that meeting, on the same day, Individual FR-1 called Intermediary 4 to complain that the $2,500 per month offer was too low.

Intermediary 4 is expected to further testify that on April 28, 2017, Individual ATT-3 confirmed to Intermediary 4 that Individual FR-1 accepted the offer of $2,500 per month. Individual ATT-3 reported that the payments were for a report on the political dynamics of the Latino Caucus of the General Assembly and the City of Chicago. Intermediary 4 will testify that that report was pretextual, and was proposed to give AT&T cover if AT&T ever had to explain why Individual FR-1 was hired, such as to the press. [48] Intermediary 4 is expected to testify that there was never any expectation that

---

[48] The evidence will thus demonstrate that Individual FR-1's supposed report for AT&T is much like the "bullshit report" McClain proposed Individual 13W-4 prepare on behalf on Individual MA-2 (discussed earlier). Both episodes—using similar concealment methods for payments made to Madigan associates—are proof of the existence of the enterprise and the pattern of racketeering activity.

Individual FR-1 do any work for Intermediary 4 or for AT&T, and that Individual FR-1 never performed any work for Intermediary 4, or even asked for an assignment.

Intermediary 4 is expected to testify that he first paid Individual FR-1 $2,500 for the month of April 2017, even though Individual FR-1 did not accept the consulting offer until April 28, 2017.

Intermediary 4 is expected to testify that when AT&T Illinois hired Individual FR-1 through his firm in April 2017, the Illinois House of Representatives was considering important legislation advanced by AT&T, namely, the COLR legislation. Intermediary 4 will testify about the important role Madigan played in passing any major legislation in the Illinois General Assembly, including the COLR legislation. Madigan's support was critical, as Madigan had the ability to prevent a bill from proceeding.

Intermediary 4 will testify that McClain worked to help get AT&T's COLR legislation passed in 2017. Intermediary 4 will testify that it was important to keep McClain on AT&T's side, because McClain had direct access to Madigan and his staff in the Speaker's Office and could make it difficult for AT&T to pass legislation. Among other efforts to help with AT&T's legislation, McClain spoke to AT&T employees about where the unions stood on the COLR bill. AT&T's coordination with the unions was important to its legislative success, because AT&T needed to garner the support of the unions to convince the Speaker and other pro-union Democrats to take up AT&T's legislation.

Intermediary 4 will testify that AT&T successfully passed two major pieces of legislation after the company started making payments to Individual FR-1: First, COLR

legislation first passed the House and Senate on May 31, 2017, but was vetoed by the governor. AT&T's COLR legislation was then added to a different bill, and an amendatory veto was overridden in the House and Senate in the summer of 2017.

Second, AT&T successfully passed small cell legislation in the fall veto session of 2017. That legislation set fees for small cell pole attachments that carriers like AT&T use to boost signal. The Illinois House of Representatives voted in favor of the small cell legislation in the fall of 2017, and the small cell legislation became law in 2018.

### c.    Individual FR-1

At trial, the government plans to call Individual FR-1, a former state legislator who was paid $22,500 in 2017 by AT&T through Intermediary 4. The government anticipates that it will be necessary to compel Individual FR-1 to testify pursuant to 18 U.S.C. § 6002.[49]

Individual FR-1 is expected to testify that he went to Madigan twice asking for help finding work: first in 2016 and then in or around early 2017 shortly after Individual FR-1 resigned from elected office.

First, in 2016, Individual FR-1 went to Madigan's office in Springfield and asked Madigan for help finding consulting or lobbying work after Individual FR-1 left office. Individual FR-1 testified that Madigan nodded and said "Mmhmm" and that he would see

---

[49]    Individual FR-1 was previously convicted of tax evasion and was sentenced to a term of imprisonment of six months. Individual FR-1 does not have any cooperation agreement with the government.

what he could do. Madigan also told Individual FR-1 to talk to McClain. Individual FR-1 is expected to testify that after this first conversation with Madigan, Individual FR-1 met with McClain at a Starbucks in Chicago about finding lobbying or consulting work. Individual FR-1 also met with McClain at the Sangamo Club in Springfield, at which time McClain said he would help Individual FR-1 get work. Individual FR-1 is expected to testify that he understood McClain to be speaking on Madigan's behalf during these conversations, and that he knew McClain was Madigan's right-hand man.

Second, Individual FR-1 is expected to testify that in early 2017, Individual FR-1 again asked Madigan for help finding work. Madigan told him he would look into getting Individual FR-1 set up with ComEd and AT&T. ComEd and AT&T both thereafter retained Individual FR-1. AT&T paid Individual FR-1 for 9 months of 2017.

### d. Legislators and Other Witnesses

The testimony discussed above from current and former members of the General Assembly (in connection with the ComEd conspiracy) will also be probative as to the AT&T-related conduct, for the same reasons as discussed above with regard to ComEd.

### 2. Documentary and Other Physical Evidence

### a. Absence of Work Records for Individual FR-1

The government expects a witness will testify that AT&T's business records and files contain no written work product from Individual FR-1, no records of meetings with Individual FR-1 in connection with his retention in 2017, or any other indication that Individual FR-1 performed work for AT&T in 2017.

131

### b.     Contract-Related Documents

The government anticipates introducing records related to its contracts with Intermediary 4.

On April 20, 2017, Paul La Schiazza and Intermediary 4 signed an amendment to Intermediary 4's 2017 contract with AT&T Services, Inc. AT&TIL-0001380 (2017 contract). That amendment provided that AT&T's payments to Intermediary 4 would increase by $2,500 per month for the last nine months of 2017 for "Consultant's services under this Agreement." AT&TIL-0001414 (2017 contract amendment).

The government will also introduce the false justifications that were provided in internal AT&T records to explain why payments to Intermediary 4 were being increased. Specifically, Individual ATT-3 instructed AT&T accounting staff to report that the increase was for the purpose of bringing on "an additional asset for consulting (not lobbying) purposes," to "make a difference for strategies associated with House Democratic Leadership views on advancing AT&T strategies for 2017 COLR legislation." AT&TIL-0007737. Individual ATT-3 further noted that "we prefer not to put an actual name in this [justification]." AT&TIL-0007737. That justification was included in AT&T's internal accounting records. AT&TIL-0004828.

This justification omitted any mention of Individual FR-1, and notably did not include any mention of any purported report on the Latino caucus dynamics.

132

### c. Financial Records Evidencing Payments to Individual FR-1

The government anticipates introducing records, including financial institution records, to demonstrate that Individual FR-1 received 9 months of payments from AT&T through Intermediary 4. See, e.g., [INTERMEDIARY 4]_004-0000002 (payments from AT&T to Intermediary 4); JPMC_001-0000011 at 503, 520, 540, 557, 575, 591, 609, 627 (checks from Intermediary 4 to Individual FR-1). Indeed, AT&T internal records also reflect that Intermediary 4's contract was increased, and the first request for payment was submitted to La Schiazza, even before any AT&T employee had spoken to Intermediary FR-1 about him providing "services" to AT&T. AT&TIL-0017840.

### d. Email Correspondence Concerning Payments to Individual FR-1

The government anticipates introducing email records that demonstrate the existence of the conspiracy and that are admissible coconspirators statements.

The timing of certain of these emails alone is compelling evidence that McClain's request for AT&T to hire Individual FR-1 was connected to AT&T's pending legislation. The emails described below span from February 2017 through April 2017 and took place at a time when the Illinois House was in session and the COLR legislation was pending in the Illinois House. For example, in an email dated February 14, 2017, McClain emailed Individual ATT-1 to ask, "is there even a small contract for [Individual FR-1]?" AT&TIL-0030347. Just two days later, McClain told La Schiazza that Madigan had assigned McClain to work on AT&T's COLR legislation as a "Special Project," which was viewed

133

internally at AT&T as a positive development by AT&T. AT&TIL-0042123; AT&TIL-0010580; AT&TIIL0041268. For the rest of the spring of 2017, McClain was involved in discussions with members of the Speaker's staff about COLR, all while continuing to advocate for Individual FR-1's hiring. McClain's simultaneous work on AT&T's legislation while pushing the company to pay Individual FR-1 illustrates how the hiring of Individual FR-1 was connected to AT&T's legislation. Indeed, in 2017, McClain had no paid position in State government and was not even a registered or paid lobbyist for AT&T (or any other company). He was operating as Madigan's agent when he interacted with AT&T.

McClain followed up on March 28, 2017, when La Schiazza wrote to Individuals ATT-1 and ATT-3 that he "Got a call" from McClain about Individual FR-1. La Schiazza asked if AT&T had $2,500 or $3,000 per month for a "small contract for [Individual FR-1]." AT&TIL-0023783; AT&TIL-0014615.

Also on March 28, 2017, La Schiazza confirmed that AT&T had gotten the "GO order" to hire Individual FR-1 (referring to a directive from McClain), and directed his employees to "move quickly to get this done." Individual ATT-1 responded that there were "some political complications related to the Republicans['] reaction to him getting a lobbying contract," and suggested Individual FR-1 be paid as a consultant not as a registered lobbyist. AT&TIL-0006471.

Like the ComEd "subcontractors," AT&T concealed its payments to Individual FR-1 through one of the company's existing lobbyists, Intermediary 4. On March 31, 2017,

the coconspirators discussed this arrangement. Individual ATT-3 asked if Individual ATT-1 had spoken to Intermediary 4 and wrote, "If not, I feel I need to at least tee this option up with Paul [La Schiazza] to see if he's open to it. He [La Schiazza] wanted to move quickly." Individual ATT-1 responded that he had traded calls with Intermediary 4. AT&TIL-0006404.

Later that same day, Individual ATT-3 proposed the "subcontractor" arrangement to La Schiazza, and emphasized that "we would make sure that ATT gets credit for fulfilling this request." La Schiazza responded that he had no objection to the plan "as long as you are sure we will get credit and the box checked," meaning credit from Madigan. AT&TIL-0070980.

Later that day, Individual ATT-3 asked Individuals ATT-1 and ATT-2, "are we 100% certain that we will get credit for being responsive?" Individual ATT-3 further sought to confirm that AT&T "would get credit from the powers that be," another veiled reference to Madigan. Individual ATT-2 responded, "I would hope that as long as we explain the approach to McClain and [Individual FR-1] gets the money then the ultimate objective is reached." Individual ATT-3 wrote in response, "I don't think Paul wants this based on 'hope.' We need to confirm prior to executing this strategy." AT&TIL-0060687. These emails demonstrate that it was McClain, acting as Madigan's agent, who dictated the payment arrangement with Individual FR-1, not AT&T, and that the payments had no connection to any legitimate business need of AT&T; AT&T personnel understood that

getting the money to Individual FR-1 was paramount, and sought to confirm that with McClain.

On April 4, 2017, Intermediary 4 forwarded Individual ATT-1 an email from Intermediary FR-1's son, in which the son was pitching his consulting firm. Intermediary 4 noted that he would not be hiring Individual FR-1 for anything else, because he was "not sure if there is any value," further demonstrating that Individual FR-1 was not engaged for any legitimate "value" he would provide AT&T or Intermediary 4. AT&TIL-0009614.

On April 5, 2017, Individual ATT-3 wrote to an AT&T employee responsible for managing AT&T's internal contract system and provided a false justification for the increase to Intermediary 4's monthly payments: "The increase is to support Intermediary 4 and Associates bringing on an additional asset for consulting (not lobbying) purposes. Inclusion of this asset on the Intermediary 4 Team will make a difference for strategies associated with House Democratic Leadership views on advancing AT&T strategies for 2017 COLR legislation." AT&TIL-0007737. Of course, as noted earlier, Individual FR-1 performed no work for AT&T, much less any work on this topic, relating to the passage of COLR legislation. Indeed, tying the payments to Individual FR-1 to the COLR legislation is a telling example that demonstrates the payments were made as part of an effort to corruptly influence and reward Madigan. As if to drive this point home, Individual ATT-3 stated that "we prefer not to put an actual name" in the justification. AT&TIL-0007737.

That same day, Individual ATT-1 wrote to Intermediary 4: "I think we will go forward utilizing Your firm" to pay Individual FR-1. AT&TIL-0015340.

On April 20, 2017, after Intermediary 4's contract amendment was signed, Individual ATT-1 wrote to Individuals ATT-2 and ATT-3: "Let's connect with [Intermediary 4] on Monday." Individual ATT-2 responded, "before [Individual FR-1] goes back to McClain or the Speaker." AT&TIL-0008739. This email thus underscores that Intermediary 4's contract was increased to allow for payments for Individual FR-1 before anyone at AT&T had even bothered to talk to Individual FR-1 about the arrangement (including what Individual FR-1 would do, if anything, for AT&T).

Individual FR-1 was not contacted until after April 26, 2017, and McClain still played a pivotal role in approving the amount of the offer. Specifically, on April 25, 2017, Individual ATT-1 wrote Intermediary 4 that he "talked to our friend," meaning McClain, and asked Intermediary 4 to reach out to Individual FR-1 to set up a meeting. AT&TIL-0023789. The next day, Individual ATT-1 emailed Individual ATT-3, Individual ATT-2, and Intermediary 4 that "we need to let [Individual FR-1] know that it is a go." AT&TIL-0007774.

Later on April 26, 2017, Intermediary 4, Individual ATT-2, and Individual ATT-3 made the offer to Individual FR-1 in the Capitol building, as described earlier. Individual ATT-3 described that meeting in an email to La Schiazza, and asked Individual ATT-1 to weigh in on whether to increase the offer "given your interaction with other key people on this." AT&TIL-0012552. Individual ATT-1 responded that he had a "message into our

friend From Quincy," a reference to McClain. AT&TIL-0071430. La Schiazza responded: "I would only go to $3000 if we find that is what it takes to satisfy the other party [a reference to Madigan and McClain]. . . . It's $4500 - I have to believe we can find $4500 somewhere else if we go over on consulting." La Schiazza then wrote: "Try to hold the line and see if he flinches - or we get bad feedback . . . . then we can move," meaning La Schiazza would increase the offer to $3,000 per month if AT&T got "bad feedback" from McClain that $2,500 was too low. Individual ATT-3 responded on April 27, 2017, that: "I will go back to [Individual FR-1] today and say that we are not in a position to increase but will coordinate the timing of that with [Individual ATT-1] based on his feedback," a reference to feedback from McClain. AT&TIL-0006273.

On April 28, 2017, La Schiazza asked Individual ATT-3 if there was "anything new on [Individual FR-1]," and Individual ATT-3 responded that "[Individual ATT-1] confirmed with our friend [McClain] that our amount was okay." AT&TIL-00003420. The fact that McClain—Madigan's agent—had to approve the amount of money paid to Individual FR-1 demonstrates that the hire was intended to influence Madigan and was not a result of AT&T's legitimate business needs.

On April 28, 2017, Individual ATT-3 reported to Intermediary 4 that Individual FR-1 accepted $2,500 per month from April 1, 2017, to December 31, 2017. Individual ATT-3 wrote that he told Individual FR-1 that "this was for the report on the political dynamics of the Latino Caucus of the General Assembly and City of Chicago." AT&TIL-0012553. Of course, as noted above, among other things this purported assignment (i) was

inconsistent with the explanation provided in internal AT&T paperwork used to justify the payment; and (ii) was never completed or intended to be completed. Individual FR-1, however, was paid in full.

### e. Text Messages

Text messages further corroborate that Madigan and McClain arranged for Individual FR-1 to be hired by AT&T, corruptly intending to influence or reward Madigan in connection with AT&T legislation.

For example, on April 2, 2017, Individual ATT-1 asked McClain if he had time to "discuss a Consulting issue," a reference to Individual FR-1 given the timing. AT&TIL-0030981.

On April 26, 2017, Individual ATT-1, Individual ATT-3, Intermediary 4, and Individual ATT-2 exchanged text messages shortly after the meeting with Individual FR-1 at the Capitol. Individual ATT-3 reported that "[Individual FR-1] called me and wants to meet again."

Later that same evening, Individual ATT-1 reported to McClain by text that "we had an interesting conversation with [Individual FR-1]," and that Individual FR-1 was "rethinking his initial reaction to the discussion." AT&TIL-0030982. On April 28, 2017, Individual ATT-1 reported to McClain that the Individual FR-1 situation was "resolved." AT&TIL-0030982.

After AT&T agreed to pay Individual FR-1, McClain continued to discuss AT&T's legislation by text message, including texts exchanged in the lead-up to COLR's passage

in the House of Representatives in late May 2017 (AT&TIL00030986), again when the House and Senate overrode the Governor's veto on July 1, 2017 (AT&TIL00030993), and after AT&T's small-cell legislation passed the House in November 2017. AT&TIL-0030097.

### f.     Telephone Toll Records

Toll records corroborate contacts between McClain and AT&T representatives during the period of the charged conspiracy.

For example, on February 16, 2017—the day La Schiazza learned that McClain was assigned to work on AT&T's legislation as a "Special Project" for Madigan—McClain had phone calls with both La Schiazza and Individual ATT-1. McClain had numerous other phone contacts with AT&T representatives in 2017, both before Individual FR-1 was hired and continuing in May, June, July, and into the fall veto session.

On March 28, 2017—the day La Schiazza wrote that he "got a call" related to a "small contract" for Individual FR-1— the toll records reflect that McClain indeed had a call with La Schiazza.

On April 3, 2017, Individual ATT-1 and McClain exchanged a phone call, consistent with their texts discussed above.

On April 26, 2017—the day Individual ATT-2, Individual ATT-3, and Intermediary 4 met with Individual FR-1 in the Capitol—McClain had phone calls with Individuals ATT-1 and ATT-2.

The next day, McClain had a phone call with Individual ATT-1, and the following day a phone call with Individual ATT-3.

Toll records similarly corroborate witness accounts that Individual FR-1 did not perform any work for AT&T. Individual ATT-3 called Individual FR-1 on April 26, 27, and 28, 2017—but there were no 2017 calls before or after those dates. Individual ATT-2 called Individual FR-1 on April 26, 2017, but not before that in 2017; the only 2017 call after that was in November 2017, around the time AT&T decided not to renew the payments to Individual FR-1 for 2018.

### g. Records Concerning Passage of AT&T Legislation

The government will introduce evidence of Madigan's voting records, to show that he took official action favorable to AT&T during the 2017 and 2018 legislative session.

For example, Madigan's staff requested a roll call on AT&T's COLR legislation on May 26, 2017 (AT&TIL-0012777), and continued to work to move the COLR legislation after that. AT&TIL-0032596. Madigan voted in favor of the COLR legislation on May 31, 2017. SB1839. And Madigan voted to override the Governor's veto of the COLR legislation on July 1, 2017. HB1811. Madigan continued to help AT&T in the fall of 2017 by moving the small-cell legislation (SB 1451) in the veto session. AT&TIL-0060522. Further, Madigan helped to defeat an amendment to the small-cell legislation that would have been harmful to AT&T's interest in the spring of 2018, as discussed below. HB1187.

141

### 3.   Wiretap Communications

The government also anticipates introducing wiretapped recordings as proof of the existence of the racketeering conspiracy in Count One and the subsidiary conspiracy in Count 23 as well as proof of the relationship of the conspirators.

Individual FR-1's testimony concerning his visits to Madigan to ask for work are corroborated by multiple wiretap interceptions. For example, on May 10, 2018, Madigan called McClain and said, "Um, you were saying that, ah, gaming companies may be in the market to hire people and, uh, [Individual FR-1] was in to see me looking for work." McClain responded, "Okay." TP 18, Session #2269 (5/10/2018). This call illustrates in simple terms that Madigan sought positions for his former political ally, Individual FR-1, and that he tasked McClain with ensuring Individual FR-1 got paid. Consistent with that, a representative of the Speaker's Office told McClain that Madigan was "in with [Individual FR-1]" on May 9, 2018. TP 18, Session #2178 (5/9/2018).

The fact that Madigan took actions favorable to AT&T after Individual FR-1 began receiving payments from AT&T is also demonstrated by the wiretap recordings. For example, in a call intercepted on May 16, 2018, Madigan and McClain discussed an amendment that would have walked back the gains AT&T had made in what was known as the "small cell" bill. During the call, Madigan asked if McClain was familiar with AT&T's "small cell" bill. McClain confirmed he was and described the original bill as "the Small Cell Bill that, uh, you, you directed me to help them pass it last year, which I did do." Madigan responded, "Yeah, yeah, yeah." TP 18, Session # 2657 (5/16/2018).

### D.    State Board-Related Conduct.

Madigan agreed to enter into a corrupt bargain, whereby he agreed to accept business steered by Alderman Solis to his private law firm, Madigan & Getzendanner and to a Madigan relative, and in exchange, Madigan agreed to assist, in his official capacity as the Speaker of the House of Representatives, in advising and inducing the Governor of the State of Illinois to appoint Solis to a State Board position. Again and again between June 2018 and January 2019, Madigan had discussions with Solis that concerned this transactional exchange of business for a board appointment—Madigan offered to help Solis secure a State Board position, in return for Solis continuing to refer legal business to Madigan's law firm.[50]

_____

[50]    Virtually all the statements the government seeks to admit with respect to the State Board-Related Conduct were made by Madigan. Accordingly, these statements are independently admissible against Madigan as statements of a party opponent. Fed. R. Evid. 801(d)(2)(A). Madigan's statements are admissible against him as to both the racketeering conspiracy charged in Count 1 and Counts 8 to 14 as statements of a party opponent. Because McClain is also a member of the charged racketeering conspiracy, the statements made by Madigan in furtherance of this racketeering activity are admissible against him as well. *See, e.g.*, *Volpendesto*, 746 F.3d at 284-85 ("An individual need not agree to perform each individual activity to violate RICO," rather, the "gravamen" of a RICO conspiracy charge is that the defendant agreed to participate, directly and indirectly, in the affairs of the enterprise) (citations omitted); *United States v. Ashburn*, No. 11-CR-0303, 2015 WL 588704, at *8 (E.D.N.Y. Feb. 11, 2015) ("RICO conspiracy, however, 'is never simply an agreement to commit specified predicate acts . . . . Nor is it merely an agreement to join a particular enterprise. Rather, it is an agreement to conduct or to participate in the conduct of a charged enterprise's affairs *through* a pattern of racketeering.'") (quoting *United States v. Pizzonia*, 577 F.3d 455, 464 (2d Cir. 2009) (emphasis in original). Here, the State Board conduct is very similar in nature and in time to other racketeering acts in which McClain personally participated—including Madigan's willingness to abuse his official position and Solis' official position to secure business for his law firm in connection with the Chinatown Parcel (discussed below). *See* Seventh

143

### 1. Consensual Recordings Made by Solis and His Anticipated Testimony.

The government anticipates calling former Alderman Daniel Solis at trial. Solis cooperated in an undercover capacity over the course of several years, and in his undercover role, Solis made secret recordings of a variety of different individuals, including Madigan and McClain. Solis was charged in an information with violating 18 U.S.C. § 666, and has entered into a deferred prosecution agreement with the government, which provides for Solis's full and truthful cooperation with the

---

Circuit Jury Instructions at 834 (2023 ed.) (Pattern Requirement—Racketeering Conspiracy) ("Acts are related to each other if they are not isolated events, that is, if they have similar purposes, or results, or participants, or victims, or are committed a similar way, or have other similar distinguishing characteristics; or are part of the affairs of the same enterprise."). Indeed, the State Board conduct occurred in tandem with efforts by McClain to help Madigan transfer the Chinatown Parcel, which, like the State Board conduct, also would result in legal business for Madigan's law firm. Indeed, at times the Chinatown Parcel was discussed during conversations that also concerned the State Board. The temporal link also extends to the other racketeering conduct, in that Madigan's conduct in relation to the State Board happened around the same time that McClain was helping Madigan to obtain benefits from ComEd and AT&T. Thus, the State Board bribery activity is proof of both the existence of the charged enterprise and Madigan's agreement to commit multiple racketeering acts having similar purposes that were committed a similar way and is therefore admissible against McClain. *United States v. Marcy*, 814 F. Supp. 673, 676–677 (N.D. Ill. 1992) (in a RICO conspiracy prosecution, finding evidence of a coconspirator's criminal conduct in which the defendant did not directly participate to be admissible and relevant to show the existence of an enterprise and a pattern of racketeering); *Ashburn*, 2015 WL 588704, at *8 ("[W]here a single pattern of racketeering is alleged to be common to a number of defendants, even though individual defendants may reasonably claim no direct participation in the acts of others, evidence of those acts is relevant to the RICO charges against each defendant . . . to prove: (i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities.") (quotations and citations omitted).

government, and provides that the information will be dismissed at the end of the deferred prosecution period, so long as Solis abides by the terms of the agreement.

Solis is expected to testify that he first met Madigan in the 1980s, and had periodic contact with Madigan since he became an Alderman in 1996. Solis understood from his position as an Alderman and as a citizen of Illinois that Madigan had enormous influence over legislation in Springfield and that he was one of the most powerful politicians in Illinois. Madigan was also a lawyer who was a partner with Madigan & Getzendanner. Solis will explain that Madigan's law firm represents people and companies trying to obtain a reduction in their real estate assessments in order to pay less in real estate taxes.

Solis is expected to explain that he would meet and talk with many developers of real estate projects in his official capacity as an Alderman and as Chairman of the Committee on Zoning, Buildings, and Historical Landmarks (which had a role in approving real estate development projects within Chicago). Solis will explain that, before he began cooperating with the government in 2016, Madigan asked Solis on multiple occasions to introduce Madigan to developers. Solis understood that Madigan wanted these developers to become clients of his law firm and for his law firm to provide tax work for these developers. Solis introduced Madigan to developers no more than about five times before he began to cooperate with federal law enforcement in 2016. Solis will explain that he did so in order to garner political support from Madigan. Solis will explain that he did not receive money from Madigan for the introductions; Solis did this to keep Madigan politically at bay. The government expects Solis to testify that he

145

understood Madigan made these requests because Madigan knew the developers needed to obtain approvals from Solis, as Chairman of the Zoning Committee.

Solis is expected to explain that his cooperation began in June 2016, after he was approached by federal law enforcement. At the time, Solis was the subject of a federal investigation. During his cooperation, Solis recorded conversations on his cellular telephone with Madigan and recorded meetings he had with Madigan in his law firm. Solis made those recordings and attended those meetings at the direction of law enforcement authorities as part of his cooperation.

Solis discussed with Madigan topics as directed by federal law enforcement authorities. One of these topics was the possibility of Madigan assisting Solis with obtaining a State Board position when he concluded his career as an Alderman. This was a ruse; Solis raised this possible appointment with Madigan at the direction of law enforcement authorities, and Solis was not seeking an appointment to a State Board. Madigan, however, based on the recordings and interceptions, responded to Solis's request as if it were real.

Solis is expected to testify that Madigan continued to ask Solis during his cooperation to make introductions to developers so that Madigan could secure their tax business for his law firm.

On June 20, 2018, at approximately 11:34 a.m., for example, Solis attended a meeting at Madigan & Getzendanner in Chicago, in which Madigan and Getzendanner pitched a real estate development firm for tax business. This meeting was consensually

146

recorded by Solis. Immediately after the meeting, Solis met with Madigan privately, and consistent with the direction provided him by law enforcement, asked for Madigan's assistance in securing a paying State Board position, in return for Solis's continued referral of customers to Madigan's private law firm. Solis said, "I'm gonna run [for re-election as Alderman] but I'm, I'm not sure I'll go through the full, full term. I wanna do, maybe do two years [of the four-year term], maybe do the, um, redistricting." Madigan responded, "Mhmm." Solis said, "Go up to redistricting. . . But I want to stay in some shape or form with, um, in, in, in government. And one of the ideas I had is maybe a, um, a board position on the state level." Madigan said, "Mhmm. Mhmm." Solis continued, "And, um, so that there's nobody in the state that better knows and . . . Than maybe you to help me." Madigan said he would "take a note down," and add it to his "file" on State Board positions.

Immediately after Madigan said, "I'll put a note in there," Solis then said, "and I'll continue to get you legal business. I, I've got all kinds of stuff [referring to developments] happening in the South Loop and in the West Loop." Solis is expected to testify that he meant that in return for Madigan's assistance in getting a State Board position, Solis would continue generating business for Madigan's law firm. Far from acting surprised, Madigan's response showed his willingness to trade official action for private benefits: "see, I never knew that that section was in your ward." Solis said, "there's some stuff I'm holding onto because of the election, and I wanna wait till after the election." Madigan said, "Yeah. Mhmm." Solis continued: "But I'm sure we can set up a . . . and get to the,

147

the business." Solis is expected to testify that he meant he could help Madigan get tax business related to property in Solis's ward that was prime for development. Madigan immediately responded, "One guy you mentioned that I've been trying to make a connection with is this [Individual A-1]." Individual A-1 was a director of the company that was developing the Old Post Office project in Solis' ward. Madigan thus made it clear that he had been trying to meet with Individual A-1 ("make a connection"), in order to pitch Individual A-1 to retain Madigan's private law firm.

Solis said, "I can bring you him, but you know, who's been, um, actually, is [Chicago Alderman Ed] Burke has been, I, I've connected him to him, but he didn't give him the work for the post office." Madigan said, "Mm." Solis said, "But he's bought other property." Madigan said, "Yeah. Oh yeah. I know." Solis replied, "So, if you want, I can bring him to you too." In other words, Solis offered to introduce Madigan to Individual A-1 so that Madigan could pitch Individual A-1 for legal business. In describing this conversation, Solis is expected to testify that he asked Madigan for a State Board position, and in return, Madigan asked Solis to introduce Madigan to Individual A-1.

Later in the conversation, Solis again brought up the board position, and Madigan told Solis he would "put together a, uh, piece of paper that shows you all the" board members and their term dates. Solis is expected to testify that he believed that Madigan was trying to secure a board position for Solis because Solis had helped Madigan's law firm get business in the past, and because Solis had told Madigan he would continue to do so, including by trying to get Individual A-1 to hire Madigan's law firm.

148

Based on Madigan's request, Solis placed a recorded call to Individual A-1 and asked if he would be willing to meet with Madigan. Individual A-1 agreed. Solis Phone, Session #61521 (7/23/2018).

On July 27, 2018, Madigan called Solis and once again asked about setting up a meeting with Individual A-1. Immediately after discussing the meeting with Individual A-1, Solis confirmed that he had received a list of board positions from Madigan, and said he wanted to sit down with Madigan to talk about the positions he was interested in.[51] They then continued to discuss Individual A-1. Solis Phone, Session #62031 (7/27/2018).

At law enforcement's direction, Solis met with Madigan at Madigan's law firm office in Chicago on August 2, 2018. The meeting was recorded. Referring to the list of State Board positions that Madigan had provided him, Solis stated that the board positions that "impressed" him were the ones with compensation above one hundred thousand dollars. Solis asked, "Now what happens, let's say I'd be interested in that, but I'm not gonna be available for a year to two years?" Solis is expected to testify that he was explaining to Madigan that he intended to serve a year or two of his next term as Alderman before retiring and then he would be interested in joining a State Board at that time. Madigan responded, "You can let 'em just sit there. You know, they, they, they sit

---

[51]     As discussed below, on or about July 11, 2018, Solis obtained from his assistant an envelope that was delivered to Solis' Aldermanic office by a representative of Madigan. The envelope contained information concerning various State Board positions.

149

until they're replaced . . . That's the basic rule." Madigan later said, "you said the, the Commerce Commission and?" Solis stated, "And Labor." Madigan stated, "Labor Relations." Solis stated, "They're both very, uh, generous in their compensation." Madigan asked, "Do you know this guy Danny, [Individual BG]?"[52] Solis responded, "No." Madigan stated, "He's, he's a good guy. He's an 11th Ward precinct captain."  Later in the conversation, Madigan explained that Individual BG had just been reappointed to the Labor Relations board, but that a named Senator "took care of it." Solis asked, "So, what would happen if you recommended me?" Madigan responded that he "would go to [the future Governor]," and "you'd come in as [the future Governor's] recommendation." Solis is expected to testify that he understood this to mean that Madigan would convince the future Governor to appoint him to the State Board.

Later in the conversation, Solis stated, "I've helped you in the past. I'm gonna continue to help you. I've got ah, [names of real estate developers and their companies redacted], the Post Office. Um, there's a lot of good stuff happening . . . in my ward." As he explained this Madigan said, "Oh yeah." Solis is expected to testify that he told Madigan this in order to explain to Madigan that he (Solis) would continue to get work for Madigan's private law firm in return for Madigan's efforts to get Solis a State Board

---

[52]     The government expects the evidence will show that, at the time of this conversation, Individual BG was the Chairman of the Illinois Labor Relations Board and who was appointed in July 2011 and whose term was to expire in January 2021.

position. Solis stated, "And I'm gonna help you." Madigan responded, "Don't worry about it," and later in the meeting confirmed that Solis was interested in Commerce Commission and the Labor Relations boards. Solis stated, "Yes." Madigan responded, "Okay, fine. Just leave it in my hands." Solis stated, "Okay. And then uh, [Individual A-1], he'll be here in a couple weeks. In the second or third week he'll be here. And, um, I talked to him. He's looking forward to meeting you.." Madigan stated, "Good, good. Yeah, I talked to [redacted name of Solis' assistant]."

In summary, during this conversation there was a direct connection established between Solis' help in setting up a meeting between Madigan and Individual A-1 (as well as other developers) in exchange for Madigan's assistance with getting Solis a State Board position. Indeed, during the same conversation, Madigan told Solis that "there's one thing you can do," and continued, "you got [Madigan's relative] a meeting with [Madigan shows a business card to Solis], is it?" Solis responded, "[Organization B]? Yes." Madigan told Solis that "after the meeting, you know, [a relative of Madigan] tried to follow up" but "never got returned calls." Madigan asked for Solis' help: "Just ask him, give [Madigan's relative] something. . . Give him a chance to show what he, what he can do." Solis is expected to testify that Solis understood that Madigan was asking Solis to get business for his relative in return for Madigan's effort to get Solis a State Board position. Later in the conversation, Madigan stated, "Just leave this in my hands," referring to the State Board position. Solis stated, "and it doesn't matter if it's two years from now. 'Cause that's, I wanna do at least two, two years. . . at City Council." Madigan

stated, "Let me get this straight. So you, you're gonna stand for election in the spring of '19?" Solis responded, "Yes." Madigan stated, "And you're thinking you'll hang on for a couple years, then you're gonna. Okay. Alright."

The following day, on August 3, 2018, Solis called Madigan to inform him that he had spoken to an individual associated with Organization B, and had arranged a meeting for Madigan's relative, which Solis would also attend. Madigan acknowledged this, and said, "Thank you very much." Solis Phone, Session #62447 (8/3/2018).

Madigan continued to press for a meeting with Individual A-1 after his meeting with Solis on August 2, 2018. Solis' assistant also told Solis that Madigan had called her on August 3, 2018, the day after Madigan and Solis' meeting, to ask about the Individual A-1 meeting; that call was recorded on August 6, 2018. Solis Phone, Session #62552 (8/6/2018). On August 14, 2018, Individual A-1 told Solis he could not schedule the meeting with Madigan until he figured out his travel schedule. Solis Phone, Session #63125.

On August 15, 2018, Madigan and Solis had another call, in which Madigan again reminded Solis that he wanted Solis to set up a meeting with Individual A-1 to help him get business, by noting "you know, we've been, um, we've been trying to get together with [Individual A-1]," and asking for Solis's help in getting tax business from Individual A-1 concerning a particular building. Solis Phone, Session #63241 (8/15/2018). These calls

reflect Madigan aggressively pursued the business, understanding it was being offered to him in order to ensure Solis got a State Board position.[53]

At Madigan's request, Solis contacted Individual A-1 on August 31, 2018, and advised Individual A-1 that Madigan was interested in getting hired to do tax work concerning the Prudential building. Solis Phone, Session #64345 (8/31/2018).[54]

On September 4, 2018, Madigan met with Solis and Individual A-1 at his law firm to solicit Individual A-1's business, in a meeting that was recorded.[55] During the meeting, Madigan together with his law partner sought legal business from Individual A-1, and explained to Individual A-1 that their firm had previously done tax work for the Old Post Office for its prior owner. Madigan also indicated his interest in obtaining work for another building, referred to as the Prudential building, only to be told that Individual A-1's company no longer had an interest in the building. Immediately after explaining that Alderman Solis had been kind and fair to Individual A-1's company, Individual A-1 told

---

[53]     During the same call, Solis also advised Madigan he was trying to schedule a meeting with Madigan's relative and Organization B for September. As noted earlier, Madigan had asked Solis to assist him in obtaining business for his relative on August 2, 2018. The government expects Solis to testify that he reached out to a representative of Organization B ("Individual B-1") so that Madigan's relative could receive an audience with Organization B for purposes of obtaining business.

[54]     Individual A-1 explained that his company no longer had an interest in the Prudential building.

[55]     The government anticipates introducing an email sent by Madigan's assistant on or about August 21, 2018 that confirmed Madigan would be available to meet with Individual A-1 on September 4, 2018.

Madigan he was happy to begin a business relationship with Madigan's firm. Madigan in return thanked Individual A-1.

On September 26, 2018, Madigan called Solis about a *Crains* article he had read that Individual A-1 had purchased a building in downtown Chicago, the One South Wacker building. Solis Phone, Session #65741 (9/26/2018). Madigan said, "That may be an opportunity for me." Solis said he would call Individual A-1. Madigan told Solis that Individual A-1 might say, "Well, we haven't closed yet," and then coached Solis to respond to this by saying to Individual A-1, "It's not time to make a decision. But the assessor is doing these things right now." Madigan said it would be advisable for them to have someone look things over. Solis then repeated to Madigan his understanding of what he just said: "So, it'd be advisable for them to, uh, hire your firm right now. You could begin to do the work in terms of . . . what the assessment's going to be." Madigan said, "Correct." Solis said he would call Individual A-1.

On October 5, 2018, Solis told Madigan that he had tried to follow up with Individual A-1, but that Individual A-1 was out of the country. Solis Phone, Session # 66259 (10/5/2018). Thereafter, on October 9, 2018, based on Madigan's request, Solis contacted Individual A-1. Solis Phone, Session #66365, 66368 (10/9/2018). Solis told Individual A-1 that Madigan was "saying is that it doesn't matter if you bought the property or not, or maybe I, maybe it may be a different property, but he was saying, because the assessments process is going on right now, it would be beneficial if you, um,

154

uh, hired them because they could be making the, uh, the appeals for the, uh, tax assessment even before you actually bought it." Solis Phone, Session #66365 (10/9/2018).

On October 26, 2018, Daniel Solis met with Madigan at Madigan's law office in Chicago, while wearing a recording device. During the meeting, Solis and Madigan discussed Individual A-1 giving legal work to Madigan, and Madigan securing a public board position for Solis after Solis retired from public office. Solis told Madigan (at the direction of law enforcement) that he had talked to Individual A-1, and that Individual A-1 was "on board" and would give Madigan "that project," referring to business for Madigan's law firm. Madigan responded, "Yeah. Great, great." Solis told Madigan that Solis's assistant would coordinate with Madigan's staff. Madigan said, "Okay. Just tell her to call me." Solis said, "Call you?" Madigan said, "Yeah, I handle . . . all, I handle the schedule." Madigan joked, "We've gotten to know each other," and laughed.

After discussing the work he had landed for Madigan's firm, Solis turned to his appointment to a State Board position, by noting, "the election's coming and, um, that, that board, that commerce board would really be—" Madigan said, "Now, you're gonna, you're gonna run again—" Solis said, "I'm gonna run again . . . and stay two years." Madigan said, "Yeah." Solis said, "But last time I spoke to you, sometimes they hold people for a while—" Madigan confirmed, "Yeah," and "I've got it in my notes." He continued: "When I sit down with [the future Governor], that's, I'll tell him here it is, this is what we want to do." Solis is expected to testify that he understood this to mean that Madigan would tell the future Governor (who was to be elected in November 2018) to

155

hold a public board position for Solis. Again, as with earlier conversations, there is a direct connection between Madigan getting legal work and the State Board position, thus making it clear to Madigan why the legal business was being referred to him.

Solis and Madigan met again on November 23, 2018. Solis told Madigan that he had decided not to run again for Alderman. Solis then started discussing development projects in the South Loop that were going to be pending prior to his retirement: "And, there's a hell of a lot of stuff going on in the South Loop. The big one is gonna be the 62 acres. They just planned, they just, um, finished with the Planning Commission. They'll be coming up to my committee pretty soon. They're gonna request about five hundred dollars in TIF . . . So, that's a big one. Well, there's a couple more in the South Loop, and there's some in the, in the West Loop. So, I figure I can still help you a lot." Madigan responded, "Good. Yeah. . . Sure." Solis then said, "I'm committed for that." In response to Solis' comment about getting more work for Madigan's law firm, Madigan said, "Okay. Thank you. Thank you. . . Do, do you want to go forward now on one of those state appointments ?" Solis replied that he wanted to wait until May. Madigan asked Solis for a resume, and said he wanted to "have a meeting with Pritzker the week after next." Madigan further explained that he would be "sending names over" and would identity five or ten people.

On December 1, 2018, Madigan called Solis to again talk about a State Board position for Solis. Madigan confirmed the two boards Solis was interested in, namely, the

Illinois Commerce Commission and the Labor Commission. Solis confirmed he would send Madigan his resume the next week. Solis Phone, Session #69799 (12/1/2018).

On December 4, 2018, Madigan updated McClain on his meeting with the Governor-elect. During the call, Madigan advised McClain of the Governor-elect's views concerning the composition of a particular State Board. Madigan told McClain that he had suggested to the Governor-elect that a bill could be introduced to "wipe out the board members," so that they would all be removed from serving on the State Board. Madigan emphasized that "I put that idea in his [the Governor-elect's] head." McClain Phone, Session #17676 (12/4/2018).

In January 2019, news media reported on a copy of a search warrant concerning Solis that had been erroneously unsealed. At that point, no further efforts were made by Madigan to solicit business with Solis's help, and efforts to arrange for a State Board position for Solis also came to a halt.

### 2.    Additional Anticipated Witness Testimony

### a.    Member 1 of the Governor's Staff

The government anticipates calling a member of the Governor's staff to demonstrate that Madigan routinely sought to make recommendations to the Governor and his administration concerning appointments—consistent with his assurance to Solis that he would be in a position to ask the future Governor to appoint Solis to a board position. Specifically, the staff member is expected to testify that after the Governor assumed office, the Governor would have approximately weekly meetings with Madigan.

These meetings would normally start the same way, with Madigan taking out his list of recommended appointments, and methodically work his way down the list, asking the Governor where he was on Madigan's recommended appointees. The staff member is expected to testify that the Governor had the power to appoint individuals to various positions in State government, including on State Boards that paid a salary, and the administration did not simply accept Madigan's recommendations. Nevertheless, Madigan's recommendations would be considered in the decision-making process. Certain individuals were not hired despite Madigan's recommendation for a variety of reasons, including but their dubious backgrounds; others who were recommended by Madigan were hired, but at times someone else had also recommended such individuals.

### b. Member 2 of the Governor's Staff

Member 2 of the Governor's staff is expected to confirm that Madigan attended regular meetings with the Governor, and at those meetings would routinely review his list of recommendations and ask for a status update concerning the recommendation he had made. Member 2 is further expected to testify that while candidates recommended by Madigan were not automatically given any position, serious consideration was given to Madigan (and other leaders' recommendations) because it was important to be thorough and cultivate a good relationship with Madigan, who was a powerful public official. To this end, during the transition period, the Governor's staff kept a list of recommended appointments to transition committees that listed what recommendations Madigan had made to each committee.

158

### c.    Member 1 of Madigan's Staff

The government anticipates calling a member of Madigan's staff who attended various meetings with the Governor's administration. The government expects that this witness will confirm that Madigan sought status updates at these meetings concerning recommendations Madigan had made for appointments to State positions. Moreover, the staff member is expected to testify that, at Madigan's request, a list was prepared that tracked what percentage of Madigan's recommendations were acted on by the Governor's office. Further, the staff member is expected to testify that the staff member attended a meeting on December 4, 2018 (after the Governor was elected, but before he took office), and that based on the notes the staff member took, the Governor-elect and Madigan were present at the meeting. During the meeting, Madigan suggested that the House of Representatives could pass a bill to reconstitute State Boards and commissions, so that the Governor could appoint all new personnel to these positions.[56]

### d.    Representatives from Organization B

Individual B-1 is expected to testify that s/he was the chief executive officer of Organization B, and that Alderman Solis encouraged Individual B-1 to meet with Madigan's relative to determine what services Madigan's relative could offer. Individual

---

[56]    As referenced above, just three days earlier, Madigan and Solis had discussed Solis's appointment to a State board position, and on December 4, 2018, Madigan reported to McClain that he had discussed introducing a bill so that it would be possible to "wipe out" the members of a State Board.

B-1 is expected to testify that Organization B hired the company Madigan's relative was associated with to provide insurance services to Organization B, and that the chief financial officer was involved in the retention of the company.

The chief financial officer of Organization B is expected to testify that s/he met with Madigan's relative in approximately September or October 2018, after Individual B-1 asked the chief financial officer to meet with Madigan's relative. The chief financial officer is expected to further testify that, after this meeting, the chief financial officer hired the company Madigan's relative was associated with to provide insurance brokerage services to Organization B.

### 3. Documentary and Other Physical Evidence

As noted earlier, during their meeting on June 20, 2018, Madigan advised Solis that Madigan would put together a "piece of paper" of the major boards, board members, and their term dates. On or about July 11, 2018, Solis obtained from his assistant an envelope from Madigan that contained information concerning various State Board positions. Within the envelope was Madigan's business card clipped to an approximately ten-page list of State Board positions and a two-page list of City of Chicago board positions. Also included within the packet of materials was a business card for Madigan's relative. The list of State Board positions contained descriptions of multiple board positions and

explained the composition of each board, how board members were appointed, board terms, and board compensation.[57]

As noted earlier, during a recorded conversation on December 1, 2018, Madigan confirmed that Solis was interested in a position on either the Illinois Commerce Commission or the Labor Relations Board, and Solis indicated that he would send a resume to Madigan the following week. At the direction of law enforcement, Solis' assistant sent his and his daughter's resume by email to a worker in the Thirteenth Ward (where Madigan often worked) on December 4, 2018. Records obtained during the investigation reflect that the Thirteenth Ward worker forwarded these resumes via email that same day to an assistant at Madigan & Getzendanner. MJM0000716. Madigan produced in response to a subpoena a copy of Solis and his daughter's resumes, along with the following handwritten memo on Madigan & Getzendanner letterhead (MJM0000056):

---

[57]     The government expects to introduce evidence reflecting that the salary for the Illinois Commerce Commission was at least $117,043 per year.



Moreover, email records of communications between Madigan's and the Governor's staff corroborate the fact that Madigan routinely met with the Governor and his staff and sought to recommend individuals to various State positions, including State Boards. For example, in an email dated February 3, 2019, Madigan's chief of staff wrote a member of the Governor's staff, and advised that "[t]he Speaker would like to get in the habit of meeting weekly with the Governor. Do you have some availability Tuesday afternoon or Wednesday?" ILGOV_001_0000001. Certain of these email communications reflect that Madigan routinely sent hiring recommendations to the Governor's staff after the Governor assumed office, including specific recommendations for board positions. For example, in an email dated June 11, 2019, Madigan recommended the appointment of an individual to the CTA board (ILGOV_001_0000001):



See attached – a bio of ▮▮▮▮ and contact info.
The Speaker recommends ▮▮▮▮ for an appointment to a board or commission. ▮ has a Republican voting record. When I spoke to ▮ he indicated that he has an interest in transit and transportation issues, and is particularly interested in the CTA Board.
Please advise if you have any questions. Take care,
Jessica

Office of the Speaker
Illinois House of Representatives

Further, records obtained during the investigation corroborate that Madigan made repeated and extensive requests for appointment of individuals to a multitude of different positions within State government. For example, an excerpt of a recommendation list bearing the date February 3, 2019 is as follows (ILGOV_001_0000143):



Moreover, these communications reflect that Madigan's staff also planned meetings with the Governor's staff concerning the review of State Boards and Commissions, as reflected below (ILGOV_001_0000001):



These communications confirm that Madigan was well-positioned to insert himself in the process of deciding the composition of State Boards, and that his assurances to Solis that he was in a position to recommend that the Governor appoint Solis to a board was not bluster, but something Madigan was able to do and did do by virtue of his position and as a part of his regular course of conduct.

### E.    Chinatown-Related Conduct.

The Chinatown Parcel was a piece of land in Chinatown—within former Alderman Solis's ward—on which a parking lot was operated. The Chinatown Parcel was owned by the State of Illinois through the Illinois Department of Transportation ("IDOT") and was leased to a Chinatown non-profit organization that collected the parking fees. Multiple

developers wanted to develop the land, but first the land had to be transferred from the State of Illinois to either the developers directly or to the City of Chicago, which could then sell the land to the developers.

As described below, after Solis began cooperating with law enforcement, he solicited Madigan's assistance with transferring the land from the State so that a group of developers (referred to as "Group A" in the superseding indictment) could purchase the land. The individuals involved with Group A did actually want to become owners of the parking lot in order to develop it. Madigan readily agreed to assist with the understanding that he would obtain legal work for Madigan & Getzendanner from Group A if the transfer occurred. Madigan enlisted McClain to work with Solis on the proposal. McClain—who identified himself as a Madigan "surrogate"—helped with the required legislation by working to add the Chinatown Parcel to a land transfer bill that was pending before the Illinois General Assembly in spring 2018 and, as it turned out, again in the fall 2018 veto session. Ultimately, the Chinatown Parcel transfer was not included in the land transfer bill that was passed due to opposition by numerous parties. The proposed amendment that would have allowed for the transfer was shelved with the expectation that it would be pursued again in 2019. But, in 2019, the government charged Alderman Edward Burke and shortly thereafter Solis was outed as a government cooperator. The Chinatown legislation from 2018 was not pursued further.

This racketeering activity surrounding the Chinatown Parcel drives home the association in fact that existed between Madigan and McClain, and how they worked in tandem to pass legislation that was in Madigan's personal interest.[58]

### 1. Consensual Recordings Made by Solis and His Anticipated Testimony.

Solis is expected to testify that, during his cooperation, a developer group, Group A, contacted Solis and expressed an interest in acquiring the Chinatown Parcel. Group A wished to develop this land into a hotel and parking complex. Based on these events, the FBI directed Solis to advise Madigan of Group A's wish to acquire the Chinatown Parcel and to ask Madigan for his assistance with the transfer of the Chinatown Parcel from the State of Illinois.

On July 18, 2017, Solis arranged for Madigan to pitch a different project, described below as the Apartment Project, and just prior to the pitch, Madigan and Solis met privately, and the conversation was recorded.[59] During that encounter, Solis told Madigan, "I might want to talk to you afterwards on an issue in Chinatown." Madigan

---

[58] Both Madigan and McClain participated in efforts to illegal direct business to Madigan's law firm from the developers of the Chinatown Parcel. Accordingly, these statements are independently admissible against both defendants as statements of a party opponent and as members of the same joint venture. This illegal activity is also charged as a subsidiary scheme/joint venture in Counts 19 to 22 of the superseding indictment, and the statements of the defendants are admissible against each other under Rule 801(d)(2)(A) with respect to these charges as well.

[59] As described below, this conversation occurs against the backdrop of Madigan being told that the developers of the Apartment Project understood that there was a "*quid pro quo*" involved in hiring Madigan as their tax attorneys.

said, "Okay." Solis said, "We need a transference of property from the State to the city." Madigan said, "Mhmm. Mhmm. Mhmm." Solis said, "You might have heard of it before. It's the Chinatown parking lot on Wentworth and, and Cermak. And, we've been working on developing that for years. But it, but before we can do anything, that property has to be transferred." Madigan said, "From the State?" And Solis confirmed "to the City." Madigan responded, "We'll talk about it." Later in the same meeting, Solis again brought up the Chinatown Parcel. Madigan said, "It sounds familiar," and "For some reason I think I, I've heard about it before."[60] Solis then described to Madigan the proposal for "the city [to] buy it from the State," and Madigan responded, "Yeah, yeah." Madigan later said, "let me get into this."

That conversation kicked off a series of exchanges between Madigan, Solis, and McClain, as Madigan's agent, concerning Madigan's efforts to use his position as Speaker to assist with legislation transferring the Chinatown Parcel from State to City ownership, in exchange for legal work being steered to his law firm by the developer.

---

[60] Madigan had heard about the Chinatown Parcel before, during an August 18, 2014 meeting recorded by another government cooperator. That recording was another meeting in which Madigan pitched his law firm's services to a local developer, with Alderman Solis present (before Solis began cooperating). Although the meeting focused on the developer's planned hotel in Chinatown, the conversation briefly turned to the Chinatown Parcel. Solis told Madigan about early efforts to develop the Chinatown Parcel parking lot. Madigan asked, "Is this owned by the state?" Solis responded, "The parking lot? Yes." The conversation then turned back to the hotel property.

On September 7, 2017 (Solis Phone, Session #39385), Solis asked Madigan what Madigan had learned about the Chinatown Parcel. Madigan explained that he was not in a position to talk to IDOT, the state agency responsible for the parcel, given that it was part of the then-Republican Governor's administration (the evidence will reflect Madigan did not enjoy a good working relationship with the then-Governor). Madigan told Solis, "Let, let me get back into it and, and, um, see if there's some way to find somebody that can talk to IDOT. That's, that's where the decision's gonna be made."

On September 11, 2017 (Solis Phone, Session #39723), Madigan and Solis spoke again about the Chinatown Parcel. During this call, Madigan asked Solis a series of questions about the parcel, and indicated that he was going to think about the issue for a few more days and would call Solis back.

A few days later, on September 13, 2017 (Solis Phone, Session #39804), Madigan called Solis and told him to have Group A "talk to a man named Mike McClain" and provided McClain's phone number.[61] Madigan indicated that Solis should tell a representative of Group A that McClain would contact the representative of Group A and "give him some ideas on how to go about it because you, you can't have me around the situation." Madigan explained, "anybody in the [the Republican Governor's]

---

[61]     This evidence also demonstrates McClain's role as Madigan's agent (as is the case with the ComEd-Related and AT&T-Related conduct described earlier), and demonstrates the relative roles of Madigan and McClain within the charged racketeering enterprise.

administration hears that I'm involved, they're gonna go in the opposite direction." Solis is expected to testify that he believed Madigan was expressing his interest in pursuing the land transfer of the Chinatown Parcel because it was a large development, and Madigan thought his law firm would get the real estate tax work for the project.

On October 26, 2017 (Solis Phone, Session #43316), Solis called Madigan and let him know he was going to be meeting soon with the developers of the Chinatown Parcel. Solis asked Madigan if he could invite McClain to the meeting, and Madigan responded, "Uh, I would be okay with it, and go ahead and invite, uh, Mike. He just got back in the country and he's—" Solis said, "Yeah I know, I know. He was out of town for about a month." Madigan said, "Right, yeah. And he's back. And um, to me it's a situation where you've gotta find somebody that's plugged into this current administration."

On November 14, 2017, Solis met with representatives of Group A and McClain. This meeting was recorded.[62] Before the meeting with the representatives from Group A, Solis and McClain met privately. McClain explained that he wanted to "get a flavor for everything" and then "decide the best pathway." During the private pre-meeting, Solis asked McClain to explain his connection to Madigan: "What's your relationship with, with the, with Mike, with the Speaker?" McClain explained that he took public office as a State Representative in 1972, that he was "number two man in the caucus. So, the Speaker was

---

[62]     Solis had reached out to McClain to talk to him about the Chinatown Parcel and to invite him to this meeting. This conversation was also recorded.

169

number one. I was number two. And, um, we became real good friends. And then after I left office, then I went back to lobbying and we continued that friendship." McClain added that he knew Madigan's children. Thereafter, McClain explained that "there are two people that have a real good relationship with, um, um, the Governor's office," and identified Lobbyist 1 as one of those individuals. Later in the conversation, Solis asked, "obviously [Lobbyist 1] has relationship both with the Governor and with Mike [Madigan]?" McClain said, "Yes . . . through me . . . So, and we try to keep it, uh, confidential. . . Because if [the Republican Governor] found out that [Lobbyist 1] was close to Mike through me, he would cut her off." McClain advised Solis that "probably the less said about the Speaker the better" in the upcoming meeting with Group A. Thereafter, Solis and McClain met with representatives of Group A concerning the Chinatown Parcel. McClain discussed Lobbyist 1, her background, and how she could assist the developers to effectuate the transfer of the Chinatown Parcel. Later in the meeting, a member of the Group A requested a meeting with Lobbyist 1, after Lobbyist 1 had an opportunity to "feel around" with State officials concerning the prospects for a successful transfer of the Chinatown Parcel.

On December 15, 2017, at approximately 1:05 p.m. (McClain Phone, Session #47158), Solis received an incoming call from McClain during which McClain discussed his plan to introduce Lobbyist 1 to Group A. Solis is expected to testify that meeting was set for December 18, 2017.

Prior to the meeting on December 18, 2017, Solis met with McClain in his office at City Hall, and that meeting was recorded. Solis described some of the history of the Chinatown development project and emphasized that the project was important to him. Solis told McClain that he could steer tax work to Madigan's law firm from the Chinatown developers if they obtained the Chinatown Parcel: "in the past, um, uh, I have been able, uh, to steer some work to, to Mike [Madigan]. And, these guys will do, do the same thing." Thus, Solis made explicit to McClain that Madigan stood to privately benefit if Madigan and McClain could engineer the transfer of the Chinatown Parcel to Group A. McClain said nothing in response to this comment—and did not express any confusion about the import of this comment either. Solis expressed his hope that the Chinatown Parcel would be transferred: "I'm hoping whatever happens in this 2019, 2018 election that this is gonna go through." McClain suggested that they wait to see how "[Lobbyist 1] does" and they would stay in touch, and if Lobbyist 1 met "resistance" then "we'll do a dual path" and get Solis inside the "[name of Democratic candidate for Governor] group." In other words, McClain told Solis that if Lobbyist 1 was unable to convince IDOT, the transfer could be pursued with the Democratic candidate for Governor of Illinois, who was expected to defeat the Republican Governor in the fall 2018 election and come into office in January 2019. Solis asked if Madigan would assist with either path, and Solis is expected to testify that McClain nodded in response. (This response was not visible in the video recording since the camera was not aimed at McClain's face.) Solis is expected to testify that he

171

understood McClain to be telling him that Madigan would support the transfer, and Solis audibly responded "Good, good."

Later in the conversation, Solis and McClain discussed another public official, and Solis commented that this public official "says and does some things that, that I think eventually will get him in trouble." McClain noted that "some people you just, they say these outrageous things that you can't say anymore." Shortly thereafter, McClain noted that the Department of Justice would be sending 40 more Assistant United States Attorneys to Chicago, and noted, "they'll wanna go after white collar crime." McClain noted that certain individuals were "too blatant" and that people "openly talk about it." McClain noted that it was not uncommon for people to recommend not going to see certain politicians alone: "You oughta take somebody with you so that you have somebody to say, 'No, that's not what was said.' I mean, don't go by yourself. I mean, that, that's what people will say." Against this backdrop, Solis asked McClain, "So, how does, um, how does the Speaker deal with all this? 'Cause these are all strong allies." McClain explained, "Well, he, he does surrogates. . . a guy like me, he sends to go talk to [a certain public official]." McClain also explained that Madigan would have a staff member attend any meeting with a certain public official. Thereafter, McClain and Solis met with the Group A and Lobbyist 1. This portion of the recording clearly establishes that Madigan utilized McClain as a surrogate to carry messages for him, and as a buffer to shield Madigan from direct contact with third parties in connection with discussing the racketeering enterprise's criminal activities.

On or about March 26, 2018, Solis met with Madigan at Madigan's law firm office so that Madigan could pitch a separate group of developers for legal work. After the pitch, Madigan and Solis discussed the plan to have the Chinatown Parcel included in a property bill, the steps Madigan would take to cause this to occur, and the fact that Madigan would receive tax business from Group A. Specifically, Solis said, "Anyway, Mike, I just wanted to give you an update on the, um, the Chinatown property. . . that you, uh, that you connected me with Mike McClain, who then connected me with [Lobbyist 1]. Well, [Lobbyist 1] has met with the developers consistently, and they've come to a point where they need to get, uh, the property on a property bill in the Senate. Think it comes up in, in May, uh, with Senator [redacted]." Madigan said, "Okay." Solis said, "And so [Lobbyist 1] wants me to call him. I don't know him that well. I don't know if you could call him ahead of time, or if I can tell him I spoke with you, and you're in support of it." Madigan said, "Mhmm. Mhmm. Mhmm." Solis said, "Would that be alright?" Madigan said, "Let's think about it a little bit. Maybe McClain will talk to [the Senator]." Solis said, "Oh, okay." Madigan said, "They know each other." Solis said, "Okay. Good. Good." Madigan said, "They call it a property transfer bill." Solis said, "Yeah, from the State to the city." Madigan said, "Yeah. Right." Madigan continued: "They don't happen all the time, but they do happen. And, um, the reason they do a bill is that there's, there's a rule there. This is the same thing that went on with the Thompson Center." Solis said, "Oh okay." Thereafter, Madigan explained how the property bill helped shorten the process needed to transfer property: "the current state law . . . would say that for the State to sell

173

property, there's a long process they have to go through. They have to declare the property surplus. Surplus. Current law would then give some local governments the opportunity to buy ahead of a private developer. . . And, so, the reason they do a bill is to get around that, we call it the Surplus Property Bill." He continued: "Now, as, as a general rule we tell 'em, 'Well follow that procedure.' It may be a local government that wants to buy stuff like that, but we run bills. Yeah, okay. . . Um, let me just take it from there and, and, and, uh-" Solis interjected, "But I will call [the Senator], right? Or?" Madigan said, "No, don't, don't do anything," and told Solis to "just wait." Solis said, "Okay." Madigan said, "I'll follow up with McClain, and McClain'll talk to [Lobbyist 1]. She'll, McClain will know when everything's gonna happen . . . He can call [the Senator]." Solis said, "Okay. Good. Good." Madigan said, "Yeah." Solis then immediately said: "And then Mike, as you know, I've been around for a long time. Uh, I can be discreet. Those developers will work with you the way that this guy has and get you the property taxes." Madigan said, "Yeah, sure. Thank you." Solis said, "And, um, it'll take some time. It'll be a negotiated sale, sale as opposed to a bid. Uh, and then we get it outta city council, and I'll bring them in to meet with you." Madigan said, "Mhmm. Mhmm. Okay, good." Shortly before the men ended their meeting, Madigan said, "I'll follow up on that." Solis said, "I don't have to call [the Senator], I don't have to call anybody? You'll take care of that?" Madigan said, "Yeah."

On March 27, 2018, at approximately 4:11 p.m. (Solis Phone, Session #54523), Solis called Madigan and told him that he took official action that benefitted another developer

group and that they now seemed likely to sign up Madigan's law firm, and again confirmed that Madigan would receive tax business from Group A if he was able to cause the transfer of the Chinatown Parcel. Specifically, Solis said, "I'm just following up on yesterday. Um, I talked to [the developer] after we met. I'm gonna be able to resolve all the issues he raised, and he seemed very interested on signing up with you. So that's good news." Madigan said, "Yeah. So, very good." Solis is expected to testify he had made these comments to Madigan to let him know that he was going to get legal work because the developer had gotten what he needed from the City concerning the development.

Solis said, "And then, yeah, no problem. And then on the other matter we discussed after meeting with [the developer], if you can take care of that matter in May [the Chinatown Parcel transfer bill], I'm confident they'll appreciate it and sign up, sign you up on after May." Madigan said, "Okay. Alright. Very good." Solis said, "Alright, thank you." Madigan said, "Thanks again." Solis is expected to testify that he was referring to the transfer of the Chinatown Parcel, which was anticipated to occur through legislation that would be passed in May, and that he was explaining that, once the transfer occurred, Group A would in return retain Madigan's law firm for the real estate work. Again, Madigan voiced no concern about this illegal arrangement; rather, he took steps to try and make sure the Chinatown Parcel was transferred.

175

Solis is expected to testify that he told Madigan that the developers of the Chinatown Parcel would give Madigan tax business (just like the individuals who had just met with Madigan during the pitch that occurred prior to this conversation), in return for Madigan's support with the transfer of the parcel. Solis is expected to testify that he made reference to being "discreet" as a way to assure Madigan that there would not be a clear connection between his efforts to get the land transferred to the developer and them giving him tax work. Madigan responded, "Yeah, sure. Thank you," which Solis understood to mean that Madigan was thanking Solis for the anticipated tax business to his law firm from the Chinatown Parcel developers.

This conversation makes explicit what was already understood: if Madigan got the Chinatown Parcel transferred, he would get business in return from Group A. Madigan evinces no problem with this arrangement once it is made explicit. Not only that, but Solis signals that this arrangement is illicit by telling Madigan he has "been around for a long time" and knows how to be discreet. These comments would have been unnecessary if the arrangement were somehow believed to be legitimate. Notably, Madigan informs Solis that *Madigan* will "take it from here," and advises Solis it is unnecessary for him to try and contact the sponsor of land transfer legislation. Rather, Madigan indicates that his trusted lieutenant McClain can work on the transfer of the parcel. This recording proves association in fact, and demonstrates McClain's role as Madigan's agent. At this time, as Madigan well knows, McClain is retired, and is no longer registered as a lobbyist.

176

Nonetheless, Madigan uses his services to help ensure the transfer of the Chinatown Parcel occurs, and that he gets private business for his law firm.

The government anticipates playing a series of wiretap calls from April to May 2018 concerning efforts by the parties to arrange for the transfer of the Chinatown Parcel through State legislation.[63] Although efforts were made by Madigan and McClain to effect the passage of legislation that would provide for the transfer of the Chinatown Parcel, the initiative was delayed until the 2018 veto session due to opposition from other public officials. For example:

- **McClain Phone, Session #1144**: On April 24, 2018, Madigan called McClain. During this call, McClain asked Madigan to call him from someone else's cell phone. After Madigan confirmed that he was on a "private phone," McClain reported two State senators were "causing a whole bunch of trouble" with respect to the transfer of the Chinatown Parcel, and added that he wasn't asking Madigan "to do anything," but wanted Madigan to "know that . . . we got troubles." Madigan gave McClain advice as to how to remove their opposition, including by having a delegation from Chinatown visit a public official who opposed the transfer.

- **McClain Phone, Session #2657**: On May 16, 2018, Madigan asked McClain for a report on McClain's progress in arranging for the transfer of the Chinatown Parcel, and McClain explained that he was in the process of having information concerning the Chinatown Parcel delivered to a member of Madigan's staff.

- **McClain Phone, Session #3851**: On May 28, 2018, McClain called a member of Madigan's staff and said, "I know you already got this covered but the Speaker asked me to make sure I called you. So the legal, um, legal description that [Lobbyist 1] gave you for Chinat— for Chinatown?" The staff member said, "Right." McClain said, "That deals with the developer of his and so he wants to

---

[63]     These calls include McClain Phone, Session #559, 651, 719, 1144, 1169, 1170, 2657, 2708, 3810, 3851, 3866, 4357, 4383, 4388, 4390, and 4428.

make sure he votes 'present.'" This call clearly demonstrates that McClain and Madigan expected Madigan to receive business from the developer, and were trying to avoid any fingerprints of Madigan's involvement with the passage of the legislation, when in fact, behind the scenes, Madigan was coordinating and overseeing the effort to pass the legislation.

- <u>McClain Phone, Session #4357</u>: On May 31, 2018, McClain spoke with Lobbyist 1. During the call, Lobbyist 1 advised that the Secretary of IDOT was opposed to the transfer of the Chinatown Parcel, and that the best course was to wait to pass legislation in the fall 2018 veto session, when the Secretary would likely no longer be serving.

- <u>McClain Phone, Session #4388</u>: Later on May 31, 2018, shortly after his call with Lobbyist 1, McClain advised Madigan of the obstacles encountered with the Chinatown Parcel legislation. Madigan instructed McClain to "put the file in the drawer for a while."

- <u>McClain Phone, Session #4390</u>: Shortly after that, on May 31, 2018, Lobbyist 1 advised McClain that Lobbyist 1 had convinced Representative A to file an amendment that provided for the transfer of the Chinatown Parcel; however, Representative A had refused to call the bill for a vote with the amendment.

Solis is expected to testify that after the amendment was introduced calling for the transfer of the Chinatown Parcel (but not called for a vote in May 2018 during the regular session of the Illinois House), he was directed by law enforcement to continue to make inquiries with Madigan and McClain about passage of the legislation in the legislature's fall veto session (which took place in November 2018).

On June 20, 2018, between the regular and veto sessions of the Illinois House, Madigan met with Solis at his law office, for the purpose of Madigan pitching another client who had business before the City. Madigan and Solis spoke privately after the pitch; in addition to discussing Solis's appointment to a State Board during this meeting (discussed above), Solis inquired about the transfer of the Chinatown Parcel. Madigan

told Solis that McClain was "gonna come in here tomorrow, and so I'll get into with McClain." Solis told Madigan that Solis believed Madigan's intervention in either November 2018 or January 2019 "will be what helps us get it done." Madigan responded, "Okay, I'll get it there."

On June 22, 2018 (McClain Phone, Session #6929), two days after Madigan assured Solis that he would see to it that the Chinatown Parcel was transferred, McClain called Lobbyist 1 and noted that he had received an inquiry from the Speaker that concerned the Chinatown Parcel transaction.

On October 26, 2018, as the fall veto session was approaching, Solis met with Madigan in Madigan's law office. In addition to discussing, among other things, Solis's appointment to a State Board and securing Individual A-1 as a client for Madigan, the men also discussed the Chinatown Parcel. Madigan asked Solis who was going to be the "proponent" of the bill in the House, and Solis advised Madigan that one had not been identified. Thereafter, Madigan told Solis, "Alright. I have to find out about that. Then, I have to find out." Solis said, "About the Veto Session?" Madigan said, "Yeah, well, yeah. And who would be the proponent in the House." Solis said, "Okay." Madigan said, "We gotta find, uh, the appropriate person for that. I have to think it through."

On November 2, 2018, at approximately 2:10 p.m. (McClain Phone, Session #14490), McClain received an incoming call from Madigan during which they discussed the Chinatown Parcel. McClain said, "Hi, Speaker." Madigan asked, "Can you talk?" McClain said, "Yeah. I'm just walking out of the room. I can now." Madigan said, "Mike, we've

talked about that, um, land transfer at Chinatown?" McClain said, "Yes." Madigan said, "And, um, we never settled on a sponsor for that, right?" McClain said, "Right. . . I've been talking to um, [Lobbyist 1] about it. . . she's sort of all of over the ballpark . . . on who's the best sponsor." Later in the conversation, Madigan recommended Representative B as the sponsor, and asked McClain if he had "any access" to Representative B. McClain said, "Sure. Absolutely." Madigan said, "Well, why don't you give that some thought?" McClain said, "Okay. Will do." Madigan said, "Yep. Anything else?" McClain said, "No sir." Madigan said, "Okay, thanks."

These two conversations demonstrate that Madigan was fully aware of the status of the Chinatown legislation and the issues that had occurred in connection with it during the spring session. They further demonstrate that Madigan was continuing to orchestrate the passage of the legislation that he understood would result in payments to him in the form of legal fees, including by selecting a sponsor of the legislation and instructing McClain to reach out to Representative B on his behalf.[64]

On November 8, 2018, at approximately 10:07 a.m. (McClain Phone, Session #15127), McClain received an incoming call from Representative B.[65] McClain said, "So, there's a piece of property in Chinatown that, um, some developers really want, and

---

[64]     While McClain was registered as a lobbyist until 2016, he retired from his role as a lobbyist starting in 2017, and was working for Madigan alone on this assignment.

[65]     Prior to this call, McClain conferred with Lobbyist 1 about the suitability of Representative B as a sponsor. McClain Phone, Session #14890 (11/6/2018).

Alderman Solis really wants, and, um, uh, i- it's ready. But there's a feeling that instead of, right now the the bill's, is, uh, sponsored by a Republican. . . a . . . friend of ours talked to me and said . . . the thought was that maybe that they would hand the bill over to you and that you'd be the chief sponsor." After asking about the position of another Representative, Representative B agreed to act as the sponsor.

McClain's conversations with Madigan and Representative B regarding Representative B sponsoring the Chinatown Parcel transfer legislation prove that Madigan intended to take official action in return for the Group A's legal business. Clearly, Madigan—despite his efforts to conceal his involvement in the legislation by using McClain as a surrogate—was deeply involved with the effort to transfer the Chinatown Parcel through legislation, going so far as to hand-pick the sponsor.

Solis is expected to testify that certain business leaders in Chinatown opposed the transfer of the Chinatown Parcel, on the ground that it would adversely impact retail stores that needed parking for customers.[66] Solis is expected to testify that, at the instruction of law enforcement, he let Madigan know that they were going to hold off on trying to pass the bill until the 2019 legislative session. Solis met with Madigan on

---

[66]     The government anticipates playing intercepted calls where the opposition to the transfer of the Chinatown Parcel was discussed by McClain, Lobbyist 1, and others. *See* McClain Phone Sessions #559, #651, #719; #790, #1076, #1141, #1144, #1169, #1170, #1209, #1275, #1284, #2180, #2198, #2708, #3810, #4244, #4246, #4357, #4380, #4383, #6929, #13416, #14346, #14890, #15029, #15035, #15579, #15759, #15844, #15851, #15852, #15855, #15868, #16024, #16520, #16562, #16563, #16574, #16804.

November 23, 2018, and told him that he wanted to hold off on moving the legislation forward.

Shortly after that meeting, on November 23, 2018, at approximately 12:17 p.m. (McClain Phone, Session #16804), McClain received an incoming call from Madigan. During the call, Madigan advised McClain that the legislation was "not gonna go forward." McClain said, "Yeah, I kind of figured that. I left a message for Solis, but he hasn't called me back." Madigan said, "Yeah. He was here today to, to tell me."

Soon after this, in January 2019, Solis' cooperation became public due to the accidental unsealing of a warrant in this investigation. The public became aware that the government had recorded a conversation with Madigan concerning Madigan's effort to obtain business from a Chinatown developer for his law firm, and that Solis was present during this conversation. Thus, nothing more happened with this particular effort to have the Chinatown Parcel transferred through legislation for Group A.

### 2. Additional Anticipated Witness Testimony

#### a. Lobbyist 1

Lobbyist 1 is expected to testify that she knew Madigan and McClain to be best friends, and that if Lobbyist 1 wanted to know what was going on with a bill in the General Assembly, Lobbyist 1 would often go to McClain to get information. In late 2017, McClain contacted Lobbyist 1 and got Lobbyist 1 involved with the Chinatown Parcel.

Lobbyist 1 will explain that, in order for Group A to acquire the Chinatown Parcel, IDOT had to release its ownership interest in the property; one way this could happen

was through legislation passed by the General Assembly. The legislation used for such a transfer is known as a land transfer bill. Lobbyist 1 is expected to testify that in late 2017, McClain told Lobbyist 1 that "our friend is fine with this," which Lobbyist 1 understood to mean that Madigan would not block any bill involving the transfer of the Chinatown Parcel.

Lobbyist 1 will testify about efforts to transfer the Chinatown Parcel, including a number of complications that surfaced during the project.[67] Lobbyist 1 will also explain that McClain's high level of involvement in the process was unusual.

Lobbyist 1 is expected to testify that ultimately the passage of the land transfer bill depended on the support of Madigan. Madigan's support was necessary to get the bill out of the Rules Committee, and Madigan was the person who decided which bills came to the floor for a vote. If Madigan did not support the bill, his chief of staff, Timothy Mapes, would not call the bill for a vote and the bill would not pass.

Lobbyist 1 is expected to testify that in May 2018, Lobbyist 1 learned that a certain Representative had refused to sponsor the transfer of the Chinatown Parcel, and so Lobbyist 1 began working on alternatives to effectuate the passage of a land transfer bill concerning the Chinatown Parcel. Lobbyist 1 instructed Lobbyist 1's Partner to contact

---

[67] Lobbyist 1's statements in this regard are covered by Rule 801(d)(2)(A); while Lobbyist 1 was not a participant in any criminal wrongdoing, Lobbyist 1 was a participant in the same joint venture, to effectuate the transfer of the Chinatown Parcel together with McClain and Madigan, and therefore Lobbyist 1's statements are admissible pursuant to that rule. *See* footnote 2.

Representative A, for the purpose of asking Representative A to include the Chinatown Parcel as a part of Representative A's own land transfer bill (which concerned separate properties). Lobbyist 1 is expected to testify that Lobbyist 1 was certain that Madigan supported the transfer of the Chinatown Parcel through an amendment that would be attached to Representative A's bill.

Lobbyist 1 will explain that Lobbyist 1 continued to work on the transfer of the Chinatown Parcel after May 2018. While Representative A had agreed to file an amendment providing for the transfer of the Chinatown Parcel, Representative A did not support the amendment. (The filing of an amendment meant that the amendment became a part of the record; the filing did not mean that the representative who filed the amendment supported the amendment.) Lobbyist 1 then turned to securing the passage of the land transfer bill in the General Assembly's fall 2018 veto session. Lobbyist 1 will explain the efforts undertaken during the summer to pass the bill.

On November 6, 2018 (McClain Phone, Session #14890), Lobbyist 1 had a telephone conversation with McClain. During the call, McClain explained that "a friend of ours" had suggested Representative B act as the sponsor of the land transfer bill concerning the Chinatown Parcel.

Thereafter, on November 10, 2018, Lobbyist 1 received an email from McClain, asking if Lobbyist 1 had spoken to Representative B, and if there were any problems in moving the bill to Representative B. Lobbyist 1 is expected to testify that Lobbyist 1 spoke to Representative B, and emailed a copy of the proposed amendment to

Representative B. Lobbyist 1 is expected to testify that, in connection with the passage of the bill, McClain said he would help as soon as Representative B asked for help. Lobbyist 1 understood this to mean that McClain could help get the bill through the veto session by going to a staff member or Madigan's chief of staff.

### b. Representative A

Representative A is expected to testify that she sponsored a bill, Senate Bill 3247, providing for the transfer of real estate separate and distinct from the Chinatown Parcel. She is expected to testify that she was asked to add the Chinatown Parcel to the land transfer bill in May 2018, and that she had discussions about it with Lobbyist 1's Partner. Specifically, Lobbyist 1's Partner texted Representative A on May 31, 2018, "Is there any chance you would run the bill with our Chinatown language as a floor amendment? The speaker would call and support it. I know this is last minute and you still have IDOT concerns, but I have to ask." Representative A is expected to testify that she refused to "run" the bill, that is, have it called for a vote, because of the concerns voiced by IDOT with respect to the Chinatown Parcel. Representative A is further expected to testify that she understood the representation from Lobbyist 1's Partner to mean that Madigan would not call her bill unless it contained the Chinatown Parcel amendment, which made Representative A feel uneasy. The whole situation seemed strange and out of the ordinary to Representative A. Therefore, Representative A simply offered to file the proposed Chinatown Parcel amendment, but would not adopt the amendment or ask that the bill, as amended, be called for a vote.

### c.   Lobbyist 1's Partner

Lobbyist 1's Partner is expected to testify about the work he performed together with Lobbyist 1 to try to transfer the Chinatown Parcel. Lobbyist 1's Partner is expected to testify that he (i) caused a draft of an amendment providing for the transfer of the Chinatown Parcel to be prepared by the legislative reference bureau, a part of the General Assembly, and (ii) met with public officials to advance the amendment.

Lobbyist 1's Partner is also expected to testify about his efforts to get Representative A to include the amendment in her land transfer bill. Lobbyist 1's Partner is expected to testify about the text he sent to Representative A, which noted that Madigan would call and support Representative A's land transfer bill. Lobbyist 1's Partner is expected to testify that he meant that Madigan would allow Representative A's bill to come to the House floor for a vote with the Speaker's support if Representative A would include the Chinatown Parcel amendment in her bill.

### 3.   Documentary and Other Physical Evidence

The government anticipates introducing text message exchanges, including text messages between Representative A and Lobbyist 1's Partner concerning the Chinatown Parcel amendment. These exchanges will include the following (which both witnesses will discuss during their testimony, as discussed above):



In addition, the government anticipates introducing email communications between McClain and Lobbyist 1 concerning the Chinatown Parcel amendment, including efforts to enlist Representative B as a sponsor. For example, as noted earlier, on November 10, 2018, Lobbyist 1 received an email from McClain, asking if Lobbyist 1 had spoken to Representative B, and if there were any problems in moving the bill to Representative B:



Lobbyist 1 is expected to testify she had spoken to Representative B, and had emailed a copy of the proposed amendment to Representative B:



The government anticipates introducing public records that reflect that on or about May 31, 2018, Representative A introduced House Floor Amendment 1 to Senate Bill 3247, which provided for the transfer of the Chinatown Parcel. House Floor Amendment 1 was re-referred to the Rules Committee that day. This amendment was later tabled, on or about June 4, 2018.[68]

### F.    Apartment Project-Related Conduct.

Madigan attempted to extort the developer of a large apartment building located in Solis's ward (the "Apartment Project"). This racketeering activity began in June 2017 when Madigan, on his own accord, reached out to Solis knowing that the Apartment Project was located in Solis' ward, and asked Solis to introduce him to the developer of the Apartment Project. At that time, the developer—identified as Company C in the superseding indictment—was working to obtain the necessary City of Chicago approvals for the Apartment Project, including a change in zoning for the property, which would require the approval of Solis's Zoning Committee. Thereafter, from approximately June 2017 through September 2017, knowing that Company C believed it had to hire Madigan's law firm in order to get the necessary zoning approvals from Solis, Madigan attempted to obtain legal business from Company C. As described below, Madigan's conduct included coaching Solis on what to tell developers regarding the need for "high quality"

---

[68]    Based on other evidence the government will introduce, the jury will be aware that the activities of the House Rule Committee were ultimately under Madigan's control, and that the forward movement of this legislation was subject to his control.

property tax representation and pitching Company C representatives for legal business during a meeting at Madigan's law firm, which Solis attended and recorded.[69]

---

[69] This conduct is also charged as substantive violations in Counts 15 to 18, which name Madigan alone. Madigan's statements are admissible against him as to both the racketeering conspiracy charged in Count 1 and Counts 15 to 18 as statements of a party opponent. Because McClain is also a member of the charged racketeering conspiracy, Madigan's statements in furtherance of this racketeering activity are admissible against McClain as well. *See, e.g.*, *Volpendesto*, 746 F.3d at 284-85 ("An individual need not agree to perform each individual activity to violate RICO," rather, the "gravamen" of a RICO conspiracy charge is that the defendant agreed to participate, directly and indirectly, in the affairs of the enterprise) (citations omitted); *Ashburn*, 2015 WL 588704, at *8 ("RICO conspiracy, however, "is never simply an agreement to commit specified predicate acts . . . . Nor is it merely an agreement to join a particular enterprise. Rather, it is an agreement to conduct or to participate in the conduct of a charged enterprise's affairs *through* a pattern of racketeering.") (citing *Pizzonia*, 577 F.3d at 464 (emphasis in original). Here, the Apartment Project conduct is very similar in nature and in time to other racketeering acts in which McClain personally participated—including Madigan's willingness to abuse his official position and Solis' official position in order to land business for his law firm in connection with the Chinatown Parcel. *See* Seventh Circuit Jury Instructions at 834 (2023) (Pattern Requirement—Racketeering Conspiracy) ("Acts are related to each other if they are not isolated events, that is, if they have similar purposes, or results, or participants, or victims, or are committed a similar way, or have other similar distinguishing characteristics; or are part of the affairs of the same enterprise."). Indeed, the Apartment project incident occurred in tandem with efforts by McClain to help Madigan transfer the Chinatown Parcel as describe above, which, like the Apartment Project matter, also would result in legal business for Madigan's law firm. Indeed, at times Madigan raised the Chinatown Parcel matter during conversations that also concerned the Apartment Project. The temporal link also extends to the ComEd and AT&T conduct, in that Madigan's conduct in relation to the Apartment Project happened around the same time that McClain was helping Madigan to obtain a stream of benefits from ComEd and AT&T. Thus, the Apartment Project attempted extortion is proof of both the existence of the charged enterprise and Madigan's agreement to commit multiple racketeering acts having similar purposes that were committed a similar way and is therefore admissible against McClain. *Marcy*, 814 F. Supp. at 676–77 (in a RICO conspiracy prosecution, finding evidence of a coconspirator's criminal conduct in which the defendant did not directly participate to be admissible and relevant to show the existence of an enterprise and a pattern of racketeering); *Ashburn*, 2015 WL 588704, at *8.

### 1. Consensual Recordings Made by Solis and His Anticipated Testimony.

The government intends to introduce a number of recording regarding the Apartment Project matter, which will demonstrate that Madigan's conduct was part of his pattern of abusing Solis' official position as a Chicago Alderman and chair of the Zoning Committee to obtain business for his private law firm. The recordings prove that the matter was initiated by Madigan on June 12, 2017, when Madigan, knowing the Apartment Project was in Solis' ward, reached out Solis to request an introduction to the Apartment Project developer. Thereafter, the recordings show that Madigan—knowing that the Apartment Project required City of Chicago approvals and that Solis was conditioning those approvals on the developer hiring Madigan's firm—sought law firm business from Company C.

Specifically, on June 12, 2017, at approximately 3:21 p.m. (Solis Phone, Session #33425), Madigan, from his law office, called Solis and left a voicemail stating, "Danny, it's Mike Madigan. Would you call at [number redacted]. Thank you." Solis returned Madigan's call minutes later at approximately 3:23 p.m. (Solis Phone, Session #33428). During this call, Madigan asked Solis to introduce him to Company C. Specifically, Madigan stated, "I was reading an article about a proposed real estate development in Washington and Sangamon, it's called the '[Apartment Project],' and the way the article read it seemed to say that it was in your ward." Solis responded, "Right, the south side of Washington is in my ward, north side is, uh, [Alderman] Walter Burnett." Madigan

stated, "Okay, alright. Uh, do you think that's gonna go forward?" Solis replied, "Yeah, I just have to wait. There is a, um, there is a West Loop study that's being done on what the guidelines should be. The continuous development in the West Loop.[70] And, uh, I think those guidelines will help me, uh, in terms of some of the concerns that some people have on it. . . . So I've advised the developer, uh, to wait until, uh, September, uh, for me to get it done in, um, in zoning. And it'll probably go in July in uh, the, um, the planning commission." Madigan responded, "Okay, alright. Uh, you think I can [unintelligible] those people?" Solis said, "Do you know the developer? Do you know the, uh, people there?" Madigan responded, "No but, no but I'd like to." Solis said, "Okay. Alright, well let me see what I can do to get you an introduction." Madigan said, "Yeah, okay, that would be great."

On or about June 23, 2017, (Solis Phone, Session #34338), Solis called Madigan and explained that Solis was going to meet with Company C and that Company C representatives understood that there was a connection between the approvals the project needed from the city and Madigan's receipt of law firm business. Specifically, Solis said, "Just wanted to let you know that next week I've got a meeting with the individuals that you . . . asked me about, the [Apartment Project] guys." Madigan responded, "Yes."

---

[70]     In 2017, the Chicago Department of Planning and Development and the Plan Commission were considering design guidelines for the West Loop area of Chicago. The Chicago Plan Commission adopted the West Loop Design Guidelines at its September 2017 meeting.

Solis said, "On Thursday. I think they understand they've got some issues that they still have to deal with me in terms of zoning." Madigan said, "Hmm, hmm." Solis said, "And I think I also told you that I was going to wait until Septem—August when there's some guidelines for the West Loop that are going to be done before I do my zoning decision." Madigan said, "Sure." Solis said, "So I'll meet with them next week on Thursday, and then I'm going to set up a meeting with you and them." Madigan said, "Good." Solis stated, "And I think they understand how this works, you know, the *quid pro quo*, the *quid pro quo*." Madigan said, "Okay." Solis stated, "So I just wanted to let you know that I did that and I'll follow up with you after Thursday." Madigan said, "Very good."

Solis is expected to testify about this call. First, Solis is expected to testify that he communicated to Madigan that Company C needed to get approvals from him, in his capacity as an Alderman, in order for the project to go forward. This testimony will highlight the fact that Madigan understood that the developer had business before Solis, needed approvals, and that Madigan was exploiting these circumstances in order to secure business for himself. Moreover, Solis is expected to testify that, when he told Madigan that Company C understood "how this works, the *quid pro quo*, the *quid pro quo*," Solis was explaining to Madigan that Company C understood it would need to give Madigan legal business in order to receive the necessary Aldermanic approvals for the Apartment Project from Solis. And, when Madigan said, "Okay" in response, Solis is expected to testify that Madigan was telling him that he understood and agreed that the law firm business would come to him as a result of a *quid pro quo*. This call is devastating

193

evidence that Madigan intended to personally benefit himself by causing Solis to leverage his official position to in turn cause Company C to give Madigan business.

As set forth above, after this call, at law enforcement's direction, Solis talked to Individual C-1 (a representative of Company C) about meeting with Madigan's firm and subsequently arranged for a meeting between Individual C-1 and Madigan on July 18, 2017. Thus, even after Solis made clear to Madigan that he was conditioning his approval of the zoning for the Apartment Project on Company C's hiring Madigan's firm (telling Madigan that the developers "understand how this works . . . the *quid pro quo*"), Madigan, unphased, continued to engage with Solis on the matter and sought to pitch Company C.

On July 12, 2017 (Solis Phone, Session #35528), Solis received a call from Madigan during which Solis confirmed the upcoming meeting with the Company C representatives and that Company C understood that approvals from Solis were conditioned upon giving business to Madigan. Specifically, Solis said, "Yeah, listen, I know there, ah, you know that we got a confirmation for the meeting with the guy from [Apartment Project]." Madigan said, "Yes." Solis said, "He's going to bring his local partner, too [referring to Individual C-2]. Is that okay?" Madigan said, "Oh yeah, sure, sure." Solis said, "Good, and I just talked to him and I think, you know, by me giving him the zoning change and everything he needs and I think he understands, so I think it'll be okay." Madigan responded, "Very good, okay."

Solis is expected to testify that he was explaining to Madigan that Company C was happy with the progress Solis had made on necessary zoning changes for the project, and

194

that Company C was ready to fulfill its end of the deal by giving Madigan the tax business for the project in return. Once again, after hearing about this corrupt trade-off, Madigan replied, "Very good, okay."

On July 17, 2017, (Solis Phone, Session #35750), Solis called Madigan, and during the call, Madigan asked Solis to come alone before the July 18, 2017, meeting with the Company C representatives. Madigan asked, "I'm gonna see you tomorrow?" Solis confirmed he would be there. Madigan asked, "Could you come a little early?" Solis said, "Sure, by myself or with—" Madigan said, "Yeah, by yourself."

On July 18, 2017, Solis, Madigan, his law partner, and Individuals C-1 and C-2 met in a conference room at Madigan & Getzendanner. Per Madigan's instructions to Solis the previous day, Solis met privately with Madigan just before the group meeting. The government intends to introduce at trial an audio and video recording of this private meeting, as well as the larger group meeting. During the private meeting between Madigan and Solis, Madigan instructed Solis not to use the phrase "*quid pro quo*," referring back to their June 23, 2017 conversation. Specifically, Madigan said, "Over the phone, you made a comment that there was a *quid pro quo*." Solis said, "Oh, I'm sorry. Yeah." Madigan said, "You shouldn't be talking like that." Solis said, "Alright." Madigan said, "You're just recommending our law firm—" Solis said, "Absolutely, absolutely." Madigan continued, "—because if they don't get a good result on their real estate taxes, the whole project will be in trouble." Solis said, "Yeah." Madigan said, "Which is not good for your ward." Solis said, "Good. Good." Madigan said, "So you want high quality

195

representation." Solis said, "Right. Right. Um, I might wanna talk to you afterwards on an issue in Chinatown." Madigan responded that they would talk about it.

This conversation, in which Madigan, unprompted, fed Solis an excuse for why a developer in Solis' Ward should meet with Madigan's law firm, further establishes the existence of the enterprise and Madigan's participation in it. First, Madigan chose not to challenge Solis about his understanding of the *quid pro quo* nature of the transaction, which was mentioned almost a month earlier on June 23, 2017. If Madigan actually intended to avoid relying upon Solis's official position and Solis's ability to hold up official action benefitting the Apartment Project, he would have taken action much earlier to prevent an understanding concerning the *quid pro quo* nature of the transaction from forming before the July 18 meeting, and from preventing himself from obtaining business based on that understanding. Among other things, Madigan could have asked Solis not to be present at the pitch meeting, which he did not do. Second, Madigan had to provide Solis with a pretextual reason immediately before the meeting with Company C representatives as to why it made sense for Company C to hire Madigan's firm, which included feeding Solis the false representation that it was *Solis* who was interested in Company C having "high quality representation," when in fact, Solis had expressed no such desire or concern. In fact, it was Madigan who called Solis and asked Solis to arrange for an introduction to Company C. And later, as described below, on or about September 11, 2017, Madigan advised Solis—using vague language—when Solis should grant the

196

Apartment Project the necessary zoning approvals required from the City of Chicago, but only after Madigan talked to his law firm partner.

Solis's testimony is expected to confirm that Madigan was presenting a made up rationalization for his request to be introduced to Company C; Solis was not the one who proposed introducing Madigan to Company C, rather it was Madigan. Solis is expected to testify that Madigan told him not to use the phrase "*quid pro quo*" out loud during the meeting with Company C representatives because Madigan knew that using a zoning change to secure a client for his law firm would be illegal.

Immediately after this private meeting between Madigan and Solis on July 18, 2017, Madigan and Solis met with Madigan's law partner, Individual C-1, and Individual C-2, which also was video and audio recorded. At the beginning of the meeting, Madigan said, "So you're going to do your project and, and, and we'd like to talk to you about the real estate taxes. This law firm represents buildings like that on real estate taxes. And at that point I bow out and he [Madigan's law partner] takes over." Madigan's law partner then explained to Individuals C-1 and C-2 how the property tax assessment system worked in Chicago. Later in the conversation, Individual C-1 stated, "So we, we, you typically, um, uh, don't engage with, uh, sort of tax attorneys at this point in time in the game, but it feels like we're—" Madigan's law partner stated, "You don't have to." Individual C-1 responded, "No, I understand that—" Madigan's law partner continued, "But I would advise you that once you close, to at least let us take a look at where things are and give you, tell you whether you need us, whether you don't. Umm, we're in it for

197

the long term . . . Most of our, we have a lot of clients that have been with us a long time and that's the goal forever." Individual C-1 stated, "Well, what I was gonna say is we typically don't, but based on what you've told me, I think we should do, engage someone before the end of the year. For sure. Uh, I'd like to at least have somebody on board. And so I, I presume you have a, a standard kind of letter that—" Madigan's law partner responded, "Yes, I'll send it." Individual C-1 continued, "—you send prospective clients that, say, uh, here's what we do. Here's our firm. And here's, what I'd like to see is just the, the fee basis." Madigan's law partner responded, "I'll send you a proposal." A few minutes later, the group returned to the discussion of the proposal, with Individual C-1 stating, "We'd love to get the letter from you and then we can start thinking through that process. We do have to, sort of vet these kind of decisions with our lead partner because they tend to, 'cause they provide most of the money so they like to—" Solis asked, "Is that the [redacted] group?" Individual C-1 answered, "Yeah, so they'll wanna have a say in who we choose, but love to get the letter. We obviously are gonna need somebody in the City of Chicago to do this for us and so—" Individual C-2 stated, "And reputation matters." Individual C-1 stated, "Reputation matters." Individual C-1 further stated, "You come highly recommended so we'd love to figure out—" Madigan's law partner and

Individual C-1 then went out to talk about the name of the entity to which Madigan & Getzendanner's proposal should be made out.[71]

On or about September 7, 2017, (Solis Phone, Session #39385), Solis received an incoming call from Madigan, during which Solis told Madigan he would be deciding on the Apartment Project soon and asked Madigan whether he had obtained business from Company C. Specifically, Solis said, "I'm gonna be deciding on this development over in the West Loop. I told, I think before, that I'm very likely to do it. I was just waiting for a West Loop guideline thing to be finished. But I wanted to know if you had done anything with them yet." Madigan said, "Ah, Danny, I'm almost positive the answer is yes." Solis said, "Oh, good." Madigan said, "I'd like to double check with my partner. My partner told me that the day after we met, that guy sent in a bunch of materials so it looked promising. Could I—" Solis said, "Good, good." Madigan said, "Could I call you, maybe tomorrow?" Solis responded, "Yeah, no problem. And the other thing, remember I mentioned to you the Chinatown parking [a reference to the Chinatown Parcel]—" Madigan responded, "Yeah, yeah." Madigan and Solis then had a conversation about the Chinatown Parcel being in the hands of IDOT. Madigan then changed subjects back to the Apartment Project, stating, "The guy that's there today." Solis responded, "The first one—" Madigan said, "Yeah, yeah." Solis said, "Right, cause I've done a lot of work with the community

---

[71]     After the meeting ended and Individuals C-1 and C-2 left, Madigan and Solis met privately again, this time to discuss the Chinatown Parcel.

and the people on that and so . . . I'll probably be meeting with Planning next week, or at the latest, the following week, and I'm gonna push for that and I just wanna make sure that you knew that." Madigan responded, "Okay, alright." Madigan added, "Let, let me get back into it and, and, um, see if there's some way to find somebody that can talk to IDOT. That, that's where the decision's going to be made." Solis said, "Yes, yes." Madigan said, "Yeah. Okay, Alright, I'll back with you on both scores."[72]

This call demonstrates that Madigan intended to extort Company C by exploiting Solis's power to take or withhold official action, consistent with the pattern of similar activity described in the RICO conspiracy allegations. Indeed, after Solis advised Madigan that Solis was going to take official action on the Apartment Project and asked whether Madigan had locked down Company C as a client, rather than advising Solis that it was irrelevant to Solis's official decision on the Apartment Project whether Madigan's law firm had been or would be retained, Madigan instead asked for time to check with his law partner. Indeed, Solis is expected to testify that he understood Madigan to mean, by requesting to check with his partner, that Madigan wanted Solis to hold off on approving a zoning change for the Apartment Project until Madigan confirmed with his partner that Company C would likely retain Madigan's law firm.

---

[72]     As noted above, Madigan and Solis also discussed the Chinatown Parcel during this call.

After the September 7, 2017 call, Madigan called Solis on September 8 and again on September 9, 2017 and left messages asking for a return call. Solis tried to return Madigan's call, and they finally connected on the afternoon of September 11, 2017. Specifically, on or about September 11, 2017, (Solis Phone, Session #39723), Solis and Madigan first discussed the Chinatown Parcel and Solis then transitioned to the Apartment Project stating, "Okay, and how about the [Apartment Project] issue? Did you ever find, you were gonna get back to me whether they had actually, umm contacted your firm or not." Madigan said, "Umm, you know, you should go ahead and process that." Solis said, "Okay." Madigan added, "You were contemplating processing something. You should go ahead and process that." Solis said, "Okay." Madigan said, "Okay Danny, very good." Solis is further expected to testify that he believed Madigan used vague terms such as "processing something" and "process that" in order to conceal what Madigan was telling him to do, because it was illegal. Indeed, Madigan's use of coded language in this call—telling Solis to "go ahead and process that"—to conceal his instruction to Solis that Solis could go forward with approving the Apartment Project is further proof that Madigan was engaged in illegal activity and was aware of the illegal nature of his activity.

On September 13, 2017 (Solis Phone, Session #39819), Solis talked to Individual C-1 in a recorded call. At the beginning of the call, they talked about the fact that the Apartment Project was on the agenda for the Chicago Plan Commission's September 20, 2017 meeting. Solis said, "Then after that, that's when I think I'll make a decision on this. I think it looks great. We might, I'm not sure, have another community meeting." Solis

then asked Individual C-1, "Did anything happen with Madigan's law firm?" Individual C-1 responded, "As you know, we met with them and I followed up again, uh. During the call, what they had indicated was that we don't need really to engage with them until after we close; that's kind of when they do their work. And we have everything we need right now. I will say I enjoyed talking to Madigan's partner and I feel they are qualified . . . I would use them."[73] Individual C-1 also noted that Madigan's law firm represents about 40% of the business owners in town and that Individual C-1 liked Madigan's law partner, and did not have any qualms about hiring the firm. Individual C-1 said that Individual C-1 wanted to compare Madigan & Getzendanner's rates to another law firm, and Solis agreed that was a smart decision.[74]

### 2. Documentary and Other Physical Evidence

The government anticipates introducing at trial documents and records that corroborate the testimony and recordings set forth above, and further prove that Madigan—through Solis—sought legal business from Company C in connection with the Apartment Project. These documents and records include City of Chicago records regarding the Apartment Project and associated approvals, travel and phone records, and email correspondence.

---

[73] Individual C-1's statements in this call are admissible as statements of intention or plan. *See* Fed. R. Evid. 803(3).

[74] As described in the following section, Company C hired Madigan's firm to perform the property tax projections for the Apartment Project.

For example, between July 6 and July 14, 2017, Solis' aldermanic assistant corresponded by email with Madigan's assistant at Madigan's Thirteenth Ward office about scheduling the July 18, 2017, pitch meeting at Madigan & Getzendanner. *E.g.*, MJM0003035. During the same time frame, Solis' aldermanic assistant corresponded by email with Individual C-1 about scheduling the meeting with Madigan. In addition, the government intends to admit records reflecting Individual C-1's travel to Chicago to attend the pitch meeting.

Furthermore, on July 19, 2017 (the day after the pitch meeting), Madigan's law partner sent an email to Individual C-1, copying Individual C-2, following up on the meeting and providing more information about the property tax system. Madigan's law partner wrote, among other things, that he hoped Company C would "give consideration to retaining our firm's services going forward." EASYPRK_001-000008. On July 20, 2017, Individual C-1 responded to Madigan's law partner by email, thanking him for the information and providing Madigan's law partner with additional information about the Apartment Project, including a survey, noting that the site was "convoluted" and that "we need to sort that out in the near term." EASYPRK_001.

In addition, as set forth above, on September 13, 2017, after trying to call Madigan's law partner, Individual C-1 emailed Madigan's law partner for the purpose of scheduling a call about hiring the firm to perform a property tax projection. The government intends to admit the header information for this email and subsequent emails

exchanged between Individual C-1 and Madigan's law partner between September 13 and September 19, 2017.

The records the government will admit at trial reflect that Company C ultimately hired Madigan & Getzendanner to perform a property tax projection on the Apartment Project. The government intends to introduce documents reflecting that Madigan & Getzendanner invoiced Company C in the amount of $3,331.25 for this work, and Company C later paid the invoice by check.

### G. Other Proof of Enterprise and Enterprise Activity.

The government also intends to introduce other evidence demonstrating the existence of the charged enterprise and other activity engaged in by the enterprise, consistent with the alleged purposes of the enterprise as set forth in the superseding indictment. This additional evidence is discussed below.

### 1. Proof of McClain's Status as an Agent for Madigan

In order to prove the association-in-fact charged in Count One, the government anticipates introducing evidence of McClain's role as a trusted agent for Madigan. Critical to the government's proof is to demonstrate that McClain was Madigan's trusted lieutenant who was given high-level, complex, and sensitive tasks by Madigan, that it was widely understood that McClain acted for Madigan, and that McClain in fact wielded power and took steps at the direction of Madigan and with Madigan's authorization. This evidence will include the categories of evidence described in the government's motions *in limine* to admit certain evidence as direct evidence of the racketeering enterprise or,

in the alternative, under Federal Rule of Evidence 404(b), filed contemporaneously with this motion.[75] Such evidence includes:

- **McClain's role as Madigan's agent in complex legislative matters.** The government will offer evidence (including wire interceptions) that reflect that McClain acted as Madigan's agent with respect to the passage of legislation. For example, the government intends to offer evidence that McClain served as Madigan's agent in connection with gaming legislation that was pending in the General Assembly. The government intends to call Representative Rita, who will explain that he understood McClain to be speaking for Madigan, as well as wire interceptions between McClain and Rita, in which McClain represents to Rita that he is acting at the direction of Madigan as it concerns the gaming legislation.[76]

- **McClain's role in responding to sexual harassment allegations.** The government expects to offer testimony (including from former Madigan staffer Will Cousineau) as well as wire interceptions that reflect that McClain was within Madigan's trusted inner circle that Madigan relied upon to respond to sexual harassment allegations that threatened his continuity as Speaker. For example, McClain helped hire a crisis management firm, participated in inner circle conference calls with Madigan and his staff about

---

[75]    As discussed in the government's motions *in limine*, it is well-established that to prove the existence of a RICO enterprise, the government may introduce evidence of other acts, even uncharged crimes. *See United States v. Matera*, 489 F.3d 115, 120 (2d Cir. 2007) (affirming admission of evidence of various crimes committed by enterprise members, including multiple uncharged murders, because the evidence was introduced to prove an essential element of the RICO crimes charged, namely, the existence of a criminal enterprise in which the defendants participated); *United States v. Thai*, 29 F.3d 785, 812-13 (2d Cir. 1994) (uncharged acts admissible as evidence of "the existence and structure of the [RICO] enterprise"); *United States v. Mejia*, 545 F.3d 179, 206-07 (2d Cir. 2008) (admitting evidence of uncharged shooting; where existence of racketeering enterprise is at issue, uncharged crimes by members of the enterprise are admissible to prove enterprise and as direct evidence of the conspiracy). The Seventh Circuit has repeatedly noted that evidence introduced to prove existence of a racketeering enterprise is not "other crimes" evidence. *United States v. Salerno*, 108 F.3d 730, 738 (7th Cir. 1997) (evidence of prior crimes committed by defendant properly admitted to establish the existence of the enterprise and defendant's participation in the enterprise).

the issue, and was even assigned by Madigan the task of telling a sitting legislator that they had to retire. In doing so, McClain explicitly advised the legislator that McClain was acting as an "agent" in delivering this edict.[77]

- McClain's role in arranging for payments to Madigan's loyal soldiers. Paragraph three of Count One of the superseding indictment alleges that the purposes of the charged racketeering enterprise included to preserve and enhance Madigan's political power, and to financially reward Madigan's political allies and political workers for the "loyalty, association with, and work for Madigan." As part of its proof to demonstrate the purposes of the enterprise, the government expects to call witnesses and offer wire interceptions that prove that McClain was entrusted with arranging for payments for loyal members of Madigan's political apparatus who needed additional compensation—even if arranging for such compensation meant the creation of false documents and do-nothing assignments. For example, the government expects to introduce a series of interceptions which reflect that McClain reached out to multiple individuals to arrange for payments to be made to a member of the Thirteenth Ward Organization ("Individual 13W-4"), who was accused of sexual harassment.[78]

### 2. Proof of Other Conduct Undertaken in Furtherance of the Objectives of the Racketeering Conspiracy.

The government intends to introduce evidence of other conduct undertaken in furtherance of the objectives of the racketeering conspiracy. This conduct not only serves to prove the existence of the charged enterprise, but also demonstrates how the members of the enterprise sought to carry out the purposes of the charged enterprise. This conduct

---

[77]    These interceptions include by are not limited to the following interceptions over McClain's telephone: McClain Phone, Session #4317, 5092, 5121, 5665, 14849, 15018, 15167, 15204, 15768.

[78]    The interceptions the government intends to introduce in evidence include but are not limited to the following: McClain Phone, Session #12132, 12138, 12178, 12278, 12279, 12339, and 12515.

includes the categories of evidence discussed in the government's motions *in limine* to admit certain evidence as direct evidence of the racketeering enterprise or, in the alternative, under Rule 404(b). Those categories of evidence include evidence of:

- The conspirators' efforts to demand a gas utility hire a Madigan associate. The government intends to introduce evidence that, in addition to seeking to obtain jobs for Madigan's associates from ComEd and AT&T, the conspirators sought to obtain work for associates at other companies, including a gas utility. The government anticipates offering witness testimony from Fidel Marquez and wire interceptions that reflect that Marquez was contacted by an individual at the gas utility who did not fully understand why she was receiving insistent requests to hire a Madigan associate. In discussing the situation during the course of an intercepted call, Marquez told McClain, "Yeah, I don't know if, I don't know that anybody likes it, but people need to understand, how, what's behind all this. . . . I says, 'That maybe one day you'll have an ask and this will be remembered.'" McClain responded, "Right exactly," followed by "it all comes . . . around right?" McClain thereafter updated Madigan's relative concerning the efforts to obtain a position for a Madigan associate at the gas utility, and complained, "I just love these people that, they are in a regulatory body, right? And they are offended when people ask for favors. Hello? Dumb shits."[79] These conversations not only prove the allegations in the racketeering conspiracy charge concerning the nature of the charged enterprise, including the allegation that the purposes of enterprise included rewarding Madigan's associates, but also demonstrates the manner and means of the racketeering conspiracy, in that private benefits for Madigan's associates were solicited from various entities having business before the General Assembly.

- Job for Wife of Public Official E. During a call intercepted on July 2, 2018, Madigan and McClain discussed efforts to secure a job for the wife of an Illinois Representative, Public Official E. Madigan said Public Official E "came to me and same story, he needs money, and he had the thought that maybe I could help his wife on something." Madigan explained, "one

---

[79] The interceptions the government intends to introduce include but are not limited to: McClain Phone, Session #3204, 3282.

thought I had was with Jay Doherty. . . . And um not necessarily with ComEd, but I had the thought that I could actually put Jay Doherty on a retainer." Madigan added, "We'd tell [Public Official E] to prepare some monthly reports on what she's doing." McClain said, "Right, right." Madigan said, "So he's got it on file." This interception demonstrates not only Madigan's knowledge of the artifice used by ComEd to pay Madigan associates indirectly through Doherty, but it also demonstrates Madigan's knowledge that false documentation was prepared to make it appear that the work relationship was *bona fide*. In a subsequent interception, Public Official E reached out to thank McClain for landing his wife a job at the Secretary of State's office—an interception which provides another example of Madigan and McClain rewarding Madigan's political allies with benefits, which is alleged as one of the purposes of the criminal enterprise.[80]

- Madigan's efforts to secure lucrative employment and raises from Metra for his associates.

- The coconspirators' efforts to arrange for additional hires at AT&T, in addition to Individual FR-1.[81]

The government also intends to introduce evidence of Madigan's regular, continual efforts to abuse Solis's official position to solicit business for Madigan's law firm. As noted earlier in this proffer, Madigan repeatedly made requests to Solis to be introduced to individuals who had business before Solis in his capacity as the Chairman for the City Council's Zoning Committee. On numerous occasions, it was made explicit to Madigan on

---

[80]  The government intends to introduce the following interceptions: McClain Phone, Session #7531, 12281.

[81]  In connection with the AT&T jobs conduct described here, the government intends to offer the following emails and documents, among others (referred to by their starting bates number): AT&TIL-0071429, AT&TIL-0028119, AT&TIL-0027601, AT&TIL-0027603, AT&TIL-0027976, AT&TIL-0028577, AT&TIL-0027619, AT&TIL-0063338, AT&TIL-0016930, AT&TIL-0012005, AT&TIL-0014408, AT&TIL-0017712, AT&TIL-0008476, AT&TIL-0000208, AT&TIL-0012763, AT&T-IL0006216.

recordings that there was an understood *quid pro quo* with certain of these developers. This understanding is further demonstrated by Madigan's pattern of repeatedly seeking out individuals who had matters pending before Solis's Zoning Committee. The government will rely upon Madigan's conduct in this regard to further demonstrate Madigan sought to abuse Solis's official position to unlawfully obtain personal business for himself.

## IV. Coconspirator Statements

The statements between the coconspirators in furtherance of the conspiracy fall into numerous categories, all concerning subjects integral to the conspiracy and its success. These statements—which will establish the information flow between coconspirators and show how each performed his or her role—will be introduced through the testimony of cooperating witnesses, including but not limited to those noted above, lawfully recorded in-person meetings and telephone calls, including the recordings referenced throughout this submission, and written communications made by coconspirators, such as emails (some of which are described herein) and business documents, including invoices and internal corporate documents, many of which are identified and described above. As outlined in the opening section of this proffer, a large number of these statements will be admissible without regard to the coconspirator hearsay rule, because they are statements of the defendants, statements against penal

interest, statements of an agent, statements not offered to prove the truth of the matter asserted, verbal acts, or for other reasons.

Given the extent and number of such statements in this case, the government does not, and cannot, detail each and every proposed coconspirator statement of each witness or document. Nor does *Santiago* or the Seventh Circuit's precedent require the government to set forth each specific, verbatim coconspirator statements. Instead, the Seventh Circuit has specifically stated that categories of statements, such as those set forth below, suffice. *See Alviar*, 573 F.3d at 540 (rejecting defendant's argument that the *Santiago* proffer was inadequate where the Santiago proffer "contained a preview of the evidence as to all defendants," summarized anticipated cooperator testimony, and summarized recorded calls); *United States v. McClellan*, 165 F.3d 535, 554 (7th Cir. 1999) (rejecting the argument that the "government is bound to give notice in advance of trial of co-conspirator statements it intends to introduce at trial"); *United States v. Johnson*, No. 08 CR 466, 2011 WL 809194, at *8 (N.D. Ill. Mar. 2, 2011) (rejecting defendant's argument that the government failed to "specifically identif[y] the statements it intends to introduce" and rejecting defendant's request "that the Government be required to specifically identify each statement by a co-conspirator it intends to introduce").

Nevertheless, the government has provided many, many, many specific examples of coconspirator statements here in this 210-plus page proffer and has also listed the recordings it plans to introduce in a table attached hereto as Government Exhibit A. Based on this thorough and detailed filing, and the fact that the government already has

210

produced transcripts of the recordings it intends to introduce at trial, the defendants are clearly on notice of the coconspirator statements at issue. The coconspirator statements offered at trial will concern the subjects listed below, and include, but are not limited to, the coconspirator statements discussed above:

1. Statements regarding other members of the conspiracy, including the following:

   a. Identifying other members of the conspiracy and their roles;

   b. Identifying the structure and origin of the conspiracy;

   c. Reviewing a coconspirator's exploits and criminal acts previously committed in order to, among other things, update a fellow coconspirator on actions taken by the enterprise;

   d. Recruiting potential coconspirators;

   e. Statements that reveal the roles of participants in the conspiracy's illegal activities or specific criminal conduct;

   f. To report coconspirators' status and in turn receive assurances of assistance from coconspirators;

2. Statements to conduct or help conduct the conspiracy's activities, including the following:

   a. The purpose behind prior criminal acts carried out by the conspiracy;

   b. To plan criminal acts by the conspiracy;

   c. To instill and maintain the trust and cohesiveness of the conspiracy;

   d. To advise of the progress and accomplishments of the conspiracy;

   e. To inform or reassure the listener regarding the conspiracy's activities;

211

f.   To control damage to an ongoing conspiracy;

g.   Statements to outsiders to enhance the conspiracy's position in the eyes of outsiders and express confidence about the ability of the conspiracy; and

h.   To inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), and to reassure or calm the listener regarding the progress or stability of the conspiracy;

3.   Statements concerning the means used to conceal the conspiracy's illegal activities;

4.   Statements to others outside the conspiracy to reassure those individuals, to seek their cooperation, and to encourage them to not reveal incriminating information.

5.   Statements concerning benefits sought by Madigan and McClain from ComEd, AT&T, and others, including requests to hire and pay individuals, and related statements concerning the consequences of failing to timely meet such requests, as well as legislation and other official action sought by the companies in exchange.

6.   Statements concerning efforts to obtain business for Madigan's law firm, Madigan & Getzendanner, including statements concerning acts taken or to be taken in exchange for such business.

7.   Statements concerning McClain's role as an agent for Madigan, and assignments and work undertaken by McClain on Madigan's behalf, including but not limited to assignments and work undertaken by McClain on Madigan's behalf to: (i) help Madigan carry out his functions as Speaker; (ii) maintain his position as Speaker; (iii) convey instructions, requests, demands, and messages to third parties on Madigan's behalf, including to public officials, lobbyists, and business executives; and (iv) intimidate third parties.

8.   Statements concerning McClain's role as an agent for Madigan, including but not limited to statements (i) made to preserve Madigan's political power and position of authority within the entities comprising the enterprise; (ii) wherein McClain provides Madigan with strategic advice on sensitive

212

political matters; (iii) wherein McClain briefs Madigan on his activities on behalf of the enterprise.

As is evident from the description of these categories, all such statements made by coconspirators furthered the conspiracy. Thus, under the case law summarized above, all such statements are properly admitted at trial as coconspirator statements under Federal Rule of Evidence 801(d)(2)(E).

## V. Conclusion

The above is an outline of the evidence that the government will introduce to establish that the charged conspiracy existed. Based upon this proffer, the government respectfully requests that this Court find that categories of coconspirator statements listed above, as well as coconspirator statements like them, are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:    s/ *Amarjeet S. Bhachu*
       AMARJEET S. BHACHU
       DIANE MacARTHUR
       SARAH STREICKER
       TIMOTHY CHAPMAN
       JULIA K. SCHWARTZ
       Assistant United States Attorneys
       219 South Dearborn Street
       Fifth Floor
       Chicago, Illinois 60604
       (312) 353-5300

# EXHIBIT A

**U.S. v. MICHAEL MADIGAN et al., 22 CR 115**
**GOVERNMENT'S DRAFT AV EXHIBITS - 3/15/2024**

| DATE | SESSION NUMBER | SOURCE |
|---|---|---|
| 8/10/2009 | | UIC Interview |
| 8/18/2014 | | In person |
| 10/9/2016 | RCFL5 | Doherty's phone |
| 10/9/2016 | RCFL5 | Doherty's phone |
| 6/12/2017 | 33425 | TP2 (Solis Phone) |
| 6/12/2017 | 33428 | TP2 |
| 6/23/2017 | 34338 | TP2 |
| 6/29/2017 | | In person |
| 7/12/2017 | 35528 | TP2 |
| 7/17/2017 | 35750 | TP2 |
| 7/18/2017 | | In person |
| 9/7/2017 | 39385 | TP2 |
| 9/8/2017 | 39499 | TP2 |
| 9/9/2017 | 39568 | TP2 |
| 9/9/2017 | 39596 | TP2 |
| 9/11/2017 | 39723 | TP2 |
| 9/11/2017 | 39702 | TP2 |
| 9/11/2017 | 39703 | TP2 |
| 9/11/2017 | 39720 | TP2 |
| 9/13/2017 | 39804 | TP2 |
| 9/13/2017 | 39819 | TP2 |
| 10/26/2017 | 43316 | TP2 |
| 10/31/2017 | 43808 | TP2 |
| 11/14/2017 | | In person |
| 12/15/2017 | 47158 | TP2 |
| 12/18/2017 | | In person |
| 1/8/2018 | | Pramaggiore's phone |
| 1/15/2018 | 48901 | TP2 |
| 2/15/2018 | EXE00375976 | Pramaggiore's phone |
| 3/22/2018 | 54077 | TP2 |
| 3/26/2018 | | In person |
| 3/27/2018 | 54523 | TP2 |
| 3/29/2018 | 54637 | TP2 |
| 4/9/2018 | 76 | TP18 (McClain Phone) |
| 4/11/2018 | 189 | TP18 |
| 4/11/2018 | 262 | TP18 |
| 4/13/2018 | 378 | TP18 |
| 4/13/2018 | 397 | TP18 |
| 4/16/2018 | 559 | TP18 |
| 4/16/2018 | 634 | TP18 |
| 4/17/2018 | 651 | TP18 |
| 4/18/2018 | 719 | TP18 |
| 4/18/2018 | 779 | TP18 |
| 4/18/2018 | 790 | TP18 |
| 4/19/2018 | 854 | TP18 |
| 4/22/2018 | 1003 | TP18 |

**U.S. v. MICHAEL MADIGAN et al., 22 CR 115**
**GOVERNMENT'S DRAFT AV EXHIBITS - 3/15/2024**

| | | |
|---|---|---|
| 4/23/2018 | 1076 | TP18 |
| 4/24/2018 | 1087 | TP18 |
| 4/24/2018 | 1141 | TP18 |
| 4/24/2018 | 1144 | TP18 |
| 4/25/2018 | 1169 | TP18 |
| 4/25/2018 | 1170 | TP18 |
| 4/26/2018 | 1209 | TP18 |
| 4/26/2018 | 1274 | TP18 |
| 4/26/2018 | 1275 | TP18 |
| 4/26/2018 | 1284 | TP18 |
| 4/26/2018 | 1306 | TP18 |
| 4/27/2018 | 1332 | TP18 |
| 4/30/2018 | 1499 | TP18 |
| 5/2/2018 | 1635 | TP18 |
| 5/2/2018 | 1648 | TP18 |
| 5/8/2018 | 2076 | TP18 |
| 5/8/2018 | 2077 | TP18 |
| 5/8/2018 | 2093 | TP18 |
| 5/9/2018 | 2178 | TP18 |
| 5/9/2018 | 2180 | TP18 |
| 5/9/2018 | 2198 | TP18 |
| 5/10/2018 | 2269 | TP18 |
| 5/16/2018 | 2628 | TP18 |
| 5/16/2018 | 2634 | TP18 |
| 5/16/2018 | 2655 | TP18 |
| 5/16/2018 | 2657 | TP18 |
| 5/16/2018 | 2664 | TP18 |
| 5/16/2018 | 2686 | TP18 |
| 5/16/2018 | 2687 | TP18 |
| 5/16/2018 | 2690 | TP18 |
| 5/16/2018 | 2706 | TP18 |
| 5/16/2018 | 2708 | TP18 |
| 5/18/2018 | 2814 | TP18 |
| 5/18/2018 | | TP18 |
| 5/20/2018 | 2871 | TP18 |
| 5/21/2018 | 3002 | TP18 |
| 5/21/2018 | 3027 | TP18 |
| 5/22/2018 | 3108 | TP18 |
| 5/22/2018 | 3155 | TP18 |
| 5/23/2018 | 3204 | TP18 |
| 5/23/2018 | 3282 | TP18 |
| 5/23/2018 | 3302 | TP18 |
| 5/24/2018 | 3340 | TP18 |
| 5/24/2018 | 3342 | TP18 |
| 5/24/2018 | 3343 | TP18 |
| 5/25/2018 | 3618 | TP18 |
| 5/28/2018 | 3810 | TP18 |

**U.S. v. MICHAEL MADIGAN et al., 22 CR 115**
**GOVERNMENT'S DRAFT AV EXHIBITS - 3/15/2024**

| | | |
|---|---|---|
| 5/28/2018 | 3851 | TP18 |
| 5/28/2018 | 3866 | TP18 |
| 5/30/2018 | 4244 | TP18 |
| 5/30/2018 | 4246 | TP18 |
| 5/30/2018 | 4319 | TP18 |
| 5/30/2018 | 4317 | TP18 |
| 5/31/2018 | 4357 | TP18 |
| 5/31/2018 | 4380 | TP18 |
| 5/31/2018 | 4383 | TP18 |
| 5/31/2018 | 4387 | TP18 |
| 5/31/2018 | 4388 | TP18 |
| 5/31/2018 | 4390 | TP18 |
| 5/31/2018 | 4420 | TP18 |
| 5/31/2018 | 4423 | TP18 |
| 5/31/2018 | 4428 | TP18 |
| 5/31/2018 | 4445 | TP18 |
| 6/2/2018 | 4602 | TP18 |
| 6/6/2018 | 5063 | TP18 |
| 6/6/2018 | 5092 | TP18 |
| 6/6/2018 | 5121 | TP18 |
| 6/10/2018 | 5358 | TP18 |
| 6/11/2018 | 5646 | TP18 |
| 6/11/2018 | 5665 | TP18 |
| 6/15/2018 | 6278 | TP18 |
| 6/18/2018 | 3257 | TP20 |
| 6/18/2018 | 6527 | TP18 |
| 6/19/2018 | 6533 | TP18 |
| 6/20/2018 | 3870 | TP20 |
| 6/20/2018 | 6692 | TP18 |
| 6/20/2018 | 6764 | TP18 |
| 6/20/2018 | | In person |
| 6/22/2018 | 4715 | TP20 (Marquez Phone) |
| 6/22/2018 | 6929 | TP18 |
| 6/23/2018 | 6962 | TP18 |
| 6/25/2018 | 7063 | TP18 |
| 6/26/2018 | 7143 | TP18 |
| 6/26/2018 | | In person |
| 6/27/2018 | 7175 | TP18 |
| 6/27/2018 | 7192 | TP18 |
| 7/2/2018 | 7508 | TP18 |
| 7/2/2018 | 7531 | TP18 |
| 7/6/2018 | 7835 | TP18 |
| 7/11/2018 | 7956 | TP18 |
| 7/11/2018 | 61015 | TP2 |
| 7/16/2018 | 8423 | TP18 |
| 7/17/2018 | 8429 | TP18 |
| 7/17/2018 | 8447 | TP18 |

**U.S. v. MICHAEL MADIGAN et al., 22 CR 115**
**GOVERNMENT'S DRAFT AV EXHIBITS - 3/15/2024**

| | | |
|---|---|---|
| 7/17/2018 | 11986 | TP20-Wire |
| 7/18/2018 | 8510 | TP18 |
| 7/23/2018 | 8872 | TP18 |
| 7/23/2018 | 61521 | TP2 |
| 7/27/2018 | 62031 | TP2 |
| 7/30/2018 | 62114 | TP2 |
| 7/30/2018 | 62119 | TP2 |
| 7/31/2018 | 9858 | TP18 |
| 8/2/2018 | 16649 | TP20-Wire |
| 8/2/2018 | | In person |
| 8/3/2018 | 16829 | TP20 |
| 8/3/2018 | 16882 | TP20-Wire |
| 8/3/2018 | 62447 | TP 2 |
| 8/4/2018 | 10276 | TP18 |
| 8/6/2018 | 62552 | TP2 |
| 8/7/2018 | 10652 | TP18 |
| 8/7/2018 | 18386 | TP20-Wire |
| 8/7/2018 | 18669 | TP20-Wire |
| 8/8/2018 | 10785 | TP18 |
| 8/10/2018 | 19235 | TP20 |
| 8/13/2018 | 11092 | TP18 |
| 8/14/2018 | 11173 | TP18 |
| 8/14/2018 | 20471 | TP20-Wire |
| 8/14/2018 | 63125 | TP2 |
| 8/15/2018 | 63241 | TP2 |
| 8/28/2018 | 12132 | TP18 |
| 8/28/2018 | 12138 | TP18 |
| 8/28/2018 | 12178 | TP18 |
| 8/29/2018 | 12278 | TP18 |
| 8/29/2018 | 12279 | TP18 |
| 8/29/2018 | 12281 | TP18 |
| 8/30/2018 | 12339 | TP18 |
| 8/30/2018 | 12393 | TP18 |
| 8/31/2018 | 12515 | TP18 |
| 8/31/2018 | 64345 | TP2 |
| 8/31/2018 | 64345 | TP 2 |
| 9/2/2018 | 12614 | TP18 |
| 9/4/2018 | 1D31 | In person |
| 9/4/2018 | 1D33 | In person |
| 9/5/2018 | 12860 | TP18 |
| 9/5/2018 | 12881 | TP18 |
| 9/7/2018 | 13095 | TP18 |
| 9/7/2018 | 13096 | TP18 |
| 9/7/2018 | 13111 | TP18 |
| 9/26/2018 | 65741 | TP2 |
| 10/5/2018 | 66259 | TP2 |
| 10/9/2018 | 66365 | TP2 |

**U.S. v. MICHAEL MADIGAN et al., 22 CR 115**
**GOVERNMENT'S DRAFT AV EXHIBITS - 3/15/2024**

| | | |
|---|---|---|
| 10/9/2018 | 66368 | TP2 |
| 10/21/2018 | 13294 | TP18 |
| 10/21/2018 | 13334 | TP18 |
| 10/22/2018 | 13416 | TP18 |
| 10/22/2018 | 13454 | TP18 |
| 10/22/2018 | 29848 | TP20-Wire |
| 10/22/2018 | 67156 | TP2 |
| 10/24/2018 | 13750 | TP18 |
| 10/26/2018 | 13947 | TP18-Wire |
| 10/26/2018 | | In person |
| 10/31/2018 | 14295 | TP18 |
| 11/1/2018 | 14346 | TP18 |
| 11/2/2018 | 14470 | TP18 |
| 11/2/2018 | 14488 | TP18 |
| 11/2/2018 | 14490 | TP18 |
| 11/5/2018 | 14723 | TP18 |
| 11/5/2018 | 14739 | TP18 |
| 11/6/2018 | 14849 | TP18 |
| 11/6/2018 | 14890 | TP18 |
| 11/7/2018 | 15018 | TP18 |
| 11/7/2018 | 15029 | TP18 |
| 11/7/2018 | 15035 | TP18 |
| 11/8/2018 | 15127 | TP18 |
| 11/8/2018 | 15128 | TP18 |
| 11/8/2018 | 15167 | TP18 |
| 11/8/2018 | 15204 | TP18 |
| 11/12/2018 | 15542 | TP18 |
| 11/12/2018 | 15579 | TP18 |
| 11/13/2018 | 15759 | TP18 |
| 11/13/2018 | 15761 | TP18 |
| 11/13/2018 | 15768 | TP18 |
| 11/13/2018 | 15844 | TP18 |
| 11/13/2018 | 15851 | TP18 |
| 11/13/2018 | 15852 | TP18 |
| 11/13/2018 | 15855 | TP18 |
| 11/13/2018 | 15868 | TP18 |
| 11/15/2018 | 16012 | TP18 |
| 11/15/2018 | 16024 | TP18 |
| 11/16/2018 | 16195 | TP18 |
| 11/16/2018 | 16239 | TP18 |
| 11/17/2018 | 16271 | TP18 |
| 11/19/2018 | 16431 | TP18 |
| 11/20/2018 | 16494 | TP18 |
| 11/20/2018 | 16520 | TP18 |
| 11/21/2018 | 16562 | TP18 |
| 11/21/2018 | 16563 | TP18 |
| 11/21/2018 | 16574 | TP18 |

**U.S. v. MICHAEL MADIGAN et al., 22 CR 115**

**GOVERNMENT'S DRAFT AV EXHIBITS - 3/15/2024**

| | | |
|---|---|---|
| 11/23/2018 | 16804 | TP18 |
| 11/23/2018 | | In person |
| 11/27/2018 | 69528 | TP2 |
| 11/28/2018 | 17140 | TP18 |
| 11/30/2018 | 17319 | TP18 |
| 11/30/2018 | 17362 | TP18 |
| 11/30/2018 | 17381 | TP18 |
| 11/30/2018 | 17395 | TP18 |
| 12/1/2018 | 17496 | TP18 |
| 12/1/2018 | 69799 | TP2 |
| 12/4/2018 | 17676 | TP18 |
| 12/5/2018 | 17725 | TP18 |
| 12/5/2018 | 17803 | TP18 |
| 12/7/2018 | 17919 | TP18 |
| 12/7/2018 | 17935 | TP18 |
| 12/8/2018 | 17973 | TP18 |
| 12/9/2018 | 17995 | TP18 |
| 12/11/2018 | 18290 | TP18 |
| 12/11/2018 | 18318 | TP18 |
| 1/17/2019 | 83 | TP20-Consensual |
| 1/17/2019 | 84 | TP20-Consensual |
| 1/17/2019 | 85 | TP20-Consensual |
| 1/22/2019 | 1073 | TP20-Consensual |
| 1/29/2019 | 1DM45 | In person |
| 2/4/2019 | 18749 | TP18 |
| 2/6/2019 | 18917 | TP18 |
| 2/6/2019 | 18918 | TP18 |
| 2/7/2019 | 18977 | TP18 |
| 2/7/2019 | 1DM51 | In person |
| 2/9/2019 | 19346 | TP18 |
| 2/10/2019 | 19368 | TP18 |
| 2/11/2019 | 4355 | TP20-Consensual |
| 2/11/2019 | 19533 | TP18 |
| 2/12/2019 | 19614 | TP18 |
| 2/12/2019 | 19623 | TP18 |
| 2/13/2019 | 1DM52 | In person |
| 2/15/2019 | 19936 | TP18 |
| 2/16/2019 | 19664 | TP18 |
| 2/16/2019 | 20021 | TP18 |
| 2/18/2019 | 6182 | TP20-Consensual |
| 2/18/2019 | 6182 | TP20-Consensual |
| 2/19/2019 | 6667 | TP20-Consensual |
| 2/19/2019 | 20344 | TP18 |
| 2/19/2019 | 20346 | TP18 |
| 2/20/2019 | 20481 | TP18 |
| 2/20/2019 | 20509 | TP18 |
| 2/20/2019 | 20526 | TP18 |

**U.S. v. MICHAEL MADIGAN et al., 22 CR 115**
**GOVERNMENT'S DRAFT AV EXHIBITS - 3/15/2024**

| 2/21/2019 | 20617 | TP18 |
|---|---|---|
| 2/21/2019 | 20664 | TP18 |
| 2/22/2019 | 20732 | TP18 |
| 2/26/2019 | 20972 | TP18 |
| 2/27/2019 | 21196 | TP18 |
| 2/27/2019 | 1DM60a | In person |
| 3/4/2019 | 10115 | TP20-Consensual |
| 3/4/2019 | 21736 | TP18 |
| 3/5/2019 | 21772 | TP18 |
| 3/5/2019 | 21779 | TP18 |
| 3/5/2019 | 21792 | TP18 |
| 3/5/2019 | 21799 | TP18 |
| 3/5/2019 | 1DM57a | In person |
| 3/6/2019 | 21893 | TP18 |
| 3/6/2019 | 21928 | TP18 |
| 3/11/2019 | 22325 | TP18 |
| 3/11/2019 | 22334 | TP18 |
| 3/11/2019 | 22399 | TP18 |
| 3/15/2019 | 22879 | TP18 |
| 3/19/2019 | 23293 | TP18 |
| 3/25/2019 | 24007 | TP18 |
| 3/25/2019 | 24013 | TP18 |
| 3/26/2019 | 24088 | TP18 |
| 3/28/2019 | 24347 | TP18 |
| 3/29/2019 | 24519 | TP18 |
| 4/8/2019 | 17239 | TP20-Consensual |
| 4/9/2019 | 17513 | TP20-Consensual |
| 5/7/2019 | ID69 | In person |