UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MICHAEL J. MADIGAN
and MICHAEL F. McCLAIN

No. 22 CR 115

Hon. John Robert Blakey

**GOVERNMENT'S CONSOLIDATED RESPONSE TO
DEFENDANTS' AMENDED PRETRIAL MOTIONS IN LIGHT OF *SNYDER***

MORRIS PASQUAL
Acting United States Attorney

AMARJEET S. BHACHU
DIANE MacARTHUR
TIMOTHY CHAPMAN
SARAH E. STREICKER
JULIA K. SCHWARTZ
Assistant United States Attorneys

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 3

    Factual Background ............................................................................................... 3

        Defendants ........................................................................................................ 3

        ComEd Conduct .............................................................................................. 4

            Consultant Hiring ...................................................................................... 4

            Law Firm A ............................................................................................... 6

            Board Appointment for Individual BM-1 .................................................. 8

            Other ComEd Hires .................................................................................. 9

            Legislation Affecting ComEd ................................................................... 9

        State Board Conduct ..................................................................................... 10

        Company C Conduct ..................................................................................... 12

        Chinatown Conduct ...................................................................................... 13

        AT&T Conduct ............................................................................................. 14

    The Indictment ................................................................................................... 16

    The Pretrial Motions .......................................................................................... 18

ARGUMENT ............................................................................................................ 18

    I.      Madigan's Revised Motion to Dismiss (R. 129) Should Be Denied ............ 18

        A.     Overview .................................................................................................. 18

        B.     Applicable Law ........................................................................................ 20

        C.     The Indictment Properly Alleges RICO Conspiracy. ............................. 21

i

1.  The Indictment Sufficiently Alleges an Enterprise. ............................ 22

2.  The Indictment Properly Alleges that Madigan and McClain Agreed to Conduct or Participate in the Affairs of an Enterprise........ 28

3.  The Illinois Bribery and Official Misconduct Statutes Are Constitutional. .................................................................................. 30

    a.  Applicable Law ................................................................................ 31

    b.  Analysis ........................................................................................... 32

        i.   The State Statutes Are Not Overbroad. ................................. 32

        ii.  The State Statutes Are Not Unconstitutionally Vague, Facially or As Applied to Madigan and McClain. ...................... 36

D.  The ComEd-Related § 666 Counts Should Not Be Dismissed. ............. 41

    1.  The ComEd Counts Track the Statutory Language and Place Madigan on Fair Notice of the Charges. .............................................. 42

    2.  The ComEd Charges Sufficiently Allege Bribery................................. 45

    3.  The Indictment Sufficiently Alleges that Madigan Intended to Engage in a *Quid Pro Quo.* ............................................................... 54

    4.  Madigan's Constitutional Arguments Regarding § 666 Are Meritless. ............................................................................................ 58

    5.  Whether Payments Were "Bona Fide" and "In the Usual Course of Business" Under 18 U.S.C. § 666(c) is a Factual Question for the Jury............................................................................................... 58

        a.  The application of § 666(c) is a jury question................................... 59

        b.  Even if properly the subject of a motion to dismiss, the allegations support a conviction under § 666................................... 61

E.  The State Board and Chinatown-Related § 666 Counts Should Not Be Dismissed. .................................................................................. 65

ii

F. The AT&T-Related Count Should Not Be Dismissed. ........................... 66

II. Madigan's Revised Motion to Strike Surplusage (R. 132) Is Meritless and Should Be Denied. ................................................................... 72

A. The Court Should Provide a Copy of the Indictment to the Jury to Use During Deliberations. ..................................................... 72

B. No Language Should be Stricken from the Indictment. ....................... 74

1. The Term "Madigan Enterprise" Is Not Prejudicial. ............................ 75

2. The Allegations in Count Two About ComEd Legislation Are Relevant to Show the Stream of Bribes ComEd Showered on Madigan. ..................................................................... 76

3. *Snyder* Provides No Basis to Strike Allegations in Count Two Related to Conduct after December 1, 2016. ........................................ 80

III. Madigan's Revised Motion for a Bill of Particulars (R. 133) Should Be Denied. ........................................................................ 82

A. Applicable Law ..................................................................... 83

B. Madigan's Motion For A Bill of Particulars Should Be Denied. ........... 84

1. The Superseding Indictment and Related Disclosures to Date Identify the Participants Involved in the Crimes Charged (Madigan Requests 1 and 2). ..................................................... 86

2. The Superseding Indictment Provides Adequate Notice of Madigan's Corrupt Intent (Madigan Request 3) .................................. 88

3. The Superseding Indictment Adequately Identifies Things of Value and Official Acts (Madigan Requests 4 and 5). ......................... 90

4. The Superseding Indictment and the Government's Disclosures Identify the ComEd Documents That Were Falsified (Madigan Request 6). ..................................................................... 96

IV. Madigan's Motion for Production of Grand Jury Minutes (R. 134) Should Be Denied. ..................................................................... 97

iii

A.    Applicable Law .......................................................................... 97

B.    Defendants Cannot Show Particularized Need for Grand Jury
      Materials................................................................................... 99

CONCLUSION........................................................................................ 100

## TABLE OF AUTHORITIES

### CASES

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005).................................... 89

*Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012) ............................................... 31

*Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015) ................... 30

*Boyle v. United States*, 556 U.S. 938 (2009).................................................... 22, 23, 24

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ........................................ 31, 37

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) ................................. 33

*Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211 (1979) .............................. 98

*Express Casino Joliet Corp. v. Johnston*, 763 F.3d 723 (7th Cir. 2014) ................... 80

*Expressions Hair Design v. Schneiderman*, 581 U.S. 37 (2017) ......................... 32, 40

*First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)........................................ 32

*Hamling v. United States*, 418 U.S. 87 (1974)................................................ 20

*Hernly v. United States*, 832 F.2d 980 (7th Cir.1987) ................................ 98

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010).................................... 32, 40

*Jordan v. DeGeorge*, 341 U.S. 223 (1951) ...................................................... 31

*Kolender v. Lawson*, 461 U.S. 352 (1983) ....................................................... 31

*Matter of Grand Jury Proc., Special Sept., 1986*, 942 F.2d 1195 (7th Cir. 1991).........
......................................................................................................... 97, 98

*McDonnell v. United States*, 579 U.S. 550 (2016)............................................. *passim*

*New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54 (1980)..................................... 66

*New York v. Ferber*, 458 U.S. 747 (1982) ....................................................... 31

*People v. Brandstetter*, 430 N.E.2d 731 (Ill. App. 1982)................................... 34

v

*People v. Johnson*, 780 N.E.2d 803 (Ill. App. 2002)..................................................... 38

*Rao v. BP Prod. N. Am., Inc.*, 589 F.3d 389 (7th Cir. 2009)....................................... 27

*Ryan v. United States*, 688 F.3d 845 (7th Cir. 2012)..................................... 47, 82, 92

*Skilling v. United States*, 561 U.S. 358 (2010) ............................................... 35, 37, 38

*Snyder v. United States*, 144 S. Ct. 1947 (2024)................................................. *passim*

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849 (7th Cir. 2013) ........................................................... 30

*United States v. Agostino*, 132 F.3d 1183 (7th Cir. 1997) .................................... 91, 95

*United States v. Alex*, 791 F. Supp. 723 (N.D. Ill. 1992) ..................................... 87, 95

*United States v. Al-Madani*, No. 23-3131, 2023 WL 9660121 (6th Cir. Dec. 20, 2023) ...................................................................................................................................... 47

*United States v. Anderson*, 280 F.3d 1121 (7th Cir. 2002)........................................ 20

*United States v. Applins*, 637 F.3d 59 (2d Cir. 2011) ................................................ 22

*United States v. Avenatti*, 432 F. Supp. 3d 354 (S.D.N.Y. 2020) ......................... 66, 68

*United States v. Bates*, 96 F.3d 964 (7th Cir. 1996) ...................................... 20, 52, 57

*United States v. Benjamin*, 95 F.4th 60 (2d Cir. 2024) .............................................. 57

*United States v. Black*, 469 F. Supp. 2d 513 (N.D. Ill. 2006) ........................ 72, 76, 77

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015) ................................. 57, 90

*United States v. Blanchard*, 542 F.3d 1133 (7th Cir. 2008)....................................... 84

*United States v. Brewster*, 408 U.S. 501 (1972) ........................................................ 68

*United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011)...................................... 54, 68, 70

*United States v. Bryant*, 556 F.Supp.2d 378 (D.N.J. 2008)................................. 62, 63

*United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011) ............................................... 63

vi

*United States v. Bucey*, 691 F. Supp. 1077 (N.D. Ill. 1988)..........................................76

*United States v. Burke*, No. 19 CR 322, 2022 WL 1970189 (N.D. Ill. June 6, 2022) ............................................................................................... *passim*

*United States v. Buske*, No. 09 CR 65, 2010 WL 3023364 (E.D. Wis. July 29, 2010) ...........................................................................................................100

*United States v. Canino*, 949 F.2d 928 (7th Cir. 1991) ......................................83, 98

*United States v. Chaverra-Cardona*, 667 F. Supp. 609 (N.D. Ill. 1987) ...................72

*United States v. Climatemp, Inc.*, 482 F. Supp. 376 (N.D. Ill. 1979).......................72

*United States v. Cook*, 970 F.3d 866 (7th Cir. 2020) ..................................................32

*United States v. Cornier-Ortiz*, 361 F.3d 29 (1st Cir. 2004)...............................58, 63

*United States v. Cox*, 536 F.3d 723 (7th Cir. 2008) ...................................................21

*United States v. Dial*, 757 F.2d 163 (7th Cir. 1985) ..................................................70

*United States v. Dwyer*, 238 Fed. App'x 631 (1st Cir. 2007) .....................................59

*United States v. Elliott*, 771 F.2d 1046 (7th Cir. 1985)..............................................96

*United States v. Farley*, No. 97 CR 0441, 1997 WL 695680 (N.D. Ill. Oct. 31, 1997) 87

*United States v. Fassnacht*, 332 F.3d 440 (7th Cir. 2003).........................................84

*United States v. Ferriero*, 866 F.3d 107 (3d Cir. 2017).......................................33, 41

*United States v. Firtash*, 392 F. Supp. 3d 872 (N.D. Ill. 2019) ................................21

*United States v. Garcia-Geronimo*, 663 F.3d 738 (7th Cir. 1981)............................46

*United States v. Gatto*, 746 F. Supp. 432 (D.N.J. 1990)............................................75

*United States v. Gee*, 432 F.3d 713 (7th Cir. 2005) ..................................................79

*United States v. Genova*, 167 F. Supp. 2d 1021 (N.D. Ill. 2001) ..............................39

*United States v. Gladhart*, 68 F. App'x 784 (9th Cir. 2003).......................................96

vii

*United States v. Glecier*, 923 F.2d 496 (7th Cir. 1991) ................................... 22, 84, 85

*United States v. Harris*, 695 F.3d 1125 (10th Cir. 2012) ........................................... 22

*United States v. Hernandez*, 330 F.3d 964 (7th Cir. 2003) ...................................... 84

*United States v. Hogan*, 886 F.2d 1497 (7th Cir. 1989).................................... 39, 53

*United States v. Hosseini*, 679 F.3d 544 (7th Cir. 2012) ...................................... 29, 30

*United States v. Jackson*, 860 F.3d 438 (7th Cir. 2017) ...................................... 72, 73

*United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998) .................................. 65, 67

*United States v. Ji Chaoqun*, No. 18 CR 611, 2020 WL 1689826 (N.D. Ill. Apr. 7, 2020) ........................................................................................................ 97

*United States v. Jones*, 275 F.3d 648 (7th Cir. 2001) ................................................ 25

*United States v. Kelerchian*, 937 F.3d 895 (7th Cir. 2019)........................................ 67

*United States v. Kendall*, 665 F.2d 126 (7th Cir. 1981) ........................... 51, 83, 84, 86

*United States v. Khan*, No. 15 CR 00286, 2017 WL 2362572 (N.D. Ill. May 31, 2017) ........................................................................................................ 83

*United States v. Kimbrew*, 944 F.3d 810 (9th Cir. 2019) ...................................... 55, 56

*United States v. Kincaid-Chauncey*, 556 F.3d 923 (9th Cir. 2009) ........................... 47

*United States v. Lavin*, 504 F. Supp. 1356 (N.D. Ill. 1981)....................................... 94

*United States v. Lisinski*, 728 F.2d 887 (7th Cir. 1984) ........................................... 98

*United States v. Lobue*, 751 F. Supp. 748 (N.D. Ill. 1990) ...................................... 87

*United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010).................................... 59, 60, 64

*United States v. Lupton*, No. 07 CR 219, 2009 WL 679649 (E.D. Wisc. 2009) .......... 60

*United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972) ...................................... 33

*United States v. Marshall*, 985 F.2d 901 (7th Cir. 1993) .......................................... 73

viii

*United States v. Masters*, 924 F.2d 1362 (7th Cir. 1991) ...................................... 25, 26

*United States v. McCabe*, 103 F.4th 259 (4th Cir. 2024)................................. 47, 57, 94

*United States v. McClain*, No. 20 CR 812, 2022 WL 488944 (N.D. Ill. Feb. 17, 2022) ................................................................................................................... *passim*

*United States v. Moore*, 563 F.3d 583 (7th Cir. 2009) .................................... 21, 28, 56

*United States v. Norfleet*, No. 05 CR 117, 2005 WL 8150055 (N.D. Ill. July 1, 2005) ................................................................................................................................... 87

*United States v. Olson*, 450 F.3d 655 (7th Cir. 2006) .................................................. 21

*United States v. Perholtz*, 842 F.2d 343 (D.C. Cir. 1988) ............................................ 26

*United States v. Plummer*, 581 F.3d 484 (7th Cir. 2009) ............................................ 32

*United States v. Proctor & Gamble*, 356 U.S. 677 (1958) ........................................... 98

*United States v. Reichberg*, 5 F.4th 233 (2d Cir. 2021) ............................................... 47

*United States v. Repak*, 852 F.3d 230 (3d Cir. 2017) .................................................. 47

*United States v. Rich*, 14 F.4th 489 (6th Cir. 2021) .................................................... 22

*United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013) ........................................... 66, 67

*United States v. Risk*, 843 F.2d 1059 (7th Cir. 1988) .................................................. 63

*United States v. Roberson*, 998 F.3d 1237 (11th Cir. 2021) ........................... 47, 79, 82

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013) .................................................. 54

*United States v. Roya*, 574 F.2d 386 (7th Cir. 1978) .................................................. 83

*United States v. Sells Engineering, Inc.*, 463 U.S. 418 (1983) .............................. 97, 98

*United States v. Shotts*, 145 F.3d 1289 (11th Cir. 1998) ............................................. 34

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020) .................................................. 93

*United States v. Skelos*, 988 F.3d 645 (2d Cir. 2021) .................................................. 44

*United States v. Smith*, 223 F.3d 554 (7th Cir. 2000) ................................................ 46

*United States v. Snyder*, 71 F.4th 555 (7th Cir. 2023) ............................................. 43

*United States v. Solomon*, 892 F.3d 273 (7th Cir. 2018) ................................... *passim*

*United States v. Suhl*, 885 F.3d 1106 (8th Cir. 2018) .................................. 47, 65, 67

*United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999) ..................... 36

*United States v. Tello*, 687 F.3d 785 (7th Cir. 2012) ................................................ 22

*United States v. Thomas*, 150 F.3d 743 (7th Cir. 1998) ........................................... 21

*United States v. Thompson*, 76 F.3d 442 (2d Cir. 1996) .......................................... 34

*United States v. Turkette*, 452 U.S. 576 (1981) ...................................................... 22

*United States v. United States Gypsum Co.*, 438 U.S. 422 (1978) ........................... 34

*United States v. Urciuoli*, 613 F.3d 11 (1st Cir. 2010) ....................................... 51, 71

*United States v. Vasquez*, No. 22-10766, 2023 WL 7381427 (5th Cir. Nov. 7, 2023) 47

*United States v. Vastola*, 899 F.2d 211 (3d Cir.) ..................................................... 75

*United States v. Vaughn*, 722 F.3d 918 (7th Cir. 2013) .......................... 20, 21, 44, 84

*United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014).......................... 26, 27, 28

*United States v. Warner*, No. 02 CR 506, 2004 WL 1794476 (N.D. Ill. Aug. 11, 2004) .................................................................................................................... 25

*United States v. Watts*, 29 F.3d 287 (7th Cir. 1994) ................................................ 73

*United States v. Westmoreland*, 240 F.3d 618 (7th Cir. 2001) ................................ 20

*United States v. White*, 443 F.3d 582 (7th Cir. 2006) ............................................. 76

*United States v. White*, 610 F.3d 956 (7th Cir. 2010)............................. 20, 21, 66, 71

*United States v. Williams*, 507 F.3d 905 (5th Cir. 2007).......................................... 60

*United States v. Williams*, 553 U.S. 285 (2008)...................................................... 31

x

*United States v. Wilson*, 493 F. Supp. 2d 364 (E.D.N.Y. 2006) ................................. 95

*United States v. Wright*, 665 F.3d 560 (3d Cir. 2012) ................................................ 57

*United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999) .............................................. 21

*Williams v. United States*, 341 U.S. 97 (1951) ........................................................... 38

*Woodward v. United States*, 905 F.3d 40 (1st Cir. 2018) .................................. *passim*

*Wright v. City of Danville*, 675 N.E.2d 110 (Ill. 1996) ............................................... 37

## STATUTES

18 U.S.C. § 2 ................................................................................................................ 17

18 U.S.C. § 371 ............................................................................................................ 17

18 U.S.C. § 666 ................................................................................................... *passim*

18 U.S.C. § 666(a)(1)(B) ..................................................................................... *passim*

18 U.S.C. § 666(a)(2) .................................................................................... 42, 65, 91

18 U.S.C. § 666(c) ............................................................................................... *passim*

18 U.S.C. § 1343 .......................................................................................................... 17

18 U.S.C. § 1346 .................................................................................................... 17, 37

18 U.S.C. § 1512(b) ..................................................................................................... 34

18 U.S.C. § 1951(a) ..................................................................................................... 17

18 U.S.C. § 1952(a)(3) ................................................................................................. 17

18 U.S.C. § 1961(4) ..................................................................................................... 22

18 U.S.C. § 1962(d) ............................................................................................. *passim*

720 ILCS § 5/33-1 ............................................................................................ 30, 32-34

720 ILCS § 5/33-3 ........................................................................................... 30, 32, 34

720 ILCS § 5/33-8 ............................................................................................... 80

## RULES

Fed. R. Crim. P. 6(e)(3)(E)(ii) .............................................................. 97, 98

Fed. R. Crim. P. 7(c)(1) ............................................................................ 20

Fed. R. Crim. P. 7(d) ................................................................................. 72

Fed. R. Crim. P. 7(f) .................................................................................. 83

## OTHER AUTHORITIES

P.A. 98-756 ................................................................................................ 90

*United States v. Mitziga,* No., 23 CR 242 (N.D. Ill.) ............................ 89-90

## **INTRODUCTION**

Defendant Michael Madigan was the leader of a corrupt criminal enterprise, the tentacles of which extended from the Office of the Speaker of the Illinois House of Representatives in Springfield to the Thirteenth Ward Democratic Organization on the south side of Chicago. For approximately eight years, through the operation of this criminal enterprise, Madigan exploited his position as a high-ranking public official to manipulate the levers of State and local government for the purpose of illegally enriching himself and his associates. Madigan, together with his loyal lieutenant Michael McClain—a self-described soldier and faithful agent for Madigan—arranged for a flood of corrupt payments and perks to be doled out to Madigan and his associates, which were bribes in exchange for Madigan's abuse of his official powers.

Major corporations handed out more than one million dollars in bribes to Madigan's cronies to secure Madigan's assistance and favor with respect to the passage of legislation worth hundreds of millions to the companies. Madigan was sure to line his own pockets as well through the abuse of his official position. Without batting an eye, time and again Madigan stood prepared to take official action in his capacity as an Illinois Representative and Speaker of the Illinois House of Representatives, at times with the connivance and assistance of his confederate McClain, in exchange for legal work being steered to his private law firm. Indeed, Madigan was prepared to exploit the official positions of others, including Chicago Alderman A, in order to personally benefit himself.

For their roles in this wide-ranging criminal enterprise, Madigan and McClain were charged by a grand jury in a 23-count superseding indictment with a litany of offenses, including racketeering conspiracy, conspiring to commit an offense against the United States, honest services fraud, extortion, use of interstate facilities in aid of racketeering activity, and federal program bribery. The 117-page indictment returned by the grand jury exhaustively details the defendants' reign of corruption over the course of an eight-year period.

The defendants have filed revised pretrial motions seeking to prevent a jury from considering their conduct and holding them accountable for their gross abuses of power. As the defendants would have it, nearly every single criminal statute targeting corruption referenced in the superseding indictment, including decades-old corruption measures passed by both the United States Congress as well as the Illinois General Assembly—a body which Madigan himself helmed for nearly forty years no less—is either unconstitutional or incomprehensible.

Defendants further claim that the Supreme Court's narrow decision in *Snyder v. United States,* 144 S. Ct. 1947 (2024), alters the entire fabric of the indictment and the trial in this case. This dog will not hunt. While *Snyder* held that 18 U.S.C. § 666 criminalizes bribes but not gratuities, the superseding indictment in this case amply alleges that Madigan engaged in bribery. Accordingly, there is no basis to disturb any of the § 666 counts. ██████████████████████████████ ████████ █

██████████████████████████████████████████████████████

███████████████████████████ ██████████ █████████████████

█████████ There is no basis to dismiss the indictment, and no basis to require disclosure of any secret grand jury material to the defendants.

Defendants also contend that the 117-page indictment returned by the grand jury lacks sufficient details for them to understand what they did wrong. This challenge is lodged despite the fact that defendants now have the benefit of a 200-page *Santiago* proffer, transcripts of all recordings the government intends to admit at trial, and the transcripts from a seven-week trial involving much of the same evidence that McClain himself sat through.

Defendants' pretrial motions should be denied and the matter should proceed to trial as scheduled.

## BACKGROUND

### *Factual Background*

#### *Defendants*

As Speaker of the Illinois House of Representatives, Michael Madigan controlled which measures were called for a vote in the House and exercised substantial influence over fellow lawmakers concerning legislation, including legislation affecting regulated entities like Commonwealth Edison ("ComEd") and AT&T Illinois ("AT&T"). R. 37 (Superseding Indictment ("SI")), Count 1, ¶¶ 1(c), 2, 6-7. Madigan was elected from a House district that was largely made up of two Chicago wards: the 13th Ward (for which he was Democratic Committeeman and Chairman) and the 23rd Ward. *Id.* ¶¶ 1(i), 6. Madigan was also Chairman of the Democratic Party of Illinois and a named partner in the property tax law firm, Madigan & Getzendanner. *Id.* ¶¶ 1(k), 6.

McClain served with Madigan in the House of Representatives for approximately 10 years beginning in 1972. SI, Count 1, ¶ 8. McClain subsequently served as a lobbyist and/or consultant for entities, including for ComEd. *Id*. McClain acted on Madigan's behalf, including by making demands for jobs and payments to third parties. *Id*. ¶ 9.

As described below, Madigan and McClain worked together to use Madigan's as well as other public officials' positions (i) to receive unlawful personal financial advantage for Madigan and his law firm, Madigan and Getzendanner, and to (ii) arrange for private benefits for Madigan's political allies and associates. *E.g.,* SI, Count 1, ¶ 13(a)-(b). Madigan used his position as Speaker of the House of Representatives to promote certain legislation and defeat other legislation and to appoint his allies and associates to public employment. *Id*. ¶ 13(c).

### *ComEd Conduct*

The superseding indictment alleges that Madigan engaged in bribery and conspired to do so by making requests, through McClain as his intermediary, for the Illinois energy company ComEd to hire individuals associated with Madigan, including as full-time employees, consultants, and contractors. SI, Count 2, ¶¶ 2, 4. These hires were made for the purpose of influencing and rewarding Madigan to take favorable action with regard to ComEd legislation. *E.g., id.* ¶ 3.

### *Consultant Hiring*

The indictment alleges that, from 2011 to 2019, ComEd hired Madigan associates as "subcontractors," even though these individuals did little or no work for ComEd and instead were paid as part of a corrupt effort to bribe Madigan in

4

connection with ComEd legislation. SI, Count 2, ¶ 3. The Madigan "subcontractors" included: a former Alderman for the 13th Ward and Treasurer of the 13th Ward Democratic Organization (Individual 13W-1), two precinct captains for the 13th Ward (Individual 13W-2 and Individual 13W-3), a former 23rd Ward Alderman (Individual 23W-1), and a former Democratic representative (Individual FR-1). *Id.* ¶¶ 2(u)-(y), 4, 31(f), 31(g), 31(h), 31(t), 31(y), 31(ii) 31(jj), 31(ss)-(uu), 31(xx). These "subcontractors" were not paid directly by ComEd, but through various intermediary lobbyists, in order to conceal the payments. *Id.* ¶¶ 6, 28.

These hires were not premised on the "subcontractors'" lobbying or consulting acumen but rather their utility to Madigan. For example, Madigan told Individual 13W-3 not to worry that he did not do any work for ComEd, even though he was paid by the company, because he was doing campaign work for Madigan. SI, Count 2, ¶ 31(kk). And McClain explained to a ComEd employee that ComEd subcontractors were valuable because of their connection to Madigan, not because of their work. *Id.* ¶ 31(ppp). And significantly, it was Madigan—not ComEd—who determined when payments to the "subcontractors" started and stopped. *Id.* ¶ 11.

The hiring of Individual 23W-1 is a perfect illustration of the corrupt scheme. In 2018, after ComEd had been paying other Madigan associates as "subcontractors" for years, Madigan requested that Individual 23W-1 be hired by ComEd. SI, Count 2, ¶¶ 2(y), 31(ll), 31(qq), 31(rr). ComEd agreed to hire Individual 23W-1, and McClain informed Madigan that he could call Individual 23W-1 to let him know, which Madigan did. *Id.* ¶¶ 31(tt), 31(uu). Individual 23W-1 was paid $5,000 per month by

ComEd, even though he did little or no work for ComEd. *Id.* ¶ 31(xx). The payments were made by one of ComEd's existing lobbyists, Jay Doherty, in order to conceal that the payments were going directly to Individual 23W-1. *Id.*

Around the same time as communications concerning hiring Individual 23W-1, McClain informed ComEd's CEO (Anne Pramaggiore) and others that Madigan ("a friend of ours") had authorized McClain to "go ahead and kill" a piece of legislation that was adverse to ComEd's interests, House Bill 5626. SI, Count 2, ¶ 31(vv). House Bill 5626 was ultimately not enacted into law. *Id.* ¶ 2(p).

Indeed, Madigan's coconspirators understood these appointments to be directly linked to Madigan's ability to help ComEd with its legislative agenda in Springfield. In a phone call on February 18, 2019, ComEd employee and cooperator Fidel Marquez told Pramaggiore that the Madigan subcontractors just "collect a check," yet Pramaggiore nevertheless advised Marquez not to change the contracts, because "we do not want to get caught up in a, you know, disruptive battle where, you know, somebody gets their nose out of joint and we're trying to move somebody off, and then we get forced to give' em a five year contract because we're in the middle of needing to get something done in Springfield." SI, Count 2, ¶ 31(mmm).

### *Law Firm A*

The superseding indictment further alleges that ComEd's retention of Law Firm A was intended to corruptly influence and reward Madigan. In 2011, McClain and ComEd employee John Hooker advised a member of ComEd's legal department that it was important to retain Law Firm A, a law firm "valuable" to Madigan. SI, Count 2, ¶¶ 14, 31(l). After that, ComEd retained Law Firm A and guaranteed the

6

firm approximately 850 hours of work each year. *Id*. In 2014, Pramaggiore instructed a member of ComEd's legal department that Law Firm A's contract had to be renewed, working through McClain to do so. *Id*. ¶ 15.

In 2016, after ComEd personnel sought to reduce the number of hours of legal work provided to Law Firm A, McClain interceded with Pramaggiore to cause Law Firm A's contract to be renewed on terms acceptable to Law Firm A. SI, Count 2, ¶ 16. On January 20, 2016, McClain wrote to Pramaggiore and Hooker, "I am sure you know how valuable [Lawyer A] is to our Friend," and continued:

> I know the drill and so do you. If you do not get involve [sic] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend. Our Friend will call me and then I will call you. Is this a drill we must go through? For me, Hook and I am sure you I just do not understand why we have to spend valuable minutes on items like this when we know it will provoke a reaction from our Friend.

*Id*. ¶ 31(l). That same day, Pramaggiore responded: "Sorry. No one informed me. I am on this." *Id*. ¶ 31(m).

The retention of Law Firm A was linked to ComEd's legislative agenda in other ways. In 2016, a ComEd project manager who had no oversight over ComEd's legal department but was tasked with helping to obtain legislative approval for the Future Energy Jobs Act ("FEJA")— legislation beneficial to ComEd that passed in December 2016—began to monitor the renewal of Law Firm A's contract. SI, Count 2, ¶¶ 17, 31(q)-(s). McClain, on Madigan's behalf, pressed for Law Firm A's continued retention on favorable terms, including by contacting the project manager for FEJA. *Id*. ¶¶ 16, 31(q), 31(s).

On December 2, 2016, the day after ComEd's FEJA legislation passed, McClain emailed a member of ComEd's legal department about Law Firm A, and asked, "After you catch a couple of good nights [sic] sleep can we put this item to bed?" SI, Count 2, ¶ 31(v).

ComEd ultimately renewed its contract with Law Firm A in 2016 on terms favorable to the law firm, as part of an effort to bribe Madigan in connection with ComEd legislation. *Id.* ¶¶ 16, 18.

### *Board Appointment for Individual BM-1*

As alleged in the superseding indictment, Madigan also conspired to appoint Individual BM-1 to ComEd's Board of Directors, in an effort to bribe Madigan with regard to ComEd legislation.

Starting in November 2017, Madigan and McClain sought to have Individual BM-1 appointed to ComEd's Board of Directors. SI, Count 2, ¶¶ 23-24. In or around April 2018, Madigan called Individual BM-1 about the expected timing of his appointment to the ComEd board. *Id.* ¶ 31(mm). On May 2, 2018, McClain advised Madigan that Pramaggiore was experiencing push-back on Individual BM-1's appointment and had proposed finding a job that would pay Individual BM-1 the same amount of money as a Board position. *Id.* ¶ 31(oo). On May 16, 2018, Madigan instructed McClain that ComEd should "go forward with" the appointment of Individual BM-1. *Id.* ¶ 31(qq). McClain did as instructed, and spoke to Pramaggiore that same day. Pramaggiore told McClain that she would, at Madigan's request, "keep pressing" for Individual BM-1's Board appointment. *Id.* ¶ 31(rr).

8

On September 7, 2018, Madigan asked McClain to confirm that Individual BM-1 would, in fact, be appointed to ComEd's Board of Directors. SI, Count 2, ¶ 31(bbb). McClain called Pramaggiore that same day, and Pramaggiore confirmed that she continued to advocate for Individual BM-1. During that call, Pramaggiore linked Individual BM-1's appointment to ComEd's success: "You take good care of me and so does our friend and I will do the best that I can to, to take care of you." *Id*. ¶ 31(ccc).

Individual BM-1 was appointed to ComEd's Board in April 2019. *Id*. ¶31(sss).

### *Other ComEd Hires*

The indictment alleges other hiring requests made for or on behalf of Madigan, which were intended to bribe Madigan with regard to ComEd legislation. SI, Count 2, ¶¶ 26-27. As one example, the conspirators caused positions in the ComEd Internship Program to be set aside for individuals associated with the Thirteenth Ward who were identified by McClain. Those interns received favorable treatment compared to other candidates because of their connection to Madigan. *Id*. ¶¶ 19-22.

### *Legislation Affecting ComEd*

While Madigan received this stream of benefits from ComEd, he repeatedly took official action that was favorable to the company. For example, in 2011, the Illinois General Assembly passed the Energy Infrastructure and Modernization Act ("EIMA"), which benefitted ComEd by allowing ComEd to more reliably determine consumer rates. Madigan voted in favor of EIMA and voted to override the Governor's veto of EIMA. SI, Count 2, ¶¶ 1(m), 31(a)-(b).

After EIMA's passage, the Illinois Commerce Commission ("ICC") interpreted EIMA in a manner adverse to ComEd. In 2013, the Illinois General Assembly passed

legislation, known as Senate Bill 9, that effectively overruled the ICC's adverse interpretation of EIMA. SI, Count 2, ¶ 2(n). Madigan voted in favor of Senate Bill 9, and voted to override the Governor's veto. *Id.* ¶¶ 31(c)-(d).

In 2016, FEJA was called for a vote in the House and ultimately passed. SI, Count 2, ¶¶ 2(o), 31(u).

After the passage of FEJA, legislation affecting ComEd continued to be considered in the Illinois House of Representatives through 2019, including a 2018 bill that ComEd opposed and ultimately defeated with Madigan's permission (SI, Count 2, ¶¶ 2(p), 31(vv)-(ww)) and a 2019 bill to continue the favorable ratemaking process originally established in EIMA.

### *State Board Conduct*

As alleged in the superseding indictment, Madigan agreed to accept business steered by Alderman A to his private law firm, Madigan & Getzendanner, and in exchange, agreed to help Alderman A secure a lucrative state board position. SI, Count 8, ¶¶ 4, 5.

On July 11, 2018, Madigan caused information about State board positions to be delivered to Alderman A. SI, Count 8, ¶ 6. On July 23, 2018, Alderman A contacted Individual A-1, who was employed by a New York real estate company, at Madigan's request, and asked Individual A-1 to meet with Madigan so that Madigan could pitch his real estate tax business. *Id.* ¶¶ 2(a), 7. In a meeting on August 2, 2018, Madigan met with Alderman A, and during the meeting: (a) Alderman A explained that he was interested in a State board position that would pay him over $100,000 per year; (b) Madigan agreed to assist Alderman A with an appointment to a State board by going

to the Governor-elect; (c) Alderman A assured Madigan that he would help Madigan obtain legal business for his law firm; and (d) in return, Madigan again assured Alderman A that he would help him secure a State board position. *Id.* ¶ 8.

Madigan followed up with Alderman A at least twice in early August 2018 to check on the meeting with the New York real estate firm. SI, Count 8, ¶¶ 9, 10. On August 21, 2018, Madigan set up a meeting with a representative of the New York real estate company. *Id.* ¶ 11-12. Madigan later asked Alderman A for his help obtaining business related to a second property owned by the New York company. *Id.* ¶ 14. In a meeting on October 26, 2018, Alderman A advised Madigan that the New York company would give Madigan business, and Madigan again assured him that he would help secure Alderman A a lucrative State board position. *Id.* ¶ 16.

On November 23, 2018, Madigan once again met with Alderman A. Alderman A told Madigan that he would not run for reelection but would still help generate business for Madigan's law firm. Madigan thanked Alderman A and asked, "Do you wanna go forward now on one of those State appointments?" Madigan also asked for Alderman A's resume, "[b]ecause I wanna have a meeting with [the Governor-elect]" to tell him about the board appointment. They also discussed Madigan's assistance in getting Alderman A's relative a State position. SI, Count 8, ¶ 17. After that, Alderman A emailed a copy of his and his relative's resumes to Madigan's office. *Id.* ¶ 19. Madigan met with the Governor-elect on December 4, 2018. *Id.* ¶ 21.

### *Company C Conduct*

The indictment further alleges that Madigan sought to obtain legal fees for his law firm from Company C, an entity involved in developing an apartment building in Chicago, through extortion. SI, Count 15, ¶ 10.

On June 23, 2017, Alderman A told Madigan that Company C would meet with Madigan about legal work but would continue to deal with Alderman A regarding Chicago zoning issues, because, in Alderman A's words, "I think they understand how this works, you know, the *quid pro quo*." SI, Count 15, ¶ 4. Madigan confirmed that he understood by saying, "Okay... very good." *Id.* On July 18, 2017, Madigan confirmed that he knew exactly what Alderman A was talking about, when he advised Alderman A not to use the phrase "*quid pro quo*" with Company C representatives, but to instead falsely suggest that Alderman A was "just recommending . . . because if they don't get a good result on their real estate taxes, the whole project will be in trouble. . . . Which is not good for your ward. So you want high quality representation." *Id.* ¶ 6. This was false, because Madigan had asked Alderman A to introduce him to Company C's representative, and Alderman A had twice informed Madigan that approvals for Company C's real estate project were to be received in exchange for legal work provided to Madigan's law firm. *Id.* After that, on July 18, 2017, Madigan pitched his law firm's work to Company C's representative. *Id.* ¶ 7.

On September 7, 2017, Alderman A told Madigan that he was about to take official action on the Company C real estate project and asked whether Madigan's firm had been engaged by Company C. Madigan responded, "I'm almost positive the answer is yes," but asked Alderman A for an opportunity to "double check with my

12

partner." SI, Count 15, ¶ 8. A few days later, on September 11, 2017, Alderman A again asked Madigan whether Company C had engaged his law firm, and Madigan responded vaguely, in an effort to conceal the nature of the discussion: "you know, you should go ahead and process that. . . You were contemplating processing something. You should go ahead and process that." *Id.* ¶ 9.

### *Chinatown Conduct*

Madigan and McClain also devised and participated in a scheme to transfer a parcel of land in Chinatown from the State ownership to the City of Chicago through legislation, for the purpose of facilitating a sale to a private developer that would, in exchange, hire Madigan's law firm for real estate tax work. SI, Count 19, ¶ 4.

On July 18, 2017, Madigan discussed with Alderman A the transfer of the Chinatown parcel from the state to the City of Chicago via a land transfer bill, which would enable Group A to acquire the parcel for commercial development. SI, Count 19, ¶ 5. Madigan told Alderman A that McClain would contact a representative of Group A to discuss the transfer, which McClain did. *Id.* ¶¶ 7-9.

After that, on December 18, 2017, Alderman A told McClain that he had previously steered work to Madigan's law firm and that "these guys," meaning Group A, would be able to do the same thing with the Chinatown parcel. SI, Count 19, ¶ 11.

On March 26, 2018, Alderman A told Madigan that he could "be discreet," and that Group A would provide Madigan with property tax work. SI, Count 19, ¶ 13. Madigan thanked Alderman A and said McClain would work on legislation to transfer the Chinatown parcel from state to city ownership. *Id.* On March 27, 2018, Alderman

A told Madigan that if Madigan transferred the Chinatown parcel, Madigan would get tax work for his firm, and Madigan responded, "Okay, alright, very good." *Id.* ¶ 14.

After that, McClain worked to pass legislation that would transfer the Chinatown parcel to the City of Chicago on Madigan's behalf. For example, McClain: (a) worked to overcome opposition to the bill in the Senate (SI, Count 19, ¶ 15), (b) reported back to Madigan on the opposition to the bill and McClain's progress (*id.* ¶¶ 16, 18, 21); and (c) informed Madigan's staff that Madigan would vote "present" on the land transfer bill in order to conceal Madigan's interest in the bill (*id.* ¶ 19).

On July 31, 2018, McClain told Alderman A that he had talked to Madigan about the land transfer bill and did not anticipate problems with the legislation. SI, Count 19, ¶ 26. On October 26, 2018, Madigan told Alderman A that he was willing to call the legislation for the land transfer bill in the veto session but needed to identify a sponsor for the bill. *Id.* ¶ 28. After that, Madigan asked McClain to work to find a sponsor for the bill, and McClain subsequently contacted Representative B and others to try to secure Representative B as a sponsor of the land transfer bill. *Id.* ¶¶ 29-33.

After that, on November 21, 2018, McClain told Alderman A that the Illinois Secretary of State had learned of opposition to the land transfer bill, which was a "major hurdle." SI, Count 19, ¶ 34. Madigan informed McClain that the bill would not go forward in that year's veto session. *Id.* ¶ 35-36.

### AT&T Conduct

As alleged in the superseding indictment, during the spring of 2017, AT&T, the telecommunications company, started making indirect payments to former

14

Democratic representative and Madigan ally, Individual FR-1 (who was also paid by ComEd), at Madigan's and McClain's request. The purpose of those payments was to bribe Madigan with regard to AT&T's Carrier of Last Resort ("COLR") legislation. SI, Count 23, ¶ 4. Like with the ComEd "subcontractor" payments, the monthly $2,500 payments to Individual FR-1 were made indirectly through an intermediary, with a false justification, in an effort to conceal the corrupt nature of the payments. *Id.* ¶¶ 8-9, 18(t).

McClain first asked AT&T to hire Individual FR-1 on or about February 14, 2017. SI, Count 23, ¶ 18(a). Just two days later, McClain informed an AT&T representative that he was working on AT&T's major legislation as a "Special Project" for Madigan. *Id.* ¶ 18(b). On March 28, 2017, McClain again asked for a "small contract" for Individual FR-1 on Madigan's behalf. *Id.* ¶ 18(c). AT&T's president understood this to be a "GO order" for the company to hire Individual FR-1, and after that AT&T representatives pushed to hire Individual FR-1 and to ensure the company would "get credit" for the hire. *Id.* ¶¶ 18(d)-(g).

AT&T employees discussed that they would need to confirm with McClain their plan to hire Individual FR-1 through an intermediary and the amount of the payments. SI, Count 23, ¶¶ 18(h)-(j). On April 20, 2017, before any AT&T representative had contacted Individual FR-1, the company amended its contract with an existing lobbyist (Intermediary 4) so that AT&T could make indirect payments to Individual FR-1 through Intermediary 4. *Id.* ¶¶ 9, 18(l). Six days after the contract amendment, AT&T representatives first met with Individual FR-1 to

discuss paying Individual FR-1 $2,500 per month. *Id.* ¶ 18(m). Individual FR-1 rejected that amount and contacted McClain. After that, on April 28, 2017, McClain informed AT&T representatives that $2,500 per month was sufficient. *Id.* ¶ 18(n). Starting in June 2017, AT&T then paid Individual FR-1 $2,500 per month for the next nine months, through February 2018, totaling $22,500. *Id.* ¶ 18(s)-(t).

Less than a month after McClain confirmed that $2,500 per month was sufficient, Madigan requested a complete roll call of AT&T's COLR legislation. SI, Count 23, ¶ 18(o). He voted in favor of the COLR legislation on two occasions and voted to override the Governor's veto of the legislation. *Id.* ¶ 18(o)-(r).

### *The Indictment*

On March 3, 2022, a grand jury returned an indictment against Madigan and McClain. R. 1. On October 12, 2022, the grand jury returned a 23-count superseding indictment against Madigan and McClain. R. 37. The superseding indictment is premised on the above-described conduct. The following chart summarizes the counts and charges in the superseding indictment. *Id.*

| Count | Defendant(s) | Violation(s) | Description |
|---|---|---|---|
| 1 | Madigan<br>McClain | 18 USC § 1962(d) | Racketeering conspiracy |
| 2 | Madigan | 18 USC § 371<br>18 USC § 2 | Conspiracy—ComEd |
| 3 | Madigan | 18 USC § 666(a)(1)(B)<br>18 USC § 2 | Solicitation—ComEd Board seat |
| 4 | Madigan | 18 USC § 666(a)(1)(B)<br>18 USC § 2 | Solicitation—ComEd payments to Individual 23W-1 in 2018 |
| 5 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—ComEd, June 29, 2018 |
| 6 | Madigan | 18 USC § 666(a)(1)(B)<br>18 USC § 2 | Solicitation—ComEd Payments to Individuals 13W-1, 13W-2, 23W-1 in 2019 |
| 7 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—ComEd, July 10, 2018 |
| 8 | Madigan | 18 USC § 1343<br>18 USC § 1346 | Wire fraud—State positions for Alderman A and relative |
| 9 | Madigan | 18 USC § 1343<br>18 USC § 1346 | Wire fraud—State positions for Alderman A and relative |
| 10 | Madigan | 18 USC § 1343<br>18 USC § 1346 | Wire fraud—State positions for Alderman A and relative |
| 11 | Madigan | 18 USC § 666(a)(1)(B) | Solicitation—State board position for Alderman A |
| 12 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act— State board position, August 15, 2018 |
| 13 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act— State board position, August 31, 2018 |
| 14 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act— State board position, December 1, 2018 |
| 15 | Madigan | 18 USC § 1951(a)<br>18 USC § 2 | Attempted extortion involving Company C—December 1, 2018 |
| 16 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Company C, June 23, 2017 |
| 17 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Company C, July 12, 2017 |
| 18 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Company C, July 18, 2017 |
| 19 | Madigan<br>McClain | 18 USC § 1343<br>18 USC § 1346 | Wire fraud—Chinatown parcel |
| 20 | Madigan<br>McClain | 18 USC § 1343<br>18 USC § 1346 | Wire fraud—Chinatown parcel |
| 21 | Madigan<br>McClain | 18 USC § 666(a)(1)(B)<br>18 USC § 2 | Solicitation—Chinatown parcel |
| 22 | Madigan<br>McClain | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act— Chinatown parcel, November 2, 2018 |
| 23 | Madigan<br>McClain | 18 USC § 371<br>18 USC § 2 | Conspiracy—AT&T |

17

***The Pretrial Motions***

Madigan seeks through his pretrial motions: (1) to dismiss the indictment (R. 129, 131); (2) to strike portions of the indictment (R. 132); (3) to require the government to file a bill of particulars (R. 133); and (4) for the disclosure of grand jury materials. (R. 134). McClain has moved to join Madigan's pretrial motions. R. 135.

## ARGUMENT

### I.  Madigan's Revised Motion to Dismiss (R. 129) Should Be Denied.

#### A.  Overview

Count One of the superseding indictment charges defendants with conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). Contrary to Madigan's motion, the superseding indictment properly alleges an association-in-fact enterprise composed of Madigan, McClain, and several entities through which Madigan exercised his power. Count One alleges the purposes of this long-lasting enterprise and the types of illegal activities committed by the enterprise's members and associates. The enterprise unquestionably had a common purpose with common actors: Madigan abused his official position (and that of others) to steer benefits to his associates and to his law firm, and directed McClain to carry out this unlawful activity. The indictment also sufficiently alleges that Madigan and McClain acted in concert to pursue the enterprise's common interests, rather than solely in their own self-interest.

In addition, the Court should decline Madigan's invitation to be the first to invalidate any of the bribery statutes charged in the superseding indictment. The state bribery statutes that serve as the predicates for the RICO conspiracy charged

18

in Count One are plainly constitutional. The Court should similarly decline to invalidate the federal programs bribery statute, 18 U.S.C. § 666, on constitutional grounds, consistent with the overwhelming weight of precedent upholding the statute.

Madigan also moves to dismiss the § 666 counts in the superseding indictment. Counts Two (in part), Three, Four, Six, Eleven, Twenty-One, and Twenty-Three of the indictment track the plain language of § 666, and detail the above-described corrupt schemes to solicit and accept valuable benefits in exchange for official action by Madigan. The Supreme Court in *Snyder* held that § 666 does not prohibit gratuities, but did not disturb the continued viability of bribery prosecutions that target schemes that involve a stream of benefits over time that are offered or received for official action. The indictment's detailed allegations, accepted as true, demonstrate that Madigan and McClain intended to engage in *quid pro quo* bribery. Indeed, the § 666 charges appear right alongside the racketeering, Travel Act, and wire fraud charges which all consistently describe *the very same conduct* as constituting bribery. There is no basis to dismiss the indictment, either before or after *Snyder*.

Finally, the Court should reject Madigan's argument that portions of the indictment must be dismissed in light of the "bona fide" exception in § 666(c). Although § 666 does not apply to bona fide salary or other compensation paid in the usual course of business, whether payments constitute such compensation is a jury question—that fact need not be specifically alleged in the indictment. Moreover, even

if such an allegation were necessary, the detailed allegations in the indictment more than adequately establish that the jobs, contracts, and payments at issue were bribes, rather than "bona fide" arrangements made in the usual course of business that are exempted from the reach of § 666.

## B. Applicable Law

An indictment must "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment complies with Rule 7 and the Constitution if it (1) states the elements of the crimes charged; (2) adequately informs a defendant of the nature of the charges brought against him; and (3) enables the defendant to assert the judgment as a bar to future prosecutions for the same offense. *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013); *United States v. White*, 610 F.3d 956, 958-59 (7th Cir. 2010); *United States v. Anderson*, 280 F.3d 1121, 1124 (7th Cir. 2002). To successfully challenge the sufficiency of an indictment based on the failure to allege a required element, a defendant must establish both that an essential element was omitted and that he suffered prejudice as a result. *Vaughn*, 722 F.3d at 925.

"Facial sufficiency is not a high hurdle"; there is no need for an indictment to "exhaustively describe the facts surrounding a crime's commission." *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996), *aff'd*, 522 U.S. 23 (1997); *United States v. Westmoreland*, 240 F.3d 618, 633 (7th Cir. 2001) (an indictment need not spell out each element so long as each element is present in context). An indictment that tracks the words of a statute to state the elements of the crime generally is acceptable, so

long as the indictment states sufficient facts to place a defendant on notice of the specific conduct at issue. *Vaughn*, 722 F.3d at 925.

When considering a motion to dismiss under Rule 12(b), a court assumes all facts in the indictment to be true and "view[s] all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999); *see also United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009). The court evaluates the allegations "on a practical basis and in their entirety, rather than in a hypertechnical manner." *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) (quotation omitted). A motion to dismiss an indictment is not a summary-judgment motion and should not be used to "test[ ] the strength or weakness of the government's case, or the sufficiency of the government's evidence." *Moore*, 563 F.3d at 586 (citation omitted); *see also White*, 610 F.3d at 959 (courts "do not consider whether any of the [indictment's] charges have been established by evidence, or whether the Government can ultimately prove its case"); *United States v. Thomas*, 150 F.3d 743, 747 (7th Cir. 1998) (Easterbrook, J., concurring) ("Summary judgment does not exist in criminal cases.") (citation omitted); *United States v. Firtash*, 392 F. Supp. 3d 872, 885 (N.D. Ill. 2019) (Pallmeyer, C.J.) ("To the extent Defendants dispute the government's ability to prove their case, that is a matter for trial, not a basis for dismissal.").

## C.     The Indictment Properly Alleges RICO Conspiracy.

To prove a RICO conspiracy in violation of 18 U.S.C. § 1962(d), "the government must show (1) an agreement to conduct or participate in the affairs (2) of an enterprise (3) through a pattern of racketeering activity." *United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006). For an indictment to adequately set forth the

elements of a racketeering conspiracy, it need only charge—after identifying a proper enterprise and the defendant's association with that enterprise—that the defendant knowingly joined a conspiracy, the objective of which was to operate that enterprise, that affected interstate commerce, through a pattern of racketeering activity. *United States v. Tello*, 687 F.3d 785, 794 (7th Cir. 2012) (citing *United States v. Glecier*, 923 F.2d 496, 500 (7th Cir. 1991) ("Neither overt acts nor specific predicate acts that the defendant agreed personally to commit need be alleged or proved for a section 1962(d) offense.")). As discussed below, Count One properly alleges all the essential elements of RICO conspiracy.

### 1. The Indictment Sufficiently Alleges an Enterprise.

Madigan argues that the indictment does not allege an "enterprise," but instead alleges two separate schemes without a common purpose. R. 131 at 15-17.

The superseding indictment properly alleges an association-in-fact enterprise, which is defined by statute as "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has held that an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," and "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle v. United States*, 556 U.S. 938, 944-45 (2009) (citing *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)).[1] The Supreme Court

---

[1] Several appellate courts have found the government is not required to prove the existence of an enterprise to prove the offense of racketeering conspiracy; rather, an agreement to create an enterprise suffices. *See United States v. Applins*, 637 F.3d. 59, 71-75 (2d Cir. 2011); *United States v. Harris*, 695 F.3d 1125, 1133 (10th Cir. 2012); *United States v. Rich*, 14 F.4th

reads this definition of enterprise broadly. In *Boyle*, the Court held that an association-in-fact enterprise need not have any structural features beyond "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946.

Consistent with *Turkette* and *Boyle*, the superseding indictment identifies the enterprise as an association-in-fact enterprise composed of Madigan and McClain, as well as several entities through which Madigan exercised his power. SI, Count 1, ¶ 2. These entities include the Office of the Speaker, the Thirteenth Ward Democratic Organization, and Madigan's law firm, Madigan & Getzendanner. *Id.* Count One alleges that the purposes of the enterprise included "(i) to exercise, to preserve, and to enhance MADIGAN's political power and financial well-being; (ii) to financially reward MADIGAN's political allies, political workers, and associates for their loyalty, association with, and work for MADIGAN; and (iii) to generate income for members and associates of the enterprise through illegal activities." *Id.* ¶ 3. The indictment outlines the types of illegal activities committed by the enterprise's members and associates, including soliciting and receiving bribes; using threats, intimidation and extortion to solicit benefits from private parties; using Madigan's official powers as Speaker (including his ability to control the passage of bills in the House and the

---

489, 493 (6th Cir. 2021). The government acknowledges that the Seventh Circuit has not expressly adopted this view, although it is contemplated in the 2023 Seventh Circuit Pattern Criminal Jury Instructions for 18 U.S.C. § 1962(d) (Racketeering Conspiracy Elements, requiring government to prove "that [name of enterprise] [was; would be] an enterprise").

resources of the Office of the Speaker) to cause third parties to financially reward Madigan and his associates; and (using facilities of interstate commerce to coordinate, plan and further the enterprise's goals. *Id.* ¶¶ 4, 11. As to longevity, the enterprise is alleged to have continued from no later than 2011 through 2019. *Id.* ¶ 10. Count One describes how the defendants jointly engaged in criminal activity to accomplish the enterprise's goals (*Id.* ¶ 13), which is sufficient to establish an association that "remain[ed] in existence long enough to pursue a course of conduct." *Boyle*, 556 U.S. at 948. The indictment properly alleges an enterprise.

Defendants contend that Count One improperly alleges "two distinct enterprise conspiracies motivated by separate goals and carried out by different actors." R. 131 at 15. Not so. The superseding indictment alleges one enterprise with a common purpose: Madigan unlawfully used his official position for his own personal gain. SI, Count 1, ¶¶ 3, 4, 7, 9. This common purpose underlies Madigan's efforts to secure lucrative payments from utilities such as ComEd and AT&T for his political allies and his efforts to secure lucrative payments for his law firm. In both contexts Madigan directed the affairs of the enterprise using his right-hand man, Michael McClain, to conduct the affairs of the enterprise. *Id.* ¶ 9; *e.g., id.* Count 2, ¶¶ 4-29 (ComEd), Count 19, ¶¶ 5-27 (Chinatown Parcel); Count 23, ¶¶ 4-17 (AT&T). While the defendants are free to challenge the existence of the alleged enterprise at trial, it is not grounds for dismissal at this stage of the proceedings.

Contrary to Madigan's contention that the indictment improperly alleges separate schemes to enhance Madigan's political and financial wellbeing (R. 131 at

15-16), a criminal enterprise may have diverse players and purposes. "So long as the evidence demonstrates that the co-conspirators embraced a common criminal objective, a single conspiracy exists, even if the parties do not know one or another and do not participate in every aspect of the scheme." *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001); *see also United States v. Warner*, No. 02 CR 506, 2004 WL 1794476, at *18 (N.D. Ill. Aug. 11, 2004) (indictment properly alleged a single conspiracy that encompassed George Ryan's actions while in the Secretary of State's Office and the Governor's Office). For example, in *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991), a lawyer named Masters, a Cook County Sheriff's lieutenant, and a local police chief were charged with RICO conspiracy. The enterprise consisted of the defendants, a law firm, and two police departments that Masters corrupted by paying kickbacks for the purpose of steering work to his law firm. *Id.* at 1365. The criminal enterprise did not just engage in bribery, however; the Sheriff's lieutenant also arranged for the murder of Masters' wife. *Id.* The Seventh Circuit observed that although the enterprise's "main purpose" was the bribery of local police agencies for legal work, Masters "did not make a rigid division between his business and his personal affairs." *Id.* at 1366. The murder-for-hire was properly part of the criminal enterprise, because:

> A criminal enterprise is more, not less, dangerous if it is versatile, flexible, diverse in its objectives and capabilities. Versatility, flexibility, and diversity are not inconsistent with pattern. The systematic corruption of law enforcement in the west Chicago suburbs brought about by the Masters enterprise could be used for a variety of purposes without destroying the integrity, the rationale, of the enterprise. The acts of a criminal enterprise within the

25

> scope of the enterprise's evolving objectives form pattern
> enough to satisfy the requirements of the RICO statute.

*Id.* at 1367.

Just as Masters' bribery-murder scheme was criminal enterprise, so too was the Madigan Enterprise; it was made up of efforts to benefit Madigan both financially and politically. The Madigan Enterprise involved the "systematic corruption" of the legislative process for Madigan's personal and political gain. *Masters*, 924 F.2d at 1367. And the Enterprise's purpose, shared by Madigan and McClain, was to benefit Michael Madigan. *See United States v. Volpendesto*, 746 F.3d 273, 296 (7th Cir. 2014) ("A person who agrees to commit multiple robberies with an association-in-fact certainly shares in the enterprise's common purpose—to enrich himself and the enterprise through illegal means."); *United States v. Perholtz*, 842 F.2d 343, 354-55 (D.C. Cir. 1988) (jury could find a criminal enterprise existed involving separate procurement fraud schemes, "despite some changes in personnel between schemes, and despite the fact that every participant did not play an identical role in each scheme," because "[t]he interlocking nature of the schemes and the overlapping nature of the wrongdoing provides sufficient evidence for the jury to conclude that this was a single enterprise").

It does not matter that McClain was not involved in every act described in the indictment. It is well established that a defendant need not participate in all aspects of a conspiracy. As the Seventh Circuit has explained, "we have never suggested that a defendant is guilty of racketeering conspiracy only if he participates in every aspect of the enterprise's affairs. To the contrary, '[s]ection 1962(d) [is] broad enough to

encompass those persons who, while intimately involved in the conspiracy, neither agreed to personally commit nor actually participated in the commission of the predicate crimes.'" *Volpendesto*, 746 F.3d at 284-85 (citations omitted). In *Volpendesto*, for example, defendants complained that they were not involved in particular predicate acts, but the court of appeals rejected those arguments. Here too, the government does not need to show participation in each of the enterprise's activities, only that McClain was aware of the "essential nature and scope of the enterprise and intended to participate in it." *Id.* at 285 (citations omitted). The indictment amply alleges that McClain embraced the nature and scope of the enterprise, given his role in helping Madigan secure lucrative contracts and payments for his political allies *and* his work to steer work to Madigan's law firm.

The case relied upon by defendants shares nothing in common with this case. In *Rao v. BP Prod. N. Am., Inc.*, 589 F.3d 389 (7th Cir. 2009), a gas station franchisee sued a franchisor, former employees of the franchisor, and the husband of one of the employees. The Seventh Circuit affirmed dismissal of the franchisee's civil RICO claims. Significantly, each event alleged as part of the enterprise involved completely different actors, and the complaint did not allege "how the different actors are associated and do not suggest a group of persons acting together for a common purpose or course of conduct." *Id.* at 400. In this case, by contrast, Madigan was at the center of each of the incidents alleged in the indictment, and McClain acted on Madigan's behalf in most of them. The indictment alleges in detail the relationship

between these two men, and the types of unlawful conduct they engaged in as part of the Madigan Enterprise.

### 2. The Indictment Properly Alleges that Madigan and McClain Agreed to Conduct or Participate in the Affairs of an Enterprise.

Contrary to Madigan's argument (R. 131 at 18-21), the indictment sufficiently alleges that Madigan and McClain acted in concert to pursue the enterprise's common interests, rather than solely in their own self-interest.

Defendants claim that "McClain interacted with Madigan to further the interests of *his* client, ComEd, and to build *his* credentials as a Springfield lobbyist." R. 131 at 20. This is a frivolous argument. Questions of fact are the province of a properly instructed jury, not an issue this Court can resolve on a motion to dismiss. *Moore*, 563 F.3d at 586.

Moreover, the indictment alleges that McClain "served the enterprise" by, among other things, "conveying MADIGAN's instructions and messages to public officials, lobbyists, and business executives . . . ; (iv) providing strategic advice to MADIGAN on sensitive political matters; (v) briefing MADIGAN on his activities on behalf of the enterprise; [and] (vi) otherwise acting as MADIGAN's agent for the purposes of conveying MADIGAN's instructions, requests, and messages to third parties." SI, Count 1, ¶ 9. These allegations clearly allege that McClain acted in concert with Madigan.

Finally, even if McClain was furthering his own self-interest, the Seventh Circuit has recognized that a defendant can act in his own self-interest while furthering a criminal enterprise. *See, e.g., Volpendesto*, 746 F.3d at 296 ("A person

who agrees to commit multiple robberies with an association-in-fact certainly shares in the enterprise's common purpose—to enrich himself and the enterprise through illegal means. He cannot escape liability just because, at the end of the day, he prizes his own self-interest above the group's."). Consistent with this principal, the jury will be instructed that, to be "associated with an enterprise,"

> a person must be involved with the enterprise in a way that is related to its affairs [or common purpose][, although the person need not have a stake in the goals of the enterprise] [and] [may even act in a way that subverts those goals. . .

Seventh Circuit Pattern Jury Instructions at 837 (2023 ed.) ("Pattern Instructions"). The fact that McClain was a lobbyist with his own clients does not defeat the Count One conspiracy.

In *United States v. Hosseini*, 679 F.3d 544 (7th Cir. 2012), the defendants made an argument similar to Madigan's after they were convicted at trial. The defendants operated three automobile dealerships and sold luxury cars to drug dealers in the Chicago area. They challenged their RICO conspiracy conviction by claiming that the evidence at trial was insufficient to establish an enterprise because they engaged in parallel rather than concerted conduct. *Id.* at 558. The Seventh Circuit held that the defendants' conduct was neither independent nor lacking in coordination. The appellants operated three car dealerships and shared bank accounts, employees, and health insurance. *Id.* They transferred money, referred customers to each other, and sold cars in the same manner. *Id.* Thus, a jury could reasonably conclude that the enterprise "had a purpose (profiting through unreported cash auto sales to drug dealers), relationships (Hosseini and Obaei's own close personal relationship, as well

29

as the dealerships' interlocking relationship), and longevity (the scheme lasted at least a decade.)" *Id.* As in *Hosseini*, the superseding indictment alleges a long-term relationship between Madigan and McClain that encompassed the various entities alleged as part of the enterprise, and their common efforts to unlawfully benefit Madigan politically and professionally. That is all that is required.

Madigan cites civil cases involving separate business entities with independent interests, but those cases have no application here, as Madigan and McClain were long-time friends and confidants who worked together to further the enterprise. *E.g., Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655–56 (7th Cir. 2015) ("Our cases have distinguished between two situations: a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest, versus a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest."); *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013) (complaint did not adequately allege that two companies acted on behalf of enterprise as opposed to in each company's self-interest).

In short, the indictment amply alleges that Madigan and McClain agreed to conduct or participate in the affairs of an enterprise.

### 3. The Illinois Bribery and Official Misconduct Statutes Are Constitutional.

Contrary to Madigan's argument, R. 131 at 22-42, none of the state law bribery predicates—720 ILCS 5/33-1(d)-(e), or 720 ILCS 5/33-3(a)(4)—is constitutionally overbroad or void for vagueness. Judge Robert Dow recently rejected a nearly

identical challenge to these statutes, concluding that the statutes do not reach substantial amounts of protected speech, provide sufficient notice to individuals regarding criminal conduct, and do not invite arbitrary enforcement. *See United States v. Burke*, No. 19 CR 322, 2022 WL 1970189, at *38-46 (N.D. Ill. June 6, 2022) (Dow, J.). This Court should apply the same analysis.

### a. Applicable Law

Where First Amendment rights are potentially implicated, a defendant may make a facial challenge to a statute but must prove that the statute "substantially" criminalizes or suppresses protected speech in comparison to its plainly legitimate sweep. *Bell v. Keating*, 697 F.3d 445, 455-56 (7th Cir. 2012) (quoting *New York v. Ferber*, 458 U.S. 747, 769 (1982) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)); *United States v. Williams*, 553 U.S. 285, 292-93 (2008)). In its analysis, the Court should take into account whether the scope of the statute has been limited by case law. *Bell*, 697 F.3d at 456.

Outside of the First Amendment context, void-for-vagueness challenges are governed by the due process clause in the Fifth Amendment, which requires that a penal statute define a criminal defense so that "ordinary people can understand what conduct is prohibited, and in a manner that does not encourage arbitrary enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). This does not require perfect clarity and precise guidance but does require "a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Jordan v. DeGeorge*, 341 U.S. 223, 231 (1951) (citations omitted). While

Madigan's First Amendment challenge is properly viewed as a facial challenge to the statute, his more general due process challenge should be analyzed as an as-applied challenge. *United States v. Plummer*, 581 F.3d 484, 488 (7th Cir. 2009); *see also United States v. Cook*, 970 F.3d 866, 877-78 (7th Cir. 2020). In other words, while a statute may not be clear in every application, so long as the statutory terms are clear in their application to the party before the court, a "vagueness challenge must fail." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010) (rejecting vagueness challenge because although "material-support statute potentially implicates speech, the statutory terms are not vague as applied to plaintiffs") (citations omitted). *Accord Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 48-49 (2017).

### b. Analysis

### i. The State Statutes Are Not Overbroad.

None of the challenged state law bribery predicates—720 ILCS 5/33-1(d)-(e), and 720 ILCS 5/33-3(a)(4)—is constitutionally overbroad in violation of the First Amendment. Each of these state statutes legitimately criminalizes bribery. Preventing corruption and preserving citizens' confidence in government are "interests of the highest importance," *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 788-89 (1978) (citations omitted), and measures calculated to prevent bribery plainly accomplish this goal. Here, each of the statutes is designed to target corruption by criminalizing efforts to provide things of value as a means of obtaining improper and unlawful influence over individuals in positions of trust.

None of the challenged statutes has the effect of substantially criminalizing protected speech. Acts of bribery—like other crimes that might be accomplished

through speech—are not protected speech. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."); *United States v. Ferriero*, 866 F.3d 107, 125 (3d Cir. 2017) (state bribery statute that punishes corrupt agreements does not criminalize legitimate First Amendment activity); *United States v. Marchetti*, 466 F.2d 1309, 1314 (4th Cir. 1972) ("Threats and bribes are not protected simply because they are written and spoken; extortion is a crime although it is verbal."). Madigan claims that the rights of citizens "to petition elected representatives" and for politicians to respond to those concerns is somehow chilled by these state statutes. R. 131 at 24. But giving money and other benefits to elected officials outside the context of campaign contributions has nothing to do with the right to petition elected representatives.

Madigan claims that the state bribery statutes are overbroad because the "any act" language in those statutes threatens to criminalize innocent conduct like routine lobbying or small gifts given to government officials. R. 131 at 23-30. This argument fails to account for the statute's scienter requirement.

By their plain text, the statutes in question clearly distinguish between criminal conduct (which is not protected speech) and permissible conduct (which can include protected speech). For example, § 33-1(e) requires that the property or personal advantage provided be given to "improperly influence" the performance of a public officer. Use of the term "improperly" to describe the nature of the influence is

33

synonymous with wrongful influence, requiring that an intention of wrongdoing accompany the tender of property, thus providing fair notice. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 445 (1978) (to meet the statute's *mens rea* requirement, a defendant must consciously behave in a way the law prohibits, "and such conduct is a fitting object of criminal punishment").

As Judge Dow recognized in the *Burke* case, "[t]he plain language of the statute imposes a scienter requirement such that the statute only proscribes the receipt of gifts intended to 'improperly influence' specific conduct." *Burke*, 2022 WL 1970189, at \*39. The court further noted that "Illinois courts have applied the intent element to rein in the statute in practice." *Id.* at \*39 n.26 (citation omitted).

Addressing analogous federal statutes, courts have held that this type of scienter requirement protects against impermissible infringement of protected speech. *See, e.g., United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996) (obstruction of justice statute that punished "corruptly persuad[ing] another person . . . with intent to influence . . . the testimony of any person in an official proceeding," 18 U.S.C. § 1512(b), was not overbroad based on corrupt intent requirement); *accord United States v. Shotts*, 145 F.3d 1289, 1301 (11th Cir. 1998).

In addition, 720 ILCS § 5/33-1(d) and 720 ILCS § 5/33-3(a)(4) apply only to property that a public official "is not authorized by law" to accept, and thus limits any potential overbreadth. *See People v. Brandstetter*, 430 N.E.2d 731, 736 (Ill. App. 1982) (rejecting claim that section (a) of same statute was overbroad in part on ground that "it is also clear that other public officials are 'authorized by law' to receive campaign

contributions from those who might seek to influence the candidate's performance as long as no promise for or performance of a specific official act is given in exchange"). As Judge Dow observed, the "not authorized by law" language is a "limitation that plainly excludes legitimate campaign contributions," *Burke*, 2022 WL 1970189, at *41.

Despite all this, Madigan maintains that the Supreme Court's decision in *McDonnell v. United States*, 579 U.S. 550 (2016), effected a seismic change in the law that rendered Illinois bribery statutes unconstitutional. Madigan exaggerates the significance of *McDonnell*. To begin with, he does not identify a single case, state or federal, where a state bribery statute has been found unconstitutional based on *McDonnell*—on either First Amendment or vagueness grounds. *See Burke*, 2022 WL 1970189, at *45 ("Although he directs this Court to *McDonnell* as a watershed case for bribery law, Ald. Burke *does not identify a single case*, state or federal, where a state bribery statute has been found unconstitutional based under McDonnell's holding or reasoning—either on First Amendment or vagueness grounds.") (emphasis original). In addition, *McDonnell* was confined to deciding what constituted an "official act" for purposes of the honest services fraud statute. In short, *McDonnell* did not purport to call into question wide swaths of State law and, in fact, specifically declined to revisit its holding in *Skilling v. United States*, 561 U.S. 358 (2010), upholding the honest services fraud statute against a vagueness challenge.

*McDonnell,* 579 U.S. at 580. Against this background, Madigan's arguments about the changes wrought by *McDonnell* fall apart.[2]

Contrary to Madigan's argument (R. 131 at 29), the Supreme Court's recent decision in *Snyder v. United States,* 144 S. Ct. 1947 (2024), does not invalidate Illinois' bribery laws. As discussed in detail in Section I(D)(1), in *Snyder,* the Court held that 18 U.S.C. § 666 criminalizes bribes (which are things of value "promised or given before the official act"), but not gratuities (which are "given as a token of appreciation after the official act"). *Id.* at 1951-60. The *Snyder* Court did not interpret Illinois law at all. On the contrary, the Court concluded that "federalism principles" required the Court to defer to the "carefully calibrated policy decisions that the States and local governments have made about gratuities." *Id.* at 1957-58. Striking down Illinois' bribery laws would directly contradict the very federalism concerns the Court sought to uphold in excluding gratuities from the reach of § 666. Moreover, as discussed above, Illinois' bribery statutes provide ample notice as to what is proscribed and prohibit bribes—not protected First Amendment activity.

### ii. The State Statutes Are Not Unconstitutionally Vague, Facially or As Applied to Madigan and McClain.

The State statutes also are not unconstitutionally vague in violation of the due process clause. Each of the State statutes plainly defines the criminalized conduct, as discussed above, and provided fair notice to defendants.

---

[2] Madigan cites *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999), but that case did not involve an overbreadth or vagueness challenge and is thus inapposite.

In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court addressed whether the honest services fraud statute, 18 U.S.C. § 1346, was unconstitutionally vague, and held that it was not, including because it was "plain as a pikestaff" that the provision, at its core, prohibited bribery and kickbacks. *Id*. at 412. The Supreme Court emphasized that, even if the outermost boundaries of a statute are imprecise, it will survive scrutiny if a defendant's conduct falls squarely within the "hard core" of the statute. *Id*. (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973)); *see also McDonnell,* 579 U.S. at 580 (citing *Skilling*, 561 U.S. at 403 (seeking "to construe, not condemn, Congress' enactments")).

Consistent with the Supreme Court's interpretation of § 1346 in *Skilling*, the Illinois bribery statutes provided fair notice to defendants of the conduct prohibited. *See Burke*, 2022 WL 1970189, at *44. As in *Skilling*, at their core, the pertinent State statutes target the crime of bribery and, much like § 666, which has withstood repeated vagueness challenges, they speak in terms of an improper or unlawful effort to influence the actions of a public official by means of a solicitation or offer of property, benefit, fee or reward. *See, e.g, Wright v. City of Danville*, 675 N.E.2d 110, 118 (Ill. 1996) ("the essence of a violation of the [official misconduct] statute 'is that a public official has attempted to personally enrich himself or another by an act exceeding his 'lawful authority' as a public servant" (citation omitted)).

Similarly, the Illinois bribery statutes are not the "vague and unfair trap for 19 million state and local officials" that the *Snyder* Court was concerned about with respect to gratuities under § 666. *See Snyder*, 144 S. Ct. at 1959. As discussed herein,

37

it is "plain as a pikestaff" that illegal bribery is the central focus of these statutes and there is simply no confusion that bribery is unlawful. Thus, there is no question that defendants were on fair notice of what the statutes proscribed, and that these statutes survive *Snyder. See Skilling*, 561 U.S. at 412 (quoting *Williams v. United States*, 341 U.S. 97, 101 (1951)). Illinois courts have similarly held that the Illinois bribery statute provides fair notice. *E.g., People v. Johnson*, 780 N.E.2d 803, 805 (Ill. App. 2002) (720 ILCS 5/33–1(a) was not unconstitutionally vague as applied to defendant).[3]

Madigan nevertheless argues that Count One does not make clear what acts were intended to be influenced. But Count One alleges that Madigan accepted bribes and used his ability to affect the progress of legislation to cause third parties to financially benefit him, including businesses with legislation pending in the Illinois General Assembly. SI, Count 1, ¶¶ 4, 7. Further, the indictment alleges that Madigan used the Office of the Speaker to take official action, including:

> (1) the promotion, support, and furtherance of legislation favorable to, and obstruction of legislation unfavorable to, companies that would and did provide private benefits to MADIGAN and MADIGAN's political allies, political workers, and associates; and (2) the appointment of MADIGAN's political allies, political workers, and associates to public employment, including but not limited to appointments made in exchange and as a reward for private benefits provided to MADIGAN, including but not

---

[3] Far from showing that the Illinois bribery statute is vague, as Madigan claims (R. 131 at 33-35), this decision underscores that the statute's prohibitions are clear: "The statute plainly prohibits the tender of property to *any* public employee who is not authorized to accept it, with intent to influence the performance of *any* act related to his or her employment or function, regardless of the amount of discretion vested in the employee." *Id.* at 805.

> limited to private work for MADIGAN's law firm, Madigan
> & Getzendanner.

*Id.* ¶ 13(c). The indictment also provides numerous examples of action Madigan took with regard to ComEd-related legislation, and AT&T-related legislation. The indictment's 117 pages make it clear that Madigan was bribed in exchange for his ability to influence state legislation and make high-level public appointments. There is no notice concern as applied to Madigan and McClain.

Nor do the statutes pose a risk of arbitrary enforcement. Opinions of state and federal courts define with specificity the conduct prohibited by the state statutes. *See, e.g., United States v. Hogan*, 886 F.2d 1497, 1502-04 (7th Cir. 1989) (construing Illinois bribery statute); *United States v. Genova*, 167 F. Supp. 2d 1021, 1039-40 (N.D. Ill. 2001) (discussing scope of official misconduct statute). Moreover, the Illinois bribery statute was first enacted in 1961, and the amendment to section (e) became effective in 1986. In the intervening 38 years, there has been no indication that the statute has been arbitrarily enforced. The same holds true of the official misconduct statute. There is simply no suggestion of arbitrary enforcement, as Judge Dow recognized. *See Burke*, 2022 WL 1970189, at *44 ("As the Government points out, there is no support for any suggestion that the statute has been arbitrarily enforced in the thirty-six years since it was last amended.").

Madigan points to other politicians who made job recommendations but were not criminally prosecuted. R. 131 at 39-40.[4] Of course, the superseding indictment in

---

[4] Madigan's continued false reliance on the "mere job recommendations" defense underlines why it is important for the government to explain the patronage system to the jury during its case-in-chief through its proposed expert, Professor Dick Simpson. These were not

this case does not allege mere job recommendations but corrupt solicitations and bribes paid to benefit Madigan and influence legislation. The superseding indictment outlines numerous emails and intercepted communications that demonstrate that Madigan's hiring demands were corruptly linked to his ability to affect legislation. In this regard, Madigan's comparison to another politician's apparent job recommendation for someone who could help to "[u]nderstand the new personalities" in the governor's office (*id*. at 40) is apples to oranges. The demands Madigan made were not premised on the candidates' lobbying or consulting acumen but rather their utility to Madigan. *E.g.,* SI, Count 2, ¶¶ 31(kk) (Madigan told Individual 13W-3 not to worry that he did not do any work for ComEd, despite receiving payments from the company, because he was doing campaign work for Madigan); 31(ss) (McClain explaining that subcontractors were paid by ComEd because of their utility to Madigan).

Finally, an examination of the State statutes as applied to Madigan and McClain makes clear that they have no legitimate vagueness claim. *Humanitarian Law Project*, 561 U.S. at 21-23; *Expressions Hair Design*, 518 U.S. at 48-49. The allegations in this case do not involve the petitioning of State officials, but rather a politician's efforts to make monetary demands on entities with business in the State and local legislatures. Whatever the outer contours of the Illinois bribery statutes

---

disinterested job recommendations; Madigan sought these jobs to *benefit himself*, by providing money to individuals that did political work for *him*. Madigan does not wish this expert to testify—not because the expert will discuss "corruption," which is not remotely a subject of the anticipated testimony, but because the witness will drive home how this hiring arrangement was personally important and beneficial to Madigan.

may be, it is plain that Madigan's efforts to solicit, obtain, and receive private benefits in exchange for his action on these matters as alleged in the superseding indictment constituted bribery and official misconduct.

Consistent with principles of federalism (a key factor motivating the Supreme Court's decision in *McDonnell*), the State of Illinois has the "prerogative to regulate the permissible scope of interactions between state officials and their constituents," *McDonnell*, 579 U.S. at 576, and can determine the scope of its own laws. It need not track identically the language later used by the Supreme Court. Here, in fact, the Illinois bribery statute is more specific than the honest services fraud statute considered in *McDonnell*, including because it requires a defendant to seek to improperly influence a public official, a phrase synonymous with corrupt or unlawful influence. *Ferriero*, 866 F.3d at 125 (state bribery statute that punishes corrupt agreements is not unconstitutionally vague). No further limitations are necessary to resolve Madigan's overbreadth and vagueness claims.[5]

### D. The ComEd-Related § 666 Counts Should Not Be Dismissed.

The Court should deny Madigan's motion to dismiss Counts Two, Three, Four, and Six related to ComEd. R. 131 at 42-57.

---

[5] Because the Illinois bribery and legislative misconduct statutes are not facially overbroad or vague, there is no basis to dismiss Counts Five and Seven related to ComEd, Counts Twelve, Thirteen, and Fourteen related to the State Board position, and Count Twenty-Two related to the Chinatown Parcel. R. 131 at 56-57.

## 1. The ComEd Counts Track the Statutory Language and Place Madigan on Fair Notice of the Charges.

Count Two charges that, from 2011 through 2019, defendants conspired to: (a) corruptly solicit and demand, and to accept and agree to accept bribes in the form of jobs and contracts at ComEd in connection with legislation affecting ComEd; (b) corruptly give, offer, and agree to give bribes in the form of jobs and contracts at ComEd in connection with legislation affecting ComEd; and (c) knowingly and willfully circumvent the internal controls and falsify books and records at Exelon and ComEd.

As pertinent here, Section 666(a)(1)(B) of Title 18 makes it a crime for an agent of state government to corruptly solicit or demand, for the benefit of any person, or to accept or agree to accept, anything of value, "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of that government involving anything of value over $5,000. In addition, § 666(a)(2) makes it a crime for an individual to corruptly give, offer, or agree to give anything of value to any person, intending to influence or reward an agent of state government "in connection with any business, transaction, or series of transactions" of such government involving anything of value over $5,000.

In *Snyder*, the Supreme Court held that while Section 666 *did* in fact cover gratuities when it was originally passed in 1984, it was amended in 1986 to completely eliminate its application to gratuities, thus reversing the Seventh Circuit's longstanding holding to the contrary. *Snyder* 144 S. Ct. at 1951, 1953-54

(2024).[6] But *Snyder* strongly reaffirmed that the statute applies to bribery, which the indictment in this case properly charges. The Court held that the word "rewarded" in Section 666 does not proscribe gratuities, but instead is a "belt and suspenders" to reach bribes where, for instance, a corrupt "agreement was made before the act but the payment was made after the act," or the official defendant "took a bribe before the official act but asserts as a defense that he would have taken the same act anyway and therefore was not 'influenced' by the payment." *Id*. at 1959.[7]

All *Snyder* means for this case is that the government cannot proceed on a gratuity theory at trial, and it does not intend to. *Snyder* did not alter the language of § 666, and the § 666 counts in the indictment track the statutory language, as Madigan concedes. R. 131 at 46. Specifically, Counts Three, Four, and Six charge Madigan with corruptly soliciting and demanding things of value from ComEd, intending to be influenced and rewarded in connection with state business, in violation of § 666(a)(1)(B). SI, Counts 3, 4, & 6. The Count Two conspiracy is similarly premised on an agreement to violate § 666, and tracks the language of the statute. SI, Count 2. Indeed, the § 666 counts are charged in conjunction with racketeering, Travel Act, and honest services fraud counts concerning the same conduct—and all of the companion charges describe the very same conduct as involving bribery—not gratuities. This alone is sufficient basis to deny Madigan's motion to dismiss.

---

[6] Reversing and remanding *United States v. Snyder,* 71 F.4th 555, 579-80 (7th Cir. 2023).

[7] *Snyder* therefore makes clear that Madigan's claim that "anything of value provided after the official act is not violative of Section 666" is incorrect, as discussed in the sections that follow. R. 131 at 49.

The indictment also contains detailed factual allegations that put Madigan on notice of the specific nature of the charges. Over a period of eight years, Madigan received unlawful benefits that included ComEd: (1) paid jobs as ComEd "subcontractors" for Madigan's associates who did little or no work for ComEd (SI, Count 2, ¶¶ 4-12); (2) a lucrative contract and contract renewal for Law Firm A and renewing Law Firm A's contract (*id.* ¶¶ 13-18); (3) the appointment of Individual BM-1 to ComEd's board of directors at Madigan's request (*id.* ¶¶ 23-25); and (4) the setting aside of summer internships to individuals associated with the 13th Ward identified by McClain (*id.* ¶¶ 19-22). The indictment sufficiently alleges that Madigan accepted these benefits intending to be influenced and rewarded in connection with ComEd legislation in Springfield, consistent with the plain language of § 666. *E.g.*, *id.* ¶¶ 1(l)-(p), 3.

Given the detailed allegations in the indictment, the § 666-related counts satisfy all legal and constitutional requirements after *Snyder*. The counts are more than sufficient to notify Madigan of the charged offenses, protect him from double jeopardy, and enable him to prepare a defense; thus, they are facially valid. *See, e.g., Vaughn*, 722 F.3d at 925 (indictment is adequate if it sets forth the elements of the offense, identifies the date and time of the alleged criminal conduct, and provides citations to applicable statutes); *United States v. Skelos*, 988 F.3d 645, 659 (2d Cir. 2021) ("The language in an indictment is not required to be as precise as the attendant jury charge, nor is it required to delineate how the government will prove the elements set forth in the indictment.").

### 2. The ComEd Charges Sufficiently Allege Bribery.

Madigan argues that the § 666 counts related to ComEd should be dismissed because they do not allege a *quid pro quo*, or that "Madigan solicited jobs from ComEd intending to take official acts to benefit ComEd *in exchange for* ComEd's hiring decisions." R. 131 at 46-47. Contrary to Madigan's argument, the indictment clearly alleges a *quid pro quo* and puts Madigan on ample notice to prepare for trial.

After *Snyder*, with respect to an agent of State government who makes a corrupt solicitation, the government must prove the intended receipt of a thing of value in exchange for official action. The majority opinion in *Snyder* does not use the phrase "*quid pro quo*;" instead it specifies that "[a] state or local official can violate § 666 when he accepts an up-front payment for a future official act or agrees to a future reward for a future official act." *Snyder*, 144 S. Ct. at 1959. Thus, under *Snyder*, § 666 prohibits bribes offered or solicited in *exchange* for an official act, which "corrupt the official act," but does not prohibit gratuities, which are paid or offered "to an official *after* an official act as a token of appreciation." *Id.* at 1951-52 (emphasis original).

As an initial matter, each ComEd-related § 666 charge alleges that Madigan corruptly solicited, demanded and agreed to accept a thing of value, intending to be influenced and rewarded. *See* SI, Counts 2, 3, 4, 6. Per the *Snyder* Court, the language of both "influenced" and "rewarded" is synonymous with bribery; indeed, the Supreme Court noted that use of the word "influenced" *alone* was probably sufficient to "have covered the waterfront of bribes," but addition of the word "rewarded" eliminated all "potential ambiguities, gaps, or loopholes," thus ensuring that the use of these words

in tandem within § 666 covered *all* species of bribery. *Snyder*, 144 S. Ct. at 1959. Here, each count relating to the ComEd indictment faithfully uses these precise words to describe the conduct Madigan engaged in; and in doing so, these charges properly allege Madigan engaged in bribery, thus eliminating any "ambiguities," "gaps," or "loopholes," and giving Madigan fair notice that he has been charged with bribery. No other special words or incantation, such as the ambiguous Latin phrase "*quid pro quo*," which does not appear in this or any other commonly used federal bribery statute, need be referenced. *United States v. Smith*, 223 F.3d 554, 572 (7th Cir. 2000) ("In determining whether an essential element of the crime has been omitted from the indictment, courts will not insist that any particular word or phrase be used.") (quoting *United States v. Garcia-Geronimo*, 663 F.3d 738, 742 (7th Cir. 1981)).

But the indictment does not stop there. It amply alleges that Madigan accepted a stream of more than $700,000 in benefits from ComEd over the course of eight years, knowing the payments were made to influence and reward Madigan's official action with regard to legislation that impacted ComEd's financial interests. The indictment makes plain that ComEd regularly had business before the General Assembly as a regulated utility, lists certain pieces of legislation as examples, and describes the benefits solicited and accepted by Madigan in exchange for official action favorable to ComEd. SI, Count 2, ¶¶ 1-31; Counts 3, 4, 6; *e.g.*, Count 2, ¶ 12.

The Seventh Circuit and every other court of appeals to consider the issue has affirmed the validity of the "stream of benefits," or "as opportunities arise," theory of

bribery, including in the wake of *McDonnell*, which clarified the definition of "official act."[8] As the Seventh Circuit explained in connection with the prosecution of former Illinois Governor George Ryan:

> [T]his is not a case in which a public official had a specific price for each official act that he did, like a menu in a restaurant where you pick an item and it has a particular price. . . . The corruption here was more like a meal plan in which you don't pay for each item on the menu. Rather, there is a cost that you pay, an ongoing cost, and you get your meals.

*Ryan v. United States*, 688 F.3d 845, 852 (7th Cir. 2012); *see also United States v. Solomon*, 892 F.3d 273, 277 (7th Cir. 2018).

The decisions affirming a stream of benefits bribery theory make sense, because to hold otherwise "would simply reward corrupt bribery schemes that involve multiple exchanges over a period of time, as opposed to the so-called 'one-and-done handshake deal.'" *United States v. McCabe*, 103 F.4th 259, 284-85 (4th Cir. 2024). Indeed, a contrary rule would have the perverse effect of insulating the most damaging of corrupt bribery schemes. *Snyder* did not discuss, and certainly does not disturb, the continued viability of bribery prosecutions that target "schemes that involve a stream of benefits over time, not just singly negotiated deals," where the

---

[8] *See United States v. McCabe*, 103 F.4th 259, 283–85 (4th Cir. 2024); *United States v. Al-Madani*, No. 23-3131, 2023 WL 9660121, at *1 (6th Cir. Dec. 20, 2023); *United States v. Vasquez*, No. 22-10766, 2023 WL 7381427, at *5 (5th Cir. Nov. 7, 2023); *United States v. Reichberg*, 5 F.4th 233, 247–48 (2d Cir. 2021); *United States v. Roberson*, 998 F.3d 1237, 1251–52 (11th Cir. 2021); *Woodward*, 905 F.3d at 48 (1st Cir. 2018); *United States v. Repak*, 852 F.3d 230, 251 (3d Cir. 2017); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 942 n.15 (9th Cir. 2009). *Cf. United States v. Suhl*, 885 F.3d 1106, 1115 (8th Cir. 2018).

government can establish an intent to engage in a *quid pro quo. Solomon*, 892 F.3d at 277.

Madigan wrongly suggests that the government cannot prove its case without resorting to a gratuity theory by pointing to several instances in *United States v. McClain et al.*, Case Number 20 CR 812 ("the ComEd Trial"), where the government contended it was entitled to rely upon the gratuity theory in that prosecution. R. 131 at 44. But the government's reliance upon that theory in the ComEd Trial was far from necessary, because the government principally relied upon a stream of benefits bribery theory at the ComEd Trial. Indeed, one of the main graphics that was shown to the jury during the government's summation appears below:



This flow chart shows that the government focused its evidence and argument on a stream of benefits bribery theory. Indeed, because of the government's focus on the bribery theory at trial, the government's reliance on a gratuity theory during the ComEd Trial was thought to be so isolated by the defendants—including defendant

McClain—that they took the position that "*the Government relied exclusively on a bribery theory* and presented no evidence that any actions were taken with intent to reward Mr. Madigan," and only made "glancing references" to the concept of gratuities. *See United States v. McClain*, 20 CR 812, Dkt. 264 at 43 (A. Pramaggiore Mem. ISO Motion for Judgment of Acquittal) (emphasis added); Dkt. 267 (McClain's Motion to Join A. Pramaggiore Mem.). Madigan's contention that the government's case can only go forward in reliance on a gratuity theory is therefore entirely meritless.

Many of the indictment's allegations support the government's theory that ComEd's payments were part of a stream of benefits given in exchange for Madigan's official action on ComEd legislation from 2011 to 2019. As alleged in the indictment, in 2011, the Illinois General Assembly passed the Energy Infrastructure and Modernization Act ("EIMA"), which benefitted ComEd by providing a regulatory process that allowed ComEd to more reliably determine consumer rates. Madigan voted in favor of EIMA in May 2011 and voted to override the Governor's veto of EIMA in October 2011. SI, Count 2, ¶¶ 2(m), 31(a)-(b). Before the final vote, Madigan approved of the plan for ComEd to pay his close associates through third-party intermediaries. *Id.* ¶ 7.

After EIMA's passage, the Illinois Commerce Commission ("ICC") interpreted EIMA in a manner adverse to ComEd. SI, Count 2, ¶ 2(n). In 2013, the Illinois General Assembly passed legislation, known as Senate Bill 9, that effectively overruled the ICC's adverse interpretation of EIMA. *Id.* Madigan, whose close

49

associates had by that point received monthly payments for nearly two years, voted to pass Senate Bill 9 and override the Governor's veto. *Id.* ¶ 31(c)-(d).

In 2016—after additional Madigan associates had been added to ComEd's payroll in return for little to no work and after McClain negotiated favorable contract terms for Law Firm A—the House passed the Future Energy Jobs Act ("FEJA"), which was a boon to ComEd and its parent company Exelon. SI, Count 2, ¶¶ 2(o), 31(u).

In February 2018—one month after ComEd renewed payments to Madigan associates that had ballooned to nearly $19,000 per month and one month after Madigan informed Individual BM-1 he would be placed on ComEd's Board—House Bill 5626 ("HB 5626") was filed in the Illinois House of Representatives, which was championed by then-Illinois Attorney General Lisa Madigan, Madigan's daughter. ComEd opposed HB 5626, which was intended to amend the Public Utilities Act and would have imposed onerous obligations upon alternative retail electric suppliers. SI, Count 2, ¶¶ 2(p), 31(f), 31(g), 31(t), 31(y), 31(nn), 31(pp), 31(vv)-(ww). As HB 5626 was debated in the spring session, Madigan successfully added still another political associate to the ComEd payroll: Individual 23W-1. *Id.* ¶ 31(ll). McClain relayed to ComEd employees that Madigan warned him about the bill and gave ComEd "permission to work to kill" the bill. *Id.* ¶¶ 1(p), 31(nn), 31(vv), 31(ww). This demonstrates that Madigan gave instructions to his agent McClain to help ComEd defeat legislation. HB 5626 was ultimately defeated in the midst of the charged conspiracy (*id.* ¶ 2(p)), when ComEd had been paying Madigan associates for years.

Madigan claims this is not an official act (R. 131 at 50), but that is factual question for the jury, not a basis for dismissal. Viewed in the light most favorable to the government, a House Speaker's greenlighting efforts to "kill" legislation demonstrates Madigan's continuing efforts to assist ComEd in defeating legislation, and signaled his willingness to do his part to kill the legislation as well. SI, Count 1, ¶ 1(c). *Woodward v. United States*, 905 F.3d 40, 45 (1st Cir. 2018) ("An official act means any decision or action in the enactment of legislation"); *see also United States v. Urciuoli*, 613 F.3d 11, 13, 18 (1st Cir. 2010) (affirming bribery conviction where hospital executive paid a state senator to use his official position to "support or oppose bills in accordance with [the hospital's] interest, including attempts to 'kill' certain bills").

Based on the allegations above, Madigan is wrong in claiming that the "last official act identified in the Superseding Indictment related to ComEd was Madigan's vote on December 1, 2016" for FEJA, and "[t]he government does not allege that Madigan agreed to take official action in exchange for" benefits provided after that date. R. 131 at 49.

First, the absence of allegations of specific official acts in the indictment after 2018 does not merit dismissal under any circumstance, given that the indictment expressly alleges that the conspiracy continued until 2019. Moreover, an indictment merely requires the government to inform the defendant of the crime he is charged with; it does not need to detail how the crime will be proved, *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981), or specify each act in furtherance of the conspiracy.

*Bates*, 96 F.3d at 970 ("Indictments need not exhaustively describe the facts surrounding a crime's commission nor provide lengthy explanations of the elements of the offense.").

Second, whether the government is able to prove that the bribery conspiracy continued after 2016 is a question for the jury, not for the Court. There are no summary judgment motions in criminal cases, and as Judge Dow recently noted in rejecting a similar tactic in the *Burke* prosecution, "[i]t is a fact-finder's role to assess whether the Government has proven the allegations beyond a reasonable doubt at trial, not this Court's at the pleadings stage," and the defendants should "[t]o put it plainly . . . tell it to a jury." *Burke*, 2022 WL 1970189 at *1, 12, 58.

Contrary to Madigan's contention that conduct after December 1, 2016 constituted gratuities, the jury will hear evidence at trial demonstrating that the stream of benefits ComEd showered on Madigan in exchange for assistance with ComEd's legislation continued well after 2018. In 2019—before the government's investigation became overt—ComEd advanced a piece of legislation designed to extend the legislative gains the company had achieved in prior years' ratemaking legislation. Specifically, the ratemaking process beneficial to ComEd provided for in the EIMA legislation, and continued in the FEJA legislation—referred to as the "formula rate"—had a "sunset" provision, meaning that it expired after a set period of years, at which point ComEd would have to go back to the Illinois General Assembly to seek an extension. In 2019, ComEd was doing just that. *See* ComEd Trial Tr. at 1842, testimony of Fidel Marquez ("Every time we extended it [the formula

rate], there was a sunset of that formula rate, meaning we would have to go back to the General Assembly to ask for a bill to get another extension, which is what we were trying to do in 2019."). As the government will prove at trial (as it did during the ComEd Trial), in 2019, ComEd sought the passage of legislation to extend the formula rate known as the "Skinny Bill." *Id.* at 1843. ComEd needed Madigan's support for this legislation, which ComEd was pushing to get passed by the end of the legislative session in late May 2019. *Id.* at 1843-45, 2020-24, and 2027-28. At the same time, ComEd was focused on being responsive to Madigan's requests and continuing, and even adding, ComEd jobs and contracts for Madigan's associates to ensure Madigan's support for the Skinny Bill. *See id.* at 2020-2024 (referencing GX131, Session 6182, February 18, 2019, recorded call between Pramaggiore and Marquez). Indeed, Individual BM-1, at Madigan's urging, was appointed to the ComEd Board of Directors in April 2019. SI, Count 2, ¶¶ 25, 31 (oo), 31(qq), 31(rr), 31(yy)-(bbb), 31(nnn), 31(rrr)-(sss). Moreover, co-conspirator Anne Pramaggiore urged Marquez to continue payments to Madigan's associates for the precise reason of assuring *future* legislative success, not on account of past victories. *Id.* ¶ 31(mmm). Put simply, Madigan is simply wrong that hiring decisions and official actions after December 1, 2016 are gratuities. R 131 at 49. To the contrary, they were part of an extended bribery scheme that lasted eight years, which is a factual determination that is properly left to the jury, not a pretrial motion.

### 3. The Indictment Sufficiently Alleges that Madigan Intended to Engage in a *Quid Pro Quo*.

As summarized above, the indictment sufficiently alleges Madigan's intent to engage in a *quid pro quo* by using the statutory language of § 666, which the Supreme Court has said "covers the waterfront" when it comes to signaling a bribery offense, and is further demonstrated by the fact that ComEd provided regular, high-value benefits to Madigan over an eight-year period. *E.g.,* SI, Count 2, ¶ 31(e)-(h). *See United States v. Rosen*, 716 F.3d 691, 703 (2d Cir. 2013) (*quid pro quo* existed where payments far exceeded token gift amounts and were structured as monthly consulting payments). In addition, Madigan's intent to engage in a *quid pro quo* can be inferred from the allegation that he knew payments to his associates were made for years and years in return for little or no work, SI, Count 2 ¶¶ 4, 31(kk), and from his knowledge of acts taken to conceal the true nature of the benefits, such as using intermediaries intermediary and falsifying records. *Id.*, Count 2 ¶¶ 6, 9, 10, 28, 31(x), 31(ee). *See United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011). In addition, accepting the facts in the indictment as true, one can readily infer a connection between Madigan's actions regarding ComEd legislation and the bribes he received. SI, Count 2 ¶¶ 31(a)-(d), 31(l)-(o), 31(oo), 31(qq), 31(rr), 31(tt), 31(ccc), 31(mmm).

Madigan is wrong that the indictment alleges "crime was afoot" simply because "legislation affecting ComEd passed the Illinois General Assembly during the same decade" that "ComEd hired certain individuals or entities at Madigan's recommendation." R. 131 at 47. To the contrary, the indictment contains ample allegations from which a *quid pro quo* may be inferred. The indictment alleges in

substantial detail that Madigan knew ComEd did not pay his allies and associates by coincidence or simply to foster goodwill, but rather because ComEd expected favorable treatment in the General Assembly from Madigan in return. *See* SI, Count 1 ¶ 1(c). As alleged in the indictment, based on recorded conversations between Madigan, McClain, and the other conspirators, Madigan approved the plan for ComEd to pay his associates through third-party intermediaries and controlled when those payments started and stopped, *e.g.* SI, Count 2 ¶¶ 7, 31(fff), 31(ggg), 31(jjj), and he knew these were not above-board payments for legitimate work, *id.* ¶¶ 3–12, 31(kk), (fff), (ggg). These allegations describe and support an inference that Madigan intentionally engaged in a corrupt bribery scheme to trade jobs (including no- or low-show jobs) at ComEd for Madigan's official action. *E.g.*, *Id.* ¶¶ 7, 11, 31(fff), (jjj).

Madigan's argument that the indictment is deficient because it does not assert that he took any specific vote in the legislature "in exchange for [ComEd's] hiring decisions" is also without merit. R. 131 at 47. A bribery indictment does not need to allege that the bribe *succeeded* or that the public official actually took the promised official action. *McDonnell*, 579 U.S. at 572. The indictment need only allege, and it does here, that a public official intended to accept benefits, knowing they were given in exchange for official action. *E.g.,* SI, Count 2 ¶¶ 2, 12; *McDonnell*, 579 U.S. at 572. *See United States v. Kimbrew*, 944 F.3d 810, 815-16 (9th Cir. 2019) ("In short, execution is immaterial" with bribery charges). Further, a "[*quid pro quo*] agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain." *McDonnell*, 579 U.S. at 572. *See also Snyder*,

144 S. Ct. at 1959 (use of word "rewarded" in § 666 "shut[s] the door" on defense where public official argues "he would have taken the same act anyway and therefore was not 'influenced' by the payment"). The key is "that there be a nexus between the public official's position and the *quo* he promises"—not his ultimate delivery of an official act. *Kimbrew*, 944 F.3d at 816.

Even if success were required, when considering the indictment as a whole and accepting its allegations as true, the allegations of the indictment demonstrate that ComEd's efforts to bribe Madigan in exchange for his official action were in fact successful; after ComEd started showering Madigan with valuable benefits, ComEd's legislation began to move. Madigan's support was critical: he voted in favor of EIMA and SB9 and voted to override the governor's veto of both bills, allowed FEJA to be called for a vote in the Illinois House of Representatives, and gave McClain "permission to work to kill" HB 5626, a bill ComEd opposed that ultimately did not become law. SI, Count 1 ¶ 1(c); Count 2 ¶ 31(a)-(d), 31(u), 31(nn), 31(ww). Indeed, the fact that ComEd continued the payments for years strongly suggests they were satisfied with the agreement they had struck with Madigan.

Judge Dow rejected similar arguments advanced by Ald. Ed Burke in challenging § 666 charges.[9] *Burke*, 2022 WL 1970189 at *16. There, Judge Dow found "ample allegations from which a *quid pro quo* may be inferred" given that the

---

[9] As in the Burke case at this stage, 2022 WL 1970189 at *18, Madigan's arguments discussing jury instructions and cases involving jury instructions are premature. R. 131 at 47-48. *See, e.g., United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009) ("Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence.").

indictment put "Ald. Burke on notice of the *quid*, the players, and the *quo*." *Id. See also United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) (*quid pro quo* need not be and indeed usually is not demanded explicitly and can be inferred based on other evidence); *United States v. Benjamin*, 95 F.4th 60, 68-69 (2d Cir. 2024) (collecting cases holding the same from every other circuit to have considered the question). Here too, the indictment sufficiently alleges that Madigan engaged in a scheme to solicit and accept bribes in exchange for official action related to ComEd legislation.

Madigan is also incorrect that the § 666 counts are defective because they "fail to allege a specific type of official action that has enough definiteness to support a *quid pro quo*." R. 131 at 48. This argument once again conflates the government's burden at trial with the motion to dismiss standard. *See Bates*, 96 F.3d at 970. More importantly, even at trial there is no requirement that the government link "each *quid*, or item of value [. . .] to a specific *quo*, or official act." *Solomon*, 892 F.3d at 277 (citing *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012)). "Rather, the underlying acts of bribery can be established 'through an ongoing course of conduct, so long as the evidence shows that the favors and gifts flowing to a public official are in exchange for a pattern of official actions favorable to the donor.'" *McCabe*, 103 F.4th at 284 (quoting *Woodward*, 905 F.3d at 46). The indictment plainly demonstrates a stream of benefits bribery scheme that spanned eight years.

### 4. Madigan's Constitutional Arguments Regarding § 666 Are Meritless.

Madigan's contention that § 666 is unconstitutionally overbroad and vague absent a *quid pro quo* is moot. The Supreme Court in *Snyder* recently reaffirmed the validity of § 666 as a bribery statute, and has also noted that the words "influence" and "reward" sufficiently "cover the waterfront" in delineating a bribery offense. 144 S. Ct. at 1959. To the extent Madigan claims § 666 is constitutional only if a *quid pro quo* is defined to require a connection between a payment and a "*specific action* intended to be influenced or rewarded*,*" this position has no support in either the text of the statute or in any caselaw, as discussed above.

### 5. Whether Payments Were "Bona Fide" and "In the Usual Course of Business" Under 18 U.S.C. § 666(c) is a Factual Question for the Jury.

Section 666 does "not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c). Subsection (c) was added in 1986 in order "to avoid [18 U.S.C. § 666's] possible application to acceptable business practices." *United States v. Cornier-Ortiz*, 361 F.3d 29, 33-34 (1st Cir. 2004) (quoting H.R.Rep. No. 99–797, at 30 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6138, 6153).

Madigan argues that Counts Two, Three, Four, and Six should be dismissed because the indictment fails to allege Madigan corruptly solicited "non-*bona fide* salary, wages, and fees" for Individuals 13W-1, 13W-2, 23W-1, and BM-1, the Thirteenth Ward interns, and Law Firm A. R. 131 at 51, 52-53. Madigan's motion should be denied because whether a payment was made in the "usual course of

business" is a question of fact for the jury. *See United States v. Lupton*, 620 F.3d 790, 802 (7th Cir. 2010) (citation omitted) ("Whether wages are *bona fide* and earned in the usual course of business is a question of fact for the jury to decide."); *United States v. Dwyer*, 238 Fed. App'x 631, 647 (1st Cir. 2007) ("Whether wages were *bona fide* is a question of fact for the jury."). Even if it were a legal question appropriate for determination in a motion to dismiss (which it is not), the allegations in the indictment—assumed to be true—adequately establish that Madigan's conduct was not an acceptable business practice exempted from the reach of § 666.

### a. The application of § 666(c) is a jury question.

The Seventh Circuit pattern instructions recognize that § 666(c) is a jury question and provide:

> Bona fide [salary, wages, fees, or other compensation paid; expenses paid or reimbursed], in the usual course of business, [does; do] not qualify as a thing of value [solicited or demanded; given, offered, or agreed to be given] by the defendant.

Pattern Instructions at 308.

In *Lupton*, for example, an agent of the State of Wisconsin was charged with soliciting a kickback in connection with his job of soliciting proposals from parties interested in purchasing property from the state. 620 F.3d at 794-95. In conversations with a real estate broker, Lupton sought a kickback of one-quarter of the fee that the broker would receive if the transaction went through. *Id.* at 794. At a bench trial, Lupton argued that he had simply proposed a legitimate "commission split" with the broker, which was permitted under Wisconsin law, and that this permissible commission split was discussed only hypothetically. *Id.* at 802. Thus, Lupton argued,

his discussions with the broker amounted to nothing more than a *bona fide* business transaction under § 666(c). *Id*. In rejecting Lupton's argument and convicting him of the § 666 charge, the district court found that Lupton's "'unusual maneuvering' with [the broker] 'reveals that this was not to be a payment in the ordinary course of business.'" *Id*. at 802 (quoting *United States v. Lupton*, No. 07 CR 219, 2009 WL 679649, at *5 (E.D. Wisc. 2009)). The Seventh Circuit agreed and made clear that whether a payment is in the ordinary course of business is a fact question:

> The evidence was sufficient to support the factfinder's conclusion. *See United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007) ("Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide.").

> Regardless of whether commission splitting is permissible under Wisconsin law, the record here is replete with evidence supporting the finding that this particular "split" was neither bona fide nor sought in the ordinary course of business.

*Id*.

Judge Dow denied a similar defense motion to dismiss public corruption charges where the alleged bribes were legal fees paid to Ald. Ed Burke's law firm. There, Judge Dow held that the charges could not be dismissed based on § 666(c), "because assessing whether any fees [co-defendant] Cui agreed to pay were made 'in the usual course of business' under § 666(c) is a jury question, not one for this Court on a motion to dismiss." *Burke,* 2022 WL 1970189 at *30. In similar fashion, prior to the ComEd Trial, Judge Leinenweber ruled that the applicability of § 666(c) should be resolved by the jury at trial. *See United States v. McClain*, No. 20 CR 812, 2022 WL 488944, at *2 (N.D. Ill. Feb. 17, 2022) ("While Defendants are entitled to use

60

§ 666(c) as an affirmative defense at trial, they are not entitled to dismissal at this stage based solely on their version of the facts."). The Court should follow these cases and find that the application of § 666(c) is a question for the jury.

### b. Even if properly the subject of a motion to dismiss, the allegations support a conviction under § 666.

Even assuming the Court may properly consider § 666(c) in a motion to dismiss, the superseding indictment's allegations are more than sufficient to allege that ComEd's hiring of Individuals 13W-1, 13W-2, 23W-1, and BM-1, the Thirteenth Ward interns, and Law Firm A were neither *bona fide* nor made in the usual course of business. Individuals 13W-1, 13W-2, and 23W-1 were all political allies of Madigan who were paid by ComEd through an intermediary despite doing little or no legitimate work. SI, Count 2, ¶¶ 4, 7-8, 10, 31(qqq). Law Firm A's contract was maintained even though there was not enough appropriate work for the firm because ComEd executives sought to ensure that Madigan did not take adverse action against the company. *Id*. ¶¶ 15-18. In addition, the Thirteenth Ward intern applicants were given preferential treatment because of their affiliation with Madigan and were not treated like interns from other parts of Chicago. *Id*. ¶¶ 20-22. And Individual BM-1 was appointed to ComEd's board over pushback within ComEd because Madigan instructed McClain that ComEd should "go forward with" his appointment. *Id*. ¶ 31(qq).

As Judge Leinenweber ruled in addressing the same ComEd conspiracy alleged in Count Two: "The fact that these incentives were laundered partially through jobs does not invalidate the indictment. A company cannot use its payroll line on its

accounting ledger to circumvent all Government oversight of public corruption." *McClain*, 2022 WL 488944, at *2. Indeed, the jury was instructed as to Section 666(c) and convicted the defendants on all counts. *United States v. McClain,* No. 20 CR 812, Dkt. 249 at 40 & Dkts. 250-253.

A federal court in New Jersey held that a salary paid under similar circumstances was a bribe. *United States v. Bryant*, 556 F.Supp.2d 378 (D.N.J. 2008). In *Bryant*, the dean of a school of medicine created a paid position for state legislator Wayne Bryant as a "program support coordinator." *Id.* at 385. The indictment alleged that the dean caused Bryant to receive a salary in that role in exchange for Bryant using his position as a state legislator to benefit the medical school. *Id.* at 385-86. The defendants moved to dismiss § 666 charges, relying on § 666(c). The court rejected this argument, holding that Bryant's "salary was not paid 'in the usual course of business' because it was allegedly the *quid* in a *quid pro quo* bribery arrangement." *Id.* at 428. The court explained that, even though it may have been paid for legitimate work, because the "salary itself constitutes the bribe . . . it was not 'bona fide' or paid 'in the regular course of business.'" *Id.* at 428-29 ("If a public official sells his office for wages, even if some legitimate work is performed in exchange for those wages, it is sufficiently clear that such wages are not "bona fide."). The court concluded:

> [T]he reason why Bryant's . . . salary was not "bona fide" has nothing to do with the value of the legitimate work he did. Even if Bryant did provide value . . . in the form of legitimate work, his salary cannot be "bona fide" if it was part of a *quid pro quo* bribery deal.

*Id.* at 429.[10] Individual BM-1's appointment, the continued retention of Law Firm A, and the hiring of Thirteenth Ward interns are similar to the arrangement in *Bryant*, in that while some work was performed, the payments nevertheless constituted a bribe.

In seeking to have the ComEd charges dismissed, Madigan relies on *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988). R. 131 at 53-56. *Risk* did not involve a bribery charge. Rather, the defendant was accused of failing to file Currency Transaction Reports. *Id.* at 1060. In discovery, the government disclosed documents (which the government conceded were accurate) demonstrating that none of the relevant transactions totaled more than $10,000, a necessary factual predicate for the charges. *Id.* at 1060-61. Under these unique facts, the Seventh Circuit affirmed the district court's dismissal of the indictment because the undisputed evidence showed that none of the transactions at issue exceeded $10,000. *Id.* at 1062. Critically, the court dismissed the indictment "not because the government could not prove its case, but because there was no case to prove." *Id.* at 1061.

Nothing remotely similar occurred here. Surely, Madigan's efforts to receive bribes by arranging for little- to no-work jobs for Individuals 13W-1, 13W-2, and 23W-1, Individual BM-1's appointment, the continued retention of Law Firm A, and the hiring of interns associated with his Chicago Ward were not the sort of "acceptable business practice" that § 666(c) was intended to protect. *See Cornier–Ortiz*, 361 F.3d

---

[10] Bryant's subsequent conviction for violating 18 U.S.C. § 666 and other statutes was affirmed. *United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011).

at 36 (rejecting a defense under § 666(c) and holding, "[a] scheme designed to evade conflict of interest rules is hardly legitimate or acceptable"); *Lupton*, 620 F.3d at 802 ("Regardless of whether commission splitting is permissible under Wisconsin law, the record here is replete with evidence supporting the finding that this particular 'split' was neither bona fide nor sought in the ordinary course of business.").

Indeed, Madigan concedes the government has alleged Individual 13W-1, Individual 13W-2, and Individual 23W-1 performed little to no work, but suggests, inaccurately, that the indictment fails to sufficiently allege that Madigan knew these were essentially no-show jobs. R. 131 at 53. The evidence at trial will demonstrate that Madigan well knew his associates did little to no work for ComEd.

Madigan's only argument as to Individual BM-1 is that "there is no question that Individual BM-1 filled a vacant, pre-existing seat on ComEd's board of directors and performed the job to which he was appointed." R. 131 at 54. But Madigan ignores the allegations in the indictment that Madigan pushed for Individual BM-1's appointment despite resistance within ComEd, and that the indictment alleges this as an act taken in furtherance of the charged bribery conspiracy. SI, Count 2, ¶ 31(rr), (ccc).

Similarly, Madigan's only argument as to why § 666(c) bars claims regarding Law Firm A is that "Law Firm A performed substantive work for ComEd" and ultimately reduced its guaranteed hours. R. 131 at 54-55. But the superseding indictment spells out that Law Firm A's contract was renewed even though there was insufficient work for the firm, and that this renewal was based on McClain's threat

64

that failure to renew the contract on favorable terms would "provoke a reaction from our Friend," referring to Madigan's ability to affect ComEd's legislation. SI, Count 2, ¶¶ 16, 31(l). This allegation plainly spells out a *quid* (renewing Law Firm A's contract) made in exchange for a *quo* (Madigan not taking unfavorable action with regard to ComEd legislation).

Similarly, even though the interns did work for ComEd, they were given a leg up in terms of application that other intern applicants did not receive, only because of their connection to Madigan. *Id.* ¶¶ 19-22. As the indictment makes clear, these were not *bona fide* payments made in the usual course of business.

## E. The State Board and Chinatown-Related § 666 Counts Should Not Be Dismissed.

Madigan's argument that the State Board and the Chinatown § 666 counts (Counts Eleven and Twenty-One, respectively) should be rejected for the reasons already provided with respect to the ComEd-related § 666 charges discussed above. R. 131 at 57-59.

In short, Section 666 does not require an agreement between the bribe payor or bribe payee or a meeting of the minds; at trial, the government is only required prove that defendants intended to engage in a *quid pro quo*. *See United States v. Jennings*, 160 F.3d 1006, 1017 (4th Cir. 1998) ("Under § 666(a)(2) the intent of the payor, not the intent of the payee, is determinative of whether a crime occurred." (collecting cases)); *United States v. Suhl*, 885 F.3d 1106, 1112 (8th Cir. 2018) (finding that neither § 666, § 201, "nor *McDonnell*, imposes a universal requirement that bribe payors and payees have a meeting of the minds about an official act."). By its plain

text, § 666 prohibits corrupt solicitations and demands, in addition to corrupt agreements to accept a thing of value. 18 U.S.C. § 666(a)(1)(B).[11] By including the phrase "or" in the statute's text, Congress made clear that an agreement is *not* required under § 666. *See New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 61 (1980).

Indeed, as noted above, the Supreme Court in *Snyder* held that § 666 shares the defining characteristics of a bribery provision: a corrupt state of mind when making an offer or solicitation and "the intent to be influenced" or the intent to influence as to an official act. *Snyder*, 144 S. Ct. at 1955. Under *Snyder*, all that is required is an intended receipt of a thing in exchange for official action.

Finally, the Court will properly instruct the jury concerning what it must find with respect to these counts, as with the others. The motions should be denied.

## F. The AT&T-Related Count Should Not Be Dismissed.

Madigan argues that Count Twenty-Three related to AT&T should be dismissed, because the indictment does not allege a *quid pro quo* or that Madigan knew AT&T intended to hire Individual FR-1 to influence him with regard to AT&T's legislation. R. 131 at 59-61. At bottom, he raises a factual dispute that is best left for the jury. *E.g., White*, 610 F.3d at 959. As with the ComEd counts, Count Twenty-

---

[11] Similarly, in the context of honest services fraud, no meeting of the minds between both parties or completed exchange is necessary to establish a *quid pro quo. See, e.g., United States v. Ring*, 706 F.3d 460, 467-68 (D.C. Cir. 2013) (no completed corrupt exchange or agreement needed for honest services fraud; the statute punishes the scheme, not its success); *United States v. Avenatti*, 432 F. Supp. 3d 354, 364 (S.D.N.Y. 2020). Take, for example, local police officer who demands $100 from a motorist in exchange for not writing a traffic ticket; the officer would not be exempt from criminal liability simply because the motorist refused the bribe.

Three clearly tracks the *mens rea* requirement of § 371 and § 666, and places Madigan on fair notice of the charges against him.

With regard to the Count Twenty-Three conspiracy, the indictment must allege, and the government must prove at trial, that (1) a conspiracy existed; (2) the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and (3) one of the conspirators committed an overt act in an effort to advance a goal of the conspiracy. Pattern Instructions § 5.08(A). The government will also be required to prove that at least two people agreed to commit a crime (*id.* § 5.09), and that defendants were "aware of the illegal goal[s] of the conspiracy and knowingly joined the conspiracy." *Id.* § 5.10. Madigan recognizes that the government need only prove at trial that "each conspirator . . . specifically intended that *some conspirator* commit each element of the substantive offense." R. 131 at 48 n.13 (citing *United States v. Kelerchian,* 937 F.3d 895, 914-15 (7th Cir. 2019)). Accordingly, the government must allege that defendants intended to violate § 666.

As noted in the preceding section, under § 666, defendants need not specifically agree to take any official action in exchange for a thing of value. Section 666 does not require an agreement between the bribe payor or bribe payee or a meeting of the minds; at trial, the government is only required prove that defendants intended to engage in a *quid pro quo. Jennings*, 160 F.3d at 1017; *Suhl*, 885 F.3d at 1112. By its plain text, § 666 prohibits corrupt solicitations and demands, in addition to corrupt agreements to accept a thing of value. 18 U.S.C. § 666(a)(1)(B).[12]

---

[12] Similarly, in the context of honest services fraud, no meeting of the minds between both parties or completed exchange is necessary to establish a *quid pro quo. See, e.g., United States*

Moreover, a public official violates § 666 when he accepts a bribe, even if it does not change his conduct; it suffices that defendants knew the payments were offered as a bribe. *See United States v. Brewster*, 408 U.S. 501, 526 (1972) (noting, for § 201 bribery, "acceptance of the bribe is the violation of the statute, not performance of the illegal promise"); *Snyder*, 144 S. Ct. at 1959 (Section 666 covers instances where a public official "took a bribe before the official act but asserts as a defense that he would have taken the same act anyway and therefore was not 'influenced' by the payment").

With those background principles in mind, the indictment amply alleges a conspiracy to violate § 666. Contrary to Madigan's argument (R. 131 at 61), the indictment sufficiently alleges that AT&T paid a thing of value, which Madigan knew was intended in exchange for his official action on AT&T's COLR legislation. Accepting the indictment's allegations as true, the conspirators' communications, their efforts at concealment, and the timing of the hiring of Individual FR-1 demonstrate that Madigan corruptly arranged for Individual FR-1 to be hired in exchange for action on AT&T's COLR legislation.

The timing alone is compelling evidence that the payments to Individual FR-1 were in exchange for AT&T's COLR legislation. *See Bruno,* 661 F.3d at 744 (timing of benefits in relation to official action can support a finding of *quid pro quo*). Early

---

*v. Ring*, 706 F.3d 460, 467-68 (D.C. Cir. 2013) (no completed corrupt exchange or agreement needed for honest services fraud; the statute punishes the scheme, not its success); *United States v. Avenatti*, 432 F. Supp. 3d 354, 365 (S.D.N.Y. 2020). Take, for example, local police officer who demands $100 from a motorist in exchange for not writing a traffic ticket; the officer would not be exempt from criminal liability simply because the motorist refused the bribe.

in the 2017 legislative session, on February 14, 2017, McClain wrote Individual ATT-1 on Madigan's behalf, asking for "a small contract" for Individual FR-1. SI, Count 23, ¶¶ 6, 18(a). Just two days later but before AT&T had responded to Madigan's request, McClain told AT&T Illinois' president that Madigan had assigned McClain to work on AT&T's COLR legislation as a "Special Project." *Id.* ¶ 6. This was a major development, as the COLR bill was AT&T's biggest legislative priority in 2017, and the company had failed to enact the legislation in prior legislative sessions. *Id.* ¶ 2(f). After these initial communications, McClain worked with AT&T's employees on the COLR bill throughout the spring of 2017, not as a lobbyist, but as Madigan's agent, all while pushing the company to pay Individual FR-1. *Id.* ¶ 15.

AT&T employees knew the request was a bribe: Before agreeing to pay Individual FR-1, the AT&T conspirators engaged in extensive internal discussion about ensuring that AT&T would receive "credit" from Madigan for authorizing payments to Individual FR-1. SI, Count 23, ¶¶ 18(e)-18(g). The repeated use of the word "credit" itself contemplates an exchange of this-for-that; the focus was on ensuring AT&T received something of value from Madigan in return for the payments.

The arrangement with Individual FR-1 did not follow the normal course for hiring a consultant, which further demonstrates the corrupt nature of the arrangement. AT&T internally approved payments intended for Individual FR-1 on or about April 20, 2017, nearly a week before anyone at AT&T even spoke to Individual FR-1. SI, Count 23, ¶¶ 18(l), 18(m). And Individual FR-1 was paid for the

69

entire month of April, even though he did not accept AT&T's offer until April 28, 2017. *Id.* ¶¶ 18(k)-(l), 18(n), 18(s)-(t). Moreover, the conspirators sought to conceal the true nature of the payments. *See, e.g., United States v. Dial*, 757 F.2d 163, 170 (7th Cir. 1985) ("The defendants' elaborate efforts at concealment provide powerful evidence of their own consciousness of wrongdoing . . . ."); *accord Bruno,* 661 F.3d at 744 (attempt to cover up payments is proof of *quid pro quo*). The conspirators used a nominee third party as a pass-through entity for the payments and ensured Individual FR-1 did not publicly register as a lobbyist. SI, Count 23, ¶¶ 18(e)-(f), 18(l). The AT&T conspirators further supplied false internal justifications for the retention of Individual FR-1. *Id.* ¶¶ 8-9.

In addition, the fact that McClain—Madigan's agent who was not engaged by AT&T and was no longer a registered lobbyist—approved the amount of money paid to Individual FR-1 demonstrates that the hire was intended to ensure that Madigan did not impede AT&T's COLR legislation, rather than the result of a legitimate business decision by AT&T. SI, Count 23, ¶ 18(n). Indeed, Individual FR-1 did not do any work for AT&T during the nine months he was paid by the company. *Id.* ¶¶ 12-13, 18(t). The indictment sufficiently alleges that payments to Individual FR-1 were intended to bribe Madigan, so that he would take favorable action on a specific piece of legislation pending before the General Assembly.

Madigan claims that the indictment fails to establish that he knew Individual FR-1 was hired in exchange for official action. R. 131 at 61. Madigan raises a factual dispute, which must be resolved by the jury, not through a motion to dismiss. *E.g.,* ,

610 F.3d at 959. Nevertheless, the allegations of the indictment demonstrate Madigan's and McClain's knowledge. Early in the 2017 legislative session, Madigan sent his right-hand man to work on AT&T's COLR legislation as a "Special Project," for the legislative session. SI, Count 23, ¶¶ 6, 18(b). McClain contacted AT&T employees about hiring Individual FR-1, and then followed up on that request through the spring, all while he was acting as Madigan's agent on the COLR legislation. *See id.* ¶¶ 18(a)-(n). Just weeks after Individual FR-1 was engaged, Madigan directed a roll call on AT&T's COLR legislation, and subsequently voted in favor of the bill on three separate occasions. *Id.* ¶¶ 18(o)-(r). These were plainly official acts. *See Woodward*, 905 F.3d at 45 ("An official act means any decision or action in the enactment of legislation"); *Urciuoli*, 613 F.3d at 13, 18 (affirming bribery conviction where hospital executive paid a state senator to use his official position to "support or oppose bills in accordance with [the hospital's] interest").

Madigan's suggestion that he did not know about Individual FR-1's unlawful hiring is inconsistent with the indictment's allegations.[13] Moreover, the government's proof at trial will demonstrate that McClain was acting as Madigan's surrogate in conveying the hiring demand to AT&T. In short, the indictment sufficiently alleges that Madigan knew Individual FR-1 was hired in exchange for an official action.

---

[13] The evidence at trial will establish that Madigan knew about Individual FR-1's engagement with AT&T. For example, in 2018, Madigan mentioned that Individual FR-1 had come to see him looking for work. 5/10/18 Tr. (Session #2269).

Because the superseding indictment clearly alleges a conspiracy to violate § 666, Madigan's claim that he was not sufficiently apprised of the nature of the accusations against him is unfounded.

## II. Madigan's Revised Motion to Strike Surplusage (R. 132) Is Meritless and Should Be Denied.

On the motion of a defendant pursuant to Federal Rule of Criminal Procedure 7(d), it is within a court's discretion to strike immaterial or irrelevant allegations as surplusage. *United States v. Climatemp, Inc.*, 482 F. Supp. 376, 391 (N.D. Ill. 1979), *aff'd sub nom.*, *United States v. Reliable Sheet Metal Works, Inc.*, 705 F.2d 461 (7th Cir.), *cert. denied*, 462 U.S. 1134 (1983). Such motions should be granted, however, "only if the targeted allegations are clearly not relevant to the charge and are inflammatory and prejudicial"—a "rather exacting" standard that applies "only rarely." *United States v. Chaverra-Cardona*, 667 F. Supp. 609, 611 (N.D. Ill. 1987); *accord United States v. Black*, 469 F. Supp. 2d 513, 518 (N.D. Ill. 2006).

Madigan argues that the Court should ignore common practice in this district and refuse to provide the jury with a copy of the indictment, or in the alternative, should strike certain portions of the indictment, despite their relevance. For the reasons set forth below, Madigan's motion should be denied.

## A. The Court Should Provide a Copy of the Indictment to the Jury to Use During Deliberations.

Providing a copy of the indictment to the jury is "common practice" within the Seventh Circuit. *United States v. Jackson*, 860 F.3d 438, 448 (7th Cir. 2017) ("As an initial matter, we note that providing a copy of the indictment to the jury is common practice.") (citation omitted); Pattern Instructions, Committee Comment to

72

Instruction 1.02 at 22 (providing a copy of the indictment to the jury is "common practice"). Indeed, the Seventh Circuit has approved of the practice where the references to the grand jury are redacted from the indictment and the Court provides the proper limiting instruction set forth in Pattern Instruction 1.02, which states: "The indictment simply the formal way of telling the defendants what crimes they are accused of committing. It is not evidence that the defendants are guilty. It does not even raise a suspicion of guilt." *Jackson*, 860 F.3d at 448-49 (rejecting defendant's claim that the district court erred by providing a redacted copy of the indictment to the jury where the court redacted reference to the grand jury from the indictment and properly instructed the jury that the indictment was not evidence); *United States v. Marshall*, 985 F.2d 901, 906 (7th Cir. 1993) (same); *United States v. Watts*, 29 F.3d 287, 291 (7th Cir. 1994) (rejecting defendant's claim that he was prejudiced by the district court's decision to give the jury a copy of the indictment, and holding that the district court has "broad discretion" to "give the jury a copy of the indictment.") (collecting cases). Consistent with this well-settled precedent and common practice, the government intends to ask the Court to so instruct the jury, and to redact references to the grand jury from the indictment before it is provided to the jury.

Nevertheless, defendants urge that the jury should not receive a copy of the indictment based on their unsupported claim that the indictment reflects the government's "spin" on the case. R. 132 at 5. Defendants mischaracterize the indictment; far from being spin, the indictment sets forth the details of the charges against the defendants and the facts the government will prove at trial, including a

description of the racketeering enterprise, the manner and means of the racketeering conspiracy, the honest services fraud scheme, the overt acts committed in furtherance of the conspiracy to commit federal program bribery, and the attempted extortion scheme. Without the indictment and the information provided therein, it would be difficult for the jury to determine whether the government has met the burden of proof on any given charge, and particularly the conspiracy charge where, in order to find the defendants guilty, the jury must find a conspirator committed an overt act. Pattern Instruction 5.08(A). There is no potential for prejudice against the defendants in this case, and even if there were, such potential prejudice would be cured by the Court's instructions to the jury consistent with Pattern Instruction 1.02.

In short, there is no reason to depart from the common practice of providing the jury a copy of the indictment for use during deliberations in this case.

## B.    No Language Should be Stricken from the Indictment.

If the Court decides to provide the jury with a copy of the indictment, Madigan asks the Court to strike from Count One the term "Madigan Enterprise" and to strike from Count Two allegations related to "job recommendations after December 1, 2016" and allegations of the passage or failure of four pieces of ComEd legislation.[14] R. 132 at 5-9.

---

[14] In his previous motion to strike (R. 59), Madigan argued that references to Madigan's "associates" should be stricken from Counts One and Two. Because Madigan does not raise that argument in the instant revised motion to strike (R. 132), the government assumes that Madigan is no longer pursuing this argument. To the extent Madigan maintains that argument, the government incorporates its prior response in opposition to striking "associates" from the superseding indictment. See R. 74 at 84-85.

### 1. The Term "Madigan Enterprise" Is Not Prejudicial.

Count One of the indictment charges defendants with conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). The alleged enterprise was an association-in-fact comprised of Madigan, McClain, and three organizations that were headed by Madigan: the Office of the Speaker, the Thirteenth Ward Democratic Organization, and Madigan & Getzendanner, referred to as the "Madigan Enterprise." SI, Count 1, ¶ 2.

Madigan requests that each reference to the "Madigan Enterprise" in Count One be changed to the "Enterprise." R. 132 at 5-7. Madigan cites a New Jersey decision in which the phrase "Gatto Group" was substituted for "criminal enterprise" when the indictment went back to the jury. *United States v. Gatto*, 746 F. Supp. 432, 456 (D.N.J. 1990), *rev'd*, 924 F.2d 491 (3d Cir. 1991). But Madigan fails to mention that in that case the government did not oppose redacting the indictment in that manner. *Id.* In a decision cited in *Gatto*, the Third Circuit recognized that naming the enterprise after a defendant carries potential prejudice, but noted that "the risk of unfair prejudice is greatest where the defendant is only loosely affiliated with the enterprise." *United States v. Vastola*, 899 F.2d 211, 232 (3d Cir.), *judgment vacated*, 497 U.S. 1001 (1990). On the other hand, where it was clear that the defendant after whom the enterprise was named was the leader, then the court ruled that it "cannot see how the naming of the enterprise possibly could have influenced the outcome of this case." *Id.* The same is true here. Count One explicitly identifies Madigan as the "leader of the enterprise" (SI, Count 1, ¶ 7), the racketeering conspiracy charged in Count One centers around Madigan's efforts to improperly use his position of power

to benefit himself, and the enterprise is comprised of the entities that Madigan himself led: the Office of the Speaker, the Thirteenth Ward Democratic Organization, and Madigan's law firm, Madigan & Getzendanner. There is no possible prejudice in naming the enterprise after him.

Likewise, Madigan's misplaced concern that the use of the term "Madigan Enterprise" will lead the jury to infer that the government has proven an element (the enterprise) of the RICO charge, even if the government has not presented such evidence, is misplaced. The Court will instruct the jury on multiple occasions that the government has the burden to prove each element of the offense, and that the defendants are presumed innocent. The jury is presumed to follow instructions. *See*, *e.g.*, *Black*, 469 F. Supp.2d at 542 (*citing United States v. White*, 443 F.3d 582, 588 (7th Cir. 2006) ("[a] jury is presumed to follow the instructions that they were given")). Further, the government will present evidence of the enterprise at trial, as it must to prove the elements of Count One. There simply is no basis to strike the phrase "Madigan Enterprise" from the superseding indictment.

### 2. The Allegations in Count Two About ComEd Legislation Are Relevant to Show the Stream of Bribes ComEd Showered on Madigan.

As alleged in Count Two, Madigan received a stream of benefits from ComEd in the form of jobs and contracts for his associates, and repeatedly took official action with regard to ComEd legislation in exchange for those benefits. The ComEd legislation described in the indictment is thus plainly relevant to the bribery scheme alleged in the indictment. *See United States v. Bucey*, 691 F. Supp. 1077, 1081 (N.D. Ill. 1988) ("Simply put, legally relevant information is not surplusage.") (collecting

cases); *Black*, 469 F.Supp.2d at 542 (rejecting defendant's motion to strike allegations that explained the circumstances surrounding the charged conduct and the chronology of events because such allegations were legally relevant). As discussed in Section I(D)(2) above, the legislation described in the indictment was part and parcel of the ComEd bribery scheme:

- In 2011, Madigan approved a plan for ComEd to pay his close associates through third-party intermediaries, and shortly thereafter he voted in favor of ComEd's EIMA legislation. SI, Count 2, ¶¶ 2(m), 7, 31(a)-(b).

- In 2013, Madigan voted in favor of Senate Bill 9 and to override the Governor's veto, after his close associates had been receiving monthly payments from ComEd for nearly two years. SI, Count 2, ¶¶ 2(n), 31(c)-(d).

- In 2016—after additional Madigan associates had been added to ComEd's payroll in return for little to no work and after McClain negotiated favorable contract terms for Law Firm A—the House passed FEJA. SI, Count 2, ¶¶ 2(o), 31(u).

- And in 2018—the same year ComEd renewed the payments to Madigan associates and even added another Madigan associate, the same year Madigan told Individual BM-1 that he would be placed on ComEd's Board—Madigan gave ComEd "permission to work to kill" the legislation, which eventually died. SI, Count 2, ¶¶ 2(p), 31(f), 31(g), 31(t), 31(y), 31(ll)-(nn), 31(pp), 31(rr), 31(vv)-(ww).

And as discussed in Section I(D)(2) above, the evidence at trial will demonstrate that the stream of benefits ComEd showered on Madigan in exchange for assistance with ComEd's legislation continued after 2018, including in the spring of 2019 when ComEd sought to extend its beneficial "formula rate" legislation as part of what was known as the "Skinny Bill." ComEd Trial Tr. at 1843. As ComEd advocated for the bill, ComEd was discussing the continuation of the bribe payments to Madigan associates and Individual BM-1 was appointed to the ComEd Board of Directors in April 2019 at Madigan's urging. *E.g.* SI, Count 2, ¶¶ 31(hhh)-(sss). As discussed above, the Skinny Bill never was voted upon because the government's investigation became public in mid-May 2019.

Madigan requests that the details concerning this legislation be stricken from the indictment. As an initial matter, Madigan appears to be taking inconsistent positions within his own motions. The careful reader will note that Madigan has complained earlier that Count 2 does not contain sufficient details about legislation that was passed after 2016, *see* Section I(D)(2), *supra*; now Madigan complains the indictment has *too many details* about the legislation that was passed under Madigan's auspices that benefitted ComEd.

Madigan claims that the superseding indictment does not allege that he caused any particular outcome with regard to the four pieces of legislation discussed in the indictment, and did not "exert singular power over the legislative process to cause the passage of this legislation." R. 132 at 9-12; Count 2 ¶¶ 2(m), 2(n), 2(o), 2(p).

78

As explained earlier, no such allegation is required to state an offense. As Speaker of the Illinois House of Representatives, Madigan indisputably had significant influence over the legislative process, as alleged in the indictment. SI, Count 1, ¶ 1(c). Nor is there a requirement that the government prove Madigan had "singular power" over the legislative process. *See* Pattern Instructions, Committee Comment to 666(a)(1)(B) at p. 302 ("The agent need not have unilateral control over the business or transaction; influence is sufficient."), *accord United States v. Gee*, 432 F.3d 713, 715 (7th Cir. 2005) (rejecting defense that legislator did not control executive grants: "This confuses influence with power to act unilaterally . . . . One does not need to live in Chicago to know that a job description is not a complete measure of clout.").

In addition, Madigan is wrong that he did not take official action on the legislation described in the superseding indictment. As discussed above, voting in favor of legislation, allowing legislation to be brought to the House floor for a vote, and working to defeat a piece of legislation are official acts. *See Woodward,* 905 F.3d at 48 ("[A]ctively preventing a vote to take place on a particular piece of proposed legislation falls well within *McDonnell's* definition of 'official acts,'" as does a legislator's efforts to actively guide bills out of committee); *United States v. Roberson*, 998 F.3d 1237, 1251-52 (11th Cir. 2021) (voting on a piece of legislation is "undeniably" an "official act" as it involves a formal exercise of governmental power) (*citing McDonnell*, 579 U.S. at 574). Indeed, the Illinois legislative misconduct statute

(which is a charged bribery predicate in Count One) includes giving and withholding votes and influence on legislation as official acts. 720 ILCS 5/33-8.

Likewise, even though the successful passage or obstruction of legislation is not required in a bribery case, the fact that ComEd successfully advanced its legislative agenda during the charged conspiracy is highly relevant. It shows that Madigan did, in fact, take action to support ComEd's legislation. Thus, references to some of the legislation that ComEd passed and successfully defeated during that period (SI, Count 2, ¶¶ 2(m)-(p), 31(nn), 31(pp), 31(vv), 31(ww)) are relevant and should not be stricken.[15]

### 3. *Snyder* Provides No Basis to Strike Allegations in Count Two Related to Conduct after December 1, 2016.

Madigan asks the Court to strike all allegations in Count Two related to jobs and payments made after December 1, 2016, which is the date that FEJA was passed by the Illinois House of Representatives. R. 132 at 8-9. Specifically, Madigan moves to strike: (i) allegations that ComEd began paying Individual FR-1 as a subcontractor beginning in March 2017; (ii) allegations related to ComEd appointing Individual BM-1 to the ComEd Board of Directors; (iii) allegations related to ComEd paying Individual 23W-1 as a subcontractor; and (iv) allegations related to interns from Madigan's 13th Ward being recommended and hired in 2017 and 2018. Madigan claims that the superseding indictment contains no allegations that Madigan agreed

---

[15]    Madigan cites a civil case, in which the plaintiff was required to show proximate causation to prevail. R. 132 at 10 (citing *Express Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 730-31 (7th Cir. 2014)). Proximate causation is not required in this criminal case, and that decision is therefore irrelevant.

to take official action after December 1, 2016, and therefore the allegations related to the individuals identified above can only be gratuities and are therefore barred by *Snyder*. R. 132 at 8-9.

As discussed in Section I(D)(2), above, Madigan's motion is wrong on both the facts and the law. First, Madigan's claim that the last official act alleged was the passage of FEJA on December 1, 2016, ignores the specific allegations regarding the defeat of HB 5626 in 2018. As described above, Count Two alleges that Madigan took official action in 2018 to benefit ComEd in regard to HB 5626. On June 20, 2018, McClain told Hooker that it was Madigan who first "warned" ComEd about HB 5626 and that Madigan had given ComEd permission to work to "kill" HB 5626. SI, Count Two, ¶ 2(ww). And in fact, ComEd opposed HB 5626, and HB 5626 ultimately died. *Id.* ¶ 2(p).

Second, even if the superseding indictment lacked specific allegations of official acts post-dating December 1, 2016 (which it does not), Madigan's motion to strike should be rejected because the superseding indictment more than sufficiently alleges a stream of benefits theory of bribery, as discussed in Section I(D)(2). Count Two alleges that ComEd was subject to extensive regulation by the State of Illinois, and that the Illinois General Assembly routinely considered bills and passed legislation that affected ComEd, including rate-making legislation. *Id.* at 2(b) and (l). The indictment further alleges that Madigan received a stream of benefits from ComEd, knowing those benefits were intended to secure favorable treatment for legislation affecting ComEd. Thus, indictment makes clear that Madigan had the opportunity to

agree to take—and did take—official action benefiting ComEd throughout the conspiracy time period, including after December 1, 2016. The trial evidence will show that legislation affecting ComEd was pending in the Illinois General Assembly through 2019, including the 2019 Skinny Bill.[16]

The Seventh Circuit endorsed the stream of benefits bribery theory. *E.g., Ryan*, 688 F.3d at 852; *Solomon*, 892 F.3d at 277. As discussed in Section I(D)(2) above, *Snyder* did not affect or disturb the stream of benefits theory of bribery. In fact, the stream of benefits theory of bribery was not even mentioned in *Snyder*. Likewise, the Supreme Court's decision in *McDonnell* also did not affect or disturb the stream of benefits theory of bribery. *See*, *e.g.*, *Woodward*, 905 F.3d at 48 (holding that the stream of benefits theory was not discussed or implicated by *McDonnell*, and that after *McDonnell*, "we remain confident that that a 'stream of benefits' theory of bribery remains valid today."); *Roberson*, 998 F.3d at 1251 (holding that *McDonnell* did not invalidate the "retainer" or "as opportunities arise" theory of bribery). Accordingly, *Snyder* provides no support for Madigan's motion to strike.

For all of the reasons stated above, Madigan's motion should be denied.

## III. Madigan's Revised Motion for a Bill of Particulars (R. 133) Should Be Denied.

The government has exceeded its obligations to apprise defendants about the nature of the charges against them. As a result of the detailed allegations in the 117-

---

[16] It is of no moment that the 2019 Skinny Bill is not specifically referenced in the superseding indictment as one of the pending pieces of legislation affecting ComEd during the conspiracy period. As discussed in detail in Section 1(B) above, the government is not required to provide the details of how it will prove an offense in an indictment.

page superseding indictment, the voluminous discovery produced, a *Santiago* proffer that runs more than 200 pages, and the seven-week trial in *United States v. McClain et al.*, No. 20 CR 812, defendants already have a road map to prepare for trial.

Nevertheless, Madigan requests six categories of information through a bill of particulars. *See* Fed. R. Crim. P. 7(f); R. 133. Two of these requests, identifying things of value and official acts, were apparently motivated by the Supreme Court's decision in *Snyder*. Madigan claims such information is "[m]issing completely" from the superseding indictment. R. 133 at 1-2. Madigan is incorrect. The superseding indictment provides all the information Madigan seeks. Furthermore, Madigan has also received the information in multiple other ways including through discovery (which includes comprehensive indices so that materials may be more easily located), the government's *Santiago* submission, and a full airing of much of the government's evidence in the ComEd Trial. Madigan is not entitled to more through a bill of particulars. *See United States v. Khan*, No. 15 CR 00286, 2017 WL 2362572, at *20 (N.D. Ill. May 31, 2017) (Blakey, J.), *aff'd*, 937 F.3d 1042 (7th Cir. 2019) (bill of particulars is not appropriate vehicle to ascertain government theory of the case).

## A.    Applicable Law

Rule 7(f) allows for "a more specific expression of the activities defendant is accused of having engaged in which are illegal." *United States v. Canino,* 949 F.2d 928, 949 (7th Cir. 1991). "The test for whether a bill of particulars is necessary is 'whether the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges to enable him to prepare for trial.'" *Kendall,* 665 F.2d at 134 (quoting *United States v. Roya,* 574 F.2d 386, 391

(7th Cir. 1978)). But a "defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003) (quotations and citation omitted); *see also Glecier*, 923 F.2d at 502 (citing *Kendall*, 665 F.2d at 135 (a defendant's "constitutional rights under the fifth and sixth amendments require that he be informed of the nature of the offense charged to allow him to prepare a defense and to protect his double jeopardy rights; they do not require the government to reveal the details of how it plans to prove its case"). A motion for a bill of particulars should be denied when the indictment "includes each of the elements of the offense charged, the time and place of the accused's conduct which constituted a violation, and a citation to the statute or statutes violated." *Fassnacht*, 332 F.3d at 446.

Where the indictment, combined with the discovery, adequately informs the defendants of the charges against them, no bill of particulars is warranted. *See, e.g.*, *Vaughn*, 722 F.3d at 927; *United States v. Blanchard*, 542 F.3d 1133, 1140-41 (7th Cir. 2008) (affirming denial of motion for bill of particulars where the defendant "was the beneficiary of extensive pretrial discovery"); *United States v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003). The "choice to grant or deny" a bill of particulars "is committed to the discretion of the trial court, and a decision denying a bill of particulars" is reviewable only for an abuse of discretion. *Fassnacht*, 332 F.3d at 446 (citing *Kendall*, 665 F.2d at 134).

### B.   Madigan's Motion For A Bill of Particulars Should Be Denied.

Madigan's bill of particulars seeks information that the superseding indictment, prior filings, and discovery already contain.

The superseding indictment alone sets forth in detail the dates, locations, events, people, and predicate crimes and, as a result, fairly informs Madigan of the charges against him. *See Glecier*, 923 F.2d at 500. The superseding indictment consists of 23 counts divided into six blocks of charges: (1) the racketeering conspiracy (Count 1); (2) the ComEd conspiracy and related substantive counts (Counts Two through Seven); (3) the state board position for Alderman A (Counts Eight through Fourteen); (4) the apartment complex (Counts Fifteen through Eighteen); (5) the Chinatown land transfer (Counts Nineteen through Twenty-Two); and (6) the AT&T conspiracy (Count Twenty-Three). Counts One, Two, Eight, Fifteen, Nineteen, and Twenty-Three provide narratives about each respective block of charges.

The 213-page *Santiago* submission, filed on March 18, 2024, R. 103, a full seven months before trial, proffers specific evidence in support of each of the six blocks of charges. The *Santiago* submission, for example, provides an overview and proof in support of the racketeering conspiracy, R. 103 at 14-20, 204-09, and, as to each of the remaining five blocks of charges, a description of the anticipated witness testimony, the documentary and other physical evidence, and the applicable wiretap or consensual recordings. *Id*. at 2-202.

In addition, the discovery produced to Madigan and McClain includes thousands of reports of interview, grand jury transcripts, Title III recordings, consensual recordings, and documents obtained by subpoena. The government provided comprehensive indices with these discovery materials so that the parties could more easily locate a particular document. Not only that, the government has

provided transcripts of the recordings it intends to introduce at trial to the defense. And as noted above, a large portion of the government's case in chief has already been presented (the ComEd Trial) and McClain, one of the defendants here, was a party who was present every day of trial.[17]

Defendants cannot possibly need more information than this to prepare for trial. A bill of particulars is not intended to force a party to compile for the opponent information that is already in the opponent's possession in a format dictated by the opponent. *See Kendall,* 665 F.2d at 135 ("The defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved."). The government has exceeded its obligations to apprise the defendants about the nature of the charges against them and a bill of particulars is not warranted.

As discussed below, each of the six categories of information Madigan seeks are either inappropriate requests or are amply spelled out in the superseding indictment and other disclosures made to date in this case.

### 1. The Superseding Indictment and Related Disclosures to Date Identify the Participants Involved in the Crimes Charged (Madigan Requests 1 and 2).

Madigan asks for a bill of particulars listing (i) each unindicted member or associate of the enterprise in Count One; and (ii) each unindicted member of the conspiracy charged in Count Two (ComEd). R. 133 at 2.

---

[17] Judge Leinenweber denied a bill of particulars in that case, with the exception of certain information related to falsified records at ComEd. *See McClain*, 2022 WL 488944, at *8-9.

Courts in this district have found that the government is not required to disclose unindicted coconspirators where the indictment and discovery adequately apprise the defendants of the nature of the charges against them. *See United States v. Alex*, 791 F. Supp. 723, 728 (N.D. Ill. 1992) (denying request for identity of unindicted coconspirators); *United States v. Lobue*, 751 F. Supp. 748, 756-57 (N.D. Ill. 1990) (defendants not entitled to a bill of particulars with names of unindicted coconspirators and other public officials involved in RICO violations); *accord United States v. Norfleet*, No. 05 CR 117, 2005 WL 8150055, at *2 (N.D. Ill. July 1, 2005).[18] Here, the superseding indictment alleges in extensive detail the bribery schemes at issue including statements by coconspirators who furthered the scheme with Madigan and McClain.

The *Santiago* submission also contains the information Madigan seeks in his first two requests. The submission sets forth the categories of evidence to be presented in support of the racketeering conspiracy charge, R. 103 at 14-20, including the names and roles of the individuals involved with each category. Madigan is not entitled to any additional information at this stage.

Madigan argues that the superseding indictment uses "vague language" to describe individuals associated with him that the government will deem at trial to be his coconspirators and that, as a result, he needs to know their identities to prepare for trial. R. 133 at 5-6. Madigan cites, for example, the allegation that "It was further

---

[18] Courts have observed that "[t]he crucial test is whether the identity of the co-conspirators is necessary for the defendants to prepare for trial." *United States v. Farley*, No. 97 CR 0441, 1997 WL 695680, at *6 (N.D. Ill. Oct. 31, 1997) (Gottschall, J.).

part of the conspiracy that private benefits for MADIGAN's political allies, political workers, and associates would be and were solicited from various entities having business before the General Assembly." R. 133 at 5 (*citing* SI, Count 1, ¶ 13(b)). But this example is from the "Manner and Means of the Conspiracy" section of Count One, which is by its nature a general summary overview. The indictment proceeds to describe in Counts Two (ComEd) and Twenty-Three (AT&T), among other places, the "entities," the "political allies, political workers, and associates," and the benefits to Madigan referenced in summary fashion in Count One. Moreover, further details on this front have been supplied by the government in discovery, the *Santiago* proffer, and its pretrial motions *in limine*, where the government identifies additional further evidence it seeks to introduce to prove the existence of the charged enterprise. Madigan has been informed in multiple ways about the details behind these allegations. He cannot plausibly claim to be hampered by "vague" language or lack of knowledge as to who was involved in the charged crimes.

## 2. The Superseding Indictment Provides Adequate Notice of Madigan's Corrupt Intent (Madigan Request 3)

Madigan requests that this Court order the government to provide "[e]ach law or regulation the government alleges Madigan knew he was violating by recommending individuals to entities with business before the Illinois legislature[.]" R. 133 at 2. Madigan claims that, without detail about the specific law or regulation the government alleges he knew he was violating when making a job recommendation, he "is unable to demonstrate whether his alleged actions were legitimate or corrupt." *Id.* at 6. This argument mischaracterizes Madigan's alleged

conduct as "job recommendations" and also mischaracterizes the definition of "corruptly." In any event, Madigan's request for a bill of particulars is meritless.

Madigan's claim that he must be told the "specific law or other regulation the government alleges [he] knew he was violating," R. 133 at 6, is flawed for several reasons. First, the government is not required to prove that Madigan knew his conduct violated a specific law or regulation in order to establish corrupt intent. The government will agree to an instruction that the jury will have to find that Madigan acted with knowledge that his conduct was wrongful or unlawful. *See Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005). But the *Snyder* Court did not even address the definition of "corruptly" under § 666, as Madigan suggests. Madigan also refers to comments made at oral argument by a government attorney concerning the meaning of corruptly, R. 133 at 6; however, the thrust of the government's argument was that corrupt solicitations included gratuities, and that position was rejected by the Supreme Court, which concluded that the reference to corruptly is a signal that the statute only applies to bribery, consistent with the use of the word "corruptly" in Section 201, the general federal bribery statute. *Snyder*, 144 S. Ct. at 1954-55.[19] If Congress had intended § 666 to require knowledge of a

---

[19] Moreover, the government's position in its briefs in *Snyder*—as well as the position the Solicitor General has formally taken after *Snyder* was decided—is consistent with the government's position here: that the discussion in *Arthur Andersen* provides appropriate guidance on the meaning of "corruptly." Indeed, at least one other member of this Court is expected to provide a preliminary jury instruction for the term corruptly in the wake of *Snyder* that is consistent with the position of the government here. That instruction does not require the government to prove the defendant knew about a specific law that was being violated. Instead, it is anticipated that in *United States v. Mitziga*, the court will instruct the jury that "[a] person acts corruptly when he gives, offers, or agrees to give something of value to a public official for the purpose of influencing the official in the performance of an official

89

specific law or regulation, it would have included a willfulness requirement in the statute. Moreover, the Seventh Circuit has never interpreted the term "corruptly" to mean the same as willfulness as it relates to § 666; indeed, the Seventh Circuit has explicitly pointed out the distinct difference of that term in a prior prosecution involving violations of § 666. *See Blagojevich*, 794 F.3d at 738 (affirming denial of good faith instruction in prosecution under § 666 and other offenses; such an instruction is only necessary where the statute contains a term such as "willful" that makes knowledge of the law essential). Nor does the defendant cite any binding precedent to the contrary. Accordingly, Madigan's request to disregard binding precedent in efforts to obtain a bill of particulars should be rejected.[20]

### 3. The Superseding Indictment Adequately Identifies Things of Value and Official Acts (Madigan Requests 4 and 5).

Madigan requests a bill of particulars requiring the government to "specify each thing of value Madigan agreed to accept and each official act the government contends he took or agreed to take (or refrain from taking) in exchange." R. 133 at 7. Madigan also requests that the government be required to identify: (1) each specific business, transaction, or series of transactions at issue; and (2) each action Madigan took or agreed to take on each specific business, transaction, or series of transactions.

---

act, understanding that doing so is wrongful or unlawful." *See United States v. Mitziga,* No. 23 CR 242 (N.D. Ill.).

[20] As a practical matter, the defendants appear to miss the forest for the trees on this point. Both defendants served and interacted with the General Assembly for most of their adult lives. Indeed, legislation did not pass the House of Representatives without Madigan's authorization. To suggest Madigan was not familiar with the concept of bribery or the laws prohibiting it and needs some primer on the subject is absurd. Indeed, as but one example, Madigan was the Chief House Sponsor of a bill that amended the Illinois bribery statute in 2014. P.A. 98-756.

The superseding indictment, as well as the discovery and prior filings in this case, provide ample notice to Madigan about each of the topics he seeks.

The government is not required to spell out for Madigan the specific legislation that forms the basis of official acts. The Seventh Circuit rejected a similar request for the government to specify transactions or series of transactions comprising official acts in *United States v. Agostino*, 132 F.3d 1183, 1191 (7th Cir. 1997)*, abrogated on other grounds by Snyder*, 144 S. Ct. 1947. There, Agostino was charged with violating § 666(a)(2) and sought to require the government to identify the particular "business, transactions, or series of transactions" involved in the bribery. *Id.* at 1191. The Seventh Circuit found "unpersuasive" Agostino's claim that he would be unable to prepare a defense without a list of the specific transactions involved in the bribery scheme. *Id.* This was particularly true "where the information requested is peculiarly within the defendant's own knowledge," as was the case for Agostino. *Id.* As the court noted, "No one knows why Agostino gave Goetz $4,000 better than Agostino does." *Id.* Here, as in *Agostino*, Madigan was well aware that his associates were hired and that his law firm obtained business from entities with government business. No one knows better than defendants what legislative action he took.

Madigan's argument also fails because the government will not be required to prove that Madigan intended to be influenced or rewarded with respect to any particular piece of legislation. Instead, the statute requires that Madigan intended to be influenced or rewarded in connection with some business, transaction, or series of transactions of the government. 18 U.S.C. § 666(a)(1)(B). As discussed in Section

I(D)(2), the Seventh Circuit has recognized that the government may proceed on a stream of benefits theory. *Ryan*, 688 F.3d at 852.

Even if the government were required to identify official acts that were intended to be influenced or rewarded—and it is not—the superseding indictment maps this out for defendants in detail. Count One (racketeering conspiracy) alleges that Madigan used his position as Speaker to take and cause official action including the promotion, support, and furtherance of legislation favorable to, and obstruction of legislation unfavorable to, companies that would and did provide private benefits to Madigan and Madigan's political allies, political workers, and associates. SI, Count 1, ¶ 13(c). Count Two (ComEd conspiracy) alleges that it was part of the conspiracy that, for the purpose of influencing and rewarding Madigan in connection with his official duties, and to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and the defeat of legislation unfavorable to ComEd and its business, the conspirators (which include Madigan) arranged for Madigan's political allies to obtain jobs from ComEd even when those individuals performed little or no work for ComEd. *Id.*, Count 2, ¶ 3, p. 24-25. Count Two identifies specific ComEd legislation that the company sought to influence as part of the bribery scheme, *e.g.*, EIMA (¶ 31(a)-(b)), SB9 (¶ 31(c)-(d)), FEJA (¶ 31(u)), and HB 5626 (¶ 31(nn)) and the benefits Madigan received in exchange, *e.g.*, hiring of identified political allies in no-work jobs, interns, hiring of a key fundraiser's law firm, naming of Madigan's choice to the ComEd board, and hiring of other individuals at Madigan's request. Counts Three through Seven are substantive counts related to the

ComEd conspiracy charge. Defendants also have the benefit of the trial transcript from the ComEd Trial, which maps out for them the various pieces of legislation in issue. The remaining counts reflect specific, identified official actions for which Madigan solicited or accepted things of value. For example, Madigan agreed to arrange for a State board appointment for Alderman A in exchange for Alderman A's zoning approval for one of Madigan's developers. Madigan sought to pass a land transfer bill in the General Assembly in exchange for receiving law firm business from a developer. And Madigan solicited a bribe in the form of payments to Individual FR-1 from AT&T, knowing those payments were for his official action on AT&T's carrier of last resort legislation. *See, e.g.,* SI, Count 8, Count 19, Count 23.

Madigan claims that the decisions in *McDonnell* and *United States v. Silver,* 948 F.3d 538 (2d Cir. 2020), require that the public official act on an identified matter or, in Madigan's parlance, a "specific […] *quo*" (R. 133 at 7) and that, as a result, the government must identify a specific official act Madigan agreed to take in relation to each thing of value. In *McDonnell,* the Court held that an official act must be "more focused and concrete" than something with a high level of generality such as economic development for the state. 579 U.S. at 570. In *Silver,* the Second Circuit interpreted *McDonnell* to mean that "for an official to promise to perform an official act—and thereby engage in the prohibited *quid pro quo*—the official must promise to act *on* an identified 'question, matter, cause, suit proceeding, or controversy' at the time of the promise." 948 F.3d at 556 (emphasis original). Here, as set forth above, the allegations in the superseding indictment meet these specificity requirements.

Indeed, the superseding indictment does not allege that Madigan agreed to be influenced in relation to *all* legislation, or legislation in general, or even legislation involving utilities. Rather, the superseding indictment alleges the "focused and concrete" official act that *McDonnell* and *Silver* describe—"to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and the defeat of legislation unfavorable to ComEd and its business." SI, Count 2, ¶ 3. *See also* SI, Count 23, ¶¶ 2(f)-(g), 16. Nothing more is required.

As discussed in Section I(D)(3), there is no requirement that the government link "each *quid,* or item of value [. . .] to a specific *quo*, or official act." *Solomon*, 892 F.3d at 277 (citation omitted). "Rather, the underlying acts of bribery can be established 'through an ongoing course of conduct, so long as the evidence shows that the favors and gifts flowing to a public official are in exchange for a pattern of official actions favorable to the donor.'" *McCabe*, 103 F.4th at 284 (quoting *Woodward*, 905 F.3d at 46).

Regarding Madigan's request for every thing of value defendants sought as a bribe, R. 133 at 2, the government should likewise not be required to prepare a list of every solicitation ever made by the defendants. *See United States v. Lavin*, 504 F. Supp. 1356, 1361-62 (N.D. Ill. 1981) (denying motion for bill of particulars in a bribery case, where defendants sought list of property owners who paid bribes and how the property owners paid). The examples detailed in the superseding indictment, the voluminous discovery, coupled with defendants' own knowledge of the hiring decisions, are more than sufficient to allow defendants to prepare for trial. *See*

*Agostino*, 132 F.3d at 1191; *see also Alex*, 791 F. Supp. at 728 (request for specific information on all instances when defendant and others took steps in furtherance of RICO conspiracy exceeded proper scope of bill of particulars); *United States v. Wilson*, 493 F. Supp. 2d 364, 372 (E.D.N.Y. 2006) ("As a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars."). Indeed, Judge Leinenweber denied a nearly identical request for a list of each individual hired by ComEd at Madigan's request, and a second motion for a bill of particulars requesting a list of the number and timing of each offers/solicitation. *See McClain*, 2022 WL 488944, at *8; *see also United States v. McClain*, No. 20 CR 812, Dkt. 151 (denying motion for bill of particulars filed at Docket Number 107).

Madigan's suggestion that without a bill of particulars he lacks any "insight into the hiring considerations and decisions after he made a job recommendation" is misguided. R. 133 at 12. The superseding indictment outlines in detail examples, and the discovery reflects McClain following up at length with entities like ComEd and AT&T regarding hiring requests. Even more significantly, the government spelled out its prosecution theory in a 200-plus page *Santiago* proffer, during the ComEd Trial, and in other filings in this case. With all of this information at their disposal, defendants are well situated to identify the requests, particularly given the examples described in detail in the superseding indictment and the *Santiago* proffer and the fact that they were personally involved in these solicitations. *See Agostino*, 132 F.3d at 1191.

### 4. The Superseding Indictment and the Government's Disclosures Identify the ComEd Documents That Were Falsified (Madigan Request 6).

Madigan asks for a bill of particulars listing every document falsified related to the conspiracy alleged in Count Two related to ComEd. R. 133 at 3. This request demonstrates that Madigan's request for a bill of particulars is an improper fishing expedition, because the exact same information Madigan requests has *already* been publicly disclosed in *United States v. McClain et al.,* No. 20 CR 812, R. 109 (21-page bill of particulars listing false statements that were part of the conspiracy to falsify Exelon's and ComEd's books and records). The government has already disclosed the false statements that are at issue in Count Two and incorporates that disclosure in this case. This portion of Madigan's motion should be denied as moot. In any event, the indictment lists numerous examples and even quotes many of them. *E.g.,* SI, Count 2, ¶¶ 9, 31(x), 31(ee), 31(hh), 31(xx), 31(ggg), 31(ooo).

Given the detailed indictment, the voluminous discovery provided to defendants, and the government's previously-filed bill of particulars, there is no basis for requiring the government to once again specify each and every false statement made by the defendants. *See, e.g., United States v. Elliott*, 771 F.2d 1046, 1050-51 (7th Cir. 1985) (affirming denial of bill of particulars requesting list of false statements, where indictment alleged false statements to government agencies, because "the indictment was specific about those statements, even if it did not quote them"); *United States v. Gladhart*, 68 F. App'x 784, 786 (9th Cir. 2003) (affirming denial of motion for bill of particulars alleging false statements to banks, where indictment sufficiently described failure to disclose transfer of ownership to

defendants' son and failure to disclose their business's "true financial picture"); *United States v. Ji Chaoqun*, No. 18 CR 611, 2020 WL 1689826, at *7 (N.D. Ill. Apr. 7, 2020) (denying request for bill of particulars in § 371 case that requested, among other information, a list of "other" material false statements the government would rely upon).

\* \* \* \*

The lengthy superseding indictment, voluminous discovery, prior filings, and Madigan's knowledge of his own requests and legislative action will enable him to prepare for trial. Madigan's motion for a bill of particulars should be denied.

## IV. Madigan's Motion for Production of Grand Jury Minutes (R. 134) Should Be Denied.

### A. Applicable Law

The Supreme Court has consistently "recognized that the proper functioning of our grand jury system depends on the secrecy of grand jury proceedings" and in "the absence of a clear indication in a statute or [r]ule, [the court] must always be reluctant to conclude that a breach of secrecy has been authorized." *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 424-25 (1983) (citations omitted). Rule 6(e) of the Federal Rules of Criminal Procedure codifies the centuries-old requirement that grand jury proceedings generally be kept secret. *See Matter of Grand Jury Proc., Special Sept., 1986*, 942 F.2d 1195, 1198 (7th Cir. 1991). As relevant to this case, Rule 6(e)(3)(E)(ii) provides that the court may authorize disclosure of a grand jury matter "at the request of a defendant who shows that a ground may exist to dismiss the

indictment because of a matter that occurred before the grand jury." Fed. R. Cr. P. 6(e)(3)(E)(ii).

A party requesting grand jury material under this provision bears the burden of showing a "strong showing of particularized need" for grand jury materials. *See Sells Engineering*, 463 U.S. at 442-43. Disclosure is only appropriate when that particularized need outweighs the public interest in grand jury secrecy. *Id.* at 443. As the Seventh Circuit has stated, "the standard for determining when the traditional secrecy of the grand jury may be broken is deliberately stringent: parties seeking disclosure of grand jury transcripts must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Matter of Grand Jury Proc.*, 942 F.2d at 1198 (citing *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979)). A party seeking disclosure of grand jury proceedings "must demonstrate more than relevance; he must show necessity to prevent injustice." *Hernly v. United States*, 832 F.2d 980, 983 (7th Cir.1987) (citing *United States v. Proctor & Gamble*, 356 U.S. 677, 682 (1958)).

Significantly, there is a presumption of regularity in grand jury proceedings. *United States v. Lisinski*, 728 F.2d 887, 893 (7th Cir. 1984). "Mere unsupported speculation of possible prosecutorial abuse does not meet the particularized need standard." *Canino*, 949 F.2d at 943.

**B. Defendants Cannot Show Particularized Need for Grand Jury Materials.[21]**



---

[21] Because this portion of the government's brief concerns matters occurring before the grand jury, the government has redacted the public version of this section and will submit grand jury materials to the Court *in camera*.



## **CONCLUSION**

For foregoing reasons, the government respectfully requests that the Court deny defendants' pretrial motions.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

*/s/ Amarjeet S. Bhachu*
AMARJEET S. BHACHU
DIANE MacARTHUR
TIMOTHY CHAPMAN
SARAH E. STREICKER
JULIA K. SCHWARTZ
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300