UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 22 CR 115 |
| v. | |
| MICHAEL MADIGAN and MICHAEL McCLAIN | Judge John Robert Blakey |

**MEMORANDUM OPINION AND ORDER**

This case comes before the Court upon the Government's motion to admit the testimony of Professor Dick Simpson and Former Alderperson Michele Smith, [108] and Defendants' motions to exclude such testimony, [113], [117]. The Court held oral argument on the parties' motions on July 16, 2024, and *Daubert* hearings on August 26, 2024, and August 29, 2024. For the reasons explained below, the Court grants in part, and denies in part, the Government's motion to admit [108] and Defendants' motions to exclude. [113], [117].

**I.   Background**

On October 12, 2022, a grand jury returned a Superseding Indictment charging Defendants Michael J. Madigan and Michael F. McClain with twenty-three corruption-related charges. [37]. Defendant Madigan held numerous public offices over the span of his long-time career as an Illinois politician. *Id.* Count 1 ¶ 6. The Superseding Indictment alleges that Madigan used these positions to "oversee, direct, and guide" (*Id.* Count 1 ¶ 7) the activities of a criminal racketeering enterprise, which served the purpose of exercising, preserving, and enhancing Madigan's political power and financial status. *Id.* Count 1 ¶¶ 2-3. The Superseding Indictment alleges that the charged enterprise also served to financially reward and generate income for Madigan's political allies, workers, and other associates for their loyalty and services to Madigan. *Id.* Count 1 ¶¶ 2-3.

The Superseding Indictment alleges that McClain served Madigan and the charged enterprise by, among other activities, making unlawful demands to third parties on Madigan's behalf, conveying Madigan's instructions to political allies, workers, and associates, causing the creation of false documentation to obscure payments made to Madigan's associates, providing strategic advice to Madigan, and engaging in other related tasks. *Id.* Count 1 ¶ 9. The Superseding Indictment covers several factual episodes occurring between 2011-2019 where Madigan, along with

McClain, allegedly engaged in a racketeering conspiracy as part of their roles within the charged enterprise. The Superseding Indictment also includes numerous fraud and bribery charges stemming from these episodes.

The Government retained Professor Dick W. Simpson to testify about politics and government within the City of Chicago, including the structure of ward organizations, the operations of Chicago's political organizations, and the system of patronage hiring. [108] at 1. The Government also retained Former Alderperson Michele Smith to testify about Chicago politics and government, including the operations of the Chicago City Council, the Council's Zoning Committee, and the role and responsibilities of Chicago Democratic Committeemen. *Id.*

Defendants Madigan and McClain filed motions to exclude Professor Simpson's testimony on the grounds that it is unreliable, irrelevant, and highly prejudicial. [113] at 1; [117] at 2. Madigan also seeks to exclude Former Alderperson Smith's testimony on the grounds that it is solely based on personal knowledge and not data or analysis, and thus is unreliable, and does not otherwise help the jury determine any facts at issue in the case. *Id.* at 17-18. McClain adopts and incorporates Madigan's arguments with respect to Former Alderperson Smith. [113] at 16.

## II. Legal Standard

Federal Rule of Evidence 702 and the Supreme Court's holding in *Daubert v. Merrell Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), "govern the admissibility of expert testimony." *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 871 (7th Cir. 2021) (citing *Haley v. Kolbe & Kolbe Millwork Co.*, 863 F.3d 600, 611 (7th Cir. 2017)). Rule 702 provides that a person may testify as an expert if: (1) the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue"; (2) the testimony is "based on sufficient facts or data"; (3) the testimony is "the product of reliable principles and methods"; and (4) the expert has "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.[1]

Under *Daubert*, the district courts serve a gatekeeping function to prevent the admission of irrelevant or unreliable testimony. *See Daubert*, 509 U.S. at 597; *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012). To perform this role, "the district court must engage in a three-step analysis, evaluating: '(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony.'" *Kirk*, 991 F.3d at 872 (quoting *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017)). Rule 702's "standard for relevance also incorporates this Court's obligations under Rule 403 to 'determine the total effects of proposed evidence, weighing its probative value against its potential

---

[1] The *Daubert* analysis applies to nonscientific expert testimony in equal force; district courts may apply *Daubert* flexibly as "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

to (among other things) confuse the jury.'" *United States v. Burke*, No. 19 CR 322, 2023 WL 7221897, at *4 (N.D. Ill. Nov. 2, 2023) (quoting *United States v. Schiro*, 679 F.3d 521, 529 (7th Cir. 2012)).

The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). So long as the proponent establishes a threshold level of reliability and relevance, then the testimony is admissible under Rule 702. *Daubert*, 509 U.S. at 596. The district court maintains "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.*

### III. Analysis

#### A. Order on Former Alderperson Michele Smith's Proposed Testimony

First, on August 26, 2024, this case was called for a *Daubert* hearing on the motions listed above. At the hearing, the Government represented that Former Alderperson Smith will no longer testify as an expert witness under Rule 702, and instead will testify pursuant to Rule 701 as a lay witness. *See* Federal Rules of Evidence 701, 702. Accordingly, the Court denied, in part as moot, the Government's motion in limine, [108] with respect to Former Alderperson Smith's testimony and Defendants' motions to exclude the testimony, [113], [117] for the same reason. [162]. As such, the admissibility of Alderperson Smith's lay testimony will be addressed under the rules of procedure in the normal course of trial, subject to timely objections. The Court now addresses the remaining portions of the parties' motions below.

#### B. Government's Proposed Expert Testimony of Professor Richard Simpson

The Government seeks to admit the testimony of Professor Dick W. Simpson as an expert witness in Chicago politics and government. [108] at 4. As proffered via live testimony at the *Daubert* hearing, Professor Simpson's proposed testimony would include explanations of the operation of political entities in Chicago's ward organizations, and the roles of Committeepersons, precinct captains, and patronage hiring within those systems. *Id.* at 4-5.[2]

Defendants seek to exclude Professor Simpson's testimony on the grounds that his testimony is not supported by any reliable methodology or principles, the testimony lacks probative value and will not assist the trier of fact as to the relevant

---

[2] This Court incorporates by reference the evidence presented at the August 29 hearing [180] into the analysis below because, as the Government confirmed on the record, the live testimony of Professor Simpson at the hearing constituted a full disclosure of the expert testimony of the witness at trial.

events, and the risk of unfair prejudice substantially outweighs any probative value of the testimony. *See* [113], [117].

In response, the Government contends that Professor Simpson's proposed "testimony will provide background, context, and history that helps the jury understand defendants' words and actions." [128] at 8.

1. **Admissibility under Rule 702**

   a) **Professor Simpson's Expert Qualifications**

Establishing whether a witness is "qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). Courts may properly "consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

Professor Simpson graduated from the University of Texas, earning a bachelor's degree in government. Tr. 8:11-16. Professor Simpson later earned a master's degree and a Ph.D. in political science from Indiana University. [117] Ex. B at 1; 8:17-9:12. He went on to teach at the University of Illinois Chicago for 55 years, retiring in 2022 and now holds the title Professor Emeritus. Tr. 7:6-8:3. Professor Simpson taught courses in American government, African politics, and Chicago politics, among other courses. Tr. 12:11-13:3. Additionally, he acted as director of graduate studies in political science, head of the political science department, and director of undergraduate studies in political science during his time at the University. Tr. at 14:15-23. Professor Simpson has also published numerous reports, books, and journal articles, in addition to producing several documentaries, concerning Chicago city government. [117] Ex. B at 1.

Professor Simpson simultaneously pursued a long career in politics. His professional work experience includes participating in approximately 30 campaigns since 1967 as a political advisor. Tr. at 14:24-15:4. He has served as a campaign manager in approximately 12 campaigns. Tr. at 15:4-6. Additionally, Professor Simpson served as the 44th Ward Alderman for two terms, totaling eight years, from 1971-1979. [117] Ex. B at 1. At the August 29 hearing, Professor Simpson testified that this practical political work, combined with his academic training and experience, provided him with an understanding of traditional ward politics, structure, and operations. Tr. 20:6-10; 22:22-24:24; 25:8-34:2. He also elaborated that he has conducted many formal and informal interviews, and engaged in numerous discussions with alderpersons, committeepersons, and other political

figures within traditional ward political structures over his multi-decade career, which further contribute to his ability to form expert opinions on the proffered topics. Tr. 22:6-24:24; 28:3-21; 33:7-34:2; 34:17-37:2.

Clearly, given his extensive personal experience in Chicago politics and his substantial academic experience and expertise in political science and Chicago politics at large, the record confirms that Professor Simpson possesses more than sufficient expert qualifications as to the function of traditional ward operations, politics, and structure from 2011-2019, including: 1) the existence and structure of wards (i.e., legislative districts in the City of Chicago and the political parties and organizations within wards); 2) the existence and structure of precincts and precinct captains as they operate within those wards; 3) the existence and functions of Alderpersons; and 4) the existence and functions of Committeepersons. *See Smith*, 215 F.3d at 718 (stating that courts may consider an "expert's full range of practical experience as well as academic or technical training" when determining the expert's qualifications under Rule 702).

Despite Professor Simpson's expert qualifications, Defendants' challenge the admissibility of his expert opinions due to an alleged lack of reliability and relevance to the case at hand, as well as potential bias concerns due to Professor Simpson's opposing political alignment in the past and his public criticism against Madigan. [117] at 8-10, 14.[3] These concerns, however, do not directly challenge Professor Simpson's expert qualifications on these topics. Accordingly, the Court finds Professor Simpson sufficiently qualified under Rule 702, and now turns to the Defendants' other concerns and objections in the sections below.

### b) Reliability of Professor Simpson's Testimony

Under Seventh Circuit precedent, "the test for reliability" for nonscientific expert opinions "is flexible." *United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999) (internal quotation marks omitted). When evaluating the reliability of expert testimony under Rule 702, the analysis "primarily" concerns "the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Insurance Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013). This is true because determinations on admissibility "should not supplant the adversarial process" and "'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Moreover, in contrast to "scientific or technical experts, whose hypotheses can be tested or subjected to peer review and whose methods can be measured against specific industry standards, a political scientist's testimony (political science is not 'science' for Rule 702 purposes) cannot be so mechanically scrutinized." *Ill. Liberty PAC v.*

---

[3] At trial, of course, this Court will permit vigorous cross-examination of the witness on any potential personal bias or animosity against the Defendants.

*Madigan*, No. 12 C 5811, 2015 WL 5589630, at *5 (N.D. Ill. Sept. 21, 2015) (citing *Lees v. Carthage Coll.*, 714 F.3d 516, 525 (7th Cir. 2013)).

Here, Defendants dispute the reliability and probative value of Professor Simpson's testimony, arguing that the Government "has identified no data, analysis or peer review that would support Professor Simpson's assertions about ward organizations." [117] at 7. *See also* [113] at 5-6. Testimony based upon years of experience, however, "is not necessarily unreliable," provided the expert can show "how his experience or expertise led to his conclusions." *Varlen Corp. v. Liberty Mutual Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019) (citing *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010)). *See also Artis v. Santos*, 95 F.4th 518, 526 (7th Cir. 2024) ("[B]y now it is no secret that an expert need not wear a lab coat nor cite peer-reviewed studies to reliably lend his expertise to the trier of fact—experience is an equally valuable teacher.") (citing cases).

At the August 29 hearing, Professor Simpson testified that he developed a broad expert understanding of the structure, politics, and operation of wards and the politics of the City of Chicago over his 55 years of academic and practical experience in the field of political science. Tr. 36:14-37:2. He also testified that he reviewed relevant literature and public documents when preparing to teach classes (such as the bylaws of the Cook County Central Committee of the Democratic Party) which has also allowed him to form opinions on the structure and operations of traditional ward political organizations in Chicago. Tr. 12:19-13:15, 34:17-37:2.

Defendants are correct that Professor Simpson did not identify any data-driven studies, or any specific, repeatable methodology that he utilized in preparing his proposed expert testimony. But an expert's testimony is not "unsupported *ipse dixit*" merely because it does not rely on specific data or scientific analysis; certainly, expert testimony cannot "pluck" conclusions "out of thin air," but an expert's reliance on his "extensive experience" may provide "ample foundation for his opinions." *Artis*, 95 F.4th at 526.

In general, the Court finds sufficient foundation for testimony under Rule 702. In preparing his expert testimony, Professor Simpson relies on his personal experience and academic expertise, which includes studying the structure, politics, and organization of traditional ward political structures, extensive personal observations of these organizations, and reviews of relevant documents and literature. The Court finds this is "a reliable methodology in political science and appropriate to the facts of this case." *Burke*, 2023 WL 7221897 at *3 (citing *Ill. Liberty PAC*, 2015 WL 5589630 at *4). Thus, Professor Simpson's testimony remains sufficiently reliable under Rule 702, subject to certain important limitations noted below. *See Empress Casino Joliet Corp. v. Johnston*, Case No. 09 C 3585, 2014 WL 6735529, at *11-12 (N.D. Ill. Nov. 28, 2014) (admitting the expert testimony of a

political science professor whose specialized knowledge derived from his academic experience, review of public documents, and other materials).

### c) Rule 403 Balance of Professor Simpson's Testimony

As mentioned above, Rule 702's "standard for relevance also incorporates the Court's obligations under Rule 403 to 'determine the total effects of proposed evidence, weighing its probative value against its potential to (among other things) confuse the jury.'" *Burke*, 2023 WL 7221897 at *4 (quoting *Schiro*, 679 F.3d at 529). And since expert evidence can be "both powerful and quite misleading because of the difficulty in evaluating it," judges may exercise "more control over experts than over lay witnesses" when evaluating and balancing "possible prejudice against probative force under Rule 403." *Daubert*, 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)). Likewise, expert testimony may assist the jury in "determining *any* fact at issue in the case" for the "expert's testimony to qualify as 'relevant' under Rule 702." *Smith v. Ford Motor Co.*, 215 F.3d 713, 721 (7th Cir. 2000) (emphasis in original). In other words, "under Rule 702, expert testimony need only be relevant to *an* issue in the case; it need not relate directly to the ultimate issue." *Id.* (emphasis in original).

Here, as shown through the testimony presented at the August 29 hearing, Professor Simpson's proposed expert testimony primarily pertains to informing the jury about the existence and basic features of traditional ward political structures in Chicago. The Court finds that this testimony is helpful to the jury in this case. Even though it might not relate to an "ultimate issue" as to whether Defendants acted unlawfully, it does assist the jury in understanding the essential characteristics of a traditional ward political organization, which provides important context in this complex case where a ward organization remains central to the charges presented in the Superseding Indictment.

Defendants point to *United States v. McClain*, a recent case where a court did not permit Professor Simpson to testify after finding that his proposed expert testimony was not sufficiently reliable and unlikely to assist trier of fact. [117] at 5 (citing *United States v. McClain*, No. 20-CR-812, 2023 WL 2403137, at *2 (N.D. Ill. Mar. 8, 2023)). The Government distinguishes this other case by noting that the instant case involves an alleged racketeering conspiracy which includes the Thirteenth Ward Democratic Organization, and therefore "Professor Simpson's testimony regarding ward organizations and Committeemen is fundamental to the jury's understanding of the evidence and the anticipated disputed issues in this case." [108] at 13. As such, the RICO conspiracy charges in this case, and the direct involvement of the Thirteenth Ward in those charges, presents a critical difference from the charges at issue in *McClain*.

While the *McClain* case bears many similarities with the present case, the material differences here increase the probative value of Professor Simpson's testimony to the jury. For example, as argued at the *Daubert* hearing, the Government intends to introduce recordings at trial in which the parties refer to individuals as "precinct captains," "precinct workers," as well as the "old fashioned patronage system" (referenced by Defendant McClain), and the evidence otherwise includes comments on the roles and values of those political workers. *See* Tr. 177:10-179:14; GX 293. Educating the jury about "the methods and the jargon" referred to in this evidence certainly constitutes helpful testimony, and thus may be properly admitted under Rule 702. *United States v. Gan*, 54 F.4th 467, 474 (7th Cir. 2022).

Subject to certain limitations noted below, this Court finds Professor Simpson's proposed expert testimony sufficiently probative and admissible. *See Burke*, 2023 WL 7221897 at *4. Nevertheless, even though the generalized subject matter of Professor Simpson's testimony will assist the jury, not every opinion proffered in the August 29 hearing possesses sufficient reliability or probative value to outweigh risk of unfair prejudice. The relevant parameters under Rules 702 and 403 are set forth below.

### 2. Admissible Expert Testimony

#### a) Professor Simpson's Background

The portions of Professor Simpson's testimony which relate to his academic and professional background in political science and active politics are relevant and admissible because they relate to Professor Simpson's qualifications to testify. Tr. 7:1-9:18; 12:11-25:3. Professor Simpson may also testify about his own academic work by describing books and articles he has written, awards he has received, political science organizations he is a member of, and related topics. Tr. 9:16-12:3; 25:4-17; 28:3-29:8; 30:3-33:6; 34:3-16. He may also testify regarding the quantitative and qualitative methods he uses when producing his academic work, the types of literature and documents he reviews, the data he collects and publishes, and related topics. Tr. 12:11-15:17; 25:4-28:21; 33:7-34:2; 34:17-37:2. This type of testimony directly relates to Professor Simpson's qualifications and provides useful context for the jury regarding the basis for his opinions, and thus is probative, relevant, and admissible testimony.

The Court notes that Defendants objected at the hearing to Professor Simpson providing testimony about historical studies he engaged in to understand the operations of traditional ward political structures. Tr. at 15:18-16:3. Respectfully, the Court overrules this objection to the extent that Professor Simpson may testify about experiences which have contributed to the specialized knowledge, and his education that enables him to form expert opinions regarding the existence, structure, and operations of traditional ward structures. But the Court limits use of

that portion of the testimony to that purpose alone: Professor Simpson may not reference or rely on the conclusions of those studies when testifying about traditional ward political structures as it relates in the relevant period of 2011-2019.[4]

### b) Structure of Chicago's City Council

Professor Simpson may also testify regarding the structure of Chicago's City Council, the roles and responsibilities of alderpersons, the roles and responsibilities of precinct captains, the roles and responsibilities of Committeepersons, and the existence and structure of the Central Committee. Specifically, Professor Simpson may explain the operations of City Council, including the internal structures and elected officials within its operation. Tr. 38:11-40:12. This includes testimony explaining the number of alderpersons which compose City Council, the election process by which alderpersons are chosen, the division of Chicago into wards, which are then subdivided into precincts, and the roles of alderpersons and precinct captains within those territories. Tr. 40:13-41:17. The Court finds that this testimony will assist the jury by providing relevant, useful context to the political terms and operations which will be discussed at trial.

### c) Role and Function of Precinct Captains/Workers

Professor Simpson may also explain generally the roles of precinct captains and precinct workers, and with respect to elections, specifically, their election day responsibilities and the importance of those responsibilities to winning elections. Tr. 42:18-47:9. Additionally, Professor Simpson may explain the existence and role of the Central Committee and Committeepersons, their functions in relation to political operations in wards and their relationship to the Central Committee. Tr. 47:9-52:8. Professor Simpson may also testify to the defining characteristics of traditional ward political organizations, including explaining their central purpose (to win elections, as he testified at the hearing, *see* Tr. 53:14-23) and the political purpose and benefit of obtaining a party's endorsement to election results. Tr. 52:9-54:8; 58:7-59:2.

The above testimony is sufficiently reliable and probative under Rules 702 and 403 as Professor Simpson's testimony will assist jurors by providing them with the basic context surrounding the facts they will hear, evaluate, and draw reasonable inference from. Even though the subject of this expert testimony does not relate

---

[4] Further, by agreement of the parties, the Court sustains Defendants' objection to Professor Simpson identifying himself with any certain political figures by name, or using the word "machine" in reference to ward politics. The Court finds that the probative value of Professor Simpson using the "machine" label or providing any specific names of politicians he worked with in the past is substantially outweighed by the risk of confusing the issues for the jury and otherwise risks suggesting a decision on an improper basis. *See United States v. Rogers,* 587 F.3d 816, 822 (7th Cir. 2009) ("Evidence poses a danger of 'unfair prejudice' if it has 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" (quoting Fed. R. Evid. 403 advisory committee's note)).

directly to a dispositive, ultimate issue in this case, it undoubtedly remains "relevant to *an* issue in the case," namely, the structure and operations of traditional ward political structures, which the allegations claim includes the Thirteenth Ward. *Smith*, 215 F.3d at 721 (7th Cir. 2000).[5]

### 3. Inadmissible Expert Testimony

#### a) Opinions on the Subjective Motives of Precinct Captains and Political Workers

The Court finds that any testimony Professor Simpson may offer regarding his generalized opinions on the subjective, internal motivations of precinct captains at large to engage in their work must be excluded under Rules 702 and 403.[6] At the hearing, Professor Simpson explained that precinct captains do not receive compensation for the political work they engage in on behalf of the ward, and that instead, these individuals work to secure votes within their precinct in exchange for, or with the expectation to receive, material rewards from their ward Committeeperson—usually a paid job (or no-show job) in a government organization, or a private sector job obtained by the ward organization. Tr. 54:9-58:6. Professor Simpson then speculated that these rewards and/or expectations are the primary motivating factor as to why precinct workers and precinct captains work on behalf of the ward organization, because such workers and captains are supposedly not ideologically driven. Tr. 56:15-18.

Even if Professor Simpson's extensive academic and personal experience leads him to believe he can reasonably opine on why an individual would choose to become a precinct captain, these observations cannot possibly be relied upon to accurately describe the subjective mental processes of individual precinct captains or precinct workers in the City of Chicago in general. Such testimony cannot validly assist the jury because it only serves to "put an 'expert gloss' on a conclusion that the jurors should draw themselves" after hearing testimony about the functions and importance of precinct captains, and the other evidence at trial. *U.S. v. Christian*, 673 F.3d 702,

---

[5] As discussed at the August 29 hearing, even though Professor Simson does not have any personal experience (either academic or otherwise) with political operations within the Thirteenth Ward itself, his "education and experience" still provide sufficient "foundation necessary to opine about" the basic features of a traditional ward political organization in general. *Ill. Liberty PAC*, 2015 WL 5589630 at *5 (finding an expert's proposed testimony concerning political science topics admissible even though the expert did not have Illinois-specific experience, because his qualifications provided sufficient foundation for him to testify on the relevant topics and those concerns impacted the weight, not admissibility, of his opinions).

[6] At the hearing, the Defendants objected to Professor Simpson's testimony regarding his generalized opinion that most members of the public do not have an in-depth understanding of the topics he testified to, namely the basic operations of Chicago city politics. *See* Tr. 37:15-24. The Government confirmed on the record, however, that it does not anticipate eliciting that testimony from Professor Simpson at trial. Tr. 37:25-38:7. Thus, the Court does not currently need to address that issue.

710 (7th Cir. 2012) (citing *U.S. v. York*, 572 F.3d 415, 423 (7th Cir. 2009)). These overgeneralizations also lack a sufficient foundation within Professor Simpson's professional competence and remain unfairly prejudicial to Defendants by improperly supplying the jury with a conclusion that all or most precinct operatives worked solely for material benefits.

## IV.   Conclusion

For the reasons expressed above, the Court grants in part, and denies in part, the Government's motion to admit [108] and Defendants' motions to exclude. [113], [117]. All other motions remain pending and will be argued and resolved at the Final Pretrial Conference on September 16, 2024.

Date:  September 13, 2024

ENTERED:

_____
John Robert Blakey
United States District Judge