**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,

Case No. 22 CR 115

v.

Judge John Robert Blakey

MICHAEL MADIGAN and
MICHAEL McCLAIN

**PRETRIAL ORDER**

This matter comes before the Court on the parties' pretrial motions and argument, and following the September 16, 2024, Final Pretrial Conference. The Court has considered the entire record, including the parties' oral arguments and written submissions. The Court has also considered all the parties' pretrial motions filed prior to the Final Pretrial Conference. For the reasons stated on the record during the prior hearings, and for the additional reasons provided herein, the Court hereby supplements its prior rulings and rules as set forth below.[1]

By prior order, [91], this matter remains set for jury selection at 9:30 a.m. on October 8, 2024, with attorneys and parties to appear at 9:00 a.m. in Courtroom 1203.

I.     **Case Statement**

As the parties agreed on the record at the Final Pretrial Conference, the case statement shall be as follows:

The indictment in this case charges Defendants Michael Madigan and Michael McClain with racketeering conspiracy; conspiracy to commit an offense against the United States; federal program bribery; wire fraud, and use of an interstate facility in aid of racketeering activity.

---

[1] To the degree that this order preliminarily bars or permits any evidence or argument, that evidence or argument remains excluded or permitted at trial, unless a party timely seeks and obtains reconsideration of this Court's order outside the presence of the jury. Additionally, reiterating its direction to the parties at the Final Pretrial Conference, this Court notes that if any of the parties determine that an outstanding issue exists which requires independent briefing, any bench memorandum must be filed by 10:00 a.m. on October 8, 2024. During trial, the parties will not be permitted to submit written briefs after that date, absent leave of the Court.

Defendant Madigan is also charged with attempted extortion. Defendant Madigan has pleaded not guilty to all the charges brought by the Government. Defendant McClain has pleaded not guilty to all of the charges brought by the Government. The indictment is simply a formal way of telling the Defendants what crimes they are accused of committing. It is not evidence that the Defendants are guilty. It does not even raise a suspicion of guilt.

## II.    Stipulations and Evidentiary Agreements

As discussed at the Final Pretrial Conference, the parties have proposed several stipulations and evidentiary agreements. *See* [176] at 4–6. To the degree the parties' enumerated list reflects agreements about the admissibility of certain testimony or exhibits, the Court accepts those agreements. As explained on the record, however, all factual and testimonial stipulations must be numbered, in writing, signed by the parties, and approved by the Court before being admitted at trial and published to the jury on the record.

## III.    Lists of Witnesses

The Court accepts the witness lists that the parties filed in conjunction with the joint pretrial memorandum. [177], Ex. A, Ex. C, Ex. E. For the purposes of jury selection, per the Court's previous order (*see* [203]), and as discussed on the record at the Final Pretrial Conference, the parties must submit a combined, alphabetical list of names material to the case to Chambers. By prior order, the new deadline for this submission is now set at 5:00 p.m. on October 4, 2024. *See* [211].

Further, during trial, the Court orders the Government to provide Defendants with an ongoing list of the witnesses it anticipates calling for the next day of trial or the next ten witnesses the Government anticipates calling, whichever is greater. Defendants, in turn, shall provide the Government with estimates of the length of their anticipated cross-examinations of each witness on the list.

To the degree the parties will seek to exclude the presence of witnesses from the trial prior to their testimony, the parties must invoke the rule on the first day of trial and enforce it themselves in good faith both for Courtroom 1203 and any overflow courtrooms used during the proceedings. Any violations of the rule may be brought to the Court's attention.

## IV.    Lists of Exhibits

Subject to timely objections and the rulings in this Order as to the parties' motions in limine, the Court will rule upon the admissibility of exhibits as the parties introduce them at trial. As such, the parties must timely raise any objections during

trial. The parties must provide two sets of printed exhibits in binders as well as electronic copies of exhibits on flash drives to Chambers by 9:30 a.m. on October 8, 2024. By prior order, the parties were directed to provide a joint submission on redaction requests, disputes as to the authenticity or contents of transcripts, and proposed additional or alternative transcripts by close of business September 26, 2024. A hearing on this submission will be held at 9:00 a.m. on October 2, 2024.

## V. Pretrial Motions in Limine[2]

The Court has already orally addressed outstanding trial-related motions in limine at the Pretrial Conference or will do so promptly in its supplemental findings by separate written order.[3]

## VI. Jury Instructions and Verdict Forms

The Court accepts the parties' agreed proposed preliminary instructions for the first day of trial, [176] at 13, but, as stated in the Final Pretrial Conference, this Court grants in part and denies in part the parties' proposed modifications to preliminary instructions 2, 5, and 6. The Court takes under advisement the parties' proposed final instructions and verdict form. [178], [183], [188], [201]. The final jury instruction conference will take place as described at the Final Pretrial Conference.

## VII. Courtroom Technology

The parties are invited and encouraged to make full use of the courtroom technology to present their evidence. The Court emphasizes that the parties should arrange for, *and test*, all technology prior to proceedings each day.

## VIII. Orderly Conduct of the Proceedings

The parties indicated to the Court, in both the joint pretrial memorandum and at the Final Pretrial Conference, that this trial will last approximately ten weeks. The Court will hold the parties to their ten-week trial length estimate.

Until jury deliberations begin, the trial will generally run Monday through Thursday, with proceedings beginning at 9:00 a.m. and concluding promptly at 5:00

---

[2] The Court notes that it maintains "authority to reconsider its rulings on motions in limine as 'the case unfolds'" and remains "free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling,'" even if "nothing unexpected happens at trial. *Lecat's Ventriloscope v. MT Tool and Mfg.*, No. 16 C 5298, 2019 WL 12528939, *1 (N.D. Ill. Feb. 22, 2019) (quoting *Luce v. United States*, 469 U.S. 38, 41 (1983)).

[3] To the extent the Court has invited the parties to submit any limiting instructions as part of its rulings on the motions in limine, the parties must provide these submissions to the Court as ordered by 9:30 a.m. on October 8, 2024. *See* [203].

p.m. in Courtroom 1203 and Overflow Courtrooms 1725 (through jury selection only) and 1944D. The trial will proceed on Fridays during jury selection and deliberations. To accommodate the jurors' personal schedules and other matters, the trial will conclude before 3:00 p.m. on Wednesdays.

On trial days, the parties and counsel must arrive to court by 9:00 a.m. unless otherwise instructed. Each morning, if the parties wish to discuss issues that arise during trial with the Court, they must immediately inform chambers staff, so that the Court may address the matter promptly and still seat the jury on time. The parties may also contact the Court in advance if an issue arises that may require more time to address, in which case the Court may take the bench before 9:00 a.m. if necessary.

The following procedures will apply in connection with the trial scheduled to commence with jury selection at 9:30 a.m. on Wednesday, October 9, 2024.

A.   The Courthouse will open at 7:00 a.m. and close at 6:00 p.m. each day.

B.   The U.S. Marshals Service will be in charge of providing security and may limit seating or access as necessary to ensure the safety of all present.

C.   One row in Courtroom 1203 will be reserved for news organizations that have reporters assigned to the courthouse on a full-time basis: Bloomberg News, Chicago Daily Law Bulletin, Chicago Sun-Times, Chicago Tribune, Courthouse News, Law 360, and Reuters. Each organization is allowed one reserved seat in this row and must be present at 8:45 a.m. in the public corridor outside Courtroom 1203. Two sketch artists will also be provided a seat in the first row and must be present at 8:45 a.m. in the public corridor outside Courtroom 1203. Sketch artists may not sketch jurors recognizably. Members of the media in this row will be asked to present valid, unexpired court-recognized media credentials.

D.   All other members of the public and media will be seated on a first-come, first-served basis.

E.   Beginning at 8:30 a.m., members of the media and public may line up in the public corridor outside Courtroom 1203 and any Overflow Courtroom(s). The Courtrooms will open at 8:45 a.m. each day.

F.   The Court will permit use of tablets, cellphones, and electronic devices without keyboards in Courtroom 1203. Ringers must be set to silent. In the absence of an objection by the parties, laptops shall be permitted in

Courtroom 1203 on a provisional basis only, provided the use of keyboard devices does not interfere with the ability of the court reporters to keep an accurate record of the proceedings.

G.    The use of electronic devices is also permitted in any Overflow Courtroom(s). Again, ringers must be set to silent.

H.    Photographing and video or audio recording or transmission of any court proceeding, including in any Overflow Courtroom(s), remains prohibited.

I.    No beverages or food are allowed in the courtroom.

J.    No conversations or disruptive gestures are permitted in the courtroom.

K.    No interviews or interview requests are permitted on the 12th floor or any other floor of the Dirksen U.S. Courthouse other than in the lobby, pursuant to the August 23, 2018, Joint Courthouse Security Order.

L.    Interviews may occur only in the designated media area of the lobby. Only credentialed members of the media may use the media area of the lobby. Filming of any security equipment or uniformed security personnel is strictly prohibited.

M.    Members of the media must display court media credentials on their person while in the courthouse.

N.    Credentialed members of the media will have lobby access until 6:00 p.m. each day.

O.    The recording, streaming, or use of cameras is not allowed in the Courthouse, except in the media area in the lobby. Cameras, photography, and recording are prohibited in all areas of the Courthouse except in the media area of the lobby.

P.    The U.S. Marshals Service may restrict the entrance to the media area in the lobby based upon safety concerns involving occupancy.

Q.    The media is reminded that public safety must be considered, and any action that may cause an unsafe environment will be addressed by the U.S. Marshals Service. No member of the public or the media may block an entrance or exit to the Courthouse.

R.    Failure to comply with these rules will result in removal from the courtroom and potentially confiscation of electronic devices. Any violation of a court order will be addressed.

S.    The Courthouse will be closed on Monday, October 14, 2024; Monday, November 11, 2024; Thursday, November 28, 2024; and Wednesday, December 25, 2024, in observance of holidays.

T.    <u>Special note for jury selection</u>:  Because of the size of the jury panel, space in the main courtroom during *voir dire* will be reserved for the parties, attorneys, and potential jurors only.  Members of the media and public will be able to view jury selection, anticipated to run October 9 through 11, 2024, in Overflow Courtrooms 1725 and 1944D. The use of electronics will be allowed in Overflow Courtrooms, subject to the limitations noted above. Ringers must be set to silent.

Additional information, procedures, and prohibitions are or will be detailed on the Court's website, www.ilnd.uscourts.gov, and posted in the Courthouse.  Questions regarding the media guidelines should be directed to Julie Hodek, Public Information Officer.

## IX.    Defendants' Pretrial Motions[4]

### A.    <u>Defendants' Motion to Dismiss Certain Counts of the Superseding Indictment, [129]</u>

Madigan, joined by McClain, moves to dismiss certain counts of the Superseding Indictment, including Counts One, Two through Seven, Eleven through Fourteen, and Twenty-One through Twenty-Three.

Federal Rule of Criminal Procedure 7(c)(1) requires an indictment to be a plain, concise, definite written statement of the essential facts constituting the offense charged.  An indictment "is constitutionally sufficient and satisfies Rule 7(c)(1) if: (1) the indictment states all of the elements of the crime charged; (2) it adequately apprises the defendant of the nature of the charges so that he may prepare a defense;

---

[4] McClain joins Madigan's motion to dismiss and revised motion to dismiss, [53], [129], [131], as to Counts One, Two, Twenty-One, Twenty-Two, and Twenty-Three and Madigan's motion to suppress, [57]; motion to strike, [59]; motion for bill of particulars, [60]; and motion for production of grand jury minutes [134] in their entirety.  [135].  Madigan joins McClain's motion to dismiss, [71].  The Court previously granted these motions to join in part, [75], [162], but noted that, to the extent a party fails to raise any additional or individualized arguments as to the motions they joined respectively, those arguments are waived.  *See United States v. Davis*, 29 F.4th 380, 385 n.2 (7th Cir. 2022) (explaining that perfunctory or undeveloped arguments are waived); *United States v. Barr*, 960 F.3d 906, 916 (7th Cir. 2020) (same); *United States v. Butler*, 58 F.4th 364, 368 (7th Cir. 2023) (same); *Griffin v. Bell,* 694 F.3d 817, 822 (7th Cir. 2012) (Arguments "raised for the first time in a reply brief are deemed waived").

and (3) it allows the defendant to plead the judgment as a bar to any future prosecutions for the same offense." *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) (citing *United States v. Harvey*, 484 F.3d 453, 456 (7th Cir. 2007)). When considering the sufficiency of an indictment, the Court must "look at the indictment as a whole, focusing on a practical, rather than a hyper-technical, reading of the document." *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009).

A motion to dismiss an indictment does not test "the strength or weakness" of the Government's case, or the "sufficiency" of the Government's evidence, *id.* at 586 (quoting *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006)), but rather whether it provides "a plain, concise, and definite written statement of the essential facts constituting the offense charges." Fed. R. Crim. Pro. 7(c)(1); *see also United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) (holding "the indictment ordinarily should be tested solely by its sufficiency to charge an offense, regardless of the strength or weakness of the government's case").

### 1.    RICO Conspiracy (Count One)

Count One of the Superseding Indictment charges Defendants with conspiring to engage in a variety of racketeering "predicate act" objectives through an association-in-fact enterprise, in violation of 18 U.S.C. § 1962(d). The Defendants move to dismiss Count One, arguing that it fails to sufficiently allege the "enterprise" element of a RICO conspiracy; fails to allege agreement to participate in the enterprise's affairs; and relies upon unconstitutional state statutes. [129].

To establish a RICO conspiracy, the Government must show: "(1) an agreement to conduct or participate in the affairs (2) of an enterprise (3) through a pattern of racketeering activity." *United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006).

### a)    RICO Enterprise Allegations

The statutory definition of an enterprise includes "any group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has further described an "association-in-fact" enterprise as any "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944–45 (2009). To qualify as an association-in-fact enterprise, the enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

Defendants first argue that the indictment fails to allege a single enterprise under *Boyle*, but rather describes two distinct schemes, with different actors who did not share the requisite common purpose or goals. According to Defendants, Madigan's interactions with ComEd and AT&T were allegedly intended to assist

Madigan's political aspirations by hiring his political allies and thus promoting loyalty among his associates. In contrast, Defendants argue, the allegations related to Madigan's private law firm were intended to promote a separate scheme to garner personal financial advantage for Madigan. As such, Defendants argue, the allegations in Count One describe two distinct enterprises with different purposes and different actors. [55] at 23. According to Defendants, the purpose of the first enterprise revolved around bolstering Madigan's political power "by directing benefits to his political allies to promote their loyalty." *Id.* The purpose of the second enterprise entailed unlawfully steering private legal work to Madigan's private law firm for personal financial gain. *Id.* Thus, Defendants argue, the two distinct purposes preclude the alleged "Madigan Enterprise" from existing as one "single" association-in-fact enterprise with a "common purpose."[5]

The allegations of indictment, however, undermine Defendants' enterprise objection. [37] at ¶¶ 2–9 (alleging, among other things, that the "Madigan Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise," which "included but were not limited to: (i) to exercise, to preserve, and to enhance Madigan's political power and financial well-being; (ii) to financially reward Madigan's political allies, political workers, and associates for their loyalty, association with, and work for Madigan; and (iii) to generate income for members and associates of the enterprise through illegal activities."). Here, the indictment clearly charges a single enterprise conspiracy, because it alleges that "the co-conspirators joined to effectuate a common design or purpose" as opposed to "separate agreements to effectuate distinct purposes." *United States v. Ceballos*, 302 F.3d 679, 688 (7th Cir. 2002).

Under well-settled law, co-conspirators engage in a single conspiracy even if they "do not know one another and do not participate in every aspect of the scheme" as long as they "embraced a common criminal objective." *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001); and, in a RICO case, this common criminal objective is broad, and includes within it, the many aspects of a substantive RICO violation.[6]

---

[5] Specifically, Defendants contest the Government's characterization of the Madigan Enterprise as a single conspiracy because it purportedly fails to allege that the participants "associated together for the 'common purpose' of effectuating both schemes" —the scheme to direct benefits to Madigan's allies and the scheme to steer business to Madigan's law firm for financial gain. Instead, Defendants note, neither Madigan's law firm nor Alderman A is "mentioned once in the sixty-five pages charging conduct related to ComEd" and "the Thirteenth Ward Democratic Organization is conspicuously absent from the thirty-four pages of the Superseding Indictment" that outline the Law Firm Allegations. [55] at 24. As such, they argue, the indictment fails to allege a single enterprise.

[6] As in all conspiracies, the essence of a RICO conspiracy violation is the agreement itself; the distinction between a traditional conspiracy and a RICO conspiracy is simply the breadth of the overall objective of the racketeering agreement. *Salinas v. United States*, 522 U.S. 52, 62–66 (1997) (In "RICO's conspiracy provision," the "goal of the conspiracy" is "the substantive RICO offense"); 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of

Seventh Circuit precedent makes clear that co-conspirators need not participate in every aspect of a scheme to be involved in a single conspiracy. *Jones*, 275 F.3d at 648; *see also Maloney*, 71 F.3d at 664 (quoting *United States v. Friedman*, 854 F.2d 535, 562 (2d Cir. 1988)) ("So long as the alleged RICO co-conspirators have agreed to participate in the affairs of the same enterprise, the mere fact that they do not conspire directly with each other does not convert the agreement . . . into multiple conspiracies."); *United States v. Miller*, 159 F.3d 1106, 1109–10 (7th Cir. 1998) ("A defendant need not know all of the co-conspirators or know the full extent of the conspiracy to be convicted.").

Viewing the allegations in their entirety (not piecemeal), the charging instrument contains the relevant information to prepare a defense and includes the elements of each charged offense (including RICO conspiracy), the allegedly criminal

---

subsection (a), (b), or (c) of this section."). Accordingly, the fact that the "many defendants and predicate crimes were different, or even unrelated," is irrelevant in a RICO conspiracy case, so long as it can "be reasonably inferred that each crime was intended to further the enterprise." *United States v. Gonzalez*, 921 F.2d 1530, 1539–40 (11th Cir. 1991); *see also United States v. Friedman*, 854 F.2d 535, 562 (2d Cir.1988) (finding that a RICO conspiracy is "by definition broader than an ordinary conspiracy to commit a discrete crime"); *United States v. Valera*, 845 F.2d 923, 930 (11th Cir. 1988) (finding that "a series of agreements, which, pre-RICO, would constitute multiple conspiracies, can form, under RICO, a single 'enterprise' conspiracy"). At a fundamental level, the Defendants' attempt to artificially divide the single charged RICO enterprise into multiple enterprises, via the mere existence of different underlying schemes, "ignores the nature" and breadth of an *enterprise* conspiracy under § 1962(d). *United States v. Maloney*, 71 F.3d 645, 664 (7th Cir. 1995); *Boyle*, 556 U.S. at 949 ("The breadth of the 'enterprise' concept in RICO is highlighted by comparing the statute with other federal statutes that target organized criminal groups."). In the words of the Seventh Circuit, the conspiracy "section of RICO is capable of providing for the linkage in one proceeding of a number of otherwise distinct crimes and/or conspiracies through the concept of enterprise conspiracy." *Maloney*, 71 F.3d at 664 (citations omitted); *United States v. Gonzalez*, 921 F.2d 1530, 1540 (11th Cir.) ("The notion of 'enterprise conspiracy' . . . has made much of the old distinction between 'single conspiracy' and 'multiple conspiracy' irrelevant to RICO conspiracy charges."); *United States v. Ashman*, 979 F.2d 469, 485 (7th Cir. 1992) (To prove a single RICO conspiracy, the government need only show that the defendant agreed to conduct the affairs of the enterprise through the commission of two predicate acts). Indeed, the Supreme Court defines the "common purpose" of a RICO enterprise not as engaging in a single scheme, but rather as engaging in a "course of conduct" constituting (if achieved) a substantive RICO offense; and this "course of conduct" approach encompasses, by definition, the diverse set of intended activities of the enterprise. *Boyle*, 556 U.S. at 946 ("From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. As we succinctly put it in *Turkette*, an association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'"); *United States v. Turkette*, 452 U.S. 576, 583 (1981) (The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of "engaging in a course of conduct."); *United States v. Warner*, No. 02 CR 506, 2004 WL 1794476, at *17 (N.D. Ill. Aug. 11, 2004) (A "series of agreements may be tried as a single 'enterprise' conspiracy if the defendants have agreed to commit a substantive RICO offense") (citing *Maloney*, 71 F.3d at 664).

conduct of the Defendants, and citations to the statutes violated.  This is enough. W*ong Tai v. United States*, 273 U.S. 77, 82 (1927) (indictment need not describe the Government's evidence, plead evidentiary detail, or identify all of the facts supporting the allegations); *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981) (same). As alleged, the co-conspirators, including McClain, embraced a clear and common unlawful goal: to unlawfully exploit Madigan's official position as a Representative and Speaker for personal and professional gain.  *See Maloney*, 71 F.3d at 664 ("The common element in each predicate act was the involvement of Judge Maloney in his capacity as a Judicial Officer in the Circuit Court of Cook County and a desire of all participants to effect a corruption of that office.") (quotation omitted); *See Jones*, 275 F.3d at 652.

### b) Agreement to Conduct/Participate in Enterprise's Affairs

Defendants next argue that Count One fails to allege that Madigan and McClain agreed to conduct or participate in the affairs of an *enterprise* as opposed to their *own* affairs.  The Seventh Circuit distinguishes "between two situations: a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest, versus a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655–56 (7th Cir. 2015) (citing *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013)).  But an individual can still share "in the enterprise's common purpose—to enrich himself and the enterprise through illegal means"— even if, "at the end of the day, he prizes his own self-interest above the group's" interests. *United States v. Volpendesto*, 746 F.3d 273, 296 (7th Cir. 2014); *United States v. Orena*, 32 F.3d 704, 710 (2d Cir. 1994) (finding that internal divisions did not undermine the existence of a single association-in-fact enterprise under RICO); *Inteliquent, Inc. v. Free Conferencing Corp.*, 503 F. Supp. 3d 608, 628 (N.D. Ill. 2020) (same).

The Court's inquiry at this stage is narrow: it must determine "whether it's possible to view the conduct alleged" as the commission of the crime alleged. *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009).  Here, the indictment alleges that McClain coordinated with Madigan to: (1) make unlawful demands on Madigan's behalf to third parties; (2) cause the creation of false documents and coordinate indirect payments to conceal the true nature of payments made to Madigan's associates; (3) convey Madigan's instructions to third parties; (4) provide Madigan strategic advice on sensitive political matters; (5) brief Madigan on his activities on behalf of the enterprise; (6) act as Madigan's agent; and (7) use intimidation to advance the enterprise's interests. [37] ¶ 9.  As such, the allegations in the indictment demonstrate a coordinated effort between McClain and Madigan to facilitate the common purpose of the enterprise.  Thus, it is "possible to view the conduct alleged

as" an agreement to conduct or participate in the affairs of an enterprise as opposed to the truly separate advancement of each individual's own affairs for each individual's self-interest. *Id.*

Based upon the allegations, Defendants' reliance on *United Food* is misplaced. In that case, plaintiff brought a civil RICO conspiracy claim against Walgreens and Par Pharmaceutical, alleging a scheme wherein Walgreens swapped out certain prescriptions with different dosage forms of certain medications that had a higher reimbursement rate than the dosage form prescribed. The court found that the complaint failed to allege a civil RICO conspiracy because the parties' communications and actions were undertaken "in their individual capacities, to advance their individual self-interest," and there was no evidence that "officials from either company involved themselves in the affairs of the other." 719 F.3d at 854; *see also Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009) (Without more, allegations that a defendant "had a business relationship with the putative RICO enterprise or that a defendant performed services for that enterprise do not suffice."). Thus, the complaint failed to state a claim for civil RICO conspiracy because nothing in the complaint suggested that Walgreens and Par worked together or were involved in each other's business operations. In sharp contrast, the allegations in the indictment here describe a coordinated effort between Madigan and McClain which demonstrate more than just a routine "business relationship" between McClain and the alleged enterprise. *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009). The allegations further allege that McClain "took some part in directing or conducting the alleged 'enterprise'" thereby participating "in the operation or management of the enterprise itself." *Id.* (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)). Such allegations suffice.[7]

## 2. Constitutionality of State Statutes

### a) First Amendment and Overbreadth

The defense next argues that the Illinois bribery and legislative misconduct statutes underlying Count One, 720 ILCS 5/33-1(d)-(e) and 720 ILCS 5/33-3(a)(4), are unconstitutionally overbroad and criminalize otherwise constitutionally protected speech.

---

[7] Finally, Defendants argue that, rather than joining an enterprise with Madigan to pursue a common goal, McClain "interacted with Madigan to further the interests of *his* client, ComEd, and to build *his* credentials as a Springfield lobbyist" [55] at 27, and to the extent Defendants associated on matters unrelated to ComEd, those interactions "demonstrate a relationship between a lobbyist and public official," not a RICO enterprise. [55] at 28. But such determinations would require the Court to make factual findings and test the sufficiency of the Government's evidence, which remains inappropriate on motion to dismiss. *Moore*, 563 F.3d at 586.

A statute is overbroad under the First Amendment "if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). The unlawful overbreadth, however, must be "*substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* Invalidating a criminal statute as overbroad is "strong medicine that is not to be casually employed." *United States v. Williams*, 553 U.S. 285, 293 (2008) (quotation omitted).

To begin, this Court must construe the plain language of each statute, *id.* at 293, and determine whether the statutory language, as properly construed, "criminalizes a substantial amount of protected expressive activity." *Id.* at 297. The Illinois bribery statute states, in relevant part, that a person commits bribery when:

> (d) He or she receives, retains or agrees to accept any property or personal advantage which he or she is not authorized by law to accept knowing that the property or personal advantage was promised or tendered with intent to cause him or her to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness; or

> (e) He or she solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he or she shall improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness.

720 ILCS 5/33-1. The Illinois legislative misconduct statute states, in relevant part:

> (a) A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he or she commits any of the following acts:
> . . .
>   (4) Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law.

720 ILCS 5/33-3(a)(4).

Here, Defendants argue that the statutes' "unlimited application to any act by a public official" would criminalize commonplace requests or petitions from citizens to public officials. [55] at 34. This Court disagrees.

While the statutes do contain the phrase "any act" either taken in a public officer's official capacity (720 ILCS § 5/33-3(a)(4)) or related to the employment or function of a public officer (720 ILCS § 5/33-1(d)-(e)), the Court construes the language "not in isolation, but instead in the context of the whole statute." *Johnson*,

875 F.3d at 366.   Like the court articulated in *United States v. Burke*, the phrase "any act" in the context of both the Illinois bribery statute and the Illinois legislative misconduct statute remains specifically narrowed by the scienter requirement contained in both statutes.   *See United States v. Burke*, Case No. 19-cr-322, 2022 WL 1970189 (N.D. Ill. June 6, 2022).   Specifically, the plain language of both statutes requires that the defendant knowingly engage in improper conduct or conduct that is not authorized by law.[8]   Thus, the plain language of the Illinois statutes refutes Defendant's claim that, as written, they encompass "a multitude of ordinary interactions between politicians and their constituents that are constitutionally protected."   [131] at 38.   Indeed, the example Defendant provides falls squarely outside the statutory text.   According to Defendant, a public official who seeks to have a power utility testify before the General Assembly as to why it took five days to restore power to the community "could be found to have violated the Illinois bribery statute."   [55] at 33–34.   Not so.   For the public official to have violated the bribery statute on these grounds, he or she would have had to receive or accept some sort of property or personal advantage in violation of the law or with the intent to improperly influence the public official's action.   Such a result properly criminalizes unprotected activity.

In sum, Defendant's claim fails to account for the limiting language already contained within the Illinois statutes.   Because the phrase "any act" must be read in the context of the entire statute, the statutes do not "substantially criminalize or suppress otherwise protected speech" relative to their "plainly legitimate sweep." *Bell*, 697 F.3d at 456 (quoting *Williams*, 553 U.S. 285, 292–293 (2008)).

Defendant also premises his constitutional challenge as to both state statutes upon the Supreme Court's decision in *McDonnell*, a case in which the Supreme Court

---

[8] The court in *Burke* analyzed the Illinois bribery statute based upon a similar claim brought by the defendant to determine if the statute was overbroad in violation of the First Amendment.   In so doing, the court surveyed Illinois Supreme Court and appellate court opinions, finding that "the discernible core of the statute targets corruption by criminalizing efforts to provide things of value as a means of obtaining improper and unlawful influence over individuals in positions of trust."   *Burke*, 2022 WL 1970189, at *38 (quotation omitted).   With respect to the bribery statute, the court also found that the scienter requirement in the statute limited its application to only "the receipt of gifts intended to 'improperly influence' specific conduct."   *Id.* at *39.   Additionally, the court found that the statute's prohibition of "the receipt of 'property or personal advantage'" also serves "a limiting function; the phrase 'personal advantage' is 'narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated.'"   *Id.* (quoting *United States v. Johnson*, 875 F.3d 360, 366 (7th Cir. 2017)).   Taken together, the court held that the bribery statute cabins "the *quid*" to "something 'related to the employment or function of any public officer'" when "these terms are viewed 'not in isolation, but instead in the context of the whole statute.'"   *Id.* (quoting *Johnson*, 875 F.3d at 366).   Consequently, the court found that the statute remains constitutional.   As explained by the *Burke* court, subsection (e) "imposes a scienter requirement such that the statute proscribes the receipt of gifts intended to 'improperly influence' specific conduct."   *Id.*   Similarly, subsection (d) and the Illinois legislative misconduct statute cabins its application to the receipt of "property or personal advantage" or "a fee or reward" that is "not authorized by law."   720 ILCS 5/33-1(d); 720 ILCS 5/33-3(a)(4).

considered the interpretation of the phrase "official act" as defined in the federal bribery statute, 18 U.S.C. § 201(a)(3). In that case, the Government advocated for an expansive interpretation of the phrase that included "nearly any activity by a public official." *McDonnell v. United States*, 579 U.S. 550, 566 (2016). The Court found the Government's reading too broad, and inconsistent with the text of the statute and precedent, as well as constitutionally problematic. *Id.* at 574–75.

The question before this Court, however, stands in stark contrast to the questions presented in *McDonnell*. The *McDonnell* Court resolved a dispute regarding competing interpretations of the definition of "official acts" in the statutory language. While the Supreme Court acknowledged constitutional issues that might arise if it adopted the Government's broader definition, it did not find that the statute was overbroad based simply upon the inclusion of the phrase "official acts." *Id.* Indeed, as the *Burke* court noted, neither *McDonnell* nor any subsequent case relying upon *McDonnell* has invalidated a statute for overbreadth or vagueness. 2022 WL 1970189, at *45. Nothing in the Court's decision suggested that the holding was intended to be read expansively, to invalidate state or federal statute simply because they contain a phrase, like "any act," and this Court thus declines to read *McDonnell* so broadly.

The plain text of the Illinois statutes remains sufficiently narrow, as written, to prevent substantial criminalization of protected activity. Thus, the Court finds that the Illinois bribery and legislative misconduct provisions are not overbroad under the constitution and accordingly denies Defendants' motion to dismiss Count One on this basis.

### b)      Fifth Amendment and Vagueness

Based upon the same "any act" phrase, Defendants also seek to invalidate the Illinois statutes on vagueness grounds under the Fifth Amendment.

A statute is void for vagueness if it fails to "define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Bell v. Keating*, 697 F.3d 445, 461 (7th Cir. 2012) (quoting *Skilling v. United States*, 561 U.S. 358, 402 (2010)).

Courts will typically "consider whether a statute is vague as applied to the particular facts at issue," but "when a statute 'interferes with the right of free speech or association, a more stringent vagueness test should apply.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)).

The statutes Defendants challenge undoubtedly implicate the right of free speech. *See Burke*, 2022 WL 1970189, at *42 (finding Illinois bribery and misconduct statutes implicate free speech). But even when a statute implicates the right of free speech, a party "whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others." *Holder*, 561 U.S. at 20.

In Count One, the Superseding Indictment alleges that Defendants conspired to use Madigan's "official position as Speaker of the House of Representatives" to "take and cause official action" to "solicit and receive from persons and parties having business" before the State of Illinois and the City of Chicago "unlawful personal financial advantage, including but not limited to fees arising from the retention of Madigan's law firm" and to solicit "private benefits for Madigan's political allies, political workers, and associates." [38] ¶ 13.

This type of conduct lies at the core of the Illinois bribery and legislative misconduct statutes, which proscribe "bribery" and "improper or unlawful efforts to influence the actions of a public official by means of soliciting or offering" property, fees, or other rewards. *Burke*, 2022 WL 1970189, at *44. Because the statutes so clearly proscribe Defendants' conduct, they cannot bring a facial challenge for vagueness.

Nonetheless, even if the Court were to consider a facial vagueness challenge of the Illinois statutes, such challenge would fail. A statute is sufficiently definite, and thus not unconstitutionally vague, if it makes clear to an ordinary individual when his conduct is criminalized. *Id.* The Court will "consider not only the words" in the statute, "but also the context for which the statute is written." *Id.* A statute encourages arbitrary or discriminatory enforcement "if it impermissibly delegates to law enforcement the authority to arrest and prosecute on 'an ad hoc and subjective basis,'" but that does not mean "a statute is vague simply because it requires law enforcement to exercise some degree of judgment." *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

Defendants argue that the broad "any act" language contained in the Illinois statutes could "criminalize constituents' token gifts to their public officials in exchange for, or because of, ceremonial government actions." [131] at 45. But Defendants' reliance on *McDonnell* is again misplaced. As previously noted, the *McDonnell* Court, deciding between competing interpretations of the phrase "official act," chose to narrowly interpret the statute to avoid any potential vagueness concerns. *See* 579 U.S. at 5717. In contrast, Defendants ask this Court to find the Illinois statutes facially vague on the grounds that the phrase "any act" may lead to the vagueness concerns discussed and avoided in *McDonnell*. But, as the *Burke* court noted, no court has ever cited *McDonnell* to invalidate a state bribery statute on

overbreadth or vagueness grounds. *Burke*, 2022 WL 1970189, at *44–45. This Court declines to blaze that false trail.

Regardless, read in context, the Illinois statutes refer to "any act related to the employment or function of any public officer, public employee, juror or witness," 720 ILCS 5/33-1, or any act committed in an individual's "official capacity or capacity as a special government agent," 720 ILCS 5/33-3(a)(4). Given this surrounding, contextual language, the Court disagrees with Defendants' characterization of the "any act" language in the Illinois statutes as "far broader" than the "official act" language considered in *McDonnell*.

Further, the Illinois statutes both impose an express scienter requirement, requiring that the individual know about the unlawful purpose of accepting the property, personal advantage, fee, or reward. *See* 720 ILCS 5/33-1; 720 ILCS 5/33-3(a)(4). Such requirement satisfies any concerns that an ordinary person would be unable to understand what conduct the statute prohibits or that the statute would encourage arbitrary or prejudicial enforcement. *See Bell v. Keating*, 697 F.3d at 461 (quoting *Skilling*, 561 U.S. at 402); *see also Burke*, 2022 WL 1970189, at *44 (noting "the Illinois state bribery statute imposes a *mens rea* requirement, which 'further reduces any potential for vagueness'") (quoting *Holder*, 561 U.S. at 21). Indeed, as the *Burke* court acknowledged, "there is no support for any suggestion that the statute has been arbitrarily enforced in the thirty-six years since it was last amended." 2022 WL 1970189, at *44.

Madigan also argues that, even if the Court does not find the Illinois statutes unconstitutionally vague on their face, the Court should find them unconstitutionally vague as applied to him. But, as discussed above, Madigan's alleged conduct falls squarely within the type of conduct proscribed by the Illinois statutes. Count One of the Superseding Indictment alleges that Defendants conspired to utilize Madigan's position to obtain rewards, including legal fees and positions for his associates, in exchange for support of certain legislation and appointments to public office. [37] ¶ 13. Thus, Defendants' argument that the Illinois statutes failed to make clear the criminal nature of Defendants' conduct fails.

Further, Defendants' attempt to characterize the allegations in the indictment as mere job recommendations falls short. The indictment alleges that Defendants conspired to utilize Madigan's role to affect legislation in exchange for certain entities' hiring his associates to private sector roles. *Id.* These allegations remain a far cry from Defendants' examples of politicians who simply made job recommendations while in office.

### 3. Federal "ComEd" Bribery under § 666 (Counts Two, Three, Four, and Six)

Based upon the Supreme Court's recent ruling in *Snyder v. United States*, 144 S.Ct. 1947 (2024), Defendants move to dismiss the indictment on the grounds that it alleges only conduct between a public official and his constituents that falls outside the purview of § 666.

In *Snyder*, the Supreme Court considered whether the term "rewarded" in § 666(a)(1)(B) criminalizes gratuities in addition to bribes. 144 S. Ct. at 1954. Drawing upon the statute's text, history, and structure, as well as the statutory proscribed punishments and concepts of federalism and fair notice, the Court concluded that it did not. *Id.* The Court held that § 666(a)(1)(B) aligns more closely with the bribery statute for federal officials, 18 U.S.C. § 201(b), than the federal gratuities provision, § 201(c), thus requiring "that the official have a corrupt state of mind and accept (or agree to accept) the payment intending to be influenced in the official act." *Id.* at 1955.

The Court, however, clarified that the term "rewarded" encompasses more situations than those included only in the word "influenced," including "where the agreement was made before the act but the payment was made after the act" or where "the official took a bribe before the official act but asserts a defense that he would have taken the same act anyway and therefore was not 'influenced' by the payment." *Id.* at 1959. Thus, an official may violate § 666 "when he accepts an up-front payment for a future official act or agrees to a future reward for a future official act." *Id.*

#### a) Bribery Charges

Defendants first argue that the Court must dismiss any bribery charges brought under § 666 on the grounds that, post-*Snyder*, the Government must allege a *quid pro quo*, and the indictment in this case fails to do so. Following *Snyder*, the Government concedes the required existence of a *quid pro quo*, but argues that the indictment in this case satisfies the *quid pro quo* requirement as contained in the bribery statute.

As noted above, in *Snyder*, the Court confirmed that a "state or local official can violate § 666 when he accepts an up-front payment for a future official act or agrees to a future reward for a future official act." *Snyder*, 144 S. Ct. at 1959. Defendants argue that the Government has failed to allege a violation of § 666 because it does not identify any particular official act Madigan took in response to a particular hiring decision by ComEd; rather, the Government describes a series of job recommendations over the course of eight years and describes various legislative actions but fails to draw any connection between the two. This, Defendants argue, fails to constitute a *quid pro quo*.

17

But contrary to Defendants' characterization, the indictment does not merely allege that ComEd hired certain individuals recommended by Madigan and that, during the same time period, Madigan happened to vote in favor of certain legislation affecting ComEd. Rather, it explicitly alleges that Madigan performed official acts related to legislation affecting ComEd *in exchange for* ComEd's hiring of certain individuals. There is no doubt the indictment "contains each of the required elements and was sufficient to notify" the Defendants of what the Government "intended to prove," *United States v. Vaughn*, 722 F.3d 918, 926 (7th Cir. 2013), providing "ample opportunity to develop a defense to" each of those charges, *United States v. Agostino*, 132 F.3d 1183, 1191 (7th Cir. 1997). Thus, under *Snyder*, these allegations sufficiently allege a violation of § 666.

Further, Defendants argue that these allegations cannot constitute a *quid pro quo* because the indictment fails to connect a specific official act Madigan performed in exchange for a specific hiring decision. But, as Defendants acknowledge, the Seventh Circuit has held that the Government may prove bribery charges under a stream of benefits theory. *See Ryan v. United States*, 688 F.3d 845, 852 (7th Cir. 2012) (finding "stream of benefits" theory valid where the "corruption here was more like a meal plan in which you don't pay for each item on the menu," but rather "there is a cost that you pay, an ongoing cost, and you get your meals"); *United States v. Solomon*, 892 F.3d 273, 277 (7th Cir. 2018) (acknowledging agreements to pay a bribe may include "schemes that involve a stream of benefits over time, not just singly negotiated deals").

While *Snyder* clarified the reach of § 666, it did not alter binding Seventh Circuit precedent regarding the stream of benefits theory or its impact on the *quid pro quo* requirement. Indeed, even Defendants' own authority acknowledges that the "*quid pro quo* requirement is satisfied so long as the evidence shows a 'course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor.'" *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) (quoting *United States v. Arthur*, 544 F.2d 730, 734 (4th Cir. 1976)). On a motion to dismiss, the Defendant's "constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *Agostino*, 132 F.3d at 1191 (quoting *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981)). Under this standard, the Government has sufficiently alleged a claim for bribery under § 666.[9]

---

[9] Defendants also argue that Counts Two, Three, Four, and Six must be dismissed on the grounds that they rely upon the Government's pre-*Snyder* gratuity theory. Although the Court agrees that the Government may not proceed on this theory at trial (indeed, the Government concedes the point), for the reasons explained above, the allegations suffice even after *Snyder*.

Because Counts Two, Three, Four, and Six have sufficiently alleged bribery under *Snyder*, this Court declines to dismiss these counts.[10]

### b) "Bona Fide" Payments under § 666(c)

Defendants also argue that Counts Two, Three, Four, and Six must be dismissed because the indictment fails to allege that the wages paid to the individuals ComEd employed did not constitute "bona fide" payments under § 666(c). Section 666(c) expressly does not apply "to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." According to Defendants, the indictment fails to allege that Madigan corruptly solicited non-*bona fide* salary, wages, and fees, because each of the ComEd counts allege that the company paid these individuals "bona fide" compensation "in the usual course of business." [131] at 63. *See also* [37].

A plain reading of the indictment undermines Defendants' argument, however, as the indictment sufficiently alleges the payments ComEd made to each individual in this case failed to constitute bona fide payments made in the usual course of business. Specifically, the indictment alleges that ComEd made these payments as part of a bribery scheme in exchange for Madigan's official acts related to legislation affecting ComEd; that the subcontractors did not perform the work for which ComEd hired them, [37] Count Two, ¶¶ 4-12; that ComEd provided a board seat to an individual only to influence Madigan, *id.* ¶¶ 23-25; that Law Firm A continued its retention agreement even though ComEd did not have sufficient work for the firm, *id.* ¶¶ 13-18; and that the interns ComEd hired bypassed standard hiring procedures and gained a preference over other, more-qualified candidates, *id.* ¶¶ 19-22. These allegations support the charging theory that any payments ComEd made to these individuals did not constitute "bona fide" compensation "in the usual course of business."

Ultimately, whether the compensation paid to these individuals constituted "bona fide" payments made "in the usual course of business" under § 666(c) remains a question of fact for the jury. *See Burke*, 2022 WL 1970189, at *30 (holding that "assessing whether any fees Cui agreed to pay were made 'in the usual course of business' under § 666(c) is a jury question, not one for this Court on a motion dismiss"); *see also United States v. McClain*, 2022 WL 488944, at *2 (N.D. Ill. Feb. 17, 2022) ("While Defendants are entitled to use § 666(c) as an affirmative defense at trial they are not entitled to dismissal at this stage based solely on their version of facts."); *United States v. Lupton*, 620 F.3d 790, 802 (7th Cir. 2010) (quoting *United*

---

[10] Defendants also argue that, if the Government maintains that § 666 does not require a *quid pro quo*, this Court must find the statute unconstitutional. Here, the Government does not proceed on this theory; and moreover, the Supreme Court in *Snyder* found § 666 constitutional, as limited. 144 S. Ct. 1947. This Court thus follows suit and declines to find the statute unconstitutional.

*States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007)) ("Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide.").

Thus, this Court declines to dismiss Counts Two, Three, Four and Six based upon the exception in § 666(c).

### 4. Federal "Company A Chinatown Parcel" Bribery under § 666 (Counts Eleven and Twenty-One)

Defendants seek to dismiss Counts Eleven and Twenty-One on the grounds that, should the Government argue § 666 does not require a *quid pro quo*, this Court should find the statute unconstitutional. But, as discussed above, the Government concedes the impact of *Snyder* on the interpretation of § 666, and this Court applies § 666 in accordance with the Supreme Court's ruling therein. Thus, the Court declines to find § 666 unconstitutional on this basis.

### 5. Travel Act Counts (Counts Five, Seven, Twelve, Thirteen, Fourteen, and Twenty-Two)

Defendants also seek to dismiss each count brought under the Travel Act, 18 U.S.C. § 1952(a)(3), on the grounds that each violation remains predicated upon a violation of the Illinois bribery and misconduct statutes, which Defendants argue are unconstitutional under the First, Fifth, and Fourteenth Amendments. But, as this Court explained in its analysis of the Illinois statutes as to Count One, the statutes are not unconstitutional on these grounds. As such, this Court declines to dismiss the Travel Act counts.

### 6. The "AT&T" Conspiracy (Count Twenty-Three)

Defendants also seek to dismiss Count Twenty-Three, arguing that the indictment fails to allege that Madigan agreed to cast his votes in favor of the COLR legislation in exchange for monetary payments made to Individual FR-1 by AT&T, or that Madigan knew AT&T intended to make such payments in exchange for Madigan's votes. Under § 371, the Government must prove: "that the alleged conspiracy existed; (2) that an overt act was committed in furtherance of the conspiracy; and (3) that the defendant knowingly and intentionally became a member of the conspiracy." *United States v. Read*, 658 F.2d 1225, 1232 (7th Cir. 1981). Defendants' argument focuses on the third element: knowledge and intent to join. Defendants argue that the indictment fails to allege a connection between the payments AT&T made to Individual FR-1 and Madigan's support for the COLR legislation. Thus, Defendants argue, that the indictment does not charge that Madigan was aware of, or agreed to, the exchange of payments for an official act.

At the motion to dismiss stage, this Court's inquiry is narrow. It must only decide whether it is "possible to view the conduct alleged" as a violation of the statute. *United States v. Moore*, 563 F.3d at 586. A defense that "relates to the strength" of the Government's evidence "ordinarily must wait for trial." *Id.*; *see also United States v. Yasak*, 884 F.2d 996, 1001 (7th Cir. 1989) ("A motion to dismiss is not intended to be a summary trial of the evidence. Such a motion is directed only to the validity of the indictment or the information, and it tests only whether an offense has been sufficiently charged.").

Here, the indictment alleges that Defendants conspired to solicit and demand and to accept and to agree to accept monetary payments to Individual FR-1 intending that Madigan be influenced to take official action with regard to the COLR legislation. Under § 371, the indictment sufficiently alleges that Defendants knowingly intended to join the conspiracy to accept monetary payments in exchange for Madigan's support. Defendants' arguments merely attack the sufficiency of the Government's evidence at the motion to dismiss stage. Whether Defendants had the requisite knowledge and intent is a factual question of fact for the jury. This Court denies Defendants' motion to dismiss Count Twenty-Three on this ground.

## B.     Madigan's Motion to Suppress, [57]

Madigan, joined by McClain, moves to suppress evidence obtained by the Government pursuant to numerous Title III orders spanning the years from 2014 to 2018. [57], [58], [61]. Defendants specifically seek statutory suppression (*see* 18 U.S.C. § 2515 and § 2518(10)(a)), of all interception evidence derived from a 2014 affidavit submitted in support of a 2014 Title III application, alleging that the affidavit failed to support a finding of probable cause and contained materially false information in addition to material omissions.

### 1.     Factual Background

#### a)     2014 Wiretap Authorization

On September 26, 2014, the Government submitted a Title III application for an order to intercept communications from a phone subscribed to Alderman A. [58], Ex. A, 9/26/14 Affidavit, ¶ 3. The application identified the intended interceptees as Alderman A and Madigan. *Id.* Among other things, the affidavit supporting the application ("2014 Affidavit") detailed the following information to support a finding of probable cause for the authorization.

According to the affidavit, in 2014 a confidential source ("CS") cooperating with the Government had several meetings with Alderman A to gain support for a hotel development project which required approval for a zoning change. *Id.* at ¶ 22. During these initial meetings, the participants did not discuss Madigan. *Id.* at ¶¶ 22–25.

21

On or about August 5, 2014, CS received a call from Alderman A. *Id.* ¶ 26. During this call, however, Alderman A asked CS if CS knew of Madigan and stated that he wanted to arrange a meeting between CS, the developer of the property, Madigan, and himself. *Id.* Alderman A did not further specify the purpose of the meeting. *Id.*

Subsequently, these same parties met on August 18, 2014, at Madigan's law office. *Id.* ¶ 30. Under the supervision of agents, CS made a video and audio recording of the meeting. *Id.* During the meeting, CS stated that the developer was looking for more "opportunity in the future" to which Madigan replied, "Good. Very good, very good" and commented on Chinese investment entering the United States. *Id.* ¶ 36. CS also discussed the developer's interest in a real estate development project in the Chinatown community. *Id.* Shortly afterward, Madigan explained that his law firm maintained "a little different approach to representation on hotels that do the work." *Id.* ¶ 37. Madigan's law partner then proceeded to explain these practices as they related to the firm's representation of hotels on tax matters. *Id.*

CS further explained that the developer's proposed hotel in Chinatown would be "about six million dollars" and that "hopefully we get support" from Alderman A "to get the zoning change." *Id.* ¶ 38. After discussing the potential tax liability from operating the hotel, Madigan's law partner left the room. *Id.* ¶ 39. CS then stated that the developer wanted "to use this opportunity to meet" Madigan and Alderman A and stated that the developer was "very interested in the Chinatown parking lots project." *Id.* ¶ 40. CS also stated that the developer wanted to know "if there is any opportunity, uh, he can work with the State and the City to, to get a nice project, uh commercial project in Chinatown." *Id.* Alderman A responded "Okay." *Id.* The CS added that the developer "had a lot of resources in China to back him up," to which Madigan replied "Uh-hmm, uh-hmm." *Id.* Alderman A then proceeded to explain to Madigan the relationship of the property in question to other development plans in the area. *Id.* Madigan asked, "Is this owned by the State?" to which Alderman A replied that it was. *Id.*

CS then asked what the right timing would be for the developer to present a proposal for the development of the land at issue. *Id.* ¶ 41. Alderman A replied that it was "still early stages" but that the developer "should bring it up, but it wouldn't be an official . . . ." *Id.* CS replied "Okay," and Madigan added "Okay." *Id.*[11] At that point, Madigan's law partner re-entered the room and the discussion returned to the representation of the hotel on tax matters. *Id.* ¶¶ 41–43.

---

[11] The Court notes that Madigan contests whether he, in fact, replied "Okay" and the Court addresses the disputed issue herein for the purposes of the pretrial motions. Ultimately, of course, the jury will resolve all disputed issues of fact at trial.

Following those discussions, the CS stated that the developer wanted to know if there were "other opportunities open" for him to get involved. *Id.* ¶ 44. Alderman A replied that there were lots of opportunities in Chinatown and across the city and he could "see that in my committee right now, as Chairman of Zoning," adding that he "would be happy to sit down and talk." *Id.* Madigan asked whether the developer was "committed to other people" and CS replied, "Not yet." *Id.* ¶ 45. Madigan then discussed options concerning the fee payment structure, adding that "We're not interested in a quick killing here. We're interested in a long-term relationship," afterwards expressing his belief that his firm could provide quality representation. *Id.*

After the meeting, Alderman A asked Madigan if he had "a couple of minutes," and Madigan replied, "Oh yeah, sure." *Id.* ¶ 46. This meeting lasted approximately four minutes, after which Madigan escorted Alderman A, CS, and the developer out of the office. *Id.* Immediately after leaving, CS told Alderman A that the developer would "love to, uh, uh give the business to uh, Mr. Speaker [Madigan], but you know, like, without your support, that hotel, you know, zoning change is very critical," to which Alderman A replied "Well if he works with the Speaker [Madigan], he will get anything he needs for that hotel." *Id.* ¶ 47. CS answered "Okay, thank you," and Alderman A added "And he's going to benefit from being with the Speaker . . . okay?" *Id.* CS thanked Alderman A again. *Id.*

Alderman A and CS then discussed the developer's donations to Alderman A's fundraiser scheduled for that September. *Id.* ¶ 48. CS noted that "He [the developer] wants to do it long term." *Id.* Alderman A replied, "So do I, so do I." *Id.* Shortly afterwards, CS said that "Hopefully, he [the developer] can break ground this year." *Id.* Alderman A replied "Yeah. I will do whatever I can to speed up the process and get everything he needs to begin, uh, breaking ground alright?" *Id.* Alderman A added "This is important, very important." *Id.* CS replied "Okay, yes. Yes. So I will make sure [the developer] will give him the business." *Id.* Alderman A replied "Good. Good." *Id.*

On August 21, 2024, CS called Alderman A and stated that the developer directed CS to call Alderman A and inform him that the developer hired Madigan's law firm and to thank Alderman A for arranging the meeting with Madigan. *Id.* ¶ 49. CS then stated that the developer had reminded CS about getting the Alderman's letter of support for the zoning change before the upcoming hearing. *Id.* In response, Alderman A told CS to have his assistants prepare the letter. *Id.* Alderman A then asked CS to find "anybody else in the network of people you know that uhm, would like to participate in my, uhm, fundraising event" and CS agreed to look for more people to participate in the fundraiser. *Id.* Later, Alderman A provided the letter of support as promised, and then voiced his support for the zoning change at the subsequent hearing on September 4, 2014. *Id.* ¶¶ 54–55. The committee approved the proposed change to the zoning of the property. *Id.* ¶ 55.

23

On September 12, 2014, Alderman A had another telephone conversation with CS. *Id.* ¶ 56. Alderman A explained to CS that he had spoken to Madigan and that Madigan would contact CS about the retention of Madigan's firm. *Id.* Three days later, Alderman A instructed CS to contact Madigan about the deal. *Id.* CS called Madigan, who asked if he could call CS back to set up a time to have CS come meet with him. *Id.* ¶ 60. CS relayed this conversation to Alderman A, who replied "Excellent. Excellent. Very, very good. Thank you." *Id.* ¶ 61.

Chief Judge Ruben Castillo approved the Government's application and entered an order ("2014 Order") authorizing the interception of communications related to Target Phone 2. [57], Ex. A, 9/26/14 Order. Pursuant to the 2014 Order, the Government intercepted communications for an initial period of 30 days. [74] at 120. Thereafter, the Government received authorization to continue interceptions on a periodic basis until the fall of 2015. *Id.*

### b)    2016 Wiretap Authorization

In June 2016, the Government approached Alderman A and persuaded him to cooperate. [58] at 6. The Government then debriefed Alderman A about the August 18, 2014, meeting. *Id.* Alderman A told the Government that he set up the meeting because he "felt badly" about an unrelated situation involving Madigan and because he wanted CS to be successful in building the hotel. [58] Ex. B at 4. Alderman A told the Government that the separate, four-minute meeting he had with Madigan did not include a discussion about the zoning change itself, but instead pertained to informing Madigan who CS and the developer were and what they were trying to accomplish with the hotel development project. *Id.*

On June 7, 2016, the Government filed a Title III application to intercept communications over the Subject Phone (assigned telephone number 312-208-0292), on which the Government anticipated Alderman A would have recorded phone calls with Madigan. *Id.* Ex. C, 6/7/16 Application. The Application incorporated previous affidavits, including the September 26, 2014 affidavit. *Id.* at 6. Chief Judge Castillo approved the Government's application and entered the order on June 7, 2016. [58] Ex. C, 6/7/16 Order.

### c)    2018 Wiretap Authorization

In April 2018, the Government again interviewed Alderman A concerning the August 18, 2014, meeting. [58] Ex. E. Alderman A maintained that the developer would have received the zoning changes he was seeking regardless of whether he hired Madigan's law firm. *Id.* at 2. When asked about what he meant by the statement "And he's going to benefit from being with the Speaker," Alderman A claimed that he meant the developer would be working with one of the best tax

24

attorneys in the area. *Id.* He also stated that he did not receive any benefit from anyone for making the introduction. *Id.*

When asked if it was possible for an outside observer to interpret that the developer should retain Madigan's law firm in order to receive the zoning change at issue, and if he felt that the developer was left with that impression, Alderman A conceded that "an outside observer would come to that same conclusion." *Id.* When asked why he made the referenced statements to the developer and CS during their conversation, Alderman A stated that Madigan is in a powerful position within the State of Illinois, and he felt that the developer would benefit from retaining Madigan's firm. *Id.* He then stated, "I wouldn't want the Speaker working against me." *Id.* When asked about how the power of Madigan applied to the situation, Alderman A stated that, viewing it from an "election" perspective, "You don't want [Madigan] to be working against you." *Id.*

On April 6, 2018, the Government submitted an application to intercept McClain's communications. [58] Ex. D, 4/6/19 Affidavit, ¶ 9. The affidavit supporting the application incorporated the September 26, 2014, affidavit, among the other affidavits previously submitted by the Government. *Id.* at ¶ 10 n.3. The affidavit also contained a footnote referencing Alderman A's statements in subsequent interviews with the Government since he began cooperating. *Id.* at ¶ 37 n. 7. The footnote reiterated, among other statements, Alderman A's statements that he did not receive anything for making the introduction and that the developer would have received his support for the zoning change even without hiring Madigan's law firm. *Id.* It also detailed Alderman A's acknowledgment that "an independent observer would interpret his comments to mean that [Madigan's] firm should be retained in order to receive the required zoning support" from Alderman A. *Id.* The footnote included Alderman A's statements concerning Madigan's powerful position within the State of Illinois, and that "You don't want [Madigan] working against you." *Id.*

On April 6, 2018, Emergency Judge Charles Norgle entered an Order granting the Government's Title III application. [58] Ex. D, 4/6/18 Order.

## 2.   Suppression Analysis

Madigan seeks to suppress the contents of communications intercepted from the September 26, 2014, Title III application and all other evidence derived from that application. This includes the information derived from the June 7, 2016, Order, and the April 6, 2018, Order, because the Government incorporated the 2014 Affidavit in each of those applications.

Madigan argues that the evidence obtained from each application submitted after the 2014 Affidavit at issue should be suppressed because: (1) the 2014 Affidavit did not establish probable cause for conspiracy to commit extortion; and (2) the

Government included materially false information within, and omitted material facts from, the 2014 affidavit. Madigan contends that at "minimum" he is entitled to a *Franks* hearing to examine the Government's explanations for the presentation of the information in the affidavit. [58] at 31. McClain joins these arguments. [61].

The Government counters that: (a) McClain does not have standing to challenge the 2014 Order; (b) the 2014 application sufficiently established probable cause for the authorization; (c) other exceptions to the exclusionary rule preclude the appropriateness of a suppression remedy; and (d) there is no basis for a *Franks* hearing.

The Court addresses these arguments in turn below.

### a)    McClain's Standing to Challenge the 2014 Order

Title III prohibits "unlawfully intercepted communications and 'evidence derived therefrom' from being used as evidence at trial, hearing, or other legal proceeding." *United States v. Spann*, No. 17 CR 611-1, 2021 WL 916083, at *2 (N.D. Ill. Mar. 10, 2021) (quoting 18 U.S.C. § 2515). Under 18 U.S.C. § 2518(10)(a)(i), any "aggrieved person in any trial, hearing, or proceeding" may move to suppress "the contents of any wire or oral communication intercepted" pursuant to this chapter, or evidence derived therefrom. Per 18 U.S.C. § 2510(11), an "aggrieved person" refers to "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."

To bring a constitutional challenge against "a search or seizure as violative of the Fourth Amendment, a defendant must show that he or she has a legitimate expectation of privacy in the property searched or seized." *U.S. v. Sims*, 808 F. Supp. 596, 602 (N.D. Ill. 1992) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). Standing under the Fourth Amendment consists of "two components: (1) whether the individual, by his conduct, has exhibited a subjective expectation of privacy; and (2) whether such an expectation is justifiable in the circumstances." *Id.* (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *United States v. Duprey*, 895 F.2d 303, 309 (7th Cir. 1989)).

The Seventh Circuit has also held that, "consistent with general Fourth Amendment law," the definition of "aggrieved person" under Title III remains "limited" such that "only one whose conversation was intercepted or against whom the interception was directed would have standing to move for suppression." *United States v. Dorfman*, 690 F.2d 1217, 1227 (7th Cir. 1982) (citing S. Rep. No. 1097, 90th Cong., 2d Sess. 106, reprinted in 1968 U.S. Code Cong. & Ad. News at 2180; *Alderman v. United States*, 394 U.S. 165, 175 & n.9 (1969)). Consequently, while the interception of a defendant's own conversation infringes on his or her legitimate

26

expectation of privacy, a defendant cannot challenge those interceptions if they were fruit of a violation of Fourth Amendment rights that he lacks standing to challenge. *U.S. v. Williams*, 565 F. Supp. 353, 362–63 (N.D. Ill. 1983) ("We know of no authority that holds that a defendant may suppress evidence seized from him as a fruit of a violation of Fourth Amendment rights which he does not have standing to challenge. There is ample authority to the contrary.") (collecting cases).

Here, McClain filed a Motion to Join Co-Defendant's Pretrial Motions, including Madigan's Motion to Suppress. [61]. With respect to the Motion to Suppress, McClain seeks to exclude "all unlawfully seized evidence" which includes any evidence "found to be derivative of an illegality"—referring to the exclusionary rule. *Id.* at 1 (quotation omitted). To that end, McClain argues that subsequent search warrants of McClain's property obtained by the Government relied upon the same information that Madigan identifies as false and lacking probable cause in his Motion to Suppress, and thus that evidence should also be excluded. *Id.* at 1–2.

Nevertheless, as the Government correctly notes in its Response, McClain was not intercepted pursuant to the 2014 Order, and indeed, he was not mentioned at all in the 2014 Application or 2014 Affidavit, nor was he named as a violator or interceptee in the 2014 Order. [74] at 124-25. Thus, McClain cannot be considered an "aggrieved person" against whom the interception was directed, and thus cannot bring any challenges under the Fourth Amendment to the 2014 Order. *Williams*, 565 F. Supp. at 365 ("Since defendants' own expectations of privacy were not infringed by the allegedly wrongful conduct at issue, they lack standing to challenge the conduct, or suppress its fruits, under either Title III or the fourth amendment."); *United States v. Vargas*, 116 F.3d 195, 196–97 (7th Cir. 1997) ("The interception of calls to which he was not a party did not intrude upon [Mr. Vargas'] fourth amendment rights . . . so he has no standing to seek suppression of evidence gathered from those intercepts." (quoting *United States v. Thompson*, 944 F.2d 1331, 1339 (7th Cir. 1991)).

To that end, even though McClain seeks to join Madigan's Motion to Suppress, McClain lacks the requisite standing to do so on the merits, nor does he otherwise articulate any individualized basis for his own challenge, thus waiving any undeveloped arguments. *United States v. Davis*, 29 F.4th 380, 385 n.2 (7th Cir. 2022) (explaining that perfunctory or undeveloped arguments are waived).

### b) Existence of Probable Cause

As relevant here, a judge may grant an order for the interception of communications if "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense" and "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception." 18 U.S.C. § 2518(3)(a)–(b).

27

The Supreme Court has stated that "it is not possible to articulate an exact definition of 'probable cause'" because it remains a fluid concept that derives its "'substantive content from the particular contexts in which'" the standard is applied. *U.S. v. McClinton*, 135 F.3d 1178, 1183 (7th Cir. 1998) (quoting *Ornelas v. U.S.*, 517 U.S. 690, 696 (1996)).  But the Court has simultaneously made clear that probable cause exists if, "under the totality of the circumstances" there is "a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  The standard "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime" so long as "the totality of the circumstances, viewed in a commonsense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists." *U.S. v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000) (citations omitted).  A court reviews "probable cause for a Title III authorization in the same manner as it reviews probable cause to support a search or arrest warrant." *U.S. v. Hanhardt*, 157 F. Supp. 2d 978, 987 (N.D. Ill. 2001) (citing *U.S. v. Fairchild*, 189 F.3d 769, 775 (8th Cir. 1999)).

When reviewing a claim that a warrant or order was unsupported by probable cause, courts "review questions of law *de novo* and questions of fact for clear error." *U.S. v. Quintanilla*, 218 F.3d 674, 677 (7th Cir. 2000) (citing *Ornelas v. U.S.*, 517 U.S. 690, 698 (1996)).  The Supreme Court has instructed that "courts should not invalidate warrants by interpreting affidavits in a hyper-technical, rather than a commonsense, manner." *U.S. v. Wilson*, 169 F.3d 418, 423 (7th Cir. 1999) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).  Additionally, the initial issuing judge's "determination of probable cause is to be given considerable weight" when later reviewing a probable cause determination. *Id.* (quoting *United States v. Spry*, 190 F.3d 829, 835 (7th Cir. 1999)).  Indeed, the initial judge's determination should be overruled only when the supporting affidavit fails to "allege specific facts and circumstances from which" the judge "could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated." *Id.* (quoting *Spry*, 190 F.3d at 835); *Gates*, 462 U.S. at 238–39 (the task of a reviewing court "is simply to ensure" that the initial judge "has a substantial basis for concluding that probable cause existed."); *United States v. Rees*, 957 F.3d 761, 766 (7th Cir. 2020) ("We turn now to the question at hand: whether the warrant-issuing judge had a substantial basis for its probable-cause determination.").[12]

---

[12] In short, the existence of probable cause remains a mixed question of law and fact, and upon challenge of the issuing judge's finding, a reviewing court must give "great deference" to the "decision of the judge who issued the warrant." *United States v. McIntire*, 516 F.3d 576, 578 (7th Cir. 2008) ("*Ornelas* thus distinguished searches conducted without a warrant, where appellate review of the justification is non-deferential, from searches authorized by a warrant, where appellate courts must afford "great deference" to the decision of the judge who issued the warrant."); *United States v. Garcia*, 528 F.3d 481, 485 (7th Cir. 2008) ("On the mixed question whether the facts add up to probable cause, we give no weight to the district judge's decision but 'great deference' to the conclusion of the judge who initially issued the warrant."); *Ornelas v. United States*, 517 U.S. 690, 696–99 (1996) ("The first

In the Memorandum accompanying the Motion to Suppress, Madigan contends that the 2014 Affidavit did not present sufficient evidence to support a finding of probable cause that he intended to enter into a knowing agreement to commit extortion in violation of the Hobbs Act. [58] at 25. 18 U.S.C. § 1951(a) imposes criminal liability on anyone who in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation" of this section. Per 18 U.S.C. § 1951(b)(2), extortion "means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." To establish that "the alleged extortion occurred under color of official right," the Government simply "must 'show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" *Burke*, 2022 WL 1970189, at *62 (quoting *United States v. Carter*, 530 F.3d 565, 574 (7th Cir. 2008)).

As part of his challenge, Madigan points to the fact that there was no evidence in the affidavit of any communications between CS and him prior to the August 18, 2014, meeting, nor was there any evidence of any express agreement between Alderman A and Madigan prior to, during, or after the August 18, 2014, meeting to extort CS or the developer. *Id.* Likewise, CS and Alderman A did not mention Madigan by name prior to the meeting that was set-up with Madigan himself. *Id.* Instead, Madigan contends, the 2014 Affidavit primarily relied upon conduct by Alderman A, which Madigan claims, occurred without his awareness and without evidence that he approved of or condoned any of Alderman A's conversations with CS. *Id.* at 22. Thus, because there was no express evidence of an intent on the part of Madigan to enter into a *quid pro quo* relating to his firm receiving business from the developer, he argues that, under the totality of the circumstances, the 2014 Affidavit

---

part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." . . . "We therefore hold that as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."); *United States v. Mancari*, 463 F.3d 590, 593 (7th Cir. 2006) ("Emphasizing that historical findings of fact, either in support of a warrant or in support of an action without a warrant, are entitled to deference, the Court nonetheless concluded that 'independent appellate review of these ultimate determinations of reasonable suspicion and probable cause" is necessary in order to permit appellate courts to apply consistent legal standards.") (citing *Ornelas*); *United States v. Taylor*, 63 F.4th 637, 652 (7th Cir. 2023) (Noting the standard of appellate review is a 'complex' one, the court held: "We review the district court's analysis *de novo*, but we afford "great deference' to the issuing judge's" finding of probable cause.").

was insufficient to establish probable cause that Madigan was attempting or conspiring to commit extortion. *Id.* at 23.

The existence of probable cause, however, does not depend upon the specific details Madigan finds lacking. To find probable cause, the Government need not prove any wrongdoing; rather, the Government must only present evidence that, viewed in "the totality of the circumstances," reveals a "probability or substantial chance of criminal activity" on the suspect's part. *Sawyer*, 224 F.3d at 679 (citations omitted). As applied to the challenge here, the Government only needed to supply facts that, under the totality of the circumstances, revealed a probability that Madigan was engaged in criminal activity, in violation of 18 U.S.C. § 1951 (a subject offense under the wiretap statute), and that evidence of such violation would be obtain by the wiretap.

Guided by the above principles, the Court finds that the 2014 Affidavit demonstrates sufficient probable cause to issue the Title III authorization. Among other things, the 2014 Affidavit contained evidence of the prior meetings between the CS and Alderman A, as well as the details of the August 18 meeting at Madigan's law firm office in which Madigan himself participated (captured via video and audio recording). [58] Ex. A, 9/26/14 Affidavit, ¶¶ 26–28, 30, 37–41. Additionally, after the meeting, Madigan and Alderman A met separately for approximately four minutes, *id.* ¶ 46, and then CS and Alderman A had further discussions. ¶¶ 47–48. The affiant relied upon these facts, other facts known in the investigation at the time, and the affiant's own training and experience to draw reasonable, incriminating inferences from these conversations and subsequent events. *See* [58] Ex. A, 9/26/14 Affidavit ¶ 1, 2, 5, 7, 8. These facts and reasonable inferences, in turn, properly supported the issuing judge's finding of probable cause. *See United States v. Carrillo*, 269 F.3d 761, 766 (7th Cir. 2001) ("In determining whether suspicious circumstances rise to the level of probable cause, law enforcement officers are entitled to draw reasonable inferences based on their own training and experience."); *United States v. Marin*, 761 F.2d 426, 432 (7th Cir. 1985) ("Government agents are entitled to reasonably rely upon their special knowledge and expertise to assess probabilities and draw inferences."); *United States v. Scott*, Cause No. 1:09-CR-98-TLS, 2011 WL 2413821, *10 (N.D. Ind. Jun. 10, 2011) (Judges "may take into account the experience and special knowledge of officers if the search warrant affidavit explains the significance of specific types of information") (citing *United States v. Lamon*, 930 F.2d 1183, 1189 (7th Cir. 1991)).

Furthermore, these facts and inferences were confirmed by evidence that, after the CS later informed Alderman A that the developer agreed to hire Madigan's firm, Alderman A then instructed CS to reach out to his assistant and direct her to write up his letter of support for the zoning change, [58] Ex. A, 9/26/14 Affidavit at ¶ 49; and as noted above, Alderman A followed through on his promises by later issuing his letter of support and voicing his support at the committee hearing for the zoning

30

change, which the City Council approved. *Id.* ¶¶ 54–55. In short, the totality of the circumstances supports a reasonable inference that a conspiracy to commit extortion existed between Alderman A and Madigan, and the facts presented in the 2014 Affidavit demonstrate a "fair probability" that Alderman A and Madigan worked together to get the developer to hire Madigan's law firm in exchange for Alderman A approving the zoning change that he needed for his proposed development plan. *See e.g. U.S. v. Davis*, 890 F.2d 1373, 1378 (7th Cir. 1989) (An official commits extortion "when he or she encourages or accepts payments prompted by the hope that the official will be influenced in the exercise of his or her powers.").

Madigan's current claim, that no actual agreement ever existed between him and Alderman A related to the zoning change, does not undermine the issuing judge's finding of probable cause. *United States v. Malin*, 908 F.2d 163, 166 (7th Cir. 1990) (An affiant "need not also negate every argument that can be asserted against" the existence of probable cause) (citing *United States v. Rambis*, 686 F.2d 620, 623 (7th Cir. 1982) and *United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985) ("The fact that an innocent explanation may be consistent with the facts alleged" does "not negate probable cause.")); *United States v. Rees*, 957 F.3d 761, 766 (7th Cir. 2020) ("Probable cause does not require a showing of criminal activity, as it rides on "the degree of suspicion that attaches to particular types of noncriminal acts.").

Because the Court finds that the 2014 Affidavit sufficiently established probable cause to support the issuing judge's finding, the Motion to Suppress is denied.

### c)    Good Faith Exception

Even if the Court found that the 2014 Affidavit did not establish probable cause, suppression would remain inappropriate because the government agents relied upon the 2014 Order in good faith.

The good-faith exception is a well-settled principle of the exclusionary rule; "suppression of evidence seized" pursuant to a warrant "that is later declared invalid is inappropriate if the officers who executed the warrant relied in good faith on the issuing judge's finding of probable cause." *U.S. v. Watts*, 535 F.3d 650, 656-57 (7th Cir. 2008) (citing *United States v. Leon*, 468 U.S. 897, 924 (1984); *United States v. Hollingsworth*, 495 F.3d 795, 803 (7th Cir. 2007); *United States v. Otero*, 495 F.3d 393, 398 (7th Cir. 2007)). The decision itself to obtain a warrant entitles officers to a presumption of good faith, *Watts*, 535 F.3d at 657 (citing *Leon*, 468 U.S. at 920–21; *United States v. Wiley*, 475 F.3d 908, 917 (7th Cir. 2007)); and a defendant may only overcome that presumption by demonstrating that: "(1) the judge issuing the warrant abandoned his detached and neutral role; (2) the officer was dishonest or reckless in preparing the affidavit; or (3) the warrant was so lacking in probable cause that the

officer's belief in its existence was entirely unreasonable." *United States v. Woodfork*, 999 F.3d 511, 519 (7th Cir. 2021) (internal citations omitted).[13]

On its face, "Title III prohibits use of 'evidence in any trial' acquired in violation of the statute and does not expressly provide a good-faith exception." *United States v. Spann*, 409 F. Supp. 3d 619, 624 (N.D. Ill. 2019) (citing 18 U.S.C. § 2515); Omnibus Crime Control and Safe Streets Act of 1968 §§ 801–803 ("Title III"), Pub. L. No. 90-351, 82 Stat. 197, 211-25 (codified at 18 USC § 2510 et seq). Nevertheless, several federal circuits have held that the "suppression provision" within Title III "is clearly modeled on the exclusionary rule created by the Supreme Court, and Congress enacted Title III with knowledge of Supreme Court decisions setting forth that rule's scope." *Spann*, 409 F. Supp. 3d at 624–25; *U.S. v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (applying *Leon* and *Franks* when affirming the district court's review of the government's Title III application); *United States v. Bunson*, 968 F.3d 325, 334 (4th Cir. 2020) (holding that "*Leon's* rationale is equally applicable in the statutory suppression context"); *United States v. Brewer*, 204 Fed. Appx. 205, 208 (4th Cir. 2006) (good-faith exception applies); *United States v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994) (same); *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988) (Rejecting a *Franks* claim, the court refused to exclude the "fruits of the wiretap" because the record "was devoid of deliberately false or recklessly false information that would provide a sufficient basis to apply the rule."); *United States v. Stowers*, 32 F.4th 1054, 1067 (11th Cir. 2022) ("So when law enforcement officers act in good faith and in reasonable reliance upon a judge's wiretap order, exclusion is not warranted.").

As for the Seventh Circuit, the court has not yet expressly decided what types of statutory or constitutional violations of Title III, if any, might remain subject to the good faith exception, and the issue remains a divided question in the courts of appeal. *See United States v. Patrick,* 842 F.3d 540, 552 (7th Cir. 2016) (Judge Wood noting, in dissent, that other circuits "disagree about whether the Title III suppression remedy is affected by the judge-made exclusionary rule."); *United States v. Carrazco-Martinez,* Case No. 19-cr-00351-2, 2022 WL 425729, at *2 (N.D. Ill. Feb. 11, 2022) (recognizing that the Seventh Circuit "has not decided whether the good faith exception applies to Title III's suppression provision" but holding that the present case "supports application of the good faith exception."); *Spann*, 409 F. Supp. 3d at 624 (analyzing the circuit split and finding those circuits applying the good faith doctrine to be "the more persuasive of the two" approaches).

---

[13] Of course, even if the good-faith exception applies to Title III generally, the doctrine would not avoid the suppression remedy if the officer materially and intentionally "misled the issuing judge with knowingly false information or reckless disregard for the truth." *United States v. Grisanti*, 943 F.3d 1044, 1049 (7th Cir. 2019). This Court considers separately, and rejects, the related *Franks* challenge raised by the defense. *Franks v. Delaware*, 438 U.S. 154 (1978).

After a careful review, this Court adopts the well-reasoned approach of the majority view of the circuit courts,[14] and finds that the good faith exception remains legally available in wiretap cases, based upon the plain language (and relevant context) of Title III.

First, the intent of Congress to incorporate traditional Fourth Amendment motion practice into Title III remains clear from the plain text of the statute.[15] For example, § 2518(10)(a) expressly states that "any aggrieved person" may "move to suppress" "before the trial, hearing, or proceeding" "on the grounds" that the wiretap communication was "unlawfully intercepted" or "the order of authorization or approval" under which it was intercepted "is insufficient on its face." 18 U.S.C. § 2518(10)(a). Here, the concepts of unlawfulness or insufficiency in Title III's plain text are not limited to technical statutory violations, but rather the words used by Congress include the litigation of wiretaps otherwise "unlawful" or "insufficient" under the Supreme Court's constitutional precedent. This natural reading of § 2518(10)(a) is confirmed by the statutory carveout in § 2518(10)(c) for non-constitutional violations, which makes specific reference to the use of "judicial" remedies within Title III. 18 U.S.C. § 2518(10)(c) (Title III's "remedies and sanctions" are the "only judicial remedies and sanctions for non-constitutional violations of this chapter involving such communications.") (amendment enacted by Congress post-*Leon*).

---

[14] *Compare United States v. Rice*, 478 F.3d 704 (6th Cir. 2007) (holding *Leon* exception inapplicable to Title III); *United States v. Glover*, 736 F.3d 509, 516 (D.C. Cir. 2013) (same); *with United States v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994) (applying *Leon* exception to Title III); *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988) (same); *United States v. Reed*, 575 F.3d 900, 917 (9th Cir. 2009) (same); *United States v. Brewer*, 204 Fed. App'x 205, 208 (4th Cir. 2006) (same); *United States v. Stowers*, 32 F.4th 1054, 1067 (11th Cir. 2022) (same); Joseph W. Gergel, III, *Wading in Murky Waters: The Good-Faith Exception to the Exclusionary Rule & Title III Wiretaps*, 37 Notre Dame J.L. Ethics & Pub. Pol'y 347 (2023); Melanie B. Harmon, Comment, *Applying Leon: Does the Good Faith Exception Apply to Title III Interceptions?*, 2012 U. Chi. Legal F. 323, 327 (2012); Derik T. Fettig, *When "Good Faith" Makes Good Sense: Applying* Leon's *Exception to the Exclusionary Rule to the Government's Reasonable Reliance on Title III Wiretap Orders*, 49 Harv. J. on Legis. 373, 381 (2012) ("Exclusion is not a necessary result of a Fourth Amendment violation, however, and the exclusionary rule should only apply where the benefits of deterring future Fourth Amendment violations outweigh the 'substantial social costs' of 'letting guilty and possibly dangerous defendants go free ....'") (citing *Herring v. United States*, 555 U.S. 135, 141 (2009)).

[15] In all cases of statutory construction, this Court looks first to the operative legislative text, and asks "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Exelon Generation Co., LLC v. Local 15, Int'l Brotherhood of Elec. Workers, AFL–CIO*, 676 F.3d 566, 570 (7th Cir. 2012) (internal quotations omitted); *Lawson v. FMR LLC*, 571 U.S. 440 (2014) (courts must give "the words used their ordinary meaning"). If the "statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Turkette*, 452 U.S. at 580, 101 S.Ct. 2524 (internal quotations omitted); *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, (1980) (same). In short, when a "statute is unambiguous, our inquiry starts and stops with the text." *United States v. Marcotte*, 835 F.3d 652, 656 (7th Cir. 2016).

Supporting this Court's construction, it remains undisputed that other "judicial remedies" developed by the Supreme Court may be employed in wiretap cases, along with statutory remedies; and these applications utilize constitutional precedent post-dating enactment of Title III (i.e., *Franks v. Delaware*, among others). *See United States v. Ambrosio*, 898 F. Supp. 177, 189 (S.D.N.Y. 1995) ("Thus, since the *Franks* standard of good faith is applicable to an affidavit made in support of a wiretap application, even in light of the statute's exclusionary rule, the good faith exception to the probable cause requirement, as set forth in *Leon,* should also apply to wiretap warrants.").

In short, when courts consider motions to suppress wiretaps for being allegedly unlawful or insufficient, the plain text of Title III provides no basis to limit that litigation to technical statutory violations or to the application of Fourth Amendment case law as it existed in 1968. Instead, the Supreme Court's ongoing constitutional case law controls the suppression analysis of Title III wiretaps for constitutionally based challenges, and this includes the good-faith exception set forth in *Leon*. Any other reading ignores the plain meaning of the Title III's text, thus creating an absurd result which this Court must reject. *See Senne v. Vill. of Palatine*, 784 F.3d 444, 447 (7th Cir. 2015) (All "statutes have to be interpreted to avoid absurd results."); *Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 976 (7th Cir. 2004) ("We interpret statutes to avoid absurd results.") (citing *FutureSource L.L.C. v. Reuters Ltd.*, 312 F.3d 281, 284-85 (7th Cir. 2002)); *United States v. Wilson*, 503 U.S. 329, 334 (1992) (When interpreting any statute, "absurd results are to be avoided.") (citing *United States v. Turkette*, 452 U.S. 576, 580 (1981)).

Lastly, the legislative history of Title III supports this Court's plain reading. In enacting Title III, Congress issued its accompanying Senate Report, which states, among other things, that the "proposed legislation" (which includes the statutory suppression remedy) "conforms to the constitutional standards set out in *Berger v. New York*, and *Katz v. United States*." S. Rep. No. 90-1097, at 67 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2154 (citations omitted); and the constitutional standards created by the Supreme Court in *Berger* and *Katz* have not remained "trapped in amber" but have evolved over time. *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024) (Supreme Court precedents were "not meant to suggest a law trapped in amber."). In other words, § 2518(10)(a) was not intended "generally to press the scope of the suppression role beyond [then] present search and seizure law." S. Rep. No. 1097, 90th Cong., 2d Sess. 96 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2185; *Scott v. United States,* 436 U.S. 128, 139 (1978) ("Any lingering doubt is dispelled by the legislative history which, as we have recognized before in another context, declares that § 2515 was not intended 'generally to press the scope of the suppression role beyond present search and seizure law.'"). Likewise, in 1986 (after the Supreme Court clarified, in *Leon*, that the suppression sanction includes a good faith exception), Congress enacted the Electronic Communications Privacy Act ("ECPA"),

34

which amended Title III "to update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S. Rep. No. 99-541, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3555. Once again, the accompanying Senate Report reveals the intent of Congress in the event a wiretap involves "a violation of the law of a constitutional magnitude," namely, "the court involved in a subsequent trial will apply the existing Constitutional law with respect to the exclusionary rule." S. Rep. 99-541, at 23 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3577.

Having found *Leon* applicable to wiretap cases, this Court finds that Madigan fails to overcome the presumption of good faith. Indeed, the factual record contains no indication or proffer of evidence that the issuing judge somehow "abandoned his detached and neutral role" in issuing the 2014 Order, "particularly given the deference the Court must afford the issuing judge." *Carrazco-Martinez,* 2022 WL 425729, at *2 (citing *United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006)). Likewise, for the reasons explained below, Madigan fails to adequately demonstrate that the Government acted dishonestly or recklessly in the preparation of the affidavit. Consequently, the agents possessed a reasonable and good faith belief that the 2014 Order was lawful because, among other things, the 2014 Affidavit demonstrated sufficient material facts to support the issuing judge's findings (as explained above).

Therefore, even if this Court were to find that the 2014 Order lacked probable cause (which it does not), the good faith exception would still apply and thus suppression remains inappropriate.[16]

### d) *Franks* Analysis

Madigan argues, if this Court does not suppress the evidence for the reasons stated above, a hearing is required under *Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether the 2014 Affidavit contains materially false or misleading information or omissions. Specifically, he claims that the 2014 Affidavit provided false information to the issuing judge and otherwise omitted material facts about the conversations at the August 18 meeting. The record, however, undermines this challenge as well.

The law presumes the validity of affidavits supporting warrants, but a warrant may be found invalid if the affiant obtains it by intentionally or recklessly presenting false, material information to the presiding judge. *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009). In making such a challenge, a defendant can obtain an evidentiary hearing only if he makes a "substantial preliminary showing" that: (1)

---

[16] Having found both that the 2014 Order was supported by probable cause, and in the alternative, that the good faith exception applies, this Court need not address the applicability of the attenuation doctrine in this case.

the warrant affidavit contained a false statement; (2) the affiant made the false statement intentionally or with reckless disregard for the truth; and (3) the false statement was material to the finding of probable cause. *Franks*, 438 U.S. at 155–156. This standard also applies to material omissions, provided a defendant shows that the affiant intentionally or recklessly omitted such information. *United States v. Mullins*, 803 F.3d 858, 862 (7th Cir. 2015); *United States v. Kimberlin*, 805 F.2d 210, 252 (7th Cir. 1986) (omission of a fact from an affidavit is material only if it undermines probable cause and amounts to a "deliberate falsehood or reckless disregard for the truth").

To warrant such a hearing, however, a defendant's showing must go beyond conclusory allegations of deliberate or reckless misstatements, and his showing must contain more than mere allegations of negligence or simple factual errors. *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013). Instead, a defendant must identify evidence showing that specific and material portions of the affidavit were not only false but were also intentional or reckless misrepresentations in which the Government knowingly misled the court or entertained "serious doubts as to the truth of his allegations" at the time of the warrant request. *United States v. Lowe*, 516 F.3d 580, 584 (7th Cir. 2008) (quoting *United States v. 218 Third Street*, 805 F.2d 256, 258 (7th Cir. 1986)); *United States v. Jones*, 208 F.3d 603, 607 (7th Cir. 2000); *United States v. Pritchard*, 745 F.2d 1112, 1116 (7th Cir. 1984). Ultimately, this Court's determination turns not just upon the existence of false information in the affidavit, but upon whether the Government knew the information was false (or recklessly disregarded the issue) at the relevant time. *United States v. Schultz*, 586 F.3d 526, 531 (7th Cir. 2009). Because it is difficult to meet this exacting standard, the law rarely requires a *Franks* hearing. *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001); *Franks*, 438 U.S. at 171 (a defendant seeking a *Franks* hearing bears a substantial burden); *see also United States v. Hornic*k, 815 F.2d 1156, 1158 (7th Cir. 1987) (defendant bears a "substantial burden to demonstrate probable falsity"); *United States v. Souffront*, 338 F.3d 809, 822–23 (7th Cir. 2003).

In this case, Madigan fails to make a substantial preliminary showing that the Government intentionally or recklessly included any materially false statement, or made any material omissions, in the 2014 Affidavit.

First, Madigan's citation to subsequent information the Government learned in interviews with Alderman A, *see* [58] at 29–30 (citing [58] Ex. F, 4/4/18 Interview, at 2), remains irrelevant to this Court's analysis, because the requisite inquiry centers on whether the Government acted with intent or recklessness at the time the affidavit was submitted. Information obtained several years after the 2014 Title III application issued cannot render the contents of the prior 2014 Affidavit intentionally false or misleading.[17]

---

[17] Once Alderman A presented this information, the Government timely presented it to the issuing court for consideration in its subsequent Title III application, as shown in Madigan's Exhibit D. *See*

Second, in an effort to show that a material statement in the affidavit was, in fact, false (and that the affiant knew, or recklessly disregarded that it was false), Madigan relies solely upon the attribution of the statement "Okay" to him, which he claims was not true. *Id.* at 30–31 (citing [58] Ex. A, 9/26/14 Affidavit, ¶ 41). According to Madigan, CS says "Okay" but Madigan "does not give any indication" that he agrees with the statement, and instead what "follows is a pause before someone says something unintelligible to prompt Madigan's law partner to continue his detailed description about how to calculate the tax." *Id.* at 27. Madigan claims that the Government intentionally included this false statement to support the Government's "inference" that he was willing to take official action on a public project involving public land while "pitching for legal work." *Id.* at 26. Beyond his own assertions, however, Madigan fails to make the requisite preliminary showing that the word is missing from the recording or that the voice identification is inaccurate.

A defendant cannot obtain a *Franks* hearing without identifying "specific portions of the warrant affidavit as intentional or reckless misrepresentations," and substantiating "the claim of falsity" with "sworn statements of witnesses." *McMurtrey*, 704 F.3d at 509 (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)); *United States v. Santiago*, 905 F.3d 1013, 1025 (7th Cir. 2018) (affirming *McMurtrey*'s analysis). Here, the affiant in the Government's 2014 Application relied on knowledge of the investigation to date, review of prior recordings, conversations with other officers and agents, and information provided by the confidential source to make the voice identifications set forth in the affidavit. [58] Ex. A, 9/26/14 Affidavit ¶ 7. As already articulated by the Court, probable cause "is not a post hoc determination," *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006), and law enforcement agents may validly rely on reasonable inferences supported by their prior knowledge of the case and training and experience in a probable cause determination. *Brown v. Howard*, Case No. 13–cv–5109, 2015 WL 1906452, *4 (N.D. Ill. Apr. 27, 2015) (citing *United States v. Carrillo*, 269 F.3d 761, 766 (7th Cir. 2001)).

In attempting to refute the affiant's preliminary voice identification and support his claims of falsity, Madigan only points to the recording itself, *see* [58] at 11, 13, 15, 16 (citing Ex. G), and to Alderman A's statements in a 2016 interview with the Government (which fails to refute the initial voice identification). [58] at 29–30 (citing Ex. F, 4/4/18 Interview at 2). Simply offering an alternative conclusion regarding the contents of the recording does not meet the bar required by *Franks*. Because Madigan fails to provide any sufficient "offer of proof" to accompany his allegations, he cannot make the substantial preliminary showing required by *Franks*. *United States v. Pate*, 665 Fed. App'x 464, 470 (6th Cir. 2016).

---

[58] Ex. D at 20 n.7. As noted above, applying a "'probable cause analysis is an *ex ante* test' . . . so the discovery of subsequent information that was unknown to" law enforcement at the time "does not speak to whether" there is "probable cause." *Braun v. Vill of Palatine*, 56 F.4th 545, 550 (7th Cir. 2022) (quoting *Padula v. Leimbach*, 656 F.3d 595, 601 (7th Cir. 2011)).

Likewise, Madigan also fails to proffer any direct evidence of the Government's state of mind, or any inferential evidence to prove the purported falsehood "Okay" was included deliberately or with reckless disregard. *United States v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984) (To prove reckless disregard for the truth, the defendant can show "that the affiant in fact entertained serious doubts as to the truth of his allegations."); *McMurtrey*, 704 F.3d at 509 ("Allegations of negligent or innocent mistakes do not entitle a defendant to a hearing, nor do conclusory allegations of deliberately or recklessly false information. The defendant must identify specific portions of the warrant affidavit as intentional or reckless misrepresentations, and the claim of falsity should be substantiated by the sworn statements of witnesses."); *Taylor*, 63 F.4th at 650 (same).

Because he proffers no evidence showing that the attribution is, in fact, false, or otherwise shows the requisite intentional deception or reckless disregard, Madigan cannot overcome the presumption of validity and thus fails to warrant a *Franks* hearing on this ground. *See Souffront*, 338. F.3d at 822 ("The presumption of validity cannot be overcome by defendant's self-interested inferences and conclusory statements.").

Third, Madigan's claim of materially false omissions fares no better. Madigan asserts that the affiant omitted the fact that the developer was talking to other tax attorneys and had already purchased 15 other commercial properties; this omission, he argues, created suspicious inferences about the August 18 meeting because the developer was seeking to employ a tax attorney for a hotel that he had not yet built, for which he had not yet generated income and thus had not yet incurred any tax liability. [58] Ex. A (9/26/14 Affidavit, ¶ 62). But, again, Madigan fails to proffer evidence that the cited omissions were material or that they were made deliberately or recklessly. *McMurtrey*, 704 F.3d at 509 ("To obtain a hearing, the defendant must also show that if the deliberately or recklessly false statements were omitted, or if the deliberately or recklessly misleading omissions included, probable cause would have been absent."). First, Madigan fails to show that the Government possessed any intent to deceive or otherwise acted recklessly in not including Madigan's proposed revisions to the affidavit. As to the challenged omissions, Madigan "must offer direct evidence" of the deceptive state of mind or sufficient "circumstantial evidence" that the Government possessed "a subjective intent to deceive based on the nature of the omissions." *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014) (citing *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990)). Madigan does neither.

Additionally, this Court assesses the element of materiality by "eliminating false statements" from the sworn testimony, "incorporating any omitted facts, and evaluating whether the resulting testimony still establishes probable cause." *United States v. Frontier,* Case No. 19-CR-556-1, 2023 WL 2599869 at *9 (N.D. Ill. May 22, 2023) (quoting *Gatzimos v. Garrett*, 431 F.App'x 497, 501 (7th Cir. 2011)). Even with

Madigan's proposed changes, the 2014 Affidavit would still have shown probable cause to authorize the wiretap. Based upon the record, Defendant has failed to meet the substantial burden necessary to warrant a *Franks* hearing on this matter, and accordingly his motion is denied.

For the reasons explained herein, the Court denies Madigan's Motion to Suppress.

## C.      Defendants' Motion to Strike, [132]

Madigan, joined by McClain, moves to keep the indictment from going back to the jury during deliberations, or in the alternative, to strike certain phrases and allegations in the indictment prior to providing it to the jury. Specifically, Defendants seek to strike the phrase "Madigan Enterprise," certain allegations related to job recommendations made after December 1, 2016, and certain allegations related to the passage or failure of four pieces of legislation.

Under Federal Rule of Criminal Procedure 7(d), this Court "may strike surplusage from the indictment or information" and it remains within the discretion of this Court to strike language it finds to be "immaterial, irrelevant, or prejudicial." *United States v. Marshall*, 985 F.2d 901, 905 (7th Cir. 1993). Allegations constitute "mere surplusage" if they "are not necessary to establish a violation of a statute in issue" and may be "disregarded if the remaining allegations are sufficient to charge a crime." *United States v. Peters*, 435 F.3d 746, 752 (7th Cir. 2006).

As an initial matter, this Court declines to preclude, at this stage, the indictment being sent back to the jury during deliberations. It remains common practice for trial courts to send a redacted indictment back to the jury room during deliberations to advise the jury of the charges and aid jurors in their deliberations, to do so only after giving Seventh Circuit Pattern Instruction 1.02 (which instructs the jury regarding the purpose of the indictment and emphasizes that it is not evidence of the defendant's guilt). Beyond the specifics addressed below, Defendants fail to establish any undue prejudice warranting a deviation from this routine procedure.

### 1.      The "Madigan" Enterprise

Defendants seek to strike from the indictment the phrase "Madigan Enterprise" on the grounds that it is irrelevant and unduly prejudicial to refer to an enterprise using a Defendant's name. Defendants rely upon a New Jersey ruling in *United States v. Gatto*, in which the court noted "that the government's naming of an enterprise after one of the defendants had the potential for prejudice." 746 F. Supp. 432, 456 (D.N.J. 1990). But the *Gatto* court also acknowledged that "the risk for unfair prejudice is greatest where the defendant is only loosely affiliated with the enterprise because, in such circumstances, a jury could infer an essential element of

the RICO offense, that is, participation in the enterprise, from the unsupported allegations in the indictment." *Id.* (citing *United States v. Vastola*, 899 F.2d 211, 232 (3d Cir. 1990).

In contrast, the Third Circuit held in *Vastola* that referring to an organization as the "Vastola Organization" did not cause prejudice because the Government "did prove the existence of an organization headed by Vastola." 899 F.2d at 232; *see also United States v. Andrews*, 749 F. Supp. 1517, 1519 (N.D. Ill. 1990) (finding phrase "El Rukn hit team" permissible because the Government "will properly be entitled to present evidence identifying the enterprise and the nature of its activities, as well as the role that each defendant played within the enterprise").

As in *Vastola*, the indictment alleges that Madigan not only joined the enterprise but that he exercised leadership and control over the enterprise's activities. The Government indicated that it intends to present evidence to prove the point at trial. The Government also stated that it believes the phrase remains proper and helpful for the jury to understand the case.

Nevertheless, the Government also conceded that the phrase remains nonessential and agreed to a modification. As a result, based upon the record, this Court grants by agreement Defendants' motion to strike this phrase and directs the Government to replace "Madigan Enterprise" with "Racketeering Enterprise," as discussed at the Final Pretrial Conference. *See* [204] 57:14–59:1.

## 2.    Allegations as to Job Recommendations post-December 1, 2016

Based upon the Supreme Court's ruling in *Snyder*, Defendants seek to strike allegations related to certain job recommendations or hiring decisions that occurred after December 1, 2016, because Madigan purportedly took the last official act in the indictment on that date when he voted on the FEJA. This challenge relies upon the defense theory that exerting influence to pass or prevent the passage of certain legislation cannot constitute an official act, thus rendering moot the allegations that Madigan warned ComEd about HB 5626 and gave McClain permission to work to kill the bill.

This defense theory, however, does not justify any redactions of the indictment. As discussed below, the last official act alleged in the indictment took place in 2018, and regardless of the exact timing of any official acts by Madigan alleged in the indictment, this Court has already found that the Government has properly asserted a "stream of benefits" theory of bribery. Under *Snyder,* § 666 applies to rewards "given after the act pursuant to an agreement beforehand," 144 S. Ct. at 1959, and here, the entirety of Count Two describes a conspiracy in which Defendants and ComEd engaged in an ongoing agreement to exchange certain official acts (by

Madigan) in exchange for certain hiring decisions (by ComEd). The Court thus declines to strike these allegations.

### 3. Passage or Failure of Certain Legislation

Lastly, Defendants seek to strike a few paragraphs from the indictment related to certain pieces of legislation that passed (or failed to pass) the legislature on the grounds that Madigan cannot "exert singular power over the legislative process to cause the passage of this legislation" and thus did not commit an official act. But the indictment alleges that Madigan exerted influence over the legislative process in exchange for certain hiring decision from ComEd; it does not allege, nor does it need to allege, that Madigan exerted "singular power" over any piece of legislation to cause its passage. It is sufficient that Madigan took action to aid in the passage (or killing) of certain legislation that impacted ComEd in exchange for ComEd's hiring decisions. *See United States v. Gee*, 432 F.3d 713, 715 (7th Cir. 2005) (finding defendant confused "influence with power to act unilaterally" and the "absence of new laws may show the successful application of influence"); *Woodward v. United States*, 905 F.3d 40, 48 (1st Cir. 2018) ("Actively preventing a vote to take place on a particular piece of proposed legislation falls well within *McDonnell*'s definition of 'official acts.'"). Thus, these allegations remain relevant to Count Two and support the charges that Madigan exerted his influence in his official capacity to impact the legislative agenda in a manner favorable to ComEd. The Court denies Defendants' motion to strike these allegations from the indictment.

### D. Defendants' Motion for a Bill of Particulars, [133]

Madigan, joined by McClain, moves under Federal Rule of Criminal Procedure Rule 7(f) for a bill of particulars. *See* [133], [135].

The decision to order a bill of particulars "rests within the sound discretion of the district court." *United States v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003). A bill of particulars provides a "more specific expression" of the illegal conduct for which defendant is accused, *United States v. Canino*, 949 F.2d 928, 949 (7th Cir. 1991), and thus enables a defendant to prepare an adequate defense. *See United States v. Kendall*, 665 F.2d 126, 134 (7th Cir. 1981). A defendant "is not entitled to know all the evidence the government intends to produce, only the theory of the government's case." *Id.* at 34. (internal quotations omitted).

In assessing the need for a bill of particulars, the "key question is whether the defendant was sufficiently apprised of the charges against him in order to enable adequate trial preparation." *United States v. Vaughn*, 722 F.3d 918, 927 (7th Cir. 2013) (quoting *United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008)). An indictment is sufficient, and a bill of particulars unnecessary, if the indictment "includes each of the elements of the charged offense, the time and place of the

41

accused's criminal conduct, and a citation to the applicable statute or statutes." *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003); *Vaughn*, 722 F.3d at 927. Likewise, a bill of particulars is "unnecessary if the information the defendant seeks is readily available through alternative means such as discovery. *Vaughn*, 722 F.3d at 927 (quoting *Blanchard*, 542 F.3d at 1140).

Here, Defendants seek an order directing the Government to provide the following information: (1) each unindicted member or associate of the enterprise alleged in Count One; (2) each unindicted member of the conspiracy alleged in Count Two; (3) each law or regulation the Government alleges Madigan knew he was violating by recommending individuals to entities with business before the Illinois legislature; (4) each thing of value Madigan allegedly accepted in exchange for an agreement to take a future official act, including when the thing of value was accepted; (5) each official act Madigan, directly or through others, allegedly agreed to take or refrain from taking, in exchange for a thing of value, including when such agreement occurred; and (6) each document the Government believes was falsified related to the conspiracy alleged in Count Two, including which representation(s) contained therein that the Government believes was false. [133] at 2–3. The Court addresses these requests in turn below.

## 1.    Requests 1 and 2

Defendants argue that they require the identities of all unindicted members or associates of the enterprise alleged in Count One and the identities of all unindicted members of the conspiracy alleged in Count Two, because the Superseding Indictment "repeatedly uses vague language" when referring to individuals that Government will designate at co-conspirators at trial. [133] at 5. Thus, Defendants argue that they must know the identities of these individuals to adequately prepare for trial. *Id.* at 5-6.

The Government responds that the Superseding Indictment describes in multiple places the entities, allies, associates, workers, and benefits involved in the Government's allegations. Additionally, the Government contends that Defendants "cannot plausibly claim to be hampered" in trial preparation when the Government has tendered ample discovery and submitted an extensive *Santiago* proffer. *See* [141] at 88; *see also* [103] (along with court-ordered supplements to the *Santiago* proffer); [104] (the Government's motions in limine, which identified additional evidence it seeks to introduce regarding the charged enterprise and conspiracy).

At this stage in the proceedings, all known members of the charged enterprise and conspiracy are set forth in the indictment or in discovery materials, including those identified by the Government and the supplemental *Santiago* and discovery disclosures ordered by this Court. These materials include extensive information identifying known conspirators and co-conspirator statements the Government

intends to offer at trial. Moreover, as stated at the Final Pretrial Conference, this Court has specifically directed the Government to tender as part of pre-trial discovery the identities of all known, unindicted members of the charged enterprise and conspiracy that are not otherwise contained in the Superseding Indictment or contained in already-produced discovery materials. The Court ordered the Government to make these disclosures on or before September 25, 2024. *See* [203]. Therefore, based upon the record, the Court denies the motion for a bill of particulars with respect to these two requests.

## 2.    Request 3

Defendants next request that the Government provide each "law or regulation" the Government "alleges Madigan knew he was violating by recommending individuals to entities with business before the Illinois legislature." [133] at 2. Defendants argue that it is not possible to demonstrate whether the alleged actions at issue "were legitimate or corrupt" especially "after the Supreme Court's decision in *Snyder*," which, according to Defendants, now requires the Government to prove "Madigan had a corrupt state of mind and accepted (or agreed to accept) a payment in exchange for a future official act to sustain a conviction under § 666." *Id.* at 6 (citing *Snyder*, 144 S.Ct. 1947, 1954).

The Government replies first that the law does not require proof that Defendants knew that their conduct violated a specific law or regulation, and second that *Snyder* does not address the definition of the term "corruptly." [141] at 102. Instead, *Snyder* holds only that a reference to "corruptly is a signal that the statute only applies to bribery, consistent with the use of the word 'corruptly' in Section 201, the general federal bribery statute." *Id.* (citing *Snyder*, 144 S. Ct. at 1954–55). To that end, the Government argues, there is no reason to doubt the validity of prior Seventh Circuit precedent which "has never interpreted the term 'corruptly' to mean the same as willfulness as it relates to § 666," and instead points "out the distinct difference of that term in a prior prosecution involving violations of § 666." *Id.* (citing *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015)).

The Court agrees with the Government on both points. First, Defendants confirmed at the Final Pretrial Conference that they cannot, and will not, present any mistake of law defense at trial, *see* [204] at 149:16–150:6; and second, the ruling in *Snyder* found "that § 666 is a bribery statute" but it does not fundamentally alter what the Government must show to establish that Defendants acted "corruptly" under prior Seventh Circuit precedent. *Snyder*, 144 S.Ct. at 1959. Seventh Circuit precedent establishes, particularly in the context of § 666, that individuals act "corruptly" when "they know that the payor is trying to get them to do the acts forbidden by" § 666, "and they take the money anyway." *United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015). *See also United States v. Mitziga,* Case No. 23 CR 242, 2024 WL 383670, * 4 (N.D. Ill. Feb. 1, 2024) ("As used in connection with

soliciting or accepting a bribe under section 666(a)(2), a person acts corruptly when he acts with the understanding that something of value is offered or given to influence or reward him in connection with his official duties."); *Burke*, 2024 WL 3090277, *16 (citing *Hawkins* and *Mitziga*). As explained above, this definition remains unaltered by *Snyder*. Accordingly, requiring "the Government to articulate and be bound to a particular theory at this early stage in the proceedings" regarding which law or regulation it believes Madigan knew he was violating "is neither constitutionally nor statutorily required." *United States v. Donagher*, 520 F. Supp. 3d 1034, 1057 (N.D. Ill. 2021) (quoting *United States v. Agostino*, 132 F.3d 1183, 1191 (7th Cir. 1997) (*abrogated on other grounds by Snyder v. United States*, 144 S.Ct. 1947 (2024))). Thus, this Motion is denied with respect to Request 3.

### 3.    Requests 4, 5

In the fourth and fifth requests, Defendants contend that the Government must detail each thing of value that Madigan "allegedly accepted in exchange for an agreement to take a future official act, including when the thing of value was accepted," and every "official act" Madigan "directly or through others, allegedly agreed to take or refrain from taking, in exchange for a thing of value." [133] at 2. For example, Defendants complain that, in the *Santiago* proffer, the Government introduced as "official acts" new pieces of legislation that were not referenced in the Superseding Indictment. [148] at 10. Accordingly, Defendants argue, they cannot prepare an adequate defense without understanding what official acts the Government indicates it will offer under its "stream of benefits" theory, *see* [148] at 9–11 (citing [141] at 107).

The Government responds that, under Seventh Circuit precedent, it is not required to identify specific business transactions or a series of transactions for Defendants, nor is it required to identify specific official acts in the indictment upon which Madigan agreed to be influenced. Nevertheless, the Government contends, the indictment adequately alleges official acts here wherein Madigan' agreed to support favorable legislation, and oppose unfavorable legislation, to ComEd. [141] at 107 (citing [37] Count 2, ¶¶ 2(f)–(g), 3, 16), which provides extensive references to specific pieces of legislation that constitute "official acts" for the purposes of the charges).

First, after reviewing the indictment, the Court finds that it sufficiently "pins down the business or transactions at issue," and, coupled with the voluminous discovery in Defendants' possession, they remain sufficiently able to identify the relevant transactions at issue. *Donagher*, 520 F. Supp. 3d at 1057; *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003).

Second, as to the identification of "official acts" the Government intends to rely upon at trial, this Court addressed the issue at the Final Pretrial Conference, directing the Government to detail any pieces of legislation not yet identified or

disclosed that it intends to use as official acts that were intended to be influenced or rewarded.  By prior order, the Government was required to tender this disclosure to Defendants on or before September 25, 2024.  *See* [203].

Based upon the record, including these court-ordered disclosures, the Defendants' motion is denied.

### 4.    Request 6

Defendants' final request is that the Government "identify every document it believes was falsified related to the conspiracy alleged in Count Two," including any "representation(s) contained therein" that were allegedly false.  [133] at 10.  The Government opposes the request, arguing that Defendants have access to "the detailed indictment" and "the voluminous discovery" already available, and that the "exact same information" Defendants request "has already been disclosed" in a related case: *United States v. McClain.*  [141] at 109 (citing *United States v. McClain et al.,* No. 20 CR 812, R. 109).[18]

But the Government's argument relating to a discovery production in a prior case says nothing about the sufficiency of their disclosures in this case.  The Court finds that, for "a complex" and multi-year "conspiracy at a public company, alleging general concealment and false statements even with some identified example documents," does not suffice.  *United States v. McClain,* 2022 WL 488944, at *8 (N.D. Ill. February 17, 2022).  Count Two of the Superseding Indictment makes several references where the conspirators "caused third-party intermediaries to enter into false contracts" or "caused the creation and retention of false documents," and other instances of false statements, but it does not refer to specific documents or specific statements themselves.  As such, this Court previously ordered the Government to provide the requested information to Defendants as part of the discovery in this case.  *See* [203].

Because the Court has already addressed Defendants' request through the previously granted court-ordered disclosures, this motion is denied as moot with respect to Request 6.

### E.    Defendants' Motion for Production of Grand Jury Minutes, [134]

Defendant Madigan, joined by Defendant McClain, [135], moves for production of grand jury minutes or, in the alternative, that the Court conduct an *in-camera* inspection of the grand jury materials and order production of any transcripts which may reasonably provide a basis for the Defendant to file a motion to dismiss the Superseding Indictment.  [134].  Specifically, Madigan filed a motion for production

---

[18] The Government reiterated this argument orally at the Final Pretrial Conference.

of grand jury minutes, contending that *Snyder* raised questions concerning whether the Government properly instructed the grand jury that indicted the Defendants.[19]

In its Response, the Government provided the relevant portions of the grand jury transcripts [141], and this Court conducted the *in-camera* inspection as requested. Based upon that review, this Court finds that the materials reflect no error (even under *Snyder*) that could support a motion to dismiss in light of that case.

Having conducted the requested *in camera* review, the Court denies as moot Defendants' motion for production of grand jury minutes.

### F. Madigan's Motion for Pretrial Publicity Related Relief, [184]

On September 3, 2024, Defendant Madigan filed a Motion for Pretrial Publicity Related Relief, [184], and previously made a related request for leave to hire an undisclosed firm to conduct internet research into prospective jurors' publicly available internet presence. [123], [137]. Specifically, Madigan requests that the Court allow the parties to pose "specific written questions that address a potential juror's exposure to Madigan and this case" on the juror questionnaire and permit "significant follow-up *voir dire* on this issue." *Id.* at 2-3.[20] Based upon publicity, Defendant Madigan also asks this Court to grant his request to investigate potential jurors' internet presence, including hiring consultants to conduct cyber searches of the venire's social media posts. [184] at 1.

While agreeing to Madigan's proposed use of an extended questionnaire, the Government and McClain oppose the request for cyber searches of the venire, and the Government asks that the Court prohibit the "parties and their agents from conducting research, including research online, of prospective jurors." [138] at 5.

The Court hereby grants in part, and denies in part, Madigan's motion, as discussed below.

---

[19] As noted above, in *Snyder*, the Court resolved a circuit split over whether § 666 criminalizes both bribes and gratuities promised in exchange for an official act. 144 S. Ct. at 1951. The Court held that the statute only proscribes bribes, leaving the regulation of gratuities to state and local governments. *Id*. Based upon this, Defendants requested production of any grand jury materials related to the Government's presentation of the indictment returned in the case. *See* [134]. In the alternative, Defendants requested that the Court conduct an *in-camera* inspection of the grand jury materials and order production of any transcripts which may reasonably provide a basis for Defendants to file a motion to dismiss the Superseding Indictment.

[20] As part of his motion, Madigan re-incorporates his prior objections to Professor Simpson's testimony—the subject of an August 29, 2024, *Daubert* hearing. [184] at 14. The Court previously addressed those objections in its September 13, 2024, Memorandum Opinion and Order. [200].

1.      **Questioning of the Venire**

Generally, the "conduct of *voir dire* is left to the trial court's sound discretion." *Gardner v. Barnett*, 199 F.3d 915, 920 (7th Cir. 1999) (citing *Morgan v. Illinois*, 504 U.S. 719, 729 (1992)). *See also Skilling*, 561 U.S. at 386 ("Jury selection, we have repeatedly emphasized, is 'particularly within the province of the trial judge.'" (quoting *Ristaino v. Ross*, 424 U.S. 589, 594 (1976))).  The purpose of the *voir dire* process is empaneling a fair "jury through inquisition, whereby the court and parties can ferret out potential jurors whose unshakable biases compromise their abilities to act as neutral arbiters."  *Artis v. Santos*, 95 F.4th 518, 528 (7th Cir. 2024).

A district court's choice to conduct "careful and intensive *voir dire* on the issue of prejudicial pretrial publicity" can suffice to "more than adequately" ensure "that the empaneled jurors [do] not harbor actual bias" toward any party.  *United States v. Gullion*, 575 F.2d 26, 30 (1st Cir. 1978) (citing *Murphy v. Florida*, 421 U.S. 794, 800–01 (1975)); *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986) (It is an "appropriate exercise of the district court's discretion and ordinarily preferable to assess the impact of the pretrial publicity through an extensive *voir dire* of the prospective jurors"), *superseded by statute on other grounds as stated in United States v. Guerrero*, 894 F.2d 261, 267 (7th Cir. 1990).

Here, Defendant Madigan points to several articles appearing in the media over the past several years which reference the present proceedings, and years of campaign advertisements, all of which cast Defendant Madigan in a negative light. [184] Ex. A–D.  Madigan argues that this level of sustained negative publicity against him renders the concerns of juror bias against him "particularly acute," justifying the implementation of extensive procedures to elucidate potential juror bias.  [184] at 14.  Madigan also relies extensively upon *Skilling v. United States*, where the Supreme Court held that "'extensive screening questionnaires and follow-up *voir dire* were well-suited' to the task of identifying and inspecting the possible effects of pretrial publicity influences."  [184] at 13 (quoting 561 U.S. at 384–85).

As already stated at the Final Pretrial Conference (and as this Order confirms), this Court will exercise its discretion to grant the joint request of the parties and utilize an extended written questionnaire for the entire venire.  Using the parties' submission as a guide, the Court will draft an extended jury questionnaire that includes the types of questions articulated by the parties (a final version of the questionnaire will be provided to the parties prior to selection), and this Court, as discussed at the Final Pretrial Conference, will also permit the parties to conduct their own individual questioning of each potential juror during the *voir dire* process.

In this way, the Court grants in part Madigan's motion and will permit "specific written questions that address a potential juror's exposure to Madigan and this case on the juror questionnaire," and allow "robust follow-up *voir dire* on this issue" during jury selection in this case.  [184] at 15.

## 2.  Cyber-Searches of the Venire

As part of jury selection, Defendant Madigan has also requested permission to hire an undisclosed firm to conduct out-of-court research about prospective jurors, including internet searches of prospective jurors that would purportedly screen for prejudice against Defendants.  [123] at ¶ 3(d).[21]  At the motion hearing on July 16, 2024, this Court instructed Madigan to provide sufficient detail about the exact procedures this proposed internet research would entail, because this Court possessed and initially expressed various concerns about the nature of such a search, including: (1) the scope of search protocols, terms, filters and websites; (2) the difficulty of accurately identifying potential jurors with common names, or the different names or nicknames potential jurors might use for website or social media accounts; (3) the timing and flow of the requisite information (especially in light of the agreed request for an anonymous jury pending return of a verdict); (4) the potential for delay of trial; and (4) the need to protect the privacy interests of the venire. Among other dangers, this Court entertained grave concerns that an unsupervised inquiry of the jurors outside of court might deprive this Court of the full factual record needed either to prevent improper outside contact with jurors, or the ability to assess claims of the improper exercise of preemptory strikes.[22]

---

[21] During discussion of the issue, Madigan and his defense team specifically did not request to conduct unsupervised internet searches of the venire on their own, and they have only requested a search by an outside firm, or some type of search by the Court itself.  [143] 50:12–53:25; 58:6–11; 62:22–64:2.

[22] Other trial courts have shared similar concerns about the various dangers of out-of-court cyber searches of the venire.  *Oracle America Inc. v. Google Inc.,* 172 F. Supp. 3d 1100, 1102–03 (N.D. Cal. 2016) (trial court denied a request to conduct internet research on potential jurors: (1) because potential jurors are instructed not to conduct any research about the parties, attorneys, or case, there is an "apparent unfairness in allowing the lawyers to do to the venire what the venire cannot do to the lawyers" and it "will likely have a corrosive effect on fidelity to the no-research admonition"; (2) permitting "counsel to conduct research about the venire and the jury" may "facilitate improper personal appeals to particular jurors via jury arguments and witness examinations patterned after preferences of jurors found through such Internet searches," such as referencing a favorite quote or novel of a particular juror in an effort to persuade that individual; and (3) "to protect the privacy of the venire," a potential juror's "privacy should yield only as necessary to reveal bias or a reluctance to follow the Court's instructions," and since "navigating privacy settings and fully understanding default settings is more a matter of blind faith than conscious choice," it "is a weak answer that venire persons, through their social media privacy settings, have chosen to expose their profiles to scrutiny.").

In response, Defendant Madigan subsequently filed a Proposed Internet Investigation Protocol, [137], and the Government again objected, [138]. In his filing, Madigan stated he wants to engage an unnamed "Company A" (a third-party company that "provides litigation support services, including conducting public facing internet and social media research of potential jurors"). [137] at ¶ 1. This unidentified company, however, uses a "proprietary research protocol," so many of this Court's questions remain unanswered, other than Madigan's conclusory assertion that the cyber search would be limited to "publicly accessible information, including public record searches and publicly facing social media profiles and platforms" to create a "report for each potential juror" and that the undisclosed research protocol purportedly "accesses platforms through the company's anonymous accounts to avoid identifying information" about who "viewed" a potential juror's profile. *Id.* at ¶ 3. Madigan also stated that the internet searches are "fully customizable," but his filing fails to describe any proposed search terms, filters, or scope customized for this case. *Id.* at ¶ 4. Lastly, Madigan claimed, without further explanation, that all data and reports can be "destroyed at the end of litigation, and the investigations could be completed without a delay of trial." *Id.* at ¶¶ 2, 3; *see id.* at ¶ 3 n.1 (even though Madigan offered to make a sample report available for the Court to review, the report itself would not provide clarity about the details of how the search itself was conducted).[23]

Upon review, Madigan's response to this Court's concerns failed to sufficiently develop, or otherwise provide adequate information to assess, his request to hire an unidentified firm to conduct undisclosed searches via a "proprietary research" protocol. Consequently, the request is deemed waived. *See Ross v. Fin. Asset Mgmt. Sys. Inc.*, 74 F.4th 429, 434 (7th Cir. 2023) (stating if a party "fails to develop an argument in the district court, the argument is waived"); *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties."); *330 West Hubbard Restaurant Corp. v. United States*, 203 F.3d 990, 997 (7th Cir. 2000) (holding it is "not the obligation of this court to research and

---

[23] Subsequently, this Court gave Madigan additional opportunities to provide more detail in support of his cyber search request, but he chose to rely upon the prior internet search submission. [143] at 66:4–68:21; [202] 170:4–172:25 (At the hearing held on August 29, 2024, the Court asked: "[T]o the degree there's going to be any OSINT materials," do you have "anything additional to file or anything you need to argue with respect to those issues? . . . [this Court requires] "information" [and] "you filed what you filed. It's going to stand or fall on what it is. But if there's – if you need an opportunity to expand on any of that, now is the time to tell me." In response, the parties only discussed wanting to file the motion for pretrial publicity relief (which they later did, [184]), but Madigan failed to offer any other arguments or request to file any supplements to their Proposed Internet Investigation Protocol itself. [137].

construct the legal arguments open to the parties, especially when they are represented by counsel.").[24]

Even if the request was not waived, this Court finds the request to employ an outside firm using an undisclosed "proprietary research protocol" remains unnecessary in this case. Clearly, the issue of prejudice has already been, and will be, fully addressed through the intensive jury selection procedures described above. *United States v. Tsarnaev*, 595 U.S. 302, 313 (2022) (trial court exercises its "broad discretion" in conducting *voir dire)*. The "ultimate question" at hand "is whether it is possible to select a fair and impartial jury, and in most situations the *voir dire* examination adequately supplies the facts upon which to base that determination." *United States v. Nettles*, 476 F.3d 508, 513 (7th Cir. 2007) (internal quotation omitted). The procedures implemented by this Court (some at the request of the parties), including anonymous jury selection, an extensive written questionnaire, and vigorous *voir dire*, and these measures are more than adequate safeguards to ensure that Defendants receive a fair trial by empaneling jurors who can "act as neutral arbiters." *Artis* 95 F.4th at 528; s*ee also Skilling*, 561 U.S. at 386–88 (upholding the district court's use of a questionnaire largely drafted by the appellant and the court's individual examinations of potential jurors as an adequate response to pretrial publicity concerns). Most importantly, the parties will obtain ample information about a potential juror's exposure to pre-trial publicity and their potential biases through answers to individualized questioning, which are presumed truthful.

Nevertheless, despite the effectiveness of the procedures noted above, this Court will add further protections to address the concerns of the defense. First, consistent with the former practice of this district in other cases, the Court will obtain (and provide to the parties along with the completed juror questionnaires) criminal background checks (NCIC reports) for each member of the venire. These reports shall remain confidential, and the parties shall destroy their copies after jury selection.

Second, this Court will permit the attorneys to conduct a passive review of the internet presence of the members of the venire themselves under the following conditions: (1) any searches must remain limited only to publicly available information via a basic search engine (such as Google or similar service); (2) the parties/attorneys shall make no contact, directly or indirectly, with any member of

---

[24] Among other things, Madigan's generalized proffer failed to: (1) provide enough information to assess the search firm's efficacy or value, or its potential for abuse; (2) cite by name or case number any court allowing the firm to conduct the requested procedure, or any court's reasoning or motivations for doing so; (3) discuss adequate safeguards for protecting juror privacy or preventing improper contact with jurors; or (4) explain why the firm's unsupervised cyber searches remain necessary in light of this Court's detailed juror questioning by way of extended questionnaires and live in-court inquiry, including attorney questioning.

the venire;[25] (3) all attorney work-product materials of such searches and search-results, including but not limited to any search terms used and sites visited, shall be preserved and submitted to the Court (via an *ex parte* filing under seal) prior to the questioning of the juror, and the attorney's copies of all such material may not be disclosed to any party absent leave of court; (4) any issue found in such searches that remains relevant to the juror's qualifications shall be identified and provided to all parties and the Court prior to the questioning of that juror; (5) any answers by a juror during jury selection that are potentially inconsistent with an internet search must be identified and raised prior to the conclusion of the questioning of the juror; (6) such searches shall remain limited to the jury selection process itself and cannot be conducted after the trial jury is sworn; and (7) any failures to abide by these restrictions shall be subject to redress by the Court.

Such supplemental procedures will more than cure any potential bias concerns. *See Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) ("Our own cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias.").

Accordingly, Madigan's motion is denied in part (as to his request to conduct an undefined search by an undisclosed firm), and it is granted in part, as set forth herein.

### 3. Selection Procedures for the Venire

As noted above, the parties submitted a draft version of the questionnaire to be filled out by potential jurors on the first day of jury selection. The Court will provide a modified version of that questionnaire to the venire, blank versions of the form will be provided to the parties prior to the beginning of jury selection, and the filled-out forms will be provided to the parties during the selection process.

---

[25] American Bar Association, Formal Opinion 466, *Lawyer Reviewing Jurors' Internet Presence* (April 24, 2014) ("A lawyer may not, either personally or through another, send an access request to a juror's electronic social media. An access request is a communication to a juror asking the juror for information that the juror has not made public and that would be the type of ex parte communication prohibited by Model Rule 3.5(b). The fact that a juror or a potential juror may become aware that a lawyer is reviewing his Internet presence when a network setting notifies the juror of such does not constitute a communication from the lawyer in violation of Rule 3.5(b). In the course of reviewing a juror's or potential juror's Internet presence, if a lawyer discovers evidence of juror or potential juror misconduct that is criminal or fraudulent, the lawyer must take reasonable remedial measures including, if necessary, disclosure to the tribunal."); New York Bar – Formal Opinion 2012-2 – Jury Research and Social Media ("Attorneys may not research jurors if the result of the research is that the juror will receive a communication. If an attorney unknowingly or inadvertently causes a communication with a juror, such conduct may run afoul of the Rules of Professional Conduct. The attorney must not use deception to gain access to a juror's website or to obtain information, and third parties working for the benefit of or on behalf of an attorney must comport with all the same restrictions as the attorney. Should a lawyer learn of juror misconduct through otherwise permissible research of a juror's social media activities, the lawyer must reveal the improper conduct to the court.").

Finally, as this Court explained in detail at the Final Pretrial Conference, the four-day jury selection process shall proceed with certain procedural modifications to the Court's standing orders. [204] at 7:1–15:2; [151] (Agreed Order on Joint Motion to Defer Disclosure of Jurors' Names). If more than four days are required to select the jury, the process will continue until completed.

### G. McClain's Motion to Dismiss Counts Nineteen and Twenty, [69]

McClain moves to dismiss Counts Nineteen and Twenty of the Superseding Indictment. [69], [70]. Madigan joins with respect to Part II of McClain's Motion to Dismiss. [71]. For the reasons explained below, the Court denies this motion.

#### 1. Background

Count Nineteen of the Superseding Indictment charged Defendants Madigan and McClain with wire fraud in violation of 18 U.S.C. § 1343 and § 1346. [37] Count 19, ¶¶ 3, 38; *id.* Count 20, ¶ 1. These charges stem from Defendants' alleged activities related to the transfer of a parcel of land located in Chinatown from the City of Chicago as part of a scheme to obtain property tax work for Madigan's private law firm. *Id.* ¶¶ 11–13.

McClain argues that the Government's wire fraud charges against him should be dismissed for failure to state an offense. [70] at 1. Counts Nineteen and Twenty allege that the Defendants committed two types of wire fraud: honest-services fraud and property fraud. *Id.* McClain claims that the Government's honest-services fraud charge against him must fail as a matter of law because McClain "did not personally owe any fiduciary duty to the people of the State of Illinois." *Id.* Further, both Defendants argue that the Government fails to properly allege property fraud "because the object of the alleged scheme was not to obtain money or property or to deprive the people of the State of Illinois of some property right." *Id.*

#### 2. Legal Analysis

An indictment validly states an offense if it: "(1) states the elements of the offense charged; (2) fairly informs the defendant of the nature of the charge so that he may prepare a defense; and (3) enables him to plead an acquittal or conviction as a bar against future prosecutions for the same offense." *United States v. Miller*, 883 F.3d 998, 1002 (7th Cir. 2018) (quotation omitted). *See also* Fed. R. Crim. P. 7(c)(1). Indictments which "follow the words of a statute to state the elements of the crime" are "generally acceptable." *U.S. v. White*, 610 F.3d 956, 958 (7th Cir. 2010) (citing *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000). The indictment must contain "enough factual particulars so the defendant is aware of the specific conduct

52

at issue," but "the presence or absence of any particular fact is not dispositive." *Id.* (citing *Smith*, 230 F.3d at 305).

### a)     Honest-Services Fraud Theory

Under 18 U.S.C. § 1343, the federal wire fraud statute "targets the use of certain instrumentalities to advance 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *United States v. Percoco*, 598 U.S. 319, 326 (2023) (quoting 18 U.S.C. § 1343).  18 U.S.C. § 1346, in turn, provides that "the term 'scheme or artifice to defraud'" in § 1343 "includes a scheme or artifice to deprive another of the intangible right" of honest services.  *Skilling*, 561 U.S. at 402 (quoting § 1346).

Per the Supreme Court's holding in *Skilling*, "'only bribery or kickbacks,' rather than any private gain whatsoever, 'can be used to show honest-services fraud.'" *U.S. v. Nayak*, 769 F.3d 978, 981 (7th Cir. 2014) (quoting *Ryan v. United States*, 688 F.3d 845, 847 (7th Cir. 2012)).  The Court "also held that 'violation of a fiduciary duty' was a prerequisite to an honest-services fraud conviction.'" *Id.* (quoting *Skilling*, 561 U.S. at 407–08).  But there "can be no doubt that a non-fiduciary who schemes with a fiduciary to deprive the victim of intangible rights is subject to prosecution under the mail fraud statute." *United States v. Alexander*, 741 F.2d 962, 964 (7th Cir. 1984), *overruled on other grounds*, *United States v. Ginsburg*, 773 F.2d (7th Cir. 1985) (en banc).

McClain argues that the Government cannot establish a violation of honest-services fraud because he personally owed no fiduciary duty to the State of Illinois since he was neither a government employee nor an agent during the relevant time. [70] at 4.  To support this argument, he points to the Supreme Court's holding in *Percoco,* where the Court found that the "'intangible right of honest services' codified in § 1346 plainly does not extend a duty to *all* private persons." 598 U.S. at 330 (emphasis in original).  Instead, the Court found that § 1346 only applies to individuals acting as an agent of the government, and thus those individuals have "a fiduciary duty to the government" and "to the public it serves." *Id.* at 330–31.

But the Supreme Court's ruling in *Percoco* does not overturn or abrogate Seventh Circuit precedent leaving "no doubt" that a non-fiduciary may be validly charged with honest-services fraud if he "schemes with a fiduciary" to commit such fraud. *Alexander*, 741 F.2d at 964.  McClain argues that the Government's reliance on pre-*McNally*[26] case law "stretches honest-services fraud too thin and is

---

[26] In *McNally v. United States*, the Supreme Court "rejected the entire concept of honest-services fraud and held that the mail fraud statute was 'limited in scope to the protection of property rights.'" *Percoco*, 598 U.S. at 327 (quoting 483 U.S. 350, 358 (1987)). In response to *McNally*, Congress passed 18 U.S.C. § 1346, which, as discussed above, provides that the language "scheme or artifice to defraud" as

inconsistent with more recent Supreme Court precedent, which has attempted to rein in the Government's misuse of the statute." [71] at 4.

But McClain fails to show how any Supreme Court decision after *McNally* or the passage of § 1346 conflicts with the Seventh Circuit's reasoning in *Alexander*. In that case, where the defendant was a private attorney who was convicted of a bribery scheme involving members of the Cook County Board of Appeals, the Seventh Circuit held that "an intangible rights scheme is only cognizable when at least one of the schemers has a fiduciary relationship with the defrauded person or entity." *Alexander*, 741 F.2d at 964. Because the "defendant's co-schemers were public employees who had a fiduciary relationship" with the victim entity, the indictment contained sufficient allegations "under an intangible rights theory." *Id.* at 965. This analysis is not in any way inconsistent with the Supreme Court's holding in *Percoco*. *See* 598 U.S. at 329 (rejecting the defendant's argument that the honest-services conspiracy count in the indictment should be dismissed because "he was out of public office during part of the time period within the indictment and that a private citizen cannot be convicted of depriving the public of honest services.").

For example, the First Circuit, in interpreting the Supreme Court's holding in *Skilling*, found that "nothing in *Skilling's* language or context suggests that the Court was distinguishing between the fiduciary who received the bribe and the non-fiduciary who gave it, a distinction that would conflict with the statute's language embracing those who participate in 'any scheme . . . to defraud." *U.S. v. Urciuoli*, 613 F.3d 11, 18 (1st Cir. 2010) (quoting 18 U.S.C. § 1341).[27]

Here, the parties do not dispute that Madigan owed a fiduciary duty to the people of the State of Illinois, and thus a duty to provide honest services. The Superseding Indictment alleges that McClain participated in a scheme with Madigan to breach that fiduciary duty through bribery by attempting to obtain business for Madigan's private law firm in exchange for Madigan using his legislative position to facilitate the land transfer bill. *See* [37] Count 19, ¶¶ 3-11. This is a proper allegation of honest-services fraud as McClain is alleged to have "scheme[d] with a fiduciary" to commit honest services fraud. *Alexander*, 741 F.2d at 964.

Consequently, this part of McClain's motion to dismiss is denied.

---

appearing in both the mail and wire fraud statutes (*see* 18 U.S.C. §§ 1341, 1343) "includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

[27] This view is supported by the explicit text of the Seventh Circuit's pattern instructions, which state that the "defendant need not owe the fiduciary duty personally, so long as he devises or participates in a bribery or kickback scheme intended to deprive the [public; employer; union] of its right to a fiduciary's honest services." Seventh Circuit Pattern Instructions at 633. Notably, the Committee Notes for that instruction explicitly cite *United States v. Alexander*. *See id*.

### b) Property Fraud Theory

McClain next argues (and Madigan joins) that Counts Nineteen and Twenty "fail to allege" that the Defendants "intended to defraud the people of State of Illinois to deprive them of their money or property." [70] at 6. According to Defendants, the indictment does not allege that the Defendants intended to defraud the people of Illinois or cause any deprivation of property or economic harm to the State of Illinois, because the attempted transfer of property detailed in Counts Nineteen and Twenty was only an "incidental byproduct of the scheme" and never actually took place. *Id.* at 7–8.

18 U.S.C. § 1343 "prohibits only deceptive schemes to deprive the victim of money or property." *Kelly v. United States*, 590 U.S. 391, 398 (2020) (internal quotation omitted). To secure a conviction under § 1343, the Government must establish that the defendant: "(1) was involved in a scheme to defraud; (2) had an intent to defraud; and (3) used the wires in furtherance of that scheme." *United States v. Faruki*, 803 F.3d 847, 852 (7th Cir. 2015) (quoting *United States v. Durham*, 766 F.3d 672, 678 (7th Cir. 2014)).

The requisite intent to defraud includes "the omission or concealment of material information, even absent an affirmative duty to disclose, if the omission was intended to induce a false belief and action to the advantage of the schemer and the disadvantage of the victim." *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). Additionally, the property at issue "must play more than some bit part in a scheme' or put differently, a "property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Kelly*, 590 U.S. at 402.

In *Kelly*, the defendants, "public officials who worked at or with the Port Authority," were convicted of property fraud after executing a scheme to shut down certain traffic lanes, causing severe traffic disruptions. *Kelly*, 590 U.S. at 394. The defendants' implemented the scheme "for a political reason—to punish the mayor of Fort Lee for refusing to support the New Jersey Governor's reelection bid." *Id.* at 393. The indictment charged the defendants with, among other offenses, property fraud pursuant to 18 U.S.C. § 1343, alleging that the defendants "sought both to 'commandeer' the Bridge's access lanes and to divert the wage labor of the Port Authority employees used in that effort." *Id.*

The Supreme Court rejected that theory, holding that the defendants' scheme to shut down traffic lanes constituted an "exercise of regulatory power," and "a scheme to alter such a regulatory choice is not one to appropriate the government's property." *Id.* at 400 (citing *Cleveland v. United States*, 531 U.S. 12, 26 (2000)). Additionally, while "a scheme to usurp a public employee's paid time is one to take the government's property," the defendants' "use of Port Authority employees was

incidental to—the mere cost of implementing—the sought-after regulation" and thus was not sufficiently central to the scheme to support the charge of property fraud. *Id.*

Here, Defendants claim that this case is also one where the property at issue is "simply an incidental byproduct of the scheme" because the main "object of the scheme was for Madigan to acquire legal work and fees from a group of individual developers." [70] at 7-8. Not so.

According to the allegations in the indictment, the Defendants' scheme involved Madigan using his position as Speaker of the Illinois House of Representatives "to assist with and cause the passage of legislation providing for the transfer of the Chinatown parcel," with the understanding that, in exchange, legal work "would be steered to his private law firm." [37], Count 19, ¶ 4. Thus, unlike in *Kelly* where the deprivation of property was not a central purpose of the defendants' scheme, here it is clear on the face of the indictment that the property at issue is a central object of the scheme, and that the transfer of that parcel formed the basis of the bargain, intrinsic to the goal of obtaining legal fees.

Additionally, Defendants argue that the indictment fails to allege that the Defendants intended to harm the people of the State of Illinois, claiming that at most, "Counts Nineteen and Twenty allege a scheme to deceive" rather than a "scheme to defraud" as required by the statute. [70] at 10. Once again, Defendants' take on the indictment is incorrect.

In general, proving "a scheme to defraud" requires the Government to show that a defendant made a materially "false statement, misrepresentation, or promise, or concealed a material fact." *Weimert*, 819 F.3d at 355 (citing *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009)). Intent to defraud can be shown by establishing that a defendant "acted willfully 'with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another.'" *Id.* (quoting *Faruki*, 803 F.3d at 853).[28]

Here, as part of a scheme to steer legal work to Madigan's law firm, the indictment alleges that Defendants "concealed, misrepresented, and hid and caused to be concealed, misrepresented, and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme." [37] Count 19, ¶ 4, 37. Specifically, it alleges that Defendants engaged in activities using Madigan's position as Speaker of the Illinois House of Representatives to secure the transfer of the Chinatown parcel, while concealing Madigan's financial interest in the transfer. *Id.* ¶¶ 11-21.

---

[28] Of course, the statute not only prohibits fraudulent misrepresentations, but also criminalizes "cheating" frauds without any misrepresentations. *United States v. Doherty*, 969 F.2d 425, 429 (7th Cir. 1992) ("As its ordinary meaning suggests, the term 'scheme to defraud' describes a broad range of conduct, some which involve false statements or misrepresentations of fact, and others which do not.") (citations omitted).

Having alleged that Defendants acted willfully to conceal a material fact with the intent to deceive or cheat for the purpose of financial gain, the indictment properly charges a "scheme to defraud" and is more than sufficient to meet the pleading requirements at this stage of the proceedings. *See U.S. v. White*, 610 F.3d 956, 958 (7th Cir. 2010).

Finally, Defendants' argument that the indictment fails to property allege property fraud because the Chinatown parcel was never actually transferred, and thus no economic loss or harm resulted, remains untethered to the law. A scheme to defraud need not be successful to be charged. *See United States v. Serpico,* 320 F.3d 691, 694 (7th Cir. 2003); *United States v. Keane*, 852 F.2d 199, 205 (7th Cir. 1988).

Thus, for the reasons explained above, the Court denies Defendants' Motion to Dismiss Counts Nineteen and Twenty of the Superseding Indictment.

## H.    McClain's Motion for Severance, [122], [139]

On July 19, 2024, Defendant McClain filed a motion for severance pursuant to Federal Rule of Criminal Procedure 14. [139].

McClain argues that a joint trial with Defendant Madigan would result in unfair prejudice to him and violate his fundamental due process rights because Madigan's counsel will act as "Second Prosecutors" against him. *Id.* at 3. According to McClain, these "Second Prosecutors" will offer an alternative, independent theory of his guilt from the Government's case, but do so while remaining free from the Government's disclosure requirements. *Id.* at 5–6. Additionally, McClain claims that he and Madigan will offer inapposite defense theories such that acceptance of one will preclude the other, confusing the jury regarding the correct burden of proof for a conviction; he further argues that, after hearing these conflicting theories, the jury could accept Madigan's theory of McClain's guilt, which (unlike the Government's theories) does not need to be proved beyond a reasonable doubt. *Id.* at 7–8.

The Government responds that severance "is particularly inappropriate in this case" because Defendants are charged with allegedly conspiring to participate in an association-in-fact enterprise which engaged in a pattern of bribery and extortion and are also charged jointly with numerous other crimes related to the alleged racketeering conspiracy. [156] at 5. The Government also points out that the "Seventh Circuit has consistently rejected the claim that antagonistic defenses merit severance," and thus McClain's arguments do not warrant a grant of severance here. *Id.* at 8.

### 1. Legal Standard

Defendants may be joined in one indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). For joinder to be proper, Rule 8(b) requires that "the defendants are charged with crimes that well up out of the same series of such acts, but they need not be the same crimes." *U.S. v. Warner*, 498 F.3d 666, 699 (7th Cir. 2007) (internal quotation omitted). Facts establishing that defendants participated in a common conspiracy may be sufficient to justify joinder under Rule 8(b). *See U.S. v. Thompson*, 286 F.3d 950, 968 (7th Cir. 2002).

When defendants are properly joined under Rule 8(b), courts should only grant a severance "if there is a serious risk that a joint trial would compromise a specific trial right" of one of the defendants, or "prevent the jury from making a reliable judgment about guilt or innocence." *U.S. v. Olson*, 450 F.3d 655, 677 (7th Cir. 2006) (citation omitted). Examples of such serious risks arise in certain situations where evidence probative of a defendant's guilt is only admissible against a codefendant, or where essential exculpatory evidence is inadmissible in a joint trial but would be admissible if a defendant were tried alone. *Zafiro v. U.S.*, 506 U.S. 534, 539 (1993). Generally, only in the "most unusual circumstances" will the risk of prejudice stemming from a joint trial outweigh the interests of judicial economy which favor trying defendants together. *United States v. Velasquez*, 772 F.3d 1348, 1352 (7th Cir. 1985). Specifically, joint trials "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Zafiro*, 506 U.S. at 537. Because of these interests, the federal system demonstrates a preference for "joint trials of defendants who are indicted together" and the Supreme Court has "repeatedly approved" joint trials. *Id.*

Mutually antagonistic defenses often fail to constitute sufficient grounds for a severance, because they "are not prejudicial per se." *Olson*, 450 F.3d at 677 (citation omitted); *Zafiro*, 506 U.S. at 538 ("the courts have reversed relatively few convictions for failure to grant a severance on grounds of mutually antagonistic or irreconcilable defenses."). Further, "blame-shifting does not necessarily 'prevent the jury from making a reliable judgment about guilt or innocence.'" *United States v. Goines*, 988 F.2d 750, 781 (7th Cir.1993) (citations omitted). *See also U.S. v. Ramirez*, 45 F.3d 1096, 1100 (7th Cir. 1995) ("mutually antagonistic defenses do not automatically require severance because less drastic measures, such as limiting instructions, will often suffice to address any risk that one defendant will be convicted on account of another defendant's actions."). Even if a defendant can establish prejudice, "Rule 14 does not require severance"; rather, the Rule leaves the "tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538.

## 2. Legal Analysis

Defendants do not challenge the appropriateness of joinder here. As a result, the issue is simply whether the joinder remains sufficiently prejudicial to merit a severance under Rule 14.

First, the interests of judicial economy weigh heavily in favor of a joint trial in this case. As the Government notes in its Response, the indictment alleges Defendants McClain conspired to participate in an association-in-fact enterprise through a pattern of both bribery and extortion. *See* [156]. It also charges both defendants with numerous other subsidiary crimes related to the alleged racketeering conspiracy. *Id.* The voluminous and overlapping nature of the evidence and testimony against each Defendant would be entirely repetitive if the trials were severed. Thus, the relatedness and extensiveness of the charges faced by both defendants supports trying both defendants together for these offenses, as separate trials would only repeat the expenditure of judicial resources to establish the same principal facts. *United States v. Morales*, 655 F.3d 608, 624 (7th Cir. 2011) (In a RICO case, Seventh Circuit emphasized that where "alleged co-conspirators are indicted together, as they are here, there is a strong preference that they be tried together.").[29]

Next, this case presents no serious risks of unfair prejudice to McClain to warrant a severance. In his Motion, McClain repeatedly claims that Madigan's planned defense will subject him to prejudice and materially conflict with his own defense. Additionally, in his Reply, McClain asserts that "the Madigan Second Prosecutors' theory" will not have "to survive a motion for acquittal at the end of this case," which he contends adds to the "high risk" that he will be unjustly convicted in this case. [165] at 3. But McClain fails to identify and support the existence of a specific trial right compromised, or a specific piece of defense evidence rendered inadmissible, in a joint trial, and he otherwise cites to no Seventh Circuit or Supreme Court authority justifying a grant of severance on the current record.

---

[29]*See also*, *United States v. Delatorre*, 522 F. Supp. 2d 1034, 1046–47 (N.D. Ill. 2007) ("Because each individual defendant is a charged member of the RICO conspiracy case, 'the vast majority, if not all, of the evidence admitted in the joint trial would have been admissible had [the defendant] been tried alone.'"), *aff'd sub nom. United States v. Benabe*, 436 F. App'x 639 (7th Cir. 2011) (citing *United States v. Souffront*, 338 F.3d 809, 831 (7th Cir. 2003); *United States v. Sababu*, 891 F.2d 1308, 1331 (7th Cir. 1989)); *United States v. Scarfo*, No. CRIM. 11-740 RBK, 2012 WL 4120504, at *11 (D.N.J. Sept. 19, 2012) ("broad joinder authority is appropriate in the RICO context" because forcing the Government "to try some alleged criminal activities separately from others alleged to be part of the same RICO enterprise would prevent" the Government "from prosecuting the type of crimes the statute was intended to combat.") (quoting *United States v. Vastola,* 670 F. Supp. 1244, 1262 (D.N.J. 1987)), *aff'd,* 41 F.4th 136 (3d Cir. 2022), *judgment entered sub nom. United States v. Maxwell*, No. 15-2925, 2023 WL 11282245 (3d Cir. July 17, 2023).

Instead, the facts here fall squarely within the scope of the Supreme Court's seminal decision on this subject, *Zafiro v. United States*. There, the petitioners claimed that the trial court abused its discretion in denying their motions to sever, asserting that "the very nature of their defenses" subjected them to prejudice. *Zafiro*, 506 U.S. at 540. The petitioners' argued that when two defendants both claim innocence and accuse the other of the crime, a jury will simply conclude either that: 1) both defendants are lying and thus convict them both; or 2) one of them must be guilty, without regard to whether the Government met its burden of proof. *Id*. The Supreme Court held that neither argument warranted a severance.

As to the petitioners' first theory, the Court found that, to the extent the testimony supporting the petitioners' conflicting defense theories was relevant and admissible, the petitioners could not exclude that testimony anyway, even "if the district court did sever their trials," and thus such evidence would not be "prejudicial merely because the witness is also a codefendant." *Id*. As to petitioners' second theory, the Court held that because the trial court properly instructed the jury concerning the Government's burden of proof and concerning the jury's duty to consider each individual charge and individual defendant, those actions "sufficed to cure any possibility of prejudice." *Id*. at 540–41.

Here, like the petitioners in *Zafiro*, McClain claims that the contradictory nature of his defense and Madigan's defense will result in unfair prejudice. He also claims that the jury will confuse the burden of proof due to the presentation of these contradictory defenses. Nevertheless, just as in *Zafiro*, neither of these contentions forms a proper basis for severance. Following *Zafiro*, the Seventh Circuit has "consistently held that blame-shifting among codefendants, without more, does not mandate severance." *U.S. v. Plato*, 629 F.3d 646, 650 (7th Cir. 2010). *See also United States v. Mietus,* 237 F.3d 866, 873 (7th Cir. 2001) ("Even a showing that two defendants have 'mutually antagonistic defenses,' that is, that the jury's acceptance of one defense precludes any possibility of acquittal for the other defendant, is not sufficient grounds to require a severance unless the defendant also shows prejudice to some specific trial right."). In this case, however, McClain does not offer more than his own assertions that his and Madigan's defense theories preclude one another and that resultingly the jury will not be able to function fairly. *See* [139], [165]. These arguments do not reference any "specific trial right" at risk, and instead only assert a generalized theory of prejudice resulting from mutually antagonistic defenses—a theory clearly rejected by *Zafiro*. Additionally, the Supreme Court and the Seventh Circuit have both clearly stated that appropriate limiting instructions generally cure these risks of prejudice. *See Plato*, 629 F.3d at 651; *Zafiro*, 506 U.S. at 539.

Because McClain does not show any serious risk of deprivation of a specific trial right which outweighs the interests of judicial economy in proceeding with a joint trial, the Court declines to grant his motion to sever.

60

## X.   Conclusion

For the reasons set forth above, the Court denies Madigan's motion to dismiss certain counts of the Superseding Indictment, [129]; denies Madigan's motion to suppress, [57]; denies Madigan's motion to strike, [132]; denies Madigan's motion for a bill of particulars, [133]; denies Madigan's motion for production of grand jury minutes, [134]; grants in part, and denies in part, Madigan's motion for pretrial publicity related relief, [184]; denies McClain's motion to dismiss, [69]; and denies McClain's motion for severance, [122], [139].  The parties shall comply with all deadlines set by the Court in this Order and in prior orders, *see* [203], [205], [206], [211].

By prior order [91], the trial will commence as scheduled on October 8, 2024, at 9:30 a.m., with attorneys and Defendants appearing at 9:00 a.m., in Courtroom 1203.

Date:  October 2, 2024

ENTERED:

John Robert Blakey
United States District Judge