# Government Sentencing Exhibit 1

1
2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

3
4
5

UNITED STATES OF AMERICA,               )
                                        )
                   Plaintiff,           )
                                        )
6       -vs-                            )   Case No. 20 CR 812-1, -2,
                                        )   -3, and -4
7       MICHAEL McCLAIN, ANNE           )
        PRAMAGGIORE, JOHN HOOKER,       )
        and JAY DOHERTY,                )   Chicago, Illinois
8                                       )   March 20, 2023
                   Defendants.          )   2:00 p.m.

9
10
11

VOLUME 4-B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE HARRY D. LEINENWEBER, and a Jury

12

APPEARANCES:

13
14
15
16
17

For the Government:       HON. MORRIS O. PASQUAL
                          ACTING UNITED STATES ATTORNEY
                          BY:   MR. AMARJEET SINGH BHACHU
                                MS. SARAH E. STREICKER
                                MS. DIANE MacARTHUR
                                MS. JULIA K. SCHWARTZ
                          219 South Dearborn Street, Suite 500,
                          Chicago, Illinois  60604
                          (312)353-5300

18
19
20

For Defendant             GREENSFELDER, HEMKER & GALE, PC
McClain:                  BY:   MR. PATRICK J. COTTER
                                MR. DAVID P. NIEMEIER
                          200 West Madison Street
                          Suite 3300
                          Chicago, Illinois  60606
                          (312) 345-5088

21
22
23
24
25

Court Reporters:
                 JUDITH A. WALSH, CSR, RDR, F/CRR
                 AMY M. SPEE, RPR, CRR
                 Official Court Reporters
                 United States District Court
                 219 South Dearborn Street, Room 2118
                 Chicago, Illinois  60604
                 Telephone:  (312) 435-5387
                 charles_zandi@ilnd.uscourts.gov

```
 1   APPEARANCES:   (Continued)

 2   For Defendant              SIDLEY AUSTIN, LLP
     Pramaggiore:               BY:   MR. SCOTT R. LASSAR
 3                                    MR. DANIEL C. CRAIG
                                      MS. JENNIFER M. WHEELER
 4                                    MS. EMILY A. ROSENBERG WOODRING
                                One South Dearborn Street
 5                              Chicago, Illinois  60603
                                (312) 853-7668
 6

 7   For Defendant Hooker:      MONICO & SPEVACK
                                BY:   MR. MICHAEL D. MONICO
 8                                    MS. JACQUELINE S. JACOBSON
                                      MR. RYAN W. MITSOS
 9                              20 South Clark Street
                                Suite 700
10                              Chicago, Illinois  60603
                                (312) 782-8500
11

12                              LAW OFFICES OF SUSAN M. PAVLOW
                                BY:   MS. SUSAN M. PAVLOW
13                              53 West Jackson Boulevard
                                Suite 1215
14                              Chicago, Illinois  60604
                                (312) 322-0094
15

16   For Defendant              LAW OFFICES OF GILLESPIE AND
     Doherty:                   GILLESPIE
17                              BY:   MR. MICHAEL P. GILLESPIE
                                53 West Jackson Boulevard
18                              Suite 1062
                                Chicago, Illinois  60604
19                              (312) 588-1281

20                              MS. GABRIELLE R. SANSONETTI
                                53 West Jackson Boulevard
21                              Suite 1062
                                Chicago, Illinois  60604
22                              (312) 588-1281

23

24

25
```

01:59:22　　1　(Proceedings heard in open court.  Jury out.)

01:59:22　　2　　　　MR. BHACHU:  Judge, if I could just put something on

01:59:24　　3　the record really quickly.  If we could, your Honor, just have

01:59:29　　4　the Court admonish all the parties not to talk to jurors and

01:59:33　　5　also not talk to witnesses.

01:59:34　　6　　　　I understand there was an incident over the break

01:59:37　　7　where one of the defendants was engaged in conversation with

01:59:40　　8　the witness that's on the stand.  And just, nothing wrong with

01:59:43　　9　the communication as I understand it.  It was more

01:59:47　 10　pleasantries, etcetera.  However, I do think it's appropriate

01:59:50　 11　that, you know, witnesses not have contact with either the

01:59:52　 12　defendants or with -- or jurors with defendants as well.

01:59:54　 13　　　　So if we could just emphasize that that should be the

01:59:57　 14　case.  Thank you.

01:59:58　 15　　　　THE COURT:  To everybody here or to the jury or both?

02:00:02　 16　　　　MR. BHACHU:  I think both is probably appropriate,

02:00:04　 17　Judge.

02:00:05　 18　　　　THE COURT:  All right.  Well, parties and lawyers

02:00:07　 19　should not contact the witnesses while they're on the stand,

02:00:11　 20　obviously.

02:00:14　 21　　　　MR. COTTER:  Thank you, your Honor.  Apologies.

02:00:16　 22　　　　THE COURT:  Even pleasantries.

02:00:18　 23　　　　MR. COTTER:  Even pleasantries.

02:01:56　 24　　(Proceedings heard in open court.  Jury in.)

02:01:57　 25　　　　THE COURT:  Please be seated.

Vogt - direct by Schwartz

823

1    Members of the jury, I've been asked to tell you that
2  the lawyers and the parties have strict instructions not to
3  talk to you.  So you may run into them in the building.  If
4  they ignore you, don't think that they're just being impolite.
5  They're following my instructions, so just so you know that.
6    You may continue your examination.
7    MS. SCHWARTZ:  Thank you, your Honor.
8    SCOTT VOGT, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
9    DIRECT EXAMINATION (Resumed)
10  BY MS. SCHWARTZ:
11  Q.  Before the lunch break, Mr. Vogt, we had been talking
12  about the EIMA legislation.  I'd now like to jump ahead and
13  ask you questions about subsequent legislation.
14    First, following EIMA's enactment, what agency was
15  charged with implementing the new formula rate?
16  A.  The Illinois Commerce Commission.
17  Q.  After EIMA, did ComEd make a filing with the commerce
18  commission to implement the new formula rate?
19  A.  Yes.
20  Q.  How would you describe the commerce commission's order on
21  that first formula rate case?
22  A.  Surprising and disappointing.
23  Q.  In what sense?
24  A.  They had misinterpreted or had issued an order that was
25  substantially lower than we expected due to the treatment

Vogt - direct by Schwartz

| | | |
|---|---|---|
| 02:03:12 | 1 | around pension costs and other things that were explicitly |
| 02:03:15 | 2 | spelled out in the statute. |
| 02:03:18 | 3 | Q.  What was the impact of the Illinois Commerce Commission's |
| 02:03:22 | 4 | interpretation of EIMA on ComEd's recovery of expenses that |
| 02:03:26 | 5 | year? |
| 02:03:26 | 6 | A.  I think it was around $100 million additional reduction. |
| 02:03:30 | 7 | Q.  Did the company do anything to address the commerce |
| 02:03:37 | 8 | commission's bad formula rate order? |
| 02:03:40 | 9 | A.  Yes.  The company initially went back to the legislator to |
| 02:03:47 | 10 | ask for some clarifying -- there's a term or procedure that |
| 02:03:55 | 11 | the House issued on our -- on ComEd's behalf to suggest that |
| 02:03:59 | 12 | the language wasn't interpreted correctly.  Ultimately, |
| 02:04:02 | 13 | though, new legislation was introduced to tighten the words in |
| 02:04:08 | 14 | the statute to make it explicitly clear. |
| 02:04:12 | 15 | Q.  And what was intended to be made explicitly clear in that |
| 02:04:18 | 16 | new legislation? |
| 02:04:18 | 17 | A.  How the treatment of pension and other things were |
| 02:04:21 | 18 | supposed to operate under the formula. |
| 02:04:23 | 19 | Q.  And did that new legislation become law? |
| 02:04:26 | 20 | A.  Yes. |
| 02:04:26 | 21 | Q.  Was that Senate Bill 9? |
| 02:04:29 | 22 | A.  Yes. |
| 02:04:29 | 23 | Q.  What year did Senate Bill 9 pass? |
| 02:04:32 | 24 | A.  I believe that was in 2013. |
| 02:04:34 | 25 | Q.  What was the effect of Senate Bill 9's passage in 2013? |

Vogt - direct by Schwartz

825

| | | |
|---|---|---|
| 02:04:41 | 1 | A.  It just tightened up the language on the formula and took |
| 02:04:45 | 2 | any discretion to a degree on how those items were supposed to |
| 02:04:50 | 3 | operate in the rate-making process away from the commission's |
| 02:04:55 | 4 | discretionary abilities to interpret them. |
| 02:04:58 | 5 | Q.  And what was ComEd's position on the Senate Bill 9? |
| 02:05:03 | 6 | A.  In favor of it. |
| 02:05:05 | 7 | Q.  Following the passage of Senate Bill 9, how did the |
| 02:05:08 | 8 | Illinois Commerce Commission treat ComEd's rate case? |
| 02:05:11 | 9 | A.  It reversed the original order putting the new language |
| 02:05:16 | 10 | into effect and correcting the issue. |
| 02:05:19 | 11 | Q.  And how was the passage of Senate Bill 9 viewed within |
| 02:05:23 | 12 | ComEd? |
| 02:05:27 | 13 | A.  Sorry.  I'm a little lost for words for once.  You know, |
| 02:05:32 | 14 | excited, relieved. |
| 02:05:37 | 15 | Q.  Mr. Vogt, were you promoted in 2013? |
| 02:05:40 | 16 | A.  Yes. |
| 02:05:40 | 17 | Q.  What was the role that you took on in 2013? |
| 02:05:43 | 18 | A.  Vice president, regulatory projects. |
| 02:05:49 | 19 | Q.  Who did you report to in that role? |
| 02:05:51 | 20 | A.  I reported to Tom O'Neill. |
| 02:05:53 | 21 | Q.  What was Tom O'Neill's position within the company? |
| 02:05:56 | 22 | A.  He was general counsel and senior vice president of |
| 02:05:59 | 23 | regulatory. |
| 02:05:59 | 24 | Q.  While you were working as vice president of regulatory |
| 02:06:02 | 25 | projects, what was your primary responsibility? |

Vogt - direct by Schwartz

826

02:06:06  1   A.  My main project when I came back to ComEd was to really

02:06:12  2   evaluate the performance of the formula against other

02:06:20  3   rate-making regimes, if you will, or structures whether

02:06:23  4   traditional rate making or some other rate-making ideas that

02:06:28  5   have emerged in Europe and other things, whether those were

02:06:31  6   better alternatives than what we currently had under the

02:06:35  7   formula rate.

02:06:39  8   Q.  And when you testified you were charged with evaluating

02:06:42  9   the formula rate, was that the same formula rate enacted

02:06:44  10  through the passage of EIMA?

02:06:46  11  A.  Yes -- well, after modification on SB9, yes.

02:06:50  12  Q.  Thank you.  Was this project referred to as Project

02:06:54  13  Sunrise?

02:06:54  14  A.  Yes.

02:06:54  15  Q.  What was the reason for evaluating how the formula rate

02:06:57  16  was doing as part of Project Sunrise?

02:07:00  17  A.  It was part of planning for the future in terms of, we

02:07:04  18  knew that the sunset was there on 12/31/2017, so the question

02:07:09  19  really was, was it worth an extension of the formula?  Did we

02:07:12  20  want the extension of the formula?  Did we want a different

02:07:17  21  model?  Did we want to return back to traditional rate making?

02:07:21  22          These were all options that were available to the

02:07:24  23  business at the time, so my job was to really take a long-term

02:07:31  24  look at the financials of the company under these different

02:07:34  25  rate-making methods to understand what was most beneficial for

Vogt - direct by Schwartz

02:07:39  1   the company and the customers.

02:07:41  2   Q.  And did you conduct a comparison of how the formula rate

02:07:46  3   was performing relative to other rate-making models?

02:07:50  4   A.  Yes.

02:07:50  5   Q.  What was your conclusion with regard to the value of the

02:07:53  6   formula rate compared to other types of rate making?

02:07:57  7   A.  We felt like the formula rate was probably the best

02:08:01  8   alternative out there for the long-term financial health of

02:08:06  9   the business as well as the most appropriate one for customers

02:08:10  10  in terms of how it married the benefits with the rate making

02:08:14  11  with what we could do for performance with the customers.

02:08:18  12  Q.  Did you and your team project the value of an extension of

02:08:22  13  the formula rate from 2018 through 2022?

02:08:27  14  A.  Actually, we went all the way to 2030.

02:08:29  15  Q.  And based on that analysis going all the way to 2030,

02:08:34  16  about how much additional shareholder value did you and your

02:08:37  17  team project would be gained by extending the formula rate?

02:08:41  18  A.  400 million to 2022.

02:08:44  19  Q.  And did you also do a calculation to 2030?

02:08:49  20  A.  Yes.

02:08:49  21  Q.  What was that value?

02:08:50  22  A.  That was around 750 million.

02:08:57  23  Q.  Can you describe to the jury how you made that projection?

02:09:02  24  A.  Yes.  We actually modeled it financially.  We looked at

02:09:09  25  the current values of the investments we had in the system,

Vogt - direct by Schwartz

02:09:14 1  the asset lives we had, and we modeled all the depreciation,

02:09:21 2  all future investments.  We modeled load, revenue, costs,

02:09:26 3  expenditures under these different rate-making methodologies,

02:09:31 4  and then we just did the difference in terms of how much

02:09:35 5  income was being generated and what was the total bill effect

02:09:40 6  to customers as we went through time.

02:09:43 7  Q.  And when did you complete that analysis, the analysis

02:09:46 8  where you determined that the shareholder value gain from the

02:09:49 9  formula rate would be 400 million to 2022 and 700 million to

02:09:54 10  2030?

02:09:55 11  A.  Right around September 2014, towards the end of September.

02:10:00 12  Q.  Did you report on those findings to ComEd's strategy and

02:10:04 13  lobbying team?

02:10:05 14  A.  Yes.

02:10:06 15  Q.  Did you report those findings to Ms. Pramaggiore?

02:10:10 16  A.  Yes.

02:10:10 17  Q.  Did you ever go back and check your numbers, do an

02:10:14 18  after-the-fact analysis to see if your 400 million, 750

02:10:19 19  million was about right?

02:10:20 20  A.  No, I never went back.

02:10:21 21  Q.  Looking back on it now based on what you know here today,

02:10:25 22  do you think those figures, the 400 million and the 750

02:10:29 23  million, were too high, too low, just about right?

02:10:34 24  A.  It -- they were probably high at the time based on --

02:10:40 25  there's a lot of interplay around return on equity that was

02:10:43  1  tied to Treasury rates, and Treasury rates dropped a lot.  So

02:10:47  2  it was probably a little higher than where we were over those

02:10:53  3  first four years.  I would say right about now, it looks

02:10:57  4  spot-on to probably what we were evaluating at that time.

02:10:59  5  Q.  So, you know, taking that into account, how would you

02:11:04  6  say -- what effect would you say the formula rate legislation

02:11:06  7  has had over time on ComEd's shareholder value?

02:11:10  8  A.  It significantly increased it.  It was -- it created this

02:11:14  9  level of certainty for us to know what a dollar invested was

02:11:21  10  going to generate in terms of earned return as well as the

02:11:24  11  cash flow that would be provided through the business.  So we

02:11:28  12  had a high degree of certainty on what we could invest in the

02:11:31  13  business.  In fact, we ended up investing probably

02:11:34  14  significantly more than what I modeled we would invest back in

02:11:39  15  2014, 2015.

02:11:42  16  Q.  You testified earlier that the formula rate was originally

02:11:48  17  set to sunset or expire in 2017.  At some point, did that

02:11:51  18  formula rate sunset get extended until 2019?

02:11:55  19  A.  Yes.

02:11:55  20  Q.  What company advocated for that extension of the formula

02:11:58  21  rate sunset?

02:11:59  22  A.  Initially, Ameren.

02:12:02  23  Q.  What is Ameren?

02:12:02  24  A.  Ameren is the public utility in southern Illinois.  So

02:12:05  25  they cover Peoria, Decatur, close to St. Louis, all the way

Case: 1:22-cr-00115 Document #: 418-1 Filed: 05/30/25 Page 12 of 57 PageID #:18647
Vogt - direct by Schwartz
830

02:12:14   1   down south to the southern border of Illinois.

02:12:19   2   Q.  So does Ameren deliver the same type of services as ComEd

02:12:22   3   but in the southern part of the state?

02:12:24   4   A.  Yes, with the addition of some natural gas delivery that

02:12:27   5   they do that we do not.

02:12:28   6   Q.  Is Ameren an affiliate of Exelon?

02:12:32   7   A.  No.

02:12:32   8   Q.  Is Ameren a regulated utility like ComEd?

02:12:36   9   A.  Yes.

02:12:38  10   Q.  Was the Ameren formula rate extension ultimately enacted

02:12:42  11   into law?

02:12:42  12   A.  Yes.

02:12:42  13   Q.  Was that part of House Bill 3975 in 2014?

02:12:48  14   A.  Yes.

02:12:51  15        MS. SCHWARTZ:  Your Honor, at this time I'd like to

02:12:52  16   read a stipulation into the record.  It's Stipulation 19:

02:13:06  17        "The United States of America, by Morris Pasqual,

02:13:09  18   Acting United States Attorney for the Northern District of

02:13:12  19   Illinois, through Assistant United States Attorneys, and the

02:13:15  20   defendants Michael McClain, Anne Pramaggiore, John Hooker, and

02:13:20  21   Jay Doherty, individually and through their attorneys hereby

02:13:23  22   agree and stipulate as follows:

02:13:26  23        "On January 13th, 2015, the Illinois General Assembly

02:13:31  24   passed House Bill 3975.  Government Exhibits 810 and 884

02:13:40  25   contain an accurate summary of the votes of all House and

02:13:43  1  Senate members on House Bill 3975.  Government Exhibit 814

02:13:49  2  contains an accurate summary of the legislation's history."

02:13:53  3          So stipulated?

02:13:56  4          MR. NIEMEIER:  Yes.

02:13:59  5          MS. SCHWARTZ:  Hearing that resounding chorus, I will

02:14:02  6  move to admit Government Exhibits 810, 884, and 814 into

02:14:12  7  admission.  I will not be publishing those at this time, your

02:14:16  8  Honor.

02:14:16  9          THE COURT:  Without objection, they're admitted.

02:14:20  10    (Government Exhibits 810, 814, and 884 received in

02:14:21  11    evidence.)

02:14:21  12  BY MS. SCHWARTZ:

02:14:21  13  Q.  Mr. Vogt, was House Bill 3975's extension of the formula

02:14:25  14  rate viewed as beneficial for ComEd?

02:14:28  15  A.  Yes.

02:14:32  16          MS. SCHWARTZ:  I'm now going to read another

02:14:34  17  stipulation into the record.  It's Stipulation 23:

02:14:37  18          "The government and the defendants individually and

02:14:46  19  through their attorneys hereby agree and stipulate as follows,

02:14:50  20  Stipulation 23:

02:14:51  21          "All exhibits with the Bates number referenced in the

02:14:53  22  left-hand column below are authentic records of the

02:14:58  23  corresponding entity or individual listed in the right-hand

02:15:01  24  column."

02:15:02  25          And I'll go through what each of these abbreviations

Vogt - direct by Schwartz

832

02:15:05  1    mean.  Documents identified as "13 WDO" are documents from the

02:15:11  2    13th Ward Democratic organizations.  Documents with label

02:15:16  3    "CCC" are documents from the City Club of Chicago.  Documents

02:15:19  4    with the label "EXE" are documents from Exelon or ComEd.

02:15:24  5    Documents with the label "ComEd" are similarly from Exelon and

02:15:28  6    ComEd.  Documents bearing labels "EXE SUPB" are likewise

02:15:35  7    documents from Exelon or Commonwealth Edison.

02:15:38  8          Documents bearing the label "Doherty" are from J.D.

02:15:41  9    Doherty & Associates.  Documents bearing "DPI" as a label are

02:15:46  10   from the Democratic Party of Illinois.  Documents bearing

02:15:50  11   "Gallegos" as a label are from Janet Gallegos.  Documents

02:15:55  12   bearing "MJM" as a label are from Michael J. Madigan.  And

02:15:58  13   documents with the "SO" label are from the Speaker's office.

02:16:02  14         Those -- those documents with those labels are

02:16:03  15   authentic records of the corresponding entity.

02:16:06  16         So stipulated?

02:16:10  17         MR. COTTER:  Yes.

02:16:15  18         MS. SANSONETTI:  So stipulated.

02:16:16  19         MS. SCHWARTZ:  Thank you.

02:16:17  20         At this point I'd like to publish to the witness

02:16:21  21   Government Exhibit 292.

02:16:30  22         And if I may, your Honor, may I publish to the jury?

02:16:34  23         THE COURT:  You may.

02:16:35  24         MS. SCHWARTZ:  I assume there's no objection.

02:16:37  25         THE COURT:  I guess, if there's no objection, you

Vogt - direct by Schwartz

833

02:16:38  1   may.

02:16:42  2          MS. SCHWARTZ:  At this time I'd move to admit

02:16:44  3   Government Exhibit 292 into evidence and publish.

02:16:46  4          THE COURT:  Without objection, it's admitted.  You

02:16:48  5   may publish.

02:16:51  6   (Government Exhibit 292 received in evidence.)

02:16:51  7   BY MS. SCHWARTZ:

02:16:51  8   Q.  Mr. Vogt, is this a letter dated April 9th, 2015?

02:16:54  9   A.  Yes.

02:16:54  10  Q.  Is it addressed to the Honorable Michael J. Madigan?

02:16:57  11  A.  Yes.

02:16:58  12  Q.  And it is -- is it signed at the bottom by Anne

02:17:01  13  Pramaggiore?

02:17:01  14  A.  Yes.

02:17:01  15  Q.  I'm going to read the body of this letter:

02:17:06  16          "Dear Speaker Madigan, I am writing to thank you for

02:17:09  17      your ongoing support for ComEd.  The passage of the original

02:17:14  18      Smart Grid bill has made our electric system stronger and

02:17:16  19      has helped us begin to build a company that will serve

02:17:19  20      customers in northern Illinois well into the future.  By

02:17:22  21      passing HB 3975, you created more certainty for us around

02:17:26  22      the regulatory platform which will ensure we complete the

02:17:30  23      Smart Grid programs we began in 2012 and deliver more

02:17:33  24      benefits to consumers.  In just three years, this energy

02:17:37  25      policy has resulted in 3.3 million avoided outages, 30

Vogt - direct by Schwartz

834

02:17:42  1    percent improvement in storm restoration times, 3,600 jobs,

02:17:47  2    and over $1.2 billion worth of supply chain spend in

02:17:52  3    Illinois.  Building this system and building it well is

02:17:54  4    important for the economy.  I appreciate both the personal

02:17:57  5    and company support."

02:18:07  6           At this point I'd also move to admit and publish

02:18:10  7    Government Exhibit 313.  Your Honor, may I -- I'd move to

02:18:26  8    admit and publish before the jury.

02:18:27  9           THE COURT:  Any objection?  Hearing none, it's

02:18:30  10   admitted.  You may publish it.

02:18:33  11   (Government Exhibit 313 received in evidence.)

02:18:33  12   BY MS. SCHWARTZ:

02:18:37  13   Q.  Is this an email dated November 9th, 2015, Mr. Vogt?

02:18:42  14   A.  Yes.

02:18:42  15   Q.  From Michael McClain to Kevin Quinn and April Burgos?

02:18:46  16   A.  Yes.

02:18:50  17   Q.  I'm going to read the body of this email:

02:18:52  18          "Kevin and April, would you give this to the Speaker

02:18:55  19   for his Wednesday event?  I do not want to bother him with

02:18:57  20   it today or tomorrow because he has more pressing items.

02:19:02  21          "Speaker, below are some talking points for you to

02:19:04  22   review.  If you remember, you passed the Smart Grid Act over

02:19:07  23   then Governor Pat Quinn's veto.  In addition, you passed an

02:19:11  24   infrastructure law for the gas companies in Illinois.  In

02:19:14  25   other words, with an infrastructure of electric and gas as

Case: 1:22-cr-00115 Document #: 418-1 Filed: 05/30/25 Page 17 of 57 PageID #:18652
Vogt - direct by Schwartz
835

02:19:17  1    old as almost 100 years, you created a pathway to upgrade

02:19:20  2    and modernize.  It is an extremely valuable tool for keeping

02:19:25  3    jobs in Illinois and attracting new ones and keeping your

02:19:28  4    citizens safe.  Huge.  I asked for the below points because

02:19:36  5    obviously you will be in front of Exelon and ComEd but

02:19:38  6    because the Smart Grid Act has already done great things for

02:19:41  7    northern Illinois.  Hope this helps.  Best, Mike."

02:19:55  8         Mr. Vogt, after Senate Bill 9 was enacted, what was

02:20:00  9    the next major piece of legislation that you were involved in

02:20:02  10   on behalf of ComEd?

02:20:04  11   A.  The Future Energy Jobs Act.

02:20:06  12   Q.  When was what became the Future Energy Jobs Act first

02:20:11  13   introduced in the General Assembly?

02:20:14  14   A.  I want to say in March of 2015.

02:20:17  15   Q.  And did FEJA ultimately pass in 2015?

02:20:21  16   A.  No.

02:20:22  17   Q.  Did it pass the next year, in 2016?

02:20:25  18   A.  Eventually in 2016.

02:20:26  19   Q.  What was your involvement in the legislation that became

02:20:30  20   FEJA?

02:20:32  21   A.  I spent a lot of time designing many of the elements that

02:20:36  22   were included in the original proposal and how the different

02:20:42  23   elements of FEJA would come together to create value for the

02:20:49  24   companies, for customers, and for external stakeholders, so

02:20:54  25   how to put this together in a way that could give the

Case: 1:22-cr-00115 Document #: 418-1 Filed: 05/30/25 Page 18 of 57 PageID #:18653
Vogt - direct by Schwartz
836

02:20:56   1   stakeholders what they were looking for in terms of renewables

02:20:59   2   and increases in energy efficiency while at the same time

02:21:03   3   putting processes and procedures in place at the utility that

02:21:07   4   it wouldn't hurt us so that we could kind of create the bridge

02:21:11   5   for that legislation to go through.

02:21:13   6   Q.  So I want to break that down a bit.  You mentioned

02:21:17   7   "companies."  Did the FEJA legislation affect both Exelon and

02:21:20   8   ComEd?

02:21:20   9   A.  Yes.

02:21:22   10  Q.  Let's start with the ComEd side of things.  What were

02:21:25   11  ComEd's primary goals with regard to FEJA?

02:21:29   12  A.  The most important thing for us was trying to make sure

02:21:34   13  that the legislation that was proposed by other stakeholders

02:21:40   14  which included big expansions in energy efficiency which is

02:21:45   15  incentives that we provide to customers to use less power,

02:21:50   16  that they wanted to expand that so much that we had to have a

02:21:53   17  mechanism in place that if that expansion occurred, it

02:21:56   18  wouldn't be detrimental to the business.

02:21:59   19          Secondly, we were looking, the stakeholders really

02:22:03   20  wanted a big expansion in renewables, a renewable portfolio,

02:22:08   21  so enabling solar and wind.  And we needed to be able to get

02:22:14   22  to a point to say we are okay with those things happening, but

02:22:18   23  in order to get there, we needed to modify some of the

02:22:22   24  business models that were currently in place.

02:22:28   25          We had elements in there for developments of

Vogt - direct by Schwartz

837

02:22:30  1  microgrids which was to provide additional reliability in

02:22:35  2  small pockets.  And then there was the nuclear plant piece

02:22:39  3  which was for the carbon-free attributes for the nuclear

02:22:45  4  plants in northern Illinois.

02:22:47  5  Q.  So focusing on that nuclear plant piece, was that

02:22:50  6  advocated by ComEd or Exelon?

02:22:52  7  A.  That was an Exelon add.

02:22:56  8  Q.  Other than the nuclear plant side of things what, if any,

02:23:00  9  piece of the FEJA legislation did Exelon advocate for?

02:23:04  10  A.  That was really it on the Exelon side.

02:23:10  11  Q.  Did the enacted version of the FEJA legislation also

02:23:13  12  include an extension of the formula rate that you just

02:23:16  13  discussed?

02:23:16  14  A.  It did.

02:23:17  15  Q.  Until when?

02:23:19  16  A.  2022.

02:23:21  17  Q.  Who from ComEd led the efforts to pass FEJA?

02:23:31  18  A.  I would say Anne, Anne Pramaggiore was the lead.

02:23:35  19  Q.  Who else was significantly involved in those efforts?

02:23:38  20  A.  Fidel Marquez was SVP, or the senior vice president, of

02:23:43  21  government and legislative affairs at that point.  Tom

02:23:48  22  O'Neill, myself, Stacy O'Brien.  Joe Trpik was the CFO --

02:23:59  23  Q.  Does CFO --

02:24:00  24  A.  -- Bob Jensen.

02:24:01  25  Q.  I'm sorry.

Vogt - direct by Schwartz

838

| | | |
|---|---|---|
| 02:24:01 | 1 | A. And Bob Jensen. |
| 02:24:03 | 2 | Q. Does CFO stand for chief financial officer? |
| 02:24:05 | 3 | A. Chief financial, sorry. |
| 02:24:06 | 4 | Q. So let's talk through some of those individuals. You |
| 02:24:08 | 5 | mentioned a person named Fidel Marquez who was senior vice |
| 02:24:14 | 6 | president of governmental affairs? |
| 02:24:15 | 7 | A. Yes. |
| 02:24:15 | 8 | Q. You testified earlier that John Hooker had been senior |
| 02:24:17 | 9 | vice president of governmental affairs when EIMA was passed in |
| 02:24:20 | 10 | 2011. What happened to Mr. Hooker between 2011 and when FEJA |
| 02:24:26 | 11 | was before the General Assembly? |
| 02:24:28 | 12 | A. He retired. |
| 02:24:29 | 13 | Q. What year did Mr. Hooker retire? |
| 02:24:31 | 14 | A. I believe 2012. |
| 02:24:33 | 15 | Q. Who took over Mr. Hooker's old role? |
| 02:24:36 | 16 | A. Fidel Marquez. |
| 02:24:38 | 17 | Q. What, if anything, did Mr. Hooker do for ComEd after he |
| 02:24:41 | 18 | retired as an employee? |
| 02:24:43 | 19 | A. He became a contractor. |
| 02:24:46 | 20 | Q. Did he continue to be involved in legislative strategy? |
| 02:24:49 | 21 | A. Yes. |
| 02:24:50 | 22 | Q. At the time FEJA was introduced, what was |
| 02:24:58 | 23 | Ms. Pramaggiore's role at ComEd? |
| 02:24:59 | 24 | A. She was CEO. |
| 02:25:00 | 25 | Q. When did that promotion happen? |

Vogt - direct by Schwartz

839

02:25:02  1   A.  I believe in 2012.

02:25:05  2   Q.  Was there a project manager on ComEd's side for the FEJA

02:25:09  3   legislation?

02:25:09  4   A.  Yes.

02:25:10  5   Q.  Who was that?

02:25:11  6   A.  Mark Falcone.

02:25:13  7   Q.  Who did Mr. Falcone report to?

02:25:16  8   A.  I believe he reported to Fidel.

02:25:21  9   Q.  And what was Mr. Falcone's role with regard to FEJA?

02:25:25  10  A.  Project management really, keeping track of all of the

02:25:28  11  meetings we were having, what deliverables we needed to

02:25:31  12  support the meetings meaning what presentations, what letters,

02:25:34  13  what documents did we need to have a meeting with the

02:25:37  14  legislator.

02:25:38  15          And he was scheduling us, making sure that he had the

02:25:41  16  right subject matter expert and the right meeting with the

02:25:44  17  right legislator.  There was a big laundry list of action

02:25:48  18  items that he maintained and managed.

02:25:51  19  Q.  You mentioned meetings.  Did you have internal meetings to

02:25:55  20  discuss the FEJA legislation over that 2015-2016 period?

02:25:59  21  A.  Yes.

02:25:59  22  Q.  About how often did those meetings occur?

02:26:02  23  A.  Weekly, biweekly.  It depended on where we were in

02:26:07  24  session, but very frequently.

02:26:09  25  Q.  Did Ms. Pramaggiore attend those meetings?

Vogt - direct by Schwartz

840

02:26:12    1    A.  Yes.

02:26:12    2    Q.  Did Mr. Hooker attend those meetings?

02:26:14    3    A.  Some of them, yes.

02:26:16    4    Q.  During the passage of FEJA, was Mr. McClain also involved

02:26:19    5    in ComEd legislative strategy?

02:26:21    6    A.  Yes.

02:26:22    7    Q.  Would Mr. McClain attend those meetings?

02:26:27    8    A.  Yes.

02:26:30    9    Q.  How would you describe Mr. McClain's role with regard to

02:26:32   10    legislative strategy for FEJA?

02:26:35   11    A.  Very integral, helping us navigate that legislative

02:26:41   12    process in terms of who we needed to talk to, who we needed to

02:26:46   13    be able to sway and move through the process.

02:26:53   14    Q.  During the lead-up to FEJA, were you ever included on

02:26:56   15    emails with Mr. McClain?

02:26:57   16    A.  Yes.

02:26:58   17    Q.  In those emails, did he ever reference Speaker Madigan?

02:27:02   18    A.  Yes.

02:27:03   19    Q.  What did Mr. McClain refer to Speaker Madigan as?

02:27:06   20    A.  Sometimes as "S," capital S; sometimes as "He" with a

02:27:12   21    capital H; "Himself" with a capital H.

02:27:15   22    Q.  Based on your interactions with Mr. McClain, did

02:27:21   23    Mr. McClain communicate the positions of the Speaker's office

02:27:24   24    as it related to FEJA?

02:27:28   25    A.  Not to me directly, but I...

Vogt - direct by Schwartz

841

| | | |
|---|---|---|
| 02:27:33 | 1 | Q. Did you come to learn information that had been passed on |
| 02:27:35 | 2 | from Mr. McClain from the Speaker? |
| 02:27:38 | 3 | MR. COTTER: Objection to the hearsay. Calls for |
| 02:27:40 | 4 | hearsay. |
| 02:27:47 | 5 | THE COURT: I -- well, overruled. He can answer. |
| 02:27:50 | 6 | BY THE WITNESS: |
| 02:27:50 | 7 | A. Yes. |
| 02:27:51 | 8 | BY MS. SCHWARTZ: |
| 02:27:52 | 9 | Q. What, if any, role did you understand Mr. McClain to have |
| 02:27:54 | 10 | in connection to Speaker Madigan when it came to FEJA? |
| 02:27:57 | 11 | A. It was really that connection between how we were |
| 02:28:03 | 12 | negotiating the bill, the progress of the bill, and |
| 02:28:08 | 13 | communicating to the Speaker's office where things were and |
| 02:28:10 | 14 | trying to ascertain what changes or modifications we might |
| 02:28:14 | 15 | need or what the hot points were on the bill as time was going |
| 02:28:18 | 16 | through as well as, okay, how is the process going to play |
| 02:28:22 | 17 | out. |
| 02:28:23 | 18 | Q. At some point in 2016, did ComEd start meeting on Sunday |
| 02:28:28 | 19 | evenings to discuss FEJA? |
| 02:28:30 | 20 | A. Yes. |
| 02:28:30 | 21 | Q. What was the purpose of those Sunday meetings? |
| 02:28:33 | 22 | A. To tee up the week; to really, you know, set the tone for |
| 02:28:39 | 23 | what was the upcoming week. So these would be Sunday evening |
| 02:28:43 | 24 | calls that would lay out what were the main things that had to |
| 02:28:45 | 25 | be accomplished over the next week in order to move the bill |

02:28:48  1  forward.

02:28:50  2  Q.  Who participated in those Sunday meetings?

02:28:54  3  A.  Anne, Tom, Joe Trpik, myself, Stacy O'Brien, Val Jensen,

02:29:05  4  Mark Falcone, anyone involved in the process.  And there was a

02:29:12  5  long list, but...

02:29:15  6  Q.  What was Anne Pramaggiore's role in terms of advancing the

02:29:17  7  FEJA legislation?

02:29:19  8  A.  She was the leader.  She was really setting the stage for,

02:29:26  9  okay, here's what we really need to accomplish and drive

02:29:31  10 forward.  So she was, I would say, the heart and the soul

02:29:35  11 behind the push of keeping us all focused and moving forward.

02:29:41  12 Q.  Did you interact with Ms. Pramaggiore regularly about

02:29:44  13 FEJA?

02:29:44  14 A.  Yes.

02:29:45  15 Q.  How detail oriented would you say Ms. Pramaggiore is?

02:29:48  16 A.  Pretty detailed.

02:29:49  17 Q.  Mr. Vogt, do you know somebody by the name of Jay Doherty?

02:29:57  18 A.  Yes.

02:29:57  19 Q.  Have you met Mr. Jay Doherty?

02:30:01  20 A.  Yes.

02:30:01  21 Q.  In what context did you meet Mr. Doherty?

02:30:05  22 A.  The first time I met Jay was at a meeting with the

02:30:09  23 Archdiocese Catholic Church in Chicago, and we were discussing

02:30:17  24 FEJA and the archdiocese's position on a competing bill versus

02:30:23  25 FEJA, and we were there to try and understand their concerns

Vogt - direct by Schwartz

843

02:30:29　1　but also make sure they actually understood what was in the

02:30:34　2　bill that we were presenting.

02:30:37　3　Q.　Who had set up that meeting between ComEd representatives

02:30:40　4　and the archdiocese?

02:30:41　5　A.　I believe Jay Doherty did.

02:30:44　6　Q.　What did you understand Mr. Doherty's role to be with

02:30:47　7　ComEd at the time?

02:30:49　8　A.　As a lobbyist.

02:30:53　9　Q.　Other than that one meeting you just described, did you

02:30:57　10　have any other interactions with Mr. Doherty about FEJA?

02:31:00　11　A.　Not that I remember.

02:31:02　12　Q.　Did you have any interactions with Mr. Doherty about

02:31:05　13　Springfield legislation generally other than that one meeting?

02:31:08　14　A.　Not that I recall.

02:31:09　15　Q.　You testified earlier about Mark Falcone who was a project

02:31:20　16　manager for FEJA.　Who did he report to directly in terms of

02:31:26　17　the FEJA legislation?　Who was his supervisor?

02:31:30　18　A.　It was either Fidel or Anne, but I'm not positive exactly

02:31:35　19　who he was directly reporting to at the time.

02:31:47　20　Q.　You testified that you traveled to Springfield for the

02:31:51　21　EIMA negotiations back in 2011.　Did you do the same for FEJA?

02:31:55　22　A.　Yes.

02:31:56　23　Q.　Were you involved in any negotiations with the Speaker or

02:32:00　24　his staff about FEJA?

02:32:01　25　A.　Yes.

Case: 1:22-cr-00115 Document #: 418-1 Filed: 05/30/25 Page 26 of 57 PageID #:18661
Vogt - direct by Schwartz
844

02:32:02    1    Q.  Who specifically in the Speaker's office did you interact
02:32:05    2    with?
02:32:06    3    A.  Heather Wier Vaught, Justin Cox.
02:32:10    4    Q.  Who was Heather Wier Vaught?
02:32:13    5    A.  She was, I believe, the general counsel for the Speaker's
02:32:15    6    office at the time.
02:32:16    7    Q.  So did she replace Dave Ellis who had been in that role
02:32:19    8    earlier?
02:32:19    9    A.  I believe so.
02:32:19    10   Q.  Who was Justin Cox?
02:32:22    11   A.  He was one of the lead attorneys that worked for Heather.
02:32:24    12   Q.  About how many meetings did you have with members of the
02:32:28    13   Speaker's office about FEJA?
02:32:34    14   A.  Probably five to ten.
02:32:35    15   Q.  And what was the purpose of those meetings?
02:32:38    16   A.  Initially, the first time we met with them was probably
02:32:42    17   just to bring them up to speed on elements in the bill and
02:32:45    18   explain details of different elements that were in the bill.
02:32:49    19           And then lastly, the week before Thanksgiving in
02:32:53    20   2016, we were meeting pretty much all day or half a day with
02:32:59    21   the Speaker's office which had coordinated meetings between
02:33:07    22   us, environmental stakeholders, Attorney General's office.  A
02:33:10    23   whole swath of stakeholders in the process were meeting to try
02:33:15    24   and hammer out the final details of the bill before veto
02:33:20    25   session.

Vogt - direct by Schwartz

845

02:33:20  1  Q.  And who had organized those meetings around Thanksgiving

02:33:23  2  of 2016?

02:33:24  3  A.  The Speaker's office.

02:33:25  4  Q.  And what was the relevance of bringing together all these

02:33:29  5  different stakeholders into one room?

02:33:31  6  A.  It was really trying to get to an agreed-upon bill so that

02:33:36  7  if all of these elements could be agreed upon by the different

02:33:39  8  parties, it was more likely that the bill was going to have a

02:33:41  9  chance to pass.

02:33:43  10  Q.  And what did you understand the significance of it to be,

02:33:46  11  the fact that the Speaker's office and the Speaker's staff

02:33:49  12  were setting up those Thanksgiving meetings?

02:33:50  13  A.  That we actually had a chance to move the bill the next

02:33:54  14  week.

02:33:54  15  Q.  Did the bill, in fact, move the next week?

02:33:56  16  A.  It did.

02:33:57  17  Q.  When did FEJA pass?

02:33:59  18  A.  It passed on December 1st, 2016.

02:34:04  19  Q.  And was it ultimately enacted into law?

02:34:07  20  A.  Yes.

02:34:07  21  Q.  What did you understand the Speaker's role to be in

02:34:10  22  helping get the FEJA legislation passed?

02:34:14  23  A.  My belief was he had opened up the pathway for it to make

02:34:18  24  it to the floor, to get a vote in the House, and that his

02:34:23  25  desires for it to move to the Senate be considered on the

Vogt - direct by Schwartz

02:34:27  1   Senate side.

02:34:28  2   Q.  And what was your understanding, if the Speaker did not

02:34:31  3   support major legislation like FEJA, what would have happened?

02:34:33  4   A.  I don't think it would have ever gotten to the floor or

02:34:36  5   out of committee.

02:34:37  6   Q.  Was the FEJA legislation financially beneficial to ComEd?

02:34:43  7   A.  Yes.

02:34:44  8   Q.  And what was your understanding of the importance of FEJA

02:34:47  9   to Exelon?

02:34:49  10  A.  Very important.

02:34:50  11  Q.  And could you remind the jury, what did FEJA do with

02:34:53  12  regard to Exelon?

02:34:54  13  A.  It really gave a lifeline to two nuclear plants for --

02:34:59  14  that were owned by Exelon:  One quad cities nuclear plant

02:35:02  15  which is out in quad cities, and the other one, Clinton, which

02:35:06  16  is in Ameren service territory.  And without that, those

02:35:10  17  plants had already been slated to shut down.

02:35:13  18        We had -- the company had given notice that those

02:35:17  19  plants would close.  I can't remember when they were going to

02:35:20  20  close, but the closure was imminent, which was the reason why

02:35:25  21  FEJA was so critical to be dealt with in that November, was

02:35:30  22  providing that lifeline to the nuclear plants.

02:35:33  23  Q.  How was the passage of FEJA received internally at ComEd?

02:35:39  24  A.  Jubilant, excited.

02:35:43  25  Q.  Who, if anyone, was given credit for spearheading that

Vogt - direct by Schwartz

847

02:35:47   1   passage?

02:35:48   2   A.   I -- it was Anne Pramaggiore, Joe Dominguez from the

02:35:55   3   Constellation side, and all the team members that were

02:35:57   4   involved.

02:35:57   5   Q.   You mentioned Joe Dominguez from the Constellation side.

02:36:02   6   What is Constellation, first off?

02:36:04   7   A.   Constellation is the name of the generation company at

02:36:07   8   Exelon.

02:36:07   9   Q.   Is it another affiliated entity?

02:36:09   10   A.   Yes.

02:36:09   11   Q.   And who is Joe Dominguez?

02:36:11   12   A.   He was senior vice president of government and regulatory

02:36:15   13   affairs for Exelon at the time which was more of a federal

02:36:21   14   kind of connection point to federal affairs.

02:36:26   15   Q.   In the course of your job responsibilities, did you

02:36:30   16   calculate an estimated value -- did you calculate an estimated

02:36:34   17   value of FEJA to ComEd?

02:36:37   18   A.   Yes.

02:36:37   19   Q.   What did you estimate that value to be?

02:36:38   20   A.   Around $1.8 billion.

02:36:41   21   Q.   1.8 billion?

02:36:43   22   A.   Yes.

02:36:43   23   Q.   You testified earlier that ComEd had been on the brink of

02:36:47   24   bankruptcy in 2006 and 2007.   How have EIMA and FEJA helped

02:36:52   25   ComEd's financial position over the last ten years?

Vogt - direct by Schwartz

848

02:36:55   1   A.   Tremendously improved it.  We've gone from earnings almost

02:37:03   2   at the low point of the company in 2006 and 2007 to highest

02:37:11   3   earnings on record in 2022.

02:37:16   4           MS. SCHWARTZ:  Your Honor, I'd like to show the

02:37:17   5   witness what's been marked Government Exhibit 462.

02:37:29   6           THE COURT:  Is there objection to it?

02:37:33   7           MR. COTTER:  No, your Honor.

02:37:34   8           THE COURT:  Okay.  It's admitted, and you can publish

02:37:36   9   it.

02:37:37  10           MS. SCHWARTZ:  Thank you.

02:37:40  11      (Government Exhibit 462 received in evidence.)

02:37:40  12           MS. SCHWARTZ:  I'm going to blow up 462 so it's

02:37:42  13   easier to read.

02:37:43  14   BY MS. SCHWARTZ:

02:37:43  15   Q.   Mr. Vogt, do you recognize Exhibit 462?

02:37:46  16   A.   Yes.

02:37:46  17   Q.   What is Exhibit, Government Exhibit 462?

02:37:49  18   A.   It's an email from Michael McClain.

02:37:52  19   Q.   And what is the date of that email from Mr. McClain?

02:37:54  20   A.   12/1/2017.

02:37:56  21   Q.   What's the significance of that date?

02:37:59  22   A.   It was the one-year anniversary of the passage of FEJA.

02:38:03  23   Q.   And did he send that email to a number of individuals

02:38:07  24   including yourself, Fidel Marquez, Anne Pramaggiore, and

02:38:11  25   others?

Vogt - direct by Schwartz

849

A. Yes.

Q. And what is the subject line of Mr. McClain's email?

A. "Happy anniversary."

Q. And could you read the body of Mr. McClain's email, please?

A. "Excellent.  You should all take pride in it.  It is historic."

Q. Does this email also include an attachment?

A. Yes.

Q. What is the image that is depicted here?

A. That is the roll call of the vote in the Senate for FEJA.

Q. I want to now turn to the time after FEJA.  Was Ms. Pramaggiore promoted after FEJA?

A. Yes.

Q. Approximately when was she promoted?

A. I want to say May of 20' -- oh, now I've got my years confused.  2018, I think May of 2018.

Q. What position did Ms. Pramaggiore take on at that point?

A. President of Exelon utilities.

Q. What, if any, oversight did Ms. Pramaggiore have over ComEd's operations in her new role?

A. She had governance and oversight over all of the utilities, which ComEd would have been one.

Q. I want to now jump ahead to 2019.  In 2019, did ComEd advocate for legislation to extend the expiration of the

Vogt - direct by Schwartz

02:39:51   1   formula rate yet again?

02:39:52   2   A.  Yes.

02:39:53   3   Q.  Why did ComEd have to go back to the legislature?

02:39:57   4   A.  The final sunset in the legislation -- or the expiration

02:40:02   5   date, it wasn't technically a sunset, on the formula rate was

02:40:07   6   12/31/2022.  So we saw that date coming closer and knew that

02:40:13   7   absent a formal extension to that legislation, it was just

02:40:17   8   going to end.

02:40:18   9   Q.  And what was ComEd's position on the 2019 legislation that

02:40:23   10  would have extended the formula rate?

02:40:25   11  A.  Supportive.

02:40:26   12  Q.  Why was ComEd supportive of that legislation?

02:40:29   13  A.  We wanted to extend the formula rate through 2032.

02:40:33   14  Q.  Did that legislation ultimately pass?

02:40:39   15  A.  No.

02:40:39   16  Q.  Why didn't it pass?

02:40:41   17  A.  It never really made it through committee or to the floor.

02:40:46   18  There was another movement by many energy stakeholders in

02:40:54   19  Illinois for another omnibus legislation piece of legislation.

02:41:01   20  And while ComEd wanted just the extension and wanted to stay

02:41:05   21  out of the conversations around this broader package, other

02:41:09   22  stakeholders wanted us to be a part of it, and they wanted us

02:41:14   23  to be a part of it to enhance the probability that that

02:41:17   24  legislation would move forward and pass.

02:41:19   25  Q.  And what was that 2019 legislation commonly referred to

02:41:23    1    within ComEd?

02:41:24    2    A.   The Skinny Bill.

02:41:26    3    Q.   The Skinny Bill?

02:41:27    4    A.   The Skinny Bill.

02:41:29    5    Q.   You've testified that you spent time in Springfield

02:41:33    6    working on ComEd legislation.  About how many lobbyists did

02:41:38    7    ComEd have in Springfield on major legislation like FEJA or

02:41:42    8    EIMA?

02:41:42    9    A.   Usually 20 to 30.

02:41:44   10    Q.   Did you get to know each of those 20 to 30 lobbyists?

02:41:47   11    A.   No.

02:41:47   12    Q.   Did you at least recognize their faces, see them around?

02:41:50   13    A.   Yes.

02:41:52   14    Q.   In what capacity would you interact with Springfield

02:41:55   15    lobbyists for ComEd?

02:41:58   16    A.   I would do briefings to the whole lobbyist team.  On

02:42:03   17    Tuesday mornings, it was pretty common practice that we'd have

02:42:05   18    all the lobbyists into our offices in Springfield, and I'd

02:42:10   19    often do a presentation on different elements of legislation

02:42:12   20    that was percolating or pending in Springfield.

02:42:16   21         I would also go with lobbyists to meet legislators.

02:42:24   22    Lobbyists all had their own relationships with different

02:42:26   23    legislators, and depending on who we were scheduled to meet

02:42:30   24    with, I would be with different lobbyists, both internal

02:42:36   25    lobbyists and external lobbyists, and then go meet

Vogt - direct by Schwartz

852

02:42:39  1  legislators.

02:42:39  2      MS. SCHWARTZ:  Your Honor, at this time I'd move to

02:42:41  3  publish what's an exhibit already admitted into evidence,

02:42:44  4  Government Exhibit 786.

02:42:46  5      THE COURT:  You may.

02:42:54  6  BY MS. SCHWARTZ:

02:42:54  7  Q.  Government Exhibit 786 is on your screen, I believe.  Did

02:42:57  8  you ever see this individual as a ComEd lobbyist in

02:43:00  9  Springfield?

02:43:00  10  A.  Not that I recall.

02:43:01  11  Q.  Did you ever see this person doing any work as a ComEd

02:43:05  12  lobbyist?

02:43:05  13  A.  Not that I recall.

02:43:06  14  Q.  Do you recognize this person?

02:43:07  15  A.  No.

02:43:14  16  Q.  I'm showing Government Exhibit 785 which has been

02:43:19  17  previously admitted into evidence.  Did you ever see the

02:43:23  18  person depicted in Government Exhibit 785 working as a

02:43:27  19  lobbyist in Springfield?

02:43:28  20  A.  Not that I recall.

02:43:29  21  Q.  Did you ever see this person doing any work for ComEd as a

02:43:32  22  lobbyist or at all?

02:43:34  23  A.  No.

02:43:35  24  Q.  Do you recognize this person?

02:43:36  25  A.  No.

Vogt - direct by Schwartz

853

| | | |
|---|---|---|
| 02:43:42 | 1 | Q.  I'd now like to publish Government Exhibit 780 which has |
| 02:43:46 | 2 | been previously admitted.  Did you ever see the person |
| 02:43:54 | 3 | depicted in Government Exhibit 780 in Springfield working as a |
| 02:43:59 | 4 | ComEd lobbyist? |
| 02:44:00 | 5 | A.  Not that I recall. |
| 02:44:00 | 6 | Q.  Did you ever see this person working for ComEd in any |
| 02:44:03 | 7 | capacity? |
| 02:44:04 | 8 | A.  Not that I recall. |
| 02:44:04 | 9 | Q.  Do you recognize this person? |
| 02:44:06 | 10 | A.  No. |
| 02:44:06 | 11 | Q.  I'd now like to publish what's been admitted as Government |
| 02:44:14 | 12 | Exhibit 789.  Did you ever see the person depicted in |
| 02:44:22 | 13 | Government Exhibit 789 working as a ComEd lobbyist in |
| 02:44:25 | 14 | Springfield? |
| 02:44:26 | 15 | A.  Not that I recall. |
| 02:44:27 | 16 | Q.  Did you ever see this person doing any work for ComEd at |
| 02:44:29 | 17 | all? |
| 02:44:30 | 18 | A.  Not that I recall. |
| 02:44:31 | 19 | Q.  Do you recognize this person? |
| 02:44:32 | 20 | A.  No. |
| 02:44:49 | 21 | MS. SCHWARTZ:  I have no further questions, your |
| 02:44:50 | 22 | Honor. |
| 02:44:50 | 23 | THE COURT:  Cross-examine? |
| 02:44:52 | 24 | MR. CRAIG:  Yes, your Honor. |
| 02:45:05 | 25 | THE COURT:  Mr. Craig, you may question the witness. |

```
1                          * * * * * * *

2                      C E R T I F I C A T E

3          We, Judith Walsh and Amy Spee, do hereby certify that

4     the foregoing is a complete, true, and accurate transcript of

5     the proceedings had in the above-entitled case before the

6     Honorable HARRY D. LEINENWEBER, one of the judges of said

7     Court, at Chicago, Illinois, on March 30th, 2023

8

9

10    /s/ Judith Walsh                        March 21st, 2023
      Official Court Reporter
11
      /s/ Amy Spee                            March 21st, 2023
12    Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# **Government Sentencing Exhibit 2**



☰

Newsletters ⌄

News

# Madigan's revenge

The high price of political payback at McCormick Place

By **James Ylisela Jr.**

**Gift Article**



Credit: AP/Wide World

Photo illustration by Sean McCabe.

 Reprints     Share

November 12, 2011 06:00 AM

Illinois House Speaker Michael Madigan cost taxpayers nearly half-a-billion dollars by blocking repeated efforts to restructure McCormick Place bonds and finance a much-needed second hotel at the convention center, a *Crain's* investigation finds.

Between 2005 and 2010, Mr. Madigan stopped five refinancing bills, ignoring declining interest rates that would have saved hundreds of millions. At the time, he never explained why, but his reasons seem petty and political: McCormick Place CEO Juan Ochoa, an appointee of then-Gov. Rod Blagojevich, had fired a Madigan ally at the convention center, and lawmakers from both parties say the speaker wanted retribution.

"It was no secret that Madigan had a beef with Ochoa and wanted him gone," says state Rep. Angelo "Skip" Saviano, an Elmwood Park Republican who sponsored refinancing bills in 2005, 2007 and 2009. "As long as Ochoa was there, Madigan wasn't going to give McCormick Place anything."

But politics may not have been Mr. Madigan's only motivation. By holding up refinancing, the speaker also denied McCormick Place the money to build a new hotel. That bought time for clout-heavy developers Gerald Fogelson and Cleveland-based Forest City Enterprises Inc. to push a controversial land swap and hotel deal with McCormick Place on property just north of the convention center. Both were then clients of Mr. Madigan's law firm, Madigan & Getzendanner, but the speaker denies any connection.

ADVERTISING



**A Whittier Trust Trustee is more than just an...**  **Learn More**
**Whittier Trust** - Sponsored

As the recession raged in early 2010, the collapse of the real estate market scuttled the deal. That May, after Mr. Ochoa resigned, the General Assembly finally passed legislation that lowered McCormick Place's debt payments, allocated funds to expand the existing Hyatt Regency McCormick Place and imposed wage restrictions and new work rules on union labor. The House sponsor was Speaker Michael Madigan.

The legislation reduced this year's debt service by $96 million, but the damage had already been done at the Metropolitan Pier and Exposition Authority, known as McPier, the agency that runs McCormick Place. Denied refinancing for six years, McPier paid out as much as $300 million more in bond interest than it should have and was forced to tap state sales tax revenue to meet its obligations.

Mr. Madigan's inaction also set off a chain of events that put Chicago's $8-billion trade show industry — and the estimated 66,000 jobs it supports — at risk. Without revenues from the debt savings and a second hotel, McPier had to mark up its prices in the middle of the recession, driving away two trade shows. With McCormick Place in crisis in late 2009, other shows threatened to leave Chicago unless state lawmakers imposed restrictions on McPier unions.



**Click above for a closer look at Speaker Madigan's costly feud with then-Gov. Blagojevich.**

Case: 1:22-cr-00115 Document #: 419-1 Filed: 05/30/25 Page 40 of 57 PageID #:18675

To find out what went wrong, and what still needs to be fixed, *Crain's* obtained internal McPier memos and emails under the Freedom of Information Act, examined state and county records, and conducted dozens of interviews with McPier officials, legislators and others. With Illinois on the verge of insolvency, what emerges is an unflattering view of how the state works — or doesn't — when politics trumps the public interest.

**'THIS STINKS'**

The exchange didn't last long, and it failed to attract much attention, despite the gaggle of press covering the final night of the 2010 state legislative session in May. But state Rep. Jim Sacia, a Pecatonica Republican, was determined to ask Mr. Madigan why numerous prior efforts to refinance McCormick Place bonds had failed to come to a vote in the Illinois House.

A month earlier, in a hearing on the McCormick Place legislation, McPier Chairman John Gates testified that failure to refinance sooner had cost taxpayers hundreds of millions in higher interest payments. Reducing debt payments also would have given the agency a surplus of tax revenue that could have been applied to McPier's struggling operating budget, Mr. Gates testified.

Two of the previous refinancing bills had passed the state Senate only to die in the House. A shocked Mr. Sacia wanted to know why.

At the closing session on May 6, he got his chance to ask Mr. Madigan. "I would be deeply grateful, Speaker, if you could explain to the body how that could happen, if that in fact was the case — did I misunderstand something?" Mr. Sacia asked, according to state transcripts of their testy exchange. "Did a bill pass the Senate that could have saved the taxpayers of this state several hundred million dollars? Would you be kind enough to address that, if you could?"

A brief back-and-forth ended with this terse response from Mr. Madigan: "Mr. Sacia, I'm not sure I understand your question. . . . To repeat what I said, there have been bills that provided for yet another restructuring of the debt payments, but none of those bills dealt with the significant work-rule changes that are in this bill."


"This stinks to high heaven and you, the taxpayers, get half-a-billion dollars worth of rotten meat. I can't wait to hear the explanation for this one."
Rep. Jim Sacia, R–Pecatonica


McPier was "engaged in a scheme, and the Speaker wasn't going to allow that to happen."
Spokesman for Illinois House Speaker Michael Madigan


"As long as (McPier CEO Juan) Ochoa was there, Madigan wasn't going to give McCormick Place anything."
Rep. Angelo "Skip" Saviano, R–Elmwood Park


"We didn't have the political strength to get what we knew was in the best interests of McCormick Place."
Juan Ochoa, former CEO, McPier

Mr. Sacia got a bit more colorful in a letter after the exchange to his constituents: "This stinks to high heaven and you, the taxpayers, get half-a-billion dollars worth of rotten meat. I can't wait to hear the explanation for this one."

He is still fuming today. "I was simply looking for a logical explanation," he says. "How can we have millions in the taxpayers' money just going away to higher interest when we had opportunities to bring that interest down?"

Many still wonder why McCormick Place took six years to refinance its debt, as plenty of government agencies, private companies and homeowners were doing at the time.

"A lot of people were expecting (refinancing) to come earlier," says John Kenward, a bond analyst in Chicago at Standard & Poor's. With interest rates dropping, "I don't know why the state wouldn't have taken advantage of that."

As for Mr. Madigan, he never spoke of his reasons for rejecting bill after bill. But in response to questions from *Crain's*, a spokesman for Mr. Madigan now says the speaker blocked refinancing to prevent the Blagojevich administration from cashing in on contracts for bond work, such as underwriting and legal services. He provided *Crain's* an unsigned memorandum of understanding, dated August 2007, in which McPier agreed to allow the state to review and approve all fees and "structuring decisions" related to bond refinancing.

Asked about the financial impact of delayed refinancing, the spokesman says the "consequences were outweighed by (opposition to) becoming part of the Blagojevich fundraising machine."

Mr. Ochoa says he received the memo but never signed it. A McPier spokeswoman confirms that the agreement never took effect. No matter, Mr. Madigan's spokesman says. McPier was "engaged in a scheme, and the speaker wasn't going to allow that to happen."

Mr. Madigan's power is so sweeping that few will state publicly what many acknowledge privately. Mr. Gates, who took on the McPier chairmanship in October 2009 after building one of the nation's largest real estate investment trusts, is now chairman of the Regional Transportation Authority. He says his testimony about the cost of refinancing delays speaks for itself.

State Sen. Kwame Raoul, a Chicago Democrat whose district includes McCormick Place, sponsored two failed efforts to refinance McPier's debt. But he treads gingerly when asked what happened. "I never got a firm answer as to why the bills never advanced in the House," he says. "I imagine there was distrust for the (McPier) leadership at the time."

Mr. Saviano is one of the few to put it more directly. Mr. Ochoa, he says, committed a cardinal sin of patronage politics: He dumped one of Mr. Madigan's "guys."

The guy was Jack Johnson, who had worked as a legislative analyst on Mr. Madigan's staff in the mid-1980s before signing on as McPier's chief of external relations in 1989. In September 2007, Mr. Ochoa, just eight months on the job, fired him.

Mr. Johnson, now senior vice-president at the Chicago Convention and Tourism Bureau, declines to comment, and Mr. Madigan's spokesman rejects the story. Management at McPier was "a national disaster," he says, "looking for other people to blame for their mistakes."

For his part, Mr. Ochoa says he was well aware of the rumors but chose to ignore them. "The speaker never called me to say he was upset with me," he says. "I tried to meet with him several times but was never granted a meeting."

**'NO-BRAINER'**

Refinancing is a concept familiar to every homeowner. When interest rates go down, you can refinance your mortgage, reduce your monthly payment and maybe even use some of the savings to make a few improvements.

McCormick Place needed to do the same thing, only its mortgage was in the billions and the improvements would have added a new hotel to the convention center campus.

Mr. Ochoa says those were his two top priorities when he took the job as McPier CEO. Unlike the convention centers in Orlando and Las Vegas, McCormick Place receives no state subsidy for its operations and has to live off the revenue it generates.

"When I came to McPier, I looked at our operating budget. It was a no-brainer that another hotel would help us further subsidize our operations," he says. "We also knew that we would soon fall short in the taxes collected to make our debt payments. Rather than wait for that to happen, we tried to address both issues at once."

From 1992 to 2004, McPier sold bonds to finance an ambitious expansion that built the West and South buildings, giving McCormick Place 2.6 million square feet of exhibit space and solidifying its position as the largest convention center in the nation.

The expansion left McPier about $3 billion in debt. To pay back the bondholders, the General Assembly approved four taxes — on hotel rooms, car rentals, restaurants and taxi rides from Midway and O'Hare airports.

At the time, the taxes were thought to be adequate to cover the debt payments, but the business downturn that followed the Sept. 11 terrorist attacks changed all of that. Tax receipts fell short by more than $26 million between 2002 and 2006, depleting the surplus fund set up when the bonds were issued. With interest rates declining, it seemed the perfect time to refinance.

By the mid- to late 2000s, many public entities, including the city of Chicago, the Chicago Board of Education and the Chicago Transit Authority, were replacing older municipal bonds with lower-interest debt.

Mr. Saviano, whose district includes the Rosemont Convention Center, sponsored the 2005 legislation in the Illinois House. He is unabashed about his motivations: "If we keep McCormick Place healthy, the trickle-down helps Rosemont," Mr. Saviano says. He introduced his bill in February 2005, when interest rates had dropped under 4.5% — well below the interest on the existing McPier expansion bonds, which carried rates as high as 7.1%.

But Mr. Saviano's bill died in the House Rules Committee, the legislative way station controlled by Mr. Madigan. Mr. Saviano's 2007 effort met a similar fate, even though interest rates had dropped to near 4%. On April 4, 2008, Mr. Raoul's bill passed the Senate 48 to 6, only to die in the House. In 2009, with rates still under 5%, the lawmakers tried again, but neither measure made it.

State Rep. Barbara Flynn Currie, a Chicago Democrat who is chairman of the rules committee, can't say why none of the bills reached the House floor for a vote. "I don't have a good explanation," she tells *Crain's*. "It's just one of those items that didn't make it to the top of the agenda."

But Mr. Saviano says, "The bills didn't come out of the rules committee because the speaker didn't want them to. It's unfortunate we had an opportunity to show some fiscal responsibility — and we didn't."

The financial impact of doing nothing was significant. Since 2005, McPier could have saved up to $300 million in interest payments alone, based on a two-percentage-point savings in interest. Restructuring the debt to push larger principal repayments into the future would have provided millions more for McPier operations. A second hotel would have added another $15 million a year, McPier officials estimate.

In October 2010, after finally winning approval to refinance its debt five months earlier, McPier sold $1.12 billion in new bonds, at interest rates between 4.98% and 5.23%, to retire some of the older, higher-interest debt. "By restructuring, we don't have to draw from the state and can save it money," McPier Chief Financial Officer Richard Oldshue said at the time. "It relieves pressure from the state's sales tax revenues."

This year's debt payment, which would have been $177 million without the restructuring, fell to $81 million — a reduction of $96 million. The restructuring also provided $80 million for McPier's operating budget and raised

$200 million for the hotel.

## LAND SWAP

Just north of McCormick Place and east of the Metra train tracks sits an empty, boot-shaped tract of dirt and weeds that developers dreamed would be worth billions.

While McPier's efforts to restructure its debt and finance a hotel were going nowhere in the General Assembly, a group of well-connected real estate agents, developers and lawyers were pushing hard for a deal that would transform the vacant land into a thriving community called the Gateway Development.



Click above to see the Gateway Development plan's proposed land swap with McCormick Place.

Gateway was the brainchild of Gerald Fogelson and Forest City Enterprises, creators of nearby Central Station, an 80-acre spread of high-end townhouses and condominiums where former Mayor Richard M. Daley once lived. The $4-billion Gateway plan called for condominiums, apartments, senior housing, office space, retail, entertainment venues and, at the south end of the property, a twin-tower hotel for McCormick Place.

The plan was as beautiful as it was ambitious, offering Lake Michigan views and easy access to Soldier Field and the Museum Campus. But there was a catch: To make the deal work, Mr. Fogelson and Forest City wanted McCormick Place to give up five acres of prime vacant land along Lake Shore Drive in exchange for less than two acres they owned toward the back of the property, documents obtained by *Crain's* show.

An October 2007 meeting on the project featured a who's who of Chicago real estate and political clout: Mr. Fogelson, Forest City's Albert and Ron Ratner, attorney Jack George of law firm Daley & George Ltd., David Haymes of architecture firm Pappageorge Haymes Ltd., and urban planner Stephen Friedman, a city consultant on tax-increment financing. The group also included then-McPier Chairman Ted Tetzlaff, a Chicago litigator, and board member Michael Scott, a real estate developer and president of the Chicago Board of Education.

A memo summarizing the meeting from Timothy Desmond, president of Central Station Development Corp., describes a busy and connected project team. Representing the developers, Mr. George, a law partner of Michael Daley's, the then-mayor's brother, confirmed that the city would approve a planned unit development designation for the land, while Mr. Friedman offered to seek TIF financing to pay for infrastructure improvements.

But Mr. Scott failed to tell the McPier board about his relationship with the developers, Mr. Ochoa says. Mr. Scott had an office and an email address with Fogelson Properties, the correspondence shows. Documents obtained by the Better Government Assn. last year revealed that Fogelson Properties provided the office rent-free and was paying Mr. Scott $10,000 a month as part of the developer's efforts to build the proposed Olympic Village. Mr. Scott was then serving on Mr. Daley's bid committee for the 2016 Olympic Games. The payments stopped in early November 2009, two weeks before Mr. Scott was found dead of what police called a self-inflicted gunshot wound; he reportedly was distraught over financial difficulties and an admissions scandal at Chicago Public Schools.

The developers also have ties to Mr. Madigan. Mr. Madigan's spokesman acknowledges that Forest City and Central Station were clients of the speaker's law firm. He says Mr. Madigan "operates at a code of conduct far beyond state ethics requirements," adding that the law firm had withdrawn its representation of the developers "when it became apparent there was a land swap" with McCormick Place that might create a possible conflict.

Yet Madigan & Getzendanner represented Central Station in cases before the Cook County Board of Review in 2007 and 2008, records show. And the firm represented both developers and Mr. Scott in the Eastgate Village condominium development, at 330 E. 26th St. The firm's appeal before the Cook County assessor successfully

lowered the property's 2010 assessment to $468,000 from $1.4 million. The firm currently represents Forest City in a Bolingbrook property, Mr. Madigan's spokesman says.

The internal documents show McPier officials enthusiastically supporting the project, with the notable exception of Messrs. Ochoa and Gates.

"Gateway was a captivating project, but the land swap shortchanged the taxpayers," Mr. Ochoa says. And by agreeing to the land deal, Mr. Ochoa says he would have been largely committed to building the hotel on the Gateway Development. But if McPier's refinancing had come through, he would have had other options, including a proposed location near the West Building.

Mr. Ochoa had high hopes for Mr. Raoul's March 2009 legislation, the senator's second attempt at debt refinancing. The bill passed the Senate easily, but only after Mr. Raoul added a last-minute amendment that reduced the bonding authority by $203 million — the exact amount designated to finance the hotel, Mr. Ochoa says.

"We didn't have the political strength to get what we knew was in the best interests of McCormick Place," says Mr. Ochoa, now CEO of Chicago-based Miramar International Group Inc., which helps organizations connect with Latino customers in the U.S. and Mexico.

Mr. Raoul says he can't remember who asked for the change, and neither can Senate President John Cullerton, a spokeswoman for the Chicago Democrat tells *Crain's* in an email.

In May 2009, Central Station's Mr. Desmond sent McPier's then-general counsel, Renee Benjamin, a letter of intent from Fogelson Properties to pursue the land deal, and two months later delivered a memorandum of understanding that would serve as the agreement for the land exchange and development. Mr. Ochoa says he never saw the document and would not have signed it.

Mr. Desmond, speaking on behalf of Central Station and Forest City, tells *Crain's* in an email that he would not comment on the negotiations, saying only that the developers are not currently involved in a hotel project with McCormick Place.

In September 2009, Ms. Benjamin proposed that the deal be part of the agenda at McPier's October board meeting. But Mr. Gates, the incoming chairman, decided against it. "This could be a critical piece of property to (McPier) in the future," Mr. Gates wrote in an email. "I am opposed to limiting our options — even in a non-binding manner."

He confirms his skepticism about the deal. "The market had collapsed, and frankly I didn't think it was in McPier's interest to give up control of the 18th Street exit to Lake Shore Drive," he says.

Without the hotel money, Mr. Raoul's bill passed the Senate easily, but it hardly mattered. Mr. Madigan once again stopped the bill from reaching the House floor.

**FATEFUL PRICE HIKES**

By 2009, McCormick Place was desperate to refinance. The recession had hit the convention business hard, and McPier had already tapped $57 million in state sales tax revenue to make its debt payments. Without refinancing, it was on track to consume up to $800 million more in sales taxes by 2027. Running short of cash to pay its bills, McPier officials kept raising prices for food and electrical services at McCormick Place.

"We were limited in our sources of revenue," Mr. Ochoa recalls. "The only alternative, unfortunately, was to raise the cost of services to our customers."

Reaction was swift. In November 2009, two trade shows declared they were leaving the convention center, citing high electrical and food costs.

Chicago-based Healthcare Information and Management Systems Society announced its departure on Nov. 11. The show, which rotates among three cities, had come to Chicago only after Hurricane Katrina made it impossible to hold the event in New Orleans.

As late as Oct. 22, HIMSS officials said they were still considering Chicago for their 2012 show, but only if McCormick Place could guarantee lower electrical prices. "If this does not get fixed, everything else is irrelevant," HIMSS Vice-president Karen Malone wrote in an email to McPier.

But Ms. Malone tells *Crain's* the HIMSS show will return in 2015 and 2019.

"Based on changes at McCormick Place and feedback from industry peers, I believe most, if not all of our concerns about electrical services have been addressed," she says.

Internal memos also reveal that McPier made an unprecedented effort to keep the International Plastics Showcase. McPier offered financial incentives for the triennial plastics show to stay in 2012 and 2015, including discounts on space rental and price freezes for services and labor. (McPier redacted the exact numbers from the documents it provided *Crain's*.) Mr. Ochoa even laid off 100 electricians to demonstrate his commitment to making some changes.

But he now says that McPier probably didn't stand a chance. The plastics show was declining and it "needed to create a diversion," Mr. Ochoa says, and McCormick Place was the perfect foil. "The (higher costs) were certainly an excuse for them to leave the city, especially since we gave them the most aggressive package of incentives we had given to any show during my tenure."

SPI, the Washington, D.C.-based plastics trade association, reported a 28% drop in show attendance between its 2006 and 2009 events, and a 24% decline in membership revenue in the same period, forcing the group to lay off one-third of its staff.

A spokesman says the association is looking forward to its upcoming Orlando event and will not comment on what happened at McCormick Place or on the state of its finances. But a spokesman for the Chicago riggers union confirmed that up to 75 of its members will travel to Orlando to help secure the heavy machinery on the show floor, working at Chicago labor rates and with all expenses paid.

McPier's showcase events, led by the National Restaurant Assn., seized on the crisis to demand labor concessions, even though McPier's higher prices had gone to pay its bills, not to provide raises for its union workers.

## Critics: Law doesn't protect exhibitors from price-gouging

Since last year's McCormick Place legislation, the convention center has reduced its payroll, restructured its debt, lowered food costs and is finally adding more hotel rooms. But critics say the law did nothing to curb the worst trade show abuses: the inflated costs imposed on exhibitors by the general contractors and the trade associations themselves, for freight handling, floor space and hotel rooms, as reported by *Crain's* in June.

"The exhibitors are still getting (screwed)," one former McPier official says. "But at least now they're getting screwed the same way they're getting screwed everywhere else. We are no longer at a competitive disadvantage." General contractors Freeman and Global Experience Specialists Inc., both of which control three out of four trade shows at McCormick Place and nationwide, have denied gouging exhibitors. But they also have been reluctant to open their books to prove it, citing proprietary and competitive reasons.

**' The exhibitors are still getting (screwed). But at least now they're getting screwed the same way they're getting screwed everywhere else.'**

*— Former McPier official*

An audit of the trade shows, required by law, was supposed to be completed last month but was delayed because the chosen auditors, Chicago-based Crowe Horwath LLP, were monitoring the selection of SMG as the private management company for McCormick Place. SMG, based in West Conshohocken, Pa., took over management of McCormick Place on July 1.

McPier officials say the audit, now expected by the end of the year, will analyze three shows to determine whether last year's labor changes resulted in real savings to exhibitors. In an August letter to the head of the decorators union, McPier Trustee Jim Reilly promised the auditors would "go beyond the statutory requirements" to examine the true costs of freight handling — the No. 1 cost cited by exhibitors.

State Rep. Angelo "Skip" Saviano, an Elmwood Park Republican who sponsored three McPier refinancing bills, isn't holding his breath. The issues at McCormick Place went way beyond labor, he says. "The issue was giving the contractors more control over every aspect of McCormick Place," he says. "With that kind of control all over the country, then they can start shopping the shows to the cities that will give them the biggest incentives. That's where we're heading."

*James Ylisela Jr.*

Case: 1:22-cr-00115 Document #: 418-1 Filed: 05/30/25 Page 46 of 57 PageID #:18681

McPier officials weren't about to waste the crisis, either. Both Mr. Gates and Mr. Ochoa acknowledge they used the trade show exodus to stoke public ire about the convention center and to reduce McPier's patronage-bloated payroll. They pushed for union work-rule changes to provide political cover for lawmakers reluctant to expand McPier's bonding authority during a recession.

Mr. Cullerton's spokeswoman says the timing of the McCormick Place legislation "wasn't tied to the rise and fall of interest rates" but rather to the issues driving trade shows out of Chicago. "That 'event' seemed to be the centralizing force that brought the leaders together to get something done."

**STILL PAYING**

Today, the financial picture at McCormick Place has changed dramatically. Restructured debt payments are now in line with tax revenue, but ballooning payments in the future will have to be refinanced yet again. The workforce, once topping 500, now stands at 25, though many former employees now work at SMG, the private management company that took over day-to-day operations on July 1. After a federal judge threw out the union wage and work-rule changes, trade shows once again threatened to leave, though an agreement brokered by Illinois Gov. Pat Quinn and Chicago Mayor Rahm Emanuel last month appears to have brought labor peace, for now.

Dallas-based Freeman and Las Vegas-based Global Experience Specialists Inc., the nation's two giant trade show contractors, have taken over most of the electrical work on McCormick Place shows. Those services, which in 2009 brought a $22-million profit to McPier's operating budget, will bring the agency only about $4.3 million in fiscal 2012. Profits from food operations, at $9 million two years ago, will total about $1 million.

With all the cuts, McCormick Place officials say they will run a $134-million operating deficit between fiscal 2011 and 2014. Savings from the debt restructuring pumped $20 million into the fiscal 2011 operating budget and will add another $60 million over the next three years while McPier builds the hotel addition, which will add 450 rooms.

The six-year delay in building a new hotel continues to cost Chicago money. When President Barack Obama invited world leaders to come to Chicago next May for a NATO meeting and the G-8 economic summit, many applauded the event as a boost for the city's global reputation — and a windfall for the local economy.

But the news didn't sit as well with the Washington, D.C.-based National Restaurant Assn., whose annual trade show at McCormick Place, from May 19 to 22, would overlap the last four days of the summit. Show organizers complained that Chicago didn't have enough hotel rooms to accommodate both events and said they had no choice but to relocate to Las Vegas or Orlando.

After several reportedly tense meetings with Mr. Emanuel, the association's executive director, Mary Pat Heftman, announced the show would stay in Chicago but would move up to May 5 to 8, aided by a reported $2-million package of concessions and incentives from the city.

"There were enough hotel rooms, but everyone was going to want to stay in the same places," Ms. Heftman says. "I was looking forward to producing a show in another city to see if (Chicago) is the right place, especially if we were forced to move."

At the time, Mr. Emanuel said he was pleased to keep the show and the estimated $100 million it generates in revenue each year. But in the midst of his own budget crisis, it was $2 million the mayor certainly didn't want to spend.

The McCormick Place hotel addition won't be ready until late 2013.

By **James Ylisela Jr.**

_____

Companies, Better Government Association, Chicago Convention and Tourism Bureau, Chicago Public Schools, Chicago Transit Authority, City of Chicago, Cook County, Crowe Horwath LLP, McCormick Place, Metropolitan Pier and Exposition Authority, National Restaurant Association, Pace, Regional Transportation Authority, Soldier Field, State of Illinois, People, Rod Blagojevich, John Cullerton, Richard M. Daley, Rahm Emanuel, Michael Madigan, Barack Obama, Juan Ochoa, Pat Quinn, Ted Tetzlaff, Industries, Convention Industry, Finance, Government and Politics, State Government, Infrastructure, Travel and Tourism, Issue, Newsletters, Weekly Alert, Issue - News, This week's issue, Central Station Development

## More in News →

**Private security firm laying off 300 workers in Chicago**

# Government Sentencing Exhibit 3



FILED
INDEX DEPARTMENT

JAN 1 9 2018

IN THE OFFICE OF
SECRETARY OF STATE

EXECUTIVE ORDER

**2018-01**

### EXECUTIVE ORDER TO ELIMINATE IMPERMISSIBLE CONFLICTS OF INTEREST AT THE PROPERTY TAX APPEALS BOARD

**WHEREAS,** the people of Illinois have the right and expectation that the business of their government will be conducted in an honest and ethical manner; and

**WHEREAS,** State officials and employees protect the public trust, and must be impartial in the performance of their duties; and

**WHEREAS,** the public loses their faith in government when they see State officials personally profit from the very constituencies they are meant to serve; and

**WHEREAS,** the State of Illinois Code of Personal Conduct (the "Code"), which applies to all State officials and employees under the Governor, requires that government be conducted in a transparent, ethical, accountable, and motivated manner; and

**WHEREAS,** the Code states that State officials and employees "may not engage in outside employment or activities, including seeking or negotiating for employment, that conflict with their official State duties and responsibilities"; and

**WHEREAS,** the Code states that State officials and employees "must take appropriate action to identify, disclose, and avoid potential conflicts of interest in the performance of their official duties"; and

**WHEREAS,** conflicts of interest clearly arise where legislators and regulators receive financial benefits by charging Illinois citizens and businesses through a morass of red tape those same officials created by passing complicated rules and establishing confusing and bureaucratic processes; and

**WHEREAS,** for decades, Illinois government has undermined the fiscal health of its citizens by passing crippling taxes and enacting policies that make the State's property tax system one of the most complicated and burdensome in the nation; and

**WHEREAS,** the disastrous outcomes of Illinois' current property tax system are eroding the State's ability to sustain the fundamental markers of our health as a state, including economic growth, business and job development, stable homeownership, and the preservation of home values; and

**WHEREAS,** recent investigations of Cook County by the University of Chicago and Chicago Tribune have also demonstrated property value assessments and appeals are systemically inequitable, yielding disproportionately high property tax burdens on low-income residents; and

**WHEREAS,** because this is profoundly unfair property tax system, and because of serious public concerns about the fairness of the tax assessment process, avoiding even the appearance of conflicts of interest in the system is of fundamental importance;

THEREFORE, I, Bruce Rauner, Governor of Illinois, by virtue of my executive authority to establish and enforce ethical standards for the executive branch vested in me by Section 8 of Article V and Section 2 of Article XIII of the Constitution of the State of Illinois, do hereby order as follows:

### I. ELIMINATION OF CONFLICTS OF INTEREST AT THE PROPERTY TAX APPEALS BOARD

The Property Tax Appeals Board (the "Board") is a State agency under the jurisdiction of the Governor. The Board hears appeals of property tax assessments made at the county-level throughout Illinois. The Board is empowered to restrict persons who appear before it as representatives of appealing parties. To ensure that the Board conducts its work in an ethical manner, and to ensure that parties before it do not present impermissible conflicts of interest, the Board shall allow no State legislator to participate in any way in any representation case on any matter before the Board. The Board shall also prohibit participation in such a representation case by a legislator where the legislator receives any fee or compensation, directly or indirectly, through any interest in a partnership, limited liability corporation, or other business entity. The Board is directed to amend its rules of practice and procedure to reflect this executive order.

Representation case means a "representation case" as defined by the Illinois Governmental Ethics Act, 5 ILCS 420/1-113.

### II. SAVINGS CLAUSE

This Executive Order does not contravene, and shall not be construed to contravene, any federal law, State statute, or collective bargaining agreement.

### III. PRIOR EXECUTIVE ORDERS

This Executive Order supersedes any contrary provision of any other prior Executive Order.

### IV. SEVERABILITY CLAUSE

If any part of this Executive Order is found invalid by a court of competent jurisdiction, the remaining provisions shall remain in full force and effect. The provisions of this Executive Order are severable

### V. EFFECTIVE DATE

This Executive Order shall take effect immediately upon filing with the Secretary of State.

Bruce Rauner, Governor

Issued by Governor: January 19th, 2018
Filed with Secretary of State: January 19th, 2018

FILED
INDEX DEPARTMENT

JAN 1 9 2018

IN THE OFFICE OF
SECRETARY OF STATE

**Government Sentencing Exhibit 4**

```
CASE TITLE:      United States v. Madigan and McClain
CASE NUMBER:     22 CR 115
ACTIVITY:        Telephone conversation between Michael McClain and
                 John Bradley
DATE:            November 13, 2018
TIME:            9:50 a.m.
TARGET PHONE:    (217) 257-6280
SESSION NUMBER:  15703

SPEAKERS:        MCCLAIN   =   MICHAEL MCCLAIN
                 BRADLEY   =   JOHN BRADLEY
```

                            (BEGIN CLIP 1)

| | | |
|---|---|---|
| 1 | BRADLEY: | Hey Mike. JCAR has not met yet, but, um, ▆▆▆▆ |
| 2 | | completed his mission, and he got a favorable |
| 3 | | response. |
| 4 | | |
| 5 | MCCLAIN: | Good. |
| 6 | | |
| 7 | BRADLEY: | So, um. |
| 8 | | |
| 9 | MCCLAIN: | So, they're not gonna call it? |
| 10 | | |
| 11 | BRADLEY: | I don't know, but if they do, I think that, |
| 12 | | according to ▆▆▆▆, PTAB is prepared to object to |
| 13 | | it themselves. |
| 14 | | |
| 15 | MCCLAIN: | Mhm. |
| 16 | | |
| 17 | | (STATIC - UNINTELLIGIBLE) |
| 18 | | |
| 19 | BRADLEY: | I'll keep you advised as, uh- |
| 20 | | |
| 21 | MCCLAIN: | Okay. |
| 22 | | |
| 23 | BRADLEY: | -matters develop, but they just, they're still pre- |
| 24 | | meeting, so I assume there's a fight over it of some |
| 25 | | sort. |
| 26 | | |
| 27 | MCCLAIN: | Yeah, yeah. |
| 28 | | |
| 29 | BRADLEY: | Okay. |
| 30 | | |
| 31 | MCCLAIN: | Okay. Good. |
| 32 | | |
| 33 | | (END CLIP 1) |

# Government Sentencing Exhibit 5

```
CASE TITLE:      United States v. Madigan and McClain
CASE NUMBER:     22 CR 115
ACTIVITY:        Telephone conversation between Michael Madigan and
                 Michael McClain
DATE:            November 13, 2018
TIME:            11:42 a.m.
TARGET PHONE:    (217) 257-6280
SESSION NUMBER:  15768

SPEAKERS:        MADIGAN   =    MICHAEL MADIGAN
                 MCCLAIN   =    MICHAEL MCCLAIN
```

| | | |
|---|---|---|
| 1 | MCCLAIN: | Hi Speaker. |
| 2 | | |
| 3 | MADIGAN: | Yeah, Mike. How are you? |
| 4 | | |
| 5 | MCCLAIN: | Good, good, and yourself? |
| 6 | | |
| 7 | MADIGAN: | Good, good. Uh, Lang was here, and, uh, you know, he |
| 8 | | told me he's gonna bow out sometime before the end |
| 9 | | of the calendar year. |
| 10 | | |
| 11 | MCCLAIN: | Good. Perfect. |
| 12 | | |
| 13 | MADIGAN: | Yeah, yeah. (Unintelligible) |
| 14 | | |
| 15 | MCCLAIN: | Now, I'll talk to him, I'll talk to him about the |
| 16 | | replacement then. Um, um, JCAR. |
| 17 | | |
| 18 | MADIGAN: | Yes. |
| 19 | | |
| 20 | MCCLAIN: | Eleven to zero prohibition on PTAB. So, it's over. |
| 21 | | |
| 22 | MADIGAN: | Okay. Alright, yeah. Very good. |
| 23 | | |
| 24 | MCCLAIN: | And ▨▨▨▨▨, John Bradley, and ▨▨▨▨▨ drove |
| 25 | | down from Chicago. They all worked on it. So, just |
| 26 | | to let- |
| 27 | | |
| 28 | MADIGAN: | Mhm, okay, very good. |
| 29 | | |
| 30 | MCCLAIN: | Alright, sir. |
| 31 | | |
| 32 | MADIGAN: | Thank you. |
| 33 | | |
| 34 | MCCLAIN: | Take care. |
| 35 | | |
| 36 | MADIGAN: | Buh-bye. |

# Government Sentencing Exhibit 6

**Jim FitzGerald**

February 12, 2025

**Hon. Robert John Blakey**
Court 1203
Dirksen Courthouse
219 S. Dearborn St.
Chicago, IL 60604

Re: UNITED STATES OF AMERICA v. MICHAEL J. MADIGAN and MICHAEL F. McCLAIN

Your Honor:

I write in reference to the upcoming sentencing of Michael J. Madigan for bribery, conspiracy and wire fraud associated with using his elected office for his personal gain. I have been a citizen of Illinois since 1987 (save one decade), and therefore I am a direct victim of Michael Madigan's crimes.

The evidence presented at trial proved to the clear satisfaction of the jury not only the defendant's guilt, but also his central role over many decades in the continuing criminal enterprise that characterizes Illinois politics.

Mike Madigan did not create graft in Illinois, but he perfected its application, he mentored its practitioners, and he perpetuated and reinforced an entrenched culture of political corruption, all to the detriment of millions of Illinoians, all for his own benefit. The victims of his crimes are not just public utilities. His victims include everyone in the state over the past half century. We're a lot poorer and a lot less free because of the chokehold Madigan and his conspiracy of political corruption has had on our state. I have been robbed by Mike Madigan and his like of honest government services and any benefits that would have accrued to me had he provided those services honestly. I've paid the Illinois Graft Tax for far too long.

It is not enough to, once again, send an aging, crooked Illinois pol off to "Club Fed" for a few months of golf practice and tanning. "The Velvet Hammer" deserves to spend any prison time in an actual prison, with other criminals, miscreants, reprobates, racketeers and thugs just like him. It's time all the other scheming Illinois politicians know that graft and corruption in Illinois is not a "Poor Guy," bump along the road to more corruption. It's time a message was sent and an example was made, that the days of old-school Illinois corruption will no longer be tolerated.

Michael Madigan didn't leave one victim bleeding, he bled out an entire state for half a century. He deserves worse than a vacation in khaki.

Sincerely,

Jim FitzGerald

After 3 days return to:

Jim FitzGerald

Return Service Requested

14 FEB 2025   PM 2   L

Hon. Robert John Blakey
Court 1203
Dirksen Courthouse
219 S. Dearborn St.
Chicago, IL 60604

RECEIVED

FEB 18 2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT