# EXHIBIT A

```
 1                   UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   UNITED STATES OF AMERICA            )  Case No. 20 CR 812
                                         )
 4                                       )
          v                              )
 5                                       )
     MICHAEL McCLAIN, ANNE PRAMAGGIORE,   )
 6   JOHN HOOKER, and JAY DOHERTY,       )  Chicago, Illinois
                                         )  May 28, 2025
 7             Defendants.               )  10:11 o'clock a.m.

 8
              TRANSCRIPT OF PROCEEDINGS - MOTION HEARING/RULING
 9                 BEFORE THE HONORABLE MANISH S. SHAH

10
     APPEARANCES:
11
     For the Government:       HON. ANDREW S. BOUTROS
12                             United States Attorney
                               219 S. Dearborn Street, Suite 500
13                             Chicago, Illinois  60604
                               BY:  MS. SARAH E. STREICKER
14                                  MS. DIANE MacARTHUR
                                    MS. JULIA K. SCHWARTZ
15

16   For Defendant Pramaggiore: SIDLEY AUSTIN, L.L.P.
                               BY:  MR. SCOTT R. LASSAR
17                                  MR. DANIEL C. CRAIG
                                    MS. JENNIFER M. WHEELER
18                                  MS. EMILY R. WOODRING
                               One S. Dearborn Street
19                             Chicago, Illinois  60603

20
     For Defendant Hooker:     LAW OFFICES OF SUSAN M. PAVLOW
21                             BY:  MS. SUSAN M. PAVLOW
                               53 W. Jackson Boulevard, #1215
22                             Chicago, Illinois  60604

23

24

25
```

```
 1   APPEARANCES (Continued):

 2

 3   For Defendant Doherty:       MS. GABRIELLE R. SANSONETTI
                                  120 N. LaSalle Street, Suite 2000
 4                                Chicago, Illinois  60602

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21   Court Reporter:              COLLEEN M. CONWAY, CSR, RMR, CRR
                                  Official Court Reporter
22                                219 S. Dearborn Street, Room 1918
                                  Chicago, Illinois  60604
23                                (312) 435-5594
                                  colleen_conway@ilnd.uscourts.gov
24
                              * * * * *
25              PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1   (Defendants out.  Proceedings heard in open court:)
2         THE CLERK:  20 CR 812, United States versus McClain,
3   Pramaggiore, Hooker, Doherty.
4         MS. STREICKER:  Good morning, Your Honor.  Sarah
5   Streicker and Julia Schwartz and Diane MacArthur on behalf of
6   the United States.
7         THE COURT:  We have all of your appearances for the
8   record, but why don't we go around the table for the record.
9         MR. LASSAR:  Scott Lassar for Anne Pramaggiore.
10        We're also representing Mr. McClain because Mr. Cotter
11  could not be here today.
12        MR. CRAIG:  Daniel Craig for Ms. Pramaggiore.
13        MS. WHEELER:  Jennifer Wheeler for Ms. Pramaggiore.
14        MS. SANSONETTI:  Gabrielle Sansonetti,
15  S-a-n-s-o-n-e-t-t-i, for Mr. Doherty.
16        MS. PAVLOW:  And Susan Pavlow on behalf of Mr. Hooker.
17        THE COURT:  Good morning, everyone.
18        I read the reply brief that was attached to the motion
19  to file the reply.  So while it's styled as a motion for
20  permission to file a reply, it's really more of a motion for
21  forgiveness for filing a reply.
22        And with that preface, does the government have any
23  objection to the filing of that reply?
24        MS. STREICKER:  Your Honor, yes, we do object to the
25  filing of the reply, particularly in light of Your Honor's

1  order at docket No. 414 that: "No reply is permitted unless
2  requested by the court." And in this instance, it was not
3  requested by the Court. So we do object on that basis.
4          THE COURT: The motion to file the reply is granted
5  because I read it, and it's easier for me to put aside my
6  disappointment in counsel for filing a brief that I didn't ask
7  for than perhaps it is for me to put aside everything I read
8  about it.
9          So I'll consider it. And the motion to file the reply
10 is granted.
11         You don't need to file it as a separate entry on the
12 docket. It's there. And, as I mentioned, I have read it.
13         Unless there are any updates from the government or
14 the defense about the FCPA counts, I can give you a ruling on
15 the motion to reconsider now.
16         Are there any updates?
17         MS. STREICKER: Your Honor, on that score, the
18 defendants' appeal, which defendants raised at the last status
19 hearing, has been denied, and the guidance we have received is
20 to move forward with sentencing.
21         THE COURT: Then I will give you the ruling on the
22 pending motion to reconsider.
23         I imagine that framing this case now as an
24 all-or-nothing battle about the internal accounting records of
25 ComEd feels probably strange to those of you who were in the

1  room trying the case, but here you are.
2          *Thompson v. United States* is, of course, binding on
3  lower courts and in cases on direct review.  As I said about
4  *Snyder*, it would make no sense to me to not consider a Supreme
5  Court decision that has come down and applies, or at least to
6  consider whether and how that decision applies, when the Court
7  of Appeals will have to anyway.  So I will entertain the motion
8  to reconsider and focus and limit it to the question of how
9  *Thompson* applies.
10          In *Thompson*, the Supreme Court said that if "false"
11 means anything, it means "not true."  A true statement is
12 obviously not false.  And a statute that criminalizes false
13 statements does not criminalize statements that are misleading
14 but not false.
15          In considering the meaning of the word "false," the
16 Court looked at, among other sources, the 12th Edition of
17 Black's Law Dictionary.
18          Justice Alito's concurrence emphasized some points
19 about the decision.  First, falsity must be judged in context.
20 Second, "false" and "misleading" may overlap.  And third, it
21 would be wrong to instruct a jury that it must acquit if it
22 finds a statement is misleading.  On the jury instructions,
23 Justice Jackson pointed out that the jury in that case had been
24 properly instructed by using the word "false."
25          So how does *Thompson* apply to our case?

1    Here, we have a statute that makes it a crime to
2 knowingly circumvent a system of internal accounting controls
3 or knowingly falsify any book, record, or account described
4 earlier in the statute. 15, United States Code, Section
5 78m(b)(5).
6    *Thompson* addresses a distinction between a false
7 statement and a misleading statement. Does that help us
8 understand the meaning of the verb "falsify" in this case?
9 Defendants say yes, that it is not falsifying a record if the
10 act only makes the record misleading while still being
11 literally true. In the defendants' view, only the act of
12 making a document literally untrue is falsifying.
13    The 12th Edition of Black's Law Dictionary defines
14 "falsify" as "to make deceptive; to counterfeit, forge, or
15 misrepresent."
16    Merriam-Webster's Unabridged Dictionary includes among
17 its definitions of "falsify" "to represent falsely:
18 misrepresent, distort."
19    The OED, cited by defendants, defines "falsify" as:
20 "to make false or incorrect," with a sub-definition of "to give
21 a false account of; to misrepresent."
22    In my view, *Thompson* does not affect the meaning of
23 the verb "falsify" in this statute; it has its ordinary meaning
24 in law, which includes to make deceptive, to misrepresent.
25    The records at issue here look like ComEd was

1 purchasing lobbying or consulting services from entities like
2 JDDA or Bradley & Decremer, but that wasn't what ComEd was
3 buying, and that's not what the transactions were about, or so
4 a jury could conclude beyond a reasonable doubt.  Contrary to
5 what the books and records were representing, ComEd was paying
6 benefits to Mr. Madigan.  Even if some of the money and
7 contractual relationships were for actual services rendered,
8 not all of it was, and defendants made the books and records
9 deceptive by purporting to record payments and describe
10 contracts for something else other than what the contracts,
11 services, invoices, Sole Source Justifications, and ledger
12 entries said they were.  These were misrepresentations and
13 distortions, and the act of doing that to the books and records
14 is falsifying.  The original analysis of these counts holds
15 under an ordinary understanding of the word "falsify," and
16 *Thompson* does not suggest otherwise.

17       As it has throughout the case, the defense is focused
18 on the omission of the subcontractors and the absence of a
19 specific requirement to identify subcontractors.  I don't agree
20 that that makes concealment of the subcontractors a misleading
21 omission but literally true.  These were acts of making the
22 books and records a distortion of reality, a misrepresentation
23 of what the company was really doing.  That's falsifying, and
24 that fits within the statutory context.

25       Subparagraph (2)(A) requires that the books and

1  records accurately and fairly reflect transactions.
2        "Falsify" in subparagraph (5) should be informed by
3  the purpose of the books and records, to be accurate and fair
4  reflections of the transactions.  It does not make subparagraph
5  (4) superfluous to make the knowing falsification of books and
6  records criminal, where falsifying the records means to render
7  the recorded transactions inaccurate or make them unfair
8  reflections of transactions.  There's no tension in reading
9  "falsify" to include making something incorrect or distorting
10 something and subparagraph (2)(A).  Subparagraph (4) does the
11 work of shielding negligent inaccuracies from criminal
12 liability.
13       The jury instructions here used the term "falsify"
14 straight out of the statute, without any further gloss, and
15 *Thompson* confirms that there was no instructional error in
16 going that route.
17       But even if "falsify" means only the partial
18 definition that the defendants rely on from the OED, namely, to
19 make false, full stop, the evidence here supports the
20 convictions and there's no plain error justifying a new trial.
21       As *Thompson* teaches us, falsity depends on context.
22       A jury could find that the books and records here were
23 literally false because the transactions they were documenting
24 were not for services rendered by JDDA, for example.  Viewed in
25 the light most favorable to the government, these books and

1  records were saying that all of the money and these contracts
2  were for services rendered, and that was not true.
3        In *Thompson*, a statement that understated a loan
4  amount might have been literally true.  Of course, we don't
5  know whether that is the case because the sufficiency of the
6  evidence in *Thompson* hasn't been decided.  It may be that even
7  in *Thompson*, the context of the statement there made it false.
8        But even if understating something could be literally
9  true, the books and records and ledger entries here were in a
10  context of asserting that these contracts and invoices, et
11  cetera, were for services rendered and those services rendered
12  only.  That's the point, the context, of all of these
13  accounting controls, to give an accurate and fair accounting of
14  what this issuer of securities is up to with its money.  Unlike
15  an arguably truthful but understated amount of a loan, these
16  books and records weren't partial statements about the
17  transactions.  They were literally untrue in context.
18        For example, in our case, it's not a true statement to
19  say that ComEd purchased JDDA's services when JDDA was, in
20  part, a pass-through for a non-consulting, non-lobbying stream
21  of benefits for Mr. Madigan.
22        That there were some services rendered does not compel
23  a finding that the records were literally true.  The defense
24  argued to the jury that there were no false statements.  The
25  jury concluded otherwise, and that was a reasonable call for

1  the jury to make.

2  I do understand the distinction between Mr. Doherty,
3  the individual, and JDDA, the entity, but a jury could easily
4  conclude from Mr. Marquez's testimony that JDDA did not have an
5  expanded role necessitating a contract amendment, and that it
6  was a lie to say that that was what the contract amendment was
7  for.  It was to pay Mr. Zalewski but not for services rendered
8  through JDDA.

9  The defense may have a stronger argument about the --
10  for the literal truth of the Sole Source Justification forms,
11  because those forms are explaining why there's no competitive
12  bidding, but in the light most favorable to the government, it
13  was not true that the consultant provided unique insight and
14  perspective.  The truth was that the consultant provided an
15  opportunity or a pass-through for benefits to be conferred on
16  Mr. Madigan.

17  The reason not to competitively bid the spending of
18  this money wasn't because of JDDA's legitimate services.  It
19  was so that they could steer the money without disclosure.
20  Saying that JDDA fell within the ordinary Sole Source
21  Justification, when the entirety of the JDDA relationship did
22  not, was a literal lie in context, or so a jury could conclude.

23  I don't agree with the defense that the ledger entries
24  were literally true because they were only documenting dates,
25  payment amounts, and remittance details without a field for

1  "purpose" or "intent."  The ledger entries reported codes for
2  professional services, consultant vouchers, legislative
3  services, political expenses.  Those were not literally true
4  because there were entries coded as professional services or
5  lobbying that the jury could conclude beyond a reasonable doubt
6  were not for professional services or lobbying.
7  　　　　　The codes were lies, as were the invoices, in context,
8  purporting to bill for services that were not what the bills
9  were for.
10 　　　　　Even a narrow construction of the verb "falsify,"
11 there was sufficient evidence to find falsification, and the
12 original analysis of each defendant's liability holds.
13 　　　　　And I'm still of the view that there was no need for a
14 special verdict on the specific falsified documents because the
15 evidence supports conviction for falsifying all of the charged
16 documents.
17 　　　　　I appreciate the point that circumventing the
18 accounting controls was not a big part of the trial, but
19 *Thompson* does not affect the analysis of that, that object.
20 　　　　　The Code of Business Conduct was part of internal
21 accounting controls, among other evidence of the accounting
22 system, and the conspiracy knowingly and willfully evaded those
23 controls.
24 　　　　　Even if I concluded that defendants were right that
25 there was literal truth in every document and record, there is

1  still no doubt that there was a conspiracy to circumvent the
2  accounting controls so that benefits to Mr. Madigan were
3  concealed. There's no prejudicial spillover from the other
4  alleged conspiratorial objects onto that object because all of
5  the evidence relates to why the conspiracy circumvented the
6  company's accounting controls. The conspirators did not want
7  the transparency that the accounting controls demanded for
8  money spent by this issuer of securities.
9        Hypothetically, I suppose in a post-*Snyder* world, if
10 an issuer of securities wanted to reward a public official with
11 no-show jobs, it could comply with its accounting controls,
12 announce truthfully what it is doing and let the shareholders
13 know. The accounting controls are designed so that the books
14 and records truthfully reflect, for example, what transactions
15 were for unique insight and lobbying and which transactions
16 were steering benefits to a public official. This conspiracy
17 willfully circumvented those controls.
18       It may not have taken a lot of time of the trial to
19 prove, but the evidence was more than sufficient to prove that
20 object of the conspiracy to circumvent the accounting controls.
21 There was no need for a special verdict on the objects of the
22 conspiracy because my view is that no jury could have concluded
23 otherwise as to this object.
24       For those reasons, the motion to reconsider is denied.
25       And the schedule for sentencing will remain as we have

1  it in place.
2         Is there anything further the parties would like me to
3  address this morning?  On behalf of the government?
4         MS. STREICKER:  Not on behalf of the government.
5  Thank you.
6         THE COURT:  On behalf of any of the defendants?
7         MR. LASSAR:  No, Your Honor.
8         THE COURT:  Thank you.
9     (Proceedings concluded at 10:28 a.m.)
10
11                    *      *      *      *      *
12
13         I certify that the foregoing is a correct
14  transcript of the record of proceedings in the above-entitled
15  matter.
16
17   /s/ Colleen M. Conway, CSR, RMR, CRR          05/29/2025
18       Official Court Reporter                      Date
         United States District Court
19       Northern District of Illinois
              Eastern Division
20
21
22
23
24
25