UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | No. 22 CR 115-1 |
|---|---|
| v. | |
| MICHAEL J. MADIGAN | Hon. John R. Blakey |

**GOVERNMENT'S RESPONSE TO DEFENDANT MADIGAN'S
SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, respectfully submits this response to defendant Michael J. Madigan's sentencing memorandum. R. 419.

Madigan seeks extraordinary leniency from the Court—a sentence of probation for a former high-level elected official convicted of abusing his office for years through bribery, fraud, and conspiracy. Each of those crimes is the antithesis of what a public official should do on behalf of the citizens he serves. Yet, as Madigan would have it, the Court should grant him great leniency based on past good acts and effectively ignore the serious crimes for which he was convicted.

Although Madigan claims to respect the "jury's work" (R. 419 at 23)—a vague reference to the ten counts of conviction—he blames everyone but himself for his crimes and attempts to minimize their seriousness. Never for a moment does Madigan acknowledge the damage his conduct has caused. Madigan's portrayal of himself, including with respect to his crimes, as being motivated solely by the desire to help others, is inconsistent with the evidence. Madigan's one-sided approach is also inconsistent with the factors set forth in 18 U.S.C. § 3553(a), including the need to

recognize the seriousness and nature of the offense, to impose just punishment, to promote respect for the law, and to deter other public officials from similar crimes.

The government respectfully submits that a sentence of incarceration of 12.5 years, and not a sentence of probation, addresses the sentencing factors in this case.

I.  **MADIGAN IGNORES THE OFFENSE CONDUCT AND THE JURY'S VERDICT.**

Madigan largely ignores the jury's verdict, choosing not to even mention the offense conduct until page 19 of his sentencing memorandum. In addressing the offense conduct, Madigan deprecates the evidence, which led the jury to find him guilty beyond a reasonable doubt.[1] Madigan's arguments—that he did not receive any personal benefit, that the ComEd legislation benefited Illinois, and that Madigan's intent was solely to help people—essentially amount to a claim that he is "innocent" of the crimes of which the jury convicted him. R. 419 at 20-21.

The evidence flatly contradicts Madigan's claim that his crimes were borne out of a desire to help people and that he received no benefit. Madigan further ignores the gravity of his conduct in focusing on the claimed merits of the ComEd legislation, which are irrelevant to the charges and sentence. Far from accepting accountability, Madigan blames "the charges" for causing him "continuous public embarrassment"

---

[1] To be clear, Madigan is entitled to assert his innocence. Acceptance of responsibility or remorse, however, are commonly and correctly considered prerequisites for leniency, and their absence here, coupled with Madigan's false testimony, weighs strongly against a lenient sentence. *See United States v. Ford*, 840 F.2d 460, 467 (7th Cir. 1988) ("[T]he trial judge did not err in considering the truthfulness of Ford's testimony or Ford's refusal to recognize her offense at the sentencing hearing.").

2

and "public humiliation so complete it has rewritten his legacy." R. 419 at 22-23. Madigan has only himself to blame for his egregious corruption of office.

### A. Madigan Sought to Exploit Solis's and His Own Office for Personal Gain.

Madigan claims his "motivating force," including with his law firm, was to "help as many people as possible." R. 419 at 7. But the evidence showed that Madigan sought to make money for himself through his law firm. Madigan's own words on recordings proved his pecuniary motives. *E.g.,* GX125 ("One guy you mentioned that I've been trying to make a connection with is this Skydell"); GX185 ("Skydell's company is buying a building at One South Wacker . . . That may be an opportunity for me."); GX28 ("you know why I'm interested."); GX311 (". . . I'd like to get an introduction to the guy to work on real estate taxes."); GX6 (Solis, "Do you know the, uh, people there [Union West developers]?" Madigan, "No but, no but I'd like to."). And contrary to Madigan's claim, the evidence proved that Madigan was not motivated by a desire to help *Solis* when he agreed to recommend him to a State board; Madigan sought to help *himself*.

Madigan also tried to use his political power to benefit his law firm by working behind-the-scenes to derail an agency rule change that, if enacted, could have reduced Madigan's firm's profits. R. 418 at 56-58.

Based on the evidence, Madigan's effort to portray his entire life's work as being driven by altruism is misleading and incomplete, at best. Madigan's true character was captured on recordings in this case.

3

Madigan's greed is even more appalling given his law firm's success. Madigan certainly did not need more legal business—Madigan has amassed a personal fortune of more than $40 million. PSR ¶ 121. Yet, Madigan was willing to trade his and Solis's office to obtain a State board position for Solis—who had suggested a *quid pro quo* to Madigan on multiple occasions—in exchange for more legal business for Madigan's law firm. Madigan put his desire for profit ahead of what was best for Illinois.

B. **Madigan Personally Benefited From Exploiting ComEd.**

Madigan's crimes involving ComEd were also not about helping other people, but about helping Madigan. Madigan used ComEd, a regulated utility, as his personal piggy bank to pay his loyal allies. These bribe payments ensured the continued loyalty of Madigan's most valuable allies and ensured Madigan's political workers continued to perform free political work for Madigan. By doling out these ComEd jobs, Madigan maintained and increased his own political power, and in doing so corrupted a regulated utility and depleted the available jobs for legitimate job candidates.

As one example, Madigan tried to secure a job for Jeffrey Rush, the son of Congressman Bobby Rush, who had been fired after having a sexual relationship with an inmate while he worked at the Illinois Department of Corrections. GX174; GX308 (McClain asking Marquez if ComEd or Exelon would hire Jeffrey Rush). Madigan admitted he knew Rush had abused his position of public trust. Tr. 9117. Contrary to Madigan's claim, this was not about "second chances," but about Madigan's desire to forge a political alliance with a powerful Congressman.

### C. The Merits of ComEd's Legislation Are Irrelevant.

Madigan's contention that ComEd's legislation benefited consumers is complex, subjective, and entirely irrelevant. Tr. 9949 (government closing, arguing, "[i]t doesn't matter if the legislation was good for the people of Illinois or bad"). To the contrary, Madigan's effort to justify his conduct in the name of the claimed good he has done for the State belittles the gravity of his crimes. Whether good policy or not, legislation should not be bought. Madigan, the most powerful politician in Illinois, orchestrated a near decade-long conspiracy where a regulated entity bought Madigan's support on legislation. That is not good for the State or consumers. Madigan's conduct casts a stain on the entire State, and it should be met with a significant custodial sentence.

## II. THE LETTERS SUPPORTING MADIGAN DO NOT OVERSHADOW THE SERIOUS OFFENSE CONDUCT.

Madigan's sentencing submission includes over 200 letters written on his behalf by a spectrum of individuals whose lives he has touched in positive ways. Madigan is fortunate to have this generous outpouring of support. These letters form a part of the full portrait of Madigan to be considered by the Court in determining the appropriate sentence.

The letters, however, in addition to their intended goal of supporting Madigan's quest for a non-custodial sentence, also have the unintended effect of bolstering the evidence of Madigan's participation in the ComEd and State board schemes. The letters describe Madigan as "direct," "straightforward," and "say[ing] what he thought, and that if "he says he is going to do something, then [you] could count on

him every time." R. 419, Ex. A at 22; *id.,* Ex. E at 17, 22, 28. 52, *id.,* Ex. F at 8. So too was Madigan direct and a man of his word, when he told McClain that ComEd could stop paying Ed Moody; when he thanked Solis for working to send him law firm business in exchange for official action; and when he told Solis to "just leave it [the appointment to a State board seat] in my hands."

The letters also underscore Madigan's longstanding reliance on patronage to maintain and enhance his base of political power, through finding jobs for his political workers in exchange for unpaid political work. One 13th Ward precinct captain described how Madigan helped him get a job and the way Madigan led precinct captain meetings by announcing: "don't ever lie to me. If you do, you are on your own." R. 419, Ex. G at 3. Another letter writer described the many hours he spent knocking on doors over the 40 years he volunteered for "Mike Madigan's organization" and how Madigan helped him get State and County jobs. *Id.,* Ex. H at 16. Letters like these are consistent with Moody's account that Madigan told him Moody's consulting payments would end if Moody stopped performing political work, and demonstrate how the jobs and contracts at ComEd benefitted Madigan.

Madigan recommended multiple letter writers to State board positions, including union leaders James Connolly and James Sweeney.[2] *Id.*, Ex. F at 23-25, 110-111; GX866; GX880; DX7249 at 3; *see also* Tr. 9132 (Madigan acknowledged that unions were sizeable contributors to Madigan's campaigns). In fact, when McClain

---

[2] Madigan secured State board appointments for other letter writers, including Barbara Flynn Curry, Sam Toia, and Jerry Costello. DX7249.

6

told Tim Mapes, Madigan's former Chief of Staff, that Madigan had secured State board positions for Connolly and Sweeney, Mapes observed: "they'll be loyal to one person that I know." GX289 at 4.[3] These letters thus demonstrate the power Madigan wielded—and to this day wields—over individuals to whom he has doled out favors.

It is important to consider loyalty in the context of general deterrence. Loyalty to a public official, particularly one who bestows benefits, can be taken to an extreme. It was misguided loyalty to Madigan that led Madigan's 25-year former Chief of Staff Tim Mapes to commit perjury in an effort to obstruct the government's investigation of Madigan, a crime for which he was sentenced to 30 months' imprisonment. *See United States v. Mapes*, No. 21 CR 345, ECF No. 168 (Kness, J.). This type of misplaced loyalty made it more difficult for the government to secure witness testimony and advance its investigation.

Multiple letters note that Madigan assisted the letter writer without asking for anything in return. This is commendable, but it must also be kept in perspective. Madigan was an elected official, and his role included helping constituents, including with access to government services. *See United States v. Vrdolyak*, 593 F.3d 676, 683 (7th Cir. 2010) ("Politicians are in the business of dispensing favors; and while gratitude like charity is a virtue, expressions of gratitude by beneficiaries of politicians' largesse should not weigh in sentencing.").[4]

---

[3] This exhibit was marked, but not admitted, at trial and is attached hereto.

[4] In *Vrdolyak*, the Seventh Circuit reversed a probationary sentence, holding that the sentencing judge acted unreasonably in giving enormous weight to letters outlining

In addition, the letters paint only a partial portrait of Madigan, which does not reflect the evidence presented to the jury. None of the letter writers were on the telephone with Madigan and McClain when they discussed finding paid positions at ComEd for Madigan's allies or were in the room with Madigan and Solis when Madigan agreed to trade his political influence for legal business.

The starkest disconnect between the letters and the evidence is how some letter writers describe Madigan as having integrity and being scrupulously honest. Madigan's testimony, and the lies he told, cannot be squared with the personal experiences expressed in these letters. It is telling that, when everything was on the line for Madigan during this trial, Madigan lied. That is not the conduct of someone who comports himself with honesty and integrity.

## III. MADIGAN'S FAMILY CIRCUMSTANCES

Madigan argues that he should obtain a lenient sentence due to the impact of his imprisonment on his ailing wife. There is no doubt that whatever sentence Madigan receives will have consequences for his family, and especially his wife. Observing the impact that imprisonment has on family members is difficult for every participant in the criminal justice system. But, unfortunately, most defendants who commit crimes find themselves in the same, or in worse, positions than Madigan and his family. Unlike many defendants, Madigan has the financial resources to provide

---

defendant's charitable donations and favors for others, while failing to discuss the evidence showing defendant's character in a negative light; gave no weight to the fact that defendant was wealthy and thus more likely to have made charitable gifts and ignored the fact that defendant had served as a city alderman and thus was in the business of dispensing favors. *Id.* at 682-83.

8

for medical and home care for his wife and adult family members in the Chicago area to help care for Madigan's wife.

As one judge noted in considering release for ex-Governor George Ryan:

> This court takes no pleasure in depriving any defendant of his or her liberty. The court has had the painful duty to take such action in circumstances more compelling than these—where a young defendant with little education or resources is the sole support of small children, or is the only caregiver for a disabled relative, for example. Any sensitive judge realizes that a lengthy prison term effectively robs the convicted person of what we all value most: months and years with loved ones, some of whom will no longer be there when the sentence has been served. Mr. Ryan, like other convicted persons, undoubtedly wishes it were otherwise. His conduct has exacted a stiff penalty not only for himself but also for his family.

*Ryan v. United States*, 759 F.Supp.2d 975, 1014 (N.D. Ill. 2010).

In resentencing former Governor Blagojevich, Judge Zagel observed:

> It is an unfortunate reality that all prisoners, even those who are good parents and good spouses, all of them have innocent family members who are made to suffer the consequences of their loved one's crime. I am sympathetic to them and how painful this experience has been to them, but I said 4 years ago, the fault lies on the Governor and no one else at that time. He was aware that illegal conduct could land him in jail, away from his wife and children, and he went ahead with it anyway.

*United States v. Blagojevich,* No. 08-cr-00888, ECF # 1255 at 55-56 (Aug. 9, 2016 Tr.).

The unfortunate impact of Madigan's incarceration on his family is the result of his own acts. Madigan's age and family circumstances do not distinguish him from most defendants and do not warrant the extraordinary leniency he has requested.[5]

---

[5] On June 3, 2025, a California judge sentenced 86-year-old attorney Thomas Girardi to more than seven years in prison for wire fraud, despite the defendant's age and ailing health. *See United States v. Thomas Vincent Girardi*, No. 23 CR 47 (C.D. Cal.). The Seventh Circuit likewise has made clear that age is only one factor to consider in fashioning an appropriate

9

## IV. MADIGAN IGNORES THE EVIDENCE PROVING HE COMMITTED PERJURY

Madigan misstates his testimony and ignores the compelling evidence that proves he committed perjury.

As an example, Madigan states: "There is no evidence that contradicted Mike's testimony that he did not trade his public office for private gain." R. 419 at 30. Madigan ignores the mountains of evidence, summarized in the Government's Version and in post-trial briefing to the contrary.[6] Madigan also mischaracterizes his testimony. Not only did Madigan deny taking official action for private gain, he also testified that he did not believe any company that acted on his recommendations sought to improperly influence him to take official action. Tr. 8585. The jury necessarily found this testimony to be false, as the jury was instructed that "[i]t is sufficient if the public official knew that the thing of value was offered with the intent to exchange the thing of value for the performance of the official act." R. 313 at 71.

As another example, Madigan claimed he did not know the subcontractors were not working (Tr. 8880-82, 9069, 9369), despite compelling evidence showing he knew they did not work, including Ed Moody's account, Madigan's coconspirators'

---

sentence. *See United States v. Johnson,* 685 F.3d 660, 663 (7th Cir. 2012) (rejecting a rule that a post-70-year-old defendant can be sentenced to no more than six months in prison).

[6] In claiming he testified truthfully, Madigan pushes an artificially narrow and strained interpretation of "private gain," claiming that because ComEd paid third parties and not Madigan, Madigan did not "gain" anything. R. 419 at 30-31. Likewise, Madigan's argument that the jury's verdict on Count 2 did not prove he lied because the jury instructions defined "thing of value" as "private benefit" that could go to a third party and not "private gain" to Madigan strains credulity. R. 419 at 31. The evidence proved Madigan *did* personally benefit from the payments to his political allies and associates: Madigan ensured the sham subcontractors remained political allies and continued to do hours upon hours of unpaid work for his political organization, which helped Madigan maintain his political power.

10

statements about Madigan's knowledge, and Madigan's own words. *See, e.g.,* GX156 (Madigan recognizing that ComEd paid *multiple* people for little work); GX135 (Madigan suggesting using Doherty as a pass-through and having reports prepared for the "file"); GX248 (Madigan instructing McClain to "pull back" on ComEd's payments to Moody, without asking what work Moody was doing); GX267 (McClain and Hooker discussing how Madigan thought the subcontractor arrangement was "great"); GX48 (Hooker, stating that Madigan thought he "might have been crazy" in suggesting the subcontractor arrangement).

For Madigan to be believed, the Court would have to accept that the following people lied on the witness stand and in recorded conversations and emails that took place long before the investigation became public:

- Ed Moody lied when he testified that he told Madigan he had not done any work for ComEd. Tr. 4426.

- Will Cousineau lied when he testified that Madigan instructed him to round up the final votes to pass FEJA. Tr. 1637-39.

- McClain lied when he said that Cousineau helped pass FEJA and that Madigan put the final votes on the bill. GX577, GX70.

- Mika Baugher lied when she testified that the conference room in the Speaker's suite that McClain frequented was not open to the public. Tr. 5743.

- McClain lied when he said Madigan asked whether there were "two Fidels" and complained about Marquez's lack of responsiveness. GX466.

- McClain lied when he told ComEd representatives that Madigan asked him to intervene on Reyes Kurson's contract. *E.g.,* GX533, GX535, GX539

- John Hooker and McClain both lied when they said Madigan thought the subcontractor arrangement was "great." GX267; *see also* GX48.

11

- Jay Doherty lied when he said Hooker talked to Madigan about the subcontractors. GX270.

Madigan lied, not these people. Madigan's efforts to shift the blame for his criminal acts to others provide insight into his character.

In fact, the real Madigan was captured in recordings, when he:

- Adopted McClain's description of the payments to Moody as part of "that ComEd agreement." GX248.[7]

- Described concealing payments by using Doherty as a pass-through, though "not necessarily with ComEd." GX135

- Laughed about people at ComEd doing very little work. GX156.

- Responded "Yeah, okay" and "very good" after Solis told him that the Union West developers understood the "*quid pro quo.*" GX7.

- Responded "Very good," after Solis again emphasized that the Union West developers understood the exchange. GX9.

- Told Solis, "you shouldn't be talking like that," rather than telling him he should not engage in a "*quid pro quo.*" GX11.

- Told Solis, "you should go ahead and process that," referring to Solis taking official action on the Union West zoning matter. GX16.

- Responded "Yeah. Yeah" and "thank you," after Solis assured him, "I can be discreet. Those developers will work with you." GX31; *see also* GX32.

- Responded "just leave it in my hands," in referring to his plan to recommend Solis for a board position, after Solis said, "I'm gonna help you." GX151.

---

[7] In its sentencing submission, the government incorrectly stated that Madigan referred to "that ComEd agreement." R. 418 at 8. Rather, it was McClain who made that statement during a conversation *with Madigan*. GX248. Specifically, McClain stated, "right now we pay him [Ed Moody] and, uh, I thought it was under Shaw Decremer, but now I remember that after Shaw had his problem, we moved it under Bradley. So, do you want us to keep going with Ed Moody under that ComEd agreement or do you want us to pull off a little bit because this Recorder of Deeds thing?" Madigan responded, "Yeah, that might be a good idea to pull back." McClain stated, "Mhmm. Do you want me to call Ed and tell him?" Madigan answered, "Yeah, sure. Sure." GX248.

- Responded "Thank you," and "Do you want to go forward now on one of those state appointments?" after Solis said, "I figure I can still help you a lot." GX236.

In considering Madigan's intent to lie, the Court should consider his testimony as a whole, which was a calculated effort to deceive the jury and deny each potentially damaging piece of evidence against him. Madigan tried to convince the jury that he did not mean the words that he said on tape. For example, he claimed his statement to Solis that "you shouldn't talk like that" was intended to send the message "that there was not going to be any *quid pro quo* involved with me, that my only request was for an introduction and then an opportunity to make a presentation concerning our law firm, and I was not going to connect a request for an introduction with anything else." Tr. 8780. But those were not the words Madigan used. Madigan also testified that he was "concerned" about Solis's later connection of official action and law firm business. Tr. 8783. But he never expressed that concern to Solis. And Madigan testified that when he told Solis to "go ahead and process that," after Solis asked if he had gotten law firm business from the Union West developers, what he actually meant was:

> I didn't feel comfortable getting into an exchange with him. I wanted to continue to show respect for the gentleman, but I didn't want to answer his question because I didn't think it appropriate.
>
> And so what I did was reference the earlier conversation where he had said that he planned to do the zoning change. He put one condition on that. He used the words "just waiting for the West Loop guidelines."
>
> So in terms of what I knew, the condition he was putting on the approval related to the West Loop guidelines and not whether my law firm had been retained.

13

Tr. 8785. Over and over during his testimony, Madigan asked the jury—and now this Court—to disbelieve his own words on tape.

Contrary to his false testimony, Madigan knew how to clearly communicate his wishes. As Michael Sacks wrote, Madigan was "renowned" for "his careful use of words and . . . for his unwavering commitment to keeping his word." R. 419, Ex. A at 38. Another letter writer put it, "He would say what he thought, clearly and concisely." *Id.* Ex. F at 8. Another wrote, "When he told you where he stood on something, he meant it. He did not merely tell you what you wanted to hear." *Id.* Ex. F at 11. Others called him "straightforward" and "direct." *E.g., Id.* Ex. E at 17, 22, 28. 52. Madigan would have this Court believe that his characteristic trait of directness disappeared when he spoke to Daniel Solis. Not so.

In short, Madigan's failure to accept responsibility for his criminal conduct—and to instead lie and blame others—mandates that leniency is inappropriate.

## V. SENTENCING DISPARITIES

The sentences that Madigan cites as examples (R. 419 at 27) confirm that a sentence of probation would result in an unwarranted sentencing disparity. In each case cited by Madigan, the defendant received a *custodial* sentence, albeit a sentence below the Guidelines range. (The government's recommendation for Madigan of 12.5 years' imprisonment likewise is below the Guidelines range.)

Furthermore, there are aggravating circumstances in this case that distinguish it from those cited. Only Madigan, among the examples cited, perjured himself at trial. *See United States v. Dunnigan*, 507 U.S. 87, 97-98 (1993) ("The perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal

14

liability suggests that the need for incapacitation and retribution is heightened as compared with the defendant charged with the same crime who allows judicial proceedings to progress without resorting to perjury.").[8] Madigan's significant positions of state-wide power, both in government (as the longest serving Speaker in Illinois history) and in politics (as chairman of the Democratic Party of Illinois, and 13th Ward Committeeman and leader of the 13th Ward Democratic Organization), in combination with Madigan's near-decade-long criminal conduct,[9] made his abuse of public office uniquely significant and harmful.

---

[8] In *Jackson*, *Grimm*, and *Collins*, the defendants pleaded guilty. Madigan was entitled to put the government to its proof at trial, and the government does not seek that he be punished more severely for having done so. But Madigan's absence of acceptance of responsibility and false testimony weigh strongly against the extraordinary lenience he seeks.

[9] Burke, for example, was convicted of an approximately two-year-long racketeering conspiracy, spanning from 2016 to 2018, and did not lie on the witness stand. In contrast, Madigan engaged in a bribery conspiracy from 2011 to 2019, and committed perjury.

## VI. CONCLUSION

Madigan's request for extraordinary leniency from the Court finds no support in the Guidelines or § 3553(a) factors. For the reasons set forth in its sentencing memorandum and herein, the government respectfully recommends a sentence of 12.5 years' imprisonment and a $1,500,000 fine, which is just and warranted.

Respectfully submitted.
ANDREW S. BOUTROS
United States Attorney

By: /s/ Sarah Streicker
SARAH STREICKER
DIANE MacARTHUR
JULIA K. SCHWARTZ
Assistant United States Attorneys
219 S. Dearborn St., 5th Floor
Chicago, IL 60604
