**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED STATES OF AMERICA,

v.

MICHAEL MADIGAN and
MICHAEL McCLAIN

Case No. 22 CR 115

Judge John Robert Blakey

**MEMORANDUM OPINION AND ORDER**

## I. Introduction

On February 12, 2025, a jury convicted Defendant Madigan of multiple violations of federal law, including federal program bribery, wire fraud, and Travel Act violations. [331]. Madigan filed a post-trial motion seeking judgment of acquittal or new trial, arguing that this Court erred in multiple respects, including certain evidentiary rulings and its crafting of the jury instructions. [396], [401]. Madigan further argued that the evidence presented at trial was insufficient to support his convictions. *Id.* On June 9, 2025, this Court denied Madigan's motion ([435]) and later issued its findings by way of a separate written order, [450].

On June 13, 2025, this Court sentenced Madigan to 7 1/2 years imprisonment (90 months), followed by a three-year term of supervised release. [445]. Madigan now moves for continued release pending appeal. [451]. For the reasons the Court explains below, the Court denies Madigan's motion.

## II. Legal Standard

Under 18 U.S.C. § 3143(b), a convicted defendant must be detained pending appeal, *unless*: (1) the defendant is not likely to flee or pose a danger to the safety of any person or the community if released; (2) the appeal is not for the purpose of delay; and (3) the appeal raises a substantial question of law or fact *and*, "assuming that the question is decided in the defendant's favor, the appellate court is more likely than not to reverse the conviction or order a new trial on all counts for which imprisonment has been imposed." *United States v. Bilanzich*, 771 F.2d 292, 298 (7th

1

Cir. 1985); *see also* 18 U.S.C. § 3143(b)(1).[1]  The defendant bears the burden to show that he does not pose a flight risk "by clear and convincing evidence" and further bears the burden to show that his appeal meets all of the other requirements of the statute.  18 U.S.C. § 3143(b)(1); *see also United States v. Henningsen*, 402 F.3d 748, 751–752 (7th Cir. 2005); *Bilanzich*, 771 F.2d at 298.

Evaluating whether an issue is "substantial" for purposes of the statute requires the district court to "essentially evaluate the difficulty of the question" the court "previously decided."  *United States v. Shoffner*, 791 F.2d 586, 589 (7th Cir. 1986).  In other words, "a 'substantial' appeal" is "one that presents a 'close' question or one that very well could be decided the other way."  *Id.* (quotation omitted); *see also United States v. Greenberg*, 772 F.2d 340, 341 (7th Cir. 1985) ("So in its particular statutory context 'substantial' must . . . mean close; it must mean that the appeal could readily go either way, that it is a toss-up or nearly so.").  Although "the phrase 'substantial question' is not capable of precise definition" and its application "must be left to a case-by-case determination," this formulation of the standard "accords fully with Congressional intent that the conviction be presumed correct."  *Bilanzich*, 771 F.2d at 299 (citing *United States v. Powell*, 761 F.2d 1227 (8th Cir. 1985) (en banc); *United States v. Giancola*, 754 F.2d 898 (11th Cir. 1985) (per curiam)).

Applying § 3143(b)'s two-step analysis "does not require the district court to predict the outcome of the appeal."  *United States v. Hattermann*, 853 F.2d 555, 557 n.6 (7th Cir. 1988); *see also Greenberg*, 772 F.2d at 341 (noting the trial judge "does not have to find that he is more likely to be reversed than affirmed"); *Bilanzich*, 771 F.2d at 299 (Requiring district judges to determine "the likelihood of their own error is repugnant, for in such a case the proper remedy would be to rectify the error on post-trial motions."); *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985) ("Judges do not knowingly leave substantial errors uncorrected, or deliberately misconstrue applicable precedent. Thus, it would have been capricious of Congress to have conditioned bail only on the willingness of a trial judge to certify his or her own error.").  Rather, the phrases "substantial question" and "likely to result in reversal or an order for new trial" simply define "*type of question* that must be presented."  *Bilanzich*, 771 F.2d at 299 (quotation omitted) (emphases in original).

---

[1] The Seventh Circuit in *Bilanzich* elaborated that "the substantial question must be one that would result in reversal or a new trial on *all counts* for which the defendant has been sentenced to prison" because "[o]therwise, 'the reason for allowing bail on appeal, that a defendant should not be imprisoned under a legally erroneous sentence, disappears.'"  *Bilanzich,* 771 F.2d at 298 n.6 (emphasis added) (quoting *United States v. Powell*, 761 F.2d 1227, 1233 (8th Cir. 1985) (*en banc*)).  *See also United States v. Cui*, No. 19-cr-322, [545] (N.D. Ill. Dec. 30, 2024), *aff'd* No. 24-2495, [17] (7th Cir. Jan. 27, 2025).

### III. Analysis

Madigan identifies several issues in his motion, each of which, according to him, presents a substantial question likely to result in reversal or an order for a new trial.[2] These issues largely fall into three categories: (1) claimed instructional errors; (2) insufficiency of the evidence claims as to all counts of conviction; and (3) a singular claim of error with respect to one of this Court's evidentiary rulings. *See* [451].[3] The Court addresses and rejects each of the arguments in turn, corresponding to these three categories.[4]

Before providing that full analysis, however, the Court first reiterates that to prevail on this motion, Madigan must raise a "substantial" question "that would result in reversal or a new trial on *all* counts for which the defendant has been sentenced to prison." *Bilanzich*, 771 F.2d at 298 n.6 (emphasis added); *see also id*.

---

[2] Madigan's motion also asserts that he poses no flight risk or danger to others if released. [451] at 8–9. The Government does not contest this point (*see* [460] at 6 n.3), and the Court finds that Madigan meets his burden with respect to these requirements of 18 U.S.C. § 3143(b)(1)(A). The Court also finds that Madigan's contemplated appeal is not for the sole purpose of delay. Nevertheless, because Madigan fails to make the required showing under 18 U.S.C. § 3143(b)(1)(B), for the reason the Court explains below, his motion must fail.

[3] Madigan also purports to incorporate "each argument raised in his post-trial motions" into the present motion for release pending appeal. [451] at 9. But those arguments pertained to entirely different motions which required this Court to apply different standards in resolving each claim. Simply citing those disparate motions in a singular sentence does not sufficiently develop an argument for purposes of the present motion and thus Madigan waives those arguments. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.,* 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.") (citing *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006)). Furthermore, even if these arguments were not waived, in its Order resolving Madigan's post-trial motions, the Court found that Madigan failed to show any errors occurred at trial, and even if there were errors, all remained harmless. *United States v. Madigan*, Case No. 22 CR 115, 2025 WL 1836050 (N.D. Ill. Jul. 3, 2025). Because "harmless errors" and "errors that have no prejudicial effect" do not constitute "substantial questions" that are "likely to result in reversal or an order for a new trial," Madigan's incorporated arguments also fail to meet § 3143's requirements. *Bilanzich*, 771 F.2d at 299 (citing *Miller*, 753 F.2d at 23). District courts are "required to provide a list of reasons either in a written order or in a hearing transcript supporting" its "ruling on a motion for release pending appeal," and therefore, to the degree it is necessary, the Court incorporates its post-trial order with respect to those prior arguments (now waived by Defendant for the purposes of the instant request for bond pending appeal). *United States v. Eaken,* 995 F.2d 740, 741 n.1 (7th Cir. 1993) (citing Fed. R. App. P. 9(b)). In this Order, therefore, the Court provides only its reasons for denying the present motion based on the developed arguments advanced by Madigan in his current motion [451]. Both Orders, taken together, constitute a full "list" of this Court's reasons in denying the Madigan's motion. *Id.*

[4] The Court set forth an extensive factual background in its Memorandum Opinion and Order resolving Madigan's post-trial motions. *See Madigan*, 2025 WL 1836050. The Court assumes the reader's familiarity with the factual background as set forth in that Order and recounts here only those facts necessary to discuss Madigan's current motion.

("Otherwise, 'the reason for allowing bail on appeal, that a defendant should not be imprisoned under a legally erroneous sentence, disappears.'") (quoting *Powell*, 761 F.2d at 1233). This Defendant fails to do, and this flaw is fatal to his motion.

Indeed, the fate of Madigan's entire motion rides on routine, and meritless, sufficiency of the evidence objections to his wire fraud convictions (Counts Eight, Nine, and Ten).[5] As such, he clings to false hope. As noted by the Seventh Circuit, "successful challenges" of this variety "are relatively rare," given a defendant's burden constitutes "a nearly insurmountable hurdle." *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). Frankly, Madigan does not come close to meeting this high burden, and thus, even if he were able to prevail on all issues directed at his other counts of conviction, he would still have to serve the 90-month concurrent sentences he received on each of those three counts.[6]

In other words, since Madigan fails to present any plausible arguments (much less substantial questions) regarding his wire fraud convictions in Counts Eight, Nine, and Ten, he cannot show that any appeal is likely to result in a reversal or grant of a new trial on those counts, and thus he must still serve his prison sentence because the total sentence imposed in this case would remain the same. This is true for two main reasons: (1) this Court, as detailed at sentencing, would have imposed the same significant downward variance in this case, even if the Guideline calculations had been different (including if the Court had used an alternate calculation based solely upon the wire fraud convictions); and (2) the total prison sentence the Court imposed would be the same, even if only the wire fraud convictions remained, based on the Court's evaluation of the whole record, including the appropriate § 3553 factors.

At sentencing, after calculating the Sentencing Guidelines and remaining "cognizant of them throughout the sentencing proceedings," a district court "has the discretion to explain how much weight (if any) the contested guideline issue had for purposes of the final sentence." *United States v. Asbury*, 27 F.4th Cir. 576, 581 (7th Cir. 2022) (quotation omitted). When the "sentencing judge gives a detailed explanation of the basis for a parallel result—a sentence different from the guideline

---

[5] These convictions were part of what comprised the "state board" conduct, as referred to at trial and in this Court's prior Order. Again, the Court assumes the reader's familiarity with the details of the extensive trial record in this case and incorporates its factual discussion from the prior Order. *See Madigan*, 2025 WL 1836050.

[6] Knowing this hurdle, Madigan also invokes an inapplicable (and erroneous) objection to the Court's answer to a juror question, attempting (unsuccessfully) to apply it to his wire fraud convictions. This objection, however, does not affect those convictions, as explained in detail below, and leaves Madigan with only his sufficiency claims to attack these counts. *See infra* Part III.a.iii.

recommendation—that explanation may render an error in the guideline calculation harmless." *Id.* (quotations omitted). Such an explanation must be "detailed," explain the "parallel result," and illustrate how the error would not affect the outcome of sentencing. *Id.* The Court did so here.

Significantly, even if only the wire fraud convictions remained, the Guidelines would still recommend an imprisonment range significantly higher than the sentence Madigan actually received. Counts Eight, Nine, and Ten would remain grouped under U.S.S.G. § 2C1.1, and none of the parties objected to this grouping. *See* [412] ¶ 48; *see also* [445] Tr. 22:17–23; 68:20–25; 75:14–18. Accordingly, the base offense level would remain 14 and a 4-level enhancement would also remain appropriate under U.S.S.G. § 2C1.1(b)(3). *See* [412] ¶¶ 61, 64; [445] Tr. 75:1–3, 13–18. The evidence and relevant conduct underlying these convictions would still support the Court's previous determination regarding the value of the benefit and obstruction of justice enhancements, resulting in 12-level and 4-level enhancements, respectively. [445] Tr. 73:1–3; 9–11; Tr. 75:10–12. Therefore, the total offense level would remain 32, resulting in a Sentencing Guideline range of 121–151 months.

The sentence imposed by the Court obviously fell significantly well below such a range (or the actual, higher range used at sentencing), and the Court notes explicitly here, as it did at sentencing, that the sentence imposed would have remained the same even if the Guidelines calculations were different. *See* [445] Tr. 49:13–16; *United States v. Anderson*, 517 F.3d 953, 965 (7th Cir. 2008) (Noting a Guidelines calculation "error is harmless if it did not affect the district court's selection of the sentence imposed.") (quotation omitted). Here, "there is no need for speculation" (*id.*); the Court explicitly stated at sentencing, and repeats now, that, in concurrence with recommendations from all parties, "some of the 3553 factors supporting a downward variance arise from the history and characteristics of the defendant and thus stand totally apart from any offense calculation." [445] Tr. 49:13–16; *see also* Tr. 5:12–20 (noting the Guideline calculation requirements but adding "everybody here has recommended a downward variance," which "because the guidelines are advisory but not mandatory," the Court will "calculate them correctly," then consider "the 3553 factors").

The Court accordingly imposed a sentence that constituted an approximate 93% downward variance from the Guideline range in this case. As required, the Court "considered the Guideline sentencing range" (which in this case advised the court "to impose a sentence of 105 years," Tr. 104:1–3), but the Court did not find a high range particularly useful in this case. The Court elaborated that any error with respect to the enhancement calculations would remain "both immaterial and harmless" (Tr. 49:5) because, among other things, all factual objections or issues were fully

5

considered and credited by the Court in analyzing the entire record, including the § 3553 factors, and those issues raised did not otherwise alter the factors resulting in the sentence imposed. *See* Tr. 49:8–16; Tr. 104:4–14; Tr. 106:23–25; Tr. 121:12–15. *See also* Tr. 111:10–11 ("[The Court]: The Guidelines say 105 years. I don't know how or what's the point of 105 years for a defendant, any defendant"). Indeed, the Court spent hours at sentencing extensively explaining its reasoning for the total sentence and the significant downward variance, relying on Madigan's background, characteristics, and other aggravating and mitigating factors in the record, and explicitly stated that these factors supported "a downward variance" and stood "totally apart from any offense calculation." Tr. 49:15–16.

The Court repeats here that these various factors transcend both the Guideline calculations, and the counts of conviction Madigan now disputes in his motion. *Id.* at 106:23–116:5.[7] Again, Madigan received 90-month *concurrent* sentences on each of the three wire fraud counts in this matter. The Court based this sentence specifically on the § 3553 factors discussed above and the Court's familiarity with the entire record. Even if Madigan was only convicted on these three counts, the Court's analysis of the appropriate sentence for those individual convictions would remain unaltered. As a result, per the Court's detailed explanation at sentencing, and its confirmation again here, Madigan's disputes beyond his sufficiency of the evidence claims, even if successful, cannot undermine the prison term he received.

Thus, while the Court finds that Madigan fails to carry his burden with respect to any of the counts of conviction, his motion would still be denied, even if the Court's conclusions were different. Madigan's sufficiency of the evidence objections pertaining to Counts Eight, Nine, and Ten, present no plausible basis to grant his motion, and thus he cannot meet § 3143's requirements of showing a "substantial"

---

[7] The Court reconfirmed this in explicit terms at the sentencing hearing, responding to a final question from the prosector:

| MS. STREICKER: | Yes, Your Honor. Would the Court impose the same sentence if its findings on the enhancements under the guidelines had been different? |
| THE COURT: | Yes. Any other objection or clarification request? From the defense – or from the government? |
| MS. STREICKER: | And, Your Honor, in terms of the reasons why for that, that's for all the reasons Your Honor just explained in terms of your analysis of the 3553(a) factors? |
| THE COURT: | Yes. |

Tr. 121:12–22.

issue that affects *all counts* of conviction. *See Bilanzich*, 771 F.2d at 298; *United States v. Cui,* No. 19 cr 322, [545] at 3 (N.D. Ill. Dec. 30, 2024) (emphasis added).

The Court now turns to the specific arguments Madigan raises in his motion. None have merit.

### a. Purported Instructional Errors

Madigan raises six challenges to the jury instructions provided in this case. For the reasons the Court explains below, none of these challenges meet § 3143's requirements.

### i. Definition of "corruptly"

First, Madigan's invitation to insert a "consciousness of wrongdoing element" into the definition of "corruptly" remains unsupported by case law and the statutory text and legislative history of § 666. [451] at 10.[8] Madigan claims "that 'corruptly' is traditionally defined to include consciousness of wrongdoing," (*id.*) but nothing in the text, context, or history of § 666 suggest any congressional intent to include knowledge of the law or some special knowledge of wrongfulness as an additional element of the statute. *See Madigan*, 2025 WL 1836050 at *27–*38.[9]

---

[8] The instructions provided to the jury defined "corruptly" for purposes of the § 666 charges as follows: "A defendant acts 'corruptly' if he acted with the understanding that a 'thing of value' is to be exchanged for an 'official act' with the intent to influence or reward a State agent in connection with his official duties." [313] at 77 (Counts Four and Six); *see also* [313] at 65–66 (Count Two).

[9] Madigan incorrectly claims that the Seventh Circuit "observed that" § 666 "required proof that 'Snyder was conscious of wrongdoing and had a corrupt state of mind.'" [451] at 10 (quoting *United States v. Snyder*, No. 21-2986, 2024 WL 4834037, at *2 (7th Cir. Nov. 20, 2024). As Justice Jackson commented in her dissent, however, "the precise meaning of the term 'corruptly'" was "not the question before" the Supreme Court in *Snyder*, nor did "it really matter here because, whatever 'corruptly' means, Snyder's behavior clearly fits the bill, making this case a poor one to explore the contours of that term." *Snyder v. United States*, 603 U.S. 1, 36 (2024) (Jackson, J., dissenting). Following this guidance, the Seventh Circuit's resulting opinion left the statutory definition of corruptly undisturbed. *See Madigan*, 2025 WL 1836050 at *29–*32. On remand after the Supreme Court's decision, the Seventh Circuit decided that because "the evidence was sufficient to convict on a bribery theory, the Double Jeopardy Clause does not bar a new trial on the bribery charge." *Snyder*, 2024 WL 4834037 at *2. After noting that its prior conclusion, "that § 666(a)(1)(B) applied to both bribes and gratuities" did not survive appeal, that same opinion then "turned to the sufficiency of the evidence" and found that "'a reasonable jury could conclude that Snyder accepted the check as a bribe or gratuity for steering the contracts'" at issue in the case. *Snyder,* 2024 WL 4834037 at *2 (quoting *United States v. Snyder*, 71 F.4th 555, 581 (7th Cir. 2023)). The court added that, even after *Snyder*, it continued "to think the evidence would support a finding of bribery here, beyond a reasonable doubt" based on "the timing and size of the payment" and other evidence which "all support reasonable inferences that Snyder was conscious of wrongdoing and had a corrupt state of mind, as well as that he had reached an understanding ahead of time leading to such a large payment." *Id.* Read in context, it becomes

7

Contrary to Madigan's motion, this traditional understanding of § 666 is consistent with the meaning of "corruptly" as used by Congress in other statutes. *See, e.g., United States v. Ogle*, 613 F.2d 233, 239 (10th Cir. 1979) (holding that, as used in 18 U.S.C. § 1503, "the view" that "most" "courts have taken is that the term 'corruptly' does not superimpose a special and additional element on the offense" but instead "is directed to the effort to bring about a particular result"); *United States v. Reeves*, 752 F.2d 995, 1000–01 (5th Cir. 1985) (finding that the term "corruptly" as in 26 U.S.C. § 7212 meant "forbidding endeavors intended to give 'some advantage inconsistent with the rights and duties of others' under the tax laws" and rejected a "definition of 'corruptly' as meaning 'with improper motive or bad or evil purpose'" because it "could potentially raise a question about the overbreadth of" the statute "as well as the question of vagueness"). That same traditional meaning is both "longstanding" and "well-accepted" in criminal law and affirms the understanding that certain acts are "obviously wrongful, just as they are necessarily 'corrupt.'" *United States v. Aguilar*, 515 U.S. 593, 616 (1995) (Scalia, J., concurring in part) (citations omitted). Without question, bribes are intrinsically unlawful (*see* 603 U.S. at 5) and there is no need under § 666 for the Government to separately prove that a defendant knew the law prohibits bribes.

In fact, the Supreme Court recognized as much in *Snyder v. United States*, commenting that "American law generally treats bribes as inherently corrupt and unlawful." 603 U.S. at 5. Thus, this Court's conclusion that "the *mens rea* term in § 666 serves to impose a statutory requirement that the government prove the defendant *knew the facts* which made his conduct unlawful, rather than prove the defendant *knew the law* which made his conduct unlawful" remains correct and consistent with the well-established understanding of the meaning of "corruptly" in criminal law. *Madigan*, 2025 WL 1836050 at *30 (emphasis in original).

Moreover, even if the definition of "corruptly" requires knowledge of law or some abstract knowledge of wrongfulness concept (which it does not), Madigan's motion would still fail because any such instructional error was harmless based on the evidence presented at trial. As a licensed attorney and long-time member of the Illinois General Assembly, Madigan knew that he was not permitted to accept bribes, that is, private benefits in exchange for official actions of his public office; thus, he remained fully aware of the "wrongfulness and illegality of his actions" when

---

clear that the Seventh Circuit's remand decision in *Snyder* did not examine, much less change, the statutory definition of "corruptly." Instead, the Seventh Circuit only discussed the sufficiency of the evidence for the purposes of its Double Jeopardy analysis. As a result, the Court's conclusion that *Snyder* did not disturb prior, binding Seventh Circuit precedent interpreting "corruptly" remains both correct and unchanged by the Seventh Circuit's most recent decision in that case. *See Madigan*, 2025 WL 1836050 at *29–*32.

participating in the bribery agreement with ComEd. *Cui*, No. 19-cr-322, [545] at 3. Indeed, he admitted such knowledge himself on the witness stand, and the jury heard no contrary evidence at trial on that point. *See* Tr. 8778:8–8781:3 (Among other examples, Madigan testified on direct examination that he felt "a great deal of surprise and concern" when Solis used the term "quid pro quo" so he deliberately arranged "a face-to-face meeting with Mr. Solis" to give him "an opportunity to tell" Solis he "would not be involved in a quid pro quo;" Madigan further claimed that he confronted Solis at that meeting to communicate "that there was not going to be any quid pro quo involved with me," and he "was not going to connect a request for an introduction" for his law firm "with anything else"); Tr. 9279:15–9282:16 (Madigan testimony on cross examination that he understood it is unlawful for a public official to "accept," "solicit," "agree to give, or agree to receive a personal benefit for the purposes of influencing official action").

Based upon both the law and the facts, Madigan's "corruptly" argument fails to present a "substantial" question meriting reversal. This Court repeatedly rejected Madigan's atextual arguments when drafting the jury instructions and when resolving his post-trial motions, and it did so based on text, statutory context, binding and persuasive precedent, and legislative history spanning decades. This determination, even though it involved a thorough analysis, did not present a "close" question, because the law remains clear and Madigan only cited cases of marginal relevance to the question at hand. Quite simply, the Court arrived at its decision after a review of the relevant history and precedent, which all pointed to the same conclusion. This issue was significant to the case, but it was not a "substantial question" for purposes of § 3143 because it was by no means "a toss-up or nearly so;" rather, without doubt, the meaning of "corruptly" remains unmodified from its historical use. *Greenberg*, 772 F.2d at 341.[10]

---

[10] Despite the overwhelming weight of this authority, Madigan continues to misplace reliance on *Arthur Andersen* in his effort to rewrite the definition of "corruptly." But *Arthur Andersen* interpreted "what it means to 'knowingly . . . corruptly persuade' another person 'with intent to . . . cause' that person to 'withhold' documents from, or 'alter' documents for use in, an 'official proceeding'" as used in 18 U.S.C § 1512. 544 U.S. 696, 703 (2005) (emphasis added). The Court explicitly noted that "Section 1512(b) punishes not just 'corruptly persuading' another, but '*knowingly* . . . corruptly persuading' another." *Id.* at 704–05 (emphasis added) (cleaned up). The Court found that the two terms, when read together, indicated that "only persons conscious of wrongdoing can be said to 'knowingly . . . corruptly persuade,'" an interpretation that "sensibly allows § 1512(b) to reach only those with" a sufficient "level of 'culpability.'" *Id.* at 706 (quotation omitted).

Unlike § 1512, the term "corruptly" does not have a second modifying *mens rea* term within § 666. Thus, the "direct holding of *Andersen,* although fully consistent" with this Court's "decision," is "of marginal relevance" in interpreting § 666 because the statute at issue in *Andersen* used two mental state terms in tandem, "and analogies [*sic*] to statutes using the former but not the latter word are 'inexact'"; [§ 666] does "not use the word 'knowingly' and the requisite state of mind is set out in the 'intending to be influenced or rewarded' phrase, which appears not to be modified by 'corruptly.'" *United States v. Ford*, 435 F.3d 204, 212 n.3 (2d Cir. 2006). Therefore, in the absence of a second

Next, Madigan inaccurately claims that the jury instructions erroneously described the bribe-recipient's intent. Specifically, he contends that instructions defining "corruptly" also contained an error incorrectly describing the intent of the *offeror* of the bribe (rather than the recipient), and as a result, it deflected "away from the bribe recipient's corrupt intent to be influenced." [451] at 10.

Not so. Madigan's argument misstates the record in two respects. First, Madigan claims that the instructions deflected "away from" a bribe recipient's intent (which is incorrect for reasons the Court explains next). Second, Madigan only cites to a limited portion of the instructions for the § 666 instructions—the Court's definition of "corruptly"—and ignores the rest of instructions the jury actually received. A simple review of the record reveals no error occurred.

In this case, the Superseding Indictment charged a conspiracy to violate both 18 U.S.C. § 666(a)(1)(B) (soliciting a bribe) *and* 18 U.S.C. § 666(a)(2) (giving or offering a bribe), among other objects, and substantive violations of 18 U.S.C. § 666(a)(1)(B). Given the charges, the jury required an explanation of the mental states of both subsections, and the instructions did just that. Each Count had specific instructions detailing the elements of the offense, consistent with the Seventh Circuit Pattern Instructions, including the § 666 charges. *See* [313] at 65–66 (Count Two), 77 (Counts Four and Six). The instructions themselves, therefore, did not improperly draw from § 666(a)(2) to create confusion as to the correct intent element, because each instruction correctly recounted the elements of every charge separately and clearly. Reading the instructions as a whole and following all of them (which the jury clearly did in this case), the record undermines Madigan's deflection theory.

Secondly, the instructions' definition of "corruptly" did not obfuscate a defendant's required intent, as Madigan falsely suggests. In *Snyder*, the Supreme Court found that 18 U.S.C. § 666 only criminalizes bribes and not gratuities, relying in part on the fact that the statute uses the *mens rea* term "corruptly." *See* 603 U.S. at 12 ("Section 666 shares the defining characteristics of § 201(b)'s bribery provision: the corrupt state of mind and the intent to be influenced in the official act. The statutory text therefore strongly suggests that § 666—like § 201(b)—is a bribery statute, not a gratuities statute."). Both § 666 (a)(1)(B) and § 666 (a)(2) use "corruptly" without any additional modifying terms, and therefore the Court provided an accurate definition of the term, which applied equally to both subsections.

---

modifier, no textual basis exists to conclude that Congress meant to modify the historical meaning of the *mens rea* term "corruptly" in § 666.

The Court's definition of "corruptly," and § 666 instructions in their entirety, also fully conformed to *Snyder*'s teaching that the statute *only* criminalizes bribes, not gratuities. Specifically, the instructions informed the jury that the requisite "exchange involves the unlawful influence of a bribe to be paid before the performance of an official action or actions, or an unlawful reward of a bribe to be paid after the performance of an official action or actions." [313] at 67; *see also id.* at 77 (Counts Four and Six). Further, the instructions also explicitly provided that "if the bribe is to be paid after an official action occurs, then the government must prove that the bribery agreement existed before the official action was to take place." *Id.* Comporting with the Supreme Court's directives, this language eliminated any risk that the jury might convict Defendant on an impermissible gratuity theory.

*Snyder* did not, however, alter binding Seventh Circuit precedent defining "corruptly" itself as applied to § 666. *See Madigan*, 2025 WL 1836050 at *29. The Court accordingly drew from, and complied with, that binding precedent in drafting the definition of "corruptly" in the jury instructions for this case. *See id.* at *29–*30.

In his motion, however, Madigan incorrectly claims that the Court drew from § 666(a)(2) in drafting the definition of "corruptly" in the instructions. Again, not so. The instructions' definition provided the correct legal principle that "a defendant acts 'corruptly' if he acted with the understanding that a 'thing of value' is to be exchanged for an 'official act' with the intent to influence or reward a State agent in connection with his official duties." [313] at 67 (Count Two); *see also* [313] at 77 (Counts Four and Six). A defendant must maintain a corrupt state of mind, or in other words, a *factual* understanding of the nature of the intended exchange, regardless of whether he is the solicitor (§ 666(a)(1)(B)) or offeror (§ 666(a)(2)) of the bribe. *See Madigan*, 2025 WL 1836050 at *30; *United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015) (upholding the lower court's instruction "that a covered agent acts 'corruptly' if he takes money 'with the understanding that something of value is to be offered or given to reward or influence him in connection with his official duties,'" adding that "in other words, the 'corruption' entails the payee's knowledge that the payor expects to achieve a forbidden influence or deliver a forbidden reward"). Madigan cites no authority showing that "corruptly" carries any different meaning between these subsections, and, for the reasons explained in depth in the Court's prior Order, the Court provided a correct definition of the term in the instructions, in compliance with binding Seventh Circuit precedent. *See Madigan*, 2025 WL 1835060 at *27–*38.

Turning to Instruction 56 specifically, this instruction applied to the Count Two conspiracy, which again charged both § 666(a)(1)(B) and § 666(a)(2) as objects. The instruction therefore provided an explicit articulation of the different intents required by each subsection:

In other words, the government must prove that:

11

> (1)    When the defendant conspired to solicit, demand, accept, or agree to accept, a "thing of value" with the intent to be influenced or rewarded in connection with his official duties; or

> (2)    When the defendant conspired to give, offer, or agree to give, a "thing of value" with the intent to influence or reward an agent of a State government or agency thereof in connection with some business, transaction, or series of transactions of the State government;

> the defendant understood the conspiracy involved a "this for that" exchange of a "thing of value" for an "official action" (as defined in this instruction and Court's Instruction 47, respectively).

[313] at 67.

Therefore, even though "corruptly" carries the same meaning between both subsections of the statute, the instructions still present no possibility of juror confusion, because the instructions explicitly clarified that "corruptly" applied to the distinct, separate elements of the § 666(a)(1)(B) and § 666(a)(2) objects of the conspiracy charged in Count Two.

Ignoring binding Seventh Circuit precedent, Madigan also argues that this Court should have followed the reasoning of the Second Circuit in *United States v. Ford*. In that case, the court held "a jury should be clearly instructed that it is the recipient's intent to make good on the bargain, not simply her awareness of the donor's intent that is essential to establishing guilt under Section 666" and commented that the Seventh Circuit's Pattern Instruction for § 666 fails to accurately communicate that intent requirement. 435 F.3d 204, 212–213 (2d Cir. 2006). This is not only a misreading of the statute and Supreme Court precedent, but it also remains inconsistent with binding (and correctly decided) Seventh Circuit precedent, affirmed after *Ford*.

As this Court recounted in its prior Order, in *United States v. Hawkins*, the Seventh Circuit declined to overturn prior case law holding that the term "corruptly" "entails the payee's knowledge that the payor expects to achieve a forbidden influence or deliver a forbidden reward." 777 F.3d at 882 (citing SEVENTH CIRCUIT PATTERN CRIMINAL JURY INSTRUCTIONS (2012 ed.); *United States v. Bonito*, 57 F.3d 167, 171 (2d Cir. 1995); *United States v. Peleti*, 576 F.3d 377, 382 (7th Cir. 2009)). Under the correct definition, "an officer can act corruptly without intending to be influenced; the officer need only solicit or receive the money on the representation that the money is for the purpose of influencing his performance of some official act." *Peleti*, 576 F.3d at 382 (quotation omitted). The crux of the inquiry becomes, then, whether the public

official's "acceptance of the money" conveys "to the briber an intent to be influenced," and thus an official still "commits bribery if he gives false promises of assistance to people he believed were offering him money to influence his official actions." *Id.* at 382–83 (quotation omitted). This long-standing and common sense understanding of bribery is consistent with the overwhelming weight of authority.[11]

Even a cursory reading of *Ford* reveals that the Second Circuit's decision was limited by its unique concern (not present here) for avoiding the criminalizing of innocent acts. Again, as stated in the prior Order, the "underlying conviction" in *Ford* related to "accepting volunteer services and related goods in an election campaign." *Ford*, 435 F.3d at 212; *see also Madigan*, 2025 WL 1836050 at *36 n.47. Significantly, the Second Circuit emphasized that this conduct was "*by itself*, not only innocuous but also rather commonplace" and although a "volunteer or donor may have arranged a quid-pro-quo, or be seeking special consideration as to future work if the campaign is successful," they may also "be acting on ideological grounds or may desire only to display his or her talents in the hope of getting work later on the merits." *Id.* (emphasis in original).

In both *Peleti* (decided three years after *Ford*) and *Hawkins* (decided nine years after *Ford*), however, the Seventh Circuit has declined to extend or otherwise adopt the unique concerns expressed in *Ford* regarding whether a bribe recipient must *actually* intend to be influenced, rather than merely understand that the payor intended to influence him in the conduct of an official act. *See Hawkins*, 777 F.3d at 882; *Peleti*, 576 F.3d at 382. In both *Hawkins* and *Peleti*, the Seventh Circuit addressed and rejected the very same issue: whether a defendant public official must actually intend to perform an official act when accepting the bribe. Thus, in light of conclusive and more recent Seventh Circuit precedent addressing, and foreclosing, Madigan's claim, the Court cannot reasonably consider this issue a "toss-up or nearly so" for purposes of this motion. *Greenberg*, 772 F.2d at 341.[12]

---

[11] Madigan's reading, in contrast, would lead to the absurd result wherein corrupt officials could legally take bribes intended to influence their official actions, provided the official lied about his intent to "follow through" on his unlawful commitment. As the Court elaborated in the prior Order, "a court must avoid absurd results in construing statutory language," and here, Madigan's asserted interpretation creates a "bizarre scenario" that "certainly does not reflect Congress' intent in § 666; nor is it consistent with binding precedent" from "the Seventh Circuit." *Madigan*, 2025 WL 1836050 at *31 n.43; *see also Peleti*, 576 F.3d at 382 (the term "'being influenced' does not describe the recipient's true intent") (quotation omitted) (cleaned up); *United States v. Gordon*, 64 F.3d 281, 283–84 (7th Cir. 1995) ("Interpretations of a statute which would produce absurd results are to be avoided . . . .") (quotation omitted) (cleaned up).

[12] Madigan also claims that the Court cannot rely on *Hawkins*' reasoning because it "relied on the invalid gratuity theory" no longer viable after *Snyder*. Not so. The question above about the requisite corrupt mental state applies equally to both bribery and gratuity offenses generally and, more importantly, as the Court's prior Order explained, *Snyder* did not disrupt Seventh Circuit precedent

In sum, Madigan fails to present any "substantial question" regarding the instructions' articulation of the intent element of § 666. The instructions, in accordance with the statutory text, binding precedent from the Supreme Court and the Seventh Circuit, as well as the Seventh Circuit Pattern Instructions, provided the correct elements for both § 666(a)(1)(B) and § 666(a)(2) as applicable, and provided the definition of "corruptly" as applied to both subsections.[13] It is not a "close" question whether the jury received the correct intent elements for both a bribe-giver and a bribe-receiver (both required in light of the charges) under established Seventh Circuit precedent. *Shoffner*, 791 F.2d at 589. The record conclusively shows the jury received the correct instructions.

Finally, Madigan claims error with respect to the instructions' use of the term "official duties" in defining the elements of § 666. Again, Madigan claims the Court "modified the statutory language" in the § 666 instructions, but he only cites to language from the instructions' definition of "corruptly," ignoring the entirety of the § 666 elements instruction. The Court reiterates that the instructions provided complete, detailed, and correct, statements of the elements of the § 666 charges, drawn directly from the Seventh Circuit's Pattern Instructions. *See* [313] at 65–66 (Count Two); [313] at 77 (Counts Four and Six); *see also United States v. Christophel*, 92 F.4th 723, 727 (7th Cir. 2024) (explaining that "jury instructions must be considered as a whole" and finding the challenged instruction, "when considered in its entirety, did not misstate the law").

Contrary to Madigan's false assertion, the Court did not insert or eliminate any statutory language in the elements or definitions portions of the § 666

---

interpreting the definition of "corruptly" nor any of the intent elements of § 666. Instead, it simply clarified "that § 666—like § 201(b)—is a bribery statute, not a gratuities statute." 603 U.S. at 11–12. Thus, "the Seventh Circuit's interpretation of the term remains binding on this Court. *Madigan*, 2025 WL 1836050 at *29.

[13] The Committee Comment to the Seventh Circuit Pattern Instruction for § 666(a)(2) notes that the definition of corruptly in the instruction derives from cases where "the defendant was a bribe *recipient* (not the bribe payer)," and "the definition does not appear to add any requirement beyond the intent requirement in the second element of the Pattern Instruction." Committee Comment, SEVENTH CIRCUIT PATTERN JURY INSTRUCTIONS at 305 (2023 ed.). Given the absence of any textual differences between these subsections of § 666, and the fact that no Seventh Circuit decision suggests one exists beyond the intent element already identified, this Court also finds that the definition applies equally to both § 666(a)(1)(B) and § 666(a)(2), so long as the distinct "intent to influence" elements in the statute are clarified, as reflected in the jury instructions in this case. *See* [313] at 67. Notably, Madigan fails to identify any authority controverting the Pattern Instruction and thus offers no basis for the Court to hold otherwise. *See United States v. Marr*, 760 F.3d 733, 744 (7th Cir. 2014) ("We presume that the Pattern Criminal Jury Instructions for the Seventh Circuit correctly state the law.") (citing *United States v. Leahy*, 464 F.3d 773, 796 (7th Cir. 2006)).

instructions. All statutory language remained the same and in compliance with the Seventh Circuit's Pattern Jury Instructions. *See* [313]. The Court did, however, provide additional clarification to the Pattern Instructions' definition of "corruptly" in accordance with the Supreme Court's decision in *Snyder* (issued after the latest edition of the Pattern Instructions).

In his motion, Madigan characterizes this necessary clarification as the Court's "sua sponte" additions. That characterization is false; *Snyder*'s effect on the charges in this case, and especially in the definition of "corruptly" remained a central issue throughout the course of the litigation and animated many of the arguments made throughout the jury instruction conference phase of trial. To put it bluntly, there was nothing "sua sponte" about that procedure—the Court extensively invited the parties' participation in the drafting of the instructions and held multiple conferences to obtain the maximum benefit of the adversarial process.[14] This process successfully prevented any "gratuity" issues in the case, and it thoroughly contradicts Madigan's suggestion that the Court "surprised" the parties or somehow modified the statutory language (a claim that, again, is separately untrue).[15]

Turning to the instruction itself, the Pattern Instructions define "corruptly" as follows: a defendant acts "with the understanding that something of value is to be offered or given to reward or influence [him/her] in connection with [his/her] [organizational; official] duties." Seventh Circuit Pattern Criminal Jury Instructions at 300 (2023 ed.). The Pattern Instruction does not provide any separate definition or explanation of the term "official duties" as used in the definition, nor does the Committee Comment. *See id.* at 300–01. Indeed, no Seventh Circuit case (and Madigan cites none) provides, much less requires, further elaboration of the term "official duties" in this context. *See e.g.*, *Hawkins*, 777 F.3d at 882 (approving "corruptly" definition utilizing the term "official duties" without further elaboration); Committee Comment, Seventh Circuit Pattern Criminal Jury Instructions at 301 (2023 ed.) (citing *United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015) and *United States v. Mullins*, 800 F.3d 866, 870 (7th Cir. 2015)

---

[14] As the Court lays out in detail below (*see infra* Part III.a.v), Madigan (and all parties) enjoyed the benefits of multiple, extensive jury instruction conference proceedings at trial. The Court held the first instruction conference on January 2, 2025 and a supplemental conference on January 22, 2025, both of which lasted multiple hours. In the intervening period, Madigan made multiple written submissions to the Court articulating objections to the draft jury instructions and proposing revised defense theory instructions. *See* [317]. The record speaks for itself—the jury instruction drafting phase of trial was fulsome, thorough, and well-reasoned, with the Court accepting maximum aid from all parties.

[15] As explained in more detail below, Madigan's claim that the language was added "sua sponte" borders on ridiculous when considering that the phrase appears in the Pattern Instruction defining "corruptly" as used in § 666.

for the definition of "corruptly," and providing no further elaboration on the definition of "official duties"). Thus, in drafting the definition of "corruptly" for the jury instructions in this case, the Court properly mirrored the Seventh Circuit's Pattern Instructions' usage of the term.

This Court also remained cognizant of *Snyder v. United States*. While *Snyder* did not in any way override or modify the Seventh Circuit's precedent interpreting "corruptly" (*see Madigan*, 2025 WL 1836050 at *29–*32), the "opinion is best understood as having found the jury instructions were erroneous because they permitted the jury to convict on a gratuity theory." *United States v. Snyder*, No. 21-2986, 2024 WL 4834037, at *2 (7th Cir. Nov. 20, 2024); *United States v. Hamilton*, 46 F.4th 389, 398 (5th Cir. 2022) (Even though "a statute-tracking instruction is often enough, the instruction must also clearly instruct jurors as to the principles of law applicable to the factual issues confronting them.") (quotation omitted) (cleaned up).

Therefore, to conform with *Snyder*'s teaching, the Court defined "corruptly" in a manner following still-binding Seventh Circuit precedent but also completely foreclosing the possibility of the jury convicting on a now-impermissible gratuity theory:

> For the purposes of this offense, the government must prove the defendant you are considering acted "corruptly" at the time he committed the offense of "corruptly soliciting a bribe." A defendant acts "corruptly" if he acted with the understanding that a "thing of value" is to be exchanged for an "official act" with the intent to influence or reward a State agent in connection with his official duties. The government need not prove, however, that the defendant knew that the law prohibited his conduct.

> In other words, the government must prove that when a defendant solicited, demanded, accepted, or agreed to accept, a "thing of value" with the intent to be influenced or rewarded in connection with his official duties, the defendant did so knowing it was a "this for that" exchange of a "thing of value" for an "official action" (as defined in this instruction and Court's Instruction 47, respectively).[16]

---

[16] Likewise, Court's Instruction 47 defined an "Official Action" as follows:

> An "official action" is a specific decision or action on, or an agreement to make a decision or take action on, a specific question or matter, which is pending or at any time may be pending, or may by law be brought before a public official, in his official capacity. Under the law, the term "official action" does not require that the official possess the power or ability to act unilaterally on the specific question or matter.

16

[313] at 77; *see also* [313] at 66.

Here, the instructions utilized the term "official duties" in the same context as the Seventh Circuit's Pattern Instruction, and followed the Committee's guidance that the term does not require further elaboration (confirmed by Seventh Circuit cases holding the same by implication, as discussed above).[17]  Accordingly, there remains no plausible claim of error where the Court complied with the Pattern Instructions' use of a common-sense term, and no Seventh Circuit case casts doubt on that position.  *See Marr*, 760 F.3d at 744 ("We presume that the Pattern Criminal Jury Instructions for the Seventh Circuit correctly state the law.") (citing *Leahy*, 464 F.3d at 796); *see also United States v. Farias*, No. 24-2725, 2025 WL 2249741, at *5 (7th Cir. Aug. 7, 2025) (citing *Marr*).[18]

Again, the Court simply added language to the Pattern Instructions' definition of "corruptly" to ensure the jury did not convict any defendant on an impermissible gratuity theory, in compliance with *Snyder*'s teachings.  To prevent this possibility, the Court clarified that "the government must prove that when a defendant solicited, demanded, accepted, or agreed to accept, a 'thing of value' with the intent to be influenced or rewarded in connection with his official duties, the defendant did so knowing it was a 'this for that' exchange of a 'thing of value' for an 'official action,'"

---

A "question" or "matter" must involve a formal exercise of governmental power and must be something specific and focused, rather than a broad policy objective.

A public official makes a specific decision or takes action on a question or matter when he uses his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that the advice will form the basis for an official act by another official.

A public official does not make a specific decision or take action on a question or matter if he does no more than set up a meeting, host an event, or call another public official.

[313] at 55.

[17] Madigan's argument that the term "official duties" does not appear in the statute is unavailing.  As explained above, the term appears in the Pattern Instruction (which, again, Madigan provides no authority to contradict).  Further, the terms "quid pro quo," "exchange," or "official act" also do not appear in the statute itself and yet constitute important concepts that were properly explained to the jury under § 666.

[18] Further, any purported jury confusion regarding the term "official duties" (there was none) was entirely dispelled by the detailed definition of "official action" given in the instructions. *See also United States v. Skelos*, 707 Fed. Appx. 733, 736–37 (2d Cir. 2017) (circuits have indicated that "official duties" is interchangeable with the term "official action") (describing *McDonnell* as defining "official duties").

as defined earlier in the instructions. That clarification ensured that the jury: (1) could not convict Madigan under an impermissible gratuity theory; and (2) instructed jurors regarding the "principles of law applicable to the factual issues confronting them," (*Hamilton*, 46 F.4th at 398) namely, that a violation of § 666 requires an exchange of a "thing of value" for an "official action"[19] as the instructions defined those terms.

Contrary to Madigan's argument, the instructions did not "improperly broadened the range of conduct that serves as the alleged quo" in the *quid pro quo* bribery agreement, and instead simply used the term "official duties" consistent with the Seventh Circuit's guidance and the Pattern Instructions (and again, Madigan fails to cite any authority showing its use is erroneous). The Court's instructions, read properly as a whole, correctly required the jury to find Madigan guilty on the § 666 charges *only* if the Government proved beyond a reasonable doubt that he participated in a corrupt, *quid pro quo* exchange involving a qualifying "official action." *See* [313] at 77. Madigan does not argue (nor could he) that the instructions misstated the law in defining an "official action" and, to the extent any conflict might exist between the terms "official action" or "official duties" (the Seventh Circuit has never suggested one), it would be immaterial here, because an unlawful "this-for-that" exchange (i.e., exchanging an official action for money or some other private benefit) constitutes a violation of a public servant's official duties under any reasonable interpretation of the law.

Like before, Madigan's objection fails to raise a "substantial question" on appeal, because he cites no applicable Supreme Court or Seventh Circuit case, or any other case, disapproving or invalidating a district court's use of the phrase "official duties" in defining "corruptly" in a § 666 prosecution, especially when the Court, as here, also provided an instruction properly defining an "official act." Because this is not a "close" question under 18 U.S.C. § 3143(b), the Court denies Madigan's motion with respect to this issue. *Shoffner*, 791 F.2d at 589.

### ii. Stream of benefits

Madigan's next argument wrongly claims that the instructions failed to inform the jury that a particular official question or matter must be identified at the time the official agrees to the corrupt exchange. [451] at 13. Once again, the record undermines Madigan's objection.

---

[19] Notably, at the January 2, 2025 Charge Conference, the Court modified Court's Instruction 47, over the Government's objection, to incorporate Madigan's own request to add language ensuring the definition excluded "broad policy objectives." Tr. 8039:8–21.

First, the Court's instructions complied with Seventh Circuit precedent recognizing and affirming the traditional "stream of benefits" theory in bribery cases. *See United States v. Solomon*, 892 F.3d 273, 277–78 (7th Cir. 2018) (finding that, "to convict someone of honest-services fraud, the government must prove that there is an agreement to pay a bribe or kickback," which can reach "schemes that involve a stream of benefits over time, not just singly negotiated deals" and therefore "the district court did not have to find an explicit agreement to exchange payment for awarding the second contract" because "it was enough to find sufficient evidence of an ongoing agreement" and that the "agreement was still active at the time" of the alleged conduct) (citations omitted); *Ryan v. United States*, 688 F.3d 845, 852 (7th Cir. 2012) (finding "the Government presented a valid 'stream of benefits,' 'retainer,' or 'course of conduct bribery theory when it explained that" the "corruption" in the case "was more like a meal plan in which you don't pay for each item on the menu. Rather, there is a cost that you pay, an ongoing cost, and you get your meals.") (quotation omitted).

Nevertheless, Madigan claims that the instructions permitted to jury to not "find any connection between a benefit and an agreement by Madigan to act on a *specific* question of matter of interest to ComEd." [451] at 13. But the instructions, in fact, provided the jury with explicit directives regarding both the required timing of the stream of benefits agreement, and the specific objects of the ongoing exchange itself. As the Court explained in its prior Order (*see Madigan*, 2025 WL 1836050 at *40–41), Instructions 56, 63, and 64, told the jury that "the government must prove that when a defendant solicited, demanded, accepted, or agreed to accept, a 'thing of value' with the intent to be influenced or rewarded in connection with his official duties, the defendant did so knowing it was a 'this for that' exchange of a 'thing of value' for an 'official action' (as defined in this instruction and Court's Instruction 47, respectively)." [313] at 77. The instructions added that the "exchange involves the unlawful influence of a bribe to be paid before the performance of an official action or actions, or an unlawful reward of a bribe to be paid after the performance of an official action or actions" and "the government must prove that an agreement existed to take an official action in exchange for a thing of value *before* the official action is to take place. Therefore, if the bribe is to be paid *after* an official action occurs, then the government must prove that the bribery agreement existed *before* the official action was to take place." *Id.* at 77–78 (emphases added). While the jury only needed to find evidence of an "ongoing agreement," per controlling Seventh Circuit precedent (*Solomon*, 892 F.3d 273, 277–78), the instructions also clearly informed the jury that the agreement to exchange *must* predate any of the official actions, even if the agreement involves multiple official actions or things of value. *See also* [313] at 67 (instruction for Count Two informing the jury that the agreement "to take an official action in exchange for a thing of value" must exist "before the official action is to take

place"). These instructions simply state what the law requires, and the law requires nothing more.

Addressing Madigan's second argument, the instructions also completely foreclosed the possibility that the jury would convict a defendant under § 666 based on an "unidentified future action." The instructions explicitly defined an official action as "a specific decision or action" and added that the official action "must be something specific and focused, rather than a broad policy objective." [313] at 55. As to the "stream of benefits" theory, the instructions also explicitly told the jury that the "thing of value" to be exchanged "may involve a stream of benefits" in an "exchange for one or more official actions." *Id.* at 78. But the "official action" requirements remained the same, regardless of how many specific "things of value" were exchanged pursuant to an ongoing agreement. *See* [313] at 67–68 *and* [313] at 77–78). Thus, the instructions foreclosed any possibility of a conviction based upon a nebulous or unidentified official action. To the contrary, the instructions clearly, and repetitiously, required the jury to find "a specific decision or action" the Defendant agreed to exchange.

Madigan thus fails to present evidence of a "substantial question" with respect to the "stream of benefits" instructions given to the jury, because he cannot show an "appeal could readily go either way," or that "it is a toss-up or nearly so" with respect to this issue. *Greenberg*, 772 F.2d at 341. There is no ambiguity in the law on the validity of the "stream of benefits theory" (*see Madigan,* 2025 WL 1836050 at *38– *39 (citing cases from the First, Second, Third, and Fourth Circuits recognizing the "stream of benefits" theory in a manner consistent with the Seventh Circuit) and the jury instructions complied with uncontroverted Seventh Circuit precedent, conformed with the Pattern Instructions, and clearly and fully articulated the theory.

### iii.  § 666(c) instruction

Madigan next claims error with respect to the jury instructions regarding 18 U.S.C. § 666(c). Here, Madigan merely reiterates his prior arguments from the jury instruction conferences and his post-trial motions asserting that the Government "was required to prove that Madigan *knew* the jobs at issue" for Counts Two, Four, and Six "were not bona fide" [451] at 13; and he still only relies upon *Ruan v. United States*, 597 U.S. 450 (2022) as the purported basis for his argument.

As this Court already explained, however, *Ruan* sheds no light on the specific statutory interpretation issues in this case. *See Madigan*, 2025 WL 1836050 at *42– *43 ("The *Ruan* case, however, provides no guidance for the issues in Madigan's case. First, and most obviously, the Supreme Court considered an entirely different statute

in *Ruan*, 21 U.S.C. § 841. That statute utilizes different *mens rea* terms than § 666 and proscribes entirely different conduct. The statutes have no relevant textual overlap and thus the interpretive issues presented in *Ruan* and those presented within § 666(c) remain distinct."); *see also United Sates v. Hall*, 134 F.4th 782, 789 (5th Cir. 2025) (declining to apply *Ruan* to the safe harbor provision in 42 U.S.C. § 1320a-7b(b)). As before, Madigan's objection falls short.

Madigan offers no instructive, much less persuasive, authority showing that § 666(c) requires the Government to prove a negative as an additional element of the offense, that is, prove that a defendant knew a thing of value was not "bona fide compensation." More importantly, he offers no authority contravening Seventh Circuit precedent interpreting § 666(c) as merely a safe-harbor provision, and thus not a separate element of the offense to be proved by the Government. *See United States v. Lupton*, 620 F.3d 790, 802 (7th Cir. 2010); *United States v. Robinson,* 663 F.3d 265, 272 (7th Cir. 2011) ("There is nothing in the text of § 666(c) to suggest that it applies more broadly to the other elements of the offense."). *See also United States v. McClain*, No. 20 cr 812, 2024 WL 50868, at *6 (N.D. Ill. Jan. 4, 2024) (citing *Lupton*); *United States v. Cui,* No. 19 cr 322, 2024 WL 3848513, *5 (N.D. Ill. Aug. 16, 2024) (same); *United States v. Burke,* No. 19 cr 322, 2022 WL 1970189, *30 (N.D. Ill. June 6, 2022) (same); *United States v. McClain,* Case No. 20 cr 812, 2022 WL 488944, at *2 (N.D. Ill. Feb. 17, 2022) (same).

In this case, the Court's bona fide compensation instructions complied with the Seventh Circuit Pattern Instructions and binding precedent. *See* [313] at 68, 78; PATTERN INSTRUCTIONS at 308. Because Madigan's objections merely constitute bald contradictions of controlling case law, without any viable legal theory or authority, he presents no "substantial" question with respect to this aspect of the instructions.[20]

Next, Madigan reiterates his objection to the Court's answer to the jury's question regarding bona fide compensation, asserting that the answer "effectively read § 666(c) out of the statute" because "once the jury found the elements of § 666(a)(1)(B), § 666(c) became inapplicable." [451] at 14. Not so.

---

[20] Here again, even if an instructional error occurred (it did not), the error would be a harmless one, where the evidence conclusively established that Madigan knew the subcontractor payments and other hires were, in fact, not bona fide. The Government presented overwhelming evidence to show both that the subcontractor payments were for "no-show" jobs made pursuant to an ongoing bribery agreement and that Madigan knew about, and participated in, that ongoing agreement. *See Madigan,* 2025 WL 1836050 at *46. Considering this evidence, any purported instructional error remained harmless. And because "harmless errors" and "errors that have no prejudicial effect" do not constitute "substantial questions" that are "likely to result in reversal or an order for a new trial," Madigan fails to meet § 3143's requirements with respect to this issue. *Bilanzich,* 771 F.2d at 299 (citing *Miller,* 753 F.2d at 23).

A district court's "decision to answer a question from the jury as well as the language used in the response" is reviewed "for an abuse of discretion." *United States v. Hewlett*, 453 F.3d 876, 880 (7th Cir. 2006) (citing *United States v. Young*, 316 F.3d 649 (7th Cir. 2002)).  Such answers must, "as a whole, fairly and adequately treat the issue," present "a correct statement of the law," and answer "the question specifically." *Id.* (citing *Young*, 316 F.3d at 649).  Here, the jury asked a specific question regarding whether a "bona fide salary" may be considered "something of value" or "a valuable thing" for purposes of the wire and honest services fraud and Travel Act charges in this case, respectively.  Over objection, the Court provided the following answer to the jury:

> On page 78, "bona fide" salary, wages, fees or other compensation paid "in the usual course of business" do not qualify as a "thing of value."  But salary, wages, fees, or other compensation paid for a job obtained by means of bribery is not a payment "in the usual course of business," and thus it can be considered a "thing of value."

> For the references to "valuable thing" on page 88 and "something of value" on page 96, a salary paid for a job obtained by means of bribery can be considered a "valuable thing" or "something of value."  You are the judges of the facts and, consistent with my legal instructions, you must decide the facts based on the evidence at trial.

> Each Count is to be considered separately and you have the specific instructions for each Count, including the required elements and definitions, in your packet.  Please follow all of my instructions on the law, as you continue to deliberate your verdicts.

> [323-1].

The Court's answer plainly did not "read § 666(c) out of the statute" as Madigan fears, but rather it contained accurate statements of the law describing the bona fide compensation exception under § 666(c).  Under well-settled precedent, courts have long held that a salary or other compensation "is not 'bona fide' simply because it is paid for legitimate work." *United States v. Bryant*, 556 F. Supp. 2d 378, 429 (D.N.J. 2008).  If a payment (compensation or not) constituted "the quid or bribe in a scheme to influence" a public official "in his official capacity," then "a reasonable jury could find" that the payment "was not in the 'usual course of business' or 'bona fide.'" *Cui*, 2024 WL 3848513 at *5; *see also Madigan*, 2025 WL 1836050 at *44 (collecting cases). The Court's answer articulated that correct legal principle, and it also accurately

reminded the jury that they must decide all questions of fact when determining whether, in fact, a "thing of value" was to be exchanged, and whether the purported "thing of value" constituted "bona fide compensation." The answer did not erase § 666(c)'s application but instead answered "the question specifically" by addressing the legal principle the jury first asked about—the bona fide compensation exception—and correctly informed the jury that they were the finders of fact, along with again reminding the jury to follow all the Court's instructions on the law. *Hewlett*, 453 F.3d at 880.[21]

---

[21] In a footnote in his motion (*see* [451] at 13 n.2), Madigan cites to *United States v. Kaufman*, a case where the district court, in resolving the parties' pretrial motions in limine, appeared to imply that the safe harbor provision in 18 U.S.C. § 215 "places on the government the burden of proving that defendant's actions did not fall within that exclusion." *United States v. Kaufman*, No. 19-cr-0504 (LAK), 2021 WL 51521, at *1 (S.D.N.Y. Jan. 6, 2021). This errant sentence, however, cannot be taken out of context (as Madigan appears to do), especially where the actual jury instructions provided in the same case do not reflect that principle (*see id*. [213] Tr. 1161:1–6 (articulation of the safe harbor provision); Tr. 1163:4–20 (articulation of elements of the offense, not including the safe harbor); Tr. 1221:5–25 (court's response to a juror note restating the elements of the offense without mentioning the bona fide compensation safe harbor provision). Likewise, in a later opinion affirming the district court's judgment (including the court's decision not to re-articulate its instruction regarding the safe harbor provision in its response to a juror question about the elements of the offense), the Second Circuit did not adopt Madigan's reading. *See United States v. Kaufman*, No. 21-2589, 2023 WL 1871669, at *3–*4 (2d Cir. Feb. 10, 2023). Thus, even though this Court is not bound by this district court opinion, the out-of-context excerpt cited by Madigan carries even less weight when it stands in sharp contrast to the actual instructions given in those same proceedings.

In that *Kaufman*, the district court gave the following bona fide compensation instruction to the jury regarding charges brought under 18 U.S.C. § 215:

> Now, the last thing I want to tell you about the bank bribery statute before we go into the detail, is that bona fide salary, wages, fees or other compensation paid or expenses paid or reimbursed in the usual course of business cannot constitute either a bribe or a gratuity. So any such payment cannot constitute a crime.

*United States v. Kaufman,* [213] Tr. 1161:1–6 (S.D.N.Y. Mar. 29, 2021). This instruction simply states the same correct legal principle the Court articulated in its response to the jury, but in the inverse: if the jury finds that a payment is bona fide, then it does not constitute criminal conduct. Accordingly, Madigan's own citation affirms the correctness of this Court's answer. *See Madigan*, 2025 WL 1836050 at *43 (recounting legislative history of § 666(c) and § 215(c), demonstrating that both provisions were intended to present "a separate safe harbor defense to be raised at trial") (quotation omitted). Clearly, *Kaufman* fails to raise a "substantial" question for purposes of Madigan's appeal.

The answer further did not introduce any confusion regarding the § 1343 or § 1346 charges in this case.[22]  Here, the jury asked a specific question[23] inquiring whether any overlap existed in the definition of "thing of value" (a term for which they received a specific definition), and the terms "valuable thing" and "something of value" (terms that they did not receive explicit definitions for in the instructions).  As the Court stated on the record, the jury's question necessitated "more than just referring them back" to the instructions and required an answer that clarified the legal principles they asked about.  Tr. 11073:13–14.  The Court observed that a bona fide salary paid in the usual course of business is "also not a valuable thing or something of [value] under" either § 1952 or § 1343.  Tr. 11069:6–9.  As the Court discusses below (see infra Part III.a.iii) and in its prior Order (see *Madigan*, 2025 WL 1836050), where a defendant obtains "money through fraudulent means," that "compensation" is "neither 'bona fide' nor received 'in the usual course of business.'" *United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007).  In the context of wire fraud under § 1343, "money obtained by fraudulent means," such as through a quid pro quo bribery agreement, falls into the same category of the jury's consideration: the object to be exchanged in a bribery scheme.

Certainly, without any applicable statutory carve-out or any countervailing legal authority (and Madigan cites none), a jury may validly consider payments made for improper purposes, i.e., pursuant to a bribe, in evaluating liability under § 1343.  The Court's answer thus informed the jury of that correct legal principle—addressing "the question specifically" of whether a "bona fide salary" may be considered "something of value." *See Hewlett*, 453 F.3d at 880.  That answer, uncontroversially, remains yes, since a real salary obtained via improper purposes (such as bribery) is not, by definition, a bona fide salary. *See Madigan*, 2025 WL 1836050 at *46.  Thus,

---

[22] As noted in its prior Order, even though the Court's answer concerned both the § 1343 and § 1952 charges, Madigan did not raise any challenge regarding § 1952 Counts in any motion.  Therefore, Madigan has waived any arguments on that issue. *Madigan*, 2025 WL 1836050 at *45 n.62.

[23] It bears mention that the question and answer arose from the allegations and evidence at issue in the trial, which included examples of payments for both no-show jobs and otherwise legitimate work that were all obtained by bribery and fraud.  As mentioned above, a court's answer to a jury's question must "as a whole, fairly and adequately treat the issue," present "a correct statement of the law," and answer "the question specifically." *Hewlett*, 453 F.3d at 880 (citation omitted).  The Court's answer, accordingly, answered the jury's question in line with those requirements, providing correct statements of the law while remaining grounded in the specific question the jury asked—triggered by the evidence.  The Court's answer also did not invade the jury's province to make the factual determinations of whether a bribery agreement existed, or whether the payments constituted bona fide compensation.  Further, the Court's answer referred the jury back to the instructions as a whole, which repeatedly reminded the jury of the Government's burden in the case and that each count should be considered separately.  Accordingly, the Court answer, in addition to the reasons expressed above, was a proper exercise of this Court's discretion and did not introduce error.

because the Court's answer constituted a correct statement of law, triggered by the jury's question and factual issues in the case, Madigan fails to show that he can present any "substantial question" on appeal regarding this claim. *Bilanzich*, 771 F.2d at 299.

But just as importantly, for purposes of this motion, even if the Court did err in providing this answer (though it did not), Madigan cannot show that any decision on appeal in his favor would result in a reversal or new trial. *See Bilanzich*, 771 F.2d at 298. Even if the Court's answer was erroneous with respect to the § 1343 charges, any such error could not have prejudiced Madigan.[24] The "safe harbor" provision of § 666(c) exempts certain payments (those made in the "usual course of business") from the jury's consideration. If that concept was misapplied to the § 1343 charges, then the jury could have excluded certain relevant payments from its consideration if it found those payments were bona fide. This would only advantage, rather than prejudice, the defense, because the jury could have mistakenly exempted certain payments that they should have considered under § 1343. Simply providing Madigan with a defense he was otherwise not entitled to cannot, under any reasonable interpretation, merit a new trial in this case.

Additionally, any error from the Court's answer would also remain harmless because, for the reasons the Court explains below, the evidence of Madigan's guilt on the wire fraud counts in this case was overwhelming. Thus, since "harmless errors" and "errors that have no prejudicial effect" do not constitute "substantial questions" that are "likely to result in reversal or an order for a new trial," Madigan fails to meet § 3143's requirements with respect to this issue. *Bilanzich*, 771 F.2d at 299 (citing *Miller*, 753 F.2d at 23).

In sum, despite his assertions to the contrary, Madigan conclusively fails to show his appeal will raise any "substantial" questions regarding the § 666 charges (or any of his claims). Again, a defendant bears the burden to show that his appeal will both raise a substantial question of law or fact and, "assuming that the question is decided in the defendant's favor, the appellate court is more likely than not to reverse the conviction or order a new trial on *all* counts for which imprisonment has been imposed." *Bilanzich*, 771 F.2d at 298 (emphasis added); *see also* 18 U.S.C. § 3143(b)(1).[25] Here, even if the Court found Madigan successfully met his burden in

---

[24] The Court also explained this point extensively in the prior Order. *See Madigan*, 2025 WL 1836050 at *44–*46.

[25] Finally, the Court recognizes that even though the § 666 instructions were heavily litigated throughout the course of trial, this does not mean that any of the issues presented "close" or "substantial" questions for purposes of this motion. Madigan claims that the "length of the Court's

showing a substantial question as to any of the § 666 instructions, he still fails to show any substantial question regarding his convictions on Counts Eight, Nine, and Ten (for reasons the Court explains below). Because he still received a prison sentence for those three Counts, and that sentence would remain unaffected (as explained above), his motion for bond pending appeal would still be denied, even if the Court's conclusion were different regarding the other counts.

### iv. State law bribery instructions

Madigan next argues that the state bribery instructions, specifically those instructions delineating the elements of 720 ILCS § 5/33-1(d) and (e), § 5/33-3(a)(4), and 720 ILCS § 5/33-8, erroneously broadened the scope of qualifying predicate "unlawful activity" under the Travel Act, because the Court found that those statutes do not require evidence of a *quid pro quo*. [451] at 14. Once again, Madigan's claims of error fail.

The Travel Act prohibits the following conduct:

Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform [an act described above, shall be subject to fine or imprisonment].

18 U.S.C. § 1952(a).

---

post-trial ruling" shows that "these issues, among others, are substantial questions," but this faulty reasoning fundamentally misunderstands § 3143's standard. [451] at 7. Just because a question requires careful analysis does not mean it was one of high "difficulty" for purposes of § 3143. *Shoffner*, 791 F.2d at 589. Indeed, where, as here, a defendant adopts a scorched-earth approach to litigation, raising a litany of arguments in his post-trial motions, the trial court's resolution will naturally entail a long, written order, and this case presents no exception. But the length or detail of a court's written opinion does not reflect on relative merits of the claims raised.

The statute defines "unlawful activity" as, among other things, "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." *Id.* § 1952(b). The statute does not define those terms but instead incorporates the "generic" definitions of those crimes. *United States v. Nardello*, 393 U.S. 286, 296 (1969). This "generic" incorporation served "the congressional desire" behind the statute: to provide "'material assistance to the States in combating pernicious undertakings which cross State lines,'" primarily organized crime. *Id.* at 292–93 (quoting S.Rep. No. 644, 87th Cong., 1st Sess., 4 (1961) (quoting Attorney General Kennedy)).

Considering this express purpose, the Supreme Court has construed § 1952 as accepting a broad, "generic definition of bribery, rather than a narrow common-law definition." *Perrin v. United States*, 444 U.S. 37, 49 (1979); *see also Nardello*, 393 U.S. at 296 (holding the same for "extortion"). Although many legal dictionaries at the time, i.e., in 1961, included "corruptly" as part of the definition of "bribery," the offense of "bribery" remained subject to a variety of formulations. *See U.S. v. Biaggi*, 674 F. Supp. 86, 88 (E.D.N.Y. 1987) (collecting citations).[26] As such, the Supreme Court in *Perrin* found "that Congress intended 'bribery'" as "used in the Travel Act to encompass" a "violation of state commercial bribery statutes," explicitly rejecting a "narrow common-law definition" of the crime. 444 U.S. at 49–50.

In line with *Perrin*, the courts have long agreed that the Travel Act incorporates commercial bribery as a predicate act, even though that offense has no relation to an "official act," a traditional element of the offense under some

---

[26] For instance, treatises at the time did "not consistently require corrupt intent to influence as an element of that offense." *Biaggi*, 674 F. Supp. At 88. In fact, "at the time the Travel Act was being debated" there was "a trend away from including the term 'corrupt' in state law definitions of the crime, although most state statutes still require some element of intent to influence for conviction under the most serious form of bribery." *Id.* In line with this trend, in 1962 "the American Law Institute approved the elimination of the word 'corrupt' from its definition of bribery, a change adopted by a great majority of states in revisions and proposed revisions of their bribery statutes." *Id.* (citing Model Penal Code § 240.1, note 2 (1980) and dozens of state statutes, including Illinois, Ill. ch. 38, § 33–1). The Editors' Notes for MPC § 240.1 also demonstrate that this abandonment of the term "corrupt" was intentional and signified a deliberate departure from the older definition of bribery. *See* Model Penal Code § 240.1, Editors' Notes (1980) ("The bribery offense abandons the usual focus upon 'corrupt' agreements or a 'corrupt' intent and instead spells out with more particularity the kinds of arrangements that are prohibited. It is made clear, for example, that compromise in the legislative process is not prohibited, whereas payments in order to meet competition or to respond to extortionate threats by public officials are within the prohibition. The offense is defined so as not to require proof of an actual agreement or mutual understanding. It thus reaches the inchoate behavior of either party accompanied by a purpose to achieve the prohibited understanding.").

formulations.[27]  Courts around the country and at all levels of the federal judiciary have followed suit in the decades since that decision.  *See, e.g., United States v.*

---

[27] Despite clear and contrary Supreme Court precedent (*see Perrin*, 444 U.S. at 49–50), Madigan misplaces reliance on *United States v. Shen Zhen New World I, LLC* to suggest that the Travel Act only incorporates state law bribery states that require proof of a "quid pro quo."  *See* [451] at 14–15.  In that case, the Ninth Circuit (examining California state statutes) noted that the Travel Act's generic definition of "bribery" covers state statutes which require "both a contemplated (1) quid pro quo and (2) an official act involving a public official."  115 F.4th 1167, 1184 (9th Cir. 2024).  In other words, the Ninth Circuit stated that a generic understanding of bribery in 1961 included the concept of a "quid pro quo" and an "official act" even in definitions utilizing the phrase "intent to influence," and primarily based its analysis on the Black's Law Dictionary available to Congress at the time of the statute's passage.  *Id.*  But even a cursory inquiry into legislative and academic trends at the time (as well as developments in the relevant case law since then), shows that the Ninth Circuit's remark fails to consider or address wide swaths of contrary authority—which the Court details herein.  This failure is readily explainable when reading the *Shen Zhen* decision in its entirety.

Indeed, the Ninth Circuit ultimately concluded that even if state law statutes are "broader than the Travel Act's generic definition of bribery," they can still "serve as predicates under the Travel Act if the jury convicted the defendant based on elements that conformed to the generic definition of the crime."  *Id.* at 1185.  The court then concluded that because the lower court departed from the statutory language and inserted the term "exchange" into the state law bribery jury instructions, the jury convicted the defendant "on elements that conform to the generic definition of 'bribery' under the Travel Act, not merely" the state's "broader" definition that did not require the defendant to have "a specific official action in mind."  *Id.*  The Ninth Circuit did not address the fact that the district court, per the Ninth Circuit's own characterization, inserted the concept of an "exchange" into the state statutes without a textual basis for doing so.  Instead, the court concluded that although "a case *could* exist in which only" state "law and not the Travel Act proscribes certain conduct," the defendant's "convictions do not present that scenario."  *Id.* (emphasis in original).  Accordingly, Madigan's cited comment does not capture the true holding of the Ninth Circuit's decision, because the *Shen Zhen* case did not *actually* turn on the issue of whether a statute must contain a *quid pro quo*, but instead it found generally that the jury instructions conformed to what the court accepted as a "generic" definition.  *See id.* (commenting that the "jury instruction language" matched what the defendant "proposed to the district court" and thus the defendant had "no cause to complain").  Although the court also engaged in a truncated (and incomplete) discussion of the historical definition of "bribery" at the time Congress passed the Travel Act, the Ninth Circuit ultimately decided the case on other grounds, holding that the elements on which the jury convicted satisfied the Travel Act's requirements, and thus declined to overturn the defendant's conviction.  *See id.* ("Because California law proscribes the generic definition of bribery, for which a jury convicted Defendant under the Travel Act, the California bribery statutes were proper predicate offenses.  We affirm Defendant's Travel Act convictions.").  In any event, this lone, out-of-circuit decision does not undermine decades of other case law, including unquestioned Seventh Circuit decisions, and thus it fails to raise a "substantial question" in this case.  Whatever the Ninth Circuit's reason was for not accounting for the other types of bribery statutes routinely considered predicate acts under the Travel Act (such as Illinois commercial bribery), this Court remains both bound (and persuaded) by the various authorities undermining the narrow comment found in *Shen Zhen*.  In other words, because decades-old Supreme Court, and the Seventh Circuit, precedent conclusively rules out the approach in *Shen Zhen*, the Court cannot fairly say that this question is a "toss up or nearly so" for purposes of Madigan's motion.  *Greenberg*, 772 F.2d at 341.

*Bowling*, No. 6:09–16–DCR, 2010 WL 5067698, at *8 (E.D. Ky. Dec. 7, 2010) (collecting cases); *United States v. Burke*, Case No. 19-cr-322, 2022 WL 1970198, at *32–*45 (N.D. Ill. Jun. 6, 2022) (identifying Illinois' commercial bribery and official misconduct statutes as predicate acts).

This overwhelming weight of authority demonstrates that the Travel Act's definition of "bribery" is not limited to state statutes that require evidence of a "corrupt" agreement or an "exchange" for an "official act," as Madigan asserts. Thus, even though certain Illinois' bribery statutes do not require evidence of a *quid pro quo* (*see Madigan*, 2025 WL 1836050 at *48–*49; *United States v. Garner*, 837 F.2d 1404, 1420–21 (7th Cir. 1987); *United States v. La Schiazza*, No. 22 CR 520, 2024 WL 5089118, at *16 (N.D. Ill. Dec. 12, 2024)), this does not disqualify them from use as valid predicate acts under the Travel Act.

Considering that this Court and the Seventh Circuit must follow the wider, more expansive definition set forth in *Perrin*, the Court cannot plausibly find that Madigan raises a "close" question on this issue. *Shoffner*, 791 F.2d at 589.[28]

### v. State Ethics Acts instructions

Madigan next reiterates his objections to the Court's inclusion of instructions regarding the Illinois State Officials and Employees Ethics Act and Illinois Governmental Ethics Act (collectively, the "Ethics Acts"). But Madigan ignores two critical aspects of the record: (1) his own strategic arguments and requested defense-theory instruction triggered the need for the State Ethics Acts instruction; and (2) without this instruction, the jury would have been left with an incomplete set of legal instructions that failed to delineate the difference between lawful and unlawful attempts to influence public officials under Illinois law—a difference Madigan himself made critical to his defense.

As the Court explained in its prior Order, both Defendants in this case consistently argued to the jury that they only engaged in permissible lobbying activities and job recommendations, i.e., lawful attempts to influence public officials, not bribery schemes. *See Madigan,* 2025 WL 1836050 at *50. As part of that chosen

---

[28] Lastly, any instructional error on this issue (there was none), would remain harmless because, for the reasons explained above, Madigan's conduct underlying the Travel Act charge in Count Five was part of an ongoing bribery agreement where Madigan agreed to, and did in fact, exchange official actions for private benefits to his associates. *See supra* Part III.a.i–iii. The same is true of his state board conduct, where he agreed to exchange an official act for a private benefit. *See infra* Part III.b.iv–v. Since any appeal on this issue could not result in a new trial, Madigan motion remains denied. *Bilanzich*, 771 F.2d at 298.

defense strategy, Defendants Madigan and McClain jointly requested instructions providing the definitions of "lobbying" and "influencing" in the lobbying context under Illinois law. *Id.*

The Court granted the defense's joint request and incorporated both defense theory instructions into the final set of instructions provided to the jury. *See United States v. Walker*, 746 F.3d 300, 307 (7th Cir. 2014).[29] But the defense theory instructions also created tension with the state bribery statute instructions, due to both instructions' use of the term "influence." Although the parties did not argue any alleged violations of the Ethics Acts, the parties *did* dispute whether the evidence at trial demonstrated permissible lobbying activity or an ongoing, illegal bribery scheme—in other words, whether the evidence constituted lawful or unlawful attempts to influence a public official.

This defense theory rendered an instruction clarifying the term "influencing" necessary, and the State Ethics Acts instruction informed the jury that Illinois law authorizes certain forms of influencing public officials and prohibits others. As previously explained, the inclusion of the clarifying instruction remedied the tension between the defense theory instructions and the state bribery instructions. Illinois courts clearly articulate that "the Illinois statutory scheme defines with specificity 'property or personal advantage' which a legislator is 'authorized by law' to accept" in the context of state bribery statutes. *People v. Brandstetter*, 430 N.E.2d 731, 735–36 (Ill. App. Ct. 1982) (holding that "the meaning of the phrase 'which he is not authorized by law' contained in section 33-1(a)" was defined by "the Illinois statutory scheme" including "the Illinois Governmental Ethics Act"). While those statutes do not carry criminal penalties themselves, under uncontroverted Illinois precedent, they liquidate the meaning of the state bribery statutes. *See id.* Taken together, the inclusion of the Ethics Acts instructions ensured the jury was provided with a complete and tailored set of legal instructions detailing Illinois' statutory scheme regulating when influence on public employees and officials remains lawful and permissible versus unlawful and criminal. *See Madigan,* 2025 WL 1836050 at *50–*51.

---

[29] While "defendants are not automatically entitled to any particular theory-of-defense jury instruction," trial courts should give such an instruction, "if (1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the defendant a fair trial." *Walker,* 746 F.3d at 307 (citations and quotation omitted). The Seventh Circuit reviews a district court's "refusal to give a requested theory-of-defense jury instruction *de novo.*" *Id.* (citing *United States v. Choiniere*, 517 F.3d 967, 970 (7th Cir. 2008)).

Notably, Madigan does not contend that the "lobbying" and "influencing" instruction contained any error.

Further, the instruction did not in any way permit the jury to convict any Defendant based upon a mere violation of any of the Ethics Acts. Instead, the instruction served, as Madigan himself admitted in his post-trial motion (*see* [401] at 62), to *narrow* the conduct the jury could consider (i.e., if certain payments *were* authorized by law, then the jury could not attribute those to a bribery agreement). Likewise, the instructions also told the jury to separately determine whether a defendant maintained the required intent in receiving the property—an entirely separate but critical element in finding a violation of the relevant state bribery statutes. *See Madigan*, 2025 WL 1836050 at *49 n.75. Accordingly, no plausible reading of the jury instructions permitted a conviction solely on a finding that a defendant's receipt of property or personal advantage, without more, violated the Ethics Acts.

Madigan also falsely claims that he did not receive an "opportunity to withdraw the lobbying instruction." [451] at 15. This assertion is blatantly contradicted by record. The Court provided all parties with multiple, extensive opportunities to present arguments regarding their proposed jury instructions. The Court permitted the parties to present numerous submissions to the Court and spent weeks engaging with the parties' ongoing revised proposals and inviting additional argument, deliberately taking advantage of the adversarial process. Moreover, at the January 2, 2025 jury instruction conference, the Court did, in fact, identify the tension raised by the proposed defense theory instruction. The Court stated that the proposed defense version, as drafted, could include conduct that would "fall within this category" of lawful lobbying "and have other attributes which make it unlawful." Tr. 8148:17–8149:6. If Madigan wanted to withdraw his request after the Court's expressed its concern that his defense, without clarification, could improperly sweep in unlawful conduct, he could have done so.

Indeed, Madigan deliberately passed on many more explicit opportunities to withdraw his proposed defense theory instruction. On January 7, 2025, Madigan submitted the Defendants' proposals for edits to the Court's draft jury instructions, and again did not withdraw his request. [317] ¶ 3. On January 16, 2025, rather than withdraw, the defense doubled down on pursuing the defense theory instructions and submitted proposed jury instructions on both "job recommendations" and "lobbying." *Id.* at ¶ 4. Three days later, the Court provided the parties with an updated version of its draft instructions for their review. *Id.* at ¶ 6. On January 21, 2025, Madigan submitted his own objections to the draft instructions and responded to the Government's objections, including its objection to his defense theory instructions. Again, Madigan chose not to withdraw his request. Furthermore, the Court also conducted a supplemental charge conference on January 22, 2025, and, yet again,

31

Madigan declined to withdraw the request. From the first to final jury instruction conference, Madigan had weeks to withdraw his requested defense theory instruction. Given that he submitted multiple written objections, revisions, and proposals to the Court in that intervening period, his claim of surprise now borders on (and frankly crosses into) the ridiculous.

Madigan also falsely argues that the Court offered a "different rationale for the instruction" in its prior Order. [451] at 15. But as stated above, the Court expressly identified tension raised by the defense instruction at the January 2, 2025 jury instruction conference, specifically stating that the proposed defense version, as drafted, could include conduct that would "fall within this category" of lawful lobbying "and have other attributes which make it unlawful." Tr. 8148:17–8149:6. Instead, the Court's draft instructions and rationale were clear, and Madigan continued to request the instruction as written—a request the Court appropriately granted, albeit while making necessary modifications to ensure the entire set of instructions correctly stated the law (*compare* [317] at 3–4 *with* [313] at 30–31), including clarifying the term "influence" to ensure it remained consistent throughout the instructions. The instructions were correct,[30] necessary, and did it expand any category of unlawful conduct.

Madigan's next false claim asserts that the Court "identified no authority supporting use of a civil regulation to inform the meaning of an unrelated criminal statute." [451] at 15. Here, Madigan blatantly ignores a significant portion of this Court's prior Order, which identified relevant Illinois precedent holding "that 'the Illinois statutory scheme defines with specificity 'property or personal advantage' which a legislator is 'authorized by law' to accept" in the context of state bribery statutes," and the "'meaning of the phrase "which he is not authorized by law" contained'" in those bribery statutes "was defined by 'the Illinois statutory scheme,' including 'the Illinois Governmental Ethics Act.'" *Madigan*, 2025 WL 1836050 at *49 (quoting *People v. Brandstetter*, 430 N.E.2d 731, 735–36 (Ill. App. Ct. 1982)).

Because Madigan's own requested defense theory instruction triggered the need for the clarifications of the State Ethics Acts instructions, and Madigan never sought to withdrew that request (despite numerous opportunities to do so, *see* [317], [384], [392]), the Court provided his instruction along with a proper instruction about the state statutory scheme governing both lawful lobbying and unlawful bribery, all based on uncontroverted Illinois precedent. As such, no "substantial question" exists with respect to this issue.

---

[30] The Court notes again that Madigan does not assert any error as to the "lobbying" and "influencing" instruction.

### vi. § 1952 interstate commerce element

Madigan's final instructional issue relates to two Travel Act offenses involving phone calls that never crossed state lines, as charged in Counts Twelve and Fourteen. [451] at 15. Unlike his other claims, Madigan does successfully raise a "substantial question" here; specifically, whether § 1952 requires some interstate travel to trigger criminal liability. But because this does not affect all counts of conviction, he still fails to satisfy § 3143's requirements, thus warranting denial of his motion.

At trial, this Court found that use of an interstate commerce facility in an intrastate fashion satisfies the requirements of the statute based on the Seventh Circuit's opinion in *United States v. Richeson*, 338 F.3d 653, 660 (7th Cir. 2003) interpreting similar language in § 1958 and the weight of circuit authority addressing the same and similar questions. *See Madigan*, 2025 WL 1836050 at *24–*25. But in a much older case, *United States v. Isaacs*, the Seventh Circuit did add, in a footnote to its decision, that the requirement of "some interstate travel" is "indicated by § 1952's use of the term 'facility in interstate or foreign commerce' rather than 'facility of interstate or foreign commerce.'" 493 F.2d 1124, 1149 n.1 (7th Cir. 1974). Upon consideration of the issue, the Court found it "unlikely" that the Seventh Circuit "would depart from the majority" of other circuits and give "an expanded reading" to the *Isaacs* footnote and concluded that *Richeson* presents a more accurate reading of the statutory language. *Madigan*, 2025 WL 1836050 at *26. Nevertheless, because countervailing Seventh Circuit precedent exists on this issue, the Court finds that Madigan meets his burden to raise a "substantial question" with respect to this issue. *Greenberg*, 772 F.2d at 341.

This does not mean, however, that the Court can grant Madigan's motion. Again under § 3143, defendants must show "the appellate court is more likely than not to reverse the conviction or order a new trial on *all* counts for which imprisonment has been imposed." *Bilanzich*, 771 F.2d 292, 298 (7th Cir. 1985) (emphasis added); *see also* 18 U.S.C. § 3143(b)(1). This Madigan fails to do, because the interstate issue only affects Counts Twelve and Fourteen, and not the other eight counts of conviction (or their resulting concurrent terms of imprisonment), and because Madigan fails to raise any substantial question with respect to the other counts (as explained herein), the Court denies his motion for bond pending appeal.

### b. Purported Insufficiency of Evidence

Madigan separately challenges the sufficiency of the evidence for each count of conviction. But none of his arguments have merit for the reasons detailed in the prior Order (*see Madigan*, 2025 WL 1836050 at *3–*26), and summarized here below.

33

### i. Count 2

Madigan asserts that the Government failed to present sufficient evidence regarding all four objects of the conspiracy charged in Count Two. But the record easily dispels each of these claims.

Starting with the object of bribery, Madigan's objection to the Government's stream of benefits theory lacks merit. For the reasons explained above, the Government pursued, and the jury instructions correctly conveyed, a proper "stream of benefits" bribery theory at trial. *See Madigan*, 2025 WL 1836050 at *4–*12. The Seventh Circuit has repeatedly affirmed the validity of the "stream of benefits" theory, *see Ryan v. United States*, 688 F.3d 845, 851–52 (7th Cir. 2012),[31] and here, the overwhelming evidence at trial showed, among other things, that Madigan received a continuous stream of "quids" in the form of no-show jobs and other contracts for his associates, in exchange for "quos" in the form of his official actions concerning ComEd legislation from 2011–2019. *See Madigan*, 2025 WL 1836050 at *4–*12. Whether Madigan actually performed any official actions pursuant to the agreement (though the evidence confirmed he did so), or whether he might have otherwise supported certain legislation even if he did not participate in the ongoing bribery agreement, does not affect the analysis. *See Peleti*, 576 F.3d at 383 (noting that the term "'being influenced' does not describe the recipient's true intent"). Per the Court's previous explanation (*see Madigan*, 2025 WL 1836050 at *11–*12), if a public official accepts money from a bribe payer knowing that the payer expects him to take an official action in exchange, then he violates § 666 regardless of whether he ever intended to follow through on the agreement (or would have done the official act anyway, in the absence of the bribery). *See Hawkins*, 777 F.3d at 882.

Furthermore, the evidence in this case did show that Madigan, in fact, took various official actions to advance ComEd's legislation as agreed, including authorizing ComEd bills to be called for a vote. *See e.g.*, GX 1204 (EIMA); GX 1206 (SB 9); GX 1209 (FEJA). Quite simply, Madigan's argument fails, because the trial evidence supported the jury's verdict that he knowingly participated in the conspiracy to accept bribes, and because, under the law, a public official can violate § 666 even without "following through" on his end of the bribery agreement. In other words, even if Madigan accepted the bribes from ComEd, knowing ComEd tendered the

---

[31] Madigan's citations to *Silver* remain misplaced for the reasons explained in the Court's prior Order, *see Madigan*, 2025 WL 1836050 at *39 n. 51; and regardless, the Seventh Circuit's continued (and correct) approval of the "stream of benefits" remains both unchallenged and binding on this Court. *See United States v. Solomon*, 892 F.3d 273, 277–78 (7th Cir. 2018)*; Ryan v. United States,* 688 F.3d 845, 851–852 (7th Cir. 2012).

payments with an intent to exchange the payment for his official action(s), but later "killed" ComEd's legislation (or simply did not change his pre-planned official actions to support or "kill" legislation), his conduct would still meet the requirements of § 666.

Turning to the FCPA objects, Madigan claims that the Court's prior Order identified no evidence showing that Madigan "knowingly joined a conspiracy" to circumvent ComEd's internal controls or falsify ComEd documents. He is mistaken.

Per the Court's correct legal instructions on the elements of conspiracy under 18 U.S.C. § 371 (which Madigan does not contest), the Government needed to prove: (1) the conspiracy charged in Count Two existed; (2) Madigan knowingly became a member of the conspiracy with an intent to advance the conspiracy; and (3) one of the co-conspirators committed an overt act in an effort to advance a goal of the conspiracy within five years of the indictment. *See* [313] at 63. The Government did not need to prove that Madigan specifically knew what ComEd's internal accounting controls were, nor that he took any steps *himself* to circumvent those controls or falsify documents. Rather, the Government only needed to prove that Madigan knowingly became a member with an intent to advance the conspiracy, along with the other elements of § 371. *See United States v. Foy*, 50 F.4th 616, 624 (7th Cir. 2022).

Here, the evidence produced at trial overwhelmingly satisfied those elements. As detailed in the prior Order, the jury heard more than sufficient evidence to reasonably conclude that the co-conspirators in this case submitted false documents in furtherance of the conspiracy charged in Count Two. *See Madigan*, 2025 WL 1836050 at *12–*15. The jury also heard extensive evidence showing Madigan's knowledge and awareness of the unlawful conspiracy to conceal the subcontractor payments. *See id.* Madigan also testified on cross-examination that he had represented numerous corporate entities in his capacity as a lawyer and knew that corporate employees cannot falsify or mischaracterize books and records. Tr. 9278:2–24. Put simply, there is no reasonable argument, let alone a "close" question regarding whether Madigan knew about, and participated in, the conspiracy he was charged with, and ultimately convicted of, in this case.

Lastly, Madigan's claim that *Thompson v. United States* forecloses the Government's theory is completely unfounded. As the Court previously explained, *Thompson* does not apply to this case "for the obvious reason that it concerned a statutory interpretation question analyzing an entirely separate statute from 15 U.S.C. §§ 78m(b)(5) and 78ff(a)." *Madigan*, 2025 WL 1836050 at *14 n.8. Further, the documents "at issue here *did* contain false statements," including explicitly false "scope of services" statements, among others. *See, e.g.*, GX 809 (2018 amendment to

Doherty's contract claiming that Doherty had an "expanded role" with certain Cook County officials, which Fidel Marquez testified was false; Doherty did not have an expanded role, rather, the increased payments accounted for the addition of Mike Zalewski's no show job to the Doherty contract). The Court also instructed the jury that the offense of "falsifying books, records, or accounts," is committed when a "person falsifies, or causes the falsification of, the books, records or accounts of the company." [313] at 65–66. This instruction complies with the language in the statute, unlike *Thompson* where the lower courts permitted a departure from the relevant statutory terms. Accordingly, *Thompson* does nothing to change the analysis in this case.

### ii. Counts 4 and 6

Madigan's sufficiency of the evidence arguments pertaining to Counts Four and Six also fail. The Government presented compelling evidence proving that the Olivo, Nice, and Zalewski contracts were part of the unlawful "stream of benefits" bribery agreement that Madigan had with ComEd. All the subcontractors did little to no work for ComEd while receiving ongoing payments from the company. *See* Tr. 2505:25–2506:6 (Marquez testimony that Olivo and Nice did no work for ComEd); Tr. 2535:10–18 (Marquez testimony that Zalewski did no work for ComEd); Tr. 3605:18–21, 3630:4–13, 3686:25–3687:24 (testimony from FBI agents that no evidence of work product was recovered during any searches conducted). As Madigan's own co-conspirators made clear, the lucrative payments served a purpose: to benefit Madigan and his political machine. *See, e.g.,* GX 270; GX 274; Tr. 2555:21–24. The Government also produced evidence confirming that Madigan understood the existence and nature of the surreptitious subcontractor arrangement through the Doherty contract (*see* GX 135; Tr. 8721:19) and that he personally controlled when the payments to the subcontractors started and stopped, giving directives to his co-conspirators to execute his decisions. *See, e.g.,* GX 248.

Furthermore, the evidence showed that this unlawful agreement remained ongoing in 2018 and 2019, when the General Assembly considered two important bills: the 2018 ARES bill (which ComEd opposed), and the 2019 "Skinny Bill" (which would have again extended the formula rate). The evidence also showed that Madigan gave "the code" to "go ahead and kill" the ARES bill (GX 794; GX 82), and during the floor vote held on May 31, 2018, the bill failed to pass. Tr. 8515:3–5.[32] Madigan repeats his post-trial arguments that other witnesses testified that Madigan tried to move the bill forward (*see* [451] at 17), but the jury remained free to assess the credibility of testimony and weigh it along with the other, contradictory evidence

---

[32] A modified version of the bill later passed in the 2019 legislative session, after the Government's investigation went public. Tr. 8546:24–25; Tr. 8298:24–8299:2.

presented at trial. *United States v. Orozco–Vasquez*, 469 F.3d 1101, 1106 (7th Cir. 2006). The mere presence of some contradictory evidence, or evidence that Madigan may have allowed a bill to move at some stages of a multi-part process, does not undermine the jury's verdicts or present any "close" question for purposes of the present motion.

The same result applies to the other parts of ComEd's legislative agenda. In the Skinny Bill, for example, ComEd sought to again extend the formula rate during the 2019 legislative session. And again, the evidence proved that ComEd continued to pay a stream of benefits to Madigan's associates in exchange for ensuring Madigan's favorable actions on that bill. As the Court recounted in the prior Order (*see Madigan,* 2025 WL 1836050 at *9–*10), in February 2019, Fidel Marquez (while cooperating with law enforcement) recorded a conversation with Madigan's co-conspirators Hooker and McClain discussing the possibility that ComEd would not renew the subcontractors' contracts. Marquez asked how "our friend will react" if that happened, and Hooker described Madigan's attitude as "You're not going to do something for me, I don't have to do anything for you," adding that Madigan "won't say it." GX 286. Co-conspirator Anne Pramaggiore expressed the same dynamic when Marquez brought up the same subject in a different recorded call, advising Marquez not to cease any payments "until after the" legislative "session's over." GX 274. Pramaggiore emphasized that ComEd did "not want to get caught up in" a "disruptive battle" with Madigan in which someone "gets their nose out of joint and we're trying to move somebody off and then we get forced to give 'em a five-year contract because we're in the middle of needing to get something done in Springfield." *Id.*[33] There is no question, much less a "substantial" one, that this evidence, along with numerous other documents and witness testimony presented at trial, more than sufficiently supported Madigan's conviction on Counts Four and Six.

Accordingly, the Court denies Madigan's motion with respect to these issues.

### iii. Count 5

Madigan also challenges his Travel Act conviction as charged in Count Five, asserting that the Illinois state law predicates "could serve as Travel Act predicates only if the government proved a quid pro quo," and that the evidence "did not show" that "requisite exchange." [451] at 17. Both assertions fail.

---

[33] In May 2019, before the end of the 2019 legislative session, the Government's investigation in this case went public. Tr. 8298:24–8299:2.

For the reasons the Court explained above (*see supra* Part III.a.iv), Madigan's failed contentions regarding the state law predicates do not raise a "substantial question" and would be, in any event, harmless errors (if errors at all) because, to the degree state law predicates might require proof of a *quid pro quo*, the Government "presented overwhelming evidence of an ongoing agreement between Madigan and ComEd to exchange private benefits for official actions; and the evidence showed that the contract obtained for Michael Zalewski was one such exchange." *Madigan*, 2025 WL 1836050 at *16 (citing GX 75; GX 270; Tr. 2533:6–23; Tr. 2534:2–13; 2538:6–16). Therefore, Madigan's Count Five challenge remains meritless.

### iv. Counts 8, 9, and 10

In his sufficiency of the evidence challenges to Counts Eight, Nine, and Ten, Madigan claims he can pose a "substantial question" on appeal. But these challenges do not, in any way, involve questions presenting the requisite high degree of "difficulty" needed to grant his motion. *Shoffner*, 791 F.2d at 589. Rather, the analysis remains straightforward.

Here, the jury heard more than sufficient evidence supporting the wire fraud counts in this case.[34] As set forth in the Court's prior Order, Madigan's false assertions that he never agreed to a "quid pro quo" (made in the present motion, his post-trial motion, and his testimony) succumb to the overwhelming evidence presented at trial. The jury remained free to reject Madigan's version of events, and did so here, convicting him on multiple counts.

---

[34] The Court restates that, to sustain a conviction for wire fraud under § 1343, the Government must prove that "the defendant (1) participated in a scheme to defraud, (2) intended to defraud, and (3) used interstate wires in furtherance of the fraud." *United States v. Buncich*, 926 F.3d 361, 366 (7th Cir. 2019) (citing *United States v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012)). To establish a defendant's intent to defraud, the Government must show a "willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Sloan*, 492 F.3d 884, 891 (7th Cir. 2007) (quoting *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006)). The Government, however, does not need to prove "that the defendant personally benefitted from the fraud." *United States v. Filer*, 56 F.4th 421, 434 (7th Cir. 2022) (citing *United States v. Ross*, 77 F.3d 1525, 1543 (7th Cir. 1996)). Because "direct evidence of an intent to defraud is rare," (*Sloan*, 492 F.3d at 891) the "specific intent to defraud is typically shown by 'circumstantial evidence and inferences drawn from the scheme itself' showing that the scheme was 'reasonably calculated to deceive individuals of ordinary prudence and comprehension.'" *Filer*, 56 F.4th at 435 (quoting *Sloan*, 492 F.3d at 891). When the Government pursues an honest services fraud theory at trial, the evidence must contain "proof of a quid pro quo.*" United States v. Johnson*, 874 F.3d 990, 999 (7th Cir. 2017). But, as stated above, any "*plan to take*" such financial gain "in exchange for an official act" constitutes a "scheme to defraud, whether or not the plan succeeds." *United States v. Hawkins*, 777 F.3d 880, 883–84 (7th Cir. 2015) (citing *United States v. McDonough*, 727 F.3d 143, 159–60 (1st Cir. 2013); *United States v. Rosen*, 716 F.3d 691, 700–02 (2d Cir. 2013); *and United States v. Bryant*, 655 F.3d 232, 244–45 (3d Cir. 2011)) (emphasis in original). *See also Lupton*, 620 F.3d at 805.

Contrary to Madigan's claims, the record presents more than a reasonable factual basis to support the jury's verdict. The Government presented numerous recordings, in person and over the phone, proving that Madigan and Solis simultaneously discussed both Solis obtaining legal business for Madigan's private law firm, and Madigan obtaining a state board appointment for Solis. Specifically, the evidence showed that Madigan and Solis did, in fact, link Madigan's agreement to recommend Solis for a state board position with Solis' efforts to get business to benefit Madigan. *See* GX 125; GX 146; GX 151; GX 166; GX 178; GX 179; GX 185; GX 197; GX 236; GX 244; *Madigan*, 2025 WL 1836050 at *18–*20. In short, the evidence showed Madigan entered into an unlawful agreement to exchange. The fact the jury rejected his alternative explanations of that overwhelming evidence does not present a "substantial question" for appeal. *Shoffner*, 791 F.2d at 589.

Madigan's claim that the Government failed to prove any misrepresentation is also disproven by the record. As the Court explained in the prior Order, the evidence showed that "Madigan participated in a plan where he would recommend Solis to the Governor-elect under the false pretense—that he was recommending Solis based on his credentials—rather than the truth—that he was doing so pursuant to a bribery scheme." *Madigan*, 2025 WL 1836050 at *22. Because Madigan's recommendation of Solis to the Governor-elect would have relied upon false representations about Solis and deprived others of the "right to know the truth" about Madigan's unlawful use of his office to make recommendations to state board positions, "the scheme itself converted" Madigan's representations about Solis into misrepresentations, because he stood to illegally profit "at the expense" of the Governor-elect and the people of Illinois, who were "entitled to his honest services." *United States v. Hausmann*, 345 F.3d 952, 957 (7th Cir. 2003). Whether Madigan successfully executed this plan does not change the outcome because the crime was completed once Madigan met the requisite elements under the statute, not upon receiving or providing any planned benefits.[35] *See Madigan*, 2025 WL 1836050 at *22 (citing *United States v. Aslan*, 644 F.3d 526, 545 (7th Cir. 2011)). Further, contrary to Madigan's assertions, the false representations certainly qualified as material to the Governor-elect's impending decision regarding state board appointments, as Rep. Budzinski (former senior advisor on Governor Pritzker's campaign team) testified definitively that the Pritzker

---

[35] In his motion, Madigan argues that any such "representation would not have been the type that would deprive a victim of money or property." [451] at 18 (citing *United States v. Ciminelli*, 598 U.S. 306, 316 (2023)). But as the Court previously noted, the Government pursued, and produced sufficient evidence of, a scheme to defraud where Madigan intended to accept "something of value," specifically business introductions for his law firm, which Madigan himself admitted (and the evidence confirmed) led to highly profitable retainer contracts with paying clients. *See Madigan*, 2025 WL 1836050 at *20. The Government also pursued, and produced sufficient evidence of, an honest-services theory at trial. *See id.* at *18–*23.

administration "would never" appoint someone to a board position who participated in a bribery plot. Tr. 6313:7–14.

In sum, the Government presented more than sufficient evidence to support the jury's reasonable determinations on Counts Eight, Nine, and Ten. That question is not a "close" one for purposes of this motion; frankly, Madigan's arguments again border on frivolous to the extent they constitute nothing more than disagreement with the jury's reasoned assessment of the evidence. Accordingly, the Court denies the motion with respect to this claim.

### v. Counts 12, 13, and 14

Madigan raises the same challenges to his Travel Act convictions on Counts Twelve, Thirteen, and Fourteen as he did with Count Five. Here again, Madigan's arguments regarding the state law predicates do not raise a "substantial question" for the reasons the Court explained above. *See supra* Part III.a.iv.

Madigan's arguments also fail with respect to these counts because, even if all of the state law predicates required proof of a *quid pro quo*, there was more than sufficient evidence that Madigan agreed to exchange something of value for an official action with respect to the state board conduct, as the Court discussed above. Each call underlying these charges furthered that scheme, and the jury reasonably inferred that Madigan maintained the requisite intent based upon that same overwhelming evidence. *See* GX 166 (Count Twelve); GX 176 (Count Thirteen); GX 244 (Count Fourteen).

That said, as noted previously, Madigan does raise a substantial question with respect to Counts Twelve and Fourteen, specifically regarding the interstate commerce element of the Travel Act. Because the interstate issue "could readily go either way," the Court finds that Madigan meets his burden to raise a "substantial question" with respect to this issue. *Greenberg*, 772 F.2d at 341.

Nevertheless, one substantial question is not enough; a defendant must also show "the appellate court is more likely than not to reverse the conviction or order a new trial on *all* counts for which imprisonment has been imposed." *Bilanzich*, 771 F.2d at 298 (emphasis added). Madigan fails to meet this requirement since the interstate issue only affects two of the ten counts of conviction and does not affect the total custody term of his sentence at all. Thus, Madigan's motion must be denied. *Id.*; *see also* 18 U.S.C. § 3143(b)(1).

### c. Purported Evidentiary Errors

The Court finally addresses Madigan's objection to the admission of GX 156. This exhibit contained a recorded call where McClain and Madigan discussed among other things, a ComEd labor consultant named Dennis Gannon. GX 156. During the call, McClain comments that Gannon received his contract with ComEd five years prior for $150,000. Madigan laughs and says that "some of those guys have made out like bandits Mike." *Id.* McClain adds "for very little work too," and Madigan replies: "Yeah." *Id.*

Madigan correctly notes that the Court initially granted the defense's pretrial motion in limine to exclude this exhibit. But, as recounted in the post-trial order (*see Madigan*, 2025 WL 1836050 at *54–*55), the Court expressly warned the parties when granting the pretrial motion that the exhibit's admissibility remained subject to the "fluidity of trial," since the Rule 403 balance may change based on the evidence, including the cross examination of witnesses or "the defendants if they testify." Tr. 188:5–8. *See also* [213] at 1 (noting that the parties may seek reconsideration of any of the Court's pretrial rulings outside the presence of the jury).

Despite this clear warning about the admissibility of the exhibit, Madigan chose to take the stand, and his own trial testimony did, in fact, change the appropriate Rule 403 analysis. On direct examination, Madigan repeatedly testified that he valued hard work and discipline and always expected others (including subcontractors) to work hard. *See e.g.*, Tr. 8587:20–23 ("Q. Were there any traits that you learned early in your career as a student that you carried through the rest of your life? A. Hardworking and discipline."); Tr. 8678:20–23 (Madigan's testimony that his reaction to learning Ray Nice did not work "again is anger" and added that Nice "should have worked just like everybody else is supposed to work"). Indeed, the version Madigan presented on the witness stand, where he falsely portrayed a sense of dismay, transcends the mere words contained in a cold transcript, and undisputably invited the Government's legitimate rebuttal. *United States v. Williams*, 945 F.2d 192, 915 (7th Cir. 1991) (Appellate courts "give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses.") (quotation omitted).[36]

Contrary to the record, however, Madigan now claims that there is nothing "inconsistent about Madigan's expressing anger about Olivo and Nice, whose work

---

[36] Madigan's purported shock and outrage at the notion of a "no-show" job was only one of many intentionally false and material statements Madigan made during his testimony, as the Court recounted in detail at his sentencing. *See* Tr. 57:16–66:9; 73:4–75:12. The jury, of course, rejected Madigan's false statements by virtue of Madigan's ten counts of conviction.

ethic might reflect on Madigan, while at the same time joking about someone unconnected to Madigan having a lobbying position that required him to perform little work." [451] at 20. But the trial record confirms that Madigan's testimony did not limit itself to this fine distinction. Instead, Madigan offered broad testimony about his upbringing and core values, including prizing honest hard work, and maintaining those values throughout his entire life and decades-long political career. Quite simply, the picture Madigan presented on the stand *was* highly inconsistent with his smug comments captured in GX 156. Madigan's audible laughter and comments about some individuals "making out like bandits" on the recording directly contradicted the sentiments he expressed on direct examination about feeling outraged at the very notion of individuals failing to work. As such, the Government was entitled to offer the exhibit for the jury's consideration and present a contrary view of Madigan's state of mind as a legitimate rebuttal of his attempt to distance himself from his co-conspirators. *See United States v. Hall*, 165 F.3d 1095, 1117 (7th Cir. 1999) ("It is well established that the admission of rebuttal evidence lies within the sound discretion of the trial court and appellate courts will not interfere with the trial court's ruling unless there is a clear abuse of discretion.") (citation omitted).

Further, Madigan's fears regarding any purported unfair prejudice from GX 156 remain unfounded and contrary to the factual record.[37] To put it frankly, there was no possibility of any unfair prejudice against Madigan resulting from GX 156's admission. As Madigan admitted in his post-trial motions, in granting the motion for reconsideration, the Court stated its prior "ruling 'did not hinge upon whether or not the Gannon recommendation [was] technically a Madigan recommendation.'" [401] at 67 (quoting Tr. 9038:2–4). Rather, the Court determined that the exhibit constituted proper rebuttal evidence by virtue of Madigan's own testimony on direct examination. *See Madigan*, 2025 WL 1836050 at \*55–\*56; *Hall*, 165 F.3d at 1117. The Government did not stray outside of those permissible bounds; the Government agreed not to argue that Gannon was a Madigan recommendation (*see* Tr. 9037:23–25) and did not argue the exhibit for any improper purpose.[38] In fact, they did not even ask Madigan about Gannon on cross-examination. *See* Tr. 9037:23–9038:14.

Further, this Court allowed, and the defense took advantage of, a full opportunity to explain and contextualize the exhibit on redirect examination. *See* Tr. 9039:4–6 (The Court: ". . . I expect there to be clarifications that Gannon was not

---

[37] It should go without saying that the frequency of the Government's citations to GX 156 in its post-trial briefings provide no support, or any relevance whatsoever, to Madigan's claim that its admission prejudiced him at trial. *See* [451] at 20.

[38] Likewise, none of the Government's arguments regarding GX 156 invited or suggested an improper propensity purpose. *See* Tr. 10849:13–14; Tr. 10875:2–5; Tr. 10878:8–14.

among those that the defendant himself recommended."); Tr. 9308:12–24, 9313:9–22 (Madigan's counsel asked him questions about Gannon and the exhibit on redirect and Madigan provided testimony explaining his understanding of the call in detail). Madigan's counsel also read stipulations into the record stating that both Tom O'Neill and Fidel Marquez did not recall Madigan's recommending Gannon to ComEd.  *See* Stip. 108; Stip. 109; Tr. 9309:17–9313:2.

In short, there was no possibility of confusion regarding the exhibit's context. The jury was clearly informed that Madigan did not recommend Gannon, and the Government did not argue otherwise.[39]  Rather, the Government confined its closing arguments on the issue to the rebuttal purposes for which the exhibit was admitted. *See* Tr. 10849:13–14 ("And you heard him laugh in comparison to the purported anger that he displayed on direct examination."); Tr. 10875:2–5 ("We've heard about the bandits call.  Again, another indication that he knows that people are not doing work, there are multiple people that are not doing work, confirmed by Mr. McClain."); Tr. 10878:8–14 ("And there were a string of lies and omissions during the course of Mr. Madigan's testimony that helps confirm that Mr. Madigan was simply just not telling the truth to you.  Number one, we talked about this already, the bandits call, which reflects he wasn't really that angry when he found out somebody wasn't doing work and he had gotten an indication that other folks were not doing work.").  That argument did not invite unfair prejudice where Madigan's own testimony triggered its admissibility, and Madigan chose to take the stand after consulting with counsel and with full knowledge of the potential effect of his choice on the Court's pretrial rulings. *See* Tr. 188:5–8.

Further, even if the admission of this exhibit was error (though it was not), any such error remained harmless.  The evidence produced at trial of Madigan's knowledge of, and participation in, the ongoing bribery agreement with ComEd was nothing short of overwhelming.  This was also true of the other counts of conviction related to the state board conduct, which had nothing to do with this exhibit. Accordingly, even if the evidentiary ruling was found to be error on appeal, that error

---

[39] After the Court revisited its pretrial ruling regarding GX 156, the Court directed the parties to meet and confer regarding the timing of the admission of the exhibit.  Tr. 8900:1–8901:10.  Pursuant to that conferral, the parties reached the stipulations the Court references above, and the Government agreed to not argue "either directly in their close or by the inference of a particular question" that "Madigan was a Gannon recommendation."  Tr. 9039:9–12.  And again, as stated above, Madigan's counsel asked him numerous clarifying questions about the exhibit on redirect examination.  Tr. 9308:12–24, 9313:9–22.  The Court reiterated that it expected "there to be clarifications that Gannon was not among those that the defendant himself recommended," and those clarifications were made for the jury on the record.  Tr. 9039:2–6.  Given this process and the absence of any potential confusion, no limiting instruction was requested (nor necessary).

was both harmless and did not affect all counts of conviction, and therefore Madigan's motion must be denied. *Bilanzich*, 771 F.2d at 298; *Shoffner*, 791 F.2d at 589.

## IV.  Conclusion

For the reasons the Court explained above, Madigan's motion for release pending appeal must fail, because he fails to meet his burden to show that his appeal will raise a substantial question of law or fact and, "assuming that the question is decided in the defendant's favor, the appellate court is more likely than not to reverse the conviction or order a new trial on *all* counts for which imprisonment has been imposed." *Bilanzich*, 771 F.2d at 298 (emphasis added); *see also* 18 U.S.C. § 3143(b)(1).  Therefore, the Court denies his motion.[40]

Date: August 8, 2025

ENTERED:

John Robert Blakey
United States District Judge

---

[40] Finally, as part of an alternate basis this Court's denial of Madigan's motion, this Court notes that Madigan's brief exceeds the fifteen-page limitation on all memoranda of law contained in Local Rule 7.1 which this Court's standing order directs shall be strictly enforced.  Madigan did not file a motion for leave to file a brief in excess of the fifteen-page limitation when filing the present motion, and the Court explicitly told all parties to limit their submissions on this issue to that fifteen-page requirement when granting two requests for continuance by Madigan with respect to the present motion.  [446], [448], [450]. District courts retain discretion to require "parties to comply strictly with local rule requirements" and here, the Court explicitly directed the parties to adhere to LR 7.1 and provided additional time to do so, at Madigan's request.  *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015).  The motion is, therefore, denied on an alternative basis, due to Madigan's failure to comply with this Court's orders and Local Rule 7.1.